# EXHIBIT A

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation), | ) ) ) ) ) ) ) ) ) ) | C.A. No. |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

KEVIN CASSIDY; STARFISH CAPITAL, )
INC., a New York corporation; and JOHN )
DOES 1-100, )
                              )
           Defendants. )
      v. )
                              )
PLATINUM MANAGEMENT (NY) LLC, )
a Delaware limited liability company; )
MARK NORDLICHT, DAVID LEVY, )
MURRAY HUBERFELD, and DAVID )
BODNER, )
                              )
      Nominal Defendants. )
                              )
                              )

## VERIFIED COMPLAINT

NOW COME plaintiffs Principal Growth Strategies, LLC, Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and Martin Trott & Christopher Smith, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) (collectively "**Plaintiffs**"), by and through their undersigned counsel, and hereby complain and allege as follows:

## PRELIMINARY STATEMENT

1.      This complaint tells the story of how the Agera Note (defined below) was stripped away from Principal Growth Strategies LLC ("**PGS**") via a series of transactions orchestrated by insiders for their own benefit and the benefit of certain select clients and friends.

2.     At all relevant times, the Agera Note was convertible into 95% of the equity of the holding company that owns Agera Energy (defined below) – a company that in 2016 was valued at about $250-300 million – and the holder of that note effectively controls the company.

3.     As a result of the Agera Transactions (defined below), the Platinum Funds (defined below) were stripped of their single largest remaining valuable asset for the benefit of the Platinum-Beechwood Alter Egos (defined below) and preferred investor clients the CNO Defendants and SHIP Defendants.  At the same time, Defendants used the Agera Transactions to enable Beechwood (defined below), the CNO Defendants (defined below) and the SHIP Defendants (defined below) to exchange nearly worthless interests in the Platinum Funds and certain related investments for valuable investments in AGH Parent, LLC.

4.     By the time the various steps of the Agera Transactions were completed, PGS was left with a pile of worthless debt and other instruments, while the Defendants here had obtained the crown jewel of the Platinum Funds' portfolios.

5.     Defendants AGH Parent, LLC and the Beechwood Agera Entities (defined below), which were created to effect the Agera Transactions at issue here, are alter egos of the Platinum-Beechwood enterprise that was owned, managed and/or controlled at all relevant times by the following nominal defendants:[1]

---

[1] Nominal Defendants Platinum Management (NY) LLC, Mark Nordlicht, David

Platinum Management (NY) LLC, PPVA's general partner, and Mark Nordlicht, Murray Huberfeld, David Bodner and David Levy, the founders/owners/mangers of Platinum Management and of Beechwood.   Defendants AGH Parent and the Beechwood Agera Entities thus are alter egos of these nominal defendants, and are liable to the same extent as the foregoing persons and entities in connection with the tortious acts described herein.

## PARTIES

6.      Plaintiff Principal Growth Strategies, LLC ("**PGS**") is a Delaware limited liability company formed on December 4, 2013 for the initial purpose of holding the Platinum Funds' interest in the Agera Note.

7.      Prior to June 8, 2016 and since the consummation of the various parts of the first step of the Agera Transactions in June 2016, PPVA (defined below) has held 55% of the membership interests in PGS, and PPCO (defined below) has held 45% of the PGS membership interests.

8.      PGS also holds certain Class C preferred membership units in AGH Parent as a result of the Agera Transactions.

---

Bodner, Murray Huberfeld and David Levy are listed herein as nominal defendants solely for purposes of alleging PPVA's Count VII claim for alter ego liability against defendants AGH Parent and the Beechwood Agera Entities.  PPVA is separately pursuing claims for liability against the nominal defendants and does not seek to recover from them here. Rather, their liability is being adjudicated in the United States District Court for the Southern District of New York.

9.     PGS had no employees of its own.  Mark Nordlicht signed the PGS LLC Operating Agreement as its "managing member."  Nordlicht, together with other persons employed by Platinum Management, oversaw and managed PGS.

10.     Plaintiffs Martin Trott and Christopher Smith are the duly appointed Joint Official Liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation).

11.     Plaintiff Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**") is an exempted limited partnership that was marketed as a multi-strategy investment fund and registered under the Exempted Limited Partnership Law, 2014, of the Cayman Islands.

12.     Defendant AGH Parent LLC ("**AGH Parent**") is and, at all material times was a limited liability company organized under the laws of the State of Delaware.   AGH Parent was organized by Beechwood and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer (defined below) in or about May 2016 for the purpose of acquiring the Agera Note.

13.     BAM Management Services, LLC ("**BAM Management Services**"), a Delaware limited liability company organized and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer, was the manager of AGH Parent at all times from the organization of AGH Parent until about

July 27, 2017, when it was replaced as manager by AGX Holdings LLC ("**AGX Holdings**").

14.     Defendant Senior Health Insurance Company of Pennsylvania ("**SHIP**") is and, at all material times was an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

15.     As a result of the transactions described herein, SHIP is a member of AGH Parent and a lender to AGH Parent.

16.     Defendant Fuzion Analytics, Inc. ("**Fuzion**" and together with SHIP, the "**SHIP Defendants**") is and, at all material times was, a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

17.     SHIP assigned certain near-worthless debt previously owned by it to AGH Parent in exchange for certain notes issued by AGH Parent.  AGH Parent in turn transferred the debt that SHIP assigned to it to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June 2016.

18.     Defendant Bankers Conseco Life Insurance Company ("**BCLIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in New York with its principal place of business in Carmel, Indiana.

19.     Defendant Washington National Insurance Company ("**WNIC**") is and, at all material times was an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

20.     Defendant CNO Financial Group, Inc. ("**CNO**") is and, at all material times hereinafter mentioned, was a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

21.     BCLIC and WNIC are direct or indirect subsidiaries of CNO.

22.     Defendant 40/86 Advisors, Inc. ("**40/86 Advisors**" and collectively with CNO, BCLIC and WNIC, the "**CNO Defendants**") is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in Carmel, Indiana.

23.     Defendants (i) Private Bankers Life Annuity LTC 2, as successor in interest to BBIL ULICO 2014 Trust ("**BBIL ULICO**"); and (ii) Washington National LTC 2, as successor in interest to BRe WNIC 2013 LTC Primary ("**BRe WNIC 2013 LTC Primary**" and collectively with BBIL ULICO, the "**CNO Reinsurance Trusts**") are reinsurance trusts formed under Delaware law.

24.     At all relevant times, the CNO Reinsurance Trusts were managed by BAM Administrative, LLC and/or Illumin Capital L.P., both Delaware limited liability companies.

7

25.    The CNO Reinsurance Trusts were used to hold funds turned over to the Beechwood Reinsurance Companies (defined below) by BCLIC and WNIC in connection with certain reinsurance agreements entered into between the Beechwood Reinsurance Companies and on the one hand and BCLIC or WNIC, as well as certain investments made by BAM (defined below) on behalf of BCLIC or WNIC in connection with such agreements.

26.    The CNO Reinsurance Trusts also held the CNO Defendants' membership interests in AGH Parent and the debt owed to them by AGH Parent in connection with the Agera Transactions described herein.

27.    The CNO Reinsurance Trusts assigned certain near-worthless debt and other instruments previously owned by them to AGH Parent in exchange for certain notes and preferred membership units in AGH Parent.  AGH Parent in turn transferred the debt and other instruments that were assigned to it by the CNO Reinsurance Trusts to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June 2016.

28.    The CNO Reinsurance Trusts and SHIP also assigned AGH Parent near-worthless debt and other instruments that AGH Parent subsequently assigned to PGS as "PGS Value" when AGH Parent purported to redeem $35.4 million worth of PGS' Class C preferred membership units in AGH Parent in January 2017.

8

29.     Defendants BHLN-Agera Corp., BOLN-Agera Corp. and BBLN-Agera Corp. each are Delaware corporations (collectively the "**Beechwood Agera Corporations**") that were incorporated between May 11 and June 2, 2016, for the specific purpose of holding Beechwood's preferred B-1 membership units in AGH Parent.  The directors of the Beechwood Agera Corporations included Feuer and Narain.

30.     The shares in Beechwood Agera Corporations are owned, directly or indirectly, by the Beechwood Reinsurance Companies (defined and discussed below), and thus ultimately by Nordlicht, Bodner, Huberfeld, Levy, Feuer and Taylor.

31.     The Beechwood Agera Corporations also assigned worthless debt and other instruments to AGH Parent in exchange for membership interests in AGH Parent.  These worthless debt and other instruments were in turn assigned to PGS as part of the consideration paid in connection with the first step of the Agera Transaction in June 2016.

32.     Defendant Beechwood Re Investments LLC ("**Beechwood Investments**") is a limited liability company formed under Delaware law. Beechwood Investments was used as a vehicle by Mark Nordlicht, David Bodner, Murray Huberfeld and David Levy to purchase all the preferred shares in the Beechwood Reinsurance Companies (defined below).

9

33.    The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various trusts of which they or their family members were the beneficiaries.

34.    Beechwood Investments was granted all of the common equity units in AGH Parent pursuant to a subscription agreement entered into on June 9, 2016 in connection with the first step of the Agera Transactions.

35.    For purposes of this complaint, Beechwood Investments and the Beechwood Agera Corporations are referred to collectively as the "**Beechwood Agera Entities.**"

36.    At all relevant times, the Beechwood Agera Entities were controlled by Beechwood's majority owners, Mark Nordlicht, David Bodner, Murray Huberfeld and David Levy, and their co-conspirators, Scott Taylor and Moshe M. Feuer.

37.    Nordlicht, Levy, Huberfeld, and Bodner used the Beechwood Agera Entities as a way of maintaining ownership and control of Agera even after the "sale" of the Agera Note from PGS to AGH Parent.

38.    Beechwood and its ultimate owners, Nordlicht, Bodner, Huberfeld and Levy, acted by and through AGH Parent and the Beechwood Agera Entities in

connection with the matters at issue in this complaint such that AGH Parent and the Beechwood Agera Entities are their alter egos.

39.     Defendant Kevin Cassidy ("**Cassidy**") is a resident of Briarcliff Manor, New York.

40.     In 2007, Optionable Inc., a fund co-founded by Cassidy and affiliated with Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives.  Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months.

41.     When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the *managing director* of Agera Energy.

42.     Defendant Starfish Capital, Inc. ("**Starfish**"), is an entity created and controlled by Cassidy.  Starfish had no employees and no separate operations or business purpose.  It was a sham entity used by the Defendants and Cassidy to serve as a party to the Agera Transactions for the improper purpose of paying Cassidy millions of dollars out of the consideration payable to PGS.

43.     Defendants John Does 1-100 are entities and/ or individuals whose identities are not known at this time who were, or may have been, involved in, or otherwise liable for, the unlawful or otherwise tortious activities described herein, including, but not limited to, any  subsequent transferees in connection with the Agera Transactions.

44.     Nominal Defendant Platinum Management (NY) LLC ("**Platinum Management**") is a Delaware limited liability company with its principal place of business in New York, New York.  Platinum Management is the general partner of PPVA and also was its investment manager.

45.     Nordlicht, Bodner, Huberfeld and Levy controlled and operated Platinum Management.

46.     Nominal Defendant Mark Nordlicht ("**Nordlicht**") is a resident of New Rochelle, New York.  Together with Huberfeld and Bodner, Nordlicht founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Huberfeld, Bodner and Levy.

47.     At all relevant times, Nordlicht was the managing member of Platinum Management and the co-chief investment officer and co-chief risk officer of PPVA.

48.     As a founder and a direct or indirect member of both Platinum Management and Beechwood, Nordlicht personally benefitted from the Agera Transactions.

49.     Nominal Defendant David Levy ("**Levy**") is a resident of New York, New York and is Murray Huberfeld's nephew.  Before 2014, Levy worked at Platinum Management as a portfolio manager and in other executive capacities.

From and after late 2014/early 2015, Levy served as co-chief investment officer of Platinum Management alongside Nordlicht.

50.     Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief investment officer of B Asset Manager LP, the Beechwood asset management entity, until the end of 2014.  Beechwood marketed Levy to the CNO Defendants and SHIP Defendants as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as a key to Beechwood's future success.  In late 2014/early 2015, Levy "left" his position at Beechwood, but continued to be involved with Beechwood and its investments.  Levy also remained an owner of Beechwood after his return to Platinum Management.

51.     As a direct or indirect member of both Platinum Management and Beechwood, Levy personally benefitted from the Agera Transactions.

52.     Nominal Defendant Murray Huberfeld ("**Huberfeld**") is a resident of Lawrence, New York.  Together with Nordlicht and Bodner, Huberfeld founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Bodner and Levy.

53.     As a direct or indirect member of both Platinum Management and Beechwood, Huberfeld personally benefitted from the Agera Transactions.

54.    Until his indictment on June 8, 2016, the day before the closing of the first step of the Agera Transactions, Huberfeld continued to make management decisions that directly impacted PGS, PPVA, PPCO and Beechwood.

55.    On or about May 25, 2018, Huberfeld pled guilty to federal charges of conspiracy to commit wire fraud, in connection with a bribe Huberfeld offered to Norman Seabrook, the former President of the Correction Officer's Benevolent Association of New York ("**COBA**"), in exchange for COBA's investment of $20 million with PPVA and other Platinum-affiliated funds.

56.    Huberfeld was instrumental in the creation, operation and management of Beechwood and helped solicit investment funds for use by Beechwood. At all relevant times, Huberfeld was a direct or indirect owner of Beechwood.

57.    Nominal Defendant David Bodner ("**Bodner**") is a resident of Monsey, New York.  Together with Nordlicht and Huberfeld, Bodner founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Huberfeld and Levy.

58.    As a direct or indirect member of both Platinum Management and Beechwood, Bodner personally benefitted from the Agera Transactions.

## NON-PARTIES RELEVANT TO PLAINTIFFS' CLAIMS

59.    Platinum Partners Credit Opportunities Master Fund L.P. ("**PPCO**"). PPCO is a limited partnership organized under Delaware law that was marketed as

a multi-strategy investment fund.  PPVA and PPCO are referred to herein as the "**Platinum Funds**."

60.    Beechwood, a business comprised of reinsurance companies, investment management entities, investment trusts and related entities, the individual members of which will be described in more detail below (collectively, "**Beechwood**"), was founded, owned and managed by the very persons who founded, owned and managed Platinum Management, PPVA, PPCO and PGS – and originally was operated out of Platinum Management's offices.

61.    Beechwood was utilized as part of a scheme to permit Platinum Management and its owners, Nordlicht, Huberfeld, Bodner and Levy, to inflate the valuation of investments held by PPVA and PPCO for purposes of siphoning unearned fees from the those funds, and then subsequently use Beechwood to strip out PPVA's remaining valuable assets, including the Agera Note, for their own benefit and the benefit of Beechwood and certain select clients.

62.    Moshe M. Feuer ("**Feuer**") is a resident of Lawrence, New York. Feuer, Levy and Taylor were the original public face of Beechwood and, together with Nordlicht, Levy, Bodner and Huberfeld, founded Beechwood.  Feuer remained with Beechwood at all relevant times.

63.    At all relevant times, Feuer (through trusts) owned common stock in various Beechwood entities and had managerial authority over Beechwood.

15

64.     Scott Taylor ("**Taylor**") is a resident of New York, New York.  Taylor, Feuer and Levy founded Beechwood together with Nordlicht, Bodner and Huberfeld.  Taylor, Feuer and Levy were the original public face of Beechwood, and Taylor remained with Beechwood at all relevant times.

65.     At all relevant times, Taylor (through trusts) owned common stock in Beechwood and had managerial authority over Beechwood.

66.     Prior to forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.

67.     Taylor, together with Levy, helped prepare the marketing documents by which the SHIP Defendants and CNO Defendants initially invested funds with Beechwood.

68.     Dhruv Narain ("**Narain**") was chief investment officer of Beechwood at the time of the Agera Transactions.

## JURISDICTION AND VENUE

69.     This Court has jurisdiction over this case and venue is appropriate pursuant to 6 Del. C. § 18-111, 6 Del. C. § 2708, and 10 Del. C. § 341.

70.     This court has personal jurisdiction over each of the Defendants because they: (i) are domiciled in the State of Delaware; (ii) are authorized to do business in the State of Delaware; (iii) have transacted business in the State of

Delaware with respect to certain of the agreements and other matters at issue in this

case and/or have consented to the jurisdiction of the state of Delaware in connection

with such agreements; or (iv) are members or former members of AGH Parent, a

Delaware limited liability company or of PGS, which also is a Delaware limited

liability company.

71.    Section 14.11 of the AGH Parent Amended Operating Agreement

(defined below) states:

> **Section 14.11 Governing Law.** All issues and questions concerning
> the application, construction, validity, interpretation and enforcement
> of this Agreement shall be governed by and construed in accordance
> with the internal laws of the State of Delaware, without giving effect
> to any choice or conflict of law provision or rule (whether of the State
> of Delaware or any other jurisdiction) that would cause the application
> of laws of any jurisdiction other than those of the State of Delaware.

72.    Section 14.12 of the AGH Parent Amended Operating Agreement

states, in part:

> **Section 14.12 Submission to Jurisdiction.** The parties hereby agree
> that any suit, action or proceeding seeking to enforce any provision of,
> or based on any matter arising out of or in connection with, this
> Agreement or the transactions contemplated hereby, whether in
> contract, tort or otherwise, shall be brought in the United States District
> Court for the District of Delaware or in the Court of Chancery of the
> State of Delaware (or, if such court lacks subject matter jurisdiction,
> in the Superior Court of the State of Delaware), so long as one of such
> courts shall have subject-matter jurisdiction over such suit, action or
> proceeding, and that any case of action arising out of this Agreement
> shall be deemed to have arisen from a transaction of business in the
> State of Delaware. Each of the parties hereby irrevocably consents to
> the jurisdiction of such courts (and of the appropriate appellate courts
> therefrom) in any such suit, action or proceeding and irrevocably

waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form.

73.    As a result of the Agera Transactions, PGS is a member of AGH Parent.

74.    At all relevant times, PPVA has been a member of PGS.

## NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW

75.    Pursuant to Court of Chancery Rule 44.1, Plaintiffs hereby gives notice of their intent to raise issues of foreign law. Specifically, Plaintiffs contend that the substantive law of the Cayman Islands, as cited herein, governs some or all of the parties' disputes.

## FACTUAL BACKGROUND

### A. PGS

76.    PGS was set up by Platinum Management in December 2013 for the purpose of holding the Agera Note.

77.    At all relevant times before June 8, 2016, PPVA held 55% of the membership interests in PGS, and PPCO held 45% of the PGS membership interests. A true and correct copy of the December 4, 2013 Operating Agreement for PGS ("**PGS Operating Agreement**") is attached hereto as **Exhibit 1**.[2]

---

[2] Although PGS actually was formed on December 4, 2013, its LLC Agreement is incorrectly dated December 4, 2014.

78.     Mark Nordlicht signed the PGS Operating Agreement as "managing member" of PGS.

79.     PGS does not have any employees.  All management and operations of PGS were handled by Platinum Management employees and the executives and other persons that managed PPVA and PPCO.

80.     Corporate formalities were not observed with respect to PGS.  For example, annual meetings that were required by the PGS Operating Agreement did not occur.  In particular, the Agera Note also was not treated as if it were a separately held asset of PGS.

81.     The Agera Note was used as collateral to secure purported debts owed by PPVA, PPCO and/or portfolio companies from time to time before June 2016 without regard to the impact of such pledges upon PGS and without paying PGS any consideration for providing such pledges.

82.     PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of its share of such value, and it had not been converted. Similarly, PPCO's financial statements and valuation statements described and calculated PPCO's interests in Agera Energy on an "as converted" basis, as though PPCO was the direct holder of its share of such value.

83. PGS was not separately capitalized so as to carry on its business. PPVA provided the initial funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

84. At all relevant times, the assets of PGS were commingled with the assets of PPVA and PPCO.

85. PGS was used as a tool in the furtherance of a fraud, namely, the Agera Transactions which culminated in the Second Scheme (described below), whereby PGS's asset valued at $250-$300 million was transferred for an amount substantially below that.

### B. The Platinum Funds

86. PPCO and PPVA are hedge funds founded between 2003 and 2005. Each of these funds was structured to include a master fund, several feeder funds and a management entity.

### i. PPVA

87. PPVA was marketed as a multi-strategy, liquid fund utilizing investment strategies such as long/short fundamental equity trading, asset-based financing in energy, mining, and other industries, energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

88.    PPVA was a Cayman Islands exempted limited partnership that, up until the commencement of the Cayman Liquidation (defined below) was managed by Platinum Management.

89.    On June 8, 2016, the day before the closing of the Agera Transactions, the United States Attorney's Office for the Southern District of New York filed criminal charges against Huberfeld in connection with a bribery scheme by which Huberfeld used PPVA funds to pay kickbacks to a New York City Correction Officer's Union official (the "**Huberfeld Arrest**").

90.    On June 14, 2016, Nordlicht announced on an investor call that Platinum Management had decided that PPVA would stop taking in new investors and all PPVA investments would be unwound and liquidated.

91.    Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral, and sought the immediate unwinding of their relationships with PPVA.

92.    On or about June 22, 2016, the Federal Bureau of Investigation executed a search warrant at Platinum Management's offices in connection with a broad, multi-agency federal investigation of their business practices.

93.    On July 8, 2016, when PPVA was facing margin calls by its securities transaction counterparties, PPVA had less than $100 cash on hand.

21

94.     On August 23, 2016, Platinum Management, as general partner of PPVA, filed a voluntary petition seeking the liquidation of PPVA and the appointment of Christopher Kennedy and Matthew Wright as joint provisional liquidators (the "**Cayman Petition**") in the Grand Court of the Cayman Islands (the "**Grand Court**").

95.     On August 25, 2016, the Grand Court entered an order (the "**August 25, 2016 Order**") directing the provisional liquidation of PPVA and appointing joint provisional liquidators (the "**Cayman Liquidation**").  A true and correct copy of the August 25, 2016 Order is attached hereto as **Exhibit 2**.

96.     On October 18, 2016, the predecessors of the JOLs filed petitions and accompanying Declarations seeking recognition of the Cayman Liquidation of PPVA and one of PPVA's feeder funds as foreign main proceedings and of the JOLs as foreign representatives and certain other relief under chapter 15 of the Bankruptcy in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Case No. 16-12925 (the "**Chapter 15 Court**").

97.     On October 27, 2016, the Grand Court entered an order directing that PPVA's Cayman Liquidation be converted to an official liquidation and appointing Messrs. Wright and Kennedy as Interim Joint Official Liquidators until a final hearing in December 2016 (the "**October 27, 2016 Order**").  A true and correct copy of the October 27, 2016 Order is attached hereto as **Exhibit 3**.

98.     On November 23, 2016, the Chapter 15 Court entered an order recognizing the Cayman Liquidation and the joint provisional liquidators as a foreign main proceeding, and as foreign representatives, respectively, pursuant to 11 U.S.C. 1501 *et seq.* (the "**Chapter 15 Recognition Order**"), permitting the foreign representatives to bring claims against third parties on behalf of the PPVA estate within the United States.  A true and correct copy of the Chapter 15 Recognition Order is attached hereto as **Exhibit 4**.

99.     On December 16, 2016, the Grand Court entered an order appointing the joint official liquidators of PPVA (the "**December 16, 2016 Order**").  Martin Trott and Christopher Smith are the current JOLs of PPVA pursuant to September 29, 2017 and July 6, 2018 Orders of the Grand Court.  True and correct copies of the Orders entered by the Cayman Court in connection with the Cayman Liquidation (the "**Cayman Orders**") are attached hereto as **Exhibit 5**.

100.    Pursuant to the Cayman Orders, the JOLs have authority to act in connection with PPVA's assets.

### ii.  PPCO

101.    The PPCO family of funds, (collectively, the "**PPCO Funds**") were marketed as a single-strategy group of funds whose business was to originate short and medium term, high yield, debt secured by collateral, and/or equity investments.

23

102.   The PPCO Funds originated loans and made equity investments in various industries, including consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

103.   Platinum Credit Management, L.P., a Delaware limited partnership ("**Platinum Credit**"), served as investment manager for PPCO.

104.   Platinum Management, Platinum Credit and the Platinum executives, including Nordlicht, Huberfeld, Bodner and Levy, operated PPVA and PPCO out of various locations in New York, New York.  From 2012 until the commencement of the Criminal Action (defined below), they operated out of an office located at 250 West 55th Street, 14th Floor, New York, NY 10019.

### iii. Commencement of the SEC Receivership and the Criminal Action

105.   On December 19, 2016, an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York, commencing a criminal action against, among others, Platinum Management, Platinum Credit, Mark Nordlicht, David Levy and certain other Platinum executives (the "**Criminal Action**").

106.   The defendants in the Criminal Action were charged with securities fraud, investment adviser fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors through, among

other wrongdoing, the overvaluation of their largest assets, the concealment of severe cash flow problems at PPVA, and the preferential payment of redemptions.

107.   Also on December 19, 2016, the Securities and Exchange Commission (the "**SEC**") commenced a civil action in the United States District Court for the Eastern District of New York (the "**Receivership Court**") against the defendants named in the Criminal Action asserting certain securities laws violations.  *See Securities and Exchange Commission v. PMNY  (NY) LLC, et al.*, Case No. 16-06848 (the "**Receivership Action**").

108.   In connection with filing the Receivership Action, the SEC sought and obtained  the appointment of Bart M. Schwartz as receiver over certain entities including PPCO and Platinum Credit Management, L.P.

109.   Effective as of July 6, 2017, the Receivership Court accepted Mr. Schwartz's resignation and appointed Melanie L. Cyganowski as Receiver.

110.   Pursuant to the October 16, 2017 *Second Amended Order Appointing Receiver* (the "**Receivership Order**"), the Receivership Court empowered the Receiver to, among other things, recover, liquidate, marshal, and preserve all assets of the Receivership Entities and to, *inter alia*: (i) "bring such legal actions based on law or equity in any state, federal, or foreign  court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver"; and (ii) "investigate, prosecute, defend, intervene in or otherwise participate in,

25

compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind  as may in the Receiver's discretion, be advisable or proper to recover and/or conserve  Receivership Property."   A true and correct copy of the Receivership Order is attached hereto as **Exhibit 6**.

111.   Under the terms of the Receivership Order, the Receiver also has authority to act in connection with assets of PPCO.

## C. The Financial Condition of PPVA and PPCO

### i.  PPVA

112.   PPVA, at one time, held valuable assets.

113.   However, from at least 2012 until the commencement of PPVA's Cayman Liquidation, Platinum Management failed to abide by the balanced investment strategies set forth in PPVA's governing documents, which were designed to maintain PPVA's liquidity and financial condition.

114.   Instead, Platinum Management, its executives and owners, including Nordlicht, Huberfeld, Bodner and Levy, caused PPVA's investment portfolio to be increasingly more concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

115.   By the end of 2012, Platinum Management and its executives and owners caused PPVA's investments to become concentrated such that nearly 40% of its reported NAV was represented by investments in just two oil and gas

operations:  Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator, and Golden Gate Oil, LLC ("**Golden Gate**"), a California-based onshore oil operation.

116.  Golden Gate was a highly speculative investment that Platinum Management realized was a failure at an early stage, as Golden Gate barely produced any oil, suffered large operating losses and never made a single interest payment on loans originated by PPVA.  Despite this, Platinum Management falsely reported a five-fold increase in the value of PPVA's Golden Gate Oil investment during fiscal year 2013.

117.  Black Elk was a Houston, Texas-based publicly reported company that mostly operated offshore platforms located in the Gulf of Mexico.  In November 2012, an explosion occurred on Black Elk's West Delta 32 platforms, resulting in the death of Black Elk employees and prompting numerous investigations (the "**Black Elk Explosion**").  Following the Black Elk Explosion, Black Elk's financial results, liquidity and business operations deteriorated significantly.

118.  Given the impact that the Black Elk and Golden Gate Oil business losses would have had on PPVA's net asset value if reported accurately, PPVA should have been liquidated in 2013.  Platinum Management and its executives and owners refused to admit a loss or realize a write-down in value, declaring instead

that PPVA's net asset actually increased during this period, in order to enrich themselves with unearned partnership shares and/or fees.

119.   The concentration of PPVA's investments in illiquid assets meant that Platinum Management and the Platinum executives and owners had significant discretion over their valuation, since there was no ready market for such investments. The lack of a ready market also meant that many of these investments could not be quickly or easily liquidated when cash was needed to pay the Platinum executives and owners themselves and operate Platinum Management.

120.   In 2013, Nordlicht, Huberfeld, Bodner (collectively the co-founders of Platinum Management, Platinum Credit, PPVA and PPCO), together with Levy, Scott Taylor, and Moshe "Mark" Feuer, created Beechwood and, between March 2013 and late 2015, these individuals used their positions of trust, authority and control over PPVA to cause PPVA and Beechwood to engage in various fraudulent, non-commercial transactions designed to support Platinum Management's fraudulently inflated valuations of PPVA's assets.

121.   To that end, during the period from 2012 through 2015, Platinum Management reported that PPVA "experienced" annualized returns of between a maximum of 11.6% and a minimum of 7.15%, and reported that the net value of its assets under management had increased steadily from $688 million until they reached $789 million as of October 1, 2015, which in turn enabled them to award

themselves tens of millions in unearned partnership distributions, fees and other compensation based on these fraudulently inflated results.

122.   By late 2015, the liabilities resulting from the non-commercial transactions to which Platinum Management and Beechwood had caused PPVA to become a party, coupled with ongoing losses at PPVA's most significant investments, made it clear that the PPVA Funds could not continue to exist for much longer.  At that time, Platinum Management and its executives and owners, including Nordlicht, Levy, Huberfeld, Bodner and others, worked with Feuer, Taylor, Narain and others at Beechwood to encumber or strip the last valuable assets away from PPVA to benefit themselves and particularly Beechwood and its preferred investor clients.

123.   This scheme culminated with the Agera Transactions.

### ii.  PPCO

124.   At the end of 2013, PPCO had only $5.7 million of cash on hand. Absent a large cash infusion from investments or subscriptions, it would likely have been unable to meet both the increased redemption requests it faced in 2014 and adequately fund its portfolio  companies. This dire situation was exacerbated because the majority of PPCO's assets  were "Level 3," assets for which there was only a small active market.

125.   The table below summarizes  PPCO and its subsidiaries' Consolidated Condensed  Schedule of Investments as of December 31, 2012 and 2013:

| Year | Total Investment Asset Value | Level 1 Assets | Level 2 Assets | Level 3 Assets | % of Level 3 Assets |
|------|------|------|------|------|------|
| As of December 31, 2012 | $306.6 million | $0 | $36.3 Million | $270-3 million | 88% |
| As of December 31, 2013 | $317.3 million | $18.9 million | $56.9 Million | $241.5 million | 76% |

126.   Not only were PPCO's assets primarily made up of illiquid Level 3 assets, but many of these assets were significantly overvalued.

127.   Much like other investment vehicles created by Platinum Management and Platinum Credit, each share of the various classes issued to investors required a different "lock up" period, a time during which investors could not redeem their investments.

128.   Given the significant percentage of PPCO Funds' shares with a relatively short lock-up period held by individual investors or families/trusts, there was significant redemption pressure – that is, a constant need to provide liquidity upon demand to investors.

129.   This short lock-up period created liquidity pressures for PPCO, which certain Platinum Fund insiders, including Nordlicht, Huberfeld, Bodner and Levy,

sought to solve by creating Beechwood, which would have an ability to attract institutional investors which generally do not require short-term liquidity.

130.   During 2012 and 2013, PPCO began to experience increasing redemptions.   In 2012, the $55.9 million of contributions (subscriptions) barely eclipsed the $50.8 million of redemptions.

131.   In 2013, the $67.7 million of redemptions exceeded the contributions (subscriptions) of $43.6 million.  At the same time, PPCO's cash balance decreased from $7.2 million to $5.7 million.

132.   Around the end of 2013, Nordlicht and the other Platinum executives and owners understood the funding requirements of PPCO's investments were not being met. In a November 26, 2013 email to Nordlicht, portfolio manager Zach Weiner asked:

> Mark, Can you please give us an update on when we can expect some liquidity in PPCO for this week. We've pushed off everyone for a month now, but we really do need 80k for greentown, 50k for alcor … and 200k for daybreak …. In addition, we need to pay 72K of receivership fees on RCKE prior to transferring the note to AYN. We have knocked this down as much as possible but we are kind of at the end of that game now.

### D. Creation of the Beechwood Alter Ego

133.   In or about February 2013, Nordlicht, Bodner, Huberfeld and Levy, among other Platinum personnel, commenced working with Taylor and Feuer - *out of Platinum Management's office space* - to create Beechwood.

134.   Beechwood was established with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets.  Beechwood used those assets to engage in transactions with PPVA and PPCO to support Platinum Management's inflated valuations, in order to enrich Platinum's and Beechwood's common owners through management and other fees.[3]

135.   The ownership in and ultimate control of Beechwood was held by Nordlicht, Huberfeld, Bodner and Levy (in part through trusts), while Taylor, as President, and Feuer, as  Chief Executive Officer, maintained ostensible and nominal management authority, with Levy.

136.   Beechwood Re Ltd. ("**Beechwood Cayman**") is a reinsurance company domiciled in the Cayman Islands, that had its principal place of business in New York, New York at all relevant times.  Nearly 70% of the common stock of Beechwood Cayman was held by various trusts created by Nordlicht, Bodner, Huberfeld and Levy.

---

[3] Reinsurance is the transfer of part or all of the risks from an insurer (referred to as the cedant) of a single  policy or pool of insurance to a second insurance carrier, the reinsurer, who typically has no direct  contractual relationship with the insured. The transfer of risk involves the contractual transfer of all or an  agreed upon portion of future claims liabilities to the reinsurer (referred to as the process of ceding policies  and related anticipated claims liabilities by the insurer to the reinsurer; the reinsurer in turn assumes  the  policies and related claims from the insurer) in exchange for a negotiated cash consideration.

137.    Beechwood Bermuda International Ltd. ("**Beechwood Bermuda**" and, collectively with Beechwood Cayman, the "**Beechwood Reinsurance Companies**") is a reinsurance company domiciled in Bermuda that had its principal place of business in New York, New York at all relevant times.

138.   As noted above, Nordlicht, Bodner Huberfeld and Levy owned and controlled all preferred shares of the Beechwood Reinsurance Companies via their interests in Beechwood Investments.

139.   In addition to the Beechwood Reinsurance Companies, Nordlicht, Bodner, Huberfeld and Levy, together with Feuer and Taylor, established, owned and controlled B Asset Manager LP and B Asset Manager II LP (together "**BAM**") both of which are Delaware limited partnerships, and BAM Administrative Services LLC ("**BAM Administrative**") a Delaware limited liability company.

140.   BAM and BAM Administrative were entities set up to serve as investment agents on behalf of the Beechwood Reinsurance Companies as well as the CNO Reinsurance Trusts and SHIP in connection with various investments.

141.   Beechwood's management team was largely comprised of personnel employed by  or otherwise connected to Platinum Management and Platinum Credit.  For example, the Beechwood team included,  from time to time, the following individuals who were former or current Platinum Fund employees: (i) Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer";

(iii) David Ottensoser, as "General Counsel"; and (iv) Daniel Small, as the "Senior Secured Collateralized Loans PM."

142.   The alter-ego relationship between the various Beechwood entities and Platinum Management/Nordlicht/Bodner/Huberfeld/Levy ("the **Platinum-Beechwood Alter Egos**") was readily apparent and otherwise easily discoverable by the CNO Defendants and SHIP Defendants, given the many ties between the Platinum-Beechwood Alter Egos, including:

- Beechwood marketed Levy to potential clients as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as key to Beechwood's future success. Levy, the co-Chief Investment Officer of Platinum Management together with Nordlicht, served as chief financial officer and secretary of Beechwood Re and Beechwood Bermuda. He was also BAM's Chief Investment Officer and Chief Financial Officer until the end of 2014, when he was replaced by Daniel Saks, Platinum Management's co-CIO.

- Ezra Beren, Huberfeld's son-in-law, was hired in January 2014 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management.

- Naftali Manela, then CFO of Platinum Credit Management and later COO of Platinum Management, performed services for Beechwood related to general operations while still employed by Platinum Credit Management.

- Eli Rakower, director of valuation for Platinum Management, provided consulting services to Beechwood related to interaction with valuation firms that would value assets of the Beechwood Reinsurance Trusts.

- Stewart Kim, an employee of Platinum Management, simultaneously worked for Beechwood as its Chief Risk Officer until January 2015, when he became Beechwood's full time Chief Risk Officer.

- Beechwood operated out of the Platinum Management's office space until at least the end of February 2014.

- Even after separate office space was procured, Levy maintained an office at Beechwood through at least the end of 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

143.   Once the CNO Defendants and SHIP Defendants could no longer deny the web of relationships between and among Platinum Management, Beechwood and their common owners, they accepted those relationships, and then directed and actively participated in a series of transactions by and among Beechwood and PPVA, PPCO and their subsidiaries, culminating with the Agera Transactions, to accomplish their goal of ridding themselves of nonperforming loans being held on their accounts at Beechwood and receiving an illicit return on their investment, in the form of looting the Platinum Funds' investment in Agera.

### E.   Formation of the Beechwood, BCLIC, WNIC and SHIP Relationship

#### i.   The Long-Term Care Insurance Industry

144.   BCLIC, WNIC and SHIP each are long-term care insurance carriers that hold portfolios largely comprised of an early generation of long-term care policies, no longer offered in the marketplace, because they were underwritten with faulty assumptions.  As a result, these carriers face both increasing claims payments and increasing capital requirements.

145.   By 2012, reinsurance for companies with legacy portfolios comprised of such long-term care policies was available only under extremely onerous financial terms, including the requirement that the ceding insurance company make

significant payments (negative ceding commissions) to the reinsurer to complete the transaction.

## ii. CNO's Spinoff of SHIP

146.   Until November 2008, CNO was the direct or indirect parent of SHIP, which was then known as Conseco Senior Health Insurance Company.

147.   As of November 2008, SHIP was in solvent run-off of a diminishing, closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into SHIP between 1997 and 2000.

148.   To reduce the strain of supporting SHIP's underwriting losses, in November 2008, CNO transferred ownership of SHIP to the Senior Healthcare Trust, which was then merged into an independent oversight trust, the Senior Healthcare Oversight Trust (k/n/a Senior Health Insurance Company of Pennsylvania).  The Trustees of Senior Healthcare Oversight Trust serve as SHIP's directors and are primarily former insurance regulators.

149.   At the time of the transfer, CNO and its subsidiaries contributed $164 million of capital to SHIP to add to SHIP's existing $125 million of adjusted statutory capital, reflecting concerns that SHIP would need additional capital to sustain itself on a standalone basis.

150.   Since being spun off, SHIP has remained a long-term care insurer in runoff.  SHIP continues to operate out of the same site in Carmel, Indiana where it

operated while under CNO's control, along with CNO's other long-term care legacy portfolios, BCLIC and WNIC.

151.   Fuzion, a wholly-owned subsidiary of Senior Healthcare Oversight Trust, was formed in 2012 to provide administrative and management services to long-term care insurance companies, including SHIP.  Fuzion is located in the same office complex as SHIP, BCLIC and WNIC.

152.   In or about December 2013, pursuant to a comprehensive master services agreement, SHIP transferred its employees and physical assets to Fuzion to provide management services to SHIP.

153.   After the SHIP spinoff in 2008, SHIP's financial condition continued to decline because, *inter alia*, SHIP's long-term care portfolio incurred significant unforeseen increases in claims totaling over $200 million in the five-year period from 2009 through 2013.

### iii. The CNO, BCLIC and WNIC Relationship

154.   After SHIP's spinoff, CNO's other legacy long-term care subsidiaries, BCLIC and WNIC, continued to flounder, dragging down CNO's overall financial performance.

155.   At CNO, a common set of holding company board members and executive management oversaw the overall financial and risk-management decisions of its individual insurance companies.

156.   Certain key functions at CNO were shared across the insurance subsidiaries, including insurance asset management, treasury, accounting and legal functions.

157.   For example, Eric Johnson ("**Johnson**"), the Chief Investment Officer and President of 40/86 Advisors, also served as an Executive Vice President of WNIC and BCLIC.  In this role, Johnson appears to have overseen the investment decisions at BCLIC and WNIC.

158.   Similarly, Mathew Zimpfer, the general counsel of CNO, was also listed as an Executive Vice President of BCLIC and WNIC in their statutory filings.

159.   CNO, as the holding company, received dividends from its subsidiaries, including BCLIC and WNIC, to fund its operations.  The debt issued by CNO was guaranteed by its subsidiaries, including BCLIC and WNIC.

160.   The value of CNO stock is derived from its ownership of its insurance subsidiaries, including BCLIC and WNIC.  Indeed, all earnings calls were, and are, directed and addressed by the executive management of CNO, who address business and financial strategy across all CNO's operating insurance companies.

161.   When assessing the value of CNO, rating agencies acknowledge the unified management of CNO.  For example, in their credit and ratings reviews for CNO as the holding company, they frequently assess transactions undertaken at the insurance company subsidiary level.

162.   CNO was highly incentivized to, and did, direct the actions of BCLIC and WNIC because its financial health was dependent on BCLIC and WNIC.

163.   Each and every action taken by BCLIC and WNIC discussed herein was done in concert with, and at the direction of, CNO.

164.   Because of the overlapping roles played by many of the employees of BCLIC, WNIC, CNO and 40|86 Advisors, such as Johnson's role as Chief Investment Officer and President of 40/86 Advisors while serving as the Executive Vice President of WNIC and BCLIC, each and every action taken by BCLIC and WNIC discussed herein was done in concert with, or at the direction of, 40/86 Advisors.

### iv. BCLIC and WNIC's Introduction to Beechwood

165.   By 2013, CNO had been searching for reinsurance for CNO's legacy long-term care policies housed at BCLIC and WNIC in order to reduce and mitigate the exposure associated from those companies' long-term care portfolios, but was unable to find a reinsurer that would reinsure its risk on acceptable terms.

166.   In connection therewith, two employees of Willis Re Inc., Rick Hodgdon (later a Platinum Management and Beechwood employee) and Michael Kaster (a former CNO employee who was familiar with the long-term care portfolio), introduced CNO's subsidiaries, BCLIC and WNIC, to Beechwood in or about November 2013.

167. By agreements that were executed later but made retroactive to October 2013, BCLIC and WNIC ceded a substantial portion of their legacy, runoff long-term care business to Beechwood Cayman. The agreements were titled: (i) *Indemnity Reinsurance Agreement by and between Washington National Insurance Company and Beechwood Re Ltd*, as amended by Amendment No. 1 to Indemnity Reinsurance Agreement; and (ii) *New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd* (together, the "**Reinsurance Agreements**").

168. As part of the transactions: (i) WNIC ceded to Beechwood Cayman $357 million of statutory reserves to cover future losses from policies and paid $394 million in cash to Beechwood Cayman; and (ii) BCLIC ceded $196 million of statutory reserves to Beechwood Cayman to cover future losses from policies and paid $198 million in cash to Beechwood Cayman.

169. Because Beechwood Cayman was an unauthorized offshore reinsurer (*i.e.*, domiciled outside New York and Indiana where BCLIC and WNIC were domiciled), it was required to create on-shore reinsurance trusts, and specifically established the CNO Reinsurance Trusts, to manage the assets received in the reinsurance transaction.

170. Wilmington Trust, N.A. was appointed the trustee for each of the CNO Reinsurance Trusts and signed various agreements on their behalf, including the AGH Parent Amended Operating Agreement.

171. B Asset Manager LP was appointed as the asset manager for the CNO Reinsurance Trusts.

172. On or about February 1, 2014, the task of administering the long-term BCLIC and WNIC policies in the Reinsurance Agreements was delegated by BCLIC and WNIC to Fuzion pursuant to a February 1, 2014 Master Services Agreement.

173. Fuzion's employees (as employees of SHIP) already were providing the same service to SHIP.

174. While Beechwood Cayman assumed CNO's (through BCLIC and WNIC) risk through the reinsurance transactions, those entities remained responsible for any unsatisfied claims to the extent Beechwood Cayman failed to replenish the CNO Reinsurance Trusts.

175. This incentivized CNO to be an active participant, not a passive investor in or with Beechwood, in order to make certain it reduced BCLIC and WNIC's exposure to any claims that might be unsatisfied because of Beechwood's inability to pay.

176.   To that end, the Reinsurance Agreements included "audit provisions" which permitted BCLIC and WNIC to initiate an audit of the investments in certain circumstances.

### v. SHIP's Introduction to Beechwood

177.   SHIP was introduced to Beechwood in late 2013, when it was made aware of the BCLIC and WNIC reinsurance arrangements through Fuzion, which also managed SHIP.

178.   Following SHIP's introduction to Beechwood in 2013, Brian Wegner ("**Wegner**"), the President and CEO of SHIP at the time, Paul Lorentz ("**Lorentz**"), the CFO of SHIP at the time, and others met with Feuer, Taylor and Levy to discuss SHIP's financial condition.

179.   A series of meetings and communications between Fuzion, for SHIP, and Beechwood, primarily through Feuer, Taylor, and Levy, ensued in 2014, when SHIP was evaluating Beechwood as a potential investment manager.

180.   Given the distressed nature of SHIP's business, Beechwood Cayman declined to enter into agreements similar to the Reinsurance Agreements it executed with BCLIC and WNIC, but agreed to enter into investment management agreements.

181.   SHIP was highly motivated to enter into the investment management agreements because it was unable to obtain reinsurance in the marketplace.

182.   Because Fuzion was highly dependent on SHIP to pay its fees, Fuzion also was highly motivated to keep SHIP out of rehabilitation proceedings.

183.   SHIP, acting by and through Fuzion, entered into three investment management agreements (collectively, the "**SHIP IMAs**") with certain Beechwood entities, all of which contained roughly similar terms.

184.   All three IMAs contain the same basic structure:

   i.   Beechwood guaranteed SHIP a 5.85% annual investment return on the net asset value of the assets SHIP contributed.

   ii.   If SHIP's investments under the IMAs did not achieve a 5.85% return, Beechwood was obligated to pay SHIP any shortfall while also being obligated to contribute its own assets to make certain the net asset value of the account funded by SHIP was no less than that initially invested.

   iii.   Beechwood would retain investment returns above the 5.85% guaranteed investment return as a "Performance Fee."

185.   The foregoing terms were highly beneficial to the SHIP Defendants: SHIP would achieve a guaranteed return on the investment that it could not otherwise obtain in the market for the level of risk that SHIP was portrayed to be assuming in exchange.

186.   The IMAs were comprised of the following agreements:

   i.   A May 22, 2014 IMA with Beechwood Bermuda (the "**BBIL IMA**"), pursuant to which SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

   ii.   A June 13, 2014 IMA with Beechwood Cayman (the "**BRe IMA**") pursuant to which it invested $80 million with Beechwood Cayman.

SHIP deposited that amount into a custody account at Wilmington Trust for investment by Beechwood Cayman on SHIP's behalf.

iii.   A January 15, 2015 IMA with B Asset Manager LP (the "**BAM I IMA**") pursuant to which SHIP invested $110 million with B Asset Manager LP.

187.   Over time, SHIP invested approximately $270 million with Beechwood and its affiliates pursuant to these three initial IMAs.

188.   While BAM generally was given discretion to invest SHIP's funds, Beechwood's discretion was required to be exercised in accordance with SHIP's corporate investment guidelines set forth in its "*Adviser Investment Policy, Guidelines and Restrictions*" and "*Guidelines for Senior Secured Credit Opportunities.*"

## F.   Beechwood's Use of the Insurance Companies' Funds

189.   Between 2014 and 2016, CNO directed BCLIC and WNIC to transfer a total of approximately $592 million to Beechwood pursuant to the Reinsurance Agreements while SHIP transferred approximately $270 million to Beechwood pursuant to the SHIP IMAs, for a total investment of approximately $862 million.

190.   Upon receipt of the funds, Beechwood quickly engaged in a series of debt and equity transactions and co-investments with PPVA, PPCO and/or their subsidiaries, even though these investments did not comport with the guidelines required under the CNO Reinsurance Agreements and the SHIP IMAs.

191.   The Beechwood and Platinum insiders structured and implemented the various non-commercial, non-arm's length transactions by which Beechwood engaged in these transactions with PPVA and PPCO, in part using the funds held in the accounts held on behalf of the CNO Defendants and SHIP.

192.   The transactions were intended to justify the values ascribed to the assets held by PPVA by Platinum Management, in order to generate unearned fees for the Platinum-Beechwood Alter Egos.

193.   At the helm of the transactions were Nordlicht, Huberfeld, Bodner, and Levy, in their hopelessly conflicted roles as common owners and control persons of both Platinum Management and Beechwood.

194.   The CNO Defendants and SHIP Defendants' knew about the hundreds of millions of dollars of transactions between Beechwood and PPVA and PPCO using the funds in the CNO Reinsurance Trusts and the SHIP IMA accounts.  Senior management and/or the agents of the CNO Defendants and SHIP Defendants were also aware early on of the Beechwood/Platinum ties and were provided with copies of valuation statements and other documents containing information that clearly identified the counterparty to the transactions as PPVA, PPCO or their affiliates.

195.   Having offloaded a substantial portion of their future claims risk to Beechwood and confronted with a market that could not provide for those claims in the same advantageous manner anywhere else, the CNO Defendants made a

conscious and calculated decision not to lose the Beechwood white knight they had found.

196.   SHIP too made that decision, having procured a guaranteed return on investment under the SHIP IMAs that it could not otherwise obtain.

197.   However, by the end of 2015, when it was clear that Beechwood's transactions with PPVA were floundering, the Platinum-Beechwood Alter Egos, for the unjust benefit of the CNO Defendants and SHIP Defendants, directed Beechwood to consummate several transactions with PPVA, PPCO and their subsidiaries, which had but one goal:  ridding the SHIP Defendants and the CNO Defendants of bad assets by assigning them back to PPVA and PPCO and obtaining possession of or a security interest in any Platinum Fund asset of value.  This scheme culminated with the Agera Transactions, discussed below.

198.   It was not until the CNO Defendants came to learn that their investments with Beechwood were underperforming that they took action to reduce their exposure to PPVA and PPCO, making sure to acquire anything of value from PPVA and PPCO on their way out, in the form of fraudulent transfers of the Platinum Funds' assets and security interests in the Platinum Funds' remaining valuable assets.  These efforts culminated with the Agera Transactions in June 2016.

199.   In September 2016, only after the initial step of the Agera Transactions closed, PPVA commenced the Cayman Liquidation and the very public indictment

of Murray Huberfeld created a public relations liability, the CNO Defendants took action to terminate the Reinsurance Agreements with Beechwood.

200.   SHIP was fully aware that the Platinum Funds related investments Beechwood arranged for it were underperforming through 2014-2016 and that its funds were used to perpetrate a host of fraudulent schemes on PPVA and PPCO, but SHIP did not seek to terminate its relationship with Beechwood and provided financing for the Agera Transactions that are the subject of this complaint with the belief that such transactions would benefit SHIP and Beechwood to the detriment of PGS and PPVA.

201.   Thus, the SHIP Defendants doubled down, participating in the fraudulent Agera Transactions by investing an additional $50 million and transferring some of the near-worthless investments in PPVA and PPCO to AGH Parent that were then used as "consideration" for the purchase of the Agera Note and the January Redemption (defined below), thereby assisting in the knowing transfer of an asset worth at least $300 million for a substantial discount.

202.   It was not until about November 2016, long after the first stage of the Agera Transactions concluded, that SHIP directed Beechwood to transfer all cash and short-term investments out of the IMA accounts managed by Beechwood and to move those assets into SHIP's custodial accounts at Bank of New York Mellon.

203.   At the same time, SHIP also instructed Beechwood to transfer all limited partnership and other equity interests in each of the IMA accounts that were not registered solely in SHIP's name into SHIP's exclusive name and advised Beechwood that it was no longer authorized to act with respect to any asset in which SHIP possessed a direct or indirect interest, without express direction from SHIP.

### G. Beechwood and the First Scheme

204.   Shortly after Beechwood gained access to the first reinsurance trust assets, Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused PPVA, PPCO and their subsidiaries to enter into numerous non-commercial transactions with Beechwood entities and, in some cases, to co-invest with the Beechwood entities in third-party companies.

205.   The prices at which assets/loans were bought and sold were used to support Platinum Management's inflated valuations of the relevant equity, debt or investment.

206.   These were not real market transactions in which prices are established as a result of arm's-length negotiations.

207.   To the contrary, the transactions between and among Beechwood and their clients, on the one hand, and PPVA and its subsidiaries/affiliates on the other, were insider transactions, orchestrated by the Platinum-Beechwood Alter Egos, which transactions harmed PPVA.

208.   The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would be repaid, but rather to further the goal to enrich the Platinum-Beechwood Alter Egos by increasing the fees payable to Platinum Management and BAM ("**First Scheme Transactions**").

209.   In some cases the First Scheme Transactions were used to justify ever-increasing valuations of the underlying assets as reported by Platinum Management

210.   In other cases, the First Scheme Transactions were used to mask the performance failures at the underlying operating companies.

211.   In all cases, the First Scheme Transactions were used as a basis to pay the Platinum-Beechwood Alter Egos' unearned fees.

212.   The Platinum-Beechwood Alter Egos used First Scheme Transactions in which significant loans were extended/purchased or investments made by a "third party," *i.e.*, Beechwood, as evidence of the validity of Platinum Management's "estimate" as to the true enterprise value of the underlying company.

213.   These were insider transactions, however.  Also, in most cases, any investment or loan made by the Beechwood entities was backed by a guarantee from or a put right back to PPVA, and thus was not a valid basis upon which to assess the merits of the underlying business.

214.   In other cases, PPVA or its subsidiaries' prior rights in collateral were made subordinate to the rights of Beechwood.

215.   The Platinum-Beechwood Alter Egos damaged PPVA because they favored the rights of the Platinum-Beechwood Alter Egos over those of PPVA, by causing PPVA and its subsidiaries to grant guarantees and put rights in favor of Beechwood, and to subordinate its rights in collateral in favor of Beechwood.

216.   These inflated valuations enabled Platinum Management to report to PPVA a steady rise in the NAV of the assets it managed, which in turn enabled Platinum Management to pay itself excessive partnership shares, investment management and performance fees, to the detriment of the Platinum Funds and their subsidiaries.

217.   A full account of the transactions with Beechwood by which Platinum Management inflated the value of PPVA's NAV is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as **Exhibit 7** hereto and incorporated herein.

## H. The Second Scheme

218.   Despite the actions of the Platinum-Beechwood Alter Egos set forth above, by mid-2015 PPVA still held assets worth approximately $300 million, a

significant portion of which was comprised of PPVA's investment positions in Implant Sciences Corporation and Agera Energy (the "**Remaining PPVA Assets**").

219.   Beginning in late 2015, the Platinum-Beechwood Alter Egos, among others, conspired to commence the Second Scheme, engaging in an intentional scheme to transfer or encumber nearly all of the Remaining PPVA Assets to or for the benefit of the Platinum-Beechwood Alter Egos, and certain select clients and friends.

220.   Throughout the course of the Second Scheme, the Platinum-Beechwood Alter Egos deliberately granted Beechwood liens on PPVA's investments at the subsidiary level, and Platinum Management would consistently report PPVA's NAV without taking into account the encumbrances provided to its Beechwood alter ego.

221.   As a result of the Second Scheme, by the time the Cayman Liquidation of PPVA commenced, PPVA had hundreds of millions of dollars in liabilities and minimal assets.

222.   A full account of the transactions involving Beechwood comprising the Second Scheme is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as Exhibit 7 hereto and incorporated herein.

223.   The Agera Transaction which is the subject of this complaint was the culmination of the Second Scheme, and redress is sought by this action.

## I.  The Platinum Investment in Agera Energy

224.   Agera Energy, LLC ("**Agera Energy**") is a Delaware limited liability company and a leading energy reseller to the consumer and business markets.

225.   Agera Energy maintains a principal place of business in Briarcliff Manor, New York.

226.   Agera Energy was formed through the combination of Agera Energy LLC, an entity formed at the direction of Platinum Management, and the assets of Glacial Energy Holdings LLC, which were purchased by the Platinum Funds pursuant to a June 17, 2014 sale order entered by the United States Bankruptcy Court for the District of Delaware pursuant to Section 363 of the Bankruptcy Code (the "**Glacial Energy Purchase**").

227.   PPVA provided all of the funding for the Glacial Energy Purchase.

228.   At all relevant times, Agera Energy was a wholly owned subsidiary of Agera Holdings, LLC, a Delaware limited liability company ("**Agera Holdings**").

229.   Agera Holdings' sole business was to act as a holding company and control the business of its wholly owned subsidiaries.  Those subsidiaries are Agera Energy, Utility Recovery LLC and Agera Solutions LLC.

230.   Although PPVA paid the initial purchase price to effect the Glacial Energy Purchase, Platinum Management gave 95.01% of the equity of Agera Holdings to Michael Joseph Nordlicht, and 4.99% of the equity in Agera Holdings to MF Energy Holdings, LLC ("**MF Holdings**").

231.   Feuer, one of the co-owners of Beechwood, owns all of the membership interests in MF Holdings.

232.   Michael Joseph Nordlicht is Nordlicht's nephew.

233.   According to his LinkedIn profile, Michael Nordlicht graduated from Georgetown University Law Center in 2012.  Following graduation, he worked a few months as a law clerk for the Public Defender's office in Baltimore, Maryland. He also was an associate attorney for about eight months at the Maryland Attorney General's office in the Department of Public Safety and Correctional Services.

234.   In or about late 2013, Nordlicht installed his nephew as the general counsel of Agera Energy, despite the fact that he appears to have had no prior experience in private practice, much less any experience in the energy sector.

235.   Neither Michael Nordlicht nor MF Holdings paid anything for the equity each held in Agera Holdings.

236.   While Michael Joseph Nordlicht and MF Holdings held the equity in Agera Energy's parent, PPVA and PPCO could nevertheless assert a controlling interest in Agera Energy because prior to spring 2016, their jointly held entity, PGS,

was the holder of that certain May 19, 2014 promissory note issued by Agera Energy that was convertible into approximately 95% of the equity in Agera Energy (the "**Agera Note**").  A true and correct copy of the Second Amended and Restated Agera Note is attached hereto as **Exhibit 8**.

### J.  Hiring Kevin Cassidy

237.   Shortly after the Glacial Energy Purchase, Agera Energy hired Kevin Cassidy as a senior executive.

238.   Cassidy, who had served two prior stints in prison, was arrested a third time in 2007 for deliberately misstating the value of natural gas derivatives held by one of Nordlicht's previous funds, Optionable Inc., which had collapsed amid scandal in 2007.

239.   Nordlicht and/or other persons employed by Platinum Management caused Cassidy to be hired as a senior executive by Agera Energy upon Cassidy's release from prison, despite the fact that he had no prior experience in the energy sector.

240.   Despite Cassidy's multiple convictions, Nordlicht vouched for Cassidy's integrity when questioned by a reporter.  A true and correct copy of a March 21, 2016 email from Nordlicht to a reporter for Thomson Reuters is attached as **Exhibit 9**.

241.  In responses to inquiries from auditors concerning Cassidy's employment and in disclosures provided concerning the same, Platinum Management provided a copy of Cassidy's offer letter from Agera Energy, which listed the salary he would be paid and specifically denied that Cassidy had been or ever was employed as a portfolio manager at Platinum Management.

242.  At no time did Platinum Management ever disclose to its auditors any promise or obligation to pay Cassidy or any entity owned or controlled by Cassidy, a percentage of the sale price to be received upon the sale of PGS' interest in Agera Energy or the Agera Note.

### K. <u>Valuation of Agera Energy</u>

243.  Despite the fact that Mark Nordlicht installed unqualified insiders to help run the operating company, Agera Energy appears to have thrived.  Based on its December 31, 2015 financial statements, Agera Energy achieved FYE 2015 revenues of $301.4 million and EBITDA of $20.2 million.

244.  According to valuation reports commissioned by Platinum Management, Agera Energy's value as of March 31, 2016 was estimated to be between $225,533,000 and $283,553,000.  A true and correct copy of portions of the PPVA 1st Quarter 2016 Valuation is attached hereto as **<u>Exhibit 10</u>**.  This valuation report was issued on the same day as the Agera Note Sale (defined below).

245.   A June 30, 2016 valuation report commissioned by Beechwood valued Agera Energy at between $260,000,000 and $330,000,000.

246.   A July 15, 2016 investment memorandum prepared on behalf of BAM states that due to Agera Energy's profitable financial performance, the true valuation of Agera Energy likely was closer to the high end of available estimates.

247.   Platinum Management caused PPVA and PPCO to hold their interests in the Agera Note via PGS, a special purpose entity with no separate employees or business operations at that time other than the ownership of the Agera Note and their interests in Agera.

248.   The valuation statements, net asset value statements and financial statements prepared on behalf of PPVA and PPCO described their interests in Agera as though they each held those interests directly, and valued their interests in Agera Energy on an "as converted basis" rather than based on the value of the face amount of the Agera Note itself.

## L. <u>The Agera Transactions</u>

249.   As set forth above, since as early as 2014, the CNO Defendants and SHIP Defendants were aware that Beechwood was engaging in transactions with PPVA and PPCO and their respective portfolio companies, using funds from the CNO Reinsurance Trusts and the SHIP IMA Accounts.  While the CNO Defendants

and SHIP Defendants questioned certain of these investments, initially neither party took any action to terminate their relationship with Beechwood.

250.    However, after determining that their investments were nonperforming, leading to a risk of sustaining large losses, they worked with Beechwood and its Platinum alter egos, including Platinum Management, Nordlicht Huberfeld, Bodner and Levy, in consummating fraudulent conveyances which were specifically designed to alleviate the CNO Defendants' and SHIP Defendants' concerns.

251.    Against this backdrop, as early as March 2016, the Platinum and Beechwood executives conspired to transfer the rest of the remaining valuable assets of PPVA and PPCO by way of a series of "insider" transactions in order to clear out the uncollectable debt obligations owed to the CNO Reinsurance Trusts and SHIP Defendants, leaving PPVA and PPCO with little to nothing in exchange for the transactions, culminating with the Agera Transactions.

252.    The Agera Transactions were conceived by Platinum-Beechwood Alter Egos as an insider transaction by at least as early as March 13, 2016.   See attached **Exhibit 11,** a true and correct copy of a March 13, 2016 email regarding a proposed insider sale of Agera.

253.    By March 27, 2016, the Platinum-Beechwood Alter Egos began planning an insider sale of Agera to a "[B]eechwood led consortium."   See attached

**Exhibit 12**, a true and correct copy of a March 27, 2016 email regarding the planning for an insider sale of Agera.

254.   The insider transaction was intended to be substantially below fair value and was the product of the insider relationship between the Platinum-Beechwood Alter Egos, with the unjust benefits flowing to the Defendants and the Platinum-Beechwood-Alter Egos.

255.   Nordlicht and the other Platinum executives did not attempt to market the Agera Note and actively dissuaded potential buyers from inquiring into the purchase of the Agera Note.

256.   For example, on May 11, 2016, in response to an inquiry by a non-investor potential purchaser, Nordlicht stated that PGS's interest in Agera Energy was off the market.  A true and correct copy of this May 11, 2016 email is attached hereto as **Exhibit 13**.

257.   Implant Sciences Corporation, PPVA's only other remaining investment of significant value by May 2016, was being marketed for sale at the same time as Platinum Management and Beechwood were "negotiating" the Agera Note Sale.

258.   By contrast to their actions in connection with the sale of the Agera Note, Platinum Management arranged for Implant Sciences Corporation to hire an

investment banker to openly market the company for sale and took all necessary due diligence actions customary for the legitimate sale of an operating company.

259.   Between April 1, 2016 and June 9, 2016, the specific terms by which the Agera Note Sale was effected were put in place by the Platinum-Beechwood Alter Egos among others, all operating with the knowledge of and in conjunction and with the assistance of, among others, the CNO Defendants, the CNO Reinsurance Trusts, SHIP Defendants, AGH Parent, Beechwood Agera Entities, Cassidy and Starfish.

### i.   The April 2016 First Assignment Agreement

260.   On April 1, 2016, pursuant to an Assignment of Note and Liens (the "**First Assignment Agreement**"), PGS assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda in exchange for $15 million in cash.

261.   The First Assignment Agreement gave PGS the unconditional right to repurchase the Agera Note by repaying the $15 million purchase price plus a fee, by June 15, 2016.

### ii.   The May 2016 Second Assignment Agreement

262.   On May 12, 2016, pursuant to an Amended and Restated Assignment of Note and Liens (the "**Second Assignment Agreement**" and collectively with the First Assignment Agreement, the "**Agera Assignment Agreements**"), PGS re-

assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda, along with newly created Defendant BBLN-Agera Corp., which effectively resold the Agera Note at a new purchase price of $25 million. This price included the $15 million previously paid pursuant to the First Assignment Agreement.

263.   Among other terms, the Agera Assignment Agreements provided that PGS would forfeit its interest in the Agera Note, and thus its control over Agera Energy, if it did not repay the amounts due to the assignees within the time provided in such Agreements.  These transactions had the effect of locking up the sale of the Agera Note.

### iii. SHIP Agrees to Provide Substantial Assistance

264.   In May 2016, representatives for the SHIP Defendants attended meetings with Dhruv Narain, Feuer and Kevin Cassidy and other representatives of Agera Energy to formulate the plan for SHIP's participation in the illicit Agera Transactions.

265.   Narain and Feuer first approached the SHIP Defendants in mid-May 2016 to invest funds in what was to become AGH Parent.  At all times, the SHIP Defendants and Beechwood understood that this new investment would be made outside of the structure of the SHIP IMA agreements.

266.   The initial meeting occurred on May 19, 2016.  During that meeting, Narain walked representatives of the SHIP Defendants through the details of what he and Feuer characterized as a tremendous "opportunity" for SHIP.

267.   Narain and Feuer told executives of the SHIP Defendants that the owners of PGS needed to generate cash and, thus, were motivated to sell Agera Energy on favorable terms.  Narain also represented that he had done extensive diligence on Agera Energy and that it was orchestrating a purchase of Agera Energy for far less than its actual value.

268.   On May 25, 2016, executives for the SHIP Defendants, including Wegner and Lorentz, attended follow up meetings in Beechwood's offices. Narain and Feuer participated, along with individuals from Agera Energy, including Kevin Cassidy.

269.   At the May 19 and May 25 meetings, Cassidy and others from Agera Energy provided information to SHIP regarding corporate operations.  Narain and other representatives of Beechwood provided the SHIP Defendants with information regarding the value of Agera Energy and the proposed purchase of the company at a substantial discount to its actual value.

270.   Meetings regarding the proposed transaction also were held on those days with representatives of the CNO Defendants.

271.   In a follow up email to representatives of the SHIP Defendants dated May 26, 2016, Narain proposed what he characterized as a "**strawman structure**" (*emphasis supplied*) that would comply with insurance industry standards governing exposure to non-investment grade debt.

272.   To that end, Narain proposed that SHIP directly invest an "incremental $50 million in the newly formed AGH Parent, with an additional $20.5 million to be acquired through the SHIP IMAs.  Narain further proposed that Beechwood would sell certain limited partnership interests in the SHIP IMA accounts, including reducing SHIP's PPCO investment from $32 million to $5.5 million and bringing SHIP's PPVA investment below $5.5 million.

273.   Though this transaction, the Platinum-Beechwood Alter Egos offered SHIP, and SHIP accepted a way to exit its investments in PPVA and PPCO, which were failing, and supplant them with Plaintiffs' interest in the remaining valuable, unencumbered asset: the Agera Note.

274.   SHIP agreed to move forward with the proposed investments in AGH Parent for this wrongful purpose.

275.   Throughout the Agera Note Sale process, the SHIP Defendants took an active role in its investment in AGH Parent, with full access to Beechwood's due diligence reports and with actual knowledge of the connection between Mark Nordlicht and Cassidy and Cassidy's checkered past.

276.   On June 1, 2016, Narain sent an email to Lorentz and SHIP's drafting counsel that "we have a motivated seller who very much needs the money. As a result, we are really trying to close and fund on Monday [, June 6, 2016]."

277.   Upon information and belief, the SHIP Defendants and CNO Defendants were acutely aware of the fraudulent circumstances at the Platinum Beechwood enterprise and the effect of the transaction on Plaintiffs.  Attached hereto as **Exhibit 14** is an email dated July 29, 2016 in which Fuzion executives describe the situation as a "real mess" and similar to "Madoff."

### iv. The Sale of the Agera Note

278.   On June 9, 2016, **the day after Huberfeld's arrest**, the Platinum-Beechwood Alter Egos, working in concert with the Defendants here, caused PGS to transfer its interest in the Agera Note to AGH Parent – an entity created at the behest of the Platinum-Beechwood Alter Egos, for purposes of the transaction, and would be controlled and managed by Beechwood post sale, for the benefit of the Defendants (the "**Agera Note Sale**").

279.   The SHIP Defendants and the CNO Defendants, with full knowledge of the insider nature of the Agera Note Sale and the detriment it would cause to PGS, PPVA and PPCO, worked in tandem with or knowingly allowed Beechwood and the other Defendants to work to the detriment of PGS, PPVA and PPCO, just weeks

before they would publicly distance themselves from Beechwood for fraud, and while litigation was anticipated.

280.   To create the appearance that the Agera Note Sale was an arm's length, valid transaction, numerous agreements were executed between and among the parties.

### v.  Assignment of Worthless Debt to AGH Parent

281.   On or about June 8 and 9, 2016, the Beechwood Agera Corporations and CNO Reinsurance Trusts each executed agreements with AGH Parent by which they contributed near-worthless debt and other investments related to the Platinum Funds to AGH Parent in exchange for preferred membership units and notes issued to them by AGH Parent.

282.   Similarly, Beechwood Investments executed an Agreement with AGH Parent stating that it had purportedly paid $100 for all of the common equity units in AGH Parent, while SHIP executed agreements stating that it was contributing cash plus certain worthless debt and other investments related to the Platinum Funds in exchange for preferred membership units and notes issued to it by AGH Parent. True and correct copies of the Agreements by which these purported "contributions" and ""subscriptions" (the "**Subscription Agreements**") were effected are attached hereto as **Exhibit 15**.

283.   As noted above, at all relevant times Nordlicht, Bodner Huberfeld and Levy or their family members, via trusts, held the membership interests in Beechwood Investments.

### vi. The Repurchase Agreement

284.   As part of the Agera Transactions, on June 9, 2016, PGS re-acquired the Agera Note from Defendant BBLN-Agera Corp. and other Beechwood-related entities under that certain Assignment of Secured Convertible Promissory Note (the "**Repurchase Assignment**").  A true and correct copy of the Repurchase Agreement is attached hereto as **Exhibit 16**.  PGS assigned the Agera Note to AGH Parent in connection with the Agera Note Sale.

### vii.   The Agera Purchase Agreement

285.   On June 9, 2016, Simultaneous with the execution of the AGH Parent Amended Operating Agreement (described below) and the Subscription Agreements, PGS and AGH Parent entered into the Purchase Agreement (the "**Agera Purchase Agreement**"), by which PGS sold the Agera Note to AGH Parent. A true and correct copy of the Agera Purchase Agreement is attached hereto as **Exhibit 17**.

286.   The Agera Purchase Agreement is governed by Delaware law.

287.   Each of PGS and AGH Parent are limited liability companies created under Delaware law, and their operating agreements are governed by Delaware law.

288.   Even though the Platinum-Beechwood Alter Egos and the Defendants were aware and believed that the market value of the Agera Note was at least $250-300 million and possibly higher, the stated purchase price for the Agera Note was only $170 million (the "**Note Purchase Price**").

289.   The Note Purchase Price was significantly below the contemporaneous valuations of the Platinum Funds' interests in the Agera Note commissioned by the Platinum-Beechwood Alter Egos, the latter of which was shared with the SHIP Defendants and, on information and belief, the other Defendants.

290.   Even then, approximately $43.67 million of the Note Purchase Price was paid in the form of nearly valueless debt and other instruments – the very instruments that had been assigned to AGH Parent by the Beechwood Agera Entities, the SHIP Defendants, the CNO Defendants and the CNO Reinsurance Trusts the day before, in partial exchange for their membership interests in AGH Parent.  Although these instruments were nearly worthless, they were provided as consideration to PGS at face value.

291.   The Purchase Agreement further provided for the transfer to PGS of a total of 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at $2,000,000.

292.   Of these, all of the Class B-2 Units and $4,552,000 of the Class C Preferred Units were immediately transferred to Starfish, Cassidy's alter ego, both discussed below.

293.   PGS retained $54 million worth of class C Preferred Units in AGH Parent that were valued at face or par value.

294.   Under the terms of the AGH Parent Operating Agreement, any distribution to the Class C Preferred Units held by PGS was subordinated to those held by the Beechwood Agera Entities, SHIP, the CNO Defendants, the CNO Reinsurance Trusts and the B-2 Units held by Starfish/Cassidy.

295.   In addition, $35.4 million of those Class C Preferred Units could be redeemed at the sole discretion of AGH Parent/Beechwood, in exchange for debt and or other instruments at face value, irrespective of the actual value of such debt or instruments.

296.   The Purchase Agreement provides that approximately $65 million of the Note Purchase Price was payable in cash.

297.   The cash paid in June 2016 was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part and had knowledge concerning.

298.   True and correct copies of the closing documents related to the Agera Note Sale and the other transactions described above are attached hereto as **Exhibit 18**.

### viii.   PGS's Payment to Starfish/Cassidy

299.   The Platinum-Beechwood Alter Egos caused PGS to pay Cassidy, via his entity Starfish, 8% of the **gross** proceeds from the sale of Agera, in connection with Cassidy's efforts to shepherd through the Agera Transactions.

300.   This payment was made despite Platinum Management's prior statements to PPVA's auditor indicating that (i) Cassidy was an employee of Agera who was paid a salary of $135,000 per annum and (ii) Cassidy was not a portfolio manager employed by Platinum Management.

301.   To effect the payment, the Platinum-Beechwood Alter Egos, Cassidy and Cassidy's counsel prepared an amendment to the PGS operating agreement that granted Starfish, Cassidy's alter ego, 8% of the membership interests in PGS on the day before the Agera Note Sale closed ("**First Amendment to PGS Operating Agreement**").   The grant was illicit.   The other parties to the Agera Note Sale, including the Beechwood Agera Entities, AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts and the CNO Defendants, were aware of the transfer to Cassidy/Starfish.

302.   Thereafter, on June 9, 2016 (concurrent with the Agera Transactions and the day after Huberfeld's arrest), PGS entered into a Purchase Agreement with Starfish by which PGS purported to "repurchase" Starfish's membership interests in PGS for $13,552,000 (the "**Starfish Purchase Agreement**"), consisting of: (i) $7,000,000 in cash; (ii) the $2,000,000 of Class B-2 Preferred Units in AGH Parent granted to PGS under the Purchase Agreement; and (iii) $4,552,000 of the total amount of Class C Preferred Units in AGH Parent granted to PGS.

303.   Notably, Cassidy's Class C Preferred Units were expressly not subject to redemption in exchange for "PGS Value." In addition, Cassidy received all of the Class B-2 Preferred Units granted to PGS under the Starfish Purchase Agreement. The Class B-2 Preferred Units, have a higher liquidation preference than the Class C Units retained by PGS.  A true and correct copy of the Starfish Purchase Agreement is attached hereto as **Exhibit 19**.

304.   The payoff to Cassidy was structured as a grant and repurchase of membership interests in PGS by Starfish so that Cassidy could avoid the payment of any withholding taxes with respect to the transfer.

305.   All of the various transactions described above and leading up to and including the purchase of the Agera Note on June 9, 2016 are referred to herein as the "**Agera Purchase Transactions**".

### ix. The AGH Parent Amended Operating Agreement

306.   Also on June 9, 2016, AGH Parent amended its Limited Liability Company Agreement (the "**AGH Parent Amended Operating Agreement**") to show the admission of the new members resulting from the transactions that comprised the various elements of the Agera Note Sale and related transactions.  A true and correct copy of the AGH Parent Amended Operating Agreement is attached hereto as **Exhibit 20**.

307.   Narain executed the AGH Parent Amended Operating Agreement on behalf of AGH Parent and the Beechwood Agera Entities.  Wegner signed the AGH Parent Amended Operating Agreement on behalf of SHIP.  The CNO Reinsurance Trusts also were admitted as members of AGH Parent.

308.   Pursuant to the AGH Parent Amended Operating Agreement and the Subscription Agreements, AGH Parent issued the following notes and membership interests:

- SHIP received 350,000 Class A Units, valued at $35 million, B-1 debt in the principal amount of $15 million, and 5,730 Common Units in AGH Parent as an "equity kicker."

- SHIP also received a $940,000 B-1 Senior Secured Note issued by AGH Parent and a $5,000,000 interest in BBLN-Agera's $9,060,000 B-1 Senior Secured Note issued by AGH Parent from cash and assets contributed through the SHIP IMA Accounts.

- BBIL ULICO 2014, BRe WNIC 2013 LTC Primary, BBLN-Agera Corp., BHLN-Agera Corp., and BOLN-Agera Corp. were collectively provided 220,000 Class B-1 Units, valued at $22 million, and B-1 debt in the

principal amount of $36,960,000.

- AGH Parent provided 5,730 Common Units in AGH Parent to Beechwood Re Investments, LLC for $100.  Beechwood Re Investments, LLC is a Delaware limited liability company managed by N Management LLC, the sole member of which is Nordlicht.

- In connection with the sale of the Agera Note, PGS was provided with 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at 2,000,000.  These valuations were misleading, as they failed to take into account "PGS Value" and the redemption rights against PGS's Class C units, and the contemporaneous transfer of the Class B-2 Units to Starfish, Cassidy's alter ego, both discussed below.

- Starfish Holdings Group, Inc., another Cassidy-controlled entity, was provided with 12,062 incentive units in AGH Parent.

309.   After the Agera Note Sale was consummated, AGH Parent did not provide PGS with any of the quarterly or annual financial statements required by section 11.01 of its operating agreement, nor did it provide PGS with any distributions.

## M. Redemption of the Class C Units for PGS Value

310.   As noted above, approximately $59,040,000 million of the Note Purchase Price was paid to PGS via Class C Units in AGH Parent.  Of these, $4,552,000 worth were given to Starfish/Cassidy, and PGS retained the remaining $54 million worth of such Class C Preferred Units.

311.   The Class C Preferred Units that PGS received were deeply subordinated to the membership interests held by the Beechwood Agera Entities,

SHIP, the CNO Reinsurance Trusts and Starfish's B-2 Units, and thus had little or no value.

312.   The Amended AGH Parent Operating Agreement further provided that $35.4 million of PGS' Class C Preferred Units were subject to being redeemed in exchange for $35.4 million of debt or partnership interests in the Platinum Funds by AGH Parent (defined as "**PGS Value**") if a notice was sent out on or before a certain date.

313.   On October 28, 2016, AGH Parent delivered a letter to PGS (the "**AGH Redemption Notice**"), indicating its intent to exercise the redemption rights set forth in Section 9.06(a)(i) of the Amended AGH Parent Operating Agreement "with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."   A true and correct copy of the AGH Redemption Notice is attached hereto as **Exhibit 21**.

314.   Thereafter, on January 26, 2017, AGH Parent delivered a letter to PGS enclosing an Assignment (the "**PGS Assignment**"), executed by AGH Parent, transferring to PGS all of AGH Parent's interest in the debt obligations/instruments set forth on Schedule A thereto.  A true and correct copy of the PGS Assignment is attached hereto as **Exhibit 22**.

315.   Together, the debt obligations/instruments listed on Schedule A of the PGS Assignment have a face value equal to the total amount of PGS Value subject to redemption, or $35.4 million.

316.   The debt obligations/instruments listed in the PGS Assignment consist of distressed debt and instruments transferred to AGH Parent by the CNO Reinsurance Trusts, SHIP and the Beechwood Agera Entities.

317.   The debt/instruments listed in the PGS Assignment include: (i) $14.1 million owed by Golden Gate Oil (ii) $5.7 million owed by PEDEVCO Corp. and (iii) $15.6 of debt owed by Montsant Partners, LLC, a subsidiary of PPVA.

318.   Defendants had actual knowledge that these distressed debt obligations were near-worthless when they were transferred to PGS in January 2017.

319.   As a result of the AGH Redemption Notice and PGS Assignment, AGH Parent sought to redeem 336,928.93 Class C Preferred Units held by PGS and recorded satisfaction relative to PGS of $1,707,107 in accretive Class C Preferred Return related to such redeemed units, leaving PGS with approximately 207,970 Class C Preferred Units (the "**January Redemption**").

320.   Together, the January Redemption and the Agera Purchase Transactions are referred to herein as the "**Agera Transactions**."

321.   PGS has not received any further distributions with respect to its Class C Preferred Units in AGH Parent.

322.   Within a week after the Agera Note Sale closed in June 2016, BAM Management Services began marketing AGH Parent to prospective investors.

323.   In or about December 2016, six months after the Agera Note Sale, BAM Management Services had entered into negotiations to sell AGH Parent to a third party investor for approximately $315 million in cash.

324.   In the summer of 2017, certain assets under Beechwood's control, including its interests in BAM Management Services and AGH Parent, as well as the CNO Defendants' interests in AGH Parent, were sold to an affiliate of Eli Global (the "**Eli Global Proceeds**").

325.   On information and belief, SHIP still remains a member of AGH Parent.

326.   AGH Parent continues to hold the Agera Note or as converted equity, and Eli Global has acquired the preferred and common Units previously held by Beechwood and the CNO Defendants in AGH Parent.

327.   The Agera Transactions were the culmination of the looting of PPVA and PPCO by the Platinum-Beechwood Alter Egos and the Defendants and, standing alone, resulted in the dissipation of as much as $250 million of value to the Defendants, at a time when PPVA and PPCO were known to be insolvent.  The loss of PGS's interest in the Agera Note has caused substantial direct and consequential

damages in an amount to be determined at trial, and the CNO Defendants were unjustly enriched by the same.

## CLAIMS FOR RELIEF

### First Count (by PGS):  Aiding and Abetting Breach of Fiduciary Duty and Corporate Waste against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy

328.    PGS repeats and re-alleges paragraphs 1-327 as if fully set forth herein.

329.    Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, who were the general partner and founders and controlling persons of PGS's members and, in the case of Nordlicht, the managing member of PGS, and were responsible for overseeing and managing PGS, owed fiduciary duties of due care, loyalty and good faith to PGS.

330.    As set forth above, Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, breached their fiduciary duties to PGS by causing the Agera Note to be sold in connection with the Agera Transactions when they believed it was worth at least $250-$300 million and potentially more.

331.    The SHIP Defendants, CNO Reinsurance Trusts and Beechwood Agera Entities knowingly and substantially assisted and participated in the foregoing breaches of fiduciary duties in connection with the Agera Transactions.  Each assigned to AGH Parent the nearly worthless debt instruments and other investments that AGH Parent in turn used as "consideration" for the purchase of the Agera Note

and the January Redemption, and in return received senior preferred units, and all of the common equity in AGH Parent as well as debt.

332. The foregoing transactions enabled the SHIP Defendants, CNO Reinsurance Trusts and Beechwood Agera Entities to exchange near-worthless investments in PPVA and PPCO and their subsidiaries and affiliates for valuable interests in Agera Energy, to the detriment of PGS.

333. Cassidy, via Starfish, received 8% of the consideration paid to PGS in connection with the Agera Transactions, including $7 million of the total cash and valuable membership units in AGH Parent illicitly, even though Cassidy already was paid a salary of $135,000 per annum for his work at Agera Energy.

334. AGH Parent, the alter ego of the Platinum-Beechwood Alter Egos, substantially assisted in the breaches of fiduciary duties by purchasing the Agera Note at a substantial discount, to the detriment of PGS and its members.

335. The SHIP Defendants also substantially assisted and participated in the breaches of fiduciary duties by contributing $50 million and nearly worthless debt to finance the fraudulent acquisition of the Agera Note by AGH Parent.

336. Cassidy and Starfish substantially assisted and participated in the breaches of fiduciary duties by participating in the execution of the purchase of the Agera Note and taking 8% of the proceeds that were supposed to be paid to PGS for no consideration.

337.   AGH Parent and the Beechwood Agera Entities substantially assisted and participated in the breaches of fiduciary duties because they are the alter egos of the Platinum-Beechwood Alter Egos, and by acting as the "insiders" by which they looted PGS's valuable asset, the Agera Note, for the benefit of the Defendants and Beechwood's ultimate owners, Nordlicht, Levy, Bodner and Huberfeld.

338.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, the CNO Reinsurance Trusts, Cassidy and Starfish were aware that the Agera Transactions enabled Nordlicht, Levy, Bodner and Huberfeld to retain control of Agera Energy via their ownership of Beechwood Investments, which owned the common equity of AGH Parent, their ownership and control of the Beechwood Agera Corporations, which held preferred units, and of BAM Management Services, the manager of AGH Parent at all relevant times.

339.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, and the CNO Reinsurance Trusts also knowingly and substantially assisted the breach of fiduciary duties to PGS and its members by engaging in a transaction by which 8% of the consideration, including $7 million of cash, was siphoned off to pay Nordlicht's friend, Cassidy, to the detriment of PGS and the Platinum Funds.

340.   AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy had actual knowledge of breaches of fiduciary duties to PGS in connection with the Agera Transactions, as the parties

77

were well aware of the financial condition of PPVA and PPCO at that time, the alter ego relationship between and among the Platinum-Beechwood Alter Egos, and the Platinum-Beechwood Alter Egos' intent to sell the Agera Note to an insider at a substantial undervalue and to direct a significant portion of even that small consideration to Cassidy/Starfish.

341.  As a direct and proximate result of the actions and substantial participation of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish, PGS was damaged.

342.  The actions of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish caused the harm on which the primary liability of breach of fiduciary duty is predicated.

343.  By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**Second Count (by PGS, in the alternative): Unjust Enrichment against the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy, Starfish and John Does 1-100**

344.  PGS repeats and re-alleges paragraphs 1-343 as if fully set forth herein.

345.  In connection with the Agera Transactions and as described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy,

Starfish and the Beechwood Agera Entities intentionally engaged in certain acts for the purpose of transferring the Agera Note away from PGS at a substantial discount.

346.   The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities worked together with the Platinum-Beechwood Alter Egos to orchestrate the Agera Transactions for the purpose of acquiring the last remaining valuable asset of PPVA, which was held by PGS.

347.   As described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities all had knowledge that the Agera Transaction would result in up to hundreds of millions in damages to PGS.

348.   The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, along with any subsequent transferees, would be unjustly enriched at the expense of PGS if they were permitted to receive and retain the full benefit of the Agera Transactions.

349.   PGS would suffer an unjust detriment if the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, and any subsequent transferees, were permitted to receive and retain the full benefit of the Agera Transactions.

350.   Permitting the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities to receive and retain the full benefit of the Agera Transactions at the expense of PGS would be against equity and good conscience.

351.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### Third Count (by PGS): Breach of the AGH Parent Amended Operating Agreement (Implied Covenant of Good Faith and Fair Dealing) against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities and John Does 1-100

352.   PGS repeats and re-alleges paragraphs 1-351 as if fully set forth herein.

353.   The AGH Parent Amended Operating Agreement provides for the redemption of $35.4 million of PGS's Class C preferred membership units in exchange for "PGS Value" under certain circumstances.

354.   The terms of the AGH Parent Operating Agreement, including the provisions concerning the redemption of PGS' Class C preferred membership units for PGS Value, were not negotiated at arm's length, but rather were imposed upon PGS by persons and entities engaged in a scheme to transfer PGS' interest in the Agera Note to Defendants for nearly worthless consideration.  Those persons and entities included AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts

and the Beechwood Agera Entities, working together with the Platinum-Beechwood Alter Egos.

355.   AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities acted in bad faith and deprived PGS of any value that it may have obtained from the Agera Transactions by receiving Class C Preferred Units in AGH Parent, by transferring to it debt and other instruments that they were aware were nearly valueless in connection with the January Redemption.

356.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**Fourth Count (by the JOLs):**
**Fraudulent Trading under Cayman Law against AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities**

357.   The JOLs repeat and re-allege paragraphs 1-356 as if fully set forth herein.

358.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

359.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

360.  At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

361.  PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

362.  For example, no annual meetings were held, as required by the PGS Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

363.  Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

364.  At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

365.  PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

366.  The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

367.    The Agera Transactions evidence all of the badges of fraud for which fraudulent transfer law was enacted.

368.    In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

369.    The transfer to AGH Parent was made to or for the benefit of insiders.

370.    PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth $300 million.

371.    At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

372.    Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

373.    Section 147 of the Cayman Islands Companies Law (2018 Revision) states as follows:

> 147. FRAUDULENT TRADING
>
> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper

374.   The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

375.   The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

376.   At the time of the January Redemption and Agera Note Sale, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the Agera Note Sale, Nordlicht announced to PPVA's investors that PPVA would be liquidated and unwound.  The Cayman Proceeding was commenced a few weeks thereafter.

377.   Accordingly, AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities are liable to the PPVA estate and are obligated to contribute to the PPVA estate amounts to be determined at trial, including cash proceeds, the Agera Note, or membership interests in AGH Parent.

**Fifth Count (by the JOLs): Transfer for Undervalue and Voidable
Preference under Cayman Law against AGH Parent and John Does 1-100**

378.  The JOLs repeat and re-allege paragraphs 1-377 as if fully set forth
herein.

379.  The JOLs are authorized and have standing to seek avoidance and
recovery of fraudulently transferred property under applicable Cayman law.

380.  For purposes of this count, the JOLs ask this Court to disregard the
corporate form of PGS and deem PPVA to have had a direct interest in the Agera
Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos
did.

381.  At the direction of the Platinum-Beechwood Alter Egos, PGS was
created as a special purpose entity owned jointly by PPVA and PPCO for the purpose
of holding the Agera Note.

382.  PGS technically held title to the Agera Note, but corporate formalities
otherwise were not observed.

383.  For example, no annual meetings were held, as required by the PGS
Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the
Agera Note as though it was a separate asset of PGS.

384.   Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

385.   At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

386.   PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

387.   The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

388.   The Agera Transactions evidence all of the badges of fraud for which fraudulent transfer law was enacted.

389.   In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

390.   The transfer to AGH Parent was made to or for the benefit of insiders.

391.   PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth at least $250-$300 million.

392.    At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

393.    Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

394.    The transfer to AGH Parent was made to or for the benefit of insiders, who were (or purported creditors) of PPVA and PPVA was unable to pay its debts.

395.    PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

396.    Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

397.    In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred,  taken  or  suffered  within  six  months  immediately  preceding  the

commencement of a liquidation.

398.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

399.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

400.   The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to Platinum Management's AGH Parent alter ego, and the other Defendants.

401.   The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

402.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the first step of the Agera Transactions, Nordlicht on behalf of Platinum Management announced to PPVA's investors that

PPVA would be liquidated and unwound.  The Cayman Liquidation was commenced a few weeks thereafter on August 23, 2016.

403.   The transfer of the Agera Note to AGH Parent amounted to a transfer of, *inter alia*, property of PPVA made (i) with the intent to give the insiders a preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

404.   Accordingly, PPVA is entitled to a judicial determination that the transfer of the Agera Note to AGH Parent and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

**Sixth Count (by the JOLs): Transfer for Undervalue and Voidable Preference under Cayman Law against Starfish, Cassidy and John Does 1-100**

405.   The JOLs repeat and re-allege paragraphs 1-404 as if fully set forth herein.

406.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

407.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera

Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

408.   At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

409.   PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

410.   For example, no annual meetings were held, as required by the PGS Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

411.   Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

412.   At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

413.   PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

414.   The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated

pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

415.   The transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement evidence all of the badges of fraud for which fraudulent transfer law was enacted.

416.   In connection with the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, Starfish and Cassidy "sold" interests in PGS that they held for a single day.

417.   The transfers pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made to or for the benefit of insiders.

418.   PPVA received less than reasonably equivalent value and/or less than fair consideration in connection with the transfers made to Cassidy and Starfish pursuant to the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement.

419.   At the time of the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, there existed substantial creditor claims against PPVA.

420.   Since the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement occurred in June 2016, additional creditor claims have been asserted against PPVA.

421.   The transfers to Cassidy and Starfish pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made to or for the benefit of insiders, who were creditors (or purported creditors) of PPVA and PPVA was unable to pay its debts.

422.   PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

423.   Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

424.   In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the

commencement of a liquidation.

425.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

426.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

427.   The transfers made to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made with intent to defraud creditors of PPVA, as it transferred valuable consideration to Cassidy and Starfish for membership interests in PGS that Cassidy and Starfish had acquired the previous day illicit purpose and inadequate or no consideration.

428.   The transfers under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship and PPVA's financial distress.

429.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the Agera Note Sale, Nordlicht on

behalf of Platinum Management announced to PPVA's investors that PPVA would be liquidated and unwound. The Cayman Liquidation was commenced a few weeks thereafter, on August 23, 2016.

430.   The transfers to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement amounted to a transfer of, *inter alia*, property of PPVA made (i) with the intent to give the insiders a preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

431.   Accordingly, PPVA is entitled to a judicial determination that the transfer of cash and other valuable assets to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

**Seventh Count (by JOLs and PPVA) (for Relief Only): Alter Ego against AGH Parent and the Beechwood Agera Entities and John Does 1-100**

432.   JOLs and PPVA repeat and re-allege paragraph 1 through 431 as if fully set forth herein.

433.   This count is pled as additional allegations for relief against AGH Parent and the Beechwood Agera Entities because they are alter egos of Platinum Management and controlling persons Nordlicht, Huberfeld, Bodner and Levy.

434.   AGH Parent and the Beechwood Agera Entities were formed and conceived as the alter egos of Platinum Management and controlling persons, Nordlicht, Huberfeld, Bodner and Levy, for the purpose of inflicting harm upon PPVA.

435.   The Beechwood Agera Entities, AGH Parent and Platinum Management had overlapping ownership and control, in particular, Nordlicht, Huberfeld, Bodner and Levy.

436.   At the time of the January Redemption and Agera Note Sale, AGH Parent, the Beechwood Agera Entities, Platinum Management and Beechwood were under common control, namely Nordlicht, Huberfeld, Bodner and Levy.

437.   Platinum Management and Beechwood have had overlapping management, direct or indirect owners and controlling persons, including Huberfeld, Nordlicht, Bodner and Levy.

438.   Beechwood was founded and initially operated from the offices of Platinum Management.

439.   The Platinum-Beechwood Alter Egos, including AGH Parent and the Beechwood Agera Entities, were inadequately capitalized and upon information and belief, have cumulative creditor claims in excess of $2 billion.

440.   AGH Parent and the Beechwood Agera Entities were created by the Platinum-Beechwood Alter Egos for a wrongful purpose, *i.e.* the transfer of the Agera Note.

441.   As set forth in detail herein, as well as in the action filed by PPVA and the JOLs pending in the United States District Court for the Southern District of New York, Platinum Management, as general partner of PPVA, and Nordlicht, Huberfeld, Bodner and Levy, as the co-founders and/or officers/controlling persons of PPVA, owed fiduciary duties of due care, loyalty and good faith to PPVA and PGS. These parties breached their fiduciary obligations and committed fraudulent and otherwise tortious acts in connection with the overvaluation of the PPVA's net asset value in order to siphon off unearned fees for their benefit, and by engaging in transactions to loot PPVA's valuable assets for their own benefit, culminating with the Agera Transactions.

442.   The Platinum-Beechwood Alter Egos used AGH Parent and the Beechwood Agera Entities, as fraudulent tools to siphon off the assets of PPVA and PGS, namely the Agera Note.

443.   The ultimate decision making for Platinum Management, Beechwood, AGH Parent and the Beechwood Agera Entities rested with the same controlling minds: Nordlicht, Huberfeld, Bodner and Levy.

444.   The Platinum-Beechwood Alter Egos regularly caused PPVA and its subsidiaries such as PGS to commit acts that benefited the Platinum-Beechwood Alter Egos and their preferred clients and friends at the expense of PPVA by way of wrongful insider transactions, including but not limited to the Agera Transactions.

445.   By reason of the foregoing, AGH Parent and the Beechwood Agera Entities are liable to the same extent as the Platinum-Beechwood-Alter Egos in connection with the tortious acts described herein.

**Eighth Count (by all Plaintiffs) (for Relief Only): Imposition of a Constructive Trust against Defendants**

446.   Plaintiffs repeat and re-allege paragraph 1 through 444 as if fully set forth herein.

447.   This count seeks the equitable remedy of imposition of a constructive trust over the Agera Note and any proceeds received by Defendants in connection with their ownership of the Agera Note, membership units in AGH Parent, sale of membership units in or notes issued by AGH Parent, the sale of membership interests in PGS, and/or or any other proceeds or benefits received in connection with the Agera Transactions.

448.   In connection with the Agera Transactions and as described herein, all Defendants each intentionally engaged in various acts and transactions for the purpose of transferring the Agera Note away from PGS at a substantial discount and receiving the benefit and proceeds thereof, and in the case of the CNO Defendants, knowingly permitted and authorized the same.

449.   Defendants, among others, orchestrated the Agera Transactions together with the Platinum-Beechwood Alter Egos for the purpose of acquiring the last remaining valuable asset of PPVA.

450.   As described herein, Defendants all had knowledge that the Agera Transactions would result in the transfer of an asset they understood to be worth at least $250-$300 million.

451.   Defendants, would be unjustly enriched at the expense of the Plaintiffs if they were permitted to receive and retain the full benefit of the Agera Transactions.

452.   The Plaintiffs would suffer an unjust detriment if Defendants, were permitted to receive and retain the full proceeds of the Agera Transactions, or of any sales of the membership units or notes received in connection therewith.

453.   Permitting the Defendants to receive and retain the full benefit of the Agera Transactions, the proceeds thereof or of any sales of the membership units in or notes issued by AGH Parent or the proceeds of membership interests in PGS

received in connection therewith at the expense of the Plaintiffs would be against equity and good conscience.

454.   As set forth herein, the Defendants engaged in fraudulent and or unfair and unconscionable conduct in connection with the Agera Transactions.

455.   Legal remedies are insufficient to compensate the Plaintiffs for the damages suffered by Plaintiffs in connection with the Agera Transactions.

456.   The Agera Note and the proceeds received from Defendants in connection with the sale of their interests in the Agera Note or in AGH Parent or PGS, or any other proceeds received in connection with the Agera Transactions, constitute identifiable property appropriate for the imposition of a constructive trust.

457.   By reason of the foregoing, the Plaintiffs request imposition of a constructive trust over certain assets of Defendants including but not limited to (i) the Agera Note; (ii) all proceeds received by the Defendants in connection with any sale of the Agera Note, *i.e.* membership units in AGH Parent and any notes issued to the foregoing entities by AGH Parent, (iii) proceeds from the sale of any membership units in or notes issued by AGH Parent; (iv) proceeds from the sale of any membership units in PGS; and (v) all other equitable relief that this Court deems just and proper.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order and judgment against Defendants as follows:

A.      PGS requests money damages including pre-judgment and post-judgment interest for aiding and abetting and abetting breach of fiduciary duty and corporate waste against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish;

B.      PGS requests money damages including pre-judgment and post-judgment interest against the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy, Starfish and John Does 1-100 for unjust enrichment.

C.      PGS requests money damages including pre-judgment and post-judgment interest against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, and John Does 1-100 for breach of the AGH Parent Operating Agreement and the implied covenant of good faith and fair dealing;

D.      The JOLs request money damages including pre-judgment and post-judgment interest, avoidance, disgorgement, set aside, recovery of and/or constructive trust against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, and John Does 1-100  in favor of the PPVA estate for fraudulent trading, voidable preference, transfer for undervalue and the other claims set forth herein;

E.      PPVA and the JOLs request a declaration that AGH Parent and the Beechwood Agera Entities are alter egos of nominal defendants Platinum

Management, Nordlicht, Huberfeld, Bodner and Levy, and request money damages against AGH Parent and the Beechwood Agera Entities, including pre-judgment and post-judgment interest, for the same malfeasance as those nominal defendants for the tortious acts described herein and elsewhere;

F.    For attorneys' fees and costs in favor of Plaintiffs and against Defendants; and

G.    Granting such other and further relief as the Court may deem just and proper.

**MORRIS JAMES LLP**

By: */s/ Brett D. Fallon*

**OF COUNSEL**:

Warren E. Gluck, Esquire
Barbra R. Parlin, Esquire
Richard A. Bixter, Jr., Esquire
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200

Brett D. Fallon, Esquire (#2480)
R. Eric Hacker, Esquire (#6122)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
*Attorneys for Plaintiffs*

Dated: June 7, 2019