# EXHIBIT F

Click to Print    Printed on: 7/17/2019 13:26:16 GMT-0400 (Eastern Daylight Time)

## Case History Search

Search Created:
7/17/2019 13:26:16 GMT-0400 (Eastern
Daylight Time)

---

| | | | |
|---|---|---|---|
| **Court:** | DE Court of Chancery Civil Action | **Judge:** Laster, J Travis | **File & ServeXpress Live Date:** 6/7/2019 |
| **Division:** | N/A | **Case Number:** 2019-0431-JTL | **Document(s) Filed:** 67 |
| **Case Type:** | Breach of Fiduciary Duties | **Case Name:** Principal Growth Strategies, LLC v. AGH Parent, LLC | **Date Range:** All |

1-22 of 22 transactions    <<Prev  Page 1 of 1  Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 63552915 | 7/16/2019 5:13 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | April M Kirby, Abrams & Bayliss LLP | 23 | Notice | Notice of Filing of Notice of Removal to Federal Court, with Certificate of Service • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Notice of Filing of Notice of Removal to Federal Court | Accepted | 5.4MB |
| 63529804 | 7/16/2019 11:05 AM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 22 | Affidavit | Affidavit of Proof of Service Pursuant to 10 Del. C. Sec. 3104 on Defendants 40-86 Advisors, Inc., Washington National Insurance Company, CNO Financial Group, Inc., David Bodner, Bankers Conseco Life Insurance Company, and Mark Nordlicht • Linked to (2) | Accepted | 0.1MB |
| | | | | | | Summons | Summons to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, served on Defendant Bankers Conseco | Accepted | 0.1MB |
| | | | | | | Summons | Summonses to Affidavit of Service Pursuant to 10 Del. C. Sec. | Accepted | 0.1MB |

| | | | | |
|---|---|---|---|---|
| | | 3104, served on Defendants Mark Nordlicht and David Bodner | | |
| | Summons | Summonses to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, served on Defendants Washington National Insurance Company, CNO Financial Group, Inc. and 40-86 Advisors, Inc. | Accepted | 0.1MB |
| | Exhibits | Exhibit A to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant 40-86 Advisors, Inc. | Accepted | 2.0MB |
| | Exhibits | Exhibit B to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant Washington National Insurance Company | Accepted | 1.8MB |
| | Exhibits | Exhibit C to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant CNO Financial Group, Inc. | Accepted | 2.1MB |
| | Exhibits | Exhibit D to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant David Bodner | Accepted | 1.9MB |
| | Exhibits | Exhibit E to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant Bankers Conseco | Accepted | 1.9MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Life Insurance Company | | |
| | | | | | | Exhibits | Exhibit F to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, Proof of Service on Defendant Mark Nordlicht | Accepted | 2.0MB |
| | | | | | | Exhibits | Exhibit G to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104, United States Post Office Proof of Mailing | Accepted | 0.4MB |
| | | | | | | Certificate of Service | Certificate of Service of: 1) Affidavit of Service Pursuant to 10 Del. C. Sec. 3104 ; 2) Summonses to Affidavit of Service Pursuant to 10 Del. C. Sec. 3104; 3) Exhibits A-G; and 4) this Certificate of Service | Accepted | 0.1MB |
| 63548240 | 7/15/2019 4:51 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Paul D Brown, Chipman Brown Cicero & Cole LLP | 21 | Answer | Defendant AGH Parent LLC's Answer to Plaintiffs' Verified Complaint with Certificate of Service <br> • Linked to (1) | Accepted | 0.9MB |
| 63546022 | 7/15/2019 12:13 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Register in Chancery, DE Court of Chancery Civil Action | 20 | Issuance of Summons | Issued (1) alias summons 7.15.19 to special process server (1 copy) <br> • Linked to (1) | Accepted | 0.2MB |
| 63531848 | 7/10/2019 3:43 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 19 | Summons Instructions | Letter to The Register in Chancery requesting an Alias Summons on Defendant Washington National LTC 2, as successor in interest to BRe WNIC 2013 LTC Primary <br> • Linked to (3) <br> • Linked from (1) | Accepted | 0.1MB |
| 63531356 | 7/10/2019 | File And | 2019-0431-JTL | R Eric Hacker, | 18 | Affidavit | Affidavit of | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2:42 PM EDT | Serve | Principal Growth Strategies, LLC v. AGH Parent, LLC | Morris James LLP | | | Service Upon Defendant David Levy<br>• Linked to (2) | | |
| | | | | | | Exhibits | Exhibits A and B to Affidavit of Service Upon Defendant David Levy | Accepted | 6.9MB |
| | | | | | | Certificate of Service | Certificate of Service to: 1) Affidavit of Service Upon Defendant David Levy; 2) Exhibits A and B to Affidavit of Service; and 3) this Certificate of Service | Accepted | 0.1MB |
| 63531119 | 7/10/2019 2:31 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 17 | Affidavit | Affidavit of Service Upon Defendant Murray Huberfeld<br>• Linked to (2) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibits A and B to Affidavit of Service Upon Defendant Murray Huberfeld | Accepted | 6.5MB |
| | | | | | | Certificate of Service | Certificate of Service to: 1) Affidavit of Service Upon Defendant Murray Huberfeld; 2) Exhibits A and B to Affidavit; and 3) this Certificate of Service | Accepted | 0.1MB |
| 63530183 | 7/10/2019 11:50 AM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 16 | Affidavit | Affidavit of Proof of Non-Receipt on Defendant Washington National LTC 2, as successor in interest to BRe WNIC 2018 LTC Primary<br>• Linked to (2)<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Affidavit of Proof of Non-Receipt on Defendant Washington National LTC 2 | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to: 1) | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Affidavit of Proof of Non-Receipt on Defendant Washington National LTC 2; 2) Exhibit A; and 3) this Certificate of Service | | |
| 63521165 | 7/9/2019 9:49 AM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | J Travis Laster, DE Court of Chancery Civil Action | 15 | Order | Granted (The Parties' Stipulation and [Proposed] Order Extending Deadline to Respond to the Complaint) • Linked to (1) | Accepted | 0.3MB |
| 63503526 | 7/8/2019 2:49 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | A Thompson Bayliss, Abrams & Bayliss LLP | 14 | Stipulation & (Proposed) Order | The Parties' Stipulation and [Proposed] Order Extending Deadline to Respond to the Complaint • Linked to (1) • Linked from (1) | Accepted | 0.1MB |
| 63511114 | 7/5/2019 2:45 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Register in Chancery, DE Court of Chancery Civil Action | 13 | Issuance of Summons | Issued Alias 3104 Summons to law firm (1 copy) | Accepted | 0.2MB |
| 63493716 | 6/28/2019 3:56 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 12 | Letter | Letter to the Register in Chancery from R. Eric Hacker, Esquire requesting a Replacement Summons for Service on Defendant Kevin Cassidy • Linked to (3) | Accepted | 1.2MB |
| 63490093 | 6/27/2019 5:33 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 11 | Letter | Letter to the Register in Chancery from R. Eric Hacker, Esquire requesting cancellation of summons to defendant Kevin Cassidy at specified address • Linked to (1) • Linked from (1) | Accepted | 1.1MB |
| 63485619 | 6/26/2019 3:57 PM | File Only | 2019-0431-JTL Principal | Brett D Fallon, Morris James | 10 | Summons | Summons and Return of Service | Accepted | 0.2MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | EDT | | Growth Strategies, LLC v. AGH Parent, LLC | LLP | | | on Defendants Fuzion Analytics, Inc., served on June 26, 2019 | | |
| 63483344 | 6/26/2019 11:04 AM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Brett D Fallon, Morris James LLP | 9 | Summons Instructions | Letter to the Register in Chancery from Brett R. Fallon, Esquire regarding a Replacement Summons for Defendant Kevin Cassidy • Linked to (2) • Linked from (1) | Accepted | 0.1MB |
| 63480853 | 6/25/2019 3:44 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Register in Chancery, DE Court of Chancery Civil Action | 8 | Issuance of Summons | Issued (1) summons 6.25.19 to special process server (1 copy) • Linked to (1) | Accepted | 0.2MB |
| 63474684 | 6/24/2019 11:51 AM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Brett D Fallon, Morris James LLP | 7 | Summons Instructions | Letter to the Register in Chancery from Brett R. Fallon, Esquire regarding a Replacement Summons to Defendant Fuzion Analytics, Inc. • Linked to (2) • Linked from (1) | Accepted | 0.1MB |
| 63374271 | 6/18/2019 1:27 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Brett D Fallon, Morris James LLP | 6 | Summons | Summons and Return of Service on Defendants AGH Parent, LLC, Private Bankers Life Annuity LTC 2, Washington National LTC 2, BHLN-Agera Corp., BOLN-Agera Corp., BBLN-Agera Corp., Beechwood Re Investments, LLC, and Platinum Management (NY) LLC • Linked to (2) | Accepted | 0.4MB |
| 63368957 | 6/17/2019 12:40 PM EDT | File And Serve | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | Register in Chancery, DE Court of Chancery Civil Action | 4 | Issuance of Summons | Issued (3) 3104 summonses to law firm (11 copies); Issued (1) summons to special process server (8 copies) on 6.14.19 • Linked to (1) | Accepted | 0.7MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | • Linked from (11) | | |
| | | | | | 5 | Issuance of Summons | Issued (1) 3104 summons 6.17.19 to law firm (1 copy)<br>• Linked to (1) | Accepted | 0.2MB |
| 63354553 | 6/12/2019 12:37 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 3 | Summons Instructions | Letter to the Register in Chancery from R. Eric Hacker, Esquire, Regarding Summons' Instructions for Service on Defendants' in Complaint filed on Friday, June 7, 2019<br>• Linked to (1)<br>• Linked from (5) | Accepted | 2.7MB |
| 63341013 | 6/7/2019 5:20 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 2 | Supplemental Information Sheet | Revised Supplemental Information Sheet<br>• Linked to (2) | Accepted | 0.2MB |
| 63335909 | 6/7/2019 3:20 PM EDT | File Only | 2019-0431-JTL Principal Growth Strategies, LLC v. AGH Parent, LLC | R Eric Hacker, Morris James LLP | 1 | Complaint with 3 or More Defendants | Verified Complaint for breach of fiduciary duties<br>• Linked from (14) | Accepted | 0.6MB |
| | | | | | | Exhibits | Exhibit 1 | Accepted | 8.0MB |
| | | | | | | Exhibits | Exhibit 2 | Accepted | 2.1MB |
| | | | | | | Exhibits | Exhibit 3 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 4 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 5 | Accepted | 1.7MB |
| | | | | | | Exhibits | Exhibit 6 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 7 | Accepted | 0.9MB |
| | | | | | | Exhibits | Exhibit 8 | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit 9 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 10 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 11 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 12 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 13 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 14 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 15 | Accepted | 0.5MB |
| | | | | | | Exhibits | Exhibit 16 | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 17 | Accepted | 0.4MB |

| | | | | Exhibits | Exhibit 18 | Accepted | 0.5MB |
| | | | | Exhibits | Exhibit 19 | Accepted | 1.4MB |
| | | | | Exhibits | Exhibit 20 | Accepted | 1.0MB |
| | | | | Exhibits | Exhibit 21 | Accepted | 0.1MB |
| | | | | Exhibits | Exhibit 22 | Accepted | 0.1MB |
| | | | | Verification to Complaint | Verification of Plaintiff Principal Growth Strategies, LLC | Accepted | 0.3MB |
| | | | | Verification to Complaint | Verification of Plaintiff Platinum Partners Value Arbitrage Fund L.P. | Accepted | 0.3MB |
| | | | | Verification to Complaint | Verification of Plaintiff Martin Trott & Christopher Smith, Joint Official Liquidators | Accepted | 0.3MB |
| | | | | Supplemental Information Sheet | Supplemental Information Sheet • Linked from (1) | Accepted | 2.1MB |

1-22 of 22 transactions    <<Prev   Page 1 of 1   Next>>

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation), | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.

KEVIN CASSIDY; STARFISH CAPITAL,  )
INC., a New York corporation; and JOHN  )
DOES 1-100,  )
 )
    Defendants.  )
  v.  )
 )
PLATINUM MANAGEMENT (NY) LLC,  )
a Delaware limited liability company;  )
MARK NORDLICHT, DAVID LEVY,  )
MURRAY HUBERFELD, and DAVID  )
BODNER,  )
 )
    Nominal Defendants.  )
 )
 )

## VERIFIED COMPLAINT

NOW COME plaintiffs Principal Growth Strategies, LLC, Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and Martin Trott & Christopher Smith, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) (collectively "**Plaintiffs**"), by and through their undersigned counsel, and hereby complain and allege as follows:

## PRELIMINARY STATEMENT

1.  This complaint tells the story of how the Agera Note (defined below) was stripped away from Principal Growth Strategies LLC ("**PGS**") via a series of transactions orchestrated by insiders for their own benefit and the benefit of certain select clients and friends.

2

2.      At all relevant times, the Agera Note was convertible into 95% of the equity of the holding company that owns Agera Energy (defined below) – a company that in 2016 was valued at about $250-300 million – and the holder of that note effectively controls the company.

3.      As a result of the Agera Transactions (defined below), the Platinum Funds (defined below) were stripped of their single largest remaining valuable asset for the benefit of the Platinum-Beechwood Alter Egos (defined below) and preferred investor clients the CNO Defendants and SHIP Defendants.  At the same time, Defendants used the Agera Transactions to enable Beechwood (defined below), the CNO Defendants (defined below) and the SHIP Defendants (defined below) to exchange nearly worthless interests in the Platinum Funds and certain related investments for valuable investments in AGH Parent, LLC.

4.      By the time the various steps of the Agera Transactions were completed, PGS was left with a pile of worthless debt and other instruments, while the Defendants here had obtained the crown jewel of the Platinum Funds' portfolios.

5.      Defendants AGH Parent, LLC and the Beechwood Agera Entities (defined below), which were created to effect the Agera Transactions at issue here, are alter egos of the Platinum-Beechwood enterprise that was owned, managed and/or controlled at all relevant times by the following nominal defendants:[1]

---

[1] Nominal Defendants Platinum Management (NY) LLC, Mark Nordlicht, David

Platinum Management (NY) LLC, PPVA's general partner, and Mark Nordlicht, Murray Huberfeld, David Bodner and David Levy, the founders/owners/mangers of Platinum Management and of Beechwood. Defendants AGH Parent and the Beechwood Agera Entities thus are alter egos of these nominal defendants, and are liable to the same extent as the foregoing persons and entities in connection with the tortious acts described herein.

## PARTIES

6.      Plaintiff Principal Growth Strategies, LLC ("**PGS**") is a Delaware limited liability company formed on December 4, 2013 for the initial purpose of holding the Platinum Funds' interest in the Agera Note.

7.      Prior to June 8, 2016 and since the consummation of the various parts of the first step of the Agera Transactions in June 2016, PPVA (defined below) has held 55% of the membership interests in PGS, and PPCO (defined below) has held 45% of the PGS membership interests.

8.      PGS also holds certain Class C preferred membership units in AGH Parent as a result of the Agera Transactions.

---

Bodner, Murray Huberfeld and David Levy are listed herein as nominal defendants solely for purposes of alleging PPVA's Count VII claim for alter ego liability against defendants AGH Parent and the Beechwood Agera Entities. PPVA is separately pursuing claims for liability against the nominal defendants and does not seek to recover from them here. Rather, their liability is being adjudicated in the United States District Court for the Southern District of New York.

9.      PGS had no employees of its own.  Mark Nordlicht signed the PGS LLC Operating Agreement as its "managing member."  Nordlicht, together with other persons employed by Platinum Management, oversaw and managed PGS.

10.     Plaintiffs Martin Trott and Christopher Smith are the duly appointed Joint Official Liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation).

11.     Plaintiff Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**") is an exempted limited partnership that was marketed as a multi-strategy investment fund and registered under the Exempted Limited Partnership Law, 2014, of the Cayman Islands.

12.     Defendant AGH Parent LLC ("**AGH Parent**") is and, at all material times was a limited liability company organized under the laws of the State of Delaware.  AGH Parent was organized by Beechwood and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer (defined below) in or about May 2016 for the purpose of acquiring the Agera Note.

13.     BAM Management Services, LLC ("**BAM Management Services**"), a Delaware limited liability company organized and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer, was the manager of AGH Parent at all times from the organization of AGH Parent until about

July 27, 2017, when it was replaced as manager by AGX Holdings LLC ("**AGX Holdings**").

14.     Defendant Senior Health Insurance Company of Pennsylvania ("**SHIP**") is and, at all material times was an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

15.     As a result of the transactions described herein, SHIP is a member of AGH Parent and a lender to AGH Parent.

16.     Defendant Fuzion Analytics, Inc. ("**Fuzion**" and together with SHIP, the "**SHIP Defendants**") is and, at all material times was, a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

17.     SHIP assigned certain near-worthless debt previously owned by it to AGH Parent in exchange for certain notes issued by AGH Parent.  AGH Parent in turn transferred the debt that SHIP assigned to it to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June 2016.

18.     Defendant Bankers Conseco Life Insurance Company ("**BCLIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in New York with its  principal place of business in Carmel, Indiana.

6

19.     Defendant Washington National Insurance Company ("**WNIC**") is and, at all material times was an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

20.     Defendant CNO Financial Group, Inc. ("**CNO**") is and, at all material times hereinafter mentioned, was a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

21.     BCLIC and WNIC are direct or indirect subsidiaries of CNO.

22.     Defendant 40/86 Advisors, Inc. ("**40/86 Advisors**" and collectively with CNO, BCLIC and WNIC, the "**CNO Defendants**") is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in Carmel, Indiana.

23.     Defendants (i) Private Bankers Life Annuity LTC 2, as successor in interest to BBIL ULICO 2014 Trust ("**BBIL ULICO**"); and (ii) Washington National LTC 2, as successor in interest to BRe WNIC 2013 LTC Primary ("**BRe WNIC 2013 LTC Primary**" and collectively with BBIL ULICO, the "**CNO Reinsurance Trusts**") are reinsurance trusts formed under Delaware law.

24.     At all relevant times, the CNO Reinsurance Trusts were managed by BAM Administrative, LLC and/or Illumin Capital L.P., both Delaware limited liability companies.

7

25. The CNO Reinsurance Trusts were used to hold funds turned over to the Beechwood Reinsurance Companies (defined below) by BCLIC and WNIC in connection with certain reinsurance agreements entered into between the Beechwood Reinsurance Companies and on the one hand and BCLIC or WNIC, as well as certain investments made by BAM (defined below) on behalf of BCLIC or WNIC in connection with such agreements.

26. The CNO Reinsurance Trusts also held the CNO Defendants' membership interests in AGH Parent and the debt owed to them by AGH Parent in connection with the Agera Transactions described herein.

27. The CNO Reinsurance Trusts assigned certain near-worthless debt and other instruments previously owned by them to AGH Parent in exchange for certain notes and preferred membership units in AGH Parent. AGH Parent in turn transferred the debt and other instruments that were assigned to it by the CNO Reinsurance Trusts to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June 2016.

28. The CNO Reinsurance Trusts and SHIP also assigned AGH Parent near-worthless debt and other instruments that AGH Parent subsequently assigned to PGS as "PGS Value" when AGH Parent purported to redeem $35.4 million worth of PGS' Class C preferred membership units in AGH Parent in January 2017.

29.     Defendants BHLN-Agera Corp., BOLN-Agera Corp. and BBLN-Agera Corp. each are Delaware corporations (collectively the "**Beechwood Agera Corporations**") that were incorporated between May 11 and June 2, 2016, for the specific purpose of holding Beechwood's preferred B-1 membership units in AGH Parent.  The directors of the Beechwood Agera Corporations included Feuer and Narain.

30.     The shares in Beechwood Agera Corporations are owned, directly or indirectly, by the Beechwood Reinsurance Companies (defined and discussed below), and thus ultimately by Nordlicht, Bodner, Huberfeld, Levy, Feuer and Taylor.

31.     The Beechwood Agera Corporations also assigned worthless debt and other instruments to AGH Parent in exchange for membership interests in AGH Parent.  These worthless debt and other instruments were in turn assigned to PGS as part of the consideration paid in connection with the first step of the Agera Transaction in June 2016.

32.     Defendant Beechwood Re Investments LLC ("**Beechwood Investments**") is a limited liability company formed under Delaware law. Beechwood Investments was used as a vehicle by Mark Nordlicht, David Bodner, Murray Huberfeld and David Levy to purchase all the preferred shares in the Beechwood Reinsurance Companies (defined below).

9

33.     The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various trusts of which they or their family members were the beneficiaries.

34.     Beechwood Investments was granted all of the common equity units in AGH Parent pursuant to a subscription agreement entered into on June 9, 2016 in connection with the first step of the Agera Transactions.

35.     For purposes of this complaint, Beechwood Investments and the Beechwood Agera Corporations are referred to collectively as the "**Beechwood Agera Entities.**"

36.     At all relevant times, the Beechwood Agera Entities were controlled by Beechwood's majority owners, Mark Nordlicht, David Bodner, Murray Huberfeld and David Levy, and their co-conspirators, Scott Taylor and Moshe M. Feuer.

37.     Nordlicht, Levy, Huberfeld, and Bodner used the Beechwood Agera Entities as a way of maintaining ownership and control of Agera even after the "sale" of the Agera Note from PGS to AGH Parent.

38.     Beechwood and its ultimate owners, Nordlicht, Bodner, Huberfeld and Levy, acted by and through AGH Parent and the Beechwood Agera Entities in

connection with the matters at issue in this complaint such that AGH Parent and the Beechwood Agera Entities are their alter egos.

39.    Defendant Kevin Cassidy ("**Cassidy**") is a resident of Briarcliff Manor, New York.

40.    In 2007, Optionable Inc., a fund co-founded by Cassidy and affiliated with Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives.  Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months.

41.    When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the *managing director* of Agera Energy.

42.    Defendant Starfish Capital, Inc. ("**Starfish**"), is an entity created and controlled by Cassidy.  Starfish had no employees and no separate operations or business purpose.  It was a sham entity used by the Defendants and Cassidy to serve as a party to the Agera Transactions for the improper purpose of paying Cassidy millions of dollars out of the consideration payable to PGS.

43.    Defendants John Does 1-100 are entities and/ or individuals whose identities are not known at this time who were, or may have been, involved in, or otherwise liable for, the unlawful or otherwise tortious activities described herein, including, but not limited to, any  subsequent transferees in connection with the Agera Transactions.

44.     Nominal Defendant Platinum Management (NY) LLC ("**Platinum Management**") is a Delaware limited liability company with its principal place of business in New York, New York.  Platinum Management is the general partner of PPVA and also was its investment manager.

45.     Nordlicht, Bodner, Huberfeld and Levy controlled and operated Platinum Management.

46.     Nominal Defendant Mark Nordlicht ("**Nordlicht**") is a resident of New Rochelle, New York.  Together with Huberfeld and Bodner, Nordlicht founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Huberfeld, Bodner and Levy.

47.     At all relevant times, Nordlicht was the managing member of Platinum Management and the co-chief investment officer and co-chief risk officer of PPVA.

48.     As a founder and a direct or indirect member of both Platinum Management and Beechwood, Nordlicht personally benefitted from the Agera Transactions.

49.     Nominal Defendant David Levy ("**Levy**") is a resident of New York, New York and is Murray Huberfeld's nephew.  Before 2014, Levy worked at Platinum Management as a portfolio manager and in other executive capacities.

From and after late 2014/early 2015, Levy served as co-chief investment officer of Platinum Management alongside Nordlicht.

50.     Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief investment officer of B Asset Manager LP, the Beechwood asset management entity, until the end of 2014.  Beechwood marketed Levy to the CNO Defendants and SHIP Defendants as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as a key to Beechwood's future success.  In late 2014/early 2015, Levy "left" his position at Beechwood, but continued to be involved with Beechwood and its investments.  Levy also remained an owner of Beechwood after his return to Platinum Management.

51.     As a direct or indirect member of both Platinum Management and Beechwood, Levy personally benefitted from the Agera Transactions.

52.     Nominal Defendant Murray Huberfeld ("**Huberfeld**") is a resident of Lawrence, New York.  Together with Nordlicht and Bodner, Huberfeld founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Bodner and Levy.

53.     As a direct or indirect member of both Platinum Management and Beechwood, Huberfeld personally benefitted from the Agera Transactions.

54.     Until his indictment on June 8, 2016, the day before the closing of the first step of the Agera Transactions, Huberfeld continued to make management decisions that directly impacted PGS, PPVA, PPCO and Beechwood.

55.     On or about May 25, 2018, Huberfeld pled guilty to federal charges of conspiracy to commit wire fraud, in connection with a bribe Huberfeld offered to Norman Seabrook, the former President of the Correction Officer's Benevolent Association of New York ("**COBA**"), in exchange for COBA's investment of $20 million with PPVA and other Platinum-affiliated funds.

56.     Huberfeld was instrumental in the creation, operation and management of Beechwood and helped solicit investment funds for use by Beechwood. At all relevant times, Huberfeld was a direct or indirect owner of Beechwood.

57.     Nominal Defendant David Bodner ("**Bodner**") is a resident of Monsey, New York.  Together with Nordlicht and Huberfeld, Bodner founded the Platinum affiliated group of funds that includes, *inter alia*, PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Huberfeld and Levy.

58.     As a direct or indirect member of both Platinum Management and Beechwood, Bodner personally benefitted from the Agera Transactions.

## **NON-PARTIES RELEVANT TO PLAINTIFFS' CLAIMS**

59.     Platinum Partners Credit Opportunities Master Fund L.P. ("**PPCO**"). PPCO is a limited partnership organized under Delaware law that was marketed as

a multi-strategy investment fund.  PPVA and PPCO are referred to herein as the "**Platinum Funds**."

60.    Beechwood, a business comprised of reinsurance companies, investment management entities, investment trusts and related entities, the individual members of which will be described in more detail below (collectively, "**Beechwood**"), was founded, owned and managed by the very persons who founded, owned and managed Platinum Management, PPVA, PPCO and PGS – and originally was operated out of Platinum Management's offices.

61.    Beechwood was utilized as part of a scheme to permit Platinum Management and its owners, Nordlicht, Huberfeld, Bodner and Levy, to inflate the valuation of investments held by PPVA and PPCO for purposes of siphoning unearned fees from the those funds, and then subsequently use Beechwood to strip out PPVA's remaining valuable assets, including the Agera Note, for their own benefit and the benefit of Beechwood and certain select clients.

62.    Moshe M. Feuer ("**Feuer**") is a resident of Lawrence, New York. Feuer, Levy and Taylor were the original public face of Beechwood and, together with Nordlicht, Levy, Bodner and Huberfeld, founded Beechwood.  Feuer remained with Beechwood at all relevant times.

63.    At all relevant times, Feuer (through trusts) owned common stock in various Beechwood entities and had managerial authority over Beechwood.

64.    Scott Taylor ("**Taylor**") is a resident of New York, New York.  Taylor, Feuer and Levy founded Beechwood together with Nordlicht, Bodner and Huberfeld.  Taylor, Feuer and Levy were the original public face of Beechwood, and Taylor remained with Beechwood at all relevant times.

65.    At all relevant times, Taylor (through trusts) owned common stock in Beechwood and had managerial authority over Beechwood.

66.    Prior to forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.

67.    Taylor, together with Levy, helped prepare the marketing documents by which the SHIP Defendants and CNO Defendants initially invested funds with Beechwood.

68.    Dhruv Narain ("**Narain**") was chief investment officer of Beechwood at the time of the Agera Transactions.

## JURISDICTION AND VENUE

69.    This Court has jurisdiction over this case and venue is appropriate pursuant to 6 Del. C. § 18-111, 6 Del. C. § 2708, and 10 Del. C. § 341.

70.    This court has personal jurisdiction over each of the Defendants because they: (i) are domiciled in the State of Delaware; (ii) are authorized to do business in the State of Delaware; (iii) have transacted business in the State of

16

Delaware with respect to certain of the agreements and other matters at issue in this case and/or have consented to the jurisdiction of the state of Delaware in connection with such agreements; or (iv) are members or former members of AGH Parent, a Delaware limited liability company or of PGS, which also is a Delaware limited liability company.

71.    Section 14.11 of the AGH Parent Amended Operating Agreement (defined below) states:

> **Section 14.11 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

72.    Section 14.12 of the AGH Parent Amended Operating Agreement states, in part:

> **Section 14.12 Submission to Jurisdiction.** The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably

waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form.

73.     As a result of the Agera Transactions, PGS is a member of AGH Parent.

74.     At all relevant times, PPVA has been a member of PGS.

**NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW**

75.     Pursuant to Court of Chancery Rule 44.1, Plaintiffs hereby gives notice of their intent to raise issues of foreign law. Specifically, Plaintiffs contend that the substantive law of the Cayman Islands, as cited herein, governs some or all of the parties' disputes.

**FACTUAL BACKGROUND**

A. **PGS**

76.     PGS was set up by Platinum Management in December 2013 for the purpose of holding the Agera Note.

77.     At all relevant times before June 8, 2016, PPVA held 55% of the membership interests in PGS, and PPCO held 45% of the PGS membership interests. A true and correct copy of the December 4, 2013 Operating Agreement for PGS ("**PGS Operating Agreement**") is attached hereto as **Exhibit 1**.[2]

_____

[2] Although PGS actually was formed on December 4, 2013, its LLC Agreement is incorrectly dated December 4, 2014.

18

78.     Mark Nordlicht signed the PGS Operating Agreement as "managing member" of PGS.

79.     PGS does not have any employees.  All management and operations of PGS were handled by Platinum Management employees and the executives and other persons that managed PPVA and PPCO.

80.     Corporate formalities were not observed with respect to PGS.  For example, annual meetings that were required by the PGS Operating Agreement did not occur.  In particular, the Agera Note also was not treated as if it were a separately held asset of PGS.

81.     The Agera Note was used as collateral to secure purported debts owed by PPVA, PPCO and/or portfolio companies from time to time before June 2016 without regard to the impact of such pledges upon PGS and without paying PGS any consideration for providing such pledges.

82.     PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of its share of such value, and it had not been converted.  Similarly, PPCO's financial statements and valuation statements described and calculated PPCO's interests in Agera Energy on an "as converted" basis, as though PPCO was the direct holder of its share of such value.

83.    PGS was not separately capitalized so as to carry on its business. PPVA provided the initial funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

84.    At all relevant times, the assets of PGS were commingled with the assets of PPVA and PPCO.

85.    PGS was used as a tool in the furtherance of a fraud, namely, the Agera Transactions which culminated in the Second Scheme (described below), whereby PGS's asset valued at $250-$300 million was transferred for an amount substantially below that.

### B. The Platinum Funds

86.    PPCO and PPVA are hedge funds founded between 2003 and 2005. Each of these funds was structured to include a master fund, several feeder funds and a management entity.

### i.  PPVA

87.    PPVA was marketed as a multi-strategy, liquid fund utilizing investment strategies such as long/short fundamental equity trading, asset-based financing in energy, mining, and other industries, energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

88.     PPVA was a Cayman Islands exempted limited partnership that, up until the commencement of the Cayman Liquidation (defined below) was managed by Platinum Management.

89.     On June 8, 2016, the day before the closing of the Agera Transactions, the United States Attorney's Office for the Southern District of New York filed criminal charges against Huberfeld in connection with a bribery scheme by which Huberfeld used PPVA funds to pay kickbacks to a New York City Correction Officer's Union official (the "**Huberfeld Arrest**").

90.     On June 14, 2016, Nordlicht announced on an investor call that Platinum Management had decided that PPVA would stop taking in new investors and all PPVA investments would be unwound and liquidated.

91.     Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral, and sought the immediate unwinding of their relationships with PPVA.

92.     On or about June 22, 2016, the Federal Bureau of Investigation executed a search warrant at Platinum Management's offices in connection with a broad, multi-agency federal investigation of their business practices.

93.     On July 8, 2016, when PPVA was facing margin calls by its securities transaction counterparties, PPVA had less than $100 cash on hand.

21

94.    On August 23, 2016, Platinum Management, as general partner of PPVA, filed a voluntary petition seeking the liquidation of PPVA and the appointment of Christopher Kennedy and Matthew Wright as joint provisional liquidators (the "**Cayman Petition**") in the Grand Court of the Cayman Islands (the "**Grand Court**").

95.    On August 25, 2016, the Grand Court entered an order (the "**August 25, 2016 Order**") directing the provisional liquidation of PPVA and appointing joint provisional liquidators (the "**Cayman Liquidation**").  A true and correct copy of the August 25, 2016 Order is attached hereto as **Exhibit 2**.

96.    On October 18, 2016, the predecessors of the JOLs filed petitions and accompanying Declarations seeking recognition of the Cayman Liquidation of PPVA and one of PPVA's feeder funds as foreign main proceedings and of the JOLs as foreign representatives and certain other relief under chapter 15 of the Bankruptcy in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Case No. 16-12925 (the "**Chapter 15 Court**").

97.    On October 27, 2016, the Grand Court entered an order directing that PPVA's Cayman Liquidation be converted to an official liquidation and appointing Messrs. Wright and Kennedy as Interim Joint Official Liquidators until a final hearing in December 2016 (the "**October 27, 2016 Order**").  A true and correct copy of the October 27, 2016 Order is attached hereto as **Exhibit 3**.

98.     On November 23, 2016, the Chapter 15 Court entered an order recognizing the Cayman Liquidation and the joint provisional liquidators as a foreign main proceeding, and as foreign representatives, respectively, pursuant to 11 U.S.C. 1501 *et seq.* (the "**Chapter 15 Recognition Order**"), permitting the foreign representatives to bring claims against third parties on behalf of the PPVA estate within the United States.  A true and correct copy of the Chapter 15 Recognition Order is attached hereto as **Exhibit 4**.

99.     On December 16, 2016, the Grand Court entered an order appointing the joint official liquidators of PPVA (the "**December 16, 2016 Order**").  Martin Trott and Christopher Smith are the current JOLs of PPVA pursuant to September 29, 2017 and July 6, 2018 Orders of the Grand Court.  True and correct copies of the Orders entered by the Cayman Court in connection with the Cayman Liquidation (the "**Cayman Orders**") are attached hereto as **Exhibit 5**.

100.    Pursuant to the Cayman Orders, the JOLs have authority to act in connection with PPVA's assets.

### ii.  PPCO

101.    The PPCO family of funds, (collectively, the "**PPCO Funds**") were marketed as a single-strategy group of funds whose business was to originate short and medium term, high yield, debt secured by collateral, and/or equity investments.

102.   The PPCO Funds originated loans and made equity investments in various industries, including consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

103.   Platinum Credit Management, L.P., a Delaware limited partnership ("**Platinum Credit**"), served as investment manager for PPCO.

104.   Platinum Management, Platinum Credit and the Platinum executives, including Nordlicht, Huberfeld, Bodner and Levy, operated PPVA and PPCO out of various locations in New York, New York.  From 2012 until the commencement of the Criminal Action (defined below), they operated out of an office located at 250 West 55th Street, 14th Floor, New York, NY 10019.

### iii. Commencement of the SEC Receivership and the Criminal Action

105.   On December 19, 2016, an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York, commencing a criminal action against, among others, Platinum Management, Platinum Credit, Mark Nordlicht, David Levy and certain other Platinum executives (the "**Criminal Action**").

106.   The defendants in the Criminal Action were charged with securities fraud, investment adviser fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors through, among

other wrongdoing, the overvaluation of their largest assets, the concealment of severe cash flow problems at PPVA, and the preferential payment of redemptions.

107.   Also on December 19, 2016, the Securities and Exchange Commission (the "**SEC**") commenced a civil action in the United States District Court for the Eastern District of New York (the "**Receivership Court**") against the defendants named in the Criminal Action asserting certain securities laws violations.   *See Securities and Exchange Commission v. PMNY  (NY) LLC, et al.*, Case No. 16-06848 (the "**Receivership Action**").

108.   In connection with filing the Receivership Action, the SEC sought and obtained  the appointment of Bart M. Schwartz as receiver over certain entities including PPCO and Platinum Credit Management, L.P.

109.   Effective as of July 6, 2017, the Receivership Court accepted Mr. Schwartz's resignation and appointed Melanie L. Cyganowski as Receiver.

110.   Pursuant to the October 16, 2017 *Second Amended Order Appointing Receiver* (the "**Receivership Order**"), the Receivership Court empowered the Receiver to, among other things, recover, liquidate, marshal, and preserve all assets of the Receivership Entities and to, *inter alia*: (i) "bring such legal actions based on law or equity in any state, federal, or foreign  court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver"; and (ii) "investigate, prosecute, defend, intervene in or otherwise participate in,

25

compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind  as may in the Receiver's discretion, be advisable or proper to recover and/or conserve  Receivership Property."   A true and correct copy of the Receivership Order is attached hereto as **Exhibit 6**.

111.   Under the terms of the Receivership Order, the Receiver also has authority to act in connection with assets of PPCO.

## C. The Financial Condition of PPVA and PPCO

### i.  PPVA

112.   PPVA, at one time, held valuable assets.

113.   However, from at least 2012 until the commencement of PPVA's Cayman Liquidation, Platinum Management failed to abide by the balanced investment strategies set forth in PPVA's governing documents, which were designed to maintain PPVA's liquidity and financial condition.

114.   Instead, Platinum Management, its executives and owners, including Nordlicht, Huberfeld, Bodner and Levy, caused PPVA's investment portfolio to be increasingly more concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

115.   By the end of 2012, Platinum Management and its executives and owners caused PPVA's investments to become concentrated such that nearly 40% of its reported NAV was represented by investments in just two oil and gas

operations:  Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator, and Golden Gate Oil, LLC ("**Golden Gate**"), a California-based onshore oil operation.

116.  Golden Gate was a highly speculative investment that Platinum Management realized was a failure at an early stage, as Golden Gate barely produced any oil, suffered large operating losses and never made a single interest payment on loans originated by PPVA.  Despite this, Platinum Management falsely reported a five-fold increase in the value of PPVA's Golden Gate Oil investment during fiscal year 2013.

117.  Black Elk was a Houston, Texas-based publicly reported company that mostly operated offshore platforms located in the Gulf of Mexico.  In November 2012, an explosion occurred on Black Elk's West Delta 32 platforms, resulting in the death of Black Elk employees and prompting numerous investigations (the "**Black Elk Explosion**").  Following the Black Elk Explosion, Black Elk's financial results, liquidity and business operations deteriorated significantly.

118.  Given the impact that the Black Elk and Golden Gate Oil business losses would have had on PPVA's net asset value if reported accurately, PPVA should have been liquidated in 2013.  Platinum Management and its executives and owners refused to admit a loss or realize a write-down in value, declaring instead

that PPVA's net asset actually increased during this period, in order to enrich themselves with unearned partnership shares and/or fees.

119.   The concentration of PPVA's investments in illiquid assets meant that Platinum Management and the Platinum executives and owners had significant discretion over their valuation, since there was no ready market for such investments. The lack of a ready market also meant that many of these investments could not be quickly or easily liquidated when cash was needed to pay the Platinum executives and owners themselves and operate Platinum Management.

120.   In 2013, Nordlicht, Huberfeld, Bodner (collectively the co-founders of Platinum Management, Platinum Credit, PPVA and PPCO), together with Levy, Scott Taylor, and Moshe "Mark" Feuer, created Beechwood and, between March 2013 and late 2015, these individuals used their positions of trust, authority and control over PPVA to cause PPVA and Beechwood to engage in various fraudulent, non-commercial transactions designed to support Platinum Management's fraudulently inflated valuations of PPVA's assets.

121.   To that end, during the period from 2012 through 2015, Platinum Management reported that PPVA "experienced" annualized returns of between a maximum of 11.6% and a minimum of 7.15%, and reported that the net value of its assets under management had increased steadily from $688 million until they reached $789 million as of October 1, 2015, which in turn enabled them to award

themselves tens of millions in unearned partnership distributions, fees and other compensation based on these fraudulently inflated results.

122.   By late 2015, the liabilities resulting from the non-commercial transactions to which Platinum Management and Beechwood had caused PPVA to become a party, coupled with ongoing losses at PPVA's most significant investments, made it clear that the PPVA Funds could not continue to exist for much longer.  At that time, Platinum Management and its executives and owners, including Nordlicht, Levy, Huberfeld, Bodner and others, worked with Feuer, Taylor, Narain and others at Beechwood to encumber or strip the last valuable assets away from PPVA to benefit themselves and particularly Beechwood and its preferred investor clients.

123.   This scheme culminated with the Agera Transactions.

### ii.  **PPCO**

124.   At the end of 2013, PPCO had only $5.7 million of cash on hand. Absent a large cash infusion from investments or subscriptions, it would likely have been unable to meet both the increased redemption requests it faced in 2014 and adequately fund its portfolio  companies. This dire situation was exacerbated because the majority of PPCO's assets  were "Level 3," assets for which there was only a small active market.

125.   The table below summarizes  PPCO and its subsidiaries' Consolidated Condensed  Schedule of Investments as of December 31, 2012 and 2013:

| Year | Total Investment Asset Value | Level 1 Assets | Level 2 Assets | Level 3 Assets | % of Level 3 Assets |
|---|---|---|---|---|---|
| As of December 31, 2012 | $306.6 million | $0 | $36.3 Million | $270-3 million | 88% |
| As of December 31, 2013 | $317.3 million | $18.9 million | $56.9 Million | $241.5 million | 76% |

126.   Not only were PPCO's assets primarily made up of illiquid Level 3 assets, but many of these assets were significantly overvalued.

127.   Much like other investment vehicles created by Platinum Management and Platinum Credit, each share of the various classes issued to investors required a different "lock up" period, a time during which investors could not redeem their investments.

128.   Given the significant percentage of PPCO Funds' shares with a relatively short lock-up period held by individual investors or families/trusts, there was significant redemption pressure – that is, a constant need to provide liquidity upon demand to investors.

129.   This short lock-up period created liquidity pressures for PPCO, which certain Platinum Fund insiders, including Nordlicht, Huberfeld, Bodner and Levy,

sought to solve by creating Beechwood, which would have an ability to attract institutional investors which generally do not require short-term liquidity.

130. During 2012 and 2013, PPCO began to experience increasing redemptions. In 2012, the $55.9 million of contributions (subscriptions) barely eclipsed the $50.8 million of redemptions.

131. In 2013, the $67.7 million of redemptions exceeded the contributions (subscriptions) of $43.6 million. At the same time, PPCO's cash balance decreased from $7.2 million to $5.7 million.

132. Around the end of 2013, Nordlicht and the other Platinum executives and owners understood the funding requirements of PPCO's investments were not being met. In a November 26, 2013 email to Nordlicht, portfolio manager Zach Weiner asked:

> Mark, Can you please give us an update on when we can expect some liquidity in PPCO for this week. We've pushed off everyone for a month now, but we really do need 80k for greentown, 50k for alcor … and 200k for daybreak …. In addition, we need to pay 72K of receivership fees on RCKE prior to transferring the note to AYN. We have knocked this down as much as possible but we are kind of at the end of that game now.

### D. Creation of the Beechwood Alter Ego

133. In or about February 2013, Nordlicht, Bodner, Huberfeld and Levy, among other Platinum personnel, commenced working with Taylor and Feuer - *out of Platinum Management's office space* - to create Beechwood.

31

134.   Beechwood was established with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets.   Beechwood used those assets to engage in transactions with PPVA and PPCO to support Platinum Management's inflated valuations, in order to enrich Platinum's and Beechwood's common owners through management and other fees.[3]

135.   The ownership in and ultimate control of Beechwood was held by Nordlicht, Huberfeld, Bodner and Levy (in part through trusts), while Taylor, as President, and Feuer, as  Chief Executive Officer, maintained ostensible and nominal management authority, with Levy.

136.   Beechwood Re Ltd. ("**Beechwood Cayman**") is a reinsurance company domiciled in the Cayman Islands, that had its principal place of business in New York, New York at all relevant times.  Nearly 70% of the common stock of Beechwood Cayman was held by various trusts created by Nordlicht, Bodner, Huberfeld and Levy.

---

[3] Reinsurance is the transfer of part or all of the risks from an insurer (referred to as the cedant) of a single  policy or pool of insurance to a second insurance carrier, the reinsurer, who typically has no direct  contractual relationship with the insured. The transfer of risk involves the contractual transfer of all or an  agreed upon portion of future claims liabilities to the reinsurer (referred to as the process of ceding policies and related anticipated claims liabilities by the insurer to the reinsurer; the reinsurer in turn assumes  the  policies and related claims from the insurer) in exchange for a negotiated cash consideration.

137.   Beechwood Bermuda International Ltd. ("**Beechwood Bermuda**" and, collectively with Beechwood Cayman, the "**Beechwood Reinsurance Companies**") is a reinsurance company domiciled in Bermuda that had its principal place of business in New York, New York at all relevant times.

138.   As noted above, Nordlicht, Bodner Huberfeld and Levy owned and controlled all preferred shares of the Beechwood Reinsurance Companies via their interests in Beechwood Investments.

139.   In addition to the Beechwood Reinsurance Companies, Nordlicht, Bodner, Huberfeld and Levy, together with Feuer and Taylor, established, owned and controlled B Asset Manager LP and B Asset Manager II LP (together "**BAM**") both of which are Delaware limited partnerships, and BAM Administrative Services LLC ("**BAM Administrative**") a Delaware limited liability company.

140.   BAM and BAM Administrative were entities set up to serve as investment agents on behalf of the Beechwood Reinsurance Companies as well as the CNO Reinsurance Trusts and SHIP in connection with various investments.

141.   Beechwood's management team was largely comprised of personnel employed by  or otherwise connected to Platinum Management and Platinum Credit.  For example, the Beechwood team included,  from time to time, the following individuals who were former or current Platinum Fund employees: (i) Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer";

(iii) David Ottensoser, as "General Counsel"; and (iv) Daniel Small, as the "Senior Secured Collateralized Loans PM."

142.   The alter-ego relationship between the various Beechwood entities and Platinum Management/Nordlicht/Bodner/Huberfeld/Levy ("the **Platinum-Beechwood Alter Egos**") was readily apparent and otherwise easily discoverable by the CNO Defendants and SHIP Defendants, given the many ties between the Platinum-Beechwood Alter Egos, including:

- Beechwood marketed Levy to potential clients as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as key to Beechwood's future success. Levy, the co-Chief Investment Officer of Platinum Management together with Nordlicht, served as chief financial officer and secretary of Beechwood Re and Beechwood Bermuda. He was also BAM's Chief Investment Officer and Chief Financial Officer until the end of 2014, when he was replaced by Daniel Saks, Platinum Management's co-CIO.

- Ezra Beren, Huberfeld's son-in-law, was hired in January 2014 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management.

- Naftali Manela, then CFO of Platinum Credit Management and later COO of Platinum Management, performed services for Beechwood related to general operations while still employed by Platinum Credit Management.

- Eli Rakower, director of valuation for Platinum Management, provided consulting services to Beechwood related to interaction with valuation firms that would value assets of the Beechwood Reinsurance Trusts.

- Stewart Kim, an employee of Platinum Management, simultaneously worked for Beechwood as its Chief Risk Officer until January 2015, when he became Beechwood's full time Chief Risk Officer.

- Beechwood operated out of the Platinum Management's office space until at least the end of February 2014.

34

- Even after separate office space was procured, Levy maintained an office at Beechwood through at least the end of 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

143.   Once the CNO Defendants and SHIP Defendants could no longer deny the web of relationships between and among Platinum Management, Beechwood and their common owners, they accepted those relationships, and then directed and actively participated in a series of transactions by and among Beechwood and PPVA, PPCO and their subsidiaries, culminating with the Agera Transactions, to accomplish their goal of ridding themselves of nonperforming loans being held on their accounts at Beechwood and receiving an illicit return on their investment, in the form of looting the Platinum Funds' investment in Agera.

### E. Formation of the Beechwood, BCLIC, WNIC and SHIP Relationship

#### i. The Long-Term Care Insurance Industry

144.   BCLIC, WNIC and SHIP each are long-term care insurance carriers that hold portfolios largely comprised of an early generation of long-term care policies, no longer offered in the marketplace, because they were underwritten with faulty assumptions.  As a result, these carriers face both increasing claims payments and increasing capital requirements.

145.   By 2012, reinsurance for companies with legacy portfolios comprised of such long-term care policies was available only under extremely onerous financial terms, including the requirement that the ceding insurance company make

35

significant payments (negative ceding commissions) to the reinsurer to complete the transaction.

## ii. CNO's Spinoff of SHIP

146.   Until November 2008, CNO was the direct or indirect parent of SHIP, which was then known as Conseco Senior Health Insurance Company.

147.   As of November 2008, SHIP was in solvent run-off of a diminishing, closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into SHIP between 1997 and 2000.

148.   To reduce the strain of supporting SHIP's underwriting losses, in November 2008, CNO transferred ownership of SHIP to the Senior Healthcare Trust, which was then merged into an independent oversight trust, the Senior Healthcare Oversight Trust (k/n/a Senior Health Insurance Company of Pennsylvania).  The Trustees of Senior Healthcare Oversight Trust serve as SHIP's directors and are primarily former insurance regulators.

149.   At the time of the transfer, CNO and its subsidiaries contributed $164 million of capital to SHIP to add to SHIP's existing $125 million of adjusted statutory capital, reflecting concerns that SHIP would need additional capital to sustain itself on a standalone basis.

150.   Since being spun off, SHIP has remained a long-term care insurer in runoff.  SHIP continues to operate out of the same site in Carmel, Indiana where it

operated while under CNO's control, along with CNO's other long-term care legacy portfolios, BCLIC and WNIC.

151.   Fuzion, a wholly-owned subsidiary of Senior Healthcare Oversight Trust, was formed in 2012 to provide administrative and management services to long-term care insurance companies, including SHIP.  Fuzion is located in the same office complex as SHIP, BCLIC and WNIC.

152.   In or about December 2013, pursuant to a comprehensive master services agreement, SHIP transferred its employees and physical assets to Fuzion to provide management services to SHIP.

153.   After the SHIP spinoff in 2008, SHIP's financial condition continued to decline because, *inter alia*, SHIP's long-term care portfolio incurred significant unforeseen increases in claims totaling over $200 million in the five-year period from 2009 through 2013.

### iii. The CNO, BCLIC and WNIC Relationship

154.   After SHIP's spinoff, CNO's other legacy long-term care subsidiaries, BCLIC and WNIC, continued to flounder, dragging down CNO's overall financial performance.

155.   At CNO, a common set of holding company board members and executive management oversaw the overall financial and risk-management decisions of its individual insurance companies.

156.    Certain key functions at CNO were shared across the insurance subsidiaries, including insurance asset management, treasury, accounting and legal functions.

157.    For example, Eric Johnson ("**Johnson**"), the Chief Investment Officer and President of 40/86 Advisors, also served as an Executive Vice President of WNIC and BCLIC.  In this role, Johnson appears to have overseen the investment decisions at BCLIC and WNIC.

158.    Similarly, Mathew Zimpfer, the general counsel of CNO, was also listed as an Executive Vice President of BCLIC and WNIC in their statutory filings.

159.    CNO, as the holding company, received dividends from its subsidiaries, including BCLIC and WNIC, to fund its operations.  The debt issued by CNO was guaranteed by its subsidiaries, including BCLIC and WNIC.

160.    The value of CNO stock is derived from its ownership of its insurance subsidiaries, including BCLIC and WNIC.  Indeed, all earnings calls were, and are, directed and addressed by the executive management of CNO, who address business and financial strategy across all CNO's operating insurance companies.

161.    When assessing the value of CNO, rating agencies acknowledge the unified management of CNO.  For example, in their credit and ratings reviews for CNO as the holding company, they frequently assess transactions undertaken at the insurance company subsidiary level.

162.   CNO was highly incentivized to, and did, direct the actions of BCLIC and WNIC because its financial health was dependent on BCLIC and WNIC.

163.   Each and every action taken by BCLIC and WNIC discussed herein was done in concert with, and at the direction of, CNO.

164.   Because of the overlapping roles played by many of the employees of BCLIC, WNIC, CNO and 40|86 Advisors, such as Johnson's role as Chief Investment Officer and President of 40/86 Advisors while serving as the Executive Vice President of WNIC and BCLIC, each and every action taken by BCLIC and WNIC discussed herein was done in concert with, or at the direction of, 40/86 Advisors.

### iv. **BCLIC and WNIC's Introduction to Beechwood**

165.   By 2013, CNO had been searching for reinsurance for CNO's legacy long-term care policies housed at BCLIC and WNIC in order to reduce and mitigate the exposure associated from those companies' long-term care portfolios, but was unable to find a reinsurer that would reinsure its risk on acceptable terms.

166.   In connection therewith, two employees of Willis Re Inc., Rick Hodgdon (later a Platinum Management and Beechwood employee) and Michael Kaster (a former CNO employee who was familiar with the long-term care portfolio), introduced CNO's subsidiaries, BCLIC and WNIC, to Beechwood in or about November 2013.

167.   By agreements that were executed later but made retroactive to October 2013, BCLIC and WNIC ceded a substantial portion of their legacy, runoff long-term care business to Beechwood Cayman.   The agreements were titled: (i) *Indemnity Reinsurance Agreement by and between Washington National Insurance Company and Beechwood Re Ltd*, as amended by Amendment No. 1 to Indemnity Reinsurance Agreement; and (ii) *New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd* (together, the "**Reinsurance Agreements**").

168.   As part of the transactions: (i) WNIC ceded to Beechwood Cayman $357 million of statutory reserves to cover future losses from policies and paid $394 million in cash to Beechwood Cayman; and (ii) BCLIC ceded $196 million of statutory reserves to Beechwood Cayman to cover future losses from policies and paid $198 million in cash to Beechwood Cayman.

169.   Because Beechwood Cayman was an unauthorized offshore reinsurer (*i.e.*, domiciled outside New York and Indiana where BCLIC and WNIC were domiciled), it was required to create on-shore reinsurance trusts, and specifically established the CNO Reinsurance Trusts, to manage the assets received in the reinsurance transaction.

170.   Wilmington Trust, N.A. was appointed the trustee for each of the CNO Reinsurance Trusts and signed various agreements on their behalf, including the AGH Parent Amended Operating Agreement.

171.   B Asset Manager LP was appointed as the asset manager for the CNO Reinsurance Trusts.

172.   On or about February 1, 2014, the task of administering the long-term BCLIC and WNIC policies in the Reinsurance Agreements was delegated by BCLIC and WNIC to Fuzion pursuant to a February 1, 2014 Master Services Agreement.

173.   Fuzion's employees (as employees of SHIP) already were providing the same service to SHIP.

174.   While Beechwood Cayman assumed CNO's (through BCLIC and WNIC) risk through the reinsurance transactions, those entities remained responsible for any unsatisfied claims to the extent Beechwood Cayman failed to replenish the CNO Reinsurance Trusts.

175.   This incentivized CNO to be an active participant, not a passive investor in or with Beechwood, in order to make certain it reduced BCLIC and WNIC's exposure to any claims that might be unsatisfied because of Beechwood's inability to pay.

176.   To that end, the Reinsurance Agreements included "audit provisions" which permitted BCLIC and WNIC to initiate an audit of the investments in certain circumstances.

### v.  SHIP's Introduction to Beechwood

177.   SHIP was introduced to Beechwood in late 2013, when it was made aware of the BCLIC and WNIC reinsurance arrangements through Fuzion, which also managed SHIP.

178.   Following SHIP's introduction to Beechwood in 2013, Brian Wegner ("**Wegner**"), the President and CEO of SHIP at the time, Paul Lorentz ("**Lorentz**"), the CFO of SHIP at the time, and others met with Feuer, Taylor and Levy to discuss SHIP's financial condition.

179.   A series of meetings and communications between Fuzion, for SHIP, and Beechwood, primarily through Feuer, Taylor, and Levy, ensued in 2014, when SHIP was evaluating Beechwood as a potential investment manager.

180.   Given the distressed nature of SHIP's business, Beechwood Cayman declined to enter into agreements similar to the Reinsurance Agreements it executed with BCLIC and WNIC, but agreed to enter into investment management agreements.

181.   SHIP was highly motivated to enter into the investment management agreements because it was unable to obtain reinsurance in the marketplace.

182.   Because Fuzion was highly dependent on SHIP to pay its fees, Fuzion also was highly motivated to keep SHIP out of rehabilitation proceedings.

183.   SHIP, acting by and through Fuzion, entered into three investment management agreements (collectively, the "**SHIP IMAs**") with certain Beechwood entities, all of which contained roughly similar terms.

184.   All three IMAs contain the same basic structure:

    i.   Beechwood guaranteed SHIP a 5.85% annual investment return on the net asset value of the assets SHIP contributed.

    ii.   If SHIP's investments under the IMAs did not achieve a 5.85% return, Beechwood was obligated to pay SHIP any shortfall while also being obligated to contribute its own assets to make certain the net asset value of the account funded by SHIP was no less than that initially invested.

    iii.   Beechwood would retain investment returns above the 5.85% guaranteed investment return as a "Performance Fee."

185.   The foregoing terms were highly beneficial to the SHIP Defendants: SHIP would achieve a guaranteed return on the investment that it could not otherwise obtain in the market for the level of risk that SHIP was portrayed to be assuming in exchange.

186.   The IMAs were comprised of the following agreements:

    i.   A May 22, 2014 IMA with Beechwood Bermuda (the "**BBIL IMA**"), pursuant to which SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

    ii.   A June 13, 2014 IMA with Beechwood Cayman (the "**BRe IMA**") pursuant to which it invested $80 million with Beechwood Cayman.

43

SHIP deposited that amount into a custody account at Wilmington Trust for investment by Beechwood Cayman on SHIP's behalf.

iii. A January 15, 2015 IMA with B Asset Manager LP (the "**BAM I IMA**") pursuant to which SHIP invested $110 million with B Asset Manager LP.

187.   Over time, SHIP invested approximately $270 million with Beechwood and its affiliates pursuant to these three initial IMAs.

188.   While BAM generally was given discretion to invest SHIP's funds, Beechwood's discretion was required to be exercised in accordance with SHIP's corporate investment guidelines set forth in its "*Adviser Investment Policy, Guidelines and Restrictions*" and "*Guidelines for Senior Secured Credit Opportunities*."

## F.   Beechwood's Use of the Insurance Companies' Funds

189.   Between 2014 and 2016, CNO directed BCLIC and WNIC to transfer a total of approximately $592 million to Beechwood pursuant to the Reinsurance Agreements while SHIP transferred approximately $270 million to Beechwood pursuant to the SHIP IMAs, for a total investment of approximately $862 million.

190.   Upon receipt of the funds, Beechwood quickly engaged in a series of debt and equity transactions and co-investments with PPVA, PPCO and/or their subsidiaries, even though these investments did not comport with the guidelines required under the CNO Reinsurance Agreements and the SHIP IMAs.

191.   The Beechwood and Platinum insiders structured and implemented the various non-commercial, non-arm's length transactions by which Beechwood engaged in these transactions with PPVA and PPCO, in part using the funds held in the accounts held on behalf of the CNO Defendants and SHIP.

192.   The transactions were intended to justify the values ascribed to the assets held by PPVA by Platinum Management, in order to generate unearned fees for the Platinum-Beechwood Alter Egos.

193.   At the helm of the transactions were Nordlicht, Huberfeld, Bodner, and Levy, in their hopelessly conflicted roles as common owners and control persons of both Platinum Management and Beechwood.

194.   The CNO Defendants and SHIP Defendants' knew about the hundreds of millions of dollars of transactions between Beechwood and PPVA and PPCO using the funds in the CNO Reinsurance Trusts and the SHIP IMA accounts.  Senior management and/or the agents of the CNO Defendants and SHIP Defendants were also aware early on of the Beechwood/Platinum ties and were provided with copies of valuation statements and other documents containing information that clearly identified the counterparty to the transactions as PPVA, PPCO or their affiliates.

195.   Having offloaded a substantial portion of their future claims risk to Beechwood and confronted with a market that could not provide for those claims in the same advantageous manner anywhere else, the CNO Defendants made a

conscious and calculated decision not to lose the Beechwood white knight they had found.

196.   SHIP too made that decision, having procured a guaranteed return on investment under the SHIP IMAs that it could not otherwise obtain.

197.   However, by the end of 2015, when it was clear that Beechwood's transactions with PPVA were floundering, the Platinum-Beechwood Alter Egos, for the unjust benefit of the CNO Defendants and SHIP Defendants, directed Beechwood to consummate several transactions with PPVA, PPCO and their subsidiaries, which had but one goal:  ridding the SHIP Defendants and the CNO Defendants of bad assets by assigning them back to PPVA and PPCO and obtaining possession of or a security interest in any Platinum Fund asset of value.  This scheme culminated with the Agera Transactions, discussed below.

198.   It was not until the CNO Defendants came to learn that their investments with Beechwood were underperforming that they took action to reduce their exposure to PPVA and PPCO, making sure to acquire anything of value from PPVA and PPCO on their way out, in the form of fraudulent transfers of the Platinum Funds' assets and security interests in the Platinum Funds' remaining valuable assets.  These efforts culminated with the Agera Transactions in June 2016.

199.   In September 2016, only after the initial step of the Agera Transactions closed, PPVA commenced the Cayman Liquidation and the very public indictment

of Murray Huberfeld created a public relations liability, the CNO Defendants took action to terminate the Reinsurance Agreements with Beechwood.

200.   SHIP was fully aware that the Platinum Funds related investments Beechwood arranged for it were underperforming through 2014-2016 and that its funds were used to perpetrate a host of fraudulent schemes on PPVA and PPCO, but SHIP did not seek to terminate its relationship with Beechwood and provided financing for the Agera Transactions that are the subject of this complaint with the belief that such transactions would benefit SHIP and Beechwood to the detriment of PGS and PPVA.

201.   Thus, the SHIP Defendants doubled down, participating in the fraudulent Agera Transactions by investing an additional $50 million and transferring some of the near-worthless investments in PPVA and PPCO to AGH Parent that were then used as "consideration" for the purchase of the Agera Note and the January Redemption (defined below), thereby assisting in the knowing transfer of an asset worth at least $300 million for a substantial discount.

202.   It was not until about November 2016, long after the first stage of the Agera Transactions concluded, that SHIP directed Beechwood to transfer all cash and short-term investments out of the IMA accounts managed by Beechwood and to move those assets into SHIP's custodial accounts at Bank of New York Mellon.

203.   At the same time, SHIP also instructed Beechwood to transfer all limited partnership and other equity interests in each of the IMA accounts that were not registered solely in SHIP's name into SHIP's exclusive name and advised Beechwood that it was no longer authorized to act with respect to any asset in which SHIP possessed a direct or indirect interest, without express direction from SHIP.

### G. Beechwood and the First Scheme

204.   Shortly after Beechwood gained access to the first reinsurance trust assets, Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused PPVA, PPCO and their subsidiaries to enter into numerous non-commercial transactions with Beechwood entities and, in some cases, to co-invest with the Beechwood entities in third-party companies.

205.   The prices at which assets/loans were bought and sold were used to support Platinum Management's inflated valuations of the relevant equity, debt or investment.

206.   These were not real market transactions in which prices are established as a result of arm's-length negotiations.

207.   To the contrary, the transactions between and among Beechwood and their clients, on the one hand, and PPVA and its subsidiaries/affiliates on the other, were insider transactions, orchestrated by the Platinum-Beechwood Alter Egos, which transactions harmed PPVA.

208.   The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would be repaid, but rather to further the goal to enrich the Platinum-Beechwood Alter Egos by increasing the fees payable to Platinum Management and BAM ("**First Scheme Transactions**").

209.   In some cases the First Scheme Transactions were used to justify ever-increasing valuations of the underlying assets as reported by Platinum Management

210.   In other cases, the First Scheme Transactions were used to mask the performance failures at the underlying operating companies.

211.   In all cases, the First Scheme Transactions were used as a basis to pay the Platinum-Beechwood Alter Egos' unearned fees.

212.   The Platinum-Beechwood Alter Egos used First Scheme Transactions in which significant loans were extended/purchased or investments made by a "third party," *i.e.*, Beechwood, as evidence of the validity of Platinum Management's "estimate" as to the true enterprise value of the underlying company.

213.   These were insider transactions, however.  Also, in most cases, any investment or loan made by the Beechwood entities was backed by a guarantee from or a put right back to PPVA, and thus was not a valid basis upon which to assess the merits of the underlying business.

214.   In other cases, PPVA or its subsidiaries' prior rights in collateral were made subordinate to the rights of Beechwood.

215.   The Platinum-Beechwood Alter Egos damaged PPVA because they favored the rights of the Platinum-Beechwood Alter Egos over those of PPVA, by causing PPVA and its subsidiaries to grant guarantees and put rights in favor of Beechwood, and to subordinate its rights in collateral in favor of Beechwood.

216.   These inflated valuations enabled Platinum Management to report to PPVA a steady rise in the NAV of the assets it managed, which in turn enabled Platinum Management to pay itself excessive partnership shares, investment management and performance fees, to the detriment of the Platinum Funds and their subsidiaries.

217.   A full account of the transactions with Beechwood by which Platinum Management inflated the value of PPVA's NAV is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as **Exhibit 7** hereto and incorporated herein.

### H. The Second Scheme

218.   Despite the actions of the Platinum-Beechwood Alter Egos set forth above, by mid-2015 PPVA still held assets worth approximately $300 million, a

significant portion of which was comprised of PPVA's investment positions in Implant Sciences Corporation and Agera Energy (the "**Remaining PPVA Assets**").

219.   Beginning in late 2015, the Platinum-Beechwood Alter Egos, among others, conspired to commence the Second Scheme, engaging in an intentional scheme to transfer or encumber nearly all of the Remaining PPVA Assets to or for the benefit of the Platinum-Beechwood Alter Egos, and certain select clients and friends.

220.   Throughout the course of the Second Scheme, the Platinum-Beechwood Alter Egos deliberately granted Beechwood liens on PPVA's investments at the subsidiary level, and Platinum Management would consistently report PPVA's NAV without taking into account the encumbrances provided to its Beechwood alter ego.

221.   As a result of the Second Scheme, by the time the Cayman Liquidation of PPVA commenced, PPVA had hundreds of millions of dollars in liabilities and minimal assets.

222.   A full account of the transactions involving Beechwood comprising the Second Scheme is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as Exhibit 7 hereto and incorporated herein.

223.   The Agera Transaction which is the subject of this complaint was the culmination of the Second Scheme, and redress is sought by this action.

## I.   The Platinum Investment in Agera Energy

224.   Agera Energy, LLC ("**Agera Energy**") is a Delaware limited liability company and a leading energy reseller to the consumer and business markets.

225.   Agera Energy maintains a principal place of business in Briarcliff Manor, New York.

226.   Agera Energy was formed through the combination of Agera Energy LLC, an entity formed at the direction of Platinum Management, and the assets of Glacial Energy Holdings LLC, which were purchased by the Platinum Funds pursuant to a June 17, 2014 sale order entered by the United States Bankruptcy Court for the District of Delaware pursuant to Section 363 of the Bankruptcy Code (the "**Glacial Energy Purchase**").

227.   PPVA provided all of the funding for the Glacial Energy Purchase.

228.   At all relevant times, Agera Energy was a wholly owned subsidiary of Agera Holdings, LLC, a Delaware limited liability company ("**Agera Holdings**").

229.   Agera Holdings' sole business was to act as a holding company and control the business of its wholly owned subsidiaries.  Those subsidiaries are Agera Energy, Utility Recovery LLC and Agera Solutions LLC.

230.   Although PPVA paid the initial purchase price to effect the Glacial Energy Purchase, Platinum Management gave 95.01% of the equity of Agera Holdings to Michael Joseph Nordlicht, and 4.99% of the equity in Agera Holdings to MF Energy Holdings, LLC ("**MF Holdings**").

231.   Feuer, one of the co-owners of Beechwood, owns all of the membership interests in MF Holdings.

232.   Michael Joseph Nordlicht is Nordlicht's nephew.

233.   According to his LinkedIn profile, Michael Nordlicht graduated from Georgetown University Law Center in 2012.  Following graduation, he worked a few months as a law clerk for the Public Defender's office in Baltimore, Maryland.  He also was an associate attorney for about eight months at the Maryland Attorney General's office in the Department of Public Safety and Correctional Services.

234.   In or about late 2013, Nordlicht installed his nephew as the general counsel of Agera Energy, despite the fact that he appears to have had no prior experience in private practice, much less any experience in the energy sector.

235.   Neither Michael Nordlicht nor MF Holdings paid anything for the equity each held in Agera Holdings.

236.   While Michael Joseph Nordlicht and MF Holdings held the equity in Agera Energy's parent, PPVA and PPCO could nevertheless assert a controlling interest in Agera Energy because prior to spring 2016, their jointly held entity, PGS,

53

was the holder of that certain May 19, 2014 promissory note issued by Agera Energy that was convertible into approximately 95% of the equity in Agera Energy (the "**Agera Note**").  A true and correct copy of the Second Amended and Restated Agera Note is attached hereto as **Exhibit 8**.

### J.  Hiring Kevin Cassidy

237.   Shortly after the Glacial Energy Purchase, Agera Energy hired Kevin Cassidy as a senior executive.

238.   Cassidy, who had served two prior stints in prison, was arrested a third time in 2007 for deliberately misstating the value of natural gas derivatives held by one of Nordlicht's previous funds, Optionable Inc., which had collapsed amid scandal in 2007.

239.   Nordlicht and/or other persons employed by Platinum Management caused Cassidy to be hired as a senior executive by Agera Energy upon Cassidy's release from prison, despite the fact that he had no prior experience in the energy sector.

240.   Despite Cassidy's multiple convictions, Nordlicht vouched for Cassidy's integrity when questioned by a reporter.  A true and correct copy of a March 21, 2016 email from Nordlicht to a reporter for Thomson Reuters is attached as **Exhibit 9**.

241. In responses to inquiries from auditors concerning Cassidy's employment and in disclosures provided concerning the same, Platinum Management provided a copy of Cassidy's offer letter from Agera Energy, which listed the salary he would be paid and specifically denied that Cassidy had been or ever was employed as a portfolio manager at Platinum Management.

242. At no time did Platinum Management ever disclose to its auditors any promise or obligation to pay Cassidy or any entity owned or controlled by Cassidy, a percentage of the sale price to be received upon the sale of PGS' interest in Agera Energy or the Agera Note.

### K. Valuation of Agera Energy

243. Despite the fact that Mark Nordlicht installed unqualified insiders to help run the operating company, Agera Energy appears to have thrived. Based on its December 31, 2015 financial statements, Agera Energy achieved FYE 2015 revenues of $301.4 million and EBITDA of $20.2 million.

244. According to valuation reports commissioned by Platinum Management, Agera Energy's value as of March 31, 2016 was estimated to be between $225,533,000 and $283,553,000. A true and correct copy of portions of the PPVA 1st Quarter 2016 Valuation is attached hereto as **Exhibit 10**. This valuation report was issued on the same day as the Agera Note Sale (defined below).

245.   A June 30, 2016 valuation report commissioned by Beechwood valued Agera Energy at between $260,000,000 and $330,000,000.

246.   A July 15, 2016 investment memorandum prepared on behalf of BAM states that due to Agera Energy's profitable financial performance, the true valuation of Agera Energy likely was closer to the high end of available estimates.

247.   Platinum Management caused PPVA and PPCO to hold their interests in the Agera Note via PGS, a special purpose entity with no separate employees or business operations at that time other than the ownership of the Agera Note and their interests in Agera.

248.   The valuation statements, net asset value statements and financial statements prepared on behalf of PPVA and PPCO described their interests in Agera as though they each held those interests directly, and valued their interests in Agera Energy on an "as converted basis" rather than based on the value of the face amount of the Agera Note itself.

## L. The Agera Transactions

249.   As set forth above, since as early as 2014, the CNO Defendants and SHIP Defendants were aware that Beechwood was engaging in transactions with PPVA and PPCO and their respective portfolio companies, using funds from the CNO Reinsurance Trusts and the SHIP IMA Accounts.  While the CNO Defendants

and SHIP Defendants questioned certain of these investments, initially neither party took any action to terminate their relationship with Beechwood.

250. However, after determining that their investments were nonperforming, leading to a risk of sustaining large losses, they worked with Beechwood and its Platinum alter egos, including Platinum Management, Nordlicht Huberfeld, Bodner and Levy, in consummating fraudulent conveyances which were specifically designed to alleviate the CNO Defendants' and SHIP Defendants' concerns.

251. Against this backdrop, as early as March 2016, the Platinum and Beechwood executives conspired to transfer the rest of the remaining valuable assets of PPVA and PPCO by way of a series of "insider" transactions in order to clear out the uncollectable debt obligations owed to the CNO Reinsurance Trusts and SHIP Defendants, leaving PPVA and PPCO with little to nothing in exchange for the transactions, culminating with the Agera Transactions.

252. The Agera Transactions were conceived by Platinum-Beechwood Alter Egos as an insider transaction by at least as early as March 13, 2016. See attached **Exhibit 11,** a true and correct copy of a March 13, 2016 email regarding a proposed insider sale of Agera.

253. By March 27, 2016, the Platinum-Beechwood Alter Egos began planning an insider sale of Agera to a "[B]eechwood led consortium." See attached

**Exhibit 12**, a true and correct copy of a March 27, 2016 email regarding the planning for an insider sale of Agera.

254.   The insider transaction was intended to be substantially below fair value and was the product of the insider relationship between the Platinum-Beechwood Alter Egos, with the unjust benefits flowing to the Defendants and the Platinum-Beechwood-Alter Egos.

255.   Nordlicht and the other Platinum executives did not attempt to market the Agera Note and actively dissuaded potential buyers from inquiring into the purchase of the Agera Note.

256.   For example, on May 11, 2016, in response to an inquiry by a non-investor potential purchaser, Nordlicht stated that PGS's interest in Agera Energy was off the market.  A true and correct copy of this May 11, 2016 email is attached hereto as **Exhibit 13**.

257.   Implant Sciences Corporation, PPVA's only other remaining investment of significant value by May 2016, was being marketed for sale at the same time as Platinum Management and Beechwood were "negotiating" the Agera Note Sale.

258.   By contrast to their actions in connection with the sale of the Agera Note, Platinum Management arranged for Implant Sciences Corporation to hire an

investment banker to openly market the company for sale and took all necessary due diligence actions customary for the legitimate sale of an operating company.

259.   Between April 1, 2016 and June 9, 2016, the specific terms by which the Agera Note Sale was effected were put in place by the Platinum-Beechwood Alter Egos among others, all operating with the knowledge of and in conjunction and with the assistance of, among others, the CNO Defendants, the CNO Reinsurance Trusts, SHIP Defendants, AGH Parent, Beechwood Agera Entities, Cassidy and Starfish.

### i.  The April 2016 First Assignment Agreement

260.   On April 1, 2016, pursuant to an Assignment of Note and Liens (the "**First Assignment Agreement**"), PGS assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda in exchange for $15 million in cash.

261.   The First Assignment Agreement gave PGS the unconditional right to repurchase the Agera Note by repaying the $15 million purchase price plus a fee, by June 15, 2016.

### ii.  The May 2016 Second Assignment Agreement

262.   On May 12, 2016, pursuant to an Amended and Restated Assignment of Note and Liens (the "**Second Assignment Agreement**" and collectively with the First Assignment Agreement, the "**Agera Assignment Agreements**"), PGS re-

assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda, along with newly created Defendant BBLN-Agera Corp., which effectively resold the Agera Note at a new purchase price of $25 million. This price included the $15 million previously paid pursuant to the First Assignment Agreement.

263.   Among other terms, the Agera Assignment Agreements provided that PGS would forfeit its interest in the Agera Note, and thus its control over Agera Energy, if it did not repay the amounts due to the assignees within the time provided in such Agreements.  These transactions had the effect of locking up the sale of the Agera Note.

### iii. SHIP Agrees to Provide Substantial Assistance

264.   In May 2016, representatives for the SHIP Defendants attended meetings with Dhruv Narain, Feuer and Kevin Cassidy and other representatives of Agera Energy to formulate the plan for SHIP's participation in the illicit Agera Transactions.

265.   Narain and Feuer first approached the SHIP Defendants in mid-May 2016 to invest funds in what was to become AGH Parent.  At all times, the SHIP Defendants and Beechwood understood that this new investment would be made outside of the structure of the SHIP IMA agreements.

266.   The initial meeting occurred on May 19, 2016.  During that meeting, Narain walked representatives of the SHIP Defendants through the details of what he and Feuer characterized as a tremendous "opportunity" for SHIP.

267.   Narain and Feuer told executives of the SHIP Defendants that the owners of PGS needed to generate cash and, thus, were motivated to sell Agera Energy on favorable terms.  Narain also represented that he had done extensive diligence on Agera Energy and that it was orchestrating a purchase of Agera Energy for far less than its actual value.

268.   On May 25, 2016, executives for the SHIP Defendants, including Wegner and Lorentz, attended follow up meetings in Beechwood's offices. Narain and Feuer participated, along with individuals from Agera Energy, including Kevin Cassidy.

269.   At the May 19 and May 25 meetings, Cassidy and others from Agera Energy provided information to SHIP regarding corporate operations.  Narain and other representatives of Beechwood provided the SHIP Defendants with information regarding the value of Agera Energy and the proposed purchase of the company at a substantial discount to its actual value.

270.   Meetings regarding the proposed transaction also were held on those days with representatives of the CNO Defendants.

271.   In a follow up email to representatives of the SHIP Defendants dated May 26, 2016, Narain proposed what he characterized as a "**strawman structure**" (*emphasis supplied*) that would comply with insurance industry standards governing exposure to non-investment grade debt.

272.   To that end, Narain proposed that SHIP directly invest an "incremental $50 million in the newly formed AGH Parent, with an additional $20.5 million to be acquired through the SHIP IMAs.  Narain further proposed that Beechwood would sell certain limited partnership interests in the SHIP IMA accounts, including reducing SHIP's PPCO investment from $32 million to $5.5 million and bringing SHIP's PPVA investment below $5.5 million.

273.   Though this transaction, the Platinum-Beechwood Alter Egos offered SHIP, and SHIP accepted a way to exit its investments in PPVA and PPCO, which were failing, and supplant them with Plaintiffs' interest in the remaining valuable, unencumbered asset: the Agera Note.

274.   SHIP agreed to move forward with the proposed investments in AGH Parent for this wrongful purpose.

275.   Throughout the Agera Note Sale process, the SHIP Defendants took an active role in its investment in AGH Parent, with full access to Beechwood's due diligence reports and with actual knowledge of the connection between Mark Nordlicht and Cassidy and Cassidy's checkered past.

276.   On June 1, 2016, Narain sent an email to Lorentz and SHIP's drafting counsel that "we have a motivated seller who very much needs the money. As a result, we are really trying to close and fund on Monday [, June 6, 2016]."

277.   Upon information and belief, the SHIP Defendants and CNO Defendants were acutely aware of the fraudulent circumstances at the Platinum Beechwood enterprise and the effect of the transaction on Plaintiffs.  Attached hereto as **Exhibit 14** is an email dated July 29, 2016 in which Fuzion executives describe the situation as a "real mess" and similar to "Madoff."

### iv. The Sale of the Agera Note

278.   On June 9, 2016, **the day after Huberfeld's arrest**, the Platinum-Beechwood Alter Egos, working in concert with the Defendants here, caused PGS to transfer its interest in the Agera Note to AGH Parent – an entity created at the behest of the Platinum-Beechwood Alter Egos, for purposes of the transaction, and would be controlled and managed by Beechwood post sale, for the benefit of the Defendants (the "**Agera Note Sale**").

279.   The SHIP Defendants and the CNO Defendants, with full knowledge of the insider nature of the Agera Note Sale and the detriment it would cause to PGS, PPVA and PPCO, worked in tandem with or knowingly allowed Beechwood and the other Defendants to work to the detriment of PGS, PPVA and PPCO, just weeks

before they would publicly distance themselves from Beechwood for fraud, and while litigation was anticipated.

280.   To create the appearance that the Agera Note Sale was an arm's length, valid transaction, numerous agreements were executed between and among the parties.

### v.  Assignment of Worthless Debt to AGH Parent

281.   On or about June 8 and 9, 2016, the Beechwood Agera Corporations and CNO Reinsurance Trusts each executed agreements with AGH Parent by which they contributed near-worthless debt and other investments related to the Platinum Funds to AGH Parent in exchange for preferred membership units and notes issued to them by AGH Parent.

282.   Similarly, Beechwood Investments executed an Agreement with AGH Parent stating that it had purportedly paid $100 for all of the common equity units in AGH Parent, while SHIP executed agreements stating that it was contributing cash plus certain worthless debt and other investments related to the Platinum Funds in exchange for preferred membership units and notes issued to it by AGH Parent. True and correct copies of the Agreements by which these purported "contributions" and ""subscriptions" (the "**Subscription Agreements**") were effected are attached hereto as **Exhibit 15**.

283.   As noted above, at all relevant times Nordlicht, Bodner Huberfeld and Levy or their family members, via trusts, held the membership interests in Beechwood Investments.

### vi. The Repurchase Agreement

284.   As part of the Agera Transactions, on June 9, 2016, PGS re-acquired the Agera Note from Defendant BBLN-Agera Corp. and other Beechwood-related entities under that certain Assignment of Secured Convertible Promissory Note (the "**Repurchase Assignment**").  A true and correct copy of the Repurchase Agreement is attached hereto as **Exhibit 16**.  PGS assigned the Agera Note to AGH Parent in connection with the Agera Note Sale.

### vii.   The Agera Purchase Agreement

285.   On June 9, 2016, Simultaneous with the execution of the AGH Parent Amended Operating Agreement (described below) and the Subscription Agreements, PGS and AGH Parent entered into the Purchase Agreement (the "**Agera Purchase Agreement**"), by which PGS sold the Agera Note to AGH Parent. A true and correct copy of the Agera Purchase Agreement is attached hereto as **Exhibit 17**.

286.   The Agera Purchase Agreement is governed by Delaware law.

287.   Each of PGS and AGH Parent are limited liability companies created under Delaware law, and their operating agreements are governed by Delaware law.

288.   Even though the Platinum-Beechwood Alter Egos and the Defendants were aware and believed that the market value of the Agera Note was at least $250-300 million and possibly higher, the stated purchase price for the Agera Note was only $170 million (the "**Note Purchase Price**").

289.   The Note Purchase Price was significantly below the contemporaneous valuations of the Platinum Funds' interests in the Agera Note commissioned by the Platinum-Beechwood Alter Egos, the latter of which was shared with the SHIP Defendants and, on information and belief, the other Defendants.

290.   Even then, approximately $43.67 million of the Note Purchase Price was paid in the form of nearly valueless debt and other instruments – the very instruments that had been assigned to AGH Parent by the Beechwood Agera Entities, the SHIP Defendants, the CNO Defendants and the CNO Reinsurance Trusts the day before, in partial exchange for their membership interests in AGH Parent.  Although these instruments were nearly worthless, they were provided as consideration to PGS at face value.

291.   The Purchase Agreement further provided for the transfer to PGS of a total of 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at $2,000,000.

292.   Of these, all of the Class B-2 Units and $4,552,000 of the Class C Preferred Units were immediately transferred to Starfish, Cassidy's alter ego, both discussed below.

293.   PGS retained $54 million worth of class C Preferred Units in AGH Parent that were valued at face or par value.

294.   Under the terms of the AGH Parent Operating Agreement, any distribution to the Class C Preferred Units held by PGS was subordinated to those held by the Beechwood Agera Entities, SHIP, the CNO Defendants, the CNO Reinsurance Trusts and the B-2 Units held by Starfish/Cassidy.

295.   In addition, $35.4 million of those Class C Preferred Units could be redeemed at the sole discretion of AGH Parent/Beechwood, in exchange for debt and or other instruments at face value, irrespective of the actual value of such debt or instruments.

296.   The Purchase Agreement provides that approximately $65 million of the Note Purchase Price was payable in cash.

297.   The cash paid in June 2016 was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part and had knowledge concerning.

298.   True and correct copies of the closing documents related to the Agera Note Sale and the other transactions described above are attached hereto as **Exhibit 18**.

### viii.   **PGS's Payment to Starfish/Cassidy**

299.   The Platinum-Beechwood Alter Egos caused PGS to pay Cassidy, via his entity Starfish, 8% of the **gross** proceeds from the sale of Agera, in connection with Cassidy's efforts to shepherd through the Agera Transactions.

300.   This payment was made despite Platinum Management's prior statements to PPVA's auditor indicating that (i) Cassidy was an employee of Agera who was paid a salary of $135,000 per annum and (ii) Cassidy was not a portfolio manager employed by Platinum Management.

301.   To effect the payment, the Platinum-Beechwood Alter Egos, Cassidy and Cassidy's counsel prepared an amendment to the PGS operating agreement that granted Starfish, Cassidy's alter ego, 8% of the membership interests in PGS on the day before the Agera Note Sale closed ("**First Amendment to PGS Operating Agreement**").   The grant was illicit.   The other parties to the Agera Note Sale, including the Beechwood Agera Entities, AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts and the CNO Defendants, were aware of the transfer to Cassidy/Starfish.

302.   Thereafter, on June 9, 2016 (concurrent with the Agera Transactions and the day after Huberfeld's arrest), PGS entered into a Purchase Agreement with Starfish by which PGS purported to "repurchase" Starfish's membership interests in PGS for $13,552,000 (the "**Starfish Purchase Agreement**"), consisting of: (i) $7,000,000 in cash; (ii) the $2,000,000 of Class B-2 Preferred Units in AGH Parent granted to PGS under the Purchase Agreement; and (iii) $4,552,000 of the total amount of Class C Preferred Units in AGH Parent granted to PGS.

303.   Notably, Cassidy's Class C Preferred Units were expressly not subject to redemption in exchange for "PGS Value." In addition, Cassidy received all of the Class B-2 Preferred Units granted to PGS under the Starfish Purchase Agreement. The Class B-2 Preferred Units, have a higher liquidation preference than the Class C Units retained by PGS.   A true and correct copy of the Starfish Purchase Agreement is attached hereto as **Exhibit 19**.

304.   The payoff to Cassidy was structured as a grant and repurchase of membership interests in PGS by Starfish so that Cassidy could avoid the payment of any withholding taxes with respect to the transfer.

305.   All of the various transactions described above and leading up to and including the purchase of the Agera Note on June 9, 2016 are referred to herein as the "**Agera Purchase Transactions**".

69

### ix. The AGH Parent Amended Operating Agreement

306.   Also on June 9, 2016, AGH Parent amended its Limited Liability Company Agreement (the "**AGH Parent Amended Operating Agreement**") to show the admission of the new members resulting from the transactions that comprised the various elements of the Agera Note Sale and related transactions.  A true and correct copy of the AGH Parent Amended Operating Agreement is attached hereto as **Exhibit 20**.

307.   Narain executed the AGH Parent Amended Operating Agreement on behalf of AGH Parent and the Beechwood Agera Entities.  Wegner signed the AGH Parent Amended Operating Agreement on behalf of SHIP.  The CNO Reinsurance Trusts also were admitted as members of AGH Parent.

308.   Pursuant to the AGH Parent Amended Operating Agreement and the Subscription Agreements, AGH Parent issued the following notes and membership interests:

- SHIP received 350,000 Class A Units, valued at $35 million, B-1 debt in the principal amount of $15 million, and 5,730 Common Units in AGH Parent as an "equity kicker."

- SHIP also received a $940,000 B-1 Senior Secured Note issued by AGH Parent and a $5,000,000 interest in BBLN-Agera's $9,060,000 B-1 Senior Secured Note issued by AGH Parent from cash and assets contributed through the SHIP IMA Accounts.

- BBIL ULICO 2014, BRe WNIC 2013 LTC Primary, BBLN-Agera Corp., BHLN-Agera Corp., and BOLN-Agera Corp. were collectively provided 220,000 Class B-1 Units, valued at $22 million, and B-1 debt in the

70

principal amount of $36,960,000.

- AGH Parent provided 5,730 Common Units in AGH Parent to Beechwood Re Investments, LLC for $100. Beechwood Re Investments, LLC is a Delaware limited liability company managed by N Management LLC, the sole member of which is Nordlicht.

- In connection with the sale of the Agera Note, PGS was provided with 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at 2,000,000. These valuations were misleading, as they failed to take into account "PGS Value" and the redemption rights against PGS's Class C units, and the contemporaneous transfer of the Class B-2 Units to Starfish, Cassidy's alter ego, both discussed below.

- Starfish Holdings Group, Inc., another Cassidy-controlled entity, was provided with 12,062 incentive units in AGH Parent.

309. After the Agera Note Sale was consummated, AGH Parent did not provide PGS with any of the quarterly or annual financial statements required by section 11.01 of its operating agreement, nor did it provide PGS with any distributions.

## M. Redemption of the Class C Units for PGS Value

310. As noted above, approximately $59,040,000 million of the Note Purchase Price was paid to PGS via Class C Units in AGH Parent. Of these, $4,552,000 worth were given to Starfish/Cassidy, and PGS retained the remaining $54 million worth of such Class C Preferred Units.

311. The Class C Preferred Units that PGS received were deeply subordinated to the membership interests held by the Beechwood Agera Entities,

SHIP, the CNO Reinsurance Trusts and Starfish's B-2 Units, and thus had little or no value.

312.   The Amended AGH Parent Operating Agreement further provided that $35.4 million of PGS' Class C Preferred Units were subject to being redeemed in exchange for $35.4 million of debt or partnership interests in the Platinum Funds by AGH Parent (defined as "**PGS Value**") if a notice was sent out on or before a certain date.

313.   On October 28, 2016, AGH Parent delivered a letter to PGS (the "**AGH Redemption Notice**"), indicating its intent to exercise the redemption rights set forth in Section 9.06(a)(i) of the Amended AGH Parent Operating Agreement "with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."   A true and correct copy of the AGH Redemption Notice is attached hereto as **Exhibit 21**.

314.   Thereafter, on January 26, 2017, AGH Parent delivered a letter to PGS enclosing an Assignment (the "**PGS Assignment**"), executed by AGH Parent, transferring to PGS all of AGH Parent's interest in the debt obligations/instruments set forth on Schedule A thereto.   A true and correct copy of the PGS Assignment is attached hereto as **Exhibit 22**.

315.   Together, the debt obligations/instruments listed on Schedule A of the PGS Assignment have a face value equal to the total amount of PGS Value subject to redemption, or $35.4 million.

316.   The debt obligations/instruments listed in the PGS Assignment consist of distressed debt and instruments transferred to AGH Parent by the CNO Reinsurance Trusts, SHIP and the Beechwood Agera Entities.

317.   The debt/instruments listed in the PGS Assignment include: (i) $14.1 million owed by Golden Gate Oil (ii) $5.7 million owed by PEDEVCO Corp. and (iii) $15.6 of debt owed by Montsant Partners, LLC, a subsidiary of PPVA.

318.   Defendants had actual knowledge that these distressed debt obligations were near-worthless when they were transferred to PGS in January 2017.

319.   As a result of the AGH Redemption Notice and PGS Assignment, AGH Parent sought to redeem 336,928.93 Class C Preferred Units held by PGS and recorded satisfaction relative to PGS of $1,707,107 in accretive Class C Preferred Return related to such redeemed units, leaving PGS with approximately 207,970 Class C Preferred Units (the "**January Redemption**").

320.   Together, the January Redemption and the Agera Purchase Transactions are referred to herein as the "**Agera Transactions**."

321.   PGS has not received any further distributions with respect to its Class C Preferred Units in AGH Parent.

322.   Within a week after the Agera Note Sale closed in June 2016, BAM Management Services began marketing AGH Parent to prospective investors.

323.   In or about December 2016, six months after the Agera Note Sale, BAM Management Services had entered into negotiations to sell AGH Parent to a third party investor for approximately $315 million in cash.

324.   In the summer of 2017, certain assets under Beechwood's control, including its interests in BAM Management Services and AGH Parent, as well as the CNO Defendants' interests in AGH Parent, were sold to an affiliate of Eli Global (the "**Eli Global Proceeds**").

325.   On information and belief, SHIP still remains a member of AGH Parent.

326.   AGH Parent continues to hold the Agera Note or as converted equity, and Eli Global has acquired the preferred and common Units previously held by Beechwood and the CNO Defendants in AGH Parent.

327.   The Agera Transactions were the culmination of the looting of PPVA and PPCO by the Platinum-Beechwood Alter Egos and the Defendants and, standing alone, resulted in the dissipation of as much as $250 million of value to the Defendants, at a time when PPVA and PPCO were known to be insolvent.  The loss of PGS's interest in the Agera Note has caused substantial direct and consequential

damages in an amount to be determined at trial, and the CNO Defendants were unjustly enriched by the same.

## CLAIMS FOR RELIEF

### First Count (by PGS):  Aiding and Abetting Breach of Fiduciary Duty and Corporate Waste against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy

328.   PGS repeats and re-alleges paragraphs 1-327 as if fully set forth herein.

329.   Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, who were the general partner and founders and controlling persons of PGS's members and, in the case of Nordlicht, the managing member of PGS, and were responsible for overseeing and managing PGS, owed fiduciary duties of due care, loyalty and good faith to PGS.

330.   As set forth above, Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, breached their fiduciary duties to PGS by causing the Agera Note to be sold in connection with the Agera Transactions when they believed it was worth at least $250-$300 million and potentially more.

331.   The SHIP Defendants, CNO Reinsurance Trusts and Beechwood Agera Entities knowingly and substantially assisted and participated in the foregoing breaches of fiduciary duties in connection with the Agera Transactions.  Each assigned to AGH Parent the nearly worthless debt instruments and other investments that AGH Parent in turn used as "consideration" for the purchase of the Agera Note

and the January Redemption, and in return received senior preferred units, and all of the common equity in AGH Parent as well as debt.

332. The foregoing transactions enabled the SHIP Defendants, CNO Reinsurance Trusts and Beechwood Agera Entities to exchange near-worthless investments in PPVA and PPCO and their subsidiaries and affiliates for valuable interests in Agera Energy, to the detriment of PGS.

333. Cassidy, via Starfish, received 8% of the consideration paid to PGS in connection with the Agera Transactions, including $7 million of the total cash and valuable membership units in AGH Parent illicitly, even though Cassidy already was paid a salary of $135,000 per annum for his work at Agera Energy.

334. AGH Parent, the alter ego of the Platinum-Beechwood Alter Egos, substantially assisted in the breaches of fiduciary duties by purchasing the Agera Note at a substantial discount, to the detriment of PGS and its members.

335. The SHIP Defendants also substantially assisted and participated in the breaches of fiduciary duties by contributing $50 million and nearly worthless debt to finance the fraudulent acquisition of the Agera Note by AGH Parent.

336. Cassidy and Starfish substantially assisted and participated in the breaches of fiduciary duties by participating in the execution of the purchase of the Agera Note and taking 8% of the proceeds that were supposed to be paid to PGS for no consideration.

337.   AGH Parent and the Beechwood Agera Entities substantially assisted and participated in the breaches of fiduciary duties because they are the alter egos of the Platinum-Beechwood Alter Egos, and by acting as the "insiders" by which they looted PGS's valuable asset, the Agera Note, for the benefit of the Defendants and Beechwood's ultimate owners, Nordlicht, Levy, Bodner and Huberfeld.

338.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, the CNO Reinsurance Trusts, Cassidy and Starfish were aware that the Agera Transactions enabled Nordlicht, Levy, Bodner and Huberfeld to retain control of Agera Energy via their ownership of Beechwood Investments, which owned the common equity of AGH Parent, their ownership and control of the Beechwood Agera Corporations, which held preferred units, and of BAM Management Services, the manager of AGH Parent at all relevant times.

339.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, and the CNO Reinsurance Trusts also knowingly and substantially assisted the breach of fiduciary duties to PGS and its members by engaging in a transaction by which 8% of the consideration, including $7 million of cash, was siphoned off to pay Nordlicht's friend, Cassidy, to the detriment of PGS and the Platinum Funds.

340.   AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy had actual knowledge of breaches of fiduciary duties to PGS in connection with the Agera Transactions, as the parties

were well aware of the financial condition of PPVA and PPCO at that time, the alter ego relationship between and among the Platinum-Beechwood Alter Egos, and the Platinum-Beechwood Alter Egos' intent to sell the Agera Note to an insider at a substantial undervalue and to direct a significant portion of even that small consideration to Cassidy/Starfish.

341.   As a direct and proximate result of the actions and substantial participation of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish, PGS was damaged.

342.   The actions of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish caused the harm on which the primary liability of breach of fiduciary duty is predicated.

343.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### Second Count (by PGS, in the alternative): Unjust Enrichment against the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy, Starfish and John Does 1-100

344.   PGS repeats and re-alleges paragraphs 1-343 as if fully set forth herein.

345.   In connection with the Agera Transactions and as described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy,

Starfish and the Beechwood Agera Entities intentionally engaged in certain acts for the purpose of transferring the Agera Note away from PGS at a substantial discount.

346.   The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities worked together with the Platinum-Beechwood Alter Egos to orchestrate the Agera Transactions for the purpose of acquiring the last remaining valuable asset of PPVA, which was held by PGS.

347.   As described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities all had knowledge that the Agera Transaction would result in up to hundreds of millions in damages to PGS.

348.   The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, along with any subsequent transferees, would be unjustly enriched at the expense of PGS if they were permitted to receive and retain the full benefit of the Agera Transactions.

349.   PGS would suffer an unjust detriment if the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, and any subsequent transferees, were permitted to receive and retain the full benefit of the Agera Transactions.

350.   Permitting the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities to receive and retain the full benefit of the Agera Transactions at the expense of PGS would be against equity and good conscience.

351.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### Third Count (by PGS): Breach of the AGH Parent Amended Operating Agreement (Implied Covenant of Good Faith and Fair Dealing) against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities and John Does 1-100

352.   PGS repeats and re-alleges paragraphs 1-351 as if fully set forth herein.

353.   The AGH Parent Amended Operating Agreement provides for the redemption of $35.4 million of PGS's Class C preferred membership units in exchange for "PGS Value" under certain circumstances.

354.   The terms of the AGH Parent Operating Agreement, including the provisions concerning the redemption of PGS' Class C preferred membership units for PGS Value, were not negotiated at arm's length, but rather were imposed upon PGS by persons and entities engaged in a scheme to transfer PGS' interest in the Agera Note to Defendants for nearly worthless consideration. Those persons and entities included AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts

and the Beechwood Agera Entities, working together with the Platinum-Beechwood Alter Egos.

355.   AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities acted in bad faith and deprived PGS of any value that it may have obtained from the Agera Transactions by receiving Class C Preferred Units in AGH Parent, by transferring to it debt and other instruments that they were aware were nearly valueless in connection with the January Redemption.

356.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**Fourth Count (by the JOLs):**
**Fraudulent Trading under Cayman Law against AGH Parent, the SHIP**
**Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities**

357.   The JOLs repeat and re-allege paragraphs 1-356 as if fully set forth herein.

358.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

359.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

360.   At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

361.   PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

362.   For example, no annual meetings were held, as required by the PGS Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

363.   Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

364.   At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

365.   PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

366.   The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

367.   The Agera Transactions evidence all of the badges of fraud for which fraudulent transfer law was enacted.

368.   In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

369.   The transfer to AGH Parent was made to or for the benefit of insiders.

370.   PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth $300 million.

371.   At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

372.   Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

373.   Section 147 of the Cayman Islands Companies Law (2018 Revision) states as follows:

> 147. FRAUDULENT TRADING
>
> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper

374.   The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

375.   The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

376.   At the time of the January Redemption and Agera Note Sale, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the Agera Note Sale, Nordlicht announced to PPVA's investors that PPVA would be liquidated and unwound.  The Cayman Proceeding was commenced a few weeks thereafter.

377.   Accordingly, AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities are liable to the PPVA estate and are obligated to contribute to the PPVA estate amounts to be determined at trial, including cash proceeds, the Agera Note, or membership interests in AGH Parent.

**Fifth Count (by the JOLs): Transfer for Undervalue and Voidable Preference under Cayman Law against AGH Parent and John Does 1-100**

378.   The JOLs repeat and re-allege paragraphs 1-377 as if fully set forth herein.

379.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

380.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

381.   At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

382.   PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

383.   For example, no annual meetings were held, as required by the PGS Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

384.   Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

385.   At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

386.   PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

387.   The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

388.   The Agera Transactions evidence all of the badges of fraud for which fraudulent transfer law was enacted.

389.   In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

390.   The transfer to AGH Parent was made to or for the benefit of insiders.

391.   PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth at least $250-$300 million.

392. At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

393. Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

394. The transfer to AGH Parent was made to or for the benefit of insiders, who were (or purported creditors) of PPVA and PPVA was unable to pay its debts.

395. PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

396. Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

397. In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the

commencement of a liquidation.

398.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

399.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

400.   The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to Platinum Management's AGH Parent alter ego, and the other Defendants.

401.   The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

402.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the first step of the Agera Transactions, Nordlicht on behalf of Platinum Management announced to PPVA's investors that

PPVA would be liquidated and unwound.  The Cayman Liquidation was commenced a few weeks thereafter on August 23, 2016.

403.   The transfer of the Agera Note to AGH Parent amounted to a transfer of, *inter alia*, property of PPVA made (i) with the intent to give the insiders a preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

404.   Accordingly, PPVA is entitled to a judicial determination that the transfer of the Agera Note to AGH Parent and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

## Sixth Count (by the JOLs): Transfer for Undervalue and Voidable Preference under Cayman Law against Starfish, Cassidy and John Does 1-100

405.   The JOLs repeat and re-allege paragraphs 1-404 as if fully set forth herein.

406.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

407.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera

Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

408.  At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

409.  PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

410.  For example, no annual meetings were held, as required by the PGS Operating Agreement.  The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

411.  Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

412.  At all relevant times, PGS had no employees.  All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

413.  PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

414.  The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated

pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

415.   The transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement evidence all of the badges of fraud for which fraudulent transfer law was enacted.

416.   In connection with the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, Starfish and Cassidy "sold" interests in PGS that they held for a single day.

417.   The transfers pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made to or for the benefit of insiders.

418.   PPVA received less than reasonably equivalent value and/or less than fair consideration in connection with the transfers made to Cassidy and Starfish pursuant to the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement.

419.   At the time of the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, there existed substantial creditor claims against PPVA.

420.   Since the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement occurred in June 2016, additional creditor claims have been asserted against PPVA.

421.   The transfers to Cassidy and Starfish pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made to or for the benefit of insiders, who were creditors (or purported creditors) of PPVA and PPVA was unable to pay its debts.

422.   PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

423.   Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

424.   In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the

commencement of a liquidation.

425.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

426.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating decisions.

427.   The transfers made to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made with intent to defraud creditors of PPVA, as it transferred valuable consideration to Cassidy and Starfish for membership interests in PGS that Cassidy and Starfish had acquired the previous day illicit purpose and inadequate or no consideration.

428.   The transfers under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship and PPVA's financial distress.

429.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts.  Five days after the closing of the Agera Note Sale, Nordlicht on

93

behalf of Platinum Management announced to PPVA's investors that PPVA would be liquidated and unwound.  The Cayman Liquidation was commenced a few weeks thereafter, on August 23, 2016.

430.   The transfers to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement amounted to a transfer of, *inter alia*, property of PPVA made (i) with the intent to give the insiders a preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

431.   Accordingly, PPVA is entitled to a judicial determination that the transfer of cash and other valuable assets to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

### Seventh Count (by JOLs and PPVA) (for Relief Only): Alter Ego against AGH Parent and the Beechwood Agera Entities and John Does 1-100

432.   JOLs and PPVA repeat and re-allege paragraph 1 through 431 as if fully set forth herein.

433.   This count is pled as additional allegations for relief against AGH Parent and the Beechwood Agera Entities because they are alter egos of Platinum Management and controlling persons Nordlicht, Huberfeld, Bodner and Levy.

434.   AGH Parent and the Beechwood Agera Entities were formed and conceived as the alter egos of Platinum Management and controlling persons, Nordlicht, Huberfeld, Bodner and Levy, for the purpose of inflicting harm upon PPVA.

435.   The Beechwood Agera Entities, AGH Parent and Platinum Management had overlapping ownership and control, in particular, Nordlicht, Huberfeld, Bodner and Levy.

436.   At the time of the January Redemption and Agera Note Sale, AGH Parent, the Beechwood Agera Entities, Platinum Management and Beechwood were under common control, namely Nordlicht, Huberfeld, Bodner and Levy.

437.   Platinum Management and Beechwood have had overlapping management, direct or indirect owners and controlling persons, including Huberfeld, Nordlicht, Bodner and Levy.

438.   Beechwood was founded and initially operated from the offices of Platinum Management.

439.   The Platinum-Beechwood Alter Egos, including AGH Parent and the Beechwood Agera Entities, were inadequately capitalized and upon information and belief, have cumulative creditor claims in excess of $2 billion.

440.   AGH Parent and the Beechwood Agera Entities were created by the Platinum-Beechwood Alter Egos for a wrongful purpose, *i.e.* the transfer of the Agera Note.

441.   As set forth in detail herein, as well as in the action filed by PPVA and the JOLs pending in the United States District Court for the Southern District of New York, Platinum Management, as general partner of PPVA, and Nordlicht, Huberfeld, Bodner and Levy, as the co-founders and/or officers/controlling persons of PPVA, owed fiduciary duties of due care, loyalty and good faith to PPVA and PGS.  These parties breached their fiduciary obligations and committed fraudulent and otherwise tortious acts in connection with the overvaluation of the PPVA's net asset value in order to siphon off unearned fees for their benefit, and by engaging in transactions to loot PPVA's valuable assets for their own benefit, culminating with the Agera Transactions.

442.   The Platinum-Beechwood Alter Egos used AGH Parent and the Beechwood Agera Entities, as fraudulent tools to siphon off the assets of PPVA and PGS, namely the Agera Note.

443.   The ultimate decision making for Platinum Management, Beechwood, AGH Parent and the Beechwood Agera Entities rested with the same controlling minds: Nordlicht, Huberfeld, Bodner and Levy.

444.   The Platinum-Beechwood Alter Egos regularly caused PPVA and its subsidiaries such as PGS to commit acts that benefited the Platinum-Beechwood Alter Egos and their preferred clients and friends at the expense of PPVA by way of wrongful insider transactions, including but not limited to the Agera Transactions.

445.   By reason of the foregoing, AGH Parent and the Beechwood Agera Entities are liable to the same extent as the Platinum-Beechwood-Alter Egos in connection with the tortious acts described herein.

## Eighth Count (by all Plaintiffs) (for Relief Only): Imposition of a Constructive Trust against Defendants

446.   Plaintiffs repeat and re-allege paragraph 1 through 444 as if fully set forth herein.

447.   This count seeks the equitable remedy of imposition of a constructive trust over the Agera Note and any proceeds received by Defendants in connection with their ownership of the Agera Note, membership units in AGH Parent, sale of membership units in or notes issued by AGH Parent, the sale of membership interests in PGS, and/or or any other proceeds or benefits received in connection with the Agera Transactions.

448.   In connection with the Agera Transactions and as described herein, all Defendants each intentionally engaged in various acts and transactions for the purpose of transferring the Agera Note away from PGS at a substantial discount and receiving the benefit and proceeds thereof, and in the case of the CNO Defendants, knowingly permitted and authorized the same.

449.   Defendants, among others, orchestrated the Agera Transactions together with the Platinum-Beechwood Alter Egos for the purpose of acquiring the last remaining valuable asset of PPVA.

450.   As described herein, Defendants all had knowledge that the Agera Transactions would result in the transfer of an asset they understood to be worth at least $250-$300 million.

451.   Defendants, would be unjustly enriched at the expense of the Plaintiffs if they were permitted to receive and retain the full benefit of the Agera Transactions.

452.   The Plaintiffs would suffer an unjust detriment if Defendants, were permitted to receive and retain the full proceeds of the Agera Transactions, or of any sales of the membership units or notes received in connection therewith.

453.   Permitting the Defendants to receive and retain the full benefit of the Agera Transactions, the proceeds thereof or of any sales of the membership units in or notes issued by AGH Parent or the proceeds of membership interests in PGS

received in connection therewith at the expense of the Plaintiffs would be against equity and good conscience.

454. As set forth herein, the Defendants engaged in fraudulent and or unfair and unconscionable conduct in connection with the Agera Transactions.

455. Legal remedies are insufficient to compensate the Plaintiffs for the damages suffered by Plaintiffs in connection with the Agera Transactions.

456. The Agera Note and the proceeds received from Defendants in connection with the sale of their interests in the Agera Note or in AGH Parent or PGS, or any other proceeds received in connection with the Agera Transactions, constitute identifiable property appropriate for the imposition of a constructive trust.

457. By reason of the foregoing, the Plaintiffs request imposition of a constructive trust over certain assets of Defendants including but not limited to (i) the Agera Note; (ii) all proceeds received by the Defendants in connection with any sale of the Agera Note, *i.e.* membership units in AGH Parent and any notes issued to the foregoing entities by AGH Parent, (iii) proceeds from the sale of any membership units in or notes issued by AGH Parent; (iv) proceeds from the sale of any membership units in PGS; and (v) all other equitable relief that this Court deems just and proper.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order and judgment against Defendants as follows:

A.     PGS requests money damages including pre-judgment and post-judgment interest for aiding and abetting and abetting breach of fiduciary duty and corporate waste against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish;

B.     PGS requests money damages including pre-judgment and post-judgment interest against the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy, Starfish and John Does 1-100 for unjust enrichment.

C.     PGS requests money damages including pre-judgment and post-judgment interest against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, and John Does 1-100 for breach of the AGH Parent Operating Agreement and the implied covenant of good faith and fair dealing;

D.     The JOLs request money damages including pre-judgment and post-judgment interest, avoidance, disgorgement, set aside, recovery of and/or constructive trust against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, and John Does 1-100  in favor of the PPVA estate for fraudulent trading, voidable preference, transfer for undervalue and the other claims set forth herein;

E.     PPVA and the JOLs request a declaration that AGH Parent and the Beechwood Agera Entities are alter egos of nominal defendants Platinum

Management, Nordlicht, Huberfeld, Bodner and Levy, and request money damages against AGH Parent and the Beechwood Agera Entities, including pre-judgment and post-judgment interest, for the same malfeasance as those nominal defendants for the tortious acts described herein and elsewhere;

F.    For attorneys' fees and costs in favor of Plaintiffs and against Defendants; and

G.    Granting such other and further relief as the Court may deem just and proper.

**MORRIS JAMES LLP**

By: */s/ Brett D. Fallon*

**OF COUNSEL**:

Warren E. Gluck, Esquire
Barbra R. Parlin, Esquire
Richard A. Bixter, Jr., Esquire
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200


Dated: June 7, 2019

Brett D. Fallon, Esquire (#2480)
R. Eric Hacker, Esquire (#6122)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
*Attorneys for Plaintiffs*

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES,  )
LLC, *et al.*,                          )
                                        )
            Plaintiffs,                 )
    v.                                  )
                                        )        C.A. No.
AGH PARENT LLC, *et al.*,               )
                                        )
            Defendants.                 )
    v.                                  )
                                        )
PLATINUM MANAGEMENT (NY)                )
LLC, *et al.*,                          )
                                        )
            Nominal Defendants.         )

### VERIFICATION

Grand Cayman , Cayman Islands :: ss.

BE IT REMEMBERED that on this 7th day of June, 2019, personally came

before me, the Subscriber, a Notary Public for the Country aforesaid, Martin

Nicholas Trott, who being duly sworn according to law, did depose and say as

follows:

1.     I, along with my colleague, Christopher Smith, are the joint official

liquidators and foreign representatives ("JOLs") of Platinum Partners Value

Arbitrage Fund L.P. (in Official Liquidation) ("PPVA").  PPVA is named as a

Plaintiff in the Verified Complaint for this action, and I am authorized on behalf of

PPVA to make and execute this Verification.

2.     I have reviewed the Verified Complaint and the exhibits thereto.

1

3.      My knowledge and information concerning events that occurred before the commencement of the liquidation of PPVA and the appointment of the JOLs is based upon my review of books and records collected by the JOLs in connection with such appointment.

4.      The statements concerning my own acts and deeds are true and correct.

5.      The statements concerning the acts and deeds of others are true and correct to the best of my knowledge, information and belief.

6.      I declare under penalty of perjury under the laws of the State of Delaware that statements in this Verification are true and correct.

Martin Nicholas Trott, as Joint Official
Liquidator and Foreign Representative of
Platinum Partners Value Arbitrage Fund
L.P. (in official liquidation)

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

Notary Public

Name:   PAMELA MYRIE
Commission expires:   January 31, 2020

Pamela E. Myrie, a Notary Public
in and for the Cayman Islands.
(My commission expires on
January 31, 20__)

2

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| AGH PARENT LLC, *et al*., | )   C.A. No. |
| | ) |
| Defendants. | ) |
| v. | ) |
| | ) |
| PLATINUM MANAGEMENT (NY) LLC, *et al*., | ) |
| | ) |
| Nominal Defendants. | ) |

## VERIFICATION

_Grand Cayman_____, Cayman Islands :: ss.

BE IT REMEMBERED that on this 7th day of June, 2019, personally came before me, the Subscriber, a Notary Public for the Country aforesaid, Martin Nicholas Trott, who being duly sworn according to law, did depose and say as follows:

1.    I, along with my colleague, Christopher Smith, are the joint official liquidators and foreign representatives ("JOLs") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("PPVA").  The JOLs are named as a Plaintiff in the Verified Complaint for this action, and I am authorized on behalf of the JOLs to make and execute this Verification.

2.    I have reviewed the Verified Complaint and the exhibits thereto.

1

3.      My knowledge and information concerning events that occurred before the commencement of the liquidation of PPVA and the appointment of the JOLs is based upon my review of books and records collected by the JOLs in connection with such appointment.

4.      The statements concerning my own acts and deeds are true and correct.

5.      The statements concerning the acts and deeds of others are true and correct to the best of my knowledge, information and belief.

6.      I declare under penalty of perjury under the laws of the State of Delaware that statements in this Verification are true and correct.

Martin Nicholas Trott, as Joint Official
Liquidator and Foreign Representative of
Platinum Partners Value Arbitrage Fund
L.P. (in official liquidation)

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

Notary Public

Name:  PAMELA MYRIE
Commission expires:  January 31, 2020

Pamela E. Myrie, a Notary Public
in and for the Cayman Islands.
(My commission expires on
January 31, 20 2c)

2

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al*., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AGH PARENT LLC, *et al*., | )    C.A. No. ) |
| Defendants. | ) ) |
| v. | ) ) |
| PLATINUM MANAGEMENT (NY) LLC, *et al*., | ) ) ) |
| Nominal Defendants. | ) ) |

### VERIFICATION

_Grand Cayman_, Cayman Islands :: ss.

BE IT REMEMBERED that on this 7th day of June, 2019, personally came before me, the Subscriber, a Notary Public for the Country aforesaid, Martin Nicholas Trott, who being duly sworn according to law, did depose and say as follows:

1.    I, along with my colleague, Christopher Smith, are the joint official liquidators and foreign representatives ("JOLs") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("PPVA"), a member of Principal Growth Strategies, LLC ("PGS"). PGS is named as a Plaintiff in the Verified Complaint for this action, and I am authorized on behalf of PGS to make and execute this Verification.

1

2.     I have reviewed the Verified Complaint and the exhibits thereto.

3.     My knowledge and information concerning events that occurred before the commencement of the liquidation of PPVA and the appointment of the JOLs is based upon my review of books and records collected by the JOLs in connection with such appointment.

4.     The statements concerning my own acts and deeds are true and correct.

5.     The statements concerning the acts and deeds of others are true and correct to the best of my knowledge, information and belief.

6.     I declare under penalty of perjury under the laws of the State of Delaware that statements in this Verification are true and correct.

Martin Nicholas Trott, as Joint Official
Liquidator and Foreign Representative of
Platinum Partners Value Arbitrage Fund
L.P. (in official liquidation), operating
manager of Principal Growth Strategies,
LLC

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

Notary Public

Name: PAMELA MYRIE
Commission expires: January 31, 2020

Pamela E. Myrle, a Notary Public
in and for the Cayman Islands.
(My commission expires on
January 31, 2020)

2

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 1

# OPERATING AGREEMENT

## OF

### Principal Growth Strategies LLC

This Operating Agreement effective as of this 4th day of December, 2014 by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## Article I

### Definitions

Section 1.1     As used herein, the following terms and phrases shall have the meanings indicated:

A.     "Act" shall mean the Delaware Limited Liability Company Act, as amended.

B.     "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member.  Members' Capital Accounts shall be determined and maintained in accordance with the rules of paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.     "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.     "Cash Flow" shall have the meaning provided in Section 7.1.

E.     "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.     "Operating Managers" shall mean the Member or Members selected by the Members in accordance with this Agreement to serve as Operating Manager or Operating Managers of the Company.

G.     "Members" shall mean the persons designated as such in this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.    The words "membership interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the current profits of the Company bears to the aggregate shares of all the Members determined in accordance with section 503 of the Act which states that profits and losses shall be allocated on the basis of the value of the contributions of each Member as stated in the Operating Agreement.  A "majority in interest of the Members" and "two-thirds in interest of the Members" shall mean Members whose aggregate share of the current profits of the Company constitute more than one-half or two-thirds, respectively, of the aggregate shares of all the Members.  A Membership Interest may be evidenced by a certificate issued by the Company.  A Membership Interest may be expressed on a certificate as "Units" where a Member's Unit bears to the aggregate Membership Interests of all Members.  A Member's Interest may be a certificated security or an uncertificated security within the meaning of section 8-102 of the uniform commercial code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the uniform commercial code, be deemed to be a general intangible asset.

J.    "Company" shall mean this Limited Liability Company.

K.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## Article II

### Organization of the Company

Section 2.1    The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

Section 2.2    The Company name shall be Principal Growth Strategies LLC.  The Members shall be Members in the Company and shall continue to do business under the name until the Operating Managers shall change the name or the Company shall terminate.

Section 2.3    The principal address of the Company shall be 152 W. 57th Street, 4th Floor, New York, NY 10019-3310, or such other place or places as the Operating Managers may determine.  The Operating Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

Section 2.4    The Company shall have perpetual existence, except that the Company may terminate prior to such date as provided in this Agreement.

## Article III

### Status of Members

Section 3.1     No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

Section 3.2     No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

Section 3.3     No Member will have the right to require partition of the Property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provisions of law to the contrary.

## Article IV

### Meeting of Members

Section 4.1     An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the State of its organization) as shall be fixed by the members.  At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

Section 4.2     A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of a majority in interest of the Members entitled to vote at such meeting.  Any such request shall state the purpose or purposes of the proposed meeting.  Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

Section 4.3     Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose discretion the meeting is being called), shall be given by the Operating Managers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting.  Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice.  The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting

may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

Section 4.4   The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute or the Articles of Organization.  If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.  When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

Section 4.5   Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy.  Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

Section 4.6   Every proxy must be signed by the member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted.  No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy.  Every proxy shall be revocable at the pleasure of the person executing its except as otherwise provided by statute.  Unless the proxy by its terms provides for a specific  revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

Section 4.7   All meetings of Members shall be presided over by the Operating Managers, or if not present, by a Member thereby chosen by the Members at the meeting.  The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

Section 4.8   For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members.  Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action.  When a determination of Members of record entitled to notice of, or to vote at any

meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

Section 4.9   The company shall be entitled to treat the holder of record of any membership interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such membership interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## Article V

## Management

Section 5.1   Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company.  The Operating Managers shall vote in proportion to their Membership Interests in the Company.  Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the Members.  All Operating Managers must be Members of the Company.  No Member will take part in or interfere in any manner with the conduct or control of the business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

Section 5.2   The Operating Managers shall hold office for the term for which elected and until a successor has been elected and qualified.  A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

Section 5.3   Any Operating Manager may resign at any time by giving written notice to the Members.  Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

Section 5.4   The Company shall by managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement.  In addition to and not in limitation of any right and powers conferred by law or other provisions of this Agreement, the Operating Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.  Such powers shall include, without limitation, the following:

A.   To open accounts and deposit and maintain funds in the name of the Company in banks or savings and loan associations;

B.   To determine the appropriate accounting method or methods to be used by the Company;

C.   To commence lawsuits and other proceedings;

D.     To retain accountants, attorneys or other agents to act on behalf of the Company;

E.     To execute, acknowledge and deliver any and all instruments to effectuate the foregoing, and to take all such action in connection therewith as the Operating Managers deem necessary or appropriate.

Section 5.5     Notwithstanding the foregoing, the Operating Managers may not make any of the following management decisions without obtaining the consent of two-thirds in interest of the Members:

A.     To acquire, sell, assign, or otherwise transfer any interest in any property;

B.     To create any indebtedness for borrowed money whether or not secured;

C.     To make, execute or deliver on behalf of the Company any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond;

D.     To obligate the Company or any Member as a surety, guarantor or accommodation party to any obligation;

E.     To confess any judgement on behalf of the Company;

F.     To do any act which makes it impossible to carry on the ordinary business of the Company;

G.     To make any decision regarding any employee;

H.     To obligate the Company in any manner for a liability in excess of $10,000.

Section 5.6     The Operating Manager shall serve as Tax Matters Member as such term is defined in Code Section 6231(a)(7).

Section 5.7     Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgements, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act.  Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

**Article VI**

**Capital**

Section 6.1     The Members have contributed to the Company in exchange for their membership interests their interests the cash and other property as set forth on Schedule A, annexed hereto.

Section 6.2     The fair market value and the adjusted basis of the contributing Member of any property other  than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

Section 6.3     Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

Section 6.4     No interest shall be paid on the Capital Account of any Member.

Section 6.5     A Capital Account shall be established for each Member on the books and records of the Company in accordance with section 1.1.B.  If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## Article VII

### Distributions of Cash

Section 7.1     The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company, (such cash is sometimes referred to herein as "Cash Flow").  For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in the ratio in which the total Capital Contributed by each Member pursuant to Section 6.1 on the last day of each calendar month during the year bears to the total Capital Contributed of days during such month in which such a person was a member.

Section 7.2     Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## Article VIII

### Profits and Losses

Section 8.1     The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

Section 8.2     The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

Section 8.3     References herein to "Reg. Sec." are to the regulations promulgated by the United States Treasury to the Code.  The terms "minimum gain", "minimum gain chargeback", "qualified income offset" and "nonrecourse deduction" are to be interpreted consistent with the definitions of such terms in Reg. Sec. 1.704-2.  "Nonrecourse liability" means any liability with

respect to which no Member bears the risk of loss under Code Section 752. The following special allocations shall be made in the following order:

A.   Except as otherwise set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.   Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such Member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

C.   A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the agreement.

D.   Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

E.   Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

Section 8.4     Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant

to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## Article IX

## Admission and Withdrawal of a Member

Section 9.1     A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

Section 9.2     The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

Section 9.3     All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

Section 9.4     Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## Article X

## Termination or Dissolution of Company

Section 10.1    The Company shall be terminated prior to the date of expiration of the term as provided in Section 2.4 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

Section 10.2    The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for of all or any substantial part of his properties; (iii) dies; or (iv) a judgement is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

Section 10.3   If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a Successor Company upon the same conditions as are set forth in this Agreement.  Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

Section 10.4   Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company.  The proceeds of such liquidation shall be applied and distributed as follows:

A.     If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled.  The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants.  The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B.     All distributions upon liquidation of the Company shall be distributed as follows: to each of the members, in proportion to the amounts of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and any deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation.  No member shall be liable to repay the negative amount of his Capital Account.

Section 10.5   Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation.  Upon completion of the liquidation, the Operating Manager shall execute and cause to be filed Articles of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## Article XI

## Books and Reports

Section 11.1   The Operating Managers shall cause the Company to maintain the following records:

A.   Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company.  The fiscal year of the Company shall be the calendar year.  The books of account of the Company shall be kept in accordance with sound accounting practices and principals applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes.  All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

B.   A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Limited Liability Company and any amendments thereto; a copy of the Limited Liability Company Operating Agreement and any amendments thereto; a copy of the Limited Liability Company's federal, state and local income tax returns for the three most recent fiscal years.

C.   Any Member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

Section 11.2   No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business.  Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

Section 11.3   The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## Article XII

### Tax Elections

Section 12.1   In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the

–11–

Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## Article XIII

### Miscellaneous

Section 13.1   Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.   If to the Company, to it in care of the Operating Managers at the address of the Company.

B.   If to the Operating Managers, to them at the address of the Company.

C.   If to any Member, to him at his address set forth on the books and records of the Company.

Section 13.2   This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members.  There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

Section 13.3   This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

Section 13.4   This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

Section 13.5   Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

Section 13.6   Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

Section 13.7    The captions, headings and table of contents in this Agreement are solely for convenience of references and shall not affect its interpretation.

Section 13.8    This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

Section 13.9    Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the  singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

**IN WITNESS WHEREOF**, the Members have executed this Agreement as of the day first above set forth.

Principal Growth Strategies LLC

By: _____
Name:  Mark Nordlicht
Title:  Managing Member

## SCHEDULE A

## Principal Growth Strategies LLC

| Member's Full Name and Mailing Address | Percentage of Membership Interests | Initial Contribution |
|---|---|---|
| Platinum Partners Value Arbitrage Fund c/o the Company | 55% | $550 |
| Platinum Partners Credit Opportunities Fund c/o the Company | 45% | $450 |

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 2

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 131 OF 2016 (AJJ)

IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC
IN CHAMBERS
25 AUGUST 2016



## ORDER

**UPON** the application (this "**Application**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") acting by Platinum Management (NY) LLC (the "**General Partner**") in its capacity as the general partner of the Master Fund pursuant its *ex parte* Summons issued on 23 August 2016 for the appointment of joint provisional liquidators pursuant to section 104(3) of the Companies Law (2013 Revision) (as amended) (the "**Companies Law**") (as applied by and subject to section 36 of the Exempted Limited Partnership Law, 2014);

**AND UPON** reading the winding up petition presented by the Master Fund acting by its General Partner on 23 August 2016 2016 (the "**Petition**"), the First Affidavit of Mark Nordlicht sworn on 23 August 2016, the Second Affidavit of Nordlicht sworn on 23 August 2016, the Third Affidavit of Mark Nordlicht sworn on 24 August 2016, the First Affidavit of Matthew Wright sworn on 19 August 2016, the First Affidavit of Christopher Kennedy sworn on 19 August 2016, the First Affidavit of Patrick McConvey sworn on 24 August 2016 and the respective exhibits thereto;

**AND UPON** hearing counsel for the Master Fund, acting by its General Partner

**IT IS ORDERED THAT**:

1.      Matthew Wright and Christopher Kennedy both of RHSW (Cayman) Limited, Windward
        1, Regatta Office Park, P.O. Box 897, West Bay Road, Grand Cayman, KY1-1103,

Cayman Islands, be appointed as joint provisional liquidators (the "**JPLs**") of the Master Fund with the power to act jointly and severally and during the period of their appointment, any act required or authorised to be done by the JPLs may be done by any one or more of the JPLs.

2.     The JPLs shall not be required to give security for their appointment.

3.     The JPLs are hereby authorised jointly and severally to take such steps as, in their discretion, may be necessary or expedient for the purpose of presenting a compromise or arrangement to the creditors of the Master Fund in order to facilitate the maximisation of the value of the assets of the Master Fund upon their realisation.

4.     In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law, the JPLs are hereby authorised jointly and severally to exercise any of the following powers without further sanction of the Court:

   (a)     the power to defend any action or other legal pending against the Master Fund;

   (b)     the power to enter into discussions and negotiations for and on behalf of the Master Fund for the purpose of, but not limited to -

      (i)      restructuring the Master Fund's business and operations;

      (ii)     restructuring or rescheduling the Master Fund's indebtedness; and/or

      (iii)    making any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Master Fund or for which the Master Fund may be rendered liable;

   (c)     the power to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels, in each case subject to the prior consent of the liquidation committee constituted pursuant to paragraph 5 of this Order (the "**Liquidation Committee**") or, if such consent is not provided, subject to the prior sanction of the Court;



(d)     the power to raise or borrow money and grant securities therefor over the property of the Master Fund, in each case subject to the prior consent of the Liquidation Committee or, if such consent is not provided, subject to the prior sanction of the Court;

(e)     the power to engage staff (whether or not as employees of the Master Fund) to assist the JPLs in the performance of their functions;

(f)     the power to engage independent attorneys and other professionally qualified persons to assist the JPLs in the performance of their functions, whether in the Cayman Islands or elsewhere provided that the JPLs shall not engage Walkers, Schulte Roth & Zabel LLP or Dechert LLP as attorneys for the JPLs;

(g)     the power to:

    (i)     take control of the ownership interests of the Master Fund in its direct subsidiaries and/or joint ventures, investment, associated companies, business or other entities ("**Subsidiaries**") of the Master Fund in which the Master Fund holds an interest, in each case wherever located, as the JPLs shall think fit;

    (ii)    call or cause to be called such meetings of such Subsidiaries and/or to sign such resolutions (in each case in accordance with the provisions of any relevant constitutional or related documentation of such companies) and take such other steps, including applications to appropriate courts and/or regulators, as the JPLs shall consider necessary to appoint or remove directors, legal representatives, officers, and/or managers  to or from such Subsidiaries, and in each case take such steps as are necessary to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries to give effect to the changes to the boards of directors, legal representatives, officers, and/or managers of such Subsidiaries, including (without limitation) effecting changes to the company registers of such Subsidiaries as may be deemed appropriate by the JPLs; and/or

(iii)    to take such other action in relation to all such Subsidiaries as the JPLs shall think fit for the purpose of protecting the assets of the Master Fund and managing the affairs of the Master Fund;

(h)    the power to communicate with and carry out any necessary filings with regulatory bodies as appropriate, including, without limitation, the Cayman Islands Registrar of Exempted Limited Partnerships, the Cayman Islands Monetary Authority and the United States Securities and Exchange Commission in the name and on behalf of the Master Fund;

(i)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage either Platinum Management (NY) LLC, or another professional asset manager, to act as investment adviser;

(j)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage or re-engage the services of Guidepost Solutions LLC; and

(k)    the power to do all acts and execute, in the name and on behalf of the Master Fund, all deeds, receipts and other documents in connection with the exercise of their powers notwithstanding that the JPLs are not the general partner of the Master Fund and, for that purpose, use the Master Fund's seal (if any) when necessary.

5.    A Liquidation Committee shall be constituted consisting of -

(a)    not more than three creditors of the Master Fund;

(b)    an unredeemed shareholder of Platinum Partners Value Arbitrage Fund (International) Limited (the "**Offshore Feeder Fund**"); and

(c)    a limited partner of Platinum Partners Value Arbitrage Fund (USA) LP ("the **Onshore Feeder Fund**")

6.    To the fullest extent permitted by law, the Liquidation Committee and its members shall have no duty, whether fiduciary or otherwise, to any other creditor, the Master Fund, the

Offshore Feeder Fund, the Onshore Feeder Fund, the JPLs or any other person by reason of, or in connection with, their membership of or participation in the Liquidation Committee.

7.    The Liquidation Committee be authorised to engage Cayman Islands attorneys whose fees and expenses, reasonably and properly incurred on the instructions of the Liquidation Committee, shall be paid out of the assets of the Master Fund as an expense of the provisional liquidation.

8.    The JPLs be authorised, if they think fit, to take any such action as may be necessary or desirable to obtain recognition of the appointment of the JPLs in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose, including, without limitation as representatives of the Master Fund (as applicable) to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate.

9.    Pursuant to Section 97 of the Companies Law, no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Master Fund except with the leave of the Court and subject to such terms as the Court may impose.

10.    Pursuant to Section 99 of the Companies Law, no disposition of the Master Fund's property by or with the authority of the JPLs in either case in the carrying out of their duties and functions and the exercise of their powers pursuant to this Order shall be avoided and any payments made into or out of the bank accounts(s) of the Master Fund in the ordinary course of business of the Master Fund between the date of the presentation of the Petition herein and the date of the appointments of the JPLs shall not be avoided by virtue of the provisions of section 99 of the Companies Law in the event of an order for the winding up of the Master Fund being made on the Petition.

11.    The costs of and incidental to the Application incurred by the Master Fund shall be agreed and paid by the JPLs out of the assets of the Master Fund.



**AND IT IS FURTHER DIRECTED THAT:**

12.  The hearing of the Petition shall be adjourned to 27 October 2016 at 10.00 am and any creditor of the Master Fund shall have liberty to apply, upon not less than 14 days' notice to the Master Fund and the JPLs, to –

    11.1 discharge or vary this order; and/or

    11.2 remove the JPLs and appoint alternative provisional liquidators.

13.  Any creditor or shareholder of the Offshore Feeder Fund and any creditor or limited partner of the Onshore Feeder Fund may be heard on the adjourned hearing of the Petition.

14.  The JPLs and/or the General Partner shall cause copies of the Petition and this Order to be served upon –

    14.1   all creditors of the Master Fund;

    14.2   all redemption creditors and shareholders of the Offshore Feeder Fund; and

    14.3   all creditors and limited partners of the Onshore Feeder Fund.

15.  The JPLs shall provide copies of all affidavits and exhibits thereto filed in support of the Petition and the Summons, upon request, to any creditor, shareholder and/or limited partner of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

16.  The JPLs shall file a report to the Court detailing the progress of the provisional liquidation and setting out their recommendations for any potential restructuring and shall make such report available to all creditors and limited partners of the Master Fund and all creditors and shareholders of the Offshore Feeder Fund and all creditors and limited partners of the Onshore Feeder Fund by no later than 13 October 2016.



17.   A transcript of the hearing of this Application shall be prepared and approved by the Judge and the JPLs shall provide copies, upon request, all creditors, shareholders and limited partners of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

DATED this 25th day of August 2016

FILED this 29th day of August 2016

_____
The Honourable Mr. Justice Andrew J. Jones QC

**JUDGE OF THE GRAND COURT**

This Order is filed by Walkers, Attorneys at Law for the Petitioner whose address for service is care of its said Attorneys at Law, Walkers, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9001, Cayman Islands.

**EFiled: Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 3

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 131 of 2016 (AJJ)

The Honourable Mr. Justice Andrew J. Jones QC
In Open Court, 27 October 2016

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN PROVISIONAL LIQUIDATION)

---

### WINDING UP ORDER

---

UPON hearing counsel for Platinum Management (NY) LLC in its capacity as general partner of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (the "**Master Fund**") on the adjourned hearing of the winding up petition presented in respect of the Master Fund on 23 August 2016

AND UPON reading the First affidavit of Harris D. Kealey sworn on 19 October 2016, the Second Affidavit of Matthew Wright sworn on 24 October 2016, the First Affidavit of Claire Loebell sworn on 10 October 2016, the First Affidavit of Kieran Hutchison sworn on 12 October 2016, the Fourth Affidavit of Mark Nordlicht sworn on 26 October 2016, the Third Affidavit of Matthew Wright sworn on 26 October 2016, the First Affidavit of Richard Bernstein sworn on 26 October 2016 and the respective exhibits thereto

AND UPON hearing (a) counsel for Mr. Matthew Wright and Mr. Christopher Kennedy, both of RHSW (Cayman) Limited ("**Messrs. Wright and Kennedy**") in their capacity as joint provisional liquidators of the Master Fund, (b) counsel for New Mountain Finance Company, a creditor of the Master Fund, (c) counsel for BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, Senior Health Insurance Company of Pennsylvania and BBIL ULICO (referred to collectively as "the Beechwood Group"), Jules and Barbara Nordlicht, Parker Family Limited Partnership, Alaska Trust Company, Swedbank for Core Peak Hedge, Adela Kenner de Katz, Shumuel and Serena Fuchs Foundation, Paularene Management Inc. and Rivie Schewebel

Retirement Plan, creditors of the Master Fund and/or shareholders or creditors of Platinum Partners Value Arbitrage Fund (International) Limited (In Liquidation) (the "**Feeder Fund**")

**AND UPON** having determined that the same insolvency practitioners should not serve as official liquidators of both the Master Fund and the Feeder Fund

**AND UPON** Messrs Wright and Kennedy having given notice to the Court of their intention to resign as official liquidators of the Feeder Fund in the event that their interim appointment as official liquidators of the Master Fund is confirmed by the Court at a hearing to be held on 12 December 2016 in respect of both this cause and Cause FSD 118 of 2016 – AJJ) (the "**Combined Hearing**")

**AND UPON** the Court having determined that all matters relating to the appointment of official liquidators of the Master Fund and Feeder Fund should be heard and determined together at the Combined Hearing

**IT IS ORDERED THAT**

1.   The Master Fund be wound up in accordance with the provisions of the Companies Law (2016 Revision) as applied by section 36 of the Exempted Limited Partnership Law 2014.

2.   Messrs. Wright and Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman, KY1-1103, be appointed as the joint official liquidators of the Master Fund on an interim basis until the end of the Combined Hearing or further order of the Court.

3.   The Official Liquidators shall have the power to act jointly and severally and any act required or authorised to be done by the official liquidators may be done by either or both of them.

4.   The Official Liquidators shall not be required to give security for their appointment.

5.   In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law (2016 revision), the Official Liquidators may also exercise the following powers set

out in Part I of the Third Schedule without further sanction or intervention from the Grand Court:

a.      the power to defend or continue any action or legal proceedings pending against the Master Fund or previously commenced by the Master Fund, including but not limited to those actions and proceedings referred to in paragraphs 3.52 to 3.59 of the Abridged Report;

b.      the power, subject to the unanimous approval of the liquidation committee (failing which, the sanction of the court, to be sought on no less than 5 days' notice),  to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels in order to be able to realise any of the Master Funds' assets;

c.      the power to engage Collas Crill as Cayman Islands legal counsel and Holland & Knight as United States legal counsel;  and

d.      power to continue the petition presented to the United States Bankruptcy Court, Southern District of New York (No.16-1295-scc) for recognition under Chapter 15 of the United States Bankruptcy Code.


6.      No suit, action or other proceedings, including criminal proceedings, shall be proceeded or commenced against the Master Fund except with leave of the Grand Court pursuant to section 97 of the Companies Law (2016 Revision).

7.      No disposition of the Master Fund property by or with the authority of the Official Liquidators in the carrying out of their duties and functions and the exercise of their powers shall be avoided by virtue of section 99 of the Companies Law.


**AND IT IS FURTHER DIRECTED THAT**

8.      The Official Liquidators shall prepare and file a report to the Court which shall deal with the following matters -

(a) A plan in respect of the work intended to be performed by or on behalf of the Official Liquidators in the six months ended 30 April 2017, including details of the staff who will be engaged;

(b) A budget in respect of the anticipated liquidation expenses for the period ended 30 April 2017;

(c) Details of any law firms other than Collas Crill and Holland & Knight which are proposed to be engaged by the Official Liquidators;

(d) Details of the professional portfolio manager(s) intended to be engaged or re-engaged  by the Official Liquidators, including drafts of the proposed contracts of engagement;

(e) In the event that the Official Liquidators intend to engage Guidepost Solutions LLC, details of the proposed engagement including a draft of the proposed contract of engagement;

(f) Details of the "key professionals" intended to be engaged by the Official liquidators or employed by the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts engagement or employment; and

(g) Details of any other professional service providers intended to be engaged by the Official Liquidators or engaged or re-engaged to act on behalf of the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts of engagement

("**the Report**").

9. The Report shall be filed by Monday 21 November 2016 and shall be served on or sent by e-mail to (a) the members of the Liquidation Committees of both the Master Fund and the Feeder Fund, (b) all known creditors of the Master Fund and (c) the shareholders and all known creditors of the Feeder Fund.

10. The Liquidation Committee constituted following the meeting convened on 28 September 2016 (pursuant to paragraph 5 of the Order made on 25 August 2016) shall remain in place and retain its authority to act until further order of the Court.

11. In the event that the Liquidation Committee (or any of its members acting individually) or any creditor of the Master Fund wishes to nominate a qualified insolvency practitioner(s) for appointment as official liquidator of the Master Fund in place of Messrs. Wright and Kennedy, notice of his intention together with supporting affidavits which shall comply

with the requirements of CWR Order 3, rule 4 and address, so far as possible, the matters referred to in the Report, shall be served on the Official Liquidators no later than Monday 5 December 2016

DATED this 27th day of October 2016

FILED this 2nd day of November 2016

The Honourable Mr. Justice Andrew J. Jones QC

This Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, Floor 2, Willow House, Cricket Square, George Town, PO Box 709, Grand Cayman, KY1-1107, CAYMAN ISLANDS

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 4

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
| PLATINUM PARTNERS VALUE | : | Case No. 16-12925 (SCC) |
| ARBITRAGE FUND L.P. (IN | : |  |
| PROVISIONAL LIQUIDATION),[1] *et al.*, | : | (Jointly Administered) |
|  | : |  |
| Debtors in | : |  |
| Foreign Proceedings. | : |  |
|  | : |  |
|  | : |  |

---------------------------------------------------------x

### ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official liquidators ("**Petitioners**" or "**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) ("**Master Fund**") and the duly appointed joint official liquidators of Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) ("**International Fund**" and together with Master Fund, the "**Funds**"), both Funds in liquidation by way of the Financial Services Division of the Grand Court of the Cayman Islands (the "**Grand Court**") (cause nos. FSD 131 of 2016 (AJJ) (Master Fund) and 118 of 2016 (AJJ) (International Fund)) as a result of the Grand Court's orders (the "**Liquidation Orders**") made pursuant to petitions for the winding up of the Funds under, as applicable, sections 92 and 104 of the Companies Law of the Cayman Islands (2016 Revision) (the "**Companies Law**") and section

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses: Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (1954) and Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) (2356). The registered office of the International Fund is c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands. The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

36 of the Exempted Limited Partnership Law, 2014 ("**ELP Law**") (collectively, the "**Cayman Liquidations**"), by its United States counsel, Holland & Knight LLP, filed Official Form Petitions, the *Verified Petition for Recognition of Foreign Insolvency Proceedings and Application for Additional Relief, Pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "**Verified Petition**,"[2] and, together with the Official Form Petitions, the "**Petition**"), and the accompanying Kennedy Declaration, Leontsinis Declaration, and Gluck Declaration, seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Petition, Kennedy Declaration, Leontsinis Declaration and the Gluck Declaration, together with all exhibits thereto, in support of the Petition, and hearing no objections thereto, and a hearing having been held on November 21, 2016 the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the Hearing thereon having been given by the Liquidators, pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and having been updated pursuant to Section 1518 of the Bankruptcy Code, and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

     A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated February 1, 2012.

---

[2] Capitalized terms used, but not otherwise defined herein shall have the meanings given to them in the Verified Petition.

B.       Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (2) because there is an action pending against the Funds within this judicial district, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.       This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.       The Liquidators are the "foreign representatives" of the Funds pursuant to 11 U.S.C. § 101(24).

E.       The chapter 15 cases of the Funds were properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

F.       The Liquidators have satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.       The Cayman Liquidations are "foreign proceedings" pursuant to 11 U.S.C. § 101(23).

H.       The Cayman Liquidations are entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.        The Cayman Liquidations are pending in the Cayman Islands, the country where the Funds' center of main interests is located, and accordingly the Cayman Liquidations are foreign main proceedings pursuant to 11 U.S.C. § 1502(4), and are entitled to recognition as foreign main proceedings pursuant to 11 U.S.C. § 1517(b)(1).

J.        The Liquidators are entitled to all of the relief provided under 11 U.S.C. § 1520 and 1521 without limitation.

K.       The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520 and 1521.

3

**NOW, THEREFORE, IT IS HEREBY**

1. **ORDERED**, that the Petition is granted as set forth herein;

2. **ORDERED**, that the Cayman Liquidations are recognized as foreign main proceedings pursuant to 11 U.S.C. §§ 1517(a) and (b)(1);

3. **ORDERED**, that all persons and entities (other than the Liquidators and their expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1) executing against the Funds' property or assets;

(2) taking or continuing any act to obtain possession of, or exercise control over, the Liquidators (with respect to the Funds), the Funds, or any of the Funds' property or assets;

(3) taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against the Liquidators (with respect to the Funds), the Funds or any of the Funds' property or assets as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to the Funds or any of the Funds' property or assets; and

(4) transferring, relinquishing or disposing of any property of the Funds to any person or entity other than the Liquidators;

and it is further

4. **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the Cayman Liquidations; and it is further

5. **ORDERED**, that 11 U.S.C. § 1521(a)(1-3) shall be effective with respect to the Cayman Liquidations and/or the stay, as provided for by Section 97(1) of the Companies Law, shall be effective in the United States of America pursuant to 11 U.S.C. § 1507; and it is further

6. **ORDERED**, that the Liquidators or any third person acting pursuant to the Liquidators' instructions or agreement may transfer funds or property belonging to the Funds

4

into or out of the United States of America in accordance with their respective obligations to the Funds or under the Cayman Liquidations; and it is further

7.      **ORDERED**, that the Liquidators are hereby authorized to examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of the Funds, the Funds affiliates and the Funds' subsidiaries by:

   a.  issuing discovery requests to intermediary banks that process U.S. dollar-denominated wire transfers and maintain records of such transfers;

   b.  upon written request, obtaining turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails that are property of, concern or were made or issued on behalf of the Funds, from any person or entity subject to this Court's jurisdiction; and

   c.  upon service of this order, prohibiting all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any electronic data, documents, records, filings, or other information, however stored, concerning or relating to the assets, affairs, rights, obligations or liabilities of the Funds; and it is further

8.      **ORDERED**, that the Liquidators are authorized to operate the business of the Funds that is the subject of Cayman Liquidations and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. §§ 1520 and 1521; and it is further

9.      **ORDERED**, that the Liquidators are hereby granted authority to assert claims of the Funds against parties that are subject to jurisdiction in the United States of America; and it is further

10.      **ORDERED**, that the administration or realization of all or part of the assets of the Funds within the territorial jurisdiction of the United States of America is hereby entrusted to the Liquidators and the Liquidators are hereby established as the exclusive representatives of the Funds in the United States of America; and it is further

5

11.     **ORDERED**, that this Court retains jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through these chapter 15 cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and it is further

12.     **ORDERED**, that, notwithstanding Bankruptcy Rule 7062, made applicable to these chapter 15 cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated:

November 22, 2016
New York, New York

/S/ Shelley C. Chapman
Honorable Shelley C. Chapman
United States Bankruptcy Judge

6

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 5

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 131 of 2016 (AJJ)**

**IN CHAMBERS**
**29 SEPTEMBER 2017**

**BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2014 REVISION)**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)**

---

**ORDER**

---

**UPON** reading the application of Mr. Matthew Wright and Mr. Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter dated 15 September 2017 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Liquidation Committee of the Master Fund consenting to the Application

**AND UPON** the JOLs having engaged Rehmann Robson as US tax advisors

**AND UPON** the JOLs having negotiated the terms of a proposed Settlement and Assignment Agreement and General Release (the "**Airdye Settlement**") made by and among the Master Fund; Platinum Partners Credit Opportunities Master Fund LP ("**PPCO**"); and Meserole LLC; Airdye Holdings LLC; Saviva FS I LP; Saviva FS I GP LLP; Fuller Smith Capital Management LLC; Daniel Fuller; Debs Corporation; Hiroshi Hayashi; Soubhi Debs; Hani Debs; and Mystic Bay Holdings Ltd

1

**AND UPON** the Court being satisfied that the resignation of Mr Matthew Wright as a joint official liquidator of the Master Fund should take effect from 30 September 2017 and that Mr Martin Nicholas John Trott should be appointed as successor liquidator

**IT IS ORDERED THAT:**

1.  The JOLs shall have the power to engage Rehmann Robson as tax advisors on the terms pursuant to the engagement letter executed on behalf of the Master Fund on 12 September 2017.

2.  The JOLs shall have the power to enter into the Airdye Settlement on substantially the same terms as the version enclosed with the Application and executed on behalf of PPCO.

3.  Mr Matthew Wright be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 30 September 2017 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules 2008 (as amended) ("**CWR**").

4.  Mr Martin Nicholas John Trott of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Matthew Wright with effect from 30 September 2017 pursuant to Order 5, rule 6 of CWR.

5.  The Application and the supporting documents enclosed with it shall be sealed for a period of six months.

6.  The costs of and incidental to this application insofar as they relate to paragraphs 1 and 2 of this Order shall be paid out of the assets under the JOLs' control as an expense of the administration of the PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

7.  The additional costs of this application insofar as they relate to paragraphs 3 and 4 of this Order are not recoverable as an expense of the administration of the

2

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

**DATED** this 29th day of September 2017

**FILED** this 2nd day of October 2017

**The Honourable Mr. Justice Andrew J. Jones QC**
**Judge of the Grand Court**

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 131 of 2016 (NAS)**

**IN CHAMBERS**

**BEFORE THE HONOURABLE MR. JUSTICE NICHOLAS A. SEGAL**

**IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)**

---

### ORDER

---

**UPON** reading the application of Mr. Martin Trott and Mr Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter from Collas Crill dated 26 June 2018 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Court being satisfied that the resignation of Mr. Christopher Kennedy as a joint official liquidator of the Master Fund should take effect from 8 June 2018 and that Mr. Christopher Smith should be appointed as successor liquidator

**AND UPON** the application having been dealt with on the papers

**IT IS ORDERED THAT:**

1.      Mr. Christopher Kennedy be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 8 June 2018 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules, 2018 ("**CWR**").

1

2.     Mr. Christopher Smith of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Mr. Christopher Kennedy with effect from 8 June 2018 pursuant to Order 5, rule 4(6) of the CWR.

3.     The costs of the Application are not recoverable as an expense of the liquidation.

**DATED** this 6th day of July 2018

**FILED** this 9ᵗʰ day of July 2018

_____
**The Honourable  Mr. Nicholas Segal**
Judge of the Grand Court

2

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,   :
       :
       Plaintiff,   :
       :
       :   **SECOND AMENDED ORDER**
   -against-   :   **APPOINTING RECEIVER**
       :   Docket No. 16-CV-6848 (DLI) (VMS)
PLATINUM MANAGEMENT (NY) LLC;   :
PLATINUM CREDIT MANAGEMENT, L.P.;   :
MARK NORDLICHT;   :
DAVID LEVY;   :
DANIEL SMALL;   :
URI LANDESMAN;   :
JOSEPH MANN;   :
JOSEPH SANFILIPPO; and   :
JEFFREY SCHULSE,   :
       :
       Defendants.   :
------------------------------------------------------------------ x

**WHEREAS** this matter has come before this Court upon motion of the Plaintiff U.S. Securities and Exchange Commission ("SEC", "Commission" or "Plaintiff") to appoint a substitute receiver in the above-captioned action;

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a substitute receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of Platinum Credit Management, L.P.; Platinum Partners Credit Opportunities Master Fund LP; Platinum Partners Credit Opportunities Fund (TE) LLC; Platinum Partners Credit Opportunities Fund LLC; Platinum Partners Credit Opportunity Fund (BL) LLC; Platinum Liquid Opportunity Management (NY) LLC; and Platinum Partners Liquid Opportunity Fund (USA) L.P. ("Receivership Entities"); to (i) preserve the status quo, (ii) ascertain the extent of commingling of funds among the Receivership Entities; (iii) ascertain the true financial condition of the Receivership Entities and the disposition of investor funds; (iv)

prevent further dissipation of the property and assets of the Receivership Entities; (v) prevent the encumbrance or disposal of property or assets of the Receivership Entities; (vi) preserve the books, records and documents of the Receivership Entities; (vii) be available to respond to investor inquiries; (viii) protect investors' assets; (ix) conduct an orderly wind down including a responsible liquidation of assets and orderly and fair distribution of those assets to investors; and (x) determine whether one or more of the Receivership Entities should undertake bankruptcy filings.

**WHEREAS** the Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. This Court continues to take exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the Receivership Entities (the "Receivership Assets").

2. By Order dated July 6, 2017, this Court appointed Melanie L. Cyganowski Receiver. Until further Order of this Court, Melanie Cyganowski will serve without bond as substitute receiver (the "Receiver") for the receivership estate of the Receivership Entities (the "Receivership Estate").

**I. Underline{General Powers and Duties of Receiver}**

3. The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, managing members, and general and limited partners of the Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed.R.Civ.P. 66.

2

4.  All officers, directors, managing members, general and limited partners of the Receivership Entities are and remain dismissed from any and all positions of management of the Receivership Entities, and the powers of any officers, directors, managing members, general and limited partners of the Receivership Entities, are and remain subject to the authority and discretion of the Receiver.  The Receiver shall assume and control the operation of the Receivership Entities and shall pursue and preserve all of the Receivership Entities' claims.

5.  No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities except as may be authorized or delegated by the Receiver.

6.  Subject to the specific provisions in this Order, the Receiver has and shall have the following general powers and duties:

A.      To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property");

B.      To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

3

C.     To manage, control, operate and maintain the Receivership Entities and hold in the Receiver's possession, custody and control all Receivership Property, pending further Order of this Court;

D.     To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the Receiver's duties as Receiver;

E.     To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities;

F.     To engage and employ persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers, subject to Court approval;

G.     To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.     To issue subpoenas for documents and testimony consistent with the Federal  Rules of Civil Procedure and Court orders;

I.     To investigate transactions by and among Receivership Entities, defendants, and any other persons and entities.

J.      To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver;

K.      To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

L.      To take such other action as may be approved by this Court.

7.  The Receiver may, in the Receiver's discretion, consult with any party in interest, including the SEC staff, the individual defendants, creditors, and investors regarding any Receivership matter.

## II. Access to Information

8.      The Receivership Entities and the Receivership Entities' past and/or present officers, directors, managers, managing members, general and limited partners, agents, attorneys, accountants and employees, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

9.      The Receivership Entities and the Receivership Entities' past and/or present officers, directors, agents, managers, managing members, general and limited partners, attorneys, employees, and accountants, shall cooperate with the Receiver and produce all documents as may be required by the Receiver regarding the business of the Receivership Entities, or any other

matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

### III. Access to Books, Records and Accounts

10.     The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Entities.   All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

11.     The Receivership Entities, as well as their past and/or present officers, directors, agents, managers, managing members, general and limited partners, attorneys, employees, and accountants, any persons acting for or on behalf of the Receivership Entities, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, the Receiver's agents and/or employees.

12.     All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, of the Receivership Entities that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

A.     Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

6

B.   Not exercise any form of set-off, alleged set-off, lien, or any form of self-help

whatsoever, or refuse to transfer any funds or assets to the Receiver's control

without the permission of this Court; and

C.   Cooperate expeditiously in providing information and transferring funds, assets

and accounts to the Receiver or at the direction of the Receiver.

**IV.   Access to Real and Personal Property**

13.   The Receiver is authorized to take immediate possession of all personal property

of the Receivership Entities, wherever located, including but not limited to electronically stored

information, computers, laptops, hard drives, external storage drives, and any other such

memory, media or electronic storage devices, books, papers, data processing records, evidence of

indebtedness, bank records and accounts, savings records and accounts, brokerage records and

accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments,

contracts, mortgages, furniture, office supplies and equipment.

14.   The Receiver is authorized to take immediate possession of all real property of the

Receivership Entities, wherever located, including but not limited to all ownership and leasehold

interests and fixtures.  Upon receiving actual notice of this Order by personal service, facsimile

transmission or otherwise, all persons other than law enforcement officials acting within the

course and scope of their official duties, are (without the express written permission of the

Receiver) prohibited from: (a) entering such premises; (b) removing anything from such

premises; or, (c) destroying, concealing or erasing anything on such premises.

15.   In order to execute the express and implied terms of this Order, the Receiver is

authorized to change door locks to the premises described above.  The Receiver shall have

exclusive control of the keys and all other means of access to the real property.   The

7

Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys or other means of access made, nor shall they have keys or other means of access in their possession during the term of the receivership except as authorized by the Receiver.

16.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

## V. Notice to Third Parties

17.     The Receiver shall promptly give notice of the Receiver's appointment to all known persons and entities including past and present officers, directors, managers, managing members, general and limited partners, agents, attorneys, accountants, and employees of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.  Such notice may be provided by electronic means.

18.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest in any Receivership Entities shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Entities had received such payment.

19.     In furtherance of the Receiver's responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that she deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate.   All government offices which maintain public files of

8

security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

20.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.   The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.   The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver.   All personal mail of any individuals, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver.   The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

21.     Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, trash removal, and any other services to the Receivership Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VI. <u>Injunction Against Interference with Receiver</u>

22.     The Receivership Entities and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, that would:

A.      Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.      Hinder, obstruct or otherwise interfere with the Receiver in the performance of the Receiver's duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.      Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Entities, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Entity or which otherwise affects any Receivership Property; or,

D.     Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

23.     The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VII.  Stay of Litigation

24.     As set forth in detail below, the following proceedings, *excluding* (i) the instant proceeding, (ii) all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, and for the avoidance of doubt, (iii) Cause No: FSD 118/2016 (NAS) and Cause No: FSD 131 of 2016 (AJJ) pending before the Grand Court of the Cayman Islands, and (iv) the bankruptcy cases *In re Platinum Partners Value Arbitrage Fund L.P.*, 16-12925 (Bankr. S.D.N.Y.) and *In re Platinum Partners Value Arbitrage Fund International Ltd.*, 16-12934 (Bankr. S.D.N.Y.), are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in the Receiver's capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities; or, (d) any of the Receivership Entities' past or present officers, directors, managers, managing members, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

25.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

26.     All Ancillary Proceedings are stayed in their entirety, and all courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.   Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## VIII.   **Managing Assets**

27.     The Receiver shall at all times administer Receivership Property with the care and diligence that an ordinary prudent individual would use in handling such person's own estate.[1]

28.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of Receivership Property in the ordinary course of business of the Receivership Entities' orderly wind down, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate.

29.     As soon as is practicable, the Receiver shall file with the Court a budget for the subsequent six-month period of the Receivership's liquidation, and shall continue to prepare and file with the Court budgets for such periods that are appropriate under the facts and circumstances of the case until the close of the case.

30.     The Receiver may engage in transactions outside of the ordinary course of business of the Receivership Entities' orderly wind down only upon motion and approval of the

---

[1]   *See, e.g., SEC v. Kirkland*, 2012 U.S. Dist. LEXIS 126739 at *6 (S.D. Fla., Aug. 1, 2012); *Fleet Nat'l Bank v. H & D Entertainment*, 926 F. Supp. 226, 240 n.51 (D. Mass. 1996), aff'd, 96 F.3d 532 (1st Cir. 1996).

Court. For purposes of this paragraph, a transaction outside of the ordinary course of business is any transaction that involves (i) the expenditure of Receivership cash in excess of $3 million, or the disposition of the Receivership Estate's interest in Receivership Property in exchange for cash or property of value in excess of $3 million, and/or (ii) any "carrying on" of a business within the meaning of 28 U.S.C. §959. Notwithstanding anything to the contrary in this Order, the Receiver's release of a security interest or other assignment or termination of rights in connection with the payoff of a loan, or the settlement of a transaction (e.g., pay out on a life insurance policy or realization of a litigation outcome purchase), at par shall be deemed within the ordinary course of business of the Receivership Entities' orderly wind down.

31. At all times the Receiver shall use the Receiver's best efforts to maximize the value realized upon the disposition of Receivership Property, considering the costs and benefits of any proposed transaction for the disposition of Receivership Property and taking into account the risk profile, and the expected time horizon for the disposition, of such Receivership Property.

32. Subject to provisions of paragraph 30 of this Order, the Receiver is authorized, without leave of Court, to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making payments to contractual counter-parties, creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities and others, as appropriate and necessary for the orderly wind down of the Receivership Property consistent with 28 U.S.C. §959.

33.    The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## IX.  **Investigate and Prosecute Claims**

34.    Subject to the requirement, in Section VII above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in the Receiver's discretion, be advisable or proper to recover and/or conserve Receivership Property.

35.    Subject to the Receiver's obligation to expend Receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate, the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits and fees, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order.

36.    The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all Receivership Entities.

## X. **Bankruptcy Filing**

37.    The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for any or all of the Receivership Entities.    If a Receivership Entity is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Entities as, a debtor in possession.    In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity.    Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all Receivership Entities and may therefore file and manage a Chapter 11 petition. *See, In re Bayou Group, LLC,* 564 F.3d 541, 548-49 (2nd Cir. 2009).

38.    The provisions of Section VII above bar any person or entity, other than the Receiver, from placing any of the Receivership Entities in bankruptcy proceedings.

## XI. **Liability of Receiver**

39.    The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, the Receiver's Retained Personnel (as that term is defined below), and the Receivership Estate.

40.    Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with the Receiver's fiduciary obligations in this matter.

41.    The Receiver and the Receiver's agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.    In no event shall the Receiver or Retained Personnel be liable to

15

anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

42.     The Receiver and the Receiver's advisers and agents shall be indemnified by each of the Receivership Entities except for gross negligence, willful misconduct, fraud, or breach of fiduciary duty determined by a final order no longer subject to appeal, for all judgments, costs, reasonable expenses including legal fees (which shall be paid under the indemnity after court approval as they arise), arising from or related to any and all claims of whatsoever type brought against any of them in their capacities as Receiver or advisers or agents of the Receiver; provided, however, that nothing herein shall limit the immunity of the Receiver and the Receiver's advisers and agents allowed by law or deprive the Receiver or the Receiver's advisers and agents of indemnity for any act or omission for which they have immunity.

43.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

44.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XII. **Recommendations and Reports**

45.     The Receiver is authorized, empowered and directed to develop a plan, on the Receiver's behalf or in conjunction with any other party, for the fair, reasonable, and efficient recovery and disposition of all remaining, recovered, and recoverable Receivership Property (the "Disposition Plan"), which may be a plan of liquidation.

46.     As soon as is practicable, the Receiver shall provide the Court with the Receiver's recommendations regarding all pending motions in this case.

47.     Within forty-five (45) days after the entry of this Order, the Receiver shall file and serve a full report and accounting of each Receivership Entity (the "First Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

48.     The Quarterly Status Report shall contain the following:

A.      A summary of the operations of the Receiver;

B.      The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.      A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.      A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.      A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

17

F.     A summary of the status of the Receiver's investigation of the transactions by and among the Receivership Entities;

G.     A list of all known investors and creditors and the amount of their investments and claims, as applicable, redacted to exclude personally identifiable information;

H.     The status of investor and creditor claims proceedings, after such proceedings have been commenced; and,

I.     The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

J.     Any other information that the Receiver reasonably deems appropriate to include in the First Status Report.

49.     Subsequent to the filing of the First Status Report, the Receiver shall file a quarterly status report (the "Quarterly Status Report") containing the same categories of information set forth in the First Status Report.  The Quarterly Status Report shall be filed within twenty (20) days of the end of each quarter, except that, the first Quarterly Status Report shall be filed upon the passing of the first full quarter after the First Status Report is filed.

50.     On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIII.  Fees, Expenses and Accountings

51.     Subject to the specific provisions of this Order, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of business of the wind down of the Receivership Estate.

52.     Subject to the specific provisions of this Order, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist the Receiver in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.  For the avoidance of doubt, the term "Retained Personnel" shall include any professionals retained to provide services to the Receivership Estate as a whole, and any counsel retained for any purpose. The term "Retained Personnel" shall not include persons retained by the Receiver for the purpose of assisting the Receiver in evaluating a specific Receivership Property whose fee is under $75,000.

53.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

54.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

55.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  Such cost benefit review may include an evaluation of the results achieved in relation to the costs associated with any particular

Receivership Asset.   At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

56.   Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court in the SEC staff's discretion or such other percentage holdback as the Court may order on its own motion or on the request of the SEC.   The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

57.     Each Quarterly Fee Application shall:

A.      Comply with the terms of the Billing Instructions agreed to by the Receiver; and

B.      Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

58.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.


Dated: Brooklyn, New York
       October 16, 2017


                                              /s/
                                    _____
                                        DORA L. IRIZARRY
                                    United States District Judge

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 7

Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
Mitchell J. Geller, Esq.
John Brownlee, Esq. (*pro hac vice*)
Richard A. Bixter Jr., Esq. (*pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Facsimile: 212-385-9010
Email: warren.gluck@hklaw.com
        barbra.parlin@hklaw.com
        mitchell.geller@hklaw.com
        john.brownlee@hklaw.com
        richard.bixter@hklaw.com

*Attorneys for Plaintiffs Martin Trott and Christopher Smith,
as Joint Official Liquidators and Foreign Representatives of
Platinum Partners Value Arbitrage Fund L.P. (in Official
Liquidation), and for Platinum Partners Value Arbitrage Fund
L.P. (in Official Liquidation)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>PLATINUM-BEECHWOOD LITIGATION | Case No. 18-cv-6658 (JSR) |
| MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation) and PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation),<br><br>                            Plaintiffs,<br><br>            - against –<br><br>PLATINUM MANAGEMENT (NY) LLC, MARK NORDLICHT, DAVID LEVY, ESTATE of URI LANDESMAN, MURRAY HUBERFELD, DAVID BODNER, DANIEL SMALL, JOSEPH SANFILIPPO, | Case No. 18-cv-10936 (JSR)<br><br>**SECOND AMENDED**<br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

i

DAVID OTTENSOSER, BERNARD FUCHS, MICHAEL NORDLICHT, MICHAEL KATZ, KEVIN CASSIDY, SETH GERSZBERG, EZRA BEREN, NAFTALI MANELA, DANIEL SAKS, MOSHE M. FEUER a/k/a MARK FEUER, SCOTT TAYLOR, DHRUV NARAIN, PLATINUM PARTNERS BLACK ELK OPPORTUNITIES FUND LLC, PLATINUM PARTNERS BLACK ELK OPPORTUNITIES FUND INTERNATIONAL LTD., MORRIS FUCHS, LEON MEYERS, MN CONSULTING NY LLC, ESTATE of JULES NORDLICHT, BARBARA NORDLICHT, ESTATE OF SOLOMON ENGLANDER, ESTATE OF GERTRUDE ENGLANDER, ROCKWELL FULTON CAPITAL, L.P., DITMAS PARK CAPITAL, L.P., PLATINUM FI GROUP LLC, FCBA TRUST, AARON PARNES, SARAH PARNES, SHMUEL FUCHS FOUNDATION, SOLOMON WERDIGER, OLIVE TREE HOLDINGS LLC, HUANG LAI TSU HSIA, HUBERFELD FAMILY FOUNDATION, MIND, BODY & SOUL CO., LIMITED, TWOSONS CORPORATION, GRD ESTATES LTD., MEADOWS CAPITAL LLC, ABRAHAM C. GROSSMAN, DAVID GICHTIN, ORA GICHTIN, GOLDA WILK, THE ESTATE OF MARCOS KATZ, ADELA KATZ, BEECHWOOD CAPITAL GROUP, LLC, B ASSET MANAGER LP, B ASSET MANAGER II LP, BEECHWOOD RE INVESTMENTS, LLC, BEECHWOOD RE HOLDINGS, INC., PB INVESTMENT HOLDINGS LTD., AS SUCCESSOR IN INTEREST TO BEECHWOOD BERMUDA INVESTMENT HOLDINGS LTD., BEECHWOOD RE LTD., BEECHWOOD BERMUDA INTERNATIONAL LTD., BAM ADMINISTRATIVE SERVICES LLC, ILLUMIN CAPITAL MANAGEMENT LP, PRIVATE BANKERS LIFE ANNUITY LTC 2, AS SUCCESSOR IN INTEREST TO BBIL ULICO 2014 TRUST, WASHING NATIONAL LTC 2, AS SUCCESSOR IN INTEREST TO BRE WNIC 2013 LTC PRIMARY AND BRE WNIC 2013 LTC SUB, BANKERS CONSECO LIFE INS. CO. – LTC 2, AS SUCCESSOR IN INTEREST TO BRE BCLIC PRIMARY AND BRE BCLIC SUB, BBLN-PEDCO CORP., BHLN-PEDCO CORP., BEECHWOOD TRUST NO. 1, BEECHWOOD TRUST NO. 2, BEECHWOOD TRUST NO. 3, BEECHWOOD TRUST NO. 4, BEECHWOOD TRUST NO. 5, BEECHWOOD TRUST NO. 6, BEECHWOOD

TRUST NO. 7, BEECHWOOD TRUST NO. 8,
BEECHWOOD TRUST NO. 9, BEECHWOOD TRUST
NO. 10, BEECHWOOD TRUST NO. 11,
BEECHWOOD TRUST NO. 12, BEECHWOOD
TRUST NO. 13, BEECHWOOD TRUST NO. 14,
BEECHWOOD TRUST NO. 15, BEECHWOOD
TRUST NO. 16, BEECHWOOD TRUST NO. 17,
BEECHWOOD TRUST NO. 18, BEECHWOOD
TRUST NO. 19, BEECHWOOD TRUST NO. 20, and
JOHN DOES 1-100,

                              Defendants.[1]

---

[1] Plaintiffs' Second Amended Complaint contains causes of action and parties subject to dismissal in connection with this Court's March 15, 2019 Order. The Second Amended Complaint includes these parties and claims so as to preserve Plaintiffs' rights during the appeal period and prior to this Court's forthcoming opinion. The Plaintiffs reserve all rights.

# TABLE OF CONTENTS

**Page**

DESCRIPTION OF THE CASE ................................................................................... 1

PARTIES RELEVANT TO THE JOLS' CLAIMS ............................................... 16

JURISDICTION AND VENUE .............................................................................. 48

FACTUAL BACKGROUND .................................................................................. 48

    A.    THE PPVA INVESTMENT STRUCTURE ................................................. 48

    B.    PLATINUM MANAGEMENT AS GENERAL PARTNER ......................... 50

    C.    PLATINUM DEFENDANTS' VALUATION AND RISK ASSESSMENT PROCESS AND REPRESENTATIONS CONCERNING INVESTMENTS AND NAV ........................... 55

    D.    THE COLLAPSE AND LIQUIDATION OF PPVA ................................... 58

    E.    CONCENTRATION IN ILLIQUID INVESTMENTS .............................. 64

    F.    MISREPRESENTATION OF PPVA'S NAV IN THE WAKE OF THE BLACK ELK EXPLOSION ................................................................ 66

    G.    MISREPRESENTATION OF VALUE FOR GOLDEN GATE OIL ........... 67

    H.    CREATION OF BEECHWOOD ................................................................ 70

    I.    STRUCTURE AND OWNERSHIP OF BEECHWOOD ............................ 75

    J.    BEECHWOOD AND THE FIRST SCHEME .......................................... 78

        1.    Golden Gate Oil .................................................................. 80

        2.    PEDEVCO ............................................................................ 81

        3.    Implant Sciences ................................................................. 83

    K.    BLACK ELK SCHEME ........................................................................... 84

    L.    CREATION OF MONTSANT AND REPURCHASE OF BLACK ELK BONDS ................... 98

    M.    NORTHSTAR ........................................................................................ 100

    N.    THE SECOND SCHEME ....................................................................... 103

        1.    Use of Montsant to Hide Beechwood Encumbrance of PPVA Assets ................................................................ 104

        2.    Nordlicht Side Letter ......................................................... 106

        3.    March 2016 "Restructuring" of PPVA/PPCO/Beechwood Transactions ................................................................ 108

    O.    THE AGERA TRANSACTIONS ............................................................. 113

        1.    Agera Energy ...................................................................... 114

        2.    The Agera Energy Valuation ............................................. 116

        3.    The Agera Sale Process ...................................................... 116

4. The Agera Sale........................................................................118

5. The Redemption of the Class C Portion of the Note
Purchase Price..................................................................121

P. THE SECURITY LOCKUP .........................................................123

1. PPNE Notes ....................................................................123

2. Kismetia .........................................................................125

3. Twosons .........................................................................126

4. Seth Gerszberg and West Loop/Epocs...................................131

CLAIMS FOR RELIEF ...................................................................137

FIRST COUNT: BREACH OF FIDUCIARY DUTY (DUTY OF CARE AND GOOD FAITH)
AGAINST THE PLATINUM DEFENDANTS ................................137

SECOND COUNT: BREACH OF FIDUCIARY DUTY (DUTY OF LOYALTY/SELF-
DEALING) AGAINST THE PLATINUM DEFENDANTS..................139

THIRD COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
THE INDIVIDUAL PLATINUM DEFENDANTS.............................140

FOURTH COUNT: FRAUD AGAINST THE PLATINUM DEFENDANTS...................141

FIFTH COUNT: CONSTRUCTIVE FRAUD AGAINST THE PLATINUM DEFENDANTS ...............145

SIXTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE INDIVIDUAL
PLATINUM DEFENDANTS.....................................................150

SEVENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
THE BEECHWOOD DEFENDANTS...........................................151

EIGHTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE BEECHWOOD
DEFENDANTS ...................................................................153

NINTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
THE BEOF FUNDS AND THE PREFERRED INVESTORS OF THE BEOF FUNDS ..........154

TENTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE BEOF FUNDS AND
THE PREFERRED INVESTORS OF THE BEOF FUNDS .............157

ELEVENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
AGAINST MICHAEL KATZ....................................................159

TWELFTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
KEVIN CASSIDY AND MICHAEL NORDLICHT ..........................160

THIRTEENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
AGAINST SETH GERSZBERG.................................................162

FOURTEENTH COUNT: IN THE ALTERNATIVE, UNJUST ENRICHMENT AGAINST THE
BEECHWOOD DEFENDANTS, KEVIN CASSIDY AND SETH GERSZBERG.................163

FIFTEENTH COUNT: IN THE ALTERNATIVE, UNJUST ENRICHMENT AGAINST THE
BEOF FUNDS AND THE PREFERRED INVESTORS OF THE BEOF FUNDS ...............165

SIXTEENTH COUNT: CIVIL CONSPIRACY AGAINST THE PLATINUM DEFENDANTS
AND THE BEECHWOOD DEFENDANTS ................................................................ 166

SEVENTEENTH COUNT: VIOLATION OF CIVIL RICO AGAINST THE PLATINUM
DEFENDANTS AND THE BEECHWOOD DEFENDANTS ............................................. 167

EIGHTEENTH COUNT: (FOR RELIEF ONLY) ALTER EGO AGAINST THE BEECHWOOD
ENTITIES IN RESPECT OF COUNTS ONE, TWO, FOUR AND FIVE ............................ 173

NINETEENTH COUNT: (FOR RELIEF ONLY) ALTER EGO AGAINST THE BEOF FUNDS
IN RESPECT OF COUNTS ONE, TWO, FOUR AND FIVE ........................................... 175

TWENTIETH COUNT: DECLARATORY JUDGMENT THE NORDLICHT SIDE LETTER IS
VOID AND UNENFORCEABLE AS CONTRARY TO PUBLIC POLICY ........................... 176

TWENTY-FIRST COUNT: DECLARATORY JUDGMENT THAT THE MASTER GUARANTY
IS VOID AND UNENFORCEABLE AS AGAINST PUBLIC POLICY ................................ 177

TWENTY-SECOND COUNT: (FOR RELIEF ONLY) ALTER EGO AGAINST THE
HUBERFELD FAMILY FOUNDATION IN RESPECT OF COUNTS ONE, TWO,
THREE, FOUR, FIVE AND SIX ............................................................................. 178

INDEX OF EXHIBITS ..................................................................................................... 186

## DESCRIPTION OF THE CASE

1.      This case arises in connection with one of the most spectacular hedge fund collapses in recent memory – whereby a fund with a purported net asset value ("**NAV**") of nearly $1 billion turns out to not only be insolvent but to have liabilities, or a ***negative*** NAV, in the range of $400 to $800 million.

2.      Martin Trott and Christopher Smith are the Court-appointed Joint Official Liquidators and Foreign Representatives (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**" and collectively with the JOLs, "**Plaintiffs**"), with authority pursuant to Orders of the Grand Court of the Cayman Islands and the United States Bankruptcy Court of the Southern District of New York to liquidate the assets of PPVA and bring litigation on its behalf.

3.      The defendants in this case are an interrelated and overlapping group of persons and entities, including (i) the **Platinum Defendants** (Mark Nordlicht, David Bodner, Murray Huberfeld, Uri Landesman, David Levy, Bernard Fuchs, Naftali Manela, David Ottensoser, Joseph SanFilippo, Daniel Small, Daniel Saks, Ezra Beren and Platinum Management (NY) LLC); (ii) the **Beechwood Defendants** (Mark Nordlicht, David Bodner, Murray Huberfeld, David Levy, Mark Feuer, Scott Taylor, Naftali Manela, David Ottensoser, Daniel Saks, Ezra Beren, Dhruv Narain, Illumin Capital Management LP, and the Beechwood Entities (as defined below)); and (iii) certain other culpable entities and individuals, including the **BEOF Funds** and the **Preferred Investors of the BEOF Funds** (both as defined below), **Michael Joseph Nordlicht**, **Kevin Cassidy**, **Seth Gerszberg**, and **Michael Katz** – several of whom have been indicted and/or sued for their role in connection with certain of the acts discussed below – who used their positions of trust, access and authority to either enrich themselves or certain friends and family at the expense of PPVA.

4.     The harm to PPVA resulted from actions constituting conspiracy, fraud, deceit, asset dissipation and breaches of fiduciary obligations.   Defendants are among those who committed these tortious acts or directly aided and abetted this conduct.

5.     Defendants "papered" their acts and transactions to make them appear legitimate when those acts and transactions actually were permeated by fraud, deceit and breach of trust.

6.     As a result, Defendants are liable to PPVA in an amount to be proved at trial for the harms caused by the nine-figure schemes.

7.     In large part, this case arises out of the relationship between and among PPVA, its general partner Platinum Management (NY) LLC ("**Platinum Management**"), Platinum Management's "Beechwood," "BEOF Funds" and "Huberfeld Family Foundation" alter egos, and the individuals who owned, operated and managed Platinum Management and its alter egos – Nordlicht, Landesman, Huberfeld, Bodner, Fuchs, Levy, Small, SanFilippo, Ottensoser, Manela, Saks, and Beren.

8.     Beechwood, a business comprised of reinsurance companies, investment management entities, investment trusts and related entities (collectively, "**Beechwood**"), was founded, owned and managed by the very persons who founded, owned and managed Platinum Management – and originally was operated out of Platinum Management's offices.

9.     From 2013 until 2015, the Platinum Defendants and Beechwood Defendants caused PPVA (and/or its subsidiaries) to engage in a series of non-commercial transactions with the Beechwood Entities (defined below) designed to:

(i)     falsely inflate the net value ascribed to PPVA's assets, thereby enabling Platinum Management to collect unearned partnership shares/fees;

(ii)    prioritize the interests of the Beechwood Entities over the interests of PPVA, by, *inter alia*, consistently subordinating PPVA's prior rights in common collateral to those of the Beechwood Entities, and granting the Beechwood Entities put rights against PPVA; and

     (iii)    enable Platinum Management insiders, friends and designated investors/creditors to take the proceeds from the sale of the assets of PPVA's largest investment, Black Elk, in contravention of the prior rights of PPVA and Black Elk's other creditors, while leaving the Black Elk investment worthless to PPVA, and PPVA liable for tens of millions of dollars of fraudulent conveyance and other claims (the "**Black Elk Scheme**");

This set of acts and transactions is referred to herein as the "**First Scheme**."

10.     By late 2015, with PPVA's collapse imminent and faced with a serious investigation of the Black Elk Scheme, the Platinum Defendants – with material assistance from the other Defendants – further breached their duties to PPVA by conspiring to transfer or encumber all or nearly all of PPVA's remaining assets for the benefit of the Beechwood Defendants, select insiders, and Platinum Partners Credit Opportunities Master Fund L.P. ("**PPCO**"), another Platinum Management operated fund. This set of acts and transactions is referred to herein as the "**Second Scheme**."

11.     The significant wrongful acts and transactions within the Second Scheme, addressed in detail below, include the following:

     (i)    a one page document dated January 13, 2016, signed by Mark Nordlicht and witnessed by Mark Feuer, which requires PPVA and any of its subsidiaries and affiliates holding the valuable proceeds from the sale of Implant Sciences Corporation ("**IMSC**") to use such proceeds to pay approximately $37 million of uncollectable debt owed to Beechwood by Golden Gate Oil, LLC, for no benefit to PPVA (the "**Nordlicht Side Letter**");

     (ii)    a March 2016 "restructuring" by which tens of millions of dollars were stripped from PPVA and assets were encumbered by Platinum Management for the benefit of PPCO and Beechwood;

     (iii)    a March 2016 "Master Guaranty Agreement" and related documents[2] between and among PPVA, certain of its subsidiaries, and Beechwood, among others, by which Beechwood was granted liens on available PPVA

---

[2] In addition to the Master Guaranty, the Platinum Defendants caused PPVA to execute that certain China Horizon Collateral Assignment dated March 21, 2016, that certain Turnover Agreement dated March 21, 2016, and that certain Carbon Credits Portfolio Assignment dated March 21, 2016 (collectively, the "**March Beechwood Assignments**").

assets to further collateralize otherwise uncollectable debt owed to Beechwood (the "**Master Guaranty**");

(iv)     the series of transactions, documents and promissory notes that the Platinum Defendants, together with Defendant Seth Gerszberg, caused PPVA to enter into with select redeeming investors and certain creditors of PPVA, by which those investors and creditors preferentially were granted security interests and liens on all assets of PPVA (and in some cases subsidiary assets) to collateralize tens of millions of dollars of equity redemption claims or otherwise unsecured debt for no additional consideration (the "**Security Lockup**"); and

(v)     the June 9, 2016 transfer of one of PPVA's last valuable assets, a majority interest in Agera Energy (defined below), worth between $200-$300 million, to Beechwood and Senior Health Insurance Company of Pennsylvania ("**SHIP**"), for little to no consideration. The Agera Energy transactions was the culmination of the Second Scheme and a self-described "insider transaction" conceived of by defendant Michael Katz, the Platinum Defendants and the Beechwood Defendants (the "**Agera Transactions**") to strip PPVA of its largest asset and acquire the value of the same while dissipating the purported proceeds.

12.     The persons responsible for sourcing, overseeing, managing and valuing PPVA's investments and assets, assessing and determining appropriate levels of risk, operating PPVA's business and in whom PPVA reposed confidence and trust for these purposes included, *inter alia*:

(i) **Mark Nordlicht ("Nordlicht")**, who was the co-chief investment officer of PPVA and managing member of Platinum Management, which in turn was the General Partner of PPVA. Nordlicht was chairman of the valuation committee and risk committee, had ultimate oversight of all trading, asset allocation and risk management activities; was the managing member/manager of substantially all of the subsidiaries through which PPVA's investments were held; and was responsible for sourcing investment opportunities, marketing to investors, overseeing the operation and management of PPVA (and Platinum Management's) business, hiring personnel, meeting with outside counsel and developing business strategy. Nordlicht is a founder and member of Platinum Management and was a

direct beneficiary of all of the inflated distributions, fees and other payments made to it by PPVA;

(ii) **Uri Landesman ("Landesman")**, who until spring 2015 held the title President of Platinum Management. Together with Nordlicht, he served as co-chief investment officer of PPVA, responsible for all trading, asset allocation and risk management on behalf of PPVA, and was a member of both the valuation and risk committees. Landesman was a member of Platinum Management, so was a direct beneficiary of all of the inflated distributions, fees and other payments made to it by PPVA even after he resigned in 2015. He remained involved in developing strategy for managing PPVA's liquidity issues and seeking out new investors even after his resignation in 2015;

(iii) **Murray Huberfeld ("Huberfeld")**, who, together with Nordlicht and David Bodner, founded and is an owner of Platinum Management. Huberfeld also is a founder and was at all relevant times an owner of the Beechwood Entities. Among other things, Huberfeld was involved with sourcing investment opportunities, meeting with and marketing to important investors and developing business and investment strategy for PPVA. He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investment partners. As an owner, Huberfeld was a direct beneficiary of all of the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(iv) **David Bodner ("Bodner")** is another founder and owner of Platinum Management. Bodner also is a founder and was at all relevant times an owner of the Beechwood Entities. Like Huberfeld, Bodner was involved with sourcing investment

5

opportunities, meeting with and marketing to important investors and developing
investment strategies for PPVA and its investments, including, for example, its investment
in China Horizon/Yellow River. He also was involved in the management and operation
of PPVA and of Platinum Management, taking part in meetings with attorneys,
interviewing new personnel, and meeting with investment partners. As an owner, Bodner
was a direct beneficiary of all of the inflated distributions, fees and other payments made
to Platinum Management by PPVA;

(v) **Bernard Fuchs** was a principal of Platinum Management who benefited from
the inflated distributions, fees and other amounts paid by PPVA. Bernard Fuchs was
involved with meeting with and marketing to new investors, efforts to retain existing
investors, sourcing and managing investments and developing business strategy for PPVA.
He was involved in planning significant investments and transactions including with
respect to Black Elk and the Agera Transactions. He also was involved in the management
and operation of PPVA and of Platinum Management, taking part in meetings with
attorneys, meeting with potential investment partners and negotiating personnel matters.
During the period leading up to the Cayman Liquidation, Bernard Fuchs was tasked with
communicating with investors seeking information as to the status of their unfulfilled
redemption requests. He provided false and misleading information to investors about the
status of PPVA's financial situation and solvency;

(vi) **David Levy ("Levy")** was a portfolio manager and beginning in 2015, co-chief
investment officer of PPVA. He had direct responsibility for overseeing and managing
many of PPVA's most significant investments, including, *inter alia*, Black Elk, Implant
Sciences, China Broadband, China Cablecomm, China Networks, and Desert Hawk, and

was paid based on the increase in value of those investments, whether realized or unrealized, as well as the profits of the Platinum affiliated management companies, including Platinum Management. As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA. He was a member of the risk and valuation committees responsible for valuing PPVA's assets and assessing risk related thereto, and was appointed as an operating officer/manager of certain subsidiaries through which PPVA's investments were held, such as DMRJ. During 2013-2014, he also was employed as the Chief Investment Officer of BAM (defined below), even when BAM ostensibly was on the opposite side of a transaction from PPVA;

(vii) non-party **David Steinberg ("Steinberg")** was at various times a portfolio manager, investment advisor and co-chief risk advisor for PPVA, and was at all relevant times a member of the valuation committee that had overall responsibility for valuing PPVA's assets. In his capacity as a member of the risk committee and co-chief risk advisor, Steinberg was responsible for assessing the risk associated with PPVA's investments, a significant issue in determining value. Steinberg had direct responsibility for overseeing and managing PPVA's investments in PEDEVCO, Navidea Biopharmaceuticals, Inc., Vistagen Therapeutics, Inc., Urigen Pharmaceuticals, Inc., and Echo Therapeutics, Inc., among other credits, was the official responsible for reviewing and negotiating the agreements and other documents relating to the March 2016 restructuring and the Agera Transactions, and was appointed as an officer/manager/authorized signatory of certain PPVA subsidiaries such as Principal Growth Strategies LLC (the entity through which PPVA held its interest in the Agera Note) and Montsant Partners LLC, as well as companies

in which PPVA invested such as PEDEVCO. During the relevant period, Steinberg was paid a base salary as well as incentive compensation that was directly tied to the increase in the value of the investments he managed, whether realized or unrealized. As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA. Beginning in 2014, Steinberg, together with Ezra Beren, also was a co-investment advisor to BAM (defined below), the Beechwood entities' investment advisor, for which he was paid based on the performance of the investments he managed;

(viii) **Daniel Small ("Small")** was the managing director and portfolio manager charged with originating, managing and overseeing many of PPVA's investments, including its investments in Black Elk, Implant Sciences, China Cablecomm, Desert Hawk and Northstar until his employment was terminated in or about July 2015. Small was responsible for identifying potential investment opportunities, performing due diligence on potential investments, designing and implementing the structure of investments, negotiating the terms of investments and monitoring and monetizing investment decisions. Small was paid a base salary plus bonus compensation that was directly tied to the increase in the value of the investments he managed, whether realized or unrealized. As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(ix) **Joseph SanFilippo ("SanFilippo")**, chief financial officer for PPVA and a member of the valuation and risk committees who also was an officer of certain

subsidiaries through which PPVA held its investments. In his capacity as a member of the valuation and risk committees and as chief financial officer, he was, among others, responsible for determining the value of and risk associated with PPVA's investments. SanFilippo also was responsible for communicating with the third parties who routinely performed valuation, accounting and administrative services on behalf of PPVA, including calculating and reporting PPVA's NAV on a monthly basis and providing valuation reports each quarter. SanFilippo received a salary as well as bonus compensation, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(x) **David Ottensoser ("Ottensoser")** was general counsel, chief compliance officer and a member of the risk committee. Ottensoser participated in drafting, reviewing and/or commenting on the contracts and other documents that bound PPVA to the improper transactions comprising the First and Second Schemes and without which the First and Second Scheme could not have occurred. As a member of the risk committee, he was responsible for assessing the risk associated with PPVA's investments, a significant issue in determining value. At the same time, Ottensoser provided legal services to BAM/the Beechwood Entities, even when those parties ostensibly were on opposite sides of a transaction from PPVA. Ottensoser received a salary as well as bonus compensation, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(xi) **Naftali Manela ("Manela")** was chief operating officer, a member of the valuation committee and an officer of certain subsidiaries through which PPVA held its investments, such as DMRJ. Manela was responsible for all aspects of the administration of PPVA's business. Manela also worked closely with senior management including Nordlicht, Bodner, Huberfeld, Levy, Fuchs, and the portfolio managers such as Small and Steinberg in structuring transactions and investments on behalf of PPVA. At the same time, Manela worked for BAM/the Beechwood Entities, performing similar services, even when those parties ostensibly were on opposite sides of a transaction from PPVA. Manela received a salary as well as bonus compensation, so he directly benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(xii) **Daniel Saks ("Saks")** was, until about 2014, a portfolio/investment manager with oversight and control over numerous PPVA investments. In particular, by the end of 2013, Saks became responsible for overseeing and managing PPVA's bio/pharma investments in companies including Advaxis Inc., Angiolight, Inc., Echo Therapeutics Inc., FluoroPharma, Navidea Biopharmaceuticals Inc., NewCardio Inc., Urigen Pharmaceuticals Inc., and Vistagen Therapeutics Inc., and previously was involved with overseeing the investment in Golden Gate Oil. During 2014, Saks began working for the Beechwood Entities, eventually serving as Chief Investment Officer and then President of B Asset Manager LP during and after 2015; and

(xiii) **Ezra Beren ("Beren")**, who until the end of 2015 was an investment manager with responsibility for overseeing and managing PPVA's subsidiary RJ Credit and its various investments (e.g., PEDEVCO), among other investments, as well as a required

10

member of the valuation committee that had responsibility for valuing all of PPVA's assets and investments and was paid a salary plus incentive compensation based on the increased value of the investments he managed, whether realized or unrealized. In 2014, Beren also entered into an investment management agreement with BAM, for which he was paid based on the performance of the investments he managed, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA. Beren worked for BAM/the Beechwood Entities even when those parties ostensibly were on opposite sides of a transaction from PPVA. As of January 1, 2016, he worked at BAM full time.

13. The Platinum and Beechwood Defendants scrambled to close the Agera Transactions on June 9, 2016, the day after defendant Murray Huberfeld, a co-founder and principal of Platinum Management, was arrested in connection with the misappropriation of PPVA funds to bribe a pension official in exchange for investing in PPVA. A true and correct copy of the Superseding Information in *United States v. Murray Huberfeld*, Case No. 16-CR-467 (AKH), filed in connection with Huberfeld's guilty plea for defrauding PPVA, is attached hereto as **Exhibit 1.**

14. After Murray Huberfeld's arrest, the Federal Bureau of Investigation executed a search warrant on Platinum Management's offices in connection with multiple government investigations.

15. By June 14, 2016, Nordlicht announced that reporting as to PPVA's NAV would be suspended and PPVA would be liquidated.

16.     PPVA was placed into provisional liquidation under the supervision of the Grand Court of the Cayman Islands on August 23, 2016 (the "**Cayman Liquidation**").  At that time, Platinum Management and its executives were still publicly claiming that PPVA had a NAV of nearly $1 billion.

17.     In reality, as of the date the Cayman Liquidation was commenced, the First and Second Schemes had left PPVA potentially liable for as much as $400-$800 million in creditor claims and virtually no valuable assets other than litigation claims and defenses.

18.     PPVA, at one time, held valuable assets.

19.     But from at least 2012 until the commencement of PPVA's Cayman Liquidation, the Platinum Defendants failed to abide by the balanced investment strategies set forth in PPVA's governing documents, which were designed to maintain PPVA's liquidity and financial condition.

20.     Rather, the Platinum Defendants caused PPVA's investment portfolio to be increasingly more concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

21.     By the end of 2012, the Platinum Defendants caused PPVA's investments to become concentrated such that 40% of its reported NAV was represented by investments in **just two** oil and gas operations:  Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator, and Golden Gate Oil, LLC ("**Golden Gate**"), a California-based onshore oil operation.

22.     Golden Gate was a highly speculative investment that the Platinum Defendants realized was a failure at an early stage, as Golden Gate barely produced any oil, suffered large operating losses and never made a single interest payment on loans originated by PPVA.  Despite

this, Platinum Management falsely reported a five-fold increase in the value of PPVA's Golden Gate Oil investment during fiscal year 2013.

23.     Black Elk was a Houston, Texas-based publicly reporting company that mostly operated offshore platforms located in the Gulf of Mexico.  In November 2012, an explosion occurred on Black Elk's West Delta 32 platforms, resulting in the death of Black Elk employees and prompting numerous investigations (the "**Black Elk Explosion**").  Following the Black Elk Explosion, Black Elk's financial results, liquidity and business operations deteriorated significantly.

24.     Given the impact that the Black Elk and Golden Gate Oil business losses would have had on PPVA's NAV if reported accurately, PPVA should have been liquidated in 2013.  Indeed, forty percent of PPVA's total portfolio was worth far less than reported.

25.     The Platinum Defendants refused to admit a loss or realize a write-down in value, declaring instead that PPVA's NAV actually *increased* during this period, in order to enrich themselves with unearned partnership shares and/or fees.

26.     The Platinum Defendants' concentration of PPVA's investments in illiquid assets meant that the Platinum Defendants had significant discretion over their valuation, since there was no ready market for such investments.  The lack of a ready market also meant that many of these investments could not be quickly or easily liquidated to meet the Platinum Defendants' need for cash to pay themselves, operate Platinum Management, and continue to hide the losses at PPVA.

27.     To resolve this difficulty, the Platinum Defendants and the Beechwood Defendants, among others, conceived of and executed the First Scheme.

28.     In 2013, Nordlicht, Huberfeld, Bodner (collectively the co-founders of Platinum Management), together with Levy, Scott Taylor ("**Taylor**"), and Moshe "Mark" Feuer ("**Feuer**"),

created Beechwood and, between March 2013 and late 2015, these individuals used their positions of trust, authority and control over PPVA to cause PPVA and the Beechwood Entities to engage in the fraudulent, non-commercial transactions that comprise the First Scheme.

29.     During the period from 2012 through 2015, the Platinum Defendants reported that PPVA "experienced" annualized returns of between a maximum of 11.6% and a minimum of 7.15%, and reported that the **_net value_** of its assets under management for PPVA had increased steadily from $688 million until they reached $789 million as of October 1, 2015, awarding themselves partnership distributions, fees and other compensation based on these results.

30.     By late 2015, the liabilities resulting from the non-commercial transactions to which the Platinum and Beechwood Defendants had caused PPVA to become a party, coupled with ongoing losses at PPVA's most significant investments, made it clear that PPVA could not continue to exist for much longer.  At that time, Defendants conceived and executed the Second Scheme to encumber or strip the last valuable assets away from PPVA to benefit themselves and particularly Beechwood, PPCO, and certain insiders of the Platinum Defendants.

31.     As a result of Defendants' actions, hundreds of millions of dollars were diverted from PPVA, PPVA's remaining assets lost value or were purportedly encumbered, and tort and contract claims crystalized against PPVA – all under circumstances where master funds like PPVA are supposed to hold zero or minimal debt.

32.     By the time the Cayman Liquidation was commenced, most of PPVA's remaining investments (i) had little to no net value; (ii) required so much investment and were at such an early stage they effectively had no value to PPVA in liquidation; and/or (iii) were valuable but subject to significant creditor liens and/or claims.

33. Thus, rather than the positive NAV that potentially could have been salvaged in 2013, Defendants ensured a 2016 liquidation outcome with NAV of less than zero and hundreds of millions of dollars of creditor claims that PPVA could not pay.

34. Platinum Management, in its capacity as PPVA's general manager, and its principals/managers/advisors/owners, Nordlicht, Huberfeld, Bodner, Landesman, Bernard Fuchs, Levy, Beren, Saks, Manela, Ottensoser, SanFilippo, and Small (collectively, the "**Platinum Defendants**") were obligated to manage and operate PPVA in good faith, in accordance with the terms of the partnership agreement, other operating documents, marketing materials, and the representations, statements and promises made to PPVA. Unless otherwise noted, all references herein to the Platinum Defendants means that each of the persons named as such were involved in the act, omission, misstatement, or breach at issue, *provided however* that references to the Platinum Defendants for the time period after July 2015 do not include Small and provided further that references to the Platinum Defendants for the period after January 2016 do not include Beren.

35. The Platinum Defendants breached this duty, and were materially assisted in this breach by, among others: (i) Nordlicht, Huberfeld, Bodner, Saks, Levy, Beren, Manela, Ottensoser (each to the extent they were acting on behalf of the Beechwood Entities), Taylor, Feuer, Dhruv Narain ("**Narain**") and Illumin Capital Management LP ("**Illumin**") (collectively, together with the Beechwood Entities, the "**Beechwood Defendants**"); (ii) the BEOF Funds (defined below); (iii) the Preferred Investors of the BEOF Funds (defined below); (iv) Kevin Cassidy; (v) Michael Katz; (vi) Michael Nordlicht; and (vii) Seth Gerszberg (collectively, the persons identified in subparagraphs (i)–(vii) together with the Platinum Defendants, "**Defendants**").[3]

---

[3] Unless otherwise stated to the contrary, references herein to the Platinum Defendants and/or the Beechwood Defendants refer to a certain Defendant to the extent he was employed or otherwise affiliated with Platinum Management or Beechwood, respectively, at the given time.

36.     Unless otherwise noted, all references herein to the Beechwood Defendants means that each of the persons named as such were involved in the act, omission, misstatement, or breach at issue, *provided however* that references to the Beechwood Defendants for the time period before January 2016 do not include Narain or Illumin.

## PARTIES RELEVANT TO THE JOLS' CLAIMS

37.     Plaintiffs Martin Trott and Christopher Smith are the duly appointed Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation).

38.     Plaintiff Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) is an exempted limited partnership marketed as a multi-strategy investment fund and registered under the Exempted Limited Partnership Law, 2014, of the Cayman Islands.

39.     Platinum Management is a Platinum Defendant and a Delaware limited liability company with its principal place of business in New York, New York.  Platinum Management is the general partner of PPVA.

40.     Defendant Mark Nordlicht is a Platinum Defendant as well as a Beechwood Defendant.  Nordlicht is a resident of New Rochelle, New York.

41.     Together with Huberfeld and Bodner, Nordlicht founded Platinum Management and the Platinum affiliated group of funds that includes, *inter alia*, PPVA, PPCO, PPLO and the BEOF Funds, and controlled and orchestrated the creation of Beechwood.

42.     Nordlicht was the managing member of Platinum Management and, together with Landesman (at all relevant times until about first quarter 2015) then Levy (at all relevant times from and after 2015), the co-chief investment officer of PPVA.

43.     Nordlicht directly or indirectly holds ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Scheme.

44.     Nordlicht was a member of the risk committee, and in that capacity was responsible for assessing the risks associated with PPVA's investments, which is a significant factor in determining the value of such investments.

45.     Nordlicht also was a member of the valuation committee.  In that capacity, he was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

46.     Nordlicht also was an owner and controlling person for Beechwood, operating the business of Beechwood both directly and via intermediaries, including Defendants David Levy, Naftali Manela, Daniel Saks, Dhruv Narain, Taylor and Feuer

47.     Indeed, from and after the period when Beechwood commenced occupying office space separate from Platinum Management through the end of 2014, Nordlicht even maintained an office within Beechwood's offices.

48.     Nordlicht was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a member of the valuation committee to falsely inflate the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other

amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

49.     Defendant David Levy is a Platinum Defendant as well as a Beechwood Defendant and Preferred Investor of the BEOF Funds. Levy is a resident of New York, New York and is defendant Huberfeld's nephew.

50.     From and after 2015, Levy served as co-chief investment officer of PPVA alongside Nordlicht. Levy also was a portfolio manager with responsibility for overseeing and managing several of PPVA's most significant investments, including, as noted above, Implant Sciences and Black Elk. He also was appointed as an officer/manager of certain of the PPVA subsidiaries, including DMRJ, in which PPVA held its investments.

51.     As a portfolio manager, Levy received a salary as well as a bonus based on the realized and/or unrealized increase in the performance of the PPVA investments that he managed. As co-chief investment officer, Levy received, among other things, a percentage of the profits of Platinum Management. As such, he personally benefitted from the inflated valuations, and excessive fees and other payments made by PPVA to Platinum Management as a result of the First and Second Scheme.

52.     Levy was a member of the valuation committee. In that capacity, he was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

53.     Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief investment officer of BAM I (defined below), the Beechwood asset management entity until the end of 2014.  Beechwood marketed Levy to potential clients as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as a key to Beechwood's future success.  In late 2014/early 2015, in the wake of the Black Elk Scheme, Levy returned to work at Platinum Management.  Levy remained an owner of Beechwood after his return to Platinum Management.

54.     Levy was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a member of the valuation committee to falsely inflate the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

55.     Defendant the Estate of Uri Landesman ("**Landesman Estate**") is a Platinum Defendant.  Landesman was a resident of New Rochelle, New York until his death on September 14, 2018.

56. At all relevant times until about April 2015, Landesman served as the President of Platinum Management, a Director of the Feeder Funds (defined below) and co-Chief Investment Officer of PPVA.

57. Until April 2015, Landesman shared responsibility with Nordlicht for all trading, asset allocation and risk management on behalf of PPVA.

58. Landesman was a member of the risk committee, and in that capacity was responsible for assessing the risks associated with PPVA's investments, which was a significant factor in determining value.

59. Landesman also was a member of the valuation committee. In that capacity, he was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

60. Landesman was involved with sourcing investment opportunities, meeting with and marketing to important investors and developing investment and business strategy for PPVA and its investments.

61. Landesman directly or indirectly holds ownership interests in Platinum Management, and thus personally benefitted from the inflated valuations and excessive fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

62. Landesman was granted distributions and/or a salary in respect of his interest in Platinum Management after his resignation, and thus he continued to be enriched by the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Scheme after April 2015.

63.     In connection with the First Scheme, Landesman was responsible for marketing PPVA on behalf of Platinum Management, and making representations concerning PPVA's NAV and the status of its various investments, such as Black Elk.  Despite his direct knowledge of PPVA's liquidity issues and the Platinum Defendants' misrepresentation of PPVA's NAV, Landesman routinely misrepresented PPVA's financial condition.

64.     Even after Landesman resigned, he continued to be involved with PPVA investor relations on behalf of Platinum Management.

65.     During 2015 and 2016, Landesman was involved in discussions with Nordlicht, Bodner, Huberfeld, Levy, Fuchs and other Platinum Defendants concerning the status of PPVA, its true financial situations and liquidity issues.

66.     Landesman materially misstated PPVA's financial condition and omitted information concerning the true status of its financial condition to PPVA and various third parties during 2015 and 2016.  As a result, the other Platinum Defendants were able to complete the transactions comprising the Second Scheme, to PPVA's detriment.

67.     Defendant Murray Huberfeld is a Platinum Defendant as well as a Beechwood Defendant.  He resides in Lawrence, New York.

68.     Huberfeld is a co-founder of Platinum Management and PPVA together with Nordlicht and Bodner.

69.     At all relevant times, Huberfeld directly or indirectly held ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

70.     Until his indictment on June 8, 2016, Huberfeld continued to make management decisions that directly impacted PPVA.

71.     On or about May 25, 2018, Huberfeld pled guilty to federal charges of conspiracy to commit wire fraud, in connection with a bribe Huberfeld offered to Norman Seabrook, the former President of the Correction Officer's Benevolent Association of New York ("**COBA**"), in exchange for COBA's investment of $20 million with PPVA and other Platinum-affiliated funds.

72.     In 2013, Huberfeld was instrumental in the creation of Beechwood and helped solicit the initial investment funds for use by Beechwood. At all relevant times, Huberfeld was a direct or indirect owner of Beechwood.

73.     Huberfeld was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) using his position as a senior Platinum Management executive to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

74.     Defendant David Bodner is a Platinum Defendant as well as a Beechwood Defendant.  Bodner is a resident of Monsey, New York.

75.     Along with Huberfeld and Nordlicht, Bodner is a co-founder of Platinum Management and PPVA who helped solicit the initial investment funds for PPVA from his contacts in the New York Jewish community.

76.     At all relevant times, Bodner directly or indirectly held ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

77.     Bodner was instrumental in the creation of Beechwood.  At all relevant times, Bodner directly or indirectly held ownership interests in Beechwood.

78.     Bodner was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a senior Platinum Management executive to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

79.     In February 1990, Huberfeld and Bodner were arrested for sending imposters to take their Series 7 brokerage licensing exams.  They eventually pled guilty to misdemeanors and were sentenced to two years of probation and paid substantial fines to the SEC.

80.     Thereafter, in 1998, Huberfeld and Bodner settled civil allegations that they sold more than 513,000 shares of restricted stock in an investment company.  Huberfeld and Broad Capital, the fund Bodner and Huberfeld were managing at that time, made large restitution payments to the SEC in connection with these acts.

81.    Huberfeld and Bodner's checkered pasts are matters of public record.  Published articles concerning Platinum Management routinely mentioned their arrests, guilty pleas and SEC fines.

82.    Neither Huberfeld nor Bodner had an official title at Platinum Management. Instead, Bodner and Huberfeld generally conducted business at Platinum Management via a shared secretary, through whom the substantial majority of emails to and from Bodner and Huberfeld were exchanged.  The secretary would, in turn, either print out copies of the relevant emails and attachments to show to Bodner and Huberfeld or forward the emails to Bodner and/or Huberfeld at their personal email addresses.  Attached as **Exhibit 2** is a true and correct copy of a February 11, 2016 email from Bernard Fuchs to the secretary for Huberfeld and Bodner, directing the secretary to provide the email to Bodner.

83.    Among other things, both Bodner and Huberfeld were involved with sourcing investment opportunities, meeting with and marketing to important investors, dealing with issues concerning liquidity and redemptions, and developing business and investment strategy for PPVA.

84.    At all relevant times, Bodner and Huberfeld also were involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investors.  Although they did not have official titles, Bodner and Huberfeld's approval was required for all significant business, investment and personnel decisions.

85.    At all relevant times Nordlicht, Levy, Bodner and Huberfeld were the concealed owners and co-lead managers of the Beechwood Entities.  They wielded this power and control via intermediaries, including the outward facing Beechwood Managers, Taylor, Feuer and Narain. Their approval was required for all significant decisions including all investment decisions.

86.     Both Bodner and Huberfeld also participated in improperly inflating the values of PPVA's assets in order to improperly increase PPVA's NAV, thereby causing PPVA to pay excessive distributions, fees and other payments to the Platinum Defendants.

87.     Defendant Daniel Small is a Platinum Defendant and Preferred Investor of the BEOF Funds.  He is a resident of New York, New York.  Small was an employee of Platinum Management from 2007 until July 2015, and served as Platinum Management's Managing Director.

88.     Together with Levy, Small served as portfolio manager for, *inter alia*, PPVA's investments in Black Elk, Implant Sciences, China Cablecomm, and China Horizon until he left Platinum Management in July 2015.  Small's compensation as portfolio manager was based in part on increases to the value of the assets he managed, so he profited from the inflated values ascribed to those assets.

89.     Small had direct knowledge of the Black Elk Explosion and the effect it had on the value of PPVA's investment in Black Elk and PPVA's overall NAV, as well as the subsequent financial issues faced by Black Elk during 2013 and 2014.  He was an architect of and helped carry out the Black Elk Scheme and the transactions by which the remaining Black Elk assets were acquired to create Northstar.  Both of these transactions have been challenged as fraudulent transfers by the Black Elk Trustee, resulting in tens of millions of potential liabilities to PPVA.

90.     Joseph SanFilippo is a Platinum Defendant and a resident of Freehold, New Jersey.  At all relevant times, SanFilippo served as Chief Financial Officer of Platinum Management and PPVA.

91.     At all relevant times, SanFilippo was a member of both the valuation committee and the risk committee.  As such, SanFilippo was responsible for assessing the value of PPVA's assets and determining the risk associated therewith.

92.     In his capacity as chief financial officer and member of the valuation and risk committees, SanFilippo played an instrumental part in the systematic overvaluation of PPVA's assets by the Platinum Defendants and the resulting inflation of PPVA's NAV.

93.     SanFilippo was responsible for, *inter alia*, the creation of false financial disclosure documents for PPVA.

94.     SanFilippo also had responsibility for communicating with PPVA's auditors, third party valuation providers, and fund administrators and did so on a routine basis.

95.     SanFilippo also was involved in preparing the documents and information necessary to complete the March 2016 Restructuring and particularly the transfer of assets to PPCO.

96.     SanFilippo was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a member of the valuation and risk committees to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable

assets; and (v) assisting in the consummation of the transactions referred to herein as the Security Lock-Up.

97.     David Ottensoser is a Platinum Defendant as well as a Beechwood Defendant.  He is a resident of Woodmere, New York.  At all relevant times, Ottensoser served as general counsel and Chief Compliance Officer for Platinum Management and PPVA.

98.     Ottensoser was one of the in house counsel responsible for documenting the transactions that comprised the First and Second Schemes and was actively involved in closing those transactions.

99.     Ottensoser also was involved in creating Beechwood and worked as general counsel for Beechwood during its initial stages, providing legal services to Beechwood and PPVA even when both parties ostensibly were on opposite sides of a transaction.

100.     In his capacity as general counsel of Platinum Management, PPVA and Beechwood, Ottensoser was aware of the conflicts between those entities and arising out of the transactions comprising the First and Second Schemes, and that PPVA's interests were being subordinated to those of Beechwood, the Preferred Investors of the BEOF Funds, PPCO and/or the counterparts in connection with the Security Lock Up.

101.     As a member of the risk committee, Ottensoser was responsible for assessing the risk associated with PPVA's assets and investments, a significant issue in determining the value thereof.

102.     Ottensoser was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a member of the risk committee to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated

during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of the transactions referred to herein as the Security Lock-Up.

103. Bernard Fuchs, a/k/a Berish Fuchs, is a Platinum Defendant.  Bernard Fuchs is a resident of Lawrence, New York.

104. Bernard Fuchs is the direct or indirect holder of ownership interests in Platinum Management.  As such, he personally benefitted from the inflated distributions, fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

105. Bernard Fuchs did not have an official title, but nevertheless had day to day involvement in the management and operations of Platinum Management and PPVA.

106. Among other things, Bernard Fuchs was involved with meeting with and marketing to important investors, dealing with issues concerning liquidity and redemptions, and developing business and investment strategy for PPVA.

107. Bernard Fuchs took part in meetings with attorneys, investors and investment partners related to the operation and management of PPVA and the transactions comprising the First and Second Schemes.  He also was aware of and participated in the planning, marketing and execution of various aspects of the transactions comprising the First and Second Schemes, such as marketing to the Preferred Investors of the BEOF Funds in connection with the Black Elk Scheme and assisting in the planning of the Agera Transactions.

108.    During late 2015 and the first quarter of 2016, Bernard Fuchs engaged in numerous discussions with investors seeking information concerning the status of PPVA, their investments and requests for redemption, often exchanging emails with Nordlicht, Bodner Huberfeld, Levy and/or  Landesman concerning the best response to those investor inquiries and/or forwarding on such inquiries.

109.    During his exchanges with investors, Bernard Fuchs misrepresented the financial status of PPVA and failed to provide information concerning PPVA's actual financial status, even encouraging investors to invest additional funds at a time when PPVA was unable to pay redemptions and potentially insolvent.

110.    In one email exchange during the last week of February 2016, Bernard Fuchs even berated an investor who suggested that it would be forced to send a letter to the SEC seeking an investigation as to why investors had not been paid for long outstanding redemption requests if those redemption requests were not honored, claiming that the letter had done damage to Platinum Management's business.  *See* Exhibit 2.

111.    Bernard Fuchs' misrepresentations and omissions delayed and or dissuaded investors from taking steps to contact authorities, which enabled the other Defendants to complete the various transactions comprising the March 2016 Restructuring, the Agera Transactions and the Security Lock-Up, to the detriment of PPVA.

112.    Defendant Ezra Beren is a Platinum Defendant as well as a Beechwood Defendant. He is a resident of New York, New York.  Beren is the son-in-law of Murray Huberfeld.

113.    From March 2007 until December 2015, Beren served as Vice President of Platinum Management.  In January 2016, Beren was hired by BAM (defined below) as a credit analyst.

114.     Due to his management role with Platinum Management and Beechwood, Beren was involved in the acts that comprise the First and Second Schemes, including the misrepresentation of PPVA's NAV, the creation of Beechwood and the series of transactions between Beechwood Entities and PPVA that are included in the Second Scheme.

115.     Beren was a portfolio manager for various PPVA investments and in that capacity participated in meetings of the valuation committee.  As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants, and from the inflated distributions, fees and other payments made to Platinum Management by PPVA.

116.     Beren also was engaged as a portfolio manager for BAM beginning in 2014, at the same time as he was working as a portfolio manager for PPVA.

117.     Defendant Naftali Manela is a Platinum Defendant as well as a Beechwood Defendant.  He is a resident of Brooklyn, New York and is a relative of Aaron Elbogen, the Platinum preferred investor and close personal friend of Huberfeld.

118.     Manela worked interchangeably at Platinum Management and Beechwood, assisting the Defendants in orchestrating the First and Second Schemes, including the Black Elk Scheme and the Agera Transactions.

119.     Manela was a member of the valuation committee, and in that capacity was responsible for assessing the value of PPVA's assets.

120.     Manela was involved in every aspect of the First and Second Schemes, including, *inter alia*, (i) by using his position as a member of the valuation committee to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the

Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of certain of the transactions referred to herein as the Security Lock-Up.

121.    Michael Joseph Nordlicht is a Defendant and the nephew of Mark Nordlicht. Michael Nordlicht resides in West Hempstead, New York. In or about 2014, Mark Nordlicht installed Michael Nordlicht as in-house counsel for Agera Energy, LLC ("**Agera Energy**"), an energy reseller managed by Platinum Management as a joint investment by PPVA and PPCO. Prior to the Agera Transactions discussed below, Michael Nordlicht held a 95.01% indirect equity interest in Agera Energy.

122.    Michael Nordlicht participated in and helped facilitate the closing of the Agera Transactions, to the detriment of PPVA.

123.    Michael Katz ("**Katz**") is a Defendant and a resident of New York, New York.

124.    Katz is the grandson of Marcos Katz, a significant investor in PPVA.

125.    In 2015, Marcos Katz sought to redeem his investment in PPVA but there was not sufficient funds to honor this request.  Instead, Nordlicht, Huberfeld, Bodner and Fuchs offered Marcos Katz the opportunity to exchange his investment in PPVA for an interest in Platinum Management and certain other consideration.  As part of the proposed deal, Marcos Katz was offered the opportunity to appoint a representative to oversee his interests.

126.    Although a term sheet was prepared, final documents between and among Marcos Katz and the other members of Platinum Management apparently were never finalized.  Despite

this, Michael Katz, Marcos Katz's grandson, began taking an active role at Platinum Management beginning in or about January 2016.

127.    Michael Katz knew Nordlicht, Levy, Huberfeld, Bodner and Fuchs before he began representing his grandfather's interests in 2016.  In fact, Katz and Levy previously had invested in an energy company that was merged into Agera in 2014, during the startup phase of that business.

128.    By March 2016, Katz began formally advising Platinum Management in connection with the Second Scheme, and, in particular, the Agera Transactions.  In March 2016, Katz conspired with Nordlicht, Levy and other Platinum Defendants to develop the plan to transfer PPVA's interest in Agera Energy to an "insider." Katz had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

129.    Kevin Cassidy ("**Cassidy**") is a Defendant and a resident of Briarcliff Manor, New York.

130.    In 2007, Optionable Inc., a fund co-founded by Cassidy and affiliated with Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives.  Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months.

131.    When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the *managing director* of Agera Energy.

132.    Starfish Capital, Inc. ("**Starfish**"), an entity created and controlled by Cassidy, was made a party to the Agera Transactions as a means of paying Cassidy millions of dollars out of the proceeds thereof for no apparent consideration.

133.    Cassidy had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

134.    Seth Gerszberg ("**Gerszberg**") is a Defendant and a resident of Englewood, New Jersey.  Beginning at the latest by about January 2016, Gerszberg served as an advisor to Platinum Management in connection with various PPVA investment positions and negotiations with PPVA's creditors.  Gerszberg orchestrated and executed certain of the transactions and transfers that comprise the Second Scheme, particularly the purported encumbrance of the debt position in Implant Sciences Corporation as well as the outflow of substantially all of PPVA's cash on hand immediately following the Agera Transactions. Gerszberg had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

135.    Defendant Platinum Partners Black Elk Opportunities Fund LLC ("**BEOF I**") is a Delaware limited liability company with its principal place of business in New York.  BEOF I is not a subsidiary of PPVA, but rather an investment vehicle for the Platinum Defendants and their preferred investors and creditors.  The Platinum Defendants used BEOF I to provide themselves and select insiders with the proceeds of the Renaissance Sale (defined below) to the detriment of PPVA.

136.    Defendant Platinum Partners Black Elk Opportunities Fund International Ltd. ("**BEOF II**" and together with BEOF I, the "**BEOF Funds**") is a limited company domiciled in the Cayman Islands with its principal place of business in New York.  BEOF II is not a subsidiary of PPVA, but rather an investment vehicle for the Platinum Defendants and their preferred investors and creditors.  The Platinum Defendants used BEOF II to provide themselves and select insiders with a majority of the proceeds of the Renaissance Sale to the detriment of PPVA.

137. Defendants "**The Preferred Investors of the BEOF Funds**" are various individuals and entities, and their successors in interest and transferees (to be discovered), that were direct or indirect investors in the BEOF Funds and received capital distributions as a result of the Renaissance Sale (defined below). The Preferred Investors of the BEOF Funds were insiders of Platinum Management, were aware of the actions of the Platinum and Beechwood Defendants in furtherance of the Black Elk Scheme, as well as Beechwood's representations that it was unaffiliated with Platinum Management.

138. The Preferred Investors of the BEOF Funds include the following persons and entities: (i) Morris Fuchs; (ii) Leon Meyers; (iii) Small; (iv) Levy; (v) MN Consulting NY LLC; (vi) Estate of Jules Nordlicht; (vii) Barbara Nordlicht; (viii) Estate of Solomon Englander; (ix) Estate of Gertrude Englander; (x) Rockwell Fulton Capital; (xi) Ditmas Park Capital, LP; (xii) Platinum FI Group LLC; (xiii) FCBA Trust; (xiv) Aaron Parnes; (xv) Sarah Parnes; (xvi) Shmuel Fuchs Foundation; (xvii) Solomon Werdiger; (xviii) Olive Tree Holdings LLC; (xix) Huang Lai Tsu Hsia; (xx) Huberfeld Family Foundation; (xxi) Mind, Body & Soul Co., Limited; (xxii) Twosons Corporation; (xxiii) GRD Estates Ltd.; (xxiv) Meadows Capital LLC; (xxv) Abraham C. Grossman; (xxvi) David Gichtin; (xxvii) Ora Gichtin; (xxviii) Golda Wilk; (xxix) Estate of Marcos Katz; (xxx) Adela Katz; and (xxxi) John Does 1-100.

139. The Preferred Investors of the BEOF Funds are comprised of Platinum Defendants such as Levy and Small, as well as persons and entities who are friends and family of or otherwise personally or professionally connected to one or more of the Platinum Defendants.

140. For example, Preferred Investors of the BEOF Funds Barbara Nordlicht and, before his death on or about August 3, 2018, Jules Nordlicht, are the parents of defendant Mark Nordlicht and grandparents of defendant Michael Joseph Nordlicht.

141. During the course of First and Second Schemes, Jules Nordlicht, with knowledge of the ongoing fraudulent conduct of his son, routinely financed transactions discussed below in connection with Black Elk and Beechwood, due to PPVA's chronic liquidity issues.

142. In the wake of the Black Elk Scheme, Jules and Barbra Nordlicht were provided with purported security interest in PPVA's assets in connection with the PPNE Notes (defined below) and the Security Lockup.

143. Preferred Investors of the BEOF Funds Gertrude and Solomon Englander, both of whom have since passed away, were long term investors in funds managed by the Platinum Defendants.

144. Preferred Investor of the BEOF Funds the Huberfeld Family Foundation is set up for the benefit of the family of defendant Murray Huberfeld, but in fact was used as a repository for assets of the Platinum Defendants and their friends and family during the course of the First and Second Schemes, and as such is the alter ego of Platinum Management and Murray Huberfeld. The Huberfeld Family Foundation's charitable grants are negligible, compared to its estimated net worth of more than $40 million.

145. Murray Huberfeld is the president, director and official signatory for the Huberfeld Family Foundation.

146. The day-to-day administration of the Huberfeld Family Foundation was handled by the Platinum Defendants and other Platinum Management employees from the offices of Platinum Management. Attached as **Exhibit 103** is a true and correct copy of an invoice for third party payroll services for the Huberfeld Family Foundation, addressed to a Platinum Management employee at Platinum Management's offices.

147. The Huberfeld Family Foundation regularly listed itself as residing in the offices of

Platinum Management. Attached as **Exhibit 104** is a true and correct copy of a February 14, 2012 promissory note issued by Howard and Janice Crosby for the benefit of the Huberfeld Family Foundation, listing Platinum Management's office as the address for the Huberfeld Family Foundation.

148. The Huberfeld Family Foundation regularly entered into transactions and agreements with Platinum insiders and certain of the Defendants in this case, such as Aaron Elbogen (discussed below), David Levy, and the Shmuel Fuchs Foundation.

149. Beyond simple cash contributions, the Huberfeld Family Foundation has a history of providing a range of "loans" to affiliated investors and friends in the Platinum circle. At year-end 2017, the foundation listed the value of loans and notes extended as more than $17.5 million.

150. The Huberfeld Family Foundation regularly provided "loans" to the Platinum Defendants and their friends and family who, due to their checkered history, could otherwise not receive financing.

151. From September-December 2016, the Huberfeld Family Foundation provided a loans in the principal amount of $3,000,000 to Hutton Ventures LLC, a company involved in a student loan scam whereby indebted students were defrauded.

152. On information and belief, Huberfeld and Nordlicht used Hutton Ventures LLC as an intermediary to provide Nordlicht with a $7.5 million in loan funds from the Huberfeld Family Foundation, in exchange for a mortgage on real estate owned by Mark Nordlicht. All funds from this transactions were used by Nordlicht in furtherance of the First and Second Schemes.

153. In April 2016, the Huberfeld Family Foundation provided a loan to the Fuchs Family Foundation in the principal amount of $325,000, at zero percent interest with a maturity date of May 2025.

154. From May 2014 to May 2017, the Huberfeld Family Foundation has provided loans to Platinum insider Moshe Oratz in the total principal amount of approximately $1,800,000.

155. Moshe Oratz is a colleague of Platinum insider Aaron Elbogen that pleaded guilty to criminal charges in connection with a racketeering conspiracy involving a Russian-American organized crime enterprise and associated illegal gambling business.

156. In May 2014, the month following Oratz's conviction, the Huberfeld Family Foundation provided a loan to Oratz in the principal amount of $750,000, which, on information and belief, was used to pay fines and other restitution owed by Oratz.

157. On information and belief, Oratz managed certain Platinum-affiliated funds at the request of Huberfeld and has entered into certain loan agreements with the Beechwood Entities.

158. Platinum Defendants Nordlicht, Levy Landesman and Bodner invested in the Huberfeld Family Foundation, regularly transferring cash and assets fraudulently acquired through the course of the First and Second Schemes.

159. From 2012 to 2014, Mark Nordlicht and his wife invested $933,333 with the Huberfeld Family Foundation, which amounts were used by the Huberfeld Family Foundation to provide loans to Platinum insiders.

160. In or about 2012, Uri Landesman invested $400,000 with the Huberfeld Family Foundation, which amounts were used by the Huberfeld Family Foundation to provide loans to Platinum insiders.

161. In or about 2014, the Huberfeld-Bodner Family Foundation, a foundation jointly managed by Huberfeld and Bodner, invested $187,500 with the Huberfeld Family Foundation, which amounts were used by the Huberfeld Family Foundation to provide loans to Platinum insiders.

162.    During the course of the First and Second Schemes, the Huberfeld Family Foundation and the Huberfeld-Bodner Family Foundation made various transfers to each other and reported them as transfers between related funds.

163.    David Levy is also an investor in the Huberfeld Family Foundation, with dividends being paid to Levy on account of such investments in 2015-2016.

164.    Preferred Investor of the BEOF Funds Morris Fuchs is the brother of defendant Bernard Fuchs and was a long term investor in various funds managed by the Platinum Defendants.

165.    Preferred Investor of the BEOF Funds the Shmuel Fuchs Foundation is set up for the benefit of the family of defendants Bernard Fuchs and Morris Fuchs.

166.    Preferred Investor of the BEOF Funds Leon Meyers is a long term investor in various funds managed by the Platinum Defendants who was a personal friend of both Nordlicht and Levy.

167.    Leon Meyers often had lunch and/or dinner with Levy or Nordlicht, and spent time with both men and their families away from the office during holidays and on weekends.

168.    Preferred Investor of the BEOF Funds MN Consulting NY LLC is an investment vehicle owned by Mark Friedman and Neil Einhorn, who are investors in a chain of nursing homes. Einhorn and Friedman both have known Huberfeld for many years. Einhorn is active in and a significant contributor to at least one charity in which Huberfeld serves as vice president.

169.    Preferred Investor of the BEOF Funds Solomon Werdiger is another close friend of Huberfeld. Solomon Werdiger is active in and a significant contributor to one or more charities in which Huberfeld serves as vice president. He also was long term investor in various funds managed by the Platinum Defendants.

170.    On information and belief, Preferred Investor of the BEOF Funds Huang Lai Tsu

38

Hsia is a personal client of defendant Bernard Fuchs.

171.    Preferred Investor of the BEOF Funds Olive Tree Holdings was a longtime client
of Murray Huberfeld.  Huberfeld referred to Olive Tree as one of "my people" and its managing
member, Avi Schron, routinely attended lunches with Huberfeld and Bodner and also is active in
a religious/political group in which Huberfeld is active.

172.    Preferred Investor of the BEOF Funds FCBA Trust is a trust set up by Aaron and
Chaya Elbogen, who are longtime friends of Bodner and Huberfeld and the family member of
Manela.  The Elbogens and their various entities are long term investors in various funds managed
by the Platinum Defendants.

173.    Notably, the SEC previously has charged Aaron Elbogen with aiding and abetting
another fraudulent scheme.  In that case, the SEC alleged that Elbogen and others employed by
Datek Securities and Securities Corp. manipulated NASDAQ's small order execution system
during the period from 1993 through 2001.  Elbogen was chief executive officer of Datek, which
was a day trading firm that subsequently sold its day trading business to Heartland, a registered
broker dealer owned in part by Aaron Elbogen.  Elbogen and the other parties charged in the
scheme settled the charges in 2003 and paid an aggregate of $70 million in fines and penalties,
including $1.4 million by Elbogen personally.  Elbogen also agreed to an order barring him from
associating with any broker or dealer, which remains in effect today.

174.    It should be noted that during 2014, the very same time that the Preferred Investors
of the BEOF Funds received the proceeds of the Black Elk Renaissance Sale as a result of the
Black Elk Scheme, Preferred Investor of the BEOF Funds the Huberfeld Family Foundation, Inc.,
a purported charitable foundation set up by defendant Huberfeld and his family, maintained two
separate loans, each in the amount of $1.5 million, to another trust apparently related to Aaron

Elbogen (the Aaron Elbogen Irrevocable Trust).  A true and correct copy of the 2014 Tax Return for the Huberfeld Family Foundation is attached as **Exhibit 3**.

175.    Preferred Investor of the BEOF Funds Platinum FI Group LLC, is a longtime client, and its principal, Mark (Moshe) Leben, is a close friend, of Huberfeld.

176.    Preferred Investor of the BEOF Funds GRD Estates Ltd. is a longtime client of Huberfeld, and its principal, Gordon Diamond, is Huberfeld's close personal friend.

177.    During a June 2-3, 2009 email exchange, Gordon Diamond and Gilad Kalter, President of Huberfeld-managed fund Centurion Credit Management LP, which was eventually renamed as PPCO and operated from Platinum Management's offices, discussed Mr. Diamond's investment in the fund.  Mr. Diamond, in a follow-up email the next day, congratulated Mr. Kalter for the "super results" and asked him to "tell Murray my friend that I love him and at this moment I am at the Golden Door . . . health spa with Barry[,] my son in law."  Mr. Kalter forwarded Mr. Diamond's email to Mr. Huberfeld requesting that he review the email.  A true and correct copy of this email exchange is attached as **Exhibit 4.**

178.    In a January 31-February 1, 2013 email exchange, Gordon Diamond raised concerns to Murray Huberfeld regarding the financial condition of Black Elk.  A true and correct copy of this email exchange is attached as **Exhibit 5.**

179.    Preferred Investor of the BEOF Funds Meadows Capital LLC is an investment firm located in New Jersey and managed by Robert Cohen.  Mr. Cohen was an acquaintance of Mr. Huberfeld, and held several meetings with Huberfeld and Bodner leading up to the Renaissance Sale.

180.    Preferred Investor of the BEOF Funds Abraham C. Grossman is a long-term investor with Murray Huberfeld and Mark Nordlicht's various funds, including the BEOF Funds

and PPVA.

181.    Preferred Investor of the BEOF Funds Golda Wilk is an investment manager located in Belgium.  Ms. Wilk is one of the largest investors in the BEOF Funds, receiving a distribution of more than $4 Million in connection with the Renaissance Sale.

182.    The late Marcos Katz, along with his wife, Adela Katz, are Preferred Investors of the BEOF Funds.  Marcos Katz was a significant investor of the BEOF Funds, PPVA and other funds managed by Nordlicht, Huberfeld and Bodner.  In March 2016, Marcos Katz was permitted to appoint Michael Katz at Platinum Management to directly oversee his investment with PPVA.

183.    Preferred Investor of the BEOF Funds Ora Gichtin is the sister of Mark Nordlicht. Along with her husband, David Gichtin, Ms. Gichtin was provided an interest in the BEOF Funds at the direction of Mark Nordlicht.

184.    Preferred Investor of the BEOF Funds Mind Body & Soul Co. Ltd. was a client of Huberfeld.  Mind Body & Soul Co. Ltd. was represented by its agent Ezra Erani, a close friend of Huberfeld, who arranged for Mind Body & Soul Co. Ltd. to invest in the BEOF Funds among other Platinum related investments.  Ezra Erani was invited to attend the celebrations following Huberfeld's daughter's wedding.

185.    Preferred Investor of the BEOF Funds Aaron Parnes and his wife Sarah also are clients of Murray Huberfeld and were referred to by him as among "his people."  They were long terms investors in various funds managed by the Platinum Defendants.

186.    Preferred Investor of the BEOF Funds Rockwell Fulton Capital, L.P. and Ditmas Park Capital L.P., both of which have common ownership, were clients of Nordlicht.

187.    Defendant Twosons Corporation ("**Twosons**") purports to be a foreign corporation authorized to do business in New York.  As a Preferred Investor of the BEOF Funds, Twosons

received $15.4 million of proceeds from the Black Elk Renaissance Sale (defined below). Twosons and its principals the Harari family were good friends and clients of Huberfeld.

188.     Defendant Daniel Saks is a Platinum Defendant and Beechwood Defendant and a resident of Teaneck, New Jersey.  Until 2014, Saks worked as a portfolio manager at Platinum Management.

189.     During 2014, Saks began working at BAM, although he was still also working for PPVA/Platinum Management.

190.     In late 2014, Daniel Saks replaced Levy as chief investment officer for BAM subsequent to Levy's return to Platinum Management, and later served as its President.

191.     Saks routinely received and was involved in commenting on the third party valuation reports sent to BAM that included inflated valuations of the Beechwood transactions with PPVA.

192.     Saks was instrumental to Beechwood's involvement in the First Scheme and Second Scheme discussed below, and acted as signatory on behalf of various Beechwood Entities in connection with several of the transactions among Beechwood Entities and PPVA.  For example, Saks was involved in orchestrating the January 2015 Montsant transaction and executed the transaction documents on behalf of BAM.  Saks similarly was involved in negotiating amendments to the Golden Gate Oil transaction documents.

193.     Defendant Moshe M. Feuer is a Beechwood Defendant and a resident of Lawrence, New York.  Feuer, Levy and Taylor were the original public face of Beechwood and, together with Nordlicht, Bodner and Huberfeld, founded the company.  Feuer remained with Beechwood at all relevant times.

194.    At all relevant times, Feuer (through trusts) owned common stock in various Beechwood Entities and had managerial authority over the Beechwood Entities.  Feuer also acted as signatory for Beechwood as to certain transactions comprising the Second Scheme, such as the Nordlicht Side Letter.

195.    Before establishing Beechwood, Feuer was the CEO of Marsh USA Inc. and had pre-existing relationships with Nordlicht, Huberfeld and certain other Platinum Defendants.  Feuer had long known the senior executives at Platinum Management, who were active in the same social community on New York's Long Island.  Feuer and Huberfeld served on the board of a charity together, and Feuer's sister went to the same school as Nordlicht.

196.    Feuer had knowledge of certain First Scheme Transactions and Second Scheme Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

197.    For example, Feuer was the person who witnessed Nordlicht's execution of the Nordlicht Side Letter.

198.    Defendant Scott Taylor is a Beechwood Defendant and a resident of New York, New York.  Taylor, Feuer and Levy founded Beechwood together with Nordlicht, Bodner and Huberfeld.  Taylor, Feuer and Levy were the original public face of Beechwood, and Taylor remained with Beechwood at all relevant times.

199.    At all relevant times, Taylor (through trusts) owned common stock in Beechwood and had managerial authority over the Beechwood Entities.

200.    Prior to forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.

201.    Taylor had knowledge of certain First Scheme Transactions and Second Scheme Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

202.    Taylor, together with Levy, helped prepare the marketing documents by which various reinsurance clients were induced to invest funds with the Beechwood Reinsurance Companies, and which did not disclose the connections between the Beechwood entities and Platinum Management.

203.    Taylor and Feuer were involved in orchestrating the various transactions comprising the First and Second Schemes.

204.    Defendant Dhruv Narain is a Beechwood Defendant and a resident of Purchase, New York.

205.    Narain became a senior executive at BAM (defined below) and the Beechwood Entities (defined below) no later than January 2016, and was instrumental in the execution of certain transactions comprising the Second Scheme, including the March 2016 PPVA Restructuring (including execution of the Master Guaranty), the 2016 Montsant Transaction, matters involving PEDEVCO during 2016, and the Agera Transactions.

206.    Narain was one of the primary persons who orchestrated the terms of the March 2016 Transaction and the Agera Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

207.    Narain was aware of the true value of Agera, having obtained third party valuation reports about that company.

208.    Narain worked with Nordlicht, Levy, Steinberg, Ottensoser, Fuchs, Bodner, Huberfeld, Katz, Cassidy, Michael Nordlicht, Platinum Management and the Beechwood Defendants to transfer ownership and control of Agera to the Beechwood Entities, which were controlled and owned, at least in part, by Nordlicht, Bodner, Huberfeld and Levy.

209.    Defendant Beechwood Capital Group, LLC ("**Beechwood Capital**") is a Beechwood Entity and a New York limited liability company with its principal place of business in Lawrence, New York, at the same address as Feuer's principal residence.

210.    Defendant B Asset Manager LP ("**BAM I**") is a Beechwood Entity and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.   BAM I served as an investment advisor for Beechwood and its various investments.

211.    Defendant B Asset Manager II LP ("**BAM II**" and, collectively with BAM I, "**BAM**") is a Beechwood Entity and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.  BAM II served as an investment advisor for Beechwood and its various investments.  Nordlicht, Bodner, Huberfeld and Levy owned nearly 70% of the partnership interests in BAM.

212.    Defendant Beechwood Re Investments, LLC ("**Beechwood Investments**") is a Beechwood Entity and a Delaware limited liability company, which had its principal place of business in New York, New York at all relevant times.  Beechwood Investments was used as a vehicle by Nordlicht, Levy, Bodner and Huberfeld to purchase all the preferred shares in the Beechwood Reinsurance Companies.  The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various Beechwood Trusts.

213.    Defendant Beechwood Re Holdings, Inc. ("**Beechwood Holdings**") is a Delaware corporation and a Beechwood Entity.   Beechwood Holdings holds all the common stock of Beechwood Re Ltd.

214.    Defendant PB Investment Holdings Ltd., as successor in interest to Beechwood Bermuda Investment Holdings Ltd. ("**PB Investment**") is a Beechwood Entity organized under Bermuda law, with its principal place of business in Bermuda. Beechwood Bermuda Investment Holdings Ltd. was a reinsurance and wealth management company domiciled in Bermuda that issued wealth management products for the Beechwood Defendants.

215.    Defendant Beechwood Re Ltd. ("**Beechwood Cayman**") is a Beechwood Entity and a reinsurance company domiciled in the Cayman Islands, which had its principal place of business in New York, New York at all relevant times.  Nearly 70% of the common stock of Beechwood Re was held by various Beechwood Trusts created by Nordlicht, Bodner, Huberfeld and Levy.  Beechwood Investments, an entity owned and controlled by Nordlicht, Bodner Huberfeld and Levy through trusts, owned all preferred shares of Beechwood Re.

216.    Defendant Beechwood Bermuda International Ltd. ("**Beechwood Bermuda**" and, collectively with Beechwood Cayman, the "**Beechwood Reinsurance Companies**") is a Beechwood Entity and a reinsurance company domiciled in Bermuda which had its principal place of business in New York, New York at all relevant times.

217.    Defendant BAM Administrative Services LLC ("**BAM Administrative**") is a Beechwood Entity and a Delaware limited liability company which had its principal place of business in New York, New York at all relevant times.   BAM Administrative served as agent for the Beechwood Insurance Trusts and acts as agent and signatory on behalf of the Beechwood Reinsurance Companies in connection with certain transactions within the First and Second Schemes.

218.    Defendants BBLN-PEDCO Corp. and BHLN-PEDCO Corp. are special purpose vehicles (collectively, the "**Beechwood SPVs**") and Beechwood Entities that, at all relevant times,

were managed by BAM Administrative or Illumin and administered in New York, New York. The Beechwood SPVs were the Beechwood Entities tasked with receiving the PEDEVCO investment from PPVA and its subsidiary, and ultimately transferred their interests in PEDEVCO back to PPVA as part of the fraudulent Agera Transactions.

219.    Defendants (i) Private Bankers Life Annuity Ltc 2, as successor in interest to BBIL ULICO 2014 Trust, (ii) Washing National Ltc 2, as successor in interest to BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub and (iii) Bankers Conseco Life Ins. Co. – Ltc 2, as successor in-interest to BRe BCLIC Primary and BRe BCLIC Sub (collectively, the "**Beechwood Insurance Trusts**") are insurance trusts and Beechwood Entities that, at all relevant times, were managed by BAM Administrative and/or Illumin Capital and administered in New York, New York. The Beechwood Defendants used the Beechwood Insurance Trusts to hold investments originated by the Platinum Defendants and used these trusts as vehicles for engaging in a significant portion of the transactions comprising the First and Second Schemes. The Beechwood Insurance Trusts were used to provide PPVA and its subsidiaries with worthless debt instruments as "PGS Value" in connection with the Agera Transactions.

220.    Defendants Beechwood Trust Nos. 1 through 20 (each a "**Beechwood Trust,**" and together with Beechwood Capital, Beechwood Holdings, BAM, Beechwood Investments, Beechwood Cayman, BAM Administrative, Beechwood Bermuda, the Beechwood Insurance Trusts and the Beechwood SPVs, the "**Beechwood Entities**") are Beechwood Entities created in connection with transactions that occurred in New York, New York. The Beechwood Trusts were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families. The Beechwood Trusts owned approximately 70 percent of the common stock of Beechwood Cayman.

221.    Each of the Beechwood Trusts is an alter ego of its respective direct or indirect owner, having been dominated and controlled by Nordlicht, Bodner, Huberfeld and Levy for the purpose of concealing their ownership and control of the Beechwood Entities.

222.    Defendant Illumin Capital Management LP is a Beechwood Defendant and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.  Illumin is owned and controlled by Dhruv Narain, who joined Beechwood in January 2016.  Illumin acted as an investment advisor to Beechwood during the course of the Second Scheme.

## JURISDICTION AND VENUE

223.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1334 and 1367.

224.    Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1409.

225.    This court has personal jurisdiction over each of the Defendants because they: (i) are a citizen otherwise domiciled in the United States; (ii) are authorized to do business in the United States; (iii) have transacted business in the United States, including the State of New York, with respect to certain of the agreements and other matters at issue in this case and have consented to the jurisdiction of the state and federal courts in New York, New York to resolve any disputes arising out of such agreements; or (iv) have committed tortious acts within the United States, including within the State of New York.

## FACTUAL BACKGROUND

**A.    The PPVA Investment Structure**

226.    PPVA was formed in 2003.  It was marketed as a multi-strategy hedge fund.

227.    At the time its insolvency proceeding was commenced, PPVA was operating pursuant to a Second Amended and Restated Limited Partnership Agreement, dated July 1, 2008,

48

registered with the Cayman Islands Registrar of Exempted Limited Partnerships (the "**PPVA Partnership Agreement**"). A true and correct copy of the PPVA Partnership Agreement is attached hereto as **<u>Exhibit 6.</u>**

228. The PPVA Partnership Agreement provides that Platinum Management is the general partner and certain Feeder Funds (defined below) are the limited partners of PPVA.

229. Platinum Partners Value Arbitrage Fund (USA) L.P. (the "**Onshore Feeder Fund**") is a limited partner under the PPVA Partnership Agreement, with investors within the United States serving as limited partners of the Onshore Feeder Fund.

230. Platinum Partners Value Arbitrage Fund (International) Limited (in official liquidation) (the "**Offshore Feeder Fund**") served as the vehicle to attract offshore investors and served as a limited partner of PPVA until June 22, 2010, when the Offshore Feeder Fund ceased to be a limited partner of PPVA and Platinum Partners Value Arbitrage Intermediate Fund Ltd. (in official liquidation) (the "**Intermediate Offshore Feeder Fund**" and, collectively with the Offshore Feeder Fund and the Onshore Feeder Fund, the "**Feeder Funds**") took its place as a limited partner of PPVA.

231. The Feeder Funds and PPVA form a master/feeder investment fund structure typical of Cayman Islands-based funds whereby:

- offshore and U.S. tax-exempt investors invested in the Offshore Feeder Fund, which in turn invested in the Intermediate Offshore Feeder Fund, which in turn invested in PPVA;

- onshore investors invested in the Onshore Feeder Fund, which in turn invested in PPVA;

- the investment activities of the Offshore Feeder Fund, the Onshore Feeder Fund and PPVA were managed by Platinum Management in its separate capacity as a General Partner of PPVA and as investment manager, appointed pursuant to the terms of the Investment Management Agreement (defined below);

- PPVA was marketed to these investors as a multi-strategy hedge fund that sought to achieve significant returns while attempting to minimize downside risk; and

- PPVA's operations were managed by Platinum Management from its offices in New York, New York.

232. From February 22, 2006 until June 15, 2016, two employees of DMS Offshore Investment Services, David Bree and Don Seymour (the "**DMS Directors**") served as directors for the Offshore Feeder Fund and Intermediate Offshore Feeder Fund (together, the "**Offshore Funds**"), which were limited partners under the PPVA Limited Partnership Agreement.

233. Landesman served as a director for the Offshore Feeder Fund and Intermediate Offshore Feeder Fund until April 15, 2015, at which time he was replaced by Nordlicht.

234. The DMS Directors regularly attended and participated in board meetings for the Offshore Funds, which were limited partners of PPVA, at which (i) the financial condition of PPVA was discussed; and (ii) representatives of Platinum Management confirmed that it was abiding by all applicable requirements set forth in the governing documents of PPVA and the Feeder Funds, including the Private Placement Memoranda (collectively, the "**PPMs**") and applicable law.

235. The approval of the DMS Directors was required for certain transactions entered into and disclosures made by PPVA.

236. The DMS Directors notified the Platinum Defendants of their resignation as directors of the Offshore Funds, effective as of June 15, 2016.

**B.     Platinum Management as General Partner**

237. Platinum Management is a Delaware limited liability company organized on or about August 22, 2001.  A true and correct copy of the January 1, 2011 Second Amended and Restated Operating Agreement for Platinum Management is attached hereto as **Exhibit 7.**

238.    In addition to being the general partner of PPVA at all relevant times, Platinum Management managed several other funds, including PPCO and Platinum Partners Liquid Opportunities Fund L.P. ("**PPLO**").

239.    The founders and, at certain times, owners of Platinum Management included Nordlicht, Huberfeld and Bodner and various trusts and entities for which they held a direct or indirect beneficial interest.

240.    Landesman and Fuchs were also managers of and holders of membership interests in Platinum Management.

241.    Upon information and belief, Levy held membership interests in Platinum Management.

242.    Platinum Management and the individual Platinum Defendants operated out of various locations in New York, New York.  From 2012 until the date of the Indictment (defined below), the office of Platinum Management and the Platinum Defendants was located at 250 West 55th Street, 14th Floor, New York, NY 10019.

243.    Section 2.02 of the PPVA Partnership Agreement provides that "the management of the Partnership shall be vested exclusively in the General Partner" *i.e*., Platinum Management.

244.    According to Section 1.06 of the PPVA Partnership Agreement, the "Purposes of the Partnership" are "realizing capital appreciation by investing and trading in U.S. and non-U.S. Securities . . . and to engage in all activities and transactions as the General Partner [Platinum Management] may deem necessary or advisable in connection therewith, including, without limitation:"

> (i) to invest on margin, to engage in short sales and option writing, to enter into repurchase agreements and reverse repurchase agreements or to engage in such other investment techniques as the General Partner believes to be appropriate;

(ii) to purchase, hold, sell, exchange, transfer and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities and other property, funds or rights held or owned by the Partnership including, without limitation, such property, funds or rights which constitute non-traditional investment instruments;

(iii) to allocate and invest discrete segments of the Partnership's assets to entities managed by others ("Portfolio Entities") and, pursuant to agreements granting trading authority over the segments of the Partnership's assets, to investment managers selected by the General Partner ("Managed Accounts"); provided, that the General Partner shall be responsible for monitoring the trading activities of the Partnership, the Portfolio Entities and the Managed Accounts;

(iv) to borrow or raise moneys, and to issue, accept, endorse and execute promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of such or other obligations of the Partnership by hypothecation or pledge of all or part of the property of the Partnership, whether at the time owned or thereafter acquired;

(v) to engage personnel, including Affiliates (as defined in Section 2.05) of the General Partner, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership; and

(vi) to engage attorneys, independent accountants, consultants, investment managers, investment advisors, traders or such other persons as the General Partner may deem necessary or advisable.

245.     As General Partner, Platinum Management was responsible for allocating Net Capital Appreciation and Net Capital Depreciation to the accounts of all partners, and for calculating PPVA's NAV.  *See* PPVA Partnership Agreement at Sections 3.05, 3.06.

246.     Although the PPVA Partnership Agreement made Platinum Management responsible for calculating PPVA's NAV, it provided criteria as to how NAV must be calculated:

(i) *Listed Securities*.  Freely marketable Securities listed or admitted to trading on any U.S. or non-U.S. stock exchange or the U.S. NASDAQ National Market System or comparable non-U.S. market system ("NMS") shall be valued (A) at the last reported sale price of the Security on the primary stock exchange or the NMS, as the case may be, on the date of determination, or in case there shall have been no sale of such security on such date, then (B) at the mean between representative "bid" and "asked" prices for such security on such exchange or the NMS at the close of business on the date of determination, or if no such "bid" and "asked" prices are reported on such date, then (C) at the last reported sale or mean between representative "bid and "asked" price within the five-day period preceding such date; or, if neither such last sale price nor "bid"

and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(ii) *Unlisted Securities*. Freely marketable Securities traded over-the-counter or on another dealer market shall be valued (A) at the "last sale" price as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or other primary U.S. or non-U.S. quotation system as of the date of determination or, if no such price is reported for such date, then (B) at the mean between representative "bid" and "asked" prices at the close of business on the date of determination, as reported in NASDAQ or such other system (or, if not so reported, then as reported by a recognized quotation service); or, if no such price is reported on such date, then (C) at the "last sale" or mean between representative "bid" and "asked" prices so reported within the five-day period preceding such date; or, if neither such "last sale" price nor such "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(iii) *Restricted Securities*. All Securities which are not freely marketable by reason of legal restrictions ("Restricted Securities"), if readily and immediately convertible into or exercisable for freely marketable Securities, shall be valued on the basis applicable to such underlying Securities, reduced by the applicable conversion or exercise price, as the case may be, and all other Restricted Securities will be valued at their fair value, on the basis of the last representative sale price of similarly restricted Securities, or if no such sale price is available, then at such price as the General Partner deems to be fair value.

(iv) *Short Positions*. Securities held short by the Partnership will be valued as respectively provided in (i), (ii) or (iii) hereof, as applicable. The value of Securities held short by the Partnership shall be treated as a liability of the Partnership and, together with the amount of any margin or other loans on account thereof, shall be subtracted from the Partnership's assets in determining net assets of the Partnership.

(v) *Options*. Options for the purchase or sale of Securities will be valued as respectively provided in (i), (ii), (iii) or (iv) hereof, as applicable, except that options listed on an exchange will in any event be valued at the mean between the representative "bid" and "asked" prices at the close of business on the date of determination. Premiums from the sale of options written by the Partnership shall be included in the assets of the Partnership and the market value of such options shall be included as a liability of the Partnership.

(vi) *Dividends*. Dividends declared but not yet received, and rights in respect of Securities which are quoted ex-dividend or ex-rights, shall be included at the fair value thereof, less any applicable taxes thereon, as determined by the General Partner, which may, but need not, be the fair market value so determined on the day the particular Securities are first quoted ex-dividend or ex-rights.

(vii) *Commodity Interests*. Positions in commodities, commodity futures contracts, options on such futures contracts or other interests in commodities traded on an exchange, through a clearing firm or a bank or other financial institution shall be valued at their most recent settlement price, or closing market quotation, as appropriate, on the applicable exchange or with such firm or institution on the applicable determination date. If such contract cannot be liquidated,

due to the operation of daily limits or otherwise, as of such determination date, the liquidating value on the first subsequent day on which the contract would be liquidated may be used or such other value as the General Partner may deem fair and reasonable.

(viii) *Cash Items*. Short-term money market instruments and bank deposits shall be valued at cost (together with accrued and unpaid interest) or market, depending on the type of investment, as the General Partner shall deem appropriate.

(ix) *Assets Allocated to Portfolio Managers*. All assets of the Partnership that are allocated to an independent portfolio manager (through a Portfolio Entity or Managed Account) for management shall be valued by the portfolio manager at their market value.

(x) *Other Assets*. The value of any other assets of the Partnership (or the value of the assets mentioned in this subsection (a) in situations not covered thereby, or in the event of any other happening determined by the General Partner in its discretion to make another method of valuation advisable) shall be their fair value, determined in such manner as may be selected from time to time by the General Partner in its discretion. All values assigned to assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

*See* PPVA Partnership Agreement at Section 3.06.

247.    PPVA was required to reimburse Platinum Management for any expenses it incurred on its behalf in its capacity as General Manager, including overhead/salaries.  *See* PPVA Partnership Agreement at Section 2.09.

248.    The partners of PPVA, including Platinum Management, also were entitled to distributions from their capital accounts as determined by the General Partner, Platinum Management.  *See* PPVA Partnership Agreement at Article 4.

249.    Platinum Management, PPVA and the Feeder Funds also were parties to that certain investment management agreement initially dated as of March 9, 2007 (as at any time amended and restated, the "**Investment Management Agreement**").  In addition to any fees and capital amounts due to it as General Partner, Platinum Management charged PPVA certain management and incentive fees in its capacity as investment manager, calculated using as their base the NAV of the realized and unrealized value of PPVA's assets.  *Id.*

250.     Between January 1, 2013 and August 23, 2016, PPVA paid the Platinum Defendants, either directly or indirectly, distributions and/or fees totaling at least $95,112,245.00, based on the Platinum Defendants' calculation of PPVA's purported net asset value.

**C.     Platinum Defendants' Valuation and Risk Assessment Process and Representations Concerning Investments and NAV**

251.     At all relevant times, Platinum Management maintained a valuation committee and a risk committee to assess the value of and risk associated with PPVA's investments.

252.     Platinum Management tasked the valuation committee with reviewing the values of all of PPVA's significant investments, and Platinum Management's valuation methodology could not be altered without the express written consent of the valuation committee.  The risk committee was tasked with setting investment strategy for Platinum Management and analyzing new investment opportunities.

253.     The members of the valuation and risk committees shifted over time as personnel changes occurred.

254.     Nordlicht and SanFilippo were members of the valuation committee throughout the relevant period.  Landesman was a member of the valuation committee until he resigned as President of Platinum Management in April 2015.  Levy, Steinberg and Manela also were members of the valuation committee.

255.     Nordlicht and Ottensoser were members of the risk committee.  Landesman was a member of the risk committee until he resigned as President of Platinum Management in April 2015.  Steinberg was a member of the risk committee and later became co-chief risk officer.

256.     The portfolio managers, such as Small, Beren, Levy and Steinberg also contributed to valuation and risk determinations.

257.     Huberfeld, Bodner and Fuchs also had input into determinations as to the value of

and risk associated with PPVA's investments.

258.    In addition to the valuation and risk committees, which met on a monthly basis, SanFilippo, Nordlicht and other Platinum Management staff routinely communicated valuation information to PPVA's external fund administrator, SS&C Technologies, Inc., which, in turn would use that information to perform the calculations necessary to prepare PPVA's monthly NAV statements.

259.    During the period from 2012 through 2015, the Platinum Defendants reported to PPVA that it had annualized returns of 11.58% (2012) to 8.76% (2015), with the lowest annualized return during that time period being 7.11% for FY 2013. *See* Platinum Management's March 2016 Tear Sheet for PPVA, a true and correct copy of which is attached as **Exhibit 8**.

260.    PPVA further reported to PPVA that PPVA had a return of 2.6% for the first three months of 2016, and a cumulative return since PPVA's inception of 687.40%. *Id*.

261.    The Platinum Defendants represented to PPVA that the value of PPVA's assets under management had increased steadily from $688 million on January 1, 2012 to $789 million as of October 1, 2015. *See* September 2015 Due Diligence Questionnaire ("**DDQ**"), a true and correct copy of which is attached as **Exhibit 9**.

262.    The Platinum Defendants paid themselves distributions, fees and other compensation based on these reported financial results.

263.    The Platinum Defendants were required to manage PPVA as a liquid fund.

264.    The PPMs for the Feeder Funds, consistent with their respective limited partnership agreements and governing articles, set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days' advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount

requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit. A true and correct copy of a November 2012 PPM for the Offshore Feeder Fund is attached hereto as **Exhibit 10**.

265. The Platinum Defendants represented to PPVA that PPVA's investments would be and were allocated across a variety of different investment strategies, including short-term relative value, event-driven, and asset-based finance. *See* September 2015 Due Diligence Questionnaire.

266. A December 2015 Presentation created by the Platinum Defendants stated that the Platinum Defendants would cause PPVA to target "30% risk allocation to short term trading and relative value strategies, 30% to event driven strategies and 40% to asset based finance strategies." A true and correct copy of the December 2015 Presentation is attached hereto as **Exhibit 11**.

267. The September 2015 DDQ stated, in part:

How long does it take to exit the most liquid positions in the portfolio?

The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage, Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

*See* September 2015 DDQ at p. 17.

268. According to the Platinum Defendants' representations, investments in the listed liquid investment strategies represented as much as 61% of PPVA's portfolio. *See* March 2016 Tear Sheet at p. 2.

269. As the general partner and/or the persons or entities who exercised day-to-day management over PPVA, its subsidiaries and its assets, the Platinum Defendants had fiduciary duties of due care and loyalty to PPVA and were obligated to manage and operate PPVA in good

faith, in accordance with its operating documents. Those fiduciary duties included investing PPVA's assets in accordance with PPVA's investment parameters, assessing the net value of its assets at their market or fair value (depending on the asset), maintaining adequate liquidity, not acting in their own interests to the detriment of the interests of PPVA, not paying themselves unearned fees and stripping or causing liens to be placed on PPVA assets for the benefit of themselves, the Beechwood Defendants, PPCO and other "friends and family."

270.    Instead, the Platinum Defendants reneged on their obligations and breached their duties of due care and loyalty to PPVA, and acted in bad faith and with blatant disregard for the terms of PPVA's operating documents.

271.    The Beechwood Defendants, together with Defendants Katz, Gerszberg, Cassidy, Michael Nordlicht, Illumin, the BEOF Funds and the Preferred Investors of the BEOF Funds, among others, materially and knowingly aided and abetted the Platinum Defendants' breach of their fiduciary duties to PPVA.

**D.    The Collapse and Liquidation of PPVA**

272.    By December 2015, cash redemption payments to PPVA's investors had ceased, with the notable exception of select redemption payments to insiders of Platinum Management and the Defendants.

273.    During the first six months of 2016, PPVA's financial condition continued to worsen. PPVA was unable to comply with its ongoing obligations to its investments, which caused the value of those investments to deteriorate significantly. It also faced numerous demands and lawsuits from creditors.

274.    For example, on January 8, 2016, Levy received an email from the operator of Desert Hawk Gold Corp. ("**Desert Hawk**") – a gold mining operation and a company in which a PPVA subsidiary had invested – claiming that Desert Hawk was "an absolute living hell … It is

not possible to run … without proper capitalization." A true and correct copy of the January 8, 2016 Desert Hawk email is attached hereto as **Exhibit 12**.

275. On February 18, 2016, a Desert Hawk representative emailed Levy that the company could not complete its audit because of insufficient funding. A true and correct copy of the February 18, 2016 Desert Hawk email is attached hereto as **Exhibit 13.**

276. Likewise, PPVA repeatedly failed to meet its lending obligations to Urigen Pharmaceuticals, Inc. ("**Urigen**"), a pharmaceutical startup in which it had invested.

277. In a series of emails from March 29-April 1, 2016, the president of Urigen informed Nordlicht and Levy that, as a result of PPVA's failure to provide the agreed-upon financing, Urigen had missed payroll and monthly overhead and had failed to pay creditors. True and correct copies of the Urigen emails are attached hereto as **Exhibit 14.**

278. Similarly, on June 15-22, 2016, a Platinum Management representative exchanged a series of email with a representative of Golden Gate Oil (an investment marketed at various times as worth more than $100 million according to the Platinum Defendants), whereby Golden Gate Oil complained that, due to PPVA's inability to fund working capital, Golden Gate Oil was unable to meet payroll expenses for the second month in a row. True and correct copies of the Golden Gate Oil emails are attached hereto as **Exhibit 15.**

279. PPVA's financial distress was exacerbated by the events of June 2016, which culminated in the commencement of the Cayman Liquidation.

280. On June 8, 2016, the United States Attorney's Office for the Southern District of New York filed criminal charges against Huberfeld in connection with a bribery scheme by which Huberfeld used PPVA funds to pay kickbacks to a New York City Correction Officer's Union official (the "**Huberfeld Arrest**").

281.    On June 14, 2016, Nordlicht announced on an investor call that Platinum Management had decided that PPVA would stop taking in new investors and all PPVA investments would be unwound and liquidated.  Attached hereto as **Exhibit 16** is a true and correct copy of Nordlicht's June 30, 2016 letter to investors, confirming the suspension of NAV reporting for PPVA and the Feeder Funds.

282.    Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral, and sought the immediate unwinding of their relationships with PPVA.

283.    On or about June 22, 2016, the Federal Bureau of Investigation executed a search warrant at Platinum Management's offices in connection with a broad, multi-agency federal investigation of PPVA's business practices (the "**Search Warrant**").

284.    On July 8, 2016, when PPVA was facing margin calls by its securities transaction counterparties, PPVA had less than $100 cash on hand.  Attached as **Exhibit 17** is a true and copy of an email from Mark Nordlicht containing Platinum Management's July 8, 2016 cash report for PPVA.

285.    On July 28, 2016, Parris Investment Limited, an investor in the Offshore Funds, filed an involuntary petition against the Offshore Feeder Fund in the Grand Court of the Cayman Islands (the "**Grand Court**"), seeking commencement of an involuntary liquidation proceeding and appointment of the JOLs' predecessors as joint official liquidators for the Offshore Feeder Fund.

286.    On August 23, 2016, the Grand Court entered a winding up order, commencing the liquidation of the Offshore Feeder Fund and appointing Christopher Kennedy and Matthew Wright as joint official liquidators.

287.     On August 23, 2016, Platinum Management, as general partner of PPVA, filed a voluntary petition seeking the liquidation of PPVA and the appointment of Christopher Kennedy and Matthew Wright as joint provisional liquidators (the "**Cayman Petition**").  A true and correct copy of the Cayman Petition is attached hereto as **Exhibit 18.**

288.     Accompanying the Cayman Petition was the August 23, 2016 Second Affidavit of Mark Nordlicht (the "**Nordlicht Affidavit**").  A true and correct copy of the Nordlicht Affidavit is attached hereto as **Exhibit 19.**

289.     In the Nordlicht Affidavit, Nordlicht states that the value of PPVA's assets as of August 23, 2016 is approximately $1.1 billion, provided that PPVA was able to wind down its operations in the ordinary course of business pursuant to a proposed restructuring plan.  *See* Nordlicht Affidavit at ¶ 33.

290.     On August 25, 2016, the Grand Court entered an order (the "**August 25, 2016 Order**") directing the provisional liquidation of PPVA and appointing Matthew Wright and Christopher Kennedy as its joint provisional liquidators (the "**Cayman Liquidation**").  A true and correct copy of the August 25, 2016 Order is attached hereto as **Exhibit 20.**

291.     After their appointment as liquidators for PPVA, Messrs. Wright and Kennedy began learning that Nordlicht's assertions as to the value of PPVA's assets were false and that there would be insufficient funds coming in from PPVA's investments to fund the restructuring plan proposed in the Nordlicht Affidavit.

292.     Messrs. Wright and Kennedy also learned that significant claims would be made against PPVA in connection with the Black Elk Scheme and the acts of the Platinum Defendants and Beechwood Defendants, but did not have full access to PPVA's documents and records, so as to learn the extent of the schemes, until the Spring of 2018.

293.     On October 26, 2016, the litigation trustee for the Black Elk bankruptcy estate (the "Black Elk Trustee") filed an adversary complaint against, among others, PPVA, seeking recovery of more than $90 million in fraudulent transfers in connection with the Black Elk Scheme and other relief, in a case styled, *Schmidt v. Platinum Partners Value Arbitrage Fund LP et al.*, Adv. No. 16-03237, pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Black Elk Adversary Complaint**").

294.     On October 18, 2016, the predecessors of the JOLs filed petitions and accompanying Declarations of Christopher Kennedy (respectively, the "**Chapter 15 Petitions**" and "**Kennedy Chapter 15 Declarations**") seeking recognition of the Cayman liquidations of PPVA and the Offshore Feeder Fund as foreign main proceedings and the JOLs as foreign representatives and certain other relief under chapter 15 of the Bankruptcy Code (the "**Chapter 15 Bankruptcy**") in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Case No. 16-12925 (the "**Chapter 15 Court**").

295.     On October 27, 2016, the Grand Court entered an order directing that PPVA's Cayman Liquidation be converted to an official liquidation and, after determining that PPVA and the Offshore Feeder Fund should not share the same liquidators, appointing Messrs. Wright and Kennedy as Interim Joint Official Liquidators until a final hearing in December 2016 (the "**October 27, 2016 Order**").  A true and correct copy of the October 27, 2016 Order is attached hereto as **Exhibit 21**.

296.     On November 23, 2016, the Chapter 15 Court entered an order recognizing the Cayman Liquidation and Messrs. Kennedy and Wright as a foreign main proceeding, and as foreign representatives, respectively, pursuant to 11 U.S.C. 1501 *et seq.* (the "**Chapter 15**

**Recognition Order**").  A true and correct copy of the Chapter 15 Recognition Order is attached hereto as **Exhibit 22**.

297.    On December 16, 2016, the Grand Court entered an order appointing Messrs. Wright and Kennedy as Joint Official Liquidators of PPVA the (the "**December 16, 2016 Order**").  A true and correct copy of the December 16, 2016 Order is attached hereto as **Exhibit 23**.  In connection with their appointment as Joint Official Liquidators, Messrs. Wright and Kennedy resigned as liquidators of the Offshore Feeder Fund.

298.    Martin Trott and Christopher Smith are the current Joint Official Liquidators of PPVA.  Attached hereto as **Exhibit 24** are true and correct copies of Orders entered by the Grand Court reflecting: (i) the September 29, 2017 appointment of Martin Trott and corresponding release of Matthew Wright as a Joint Official Liquidator; and (ii) the July 6, 2018 appointment of Christopher Smith and corresponding release of Christopher Kennedy as a Joint Official Liquidator.

299.    On December 19, 2016, a Grand Jury for the Eastern District of New York returned a criminal indictment, pending as Case No. 16-cr-00640, against, among others, Nordlicht, Levy, Landesman and Small, stating charges including Securities Fraud, Investment Advisor Fraud and Wire Fraud (the "**Indictment**").

300.    On December 19, 2016, the Securities and Exchange Commission filed a parallel civil action against, among others, Nordlicht, Levy, Small, Landesman and Platinum Management (the "**SEC Action**"), in the United States District Court for the Eastern District of New York as Case No. 16-cv-06848, alleging civil damages for violations of, among other things, the Investment Advisors Act of 1940, 15 U.S.C.§ 80b-1 *et seq.*, the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*  A true and

correct copy of the December 19, 2016 civil complaint filed by the Securities and Exchange Commission is attached hereto as **Exhibit 25**.

301. Since their appointment, the JOLs have continued their investigation into the assets and liabilities of PPVA, and have been engaged in the process of liquidating PPVA's assets.

302. Among other things, as of the date of this complaint, the JOLs have realized $73,719,174 in connection with the liquidation of PPVA and its subsidiaries, and estimate that the gross, total realization in connection with PPVA's assets will be between $75,719,174 and $88,294,174, less encumbrances, claims, fees and litigation claims to the recovery – at the subsidiary level – and not including any amounts recovered as a result of litigation against third parties commenced by the JOLs.

303. The aggregate amount of proofs of debt filed in the Cayman Liquidation is $1,156,949,339, with at least $132,000,000 of such debt being on account of purported secured creditors.

304. The aggregate amount of proofs of debt filed in the Cayman Liquidation by parties affiliated with Beechwood is $79,146,350.64.

305. On November 20, 2018, the Grand Court entered an Order permitting the JOLs to file this complaint against the Defendants ("**Sanction Order**").

**E.     Concentration in Illiquid Investments**

306. By about the end of 2012, the Platinum Defendants' statements to PPVA concerning the amount of and purported growth in PPVA's NAV, as well as their claims regarding the allocation of PPVA's investments and the liquidity thereof were false.

307.     Notwithstanding the representations made to PPVA, the Platinum Defendants had concentrated PPVA's investments in certain highly illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

308.     As of December 31, 2012, approximately 37-43% of PPVA's reported NAV consisted of its investments in Black Elk and Golden Gate Oil.  A true and correct copy of selected portions of the 2012 4th Quarter Valuation Report commissioned by Platinum Defendants and prepared by Sterling Valuation Group, Inc. is attached hereto as **Exhibit 26.**

309.     Under the terms of the PPVA Partnership Agreement, the value of assets of the partnership for which a valuation method was not prescribed or where the Platinum Management believed other methods were advisable, was to be their "fair value" as determined in Platinum Management's discretion.  *See* PPVA Partnership Agreement at Section 3.06(x).

310.     PPVA's PPMs required that the Platinum Defendants exercise their discretion in determining net asset value so that the results represent "fair value."  *See* November 2012 PPM for the Offshore Feeder Fund.

311.     The Platinum Defendants stated in its DDQs that valuations of PPVA's assets were verified and finalized by an internal valuation committee.  *See* September 2015 DDQ, at p. 26.

312.     The Platinum Defendants, however, routinely engaged in the practice of adjusting NAV subsequent to valuation committee meetings, in order to continue the illusion of a steadily increasing NAV, in order to award themselves fees.  For example, attached as **Exhibit 27** is a true and correct copy of a January 21-22, 2015 email exchange among Platinum Management employees discussing Nordlicht's readjustment of NAV subsequent to a valuation committee meeting.

F.    **Misrepresentation of PPVA's NAV in the Wake of the Black Elk Explosion**

313.    As of the fourth quarter of 2012, PPVA's investment in Black Elk was its single biggest position.

314.    As noted above, the Black Elk Explosion occurred in November 2012. The Black Elk Explosion caused the deaths of Black Elk employees and a serious devaluation in PPVA's investment in Black Elk.

315.    In the wake of the Black Elk Explosion, Black Elk faced increasing liquidity problems throughout 2013.

316.    Nevertheless, the Platinum Defendants actually <u>increased</u> their valuation of PPVA's investment in Black Elk during this same period.

317.    At the time of the Black Elk Explosion, approximately 40% of PPVA's total portfolio was worth significantly less than reported to PPVA by the Platinum Defendants, and the remaining "assets" were speculative and early-stage investments that would have required significant capital unavailable to PPVA for any hope of profitability.

318.    Instead of winding down in the face of these events, the Defendants conceived and executed the First Scheme and then the Second Scheme to award fees to Platinum Defendants and eventually to strip PPVA of its remaining valuable assets.

319.    Keeping a substantial majority of PPVA's assets concentrated in illiquid positions, most of them categorized for accounting purposes as "Level 3" assets[4] that were not publicly traded and for which there were no readily available market prices, enabled the Platinum

---

[4] Level 3 assets are assets whose fair value cannot be determined by using observable inputs or measures, such as market prices or models. Level 3 assets are typically very illiquid, and fair values can only be calculated using estimates or risk-adjusted value ranges.

Defendants to retain control over how those assets would be valued for purposes of determining PPVA's NAV.

320.    The Platinum Defendants' control over the valuation of PPVA's illiquid positions in turn enabled them to ensure that PPVA's "performance," which was largely composed of unrealized gains, steadily increased, thereby ensuring that there would always be distributions and fees due to Platinum Management and its members, Nordlicht, Bodner, Huberfeld, Landesman, Fuchs and Levy, and bonuses due and payable to the individuals, such as David Levy, Dan Small, David Steinberg, Ezra Beren and others whose compensation was directly tied to such increases.

321.    The lack of liquidity in PPVA's investments as well as the misrepresented NAV created problems when investors sought to redeem their investments on the short timeline provided for in the PPMs and the applicable limited partnership agreements, and when the Platinum Defendants sought to pay themselves.

322.    Despite the financial reports and the PPMs representing PPVA as a liquid fund, the Platinum Defendants routinely relied upon funds invested by new investors in order to pay redemptions, as a significant amount of PPVA's assets were concentrated in illiquid "Level 3" assets that were grossly overvalued by the Platinum Defendants and did not provide PPVA with a source of liquidity.

## G.    Misrepresentation of Value for Golden Gate Oil

323.    An example of the Platinum Defendants misrepresenting the value of PPVA's assets concerns PPVA's debt and equity position in Golden Gate Oil.

324.    At the end of 2012, PPVA held 48% of the equity in Golden Gate via a wholly owned subsidiary, Precious Capital LLC ("**Precious Capital**").  *See* Exhibit 26 at pp. 143-146.

325.    Precious Capital also had extended a working capital loan to Golden Gate that was secured by all of Golden Gate's assets (the "**Golden Gate Oil Loan**").  At the end of 2012, the principal and interest outstanding on the Golden Gate Oil Loan totaled $12,893,000.  *See id.*

326.    At the end of 2012, the Platinum Defendants valued PPVA's 48% equity investment in Golden Gate Oil at $37 million, which implied a total value for the company of approximately $78 million, and valued the Golden Gate Oil Loan at par.  *Id.*

327.    One year later, the Platinum Defendants reported that the value of PPVA's 48% investment in Golden Gate Oil had risen sharply, to as much as $173 million.  The Platinum Defendants once again valued the Golden Gate Oil Loan, which by then had grown to $24,392,489, at par.  True and correct copies of selected portions of Sterling Valuation's 4th Quarter 2013 Valuation Report are attached hereto as **Exhibit 28**.

328.    The Golden Gate Oil equity interests and Golden Gate Oil Loan constituted approximately 19% of PPVA's reported NAV as of the end of 2013, and other than Black Elk was one of PPVA's largest investments.

329.    The value ascribed to PPVA's investment in Golden Gate Oil by the Platinum Defendants, including the value of the Golden Gate Oil Loan, was significantly inflated.

330.    Golden Gate's first stage of operations involved the drilling of seven wells (the "**Golden Gate Oil Wells**"), but it encountered large drilling cost overruns, as well as delays in obtaining needed permits.

331.    As a result, Golden Gate Oil had utilized the $18 million borrowed from PPVA by the end of 2013.

332. More problematic than the delays and cost overruns was the fact that the Golden Gate Oil Wells that eventually were completed produced mostly water and many were shut in (*i.e.,* not producing).

333. During 2013, the revenue realized from the only consistently-producing Golden Gate Oil Well was less than 10% of initial projections.

334. As a result, far from generating the millions in present cash flow that had been expected to pay for future drilling, Golden Gate Oil suffered $6 million in *net losses* in 2013.

335. The Platinum Defendants did not disclose any of this information in its valuation reports when valuing PPVA's investment in Golden Gate Oil.

336. In November 2013, Black Elk reported in a public filing that it had obtained an option to purchase all membership interests in Golden Gate Oil for $60 million. True and correct copies of the relevant pages from the Form 10-Q filed with the Securities and Exchange Commission by Black Elk are attached hereto as **Exhibit 29**.

337. This disclosure demonstrated that the value the Platinum Defendants placed on Golden Gate Oil was inflated.

338. On May 23, 2014, Ari Hirt, a Platinum Management portfolio manager for Golden Gate Oil, told Nordlicht, Levy, Saks and Steinberg that a potential third-party lender had brought up Black Elk's SEC filing, saying "the issue is that it publicly discloses the value of the option and therefore pegs GGO [Golden Gate Oil]'s value to $60M. This is ultimately a marketing issue that could be dealt with but something we should all be aware of." A true and correct copy of this May 23, 2014 email is attached hereto as **Exhibit 30**.

339. Internal emails indicate that Nordlicht and the other Platinum Defendants were well aware that the values ascribed to Golden Gate Oil were inflated as early as 2012.

340.     For example, in early 2012, Nordlicht scoffed at his portfolio manager's optimistic projections concerning Golden Gate Oil's performance: "I cringe at the 1 billion PV-10 number [a measure of the present value of the oil reserves] as it doesn't mean anything . . . . when u have billion pv 10 on fields that are worth 15 [$15 million] in sale now, it doesn't really mean much..." A true and correct copy of this April 3, 2012 Nordlicht email is attached hereto as **Exhibit 31.**

341.     Likewise, in late 2012, one of Platinum Management's project managers for Golden Gate Oil wrote to Nordlicht that once Golden Gate Oil, as a first step, had the first seven Golden Gate Oil Wells producing at its two fields, the value of Golden Gate Oil would rise to $45 million.  A true and correct copy of this email is attached hereto as **Exhibit 32.**

342.     Yet, at the end of 2013, when Golden Gate Oil's drilling program had fallen far short even of that goal and Golden Gate Oil was deeply in debt, the Platinum Defendants increased their valuation of PPVA's equity interest in Golden Gate Oil to $173 million.

343.     The Platinum Defendants also continuously valued the Golden Gate Oil Loan at par, even though it appears that Golden Gate Oil never made a single interest payment to the holder of the debt during the entire period the Golden Gate Loan was outstanding.

## H.     **Creation of Beechwood**

344.     In order to justify charging PPVA for increasing partnership distributions and other fees, the Platinum Defendants had to keep up the pretense that PPVA's NAV was steadily increasing.

345.     As a corollary, the Platinum Defendants had to keep pace with ongoing requests for investor redemptions, or risk disclosure of the liquidity issues and true NAV of PPVA.

346.     The Platinum Defendants had caused PPVA's assets to be invested in illiquid investments, however, which made this difficult.

347.     Nordlicht, Huberfeld, Levy and Bodner, together with Feuer and Taylor, developed a scheme to create Beechwood as a way to generate capital in a new business venture that they could use for their personal benefit to, among other things, allocate to themselves an ever increasing share of PPVA assets.

348.     The majority ownership in and ultimate control of Beechwood was in fact held by Nordlicht, Huberfeld, Bodner and Levy, while Taylor and Feuer maintained ostensible and nominal management authority, with Levy.

349.     The Platinum Defendants established Beechwood while working out of Platinum Management's offices.  The effort was coordinated by Nordlicht, Levy, Huberfeld, Taylor, Feuer and Bodner.

350.     Beechwood's investment professionals were simply a revolving door of Platinum Management personnel, including Levy, Saks, Manela, Ottensoser, Beren, and others.

351.     The Platinum Defendants and individual Beechwood Defendants used a portion of the funds entrusted to the Beechwood Entities to enrich themselves, as the Beechwood Entities provided Platinum Management with transaction partners that could be used to justify the First Scheme and PPVA's inflated NAV, while ultimately causing significant harm to PPVA.

352.     The Beechwood Entities were conceived of and functioned as the alter ego of Platinum Management for this wrongful purpose.

353.     David Bodner himself confirmed that Platinum Management and the Beechwood Entities are alter egos and that the connections between the entities were hidden from third parties in order to serve the purposes of the Platinum and Beechwood Defendants.

354.     In a July 29, 2015 email that Bodner apparently asked his secretary to type and send to his personal email and which was sent two years after the framework for Beechwood was

first conceived, Bodner expressed concern that a Beechwood client not discover that the funds it had entrusted to Beechwood for investment actually were invested in illiquid investments at PPVA, which did not fit the client's investment parameters.

355.    In the same email, Bodner stated that he did not want the client to find out that the Beechwood Defendants "weren't exactly honest" about the fact that Beechwood and Platinum Management "really were integrated."

356.    If this information came out, Bodner cautioned that the client might seek to pull all of its money out, which could result in Beechwood having to dissolve.  A true and correct copy of this July 29, 2015 email is attached hereto as **Exhibit 33**.

357.    The scheme began in about February 2013, when Bodner, Huberfeld, Nordlicht and Levy commenced working with Taylor and Feuer to create the Beechwood Entities.

358.    By February 28, 2013, Levy and Nordlicht were advising Beechwood Capital and designating Taylor as Beechwood Capital's manager.

359.    On February 26-28, 2013, writing from "beechwoodcapitalgroup.com" email domains, Taylor and Feuer, copying Levy at his Platinum Management email address, discussed the execution of an NDA between Beechwood Capital and Alpha Re Limited, another reinsurance company.  A true and correct copy of this February 26-28, 2013 email exchange is attached hereto as **Exhibit 34**.

360.    On March 28, 2013, Steinberg sent an email to Huberfeld forwarding a list of wire transfers.[5]  Included among them is a transfer between Platinum Management and Beechwood

---

[5] The list also appears to reflect investments connected to certain of the Preferred Investors of the BEOF Funds.

Capital as well as a number of related party transfers. A true and correct copy of this email is attached hereto as **Exhibit 35.**

361.    On or around April 17, 2013, Taylor drafted a memorandum intended to provide Beechwood's captive managers with an overview of Beechwood's corporate structure (the "**Beechwood Overview Memorandum**").  A true and correct copy of a cover email from Taylor to Levy, attaching the Beechwood Overview Memorandum, is attached hereto as **Exhibit 36**.

362.    On or about May 15, 2013, Levy executed initial due diligence documents for Beechwood Cayman as required by the Cayman Islands Monetary Authority.  True and correct copies of April-May 2013 correspondence between Levy and Crystal O'Sullivan concerning the Beechwood questionnaire are attached hereto as **Exhibit 37**.

363.    On or about May 30, 2013, Levy emailed Nordlicht a draft term sheet for Beechwood Cayman.  A true and correct copy of this email together with the draft term sheet is attached hereto as **Exhibit 38**.

364.    On or about May 31, 2013, Crystal O'Sullivan sent Levy an invoice for $25,000 for filing, licensing, legal, and administrative services in connection with the creation of the Beechwood Reinsurance Companies, so that Platinum Management could pay such fees on behalf of Beechwood.  A true and correct copy of the cover email from Crystal O'Sullivan, together with the invoice, is attached hereto as **Exhibit 39**.

365.    On June 4, 2013, Taylor emailed Levy under the subject "when you have a set of sample investment guidelines, please send them."  The text of the email states "I am creating our Beechwood Re [Beechwood Cayman] 'document.'"  A true and correct copy of this June 4, 2013 email is attached hereto as **Exhibit 40**.

366.    On June 12, 2013, Taylor emailed Nordlicht, seeking Nordlicht's approval in

regard to several potential "deal" opportunities for the Beechwood Reinsurance Companies. A true and correct copy of this June 12, 2013 email correspondence between Taylor and Nordlicht is attached hereto as **Exhibit 41**.

367. Also on June 12, 2013, Taylor sent Levy a general management and strategy document to assist Levy in drafting an unspecified "investment document." *See id.*

368. On June 16, 2013, Taylor emailed Levy a PowerPoint Presentation that he prepared entitled "Beechwood Re Investment Strategy & Guidelines Discussion Document" (the "**Beechwood Re Presentation**"). A true and correct copy of the June 16, 2013 cover email from Taylor to Levy, together with the attached Beechwood Re Presentation, is attached hereto as **Exhibit 42**.

369. The Beechwood Re Presentation identifies Levy as a key member of the management team, and touts his 8 years of experience with Platinum Management as a strategy for Beechwood's future success. *See id.* at 12. The presentation did not, however, indicate that Levy would continue to work at Platinum Management while working at Beechwood.

370. Platinum Management engaged the law firm of Bryan Cave LLP ("**Bryan Cave**") as outside counsel to assist in the creation of the Beechwood Entities. True and correct copies of emails dated June 20, 2013, between Andrew E. Auerbach of Bryan Cave, Levy and David Ottensoser, discussing the opening of a new matter for creation of "Beechwood Re Investment LLC," are attached hereto as **Exhibit 43**. A true and correct copy of the Bryan Cave engagement letter, directed to "David Levy at Beechwood Re, c/o Platinum Partners," is attached hereto as **Exhibit 44**.

371. By July 3, 2013, Bryan Cave prepared the initial corporate documents, including an LLC agreement for Beechwood Reinvestment LLC and subscription documents for

investment in the membership interests in that entity.

372.     These documents were sent to the Platinum Defendants and used by them to grant Nordlicht, Bodner, Huberfeld and Levy majority ownership and control over Beechwood.  A true and correct copy of an email from Laurel A. Durham of Bryan Cave to Levy and Ottensoser, attaching a draft of the Beechwood Reinvestment LLC Operating Agreement and subscription documents is attached hereto as **Exhibit 45**.

I.     **Structure and Ownership of Beechwood**

373.     As a result of the foregoing actions by the Platinum Defendants acting in concert with the Beechwood Defendants, by February 26, 2014, the Beechwood Reinsurance Companies were established and had received significant funds for investment from insurance investors, including SHIP.

374.     The common stock of Beechwood Cayman was held by Beechwood Holdings.

375.     Beechwood Holdings' equity, and the share capital of Beechwood Bermuda, was in turn owned by Feuer, Taylor, Levy, Nordlicht, Bodner and Huberfeld.

376.     Nordlicht, Bodner and Huberfeld together owned nearly **70%** of the common stock in Beechwood Holdings and Beechwood Bermuda, and held their shares through Beechwood Trusts No. 1-19, in which each of their children were the beneficiaries.

377.     Levy held his common stock in Beechwood Holdings and Beechwood Bermuda as the beneficiary of Beechwood Trust No. 20.

378.     The Platinum Defendants and Beechwood Defendants also created BAM to manage and invest the assets obtained through reinsurance agreements with the Beechwood Reinsurance Companies.

379.     Nordlicht, Bodner, Huberfeld and Levy owned a controlling interest in BAM.

380.    To attract reinsurance business and also satisfy the requirements of regulators, Beechwood required a source of capital.

381.    In the materials used to market the Beechwood Reinsurance Companies, the Beechwood Defendants indicated that they were capitalized with cash provided by Feuer, Taylor, Levy and certain investors.

382.    For example, Levy, Feuer and Taylor created and showed potential clients an "Unaudited Balance Sheet September 1, 2013," which stated that the Beechwood Reinsurance Companies held assets totaling $114,801,585, including over $37 million in shares issued by a publicly traded company and over $10 million in "cash and cash equivalents," but no liabilities. A true and correct copy of the September 1, 2013 Balance Sheet is attached hereto as **Exhibit 46**.

383.    Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused the creation of another Delaware limited liability company, Beechwood Investments.

384.    The managing member of Beechwood Investments was N Management LLC, an entity controlled by Nordlicht.

385.    The other nine members of Beechwood Investments were denominated as Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I, with each of these "series" corresponding to the beneficial interests held by Nordlicht, Bodner, Huberfeld, Levy and their families.

386.    From the time they were formed and at all relevant times thereafter, Feuer was Chief Executive Officer and Taylor was President of the Beechwood Reinsurance Companies.

387.    Levy served as BAM's Chief Financial Officer and Chief Investment Officer until the end of 2014, when he was replaced by Saks, another Platinum Management executive.

388.    Narain became a senior executive of BAM no later than January 2016.  On information and belief, Narain held ownership interests and/or control in certain of the Beechwood Entities.

389.    At all relevant times, the management teams of the Beechwood Entities served and worked at the sole discretion of Beechwood's ultimate beneficial owners – Nordlicht, Bodner, Huberfeld and Levy -- and functioned as the alter ego of Platinum Management to PPVA's detriment.

390.    The management team of the Beechwood Entities largely was comprised of personnel employed by or otherwise connected to Platinum Management.

391.    For example, the Beechwood team included, from time to time, the following persons: (i) Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer"; (iii) Paul Poteat, as "Chief Technology Officer"; (iv) David Ottensoser, as "General Counsel"; and (v) Daniel Small, as the "Senior Secured Collateralized Loans PM."

392.    Although each of the foregoing persons had titles at Beechwood, they also were full-time officers or employees of Platinum Management.

393.    During the following two years, additional Platinum Management employees also worked at Beechwood or otherwise directed the activities of the Beechwood Entities.

394.    Stewart Kim, a former Platinum Management employee, was hired by Feuer and Taylor as the Beechwood Reinsurance Companies' Chief Risk Officer.

395.    Beren, Huberfeld's son-in-law, was hired by Feuer and Taylor in January 2016 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management from 2011 through 2015.

396.     After Levy left Beechwood to return to Platinum Management full time, Feuer and Taylor hired Saks to replace Levy as CIO and president of BAM

397.     Manela and Eli Rakower, both employees of Platinum Management, provided extensive and regular consulting services to the Beechwood Entities while also employed by Platinum Management.

398.     BAM and the other Beechwood Entities operated out of Platinum Management's office space until at least the end of February 2014.

399.     Even after separate office space was set up, Nordlicht maintained an office at Beechwood through at least 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

## J.     **Beechwood and the First Scheme**

400.     Immediately after the Beechwood Entities gained access to the first reinsurance trust assets, the Platinum Defendants and the individual Beechwood Defendants caused PPVA to enter into numerous non-commercial transactions with the Beechwood Entities and, in some cases, to co-invest with the Beechwood Entities in third-party companies.

401.     The prices at which assets/loans were bought and sold were used to support the Platinum Defendants' valuations of the relevant equity, debt or investment.

402.     These were not real market transactions in which prices are established as a result of arm's-length negotiations.

403.     To the contrary, the transactions between and among the Beechwood Entities and their clients, on the one hand, and PPVA and its subsidiaries/affiliates on the other, were insider transactions, orchestrated by the Platinum Defendants and the Beechwood Defendants, including the Platinum Management executives that owned the Beechwood Entities, which transactions harmed PPVA.

404.    The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would be repaid, but rather to further the goal to enrich the Platinum Defendants and Beechwood by increasing the fees payable to Platinum Management and BAM (the "**First Scheme Transactions**")

405.    In some cases the First Scheme Transactions were used to justify ever-increasing valuations of the underlying assets as reported by Platinum Management.

406.    In other cases, the First Scheme Transactions were used to mask the performance failures at the underlying operating companies.

407.    In all cases, the First Scheme Transactions were used as a basis to pay the Platinum Defendants unearned partnership shares and/or fees.

408.    Platinum Defendants used First Scheme Transactions in which significant loans were extended/purchased or investments made by a "third party," *i.e.*, the Beechwood Entities, as evidence of the validity of the Platinum Defendants' "estimate" as to the true enterprise value of the underlying company.

409.    These were insider transactions, however. Also, in most cases, any investment or loan made by the Beechwood Entities was backed by a guarantee from or a put right back to PPVA, and thus was not a valid basis upon which to assess the merits of the underlying business.

410.    In other cases, PPVA's prior rights in collateral were made subordinate to the rights of the Beechwood Entities.

411.    The Platinum and Beechwood Defendants damaged PPVA because they favored the rights of the Beechwood Entities – which were owned by Nordlicht, Huberfeld, Levy, Bodner, Feuer and Taylor – over those of PPVA, by causing PPVA to grant guarantees and put rights in

favor of the Beechwood Entities, and to subordinate its rights in collateral in favor of the Beechwood Entities.

412. These inflated valuations enabled the Platinum Defendants to report to PPVA a steady rise in the NAV of the assets they managed, which in turn enabled the Platinum Defendants to pay themselves excessive partnership shares, investment management and performance fees, to the detriment of PPVA.

### 1. <u>Golden Gate Oil</u>

413. An example of a First Scheme Transaction used to artificially inflate the reported value of PPVA's investments is the sale of Precious Capital's interest in the Golden Gate Oil Loan to the Beechwood Entities.

414. Given Golden Gate Oil's ongoing operational issues, steep losses and the serious questions concerning the true value of its business, it would be difficult to find an arm's length lender willing to purchase its debt, and certainly not for anything close to par.

415. On February 3, 2014, Nordlicht sent an email to Platinum Management executives complaining about Golden Gate Oil's lack of performance and increased need for financing. A true and correct copy of Nordlicht's February 3, 2014 email is attached hereto as **<u>Exhibit 47.</u>**

416. On February 26, 2014, the Platinum Defendants and Beechwood Defendants caused BAM I, acting as agent for certain Beechwood reinsurance trusts, to purchase the Golden Gate Oil Loan from Precious Capital.

417. As of February 26, 2014, the total amount of principal and interest outstanding on the Golden Gate Oil Loan was in excess of $28 million.

418. The Platinum Defendants and Beechwood Defendants caused BAM Administrative, on behalf of its clients, to buy the Golden Gate Oil Loan at par. A copy of the February 26, 2014 Note Purchase Agreement by and among Precious Capital and BAM

Administrative (the "**GGO Note Purchase Agreement**") is attached hereto as <u>**Exhibit 48.**</u>

419.     This transaction provided the Platinum Defendants with a basis upon which to justify their valuation of that investment as reported to PPVA.

420.     However, the GGO Note Purchase Agreement contained a hidden failsafe for the benefit of Beechwood.

421.     The GGO Note Purchase Agreement specifically provided that BAM I could put the Golden Gate Oil Loan it had purchased to PPVA and that PPVA would guarantee payment of that debt in full (the "**GGO Put Option and Guaranty**").  *See* GGO Note Purchase Agreement at ¶ 8.

422.     The Platinum Defendants and Beechwood Defendants used BAM I's purchase of the Golden Gate Oil Loan as a way to justify their then-current valuation of PPVA's investment in Golden Gate Oil, which had inexplicably risen from $37 million to $173 million during 2013, and to justify their management fees, but nevertheless left PPVA liable to pay the Beechwood Entities in the event that the underlying operating company failed to repay the Golden Gate Loan, which all parties knew would likely occur.

423.     The GGO Put Option and Guaranty protected Beechwood's investment in Golden Gate Oil at the expense of PPVA.

### 2.     <u>PEDEVCO</u>

424.     During the following months, the Platinum Defendants and Beechwood Defendants caused PPVA and the Beechwood Entities to engage in a series of additional transactions whereby PPVA was required to subordinate, willfully and improperly, its interests to those of Beechwood.

425.     By such transactions, the Platinum Defendants breached their fiduciary duties to PPVA, and such breaches were aided and abetted by the Beechwood Defendants.

426.    Although the Platinum Defendants directed PPVA and its subsidiaries to enter into certain multi-party agreements with certain Beechwood Entities as co-lenders, the Platinum Defendants did not ensure that the interests of PPVA were protected.

427.    Instead, the Platinum Defendants, with the assistance of the Beechwood Defendants, acted to protect the interests of the Beechwood Entities at the expense and to the detriment of the interests of PPVA.

428.    For example, on March 7, 2014, Platinum Defendants, and Beechwood Defendants caused a subsidiary of PPVA – RJ Credit LLC ("**RJ Credit**") – as well as certain Beechwood Entities to purchase certain senior secured notes (the "**PEDEVCO Notes**") issued by PEDEVCO Corp. ("**PEDEVCO**"), a publicly traded oil and gas company based in Texas.  A true and correct copy of the Note Purchase Agreement by which RJ Credit obtained its interest in PEDEVCO is attached hereto as **Exhibit 49**.

429.    Under the terms of the PEDEVCO Notes, RJ Credit was the only lender obligated to make continuing loans to PEDEVCO, such that the Platinum Defendants and Beechwood Defendants favored the interests of the Beechwood Entities and its clients over PPVA with this transaction.

430.    The PEDEVCO Notes held by PPVA's subsidiary were also subordinated in priority to those held by the Beechwood Entities and its clients such that no interest could be paid on the PEDEVCO Notes held by RJ Credit unless and until all interest due to Beechwood's clients was paid in full.

431.    In addition, no principal could be paid on the PEDEVCO Notes held by RJ Credit until all principal on the PEDEVCO Notes held by the Beechwood investors was paid in full.

432.    In May 2016, the PEDEVCO Notes were restructured due to the falling price of oil and other operational issues that had caused a significant revenue shortfall at the company, as a result of which PEDEVCO was unable to pay interest on the notes and its other liabilities.

433.    Beechwood Defendant Dhruv Narain caused certain affiliates of the Beechwood Entities to make a further investment in PEDEVCO.  The monies invested by these affiliates of the Beechwood Entities in May 2016 were made senior in priority to the monies invested by certain Beechwood Entities in March 2014, however, further subordinating the PEDEVCO Notes held by RJ Credit.

434.    Despite the fact that they were aware that the PEDEVCO Notes held by RJ Credit were now subordinated to two layers of financing and that, by spring 2016, PEDEVCO was unable to pay interest on its secured debt and that PEDEVCO's ability to pay the note and other liabilities was in significant doubt, the Platinum Defendants nevertheless claimed that the net asset value of PPVA indirect interests in PEDEVCO still were worth approximately $28 million.

435.    The Beechwood Defendants had direct knowledge of this misrepresented valuation and participated in misleading PPVA as to the value of this asset.

### 3.    Implant Sciences

436.    Also in March 2014, the Platinum Defendants and Beechwood Defendants caused BAM Administrative, on behalf of its clients, to refinance $20 million of the revolving loan issued by PPVA's subsidiary, DMRJ Group, LLC ("**DMRJ**"), to Implant Sciences Corporation ("**IMSC**").

437.    The revolving loan and certain existing term loans also held by DMRJ were secured by liens on and security interests in all of the assets of IMSC and its affiliates.

438.    The Platinum Defendants could have arranged for IMSC to issue a new term note to Beechwood that would be *pari passu* with the existing IMSC debt held by DMRJ, as had been done previously when IMSC revolver debt was refinanced.

439.    Instead the Platinum Defendants and Beechwood Defendants caused DMRJ to subordinate all of its liens on IMSC's assets, including the lien securing DMRJ's revolving loan to IMSC – even though that lien secured future loans to that company – to the liens securing repayment of BAM Administrative's term loan.  The intercreditor agreement between DMRJ and BAM Administrative also ceded to BAM I significant rights in the event of an IMSC bankruptcy, even though DMRJ held much larger loans to that company.  A true and correct copy of the March 2014 Intercreditor Agreement by and between BAM Administrative and DMRJ is attached hereto as **Exhibit 50**.

## K.    **Black Elk Scheme**

440.    The Platinum Defendants also conspired with the Beechwood Defendants, as well as the BEOF Funds and the Preferred Investors of the BEOF Funds, to help the Platinum Defendants and the Preferred Investors of the BEOF Funds cash out their investment in a rapidly deteriorating Black Elk ahead of the interests of PPVA.  The Platinum Defendants returned the favor by causing PPVA to cash out the Beechwood Entities, leaving PPVA holding the bag.

441.    As noted above, Black Elk was an oil and gas company headquartered in Houston, Texas.  Most of its producing assets were located offshore in the Gulf of Mexico.

442.    In 2009, the Platinum Defendants caused PPVA to acquire ownership of a majority of Black Elk's common equity in connection with a loan made to the company.  The original loan was repaid in December 2010, with a portion of the proceeds realized by Black Elk through the private placement of $150 million in 13.75% Senior Secured Notes.

443.    In August 2011, Black Elk completed an exchange offer by which the original Black Elk 13.75% Senior Secured Notes were exchanged for new notes with substantially the same terms, except that the new notes were publicly listed and did not contain trading restrictions (the "**13.75% Senior Secured Notes**").

444.    PPVA and/or its subsidiaries held a significant portion of the 13.75% Senior Secured Notes, while the remainder were publicly held.

445.    The indenture governing the 13.75% Senior Secured Notes (the "**Indenture**") did not permit Black Elk to use the proceeds of an asset sale to make a dividend to or otherwise redeem its preferred equity.  A true and correct copy of the Indenture is attached hereto as **Exhibit 51**.

446.    The Black Elk Explosion occurred in November 2012.

447.    The Platinum Defendants represented that, as of the end of 2012, PPVA's investment in Black Elk's common and preferred equity was worth between $208 to 286 million. *See* Exhibit 26.

448.    PPVA's investment in Black Elk constituted approximately 35% of PPVA's total reported net asset value at the end of 2012 and was by far the largest position held by PPVA.

449.    The Black Elk Explosion was followed by a series of investigations and litigation and a significant deterioration in Black Elk's financial condition and liquidity that worsened throughout 2013.

450.    During the first quarter of 2013, the Platinum Defendants caused PPVA, via its subsidiary PPVA Black Elk (Equity) LLC, to buy $10 million of Series E preferred equity units and additional class B equity units, and to exchange class D preferred units that PPVA already held for more Series E preferred equity from Black Elk.   The agreements between Black Elk (Equity) LLC and Black Elk were signed by David Levy.

451.    In addition, the Platinum Defendants set up the BEOF Funds.  The BEOF Funds were not PPVA subsidiaries.

452.    Rather, the BEOF Funds were a standalone mechanism by which Platinum Management personnel, their family and friends, and certain preferred investors were offered the opportunity to invest in Black Elk "outside of the regular funds."  *See, e.g.,* February 1, 2013 Email from Murray Huberfeld to Fabrice Harari of Twosons describing opportunity to invest in BEOF Funds, a true and correct copy of which is attached as **Exhibit 52**.

453.    The key persons managing the BEOF Funds included Mark Nordlicht, Uri Landesman, Naftali Manela, David Levy and Daniel Small.  In addition, Nordlicht, Fuchs, Huberfeld, Landesman and Bodner were heavily involved in marketing the investment to potential investors and were aware of and involved in the planning of all aspects of the transactions between and among the BEOF Funds and PPVA.

454.    Twosons was one of the "important client[s] and good friend[s]" to which Murray Huberfeld pitched an investment in Black Elk via the BEOF Funds during the first quarter of 2013. A true and correct copy of a February 7, 2013 email from Huberfeld to Fabrice Harari, copying David Levy, is attached hereto as **Exhibit 53.** Others included Jules and Barbara Nordlicht, Mark Nordlicht's parents, and the Huberfeld Family Foundation, an investment vehicle related to Murray Huberfeld that regularly invested in companies owned or managed by the Platinum Defendants or their friends and family.

455.    Collectively, the Preferred Investors of the BEOF Funds purchased an aggregate of $40 million of the Series E preferred equity pursuant to contribution agreements executed between Black Elk and BEOF I during the first quarter of 2013.

456.    Daniel Small and David Levy each signed one or more contribution agreements between BEOF I and Black Elk on behalf of BEOF I.

457.    The first round of BEOF Fund investment in Black Elk occurred during the first quarter of 2013, before the full extent of Black Elk's financial difficulties arising out of the Black Elk Explosion was fully known.

458.    Nevertheless, the onerous terms of the series E preferred clearly indicate that Black Elk was having difficulty obtaining financing even as early as the beginning of 2013.

459.    Pursuant to the Third Amendment to the Second Amended and Restated Operating Agreement of Black Elk, which is dated January 25, 2013 and which set the terms of the series E preferred equity, Black Elk was obligated to pay 20% interest per annum on that security through March 24, 2014, with such interest to be capitalized each quarter and added to the balance to the extent not distributed, plus additional class B shares.  If the total principal and interest due with respect to the series E preferred equity was not repaid by March 24, 2014, interest would increase to *36% per annum*.

460.    During 2013, Black Elk accrued significant unsecured liabilities in addition to its secured obligations, because it was not paying its trade creditors on a timely basis.  As a result, Black Elk may even have been insolvent by the end of 2013.

461.    The facts concerning Black Elk's deteriorating financial condition, were reported clearly and in detail by Black Elk in its public filings.

462.    In addition, during 2013, the rating agencies downgraded Black Elk, first in June and then in September 2013. On June 7, 2013, Moody's downgraded Black Elk because of "the significant deterioration in [Black Elk's] liquidity position since the third quarter of 2012." On September 17, 2013, Reuters published an article titled "S&P cuts Black Elk Energy Offshore

rating to 'CCC+',' reporting a downgrade in both Black Elk's credit rating and Note rating. That article stated: "The outlook is negative" and explained its rationale that "[t]he rating on Black Elk reflects our view of its 'vulnerable' business risk and 'highly-leveraged' financial risk, incorporating the company's small reserve and production base, high operating costs, and acquisitive growth strategy."

463.    Black Elk's second quarter 2013 10-Q, issued on August 14, 2013, discussed at length the legal effects of the Black Elk explosion and again showed that total liabilities exceeded total assets, accounts payable and accrued expenses growing to $160.1 million, a members deficit of $186.0 million, and acknowledged "restricted credit availability." Black Elk also reported that it was evaluating other credit sources, including Platinum.

464.    Black Elk reported in its public filings that, as of December 31, 2013, entities affiliated with Platinum Management beneficially owned approximately 85% of its outstanding voting membership interests and approximately 66% of total outstanding membership interests. A true and correct copy of relevant pages from Black Elk's 10-K for FY 2013 is attached hereto as **Exhibit 54**.

465.    As a result, Black Elk stated that "for as long as [the Platinum entities] hold a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions. As a controlling member, Platinum could make decisions that may conflict with noteholders' interests." *Id*.

466.     The Platinum Defendants aggressively exercised this power, through Nordlicht, as well as through Levy and Small who were the portfolio managers for Black Elk.  However, the other individual Platinum Defendants, including Bodner, Huberfeld, Landesman, Saks, Manela, SanFilippo, Ottensoser, Beren and Fuchs were aware of and participated in the actions and transactions with respect to Black Elk and the Black Elk Scheme as set forth below.

467.     Nordlicht, Levy and Small exercised this power by, *inter alia*, appointing a majority of Black Elk's Board of Managers, appointing Jeffrey Shulse ("**Shulse**") as CFO of Black Elk, repeatedly forcing the Black Elk CEO to rescind his firing of Shulse as CFO and otherwise usurping the CEO's authority.  True and correct copies of a collection of these communications are attached hereto as **Exhibit 55.**

468.     In early 2014, at the direction of the Platinum Defendants, Black Elk entered into negotiations to sell a significant portion of its prime assets (the "**Renaissance Sale**") to Renaissance Offshore, LLC ("**Renaissance**").

469.     The Indenture required that unless the proceeds of such a sale were to be used to purchase replacement assets, Black Elk was required to use the sale proceeds to repay the holders of the 13.75% Senior Secured Notes, a significant portion of which were held by PPVA or its subsidiaries.

470.     In addition to the 13.75% Senior Secured Notes that were held by PPVA and its affiliates, a significant number of such Notes were then held by public bondholders.

471.     By 2014, Black Elk had tens of millions of unsecured debt in addition to the amounts it owed with respect to the 13.75% Senior Secured Notes.

472.     If the proceeds of the Renaissance Sale were to be distributed to the bondholders, it was unlikely that there would be any recovery for holders of Black Elk's preferred and equity

interests, a substantial portion of which were held by the Preferred Investors of the BEOF Funds such as Twosons, Jules and Barbara Nordlicht, the Huberfeld Family Foundation and other friends and family of the Platinum Defendants.

473. Certain of the investors in the BEOF Funds raised concerns as to the status of their investment by the beginning of 2014.

474. As a result, Platinum Management's statements concerning the value of PPVA's investment in Black Elk's equity would be exposed as a lie, and the Preferred Investors of the BEOF Funds would lose their investment.

475. The Platinum Defendants and Beechwood Defendants developed the Black Elk Scheme to divert the proceeds from the Renaissance Sale to redeem the series E preferred shares in Black Elk for the benefit of the Preferred Investors of the BEOF Funds and to hide Platinum Management's false valuations of the Black Elk equity.

476. An amendment to the Indenture governing the 13.75% Senior Secured Notes was needed to allow Black Elk to use the proceeds of the Renaissance Sale to redeem its series E preferred shares and accomplish their goal.

477. The Indenture required a majority vote of the holders of the 13.75% Senior Secured Notes to amend the Indenture.

478. While Platinum Management and affiliates controlled a significant portion of the 13.75% Senior Secured Notes by that time, they could not vote in favor of an amendment to the Indenture, because the consent solicitation (the "**Consent Solicitation**") specifically provided that "Notes owned by [Black Elk] or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with [Black Elk] shall be disregarded for purposes of determining the majority."

479.    Therefore, the Platinum Defendants, led by Nordlicht, Levy and Small, needed to obtain the necessary consents in a manner that deceived independent noteholders.

480.    To that end, Nordlicht, Landesman, Small, Levy and the other managers of the BEOF Funds, working with Huberfeld and Platinum Defendants, caused PPVA to transfer a portion of the 13.75% Senior Secured Notes it held to the BEOF Funds, partly in exchange for series E preferred equity held by the BEOF Funds.

481.    The debt for equity swaps were made pursuant to a March 2014 offering by the BEOF Funds, by which investors were offered the opportunity to roll over their existing investment in the BEOF Funds and/or invest additional capital, which purportedly would be used to purchase 13.75% Senior Secured Notes from PPVA or its affiliates, the open market or from Black Elk in the event it issued additional Notes (none were issued).

482.    The Preferred Investors of the BEOF Funds each agreed to participate in the March 2014 offering, either by rolling over their existing investment in the BEOF Funds (and thus in Black Elk) and/or by investing additional capital.  For example, Twosons invested $10 million in connection with the March 2014 offering.

483.    Given Black Elk's precarious financial condition, the Preferred Investors of the BEOF Funds clearly were aware of and agreed to participate in the March 2014 offering in order to aid Nordlicht, Levy, Small, Landesman, Manela and the other Platinum Defendants and the Beechwood Defendants in their scheme to ensure that those Preferred Investors would not lose their investment in Black Elk, with actual knowledge that Beechwood was affiliated with the Platinum Defendants.

484.    The true purpose of the swaps was to create the appearance that independent entities, *i.e.*, the BEOF Funds, were the owners of the 13.75% Senior Secured Notes,

notwithstanding that the same people, including Nordlicht, Levy, Small, Landesman, Manela, Huberfeld, Bodner and SanFilippo, were managing both PPVA and the BEOF Funds.

485.   Platinum Management thereafter caused PPVA to sell approximately $24.5 million worth of the 13.75% Senior Secured Notes to Beechwood Entities managed by BAM at prices solely designated by Nordlicht.

486.   Levy and the other Beechwood Defendants also caused certain Beechwood Entities to purchase 13.75% Senior Secured Notes on the "open market," and through allegedly independent noteholders, including but not limited to friends and family of Platinum executives.

487.   Numerous emails reflect the involvement of Nordlicht, Levy, Small, and other Platinum Defendants and Beechwood Defendants in this scheme.  For example, in a May 13, 2014 email, Nordlicht instructed that "Beechwood is buying 8 million black elk from PPVA. What is the best way to cross? Can we do it today please."

488.   Similarly, on June 23, 2014, Nordlicht emailed: "I want to move/sell 10 million of black elk bonds to bbil the nomura account.  Please take care of it."

489.   After confirming that "BBIL" (a Beechwood reinsurance trust) was buying 13.75% Senior Secured Notes from PPVA, Nordlicht emailed instructions on July 1, 2014, to sell $7 million in 13.75% Senior Secured Notes from PPVA to a Beechwood reinsurance trust.  True and correct copies of these emails are attached hereto as **Exhibit 56.**

490.   Levy's position as CIO for BAM (along with the fact that many other Platinum Management employees also worked at Beechwood) assured Nordlicht that the Beechwood Entities would support the scheme by purchasing the required amount of 13.75% Senior Secured Notes and supporting amendment of the Black Elk Note Indenture.

491.    Similarly, the BEOF Funds supported the amendment to the Black Elk Notes Indenture.

492.    By July 2014, Platinum Management, Beechwood and their affiliates managed or controlled approximately 66% of the 13.75% Senior Secured Notes.

493.    The Beechwood Defendants worked with their own counsel and with counsel for Black Elk to draft the Consent Solicitation to be circulated to the holders of the 13.75% Senior Secured Notes, which contained two closely related parts.

494.    The first part was a tender offer, which included an offer by Black Elk to buy back the 13.75% Senior Secured Notes at par.

495.    The second part was a request that noteholders consent to certain amendments to the Indenture.   The most notable proposed amendment provided that, after payment of any tendered 13.75% Senior Secured Notes, the proceeds of the Renaissance Sale could be used to redeem Black Elk preferred shares.

496.    The final Consent Solicitation contained this false representation:

> As of the date hereof, there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture.  Platinum Partners Value Arbitrage Fund, L.P. and _its affiliates, which own approximately 85% of our outstanding voting membership interests,_ own approximately $18,321,000 principal amount of the outstanding Notes.
>
> _Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, hold any Notes._  (Emphasis added.)

497.    The $18 million figure was a vast understatement, as it failed to disclose the $72 million in 13.75% Senior Secured Notes held by other funds managed by the Platinum Defendants and the Beechwood Defendants.

498.    The Platinum Defendants and Beechwood Defendants were aware that the Consent Solicitation contained this falsehood, that the vote was rigged, and the result would be a massive loss to PPVA to the benefit of the BEOF Funds and their equity interests.

499.    Despite this, Small signed as a manager and directed the CEO to sign the Black Elk Board of Managers' authorization for Black Elk to conduct the Consent Solicitation, and to implement the solicitation should the requisite number of consents be obtained. A true and correct copy of this authorization is attached hereto as **Exhibit 57.**

500.    The Platinum Defendants and Beechwood Defendants caused all of the 13.75% Senior Secured Notes held by the other funds managed by the individual Platinum Defendants (including the BEOF Funds) and the Beechwood Entities to vote in favor of the Consent Solicitation.

501.    On August 21, 2014, Black Elk issued a Form 8-K announcing that it had received "the requisite consents" of noteholders to, among other things, apply the proceeds from the recently-concluded Renaissance Sale to retire the tendered notes and use the remaining proceeds to repurchase preferred equity issued by Black Elk. A true and correct copy of the August 21, 2014 Black Elk 8-K, exhibits excluded, is attached hereto as **Exhibit 58.**

502.    On August 18, 2014, Small sent an email from his Platinum Management email address that purported to speak for the Black Elk Board of Managers directing Shulse to wire $70 million in partial payment of series E preferred shareholders. Levy also sent Shulse specific wire instructions for sending the designated parties most of the proceeds from the Renaissance Sale. After Nordlicht emailed Shulse to "send these wires out already," Shulse complied with the directions and caused the wire transfers to be sent out. A true and correct copy of the August 18, 2014 email is attached hereto as **Exhibit 59**.

503.   Between August 18 and 21, 2014, Black Elk wired approximately $98 million in Renaissance Sale proceeds to holders of its series E preferred equity.

504.   Included in this amount was approximately $47 million that was transferred to a Sterling Bank Account in the name of PPVA (the "**Sterling Bank Deposit**").  A true and correct copy of PPVA's Sterling Bank account statement for the month of August 2014 is attached hereto as **Exhibit 60**.

505.   In the days following the Sterling Bank Deposit, the Platinum Defendants caused PPVA to transfer approximately $36 million of the Sterling Bank Deposit to bank accounts in the name of the BEOF Funds at North Fork Bank.  A true and correct copy of wire records evidencing wire transfers from PPVA's Sterling Bank account to the BEOF Funds' bank account is attached hereto as **Exhibit 61**.

506.   The BEOF Funds subsequently distributed the amounts they received to the Preferred Investors of the BEOF Funds.  The following is a list detailing the date[s] and amount of the distributions to each of the Preferred Investors of the BEOF Funds, along with their investment positions at critical points:

| | Investment | | Final Capital Distribution | Date |
|---|---|---|---|---|
| | As of 31 December 13 | As at 1 August 14 | | |
| **Platinum Partners Black Elk Opporutnities Fund LLC** | | | | |
| Jules Nordlicht | $ 7,000,000 | $ 7,000,000 | $ 7,187,005 | 21-Aug-14 |
| Jules and Barbara Nordlicht Foundation Inc | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Morris Fuchs | $ 3,000,000 | $ 2,000,000 | $ 2,053,430 | 21-Aug-14 |
| Shmuel Fuchs Foundation Inc | $ 1,500,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| David Levy | $ 250,000 | $ 250,000 | $ 256,679 | 21-Aug-14 |
| Dan Small | $ 100,000 | $ 100,000 | $ 102,672 | 21-Aug-14 |
| Leon Meyers | $ 3,250,000 | $ 3,250,000 | $ 3,433,002 | 21-Aug-14 |
| GRD Estates Ltd | $ 2,000,000 | $ 1,898,000 | $ 1,948,705 | 21-Aug-14 |
| Olive Tree Holdings LLC | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Solomon and Gertrude Englander | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Platinum F.I Group LLC | $ 750,000 | $ 750,000 | $ 770,036 | 21-Aug-14 |
| Aaron Parnes | $ 1,000,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| Sol Werdiger | $ 1,000,000 | $ 2,000,000 | $ 2,053,430 | 21-Aug-14 |
| Rockwell Fulton Capital, L.P. | $ 550,000 | $ 550,000 | $ 564,693 | 21-Aug-14 |
| Ditmas Park Capital L.P. | $ 500,000 | $ 500,000 | $ 616,029 | 21-Aug-14 |
| FCBA Trust | $ 1,500,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| MN Consulting NY LLC | $ - | $ 250,000 | $ 256,679 | 21-Aug-14 |
| Meadows Capital LLC | $ 500,000 | $ 500,000 | $ 508,329 | 21-Aug-14 |
| Abraham C. Grossman | $ 250,000 | $ 500,000 | $ 508,329 | August-14 |
| David and Ora Gichtin | $ 500,000 | $ 500,000 | $ 508,329 | 21-Aug-14 |
| **Platinum Partners Black Elk Opporutnities Fund Internaitonal LLC** | | | | |
| Huberfeld Family Foundation | $ 1,000,000 | $ 1,000,000 | $ 1,026,677 | 21-Aug-14 |
| Twosons Corp. | $ - | $ 15,000,000 | $ 15,400,152 | 21-Aug-14 |
| Mind, Body and Soul Co. LTD | $ - | $ 1,000,000 | $ 1,026,677 | 21-Aug-14 |
| Huang Lai Tsu Hsia | $ - | $ 500,000 | $ 513,338 | 21-Aug-14 |
| Golda Wilk | $ 300,000 | $ 4,002,145 | $ 4,068,741 | 21-Aug-14 |
| Marcos and Adela Katz | $ 4,000,000 | $ 4,000,000 | $ 4,066,560 | 21-Aug-14 |

507.    An involuntary bankruptcy petition was filed against Black Elk in August 2015 in the United States Bankruptcy Court for the Southern District of Texas, which subsequently was converted to a voluntary chapter 11 case in September 2015 (the "**Black Elk Bankruptcy**").

508.    At the time of the Black Elk Bankruptcy, PPVA held approximately $22 Million of 13.75% Senior Secured Notes, which remained unpaid.

509.    During the Black Elk Bankruptcy, the creditors' committee commenced an investigation of the events surrounding the 13.75% Senior Secured Notes Consent Solicitation.

510.    The investigation of the Black Elk Scheme, orchestrated by the Platinum Defendants and Beechwood Defendants, resulted in the commencement of litigation against PPVA by the Black Elk post-confirmation litigation trustee in which the trustee has asserted millions of dollars of claims against PPVA.  Among other things, the trustee sought to avoid and recover all

transfers to PPVA and to equitably subordinate PPVA's claims in connection with its 13.75% Senior Secured Notes.

511.    The Black Elk Scheme also forms one of the primary bases for the Criminal Action and the SEC Action, which had the effect of further devaluing PPVA's assets.  A true and correct copy of the Black Elk Adversary Complaint against, among others, PPVA, is attached hereto as **Exhibit 62**.

512.    The Platinum Defendants, under Nordlicht's direction, generated certain reports to PPVA regarding PPVA's performance, such as financial statements that reported fund performance based, in part, on the outcome of the Black Elk Scheme.

513.    These reports omitted the material fact that the proceeds initially paid to PPVA on account of its Black Elk Class E preferred shares were based on the above-referenced conduct and for the benefit of the BEOF Funds and **not** PPVA.

514.    If the Platinum and Beechwood Defendants had not engaged in the Black Elk Scheme, the proceeds of the Renaissance Sale likely would have been used to pay off the Black Elk 13.75% Senior Secured Notes in full, a portion of which would have gone to PPVA in respect of the Notes it held, including the Notes it sold to the Beechwood Entities.

515.    Instead, as a result of the actions of the Platinum and Beechwood Defendants, the Black Elk Scheme enabled the Preferred Investors of the BEOF Funds to unjustly recoup their equity investment ahead of the higher priority bonds held by PPVA, render those bonds and re-acquired bonds worthless, and enabled the Platinum Defendants to pay themselves inflated distributions and/or fees, while leaving PPVA vulnerable to millions of dollars of claims by the Black Elk Litigation Trustee.

**L.**   **Creation of Montsant and Repurchase of Black Elk Bonds**

516.   In connection with the Black Elk Scheme, the Platinum Defendants and Beechwood Defendants caused the Beechwood Entities to purchase approximately $25 million worth of 13.75% Senior Secured Notes from PPVA and its subsidiaries.

517.   In addition, Platinum Defendants and Beechwood Defendants caused the Beechwood Entities to purchase additional 13.75% Senior Secured Notes on the open market, such that the total amount of 13.75% Senior Secured Notes ultimately held by the Beechwood Entities was approximately $37 million.

518.   Once the Platinum Defendants diverted the proceeds from the Renaissance Sale to themselves and their insider friends and family at the BEOF Funds, the 13.75% Senior Secured Notes held by the Beechwood Entities for purposes of the Black Elk Scheme were worth significantly less than they had been before the Renaissance Sale.

519.   Moreover, the Platinum Defendants and Beechwood Defendants were aware that and acknowledged that any recovery Beechwood received with respect to the 13.75% Senior Secured Notes would be subject to a claim for equitable subordination once the Black Elk Scheme was inevitably disclosed in connection with Black Elk's bankruptcy.

520.   Black Elk's quarterly report for the third quarter of 2014 indicates that, after the Black Elk bond solicitation described above was completed and the proceeds of the Renaissance Sale distributed to the holders of Black Elk series E preferred and the few non-consenting bondholders, Black Elk was left with $138 million of outstanding bonds, approximately $100 million of accounts payable as well as significant other liabilities, but limited assets or sources of revenue with which to pay such liabilities.  A true and correct copy of the Black Elk 2014 Third Quarter 10-Q Report is attached hereto as **Exhibit 63.**

521. Due to these public reports and their own inside knowledge of Black Elk, the Platinum Defendants and Beechwood Defendants were well aware that Black Elk would be unable to meet its obligations under the 13.75% Senior Secured Notes.

522. Despite this, on or about January 31, 2015, the Platinum Defendants and Beechwood Defendants caused a wholly-owned subsidiary of PPVA, Montsant Partners LLC ("**Montsant**"), to purchase all of the 13.75% Senior Secured Notes held by the Beechwood Entities at 93.5% of par, and to pay interest on the Golden Gate Oil Loan.

523. To finance these transactions, Platinum Defendants and Beechwood Defendants caused Montsant to "borrow" $35.5 million at 12% interest from SHIP, a Beechwood client, via a loan administered by Beechwood (the "**2015 Montsant Loan**").

524. Although the 2015 Montsant Loan initially was made on an unsecured basis, the transaction documents required that collateral be posted to secure the loan post-closing. A true and correct copy of the promissory note evidencing the 2015 Montsant Loan ("**2015 Montsant Note**") is attached hereto as **Exhibit 64**.

525. David Steinberg, listed as an "authorized signatory" executed the transaction documents related to the 2015 Montsant Loan on behalf of Montsant. Steinberg also negotiated the terms of the 2015 Montsant Loan in his capacity as a fiduciary of this wholly owned PPVA subsidiary.

526. Thereafter, Platinum Management transferred equity securities and notes belonging to PPVA and DMRJ to an account pledged as collateral to secure amounts due under the 2015 Montsant Loan (the "**Montsant Collateral Account**"), under transactions and circumstances that are the subject of continuing investigation. A true and correct copy of the May 13, 2015 Pledge Agreement by and between Montsant and BAM Administrative, as agent (the "**Montsant Pledge**

Agreement" and along with the 2015 Montsant Loan, the "**Montsant Loan Documents**") is attached hereto as __Exhibit 65.__

527.    SanFilippo and Levy, among other Platinum Defendants, were involved with and responsible for transferring the PPVA and DMRJ assets and securities to the Montsant Collateral Account.

528.    As a result, the Platinum Defendants caused PPVA assets to be pledged to secure a debt to benefit Beechwood, the Platinum Defendants' new business venture, which debt was only incurred in order to repay Beechwood for its corrupt participation in the Black Elk Scheme for the BEOF Funds' benefit and to PPVA's detriment.  Additional details related to this transaction are set forth below.

**M.    __Northstar__**

529.    In May 2014, Platinum Defendants and Beechwood Defendants entered into negotiations to invest in certain oil and gas properties located in the Gulf of Mexico and owned by a predecessor to Northstar Offshore Group, LLC ("**Northstar**").

530.    Northstar's initial acquisition of assets in 2014 was financed in part by the issuance of $80 million of notes (the "**Northstar Notes**"), of which $50 million subsequently were purchased by Beechwood Entities.  The initial Northstar acquisition was completed in Fall 2014. True and correct copies of the Northstar Notes issued to Beechwood Entities are attached hereto as __Exhibit 66.__

531.    The Northstar Notes were supposed to be fully secured by all of the assets of Northstar.

532.    The Platinum Defendants and Beechwood Defendants nevertheless took additional steps to protect the interests of Beechwood over those of PPVA by granting certain Beechwood Entities a lien on PPVA's interests in Agera Energy, one of PPVA's most significant assets, as

additional collateral to secure repayment of the Northstar Notes (the "**Agera Security Agreement**").  A true and correct copy of the Agera Security Agreement is attached hereto as **Exhibit 67.**

533.    In or around Spring 2015, the Platinum Defendants caused Northstar to purchase certain remaining assets of Black Elk, with the consideration for such purchase being the assumption by Northstar of the obligation to pay approximately $65 million worth of Black Elk 13.75% Senior Secured Notes held by PPVA and funds affiliated with Platinum Management, which the Platinum Defendants subsequently caused to be converted to equity in the parent company of Northstar.[6]

534.    The Platinum Defendants represented to investors that PPVA's equity interests in its oil and gas investments (including Northstar, Black Elk and Golden Gate Oil) were worth approximately $240 million as of the end of 2014.

535.    By the first quarter of 2015, the Platinum Defendants claimed that PPVA's interests in the preferred equity of Northstar's parent separately were worth an additional $26-28 million.  True and correct copies of the selected portions of PPVA's 4th Quarter 2014 and 1st Quarter 2015 Valuations are attached hereto as **Exhibit 68** and **Exhibit 69** respectively.

536.    By June 2016, the Platinum Defendants valued PPVA's equity interests in Northstar as approximately $200 million, or 21.3% of PPVA's NAV.  A true and correct copy of the June 30, 2016 Indicative NAV Report shared with PPVA's investors is attached hereto as **Exhibit 70**.

537.    The Platinum Defendants consistently valued PPVA's approximately $8 million of unsecured loans to Northstar at par.

---

[6] Even after this transaction, PPVA still held a portion of Black Elk 13.75% Senior Secured Notes.

538.     By June 30, 2016, the Platinum Defendants and Beechwood Defendants had caused PPVA to engage in a series of transactions with the Beechwood Entities and PPCO that resulted in PPVA holding $22 million worth of the Northstar Notes, which it reported as being secured by a second priority interest in all of Northstar's assets and also valued at par.

539.     Throughout the first six months of 2016, the equity, preferred equity and debt investment in Northstar was the largest portion of PPVA's reported net asset value. A true and correct copy of portions of PPVA 1st Quarter 2016 Valuation is attached hereto as **Exhibit 71**.

540.     The Platinum Defendants' valuation of Northstar was inflated, false and omitted material information.

541.     For example, the Platinum Defendants' claim that PPVA's interest in $22 million of Northstar Notes was secured by liens on all of Northstar's assets was materially false.

542.     No mortgages or financing statements were filed on behalf of the holders of the Northstar Notes with respect to the properties acquired from Black Elk.

543.     At all relevant times, Platinum Defendants controlled P Administrative Services LLC, the entity serving as trustee for the Northstar Notes, but failed to ensure that the necessary filings to perfect the security interests and liens of holders of the Northstar Notes were ever made.

544.     By 2016, Northstar was experiencing significant challenges managing operations and expenses due to the reduction in revenue resulting from falling oil prices.

545.     As a result, Northstar had accumulated millions of dollars in unpaid trade payables and accrued and unpaid interest on the Northstar Notes, with Platinum Management largely financing Northstar's day-to-day operations by allowing it to draw on unsecured credit lines from PPVA and PPCO.

546. Moreover, the Northstar transactions detailed above, which were engineered by the Platinum Defendants, were the subject of claims for breach of fiduciary duty, usurpation of a corporate opportunity and other allegations against PPVA and potential fraudulent conveyance claims against Northstar by the Black Elk Trustee. *See* Black Elk Adversary Complaint, Exhibit 62.

547. A Platinum Management employee served on the Northstar board of directors and thus the Platinum Defendants were well aware of Northstar's financial condition.

548. On August 12, 2016, certain of Northstar's creditors filed an involuntary chapter 7 bankruptcy petition against the company. Northstar subsequently moved to convert the case to a case under chapter 11 of the Bankruptcy Code, and an order for relief was entered on December 2, 2016.

549. Northstar's assets eventually were sold pursuant to a transaction effected under 11 U.S.C. § 363 for $13,250,000 in cash, a $19 million working capital facility in order to pay assumed liabilities, replacement of certain plugging & abandonment bonds and up to $150,000 to fund a post-confirmation litigation trust (the "**Northstar Sale**"). A true and correct copy of the Order of the United States Bankruptcy Court for the Southern District of Texas approving the Northstar Sale, exhibit excluded, is attached hereto as **Exhibit 72**.

550. Holders of the Northstar Notes and Northstar's preferred and common equity, including PPVA and its subsidiaries, received no recovery from the proceeds of the Northstar Sale.

**N.**     **The Second Scheme**

551. Despite the actions of the Defendants set forth above, by mid-2015 PPVA still held assets worth approximately $300 million, a significant portion of which was comprised of PPVA's investment positions in IMSC and Agera Energy (the "**Remaining PPVA Assets**").

552.     Beginning in late 2015, the Defendants conspired to commence the Second Scheme, engaging in an intentional scheme to transfer or encumber nearly all of the Remaining PPVA Assets to or for the benefit of the Platinum Defendants, the Beechwood Defendants, PPCO and select insiders of the Platinum Defendants, and to the detriment of PPVA.

553.     Throughout the course of the Second Scheme, the Platinum Defendants deliberately granted the Beechwood Entities, PPCO and other insiders/friends/preferred investors liens on PPVA's investments at the subsidiary level, and the Platinum Defendants would consistently report PPVA's NAV without taking into account the encumbrances provided to these insider parties, thereby inflating the total amount of fees and other compensation due to them.  *See* Exhibit 71.

554.     The Second Scheme was executed successfully by the Defendants, such that by the time the Cayman Liquidation of PPVA had commenced, PPVA had hundreds of millions in liabilities and minimal assets.

555.     Certain of the transactions comprising the Second Scheme ("**Second Scheme Transactions**") are set forth below.

### 1.     Use of Montsant to Hide Beechwood Encumbrance of PPVA Assets

556.     As noted above, the Platinum Defendants used Montsant to provide subsidiary level liens on certain of the Remaining PPVA Assets to or for the benefit of the Beechwood Defendants by way of the Montsant Collateral Account.

557.     At the direction of the Platinum Defendants and Beechwood Defendants, Montsant was a party to a series of transactions whereby Beechwood was granted liens on certain of the Remaining PPVA Assets that held actual value.

558.     Notably, Beechwood was not granted liens on PPVA's oil and gas investments, which the Platinum Defendants and Beechwood Defendants knew had little or no value.

559.     Instead, interests in oil and gas companies such as Golden Gate Oil and PEDEVCO were used as illusory consideration to offload assets and security interests to Beechwood during the course of the Second Scheme.

560.     As noted above, the Beechwood Entities held liens against PPVA's assets via the Montsant Collateral Account.

561.     The Platinum Defendants transferred assets held by PPVA into the Montsant Collateral Account at will and generally with no consideration.

562.     Although the assets within the Montsant Collateral Account were still included in calculations of PPVA's NAV as though they held value to PPVA, the assets were wholly encumbered, at the subsidiary level, for the benefit of Beechwood and its clients in connection with the First and Second Schemes.

563.     The existence of these subsidiary level encumbrances were not incorporated in the PPVA NAV calculations by SanFilippo, Manela or the other Platinum Defendants.

564.     The assets that the Platinum Defendants caused PPVA and its subsidiaries to transfer into the Montsant Collateral Account included equity securities in Navidea Biopharmaceuticals, Inc. ("**Navidea**") and equity securities and debt instruments issued by Vistagen Therapeutics, Inc. ("**Vistagen**").

565.     The Navidea and Vistagen shares transferred into the Montsant Collateral Account were previously directly held by PPVA and/or another of its subsidiaries.

566.     Similarly, on May 4, 2015, DMRJ and Montsant entered into an agreement (the "**Montsant Assignment Agreement**") by which DMRJ assigned to Montsant its rights, title, and interest in that certain December 2008 Term Note issued by IMSC with an original principal

amount of $5.6 million (the "**December 2008 Note**").  A true and correct copy of the Montsant Assignment Agreement is attached hereto as **Exhibit 73.**

567.    The Platinum Defendants and Beechwood Defendants thereafter caused Montsant to deposit the December 2008 Note into the Montsant Collateral Account, as part of the collateral securing Montsant's obligations under the 2015 Montsant Loan.

**2.      Nordlicht Side Letter**

568.    In January 2016, the Platinum Defendants and Beechwood Defendants faced a crisis at Beechwood.

569.    The Beechwood Entities were saddled with the approximately $37 million due and owing under the Golden Gate Oil Loan, with, as they were aware, no prospect for Golden Gate Oil to repay this debt.  They also had purchased shares of Navidea stock from Montsant on or about October 25, 2015 at the then market price of $6,137.215.50, but by January the value of the stock had dropped significantly.

570.    Until January 2016, the Platinum Defendants caused PPVA to pay the interest on the Golden Gate Oil loan to Beechwood.  At that time, however, PPVA no longer was able to do so because it was facing margin calls of more than $1.5 million and had only $16,700.00 in available cash. A true and correct copy of PPVA's January 13, 2016 cash report is attached hereto as **Exhibit 74.**

571.    The Beechwood Entities were facing questions from regulators due to the significant drop in the share price of the Navidea stock they had purchased from PPVA only a few months before.

572.    To help his Beechwood interests, but to the detriment of PPVA, on or about January 13, 2016, Nordlicht apparently executed the Nordlicht Side Letter.

573.    The Nordlicht Side Letter states that it is made on behalf of Nordlicht, PPVA, PPCO "and each of their affiliates" and provides:

> To the extent not otherwise in violation of applicable law, *upon the sale of the assets and/or equity (collectively, the "Sale") of Implant Sciences, Inc. and/or any of its subsidiaries (collectively, the "Company"), the proceeds of such Sale that inure, directly or indirectly, to the benefit of Platinum, shall immediately upon consummation of such Sale be applied and remitted to B Asset Manager, LP ("BAMLP"), in such amount necessary to purchase and/or repay in full all indebtedness owing by Golden Gate Oil Inc. to BAMLP and each of its investment advisory clients at such time (collectively, "BAM")*; <u>provided</u>, <u>that</u>, nothing herein shall modify the obligations of the Company herein to first repay all indebtedness owing by the Company to BAM with proceeds of a Sale ("Implant Repayment").

A true and correct copy of the Nordlicht Side Letter is attached hereto as **<u>Exhibit 75.</u>**

574.    The Nordlicht Side Letter further states that Nordlicht agrees "to take or cause to be taken all additional actions deemed by BAM to be reasonably necessary in furtherance of the foregoing, as well as to create a perfected security interest in the obligations described above to the extent requested by BAM." *Id*.

575.    The Nordlicht Side Letter is purportedly signed by Beechwood Defendant Mark Feuer as a witness.

576.    Neither PPVA nor any of its subsidiaries received any consideration whatsoever for the Nordlicht Side Letter.

577.    At the time of execution of the Nordlicht Side Letter, IMSC was being marketed for sale.

578.    By executing the Nordlicht Side Letter, Nordlicht purported to grant the Beechwood Entities an interest in the proceeds of a separate investment held by another PPVA subsidiary, that otherwise would not have been available to them to pay off the Golden Gate Oil Loan, to the detriment of PPVA.

579.    At the time the Nordlicht Side Letter was executed, approximately $37 million was due and owing under the Golden Gate Oil Loan.

580.    The Nordlicht Side Letter benefits the Beechwood Entities, owned by Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor, at the expense of PPVA.

581.    The executed Nordlicht Side Letter was circulated among the executives and lawyers employed by Platinum Management, including Ottensoser and Manela. Despite this, the Nordlicht Side Letter was not considered when determining the value of the PPVA assets to which it ostensibly applied, thereby inflating the value of those assets.

582.    The existence of the Nordlicht Side Letter also was not disclosed in the Nordlicht Affidavit or any of the supporting documents submitted in connection with the Cayman Liquidation.

583.    BAM subsequently has asserted a claim that the Nordlicht Side Letter was a valid and binding encumbrance upon the proceeds of PPVA's subsidiary DMRJ's interest in IMSC, and has asserted a claim to recover up to the full amount of the Golden Gate Oil debt out of the proceeds that DMRJ received from IMSC pursuant to the terms of the Nordlicht Side Letter.

**3.    March 2016 "Restructuring" of PPVA/PPCO/Beechwood Transactions**

584.    A few weeks later, in March 2016, Platinum Defendants and Beechwood Defendants orchestrated a series of transactions in connection with a "restructuring" of all of the transactions previously entered into between and among PPVA, PPCO and the Beechwood Entities, whereby all the benefits flowed directly to certain Beechwood Entities and PPCO, and thus to the individual Platinum and Beechwood Defendants who owned and managed those entities and were entitled to charge them for partnership shares and fees, to the detriment of PPVA.

585.    For example, on March 21, 2016, Montsant and BAM entered into a series of agreements (the "**2016 Montsant Transactions**" and collectively with the 2015 Montsant Loan

Documents, the "**Montsant Transactions**") by which the 2015 Montsant Loan was amended and restated, and Montsant purportedly borrowed an additional $6,137,215.50 from BAM client and Beechwood Entity BBIL ULICO 2014 to fund Montsant's purported re-purchase of certain Navidea shares.

586.    The 2016 Montsant Transactions reversed the October 25, 2015 sale by which Montsant had sold equity securities in Navidea from the Montsant Collateral Account to certain Beechwood Entities for $6,137.215.50.  The October 2015 sale was made for the then market price of $1.95 per share.  Attached as **Exhibit 76** is the stock ticker price reflecting the October 26, 2015 share price for Navidea on the open market.

587.    The actual closing price for Navidea stock as of March 21, 2016 was approximately $1 per share.  True and correct copies of stock ticker reports evidencing the March 21, 2016 share price for Navidea are attached hereto as **Exhibit 77.**

588.    Nevertheless, pursuant to the 2016 Montsant Transactions, Montsant re-purchased the Navidea shares from the Beechwood Entities at $1.95 per share.

589.    Nothing in the original October 25, 2015 transaction documents granted the Beechwood Entities the right to put the Navidea stock back to PPVA at the October 2015 sale price.

590.    Rather than purchase the Navidea stock at the market price, the Platinum Defendants and Beechwood Defendants conspired for Montsant to purchase the Navidea shares at **double the market price**, in order to boost the Beechwood Entities' secured claim against Montsant and PPVA and further enrich the Beechwood Entities at PPVA's expense.

591.    The assets in the Montsant Collateral Account, including the December 2008 Note and the Navidea shares that were re-purchased by Montsant pursuant to the 2016 Montsant

Transactions, were pledged for the repayment of both the original amounts owing to SHIP under the 2015 Montsant Loan as well as the additional amounts purportedly borrowed from BBIL ULICO 2014 by Montsant in March 2016.

592.     Also on March 21, 2016, Precious Capital, BAM Administrative, Golden Gate Oil and certain Beechwood Entities entered into the Sixth Omnibus Amendment to the Golden Gate Oil Loan (the "**Sixth Omnibus Amendment**"), by which notes evidencing the Golden Gate Oil Loan were reissued in the following amounts (the "**GGO Notes**"):

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $11,249,414.40, originally issued to SHIP;

- Fifth Amended & Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $551,147.03, originally issued to BRe BCLIC Sub;

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $20,405,749.26, originally issued to BRe WNIC 2013 LTC Primary; and

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $999,370.23, originally issued to BRe WNIC 2013 LTC Sub.

593.     Also on or about March 21, 2016, Montsant, PPVA, Golden Gate Oil and BAM Administrative entered into the Master Guaranty, by which, inter alia, Montsant agreed to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate Oil, to the extent of the assets contained in the Montsant Collateral Account.   A true and correct copy of the Master Guaranty is attached hereto as **Exhibit 78.**

594.     The Master Guaranty further purported to provide BAM Administrative, as agent for certain Beechwood Entities and SHIP, with a non-recourse guaranty from PPVA of amounts owed by Golden Gate Oil and amounts owed by Montsant.

595.     The guaranty was limited to certain amounts to be received by PPVA from the anticipated future sale of IMSC.  As stated in the Master Guaranty:

Immediately following PPVA's receipt of any payments, proceeds, distributions and/or other amounts arising in any manner whatsoever from any right, title and/or interest, PPVA may have in and to Implant Sciences Corporation (the "Proceeds"), PPVA shall immediately following such receipt remit such Proceeds in immediately available funds as follows:

(a) First, PPVA shall make or cause to be made a payment to  BAM [BAM Administrative] in an amount equal to Twenty-Million Dollars ($20,000,000.00) to prepay the principal amount owed by GGO to the Investors, as such term defined in that certain Note Purchase Agreement, (as same may be amended, restated, modified and or supplemented from time to time), dated as of April 10, 2012, by and between GGO and BAM (as successor agent to Precious); and

(b) Second, PPVA shall make or cause to be made a payment of any remaining Proceeds to pay in full all outstanding obligations and liabilities under that certain Note Purchase Agreement, dated as of March 19, 2014, by and between Implant Sciences Corporation, each of the investors party thereto, and the Agent [BAM Administrative].

Master Guaranty at ¶ 1.

596.    The Master Guaranty was further secured by collateral assignments from PPVA to Beechwood Entities of: (i) amounts owed under certain promissory notes issued by China Horizon Investment Group ("**China Horizon**") to PPVA, in the original principal amount of $4,764,872; and (ii) carbon credits, emission reductions and related assets due and payable to PPVA under certain carbon credit portfolio agreements.  True and correct copies of the Collateral Assignment and Turnover Agreement assigning PPVA's interests in the China Horizon promissory note to BAM Administrative are attached as **Exhibit 79** and **Exhibit 80**, respectively.  A true and correct copy of the Collateral Assignment of carbon credits from PPVA to BAM Administrative is attached as **Exhibit 81**.

597.    Also on March 21, 2016, the Montsant Pledge Agreement in favor of BAM was amended to provide that the Montsant Collateral Account would secure all of Montsant's obligations under the March 2016 Guaranty and the 2016 Montsant Transactions.

598.    The Master Guaranty in no way benefitted PPVA.

599. Rather, the Master Guaranty benefited Beechwood by providing it with additional collateral to secure the non-performing Golden Gate Oil Loan, comprised of a significant portion of PPVA's remaining valuable assets.

600. In connection with the Master Guaranty, several of the transactions entered into during the prior two years among PPVA and its subsidiaries and Beechwood were effectively reversed for Beechwood's benefit and to PPVA's detriment via a $70 million "loan" to PPCO, by which certain Platinum positions were transferred from certain Beechwood reinsurance trusts to PPCO, which was thought to be solvent (unlike PPVA), and then, in a classic insider and undervalue transaction, valuable assets of PPVA, then worth in excess of $20-$80 Million, were transferred to PPCO without valuable consideration.

601. On March 22, 2016, various documents were executed among various Beechwood Entities and PPCO, by which PPCO became indebted to these Beechwood Entities in the original principal amount of $70,000,000 (the "**PPCO Indebtedness**").

602. Thereafter, the Platinum Defendants caused PPCO to transfer approximately $20 million in undercollectable Northstar debt to PPVA at par, in exchange for certain known "good and collectable" assets of PPVA, including PPVA's equity and debt interests in certain investments, such as Navidea, Urigen, and Airdye Solutions, LLC, among others.

603. The Platinum Defendants and PPCO were aware that the Northstar notes had no value, while the assets transferred to PPCO were believed to have significant value at the time they were transferred to PPCO. In fact, the Navidea note ultimately was paid at par.

604. The net effect of this March 2016 "restructuring" was to prop up Beechwood and PPCO to PPVA's substantial detriment, under circumstances where Beechwood and PPCO were

chosen as the "good funds" to continue onward, while PPVA was left heading towards liquidation with the Platinum Defendants' insiders largely paid out for their actual investments.

605.    The transaction documents evidencing the March restructuring were signed by Mark Nordlicht on behalf of PPVA, Montsant and Golden Gate Oil.  Notably, David Steinberg is listed as the notice party in the documents.

606.    The terms of and specific steps by which the various transactions comprising the March 2016 restructuring were accomplished were developed, coordinated and accomplished by Nordlicht, Huberfeld, Bodner, Levy, Bernard Fuchs, Steinberg, SanFilippo and Ottensoser, working together with Narain, Taylor, and Feuer.

## O.    **The Agera Transactions**

607.    As early as March 2016, the Platinum Defendants and Beechwood Defendants had conspired to transfer the rest of the Remaining PPVA Assets by way of a series of "insider" transactions in order to clear out the uncollectable debt obligations owed to Beechwood by companies such as Golden Gate Oil and PEDEVCO, leaving PPVA with little to nothing in exchange for the transactions.

608.    The scheme was initiated by Defendant Katz, who, by email on March 13, 2016, suggested to Mark Nordlicht a "potential sale to an insider" as a "solution" in order to keep PPVA's interest in Agera with the Platinum Defendants' friends and family.  Attached as **Exhibit 82** is a true and correct copy of the March 13, 2016 email from Katz to Nordlicht.

609.    Katz is an advisor to Platinum Management and the grandson of Platinum investor Marcos Katz.

610.    In March 2016, Nordlicht introduced Katz as an advisor to Platinum Management to oversee the final stages of the Second Scheme.  A true and correct copy of Nordlicht's March

21, 2016 email introducing Katz to certain Platinum Management employees is attached hereto as **Exhibit 83.**

    1.    **Agera Energy**

611.    Agera Energy is a Delaware limited liability company and a leading energy reseller to the consumer and business markets.

612.    Agera Energy maintains a principal place of business in Briarcliff Manor, New York.

613.    Agera Energy was formed through the combination of Agera Energy LLC, an entity formed at the direction of the Platinum Defendants, and the assets of Glacial Energy Holdings LLC, which were purchased pursuant to a June 17, 2014 sale order entered by the United States Bankruptcy Court for the District of Delaware pursuant to Section 363 of the Bankruptcy Code (the "**Glacial Energy Purchase**").

614.    PPVA and PPCO owned a controlling interest in Agera Energy through a jointly-owned subsidiary, Principal Growth Strategies, LLC ("**PGS**"). Before June 8, 2016, PPVA held 55% of the membership interests in PGS, and PPCO held 45% of the PGS membership interests.

615.    At all relevant times before the Agera Sale, PGS was the holder of a May 19, 2014 promissory note convertible into approximately 95% of the equity in Agera Energy (the "**Agera Note**"). A true and correct copy of the Second Amended and Restated Agera Note is attached hereto as **Exhibit 84.**

616.    Shortly after the Glacial Energy Purchase, at the direction of Nordlicht, Kevin Cassidy was hired by Agera Energy as a senior executive.

617.    Cassidy, who had served two prior stints in prison, was arrested a third time in 2007 for deliberately misstating the value of natural gas derivatives held by one of Nordlicht's previous funds, Optionable Inc., which had collapsed amid scandal in 2007.

618.    Nordlicht or other persons employed by Platinum Management caused Cassidy to be hired as a senior executive by Agera Energy upon Cassidy's release from prison, despite the fact that he had no prior experience in the energy sector.

619.    Despite Cassidy's multiple convictions, Nordlicht vouched for Cassidy's integrity when questioned by a reporter.  A true and correct copy of a March 21, 2016 email from Nordlicht to a reporter for Thomson Reuters, attached as **Exhibit 85.**

620.    Agera Energy is a wholly owned subsidiary of Agera Holdings, LLC, a Delaware limited liability company ("**Agera Holdings**").

621.    Agera Holdings' sole business is to act as a holding company and control the business of its wholly owned subsidiaries. Those subsidiaries are Agera Energy, Utility Recovery LLC and Agera Solutions LLC.

622.    Immediately prior to the Agera Sale, Agera Holdings was owned 95.01% by Michael Joseph Nordlicht and 4.99% by MF Energy Holdings, LLC ("**MF Holdings**").  Feuer held all of the membership interests in MF Holdings.

623.    Michael Joseph Nordlicht is Nordlicht's nephew.

624.    According to his LinkedIn profile, he graduated from Georgetown University Law Center in 2012 and then he worked a few months as a law clerk for the Public Defender's office in Baltimore, Maryland.  He also was an associate attorney for about eight months at the Maryland Attorney General's office in the Department of Public Safety and Correctional Services.

625.    In or about late 2013, Nordlicht installed his nephew as the general counsel of Agera Energy, despite the fact that he appears to have had no prior experience in private practice or in the energy sector.

626.    Michael Nordlicht did not pay anything for the equity he held in Agera Holdings.

2.      **The Agera Energy Valuation**

627.    Based on its December 31, 2015 financial statements, Agera Energy achieved FYE 2015 revenues of $301.4 million and EBITDA of $20.2 million.

628.    Agera Energy's value as of March 31, 2016 was estimated to be between $225,533,000 and $283,553,000. *See* PPVA 1st Quarter 2016 Valuation, Exhibit 71 at p. 128. This valuation report was issued on the same day as the Agera Sale.

629.    In a July 15, 2016 investment memorandum sent to BAM, Narain stated that due to Agera Energy's profitable financial performance, the true valuation of Agera Energy was closer to the high end of available estimates. A true and correct copy of this investment memorandum from Narain to BAM is attached as **Exhibit 86.**

3.      **The Agera Sale Process**

630.    By March 27, 2016, Nordlicht, Bodner, Huberfeld, Levy, Bernard Fuchs and Katz began planning an insider sale of Agera to a "[B]eechwood led consortium." A true and correct copy of this email is attached hereto as **Exhibit 87**.

631.    Between May 1, 2016 and June 9, 2016, the specific terms by which the Agera Sale was effected were put in place by Steinberg, Ottensoser, Taylor and Narain, all operating with the knowledge of and in conjunction with the Platinum Defendants, Katz, the Beechwood Defendants, SHIP, Cassidy and Michael Nordlicht. Steinberg and Michael Nordlicht, together with help from Cassidy, also worked together to create the schedules and back up for the deal documents.

632.    Steinberg also worked directly with Cassidy and his counsel to create the mechanism by which 8% of the Agera purchase price was paid to an entity set up by Cassidy to avoid having taxes withheld from such payment.

633.    Platinum Management portfolio managers typically were compensated with a bonus calculated as a percentage of the profits earned on the PPVA investments they managed.

Between 2014 and June 2016, Platinum Management had alleged in responses to SEC inquiries that Cassidy was not employed as a portfolio manager at Platinum Management. Cassidy also did not have a written contract with Platinum Management, PPVA or PGS that would entitle him to any payment in connection with the sale of the Agera Note.

634. During the period between 2014 and June 2016, Cassidy was paid a salary of $135,000 per year and Starfish was paid approximately $2.5 million by Agera in connection with Cassidy's work at Agera.

635. Steinberg, Ottensoser, Michael Nordlicht, Narain and Cassidy, worked together to prepare the documents by which the various parts of the Agera transaction were accomplished.

636. Michael Nordlicht and Kevin Cassidy actively participated in the negotiation and closing of the Agera Transactions, with actual knowledge of the deflated sale price and that Beechwood would be paid substantial fees from the closing.

637. The insider transaction was intended to be substantially below fair value and was the product of the insider relationship between Beechwood and Platinum Management. The transaction was executed, performed, overseen and then managed by Narain and Illumin.

638. The Platinum Defendants did not attempt to market the Agera Note and actively dissuaded potential buyers from inquiring into the purchase of the Agera Note.

639. For example, on May 11, 2016, in response to an inquiry by a non-investor potential purchaser, Nordlicht stated that PPVA's interest in Agera Energy was off the market. A true and correct copy of this May 11, 2016 email is attached hereto as **Exhibit 88.**

640. The Platinum Defendants also did not obtain a fairness opinion in connection with the Agera Sale.

641.    IMSC, PPVA's other remaining investment of significant value, was being marketed for sale at the same time as the Platinum Defendants and Beechwood Defendants were "negotiating" the Agera Sale.

642.    By contrast to their actions in connection with the sale of the Agera Note, the Platinum Defendants arranged for IMSC to hire an investment banker to openly market IMSC for sale and took all necessary due diligence actions customary for the legitimate sale of an operating company.

### 4.    The Agera Sale

643.    On June 9, 2016, the day after the arrest of Huberfeld, the Platinum Defendants, working in concert with the Beechwood Defendants and SHIP, caused PGS to transfer its interest in the Agera Note to AGH Parent LLC ("**AGH Parent**") – an entity not affiliated with PPVA, but at that time controlled directly by the Platinum Defendants and Beechwood Defendants, and for the benefit of SHIP (the "**Agera Sale**").

644.    SHIP, with full knowledge of the insider nature of the Agera Sale and the detriment it caused to PPVA, contributed approximately $50 million for the closing of the Agera Sale to benefit and enrich itself, working in tandem with Beechwood to the detriment of PPVA, just weeks before SHIP would publicly distance themselves from Beechwood for fraud, and while litigation was anticipated.

645.    On June 9, 2016, AGH Parent amended its Limited Liability Company Agreement (the "**AGH Parent Amended Operating Agreement**") and entered into a series of related transactions, resulting in AGH Parent admitting SHIP and certain Beechwood Entities as new

members of AGH Parent. A true and correct copy of the AGH Parent Amended Operating Agreement is attached hereto as **Exhibit 89.**

646. Narain executed the AGH Parent Amended Operating Agreement on behalf of both AGH Parent and certain Beechwood Entities. Only the AGH entities were advised by outside counsel in connection with the Agera Transactions, which was hurriedly closed the day after Huberfeld's arrest.

647. Simultaneous with the execution of the AGH Parent Amended Operating Agreement, PGS and AGH Parent entered into the Purchase Agreement (the "**Agera Purchase Agreement**"), by which PGS sold the Agera Note to AGH Parent. A true and correct copy of the Agera Purchase Agreement is attached hereto as **Exhibit 90.**

648. Even though the Platinum Defendants and Beechwood Defendants had evidence and believed that the market value for the Agera Note was between $225-285 million, the stated purchase price for the Agera Note was only $170 million (the "**Note Purchase Price**").

649. The Note Purchase Price also was significantly below the $213,256,350-$269,356,350 million valuation of the Agera Note that Platinum Management had commissioned on March 31, 2016, just two months prior to the transaction, which valuation was delivered to SanFilippo on behalf of Platinum Management on the same day the Agera Sale closed. *See* PPVA 2016 First Quarter Valuation at Exhibit 71. Copies of that report, in both draft and final form, were circulated among the Platinum Defendants.

650. Even then, at least **two-thirds** of the Note Purchase Price was paid in the form of uncollectable, valueless debt instruments that were transferred at par value, as well as membership interests in AGH Parent that were subject to redemption at the sole discretion of the Beechwood Defendants and Beechwood Entities in exchange for worthless debt and equity interests.

651.     Altogether, approximately $115 million of the purported $170 million Note
Purchase Price was paid or payable in a combination of Beechwood "debt forgiveness" and
worthless debt and equity assignments, which assignments benefited the Defendants, and in no
way benefitted PPVA.

652.     A significant portion of the $43,666,460 of the Note Purchase Price attributed to
debt transfers was comprised of highly distressed debt, including debt owed by China Horizon and
under the PEDEVCO Notes, which were transferred to AGH Parent by certain Beechwood Entities
and SHIP at the direction of Narain and Illumin, and which had little or no actual value.

653.     Documents drafted by the Platinum Defendants in connection with the Agera
Transactions evidence that only $55 million of the Note Purchase Price was paid in cash to PGS,
with approximately $10 million still remaining unaccounted for.  True and correct copies of these
closing documents are attached hereto as **Exhibit 91**.

654.     In connection with the Agera Sale, all of the equity and voting interests in Agera
Holdings were transferred from Michael Nordlicht and MF Holdings to AGH Parent.

655.     As noted above, Cassidy was not an employee of Platinum Management, PPVA or
PGS.  Nevertheless, Nordlicht, Steinberg, Narain and Ottensoser conspired with Cassidy to pay
Cassidy 8% of the **gross** proceeds from the sale of Agera.

656.     To effect the payment, Steinberg, Cassidy and his counsel prepared an amendment
to the PGS operating agreement that granted Starfish, Cassidy's alter ego, 8% of the membership
interests in PGS on the day before the Agera Sale closed.  The grant was made for no consideration.

657.     Thereafter, on June 9, 2016 (concurrent with the Agera Sale and Huberfeld's
arrest), PGS entered into a Purchase Agreement with Starfish by which PGS purported to
"repurchase" Starfish's membership interests in PGS for $13,552,000 (the "**Starfish Purchase**

Agreement"), consisting of: (i) $7,000,000 in cash; (ii) $2,000,000 of Class B-2 Preferred Interests in AGH Parent; and (iii) $4,552,000 in Class C Preferred Interests in AGH Parent. Cassidy's Class C Preferred Interests were not subject to redemption in exchange for "PGS Value." A true and correct copy of the Starfish Purchase Agreement is attached hereto as **Exhibit 92.**

658.    The payoff to Cassidy was structured as a grant and repurchase of membership interests in PGS by Starfish so that Cassidy could avoid the payment of any withholding taxes with respect to the transfer.

659.    Immediately after the Agera Sale, the Platinum Defendants transferred substantially all of the remaining cash proceeds of the Agera Sale to insiders of Platinum Management, including $15 million for the benefit of Seth Gerszberg, as discussed below.

### 5.    The Redemption of the Class C Portion of the Note Purchase Price

660.    Approximately $59 million of the Note Purchase Price was paid to PGS via Class C Units in AGH Parent.  In fact, these units had little or no value.

661.    The Amended AGH Parent Operating Agreement provided that $35.4 million of the Class C Portion was subject to being redeemed in exchange for $35.4 million (the "**PGS Value**") of debt or partnership interests held by Beechwood Entities or SHIP.

662.    On October 28, 2016, the Beechwood Defendants caused AGH Parent to deliver a letter to PGS (the "**AGH Redemption Notice**"), indicating its intent to exercise the redemption rights set forth in Section 9.06(a)(i) of the Amended AGH Parent Operating Agreement "with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."  A true and correct copy of the AGH Redemption Notice is attached hereto as **Exhibit 93.**

663.    Thereafter, on January 26, 2017, the Beechwood Defendants and Illumin caused AGH Parent to deliver a letter to PGS enclosing an Assignment (the "**PGS Assignment**"),

executed by AGH Parent, transferring to PGS all of AGH Parent's interest in the debt obligations set forth on Schedule A thereto. A true and correct copy of the PGS Assignment is attached hereto as **Exhibit 94.**

664.    Together, the investments listed on Schedule A of the PGS Assignment have a face value equal to the PGS Value ($35.4 million).

665.    However, the investments listed in the PGS Assignment consist of distressed debt obligations transferred to AGH Parent by various Beechwood Entities and SHIP at the direction of the Beechwood Defendants and Illumin.

666.    The distressed debt obligations listed in the PGS Assignment include: (i) $14.1 million owed by Golden Gate Oil under the GGO Notes (ii) $5.7 million owed by PEDEVCO under the PEDEVCO Notes; and (iii) $15.6 owed by Montsant under the 2015 Montsant Loan.

667.    As a result of the purported AGH Redemption Notice and purported PGS Assignment, AGH Parent redeemed 336,928.93 Class C Preferred Units held by PGS and recorded satisfaction relative to PGS of $1,707,107 in accretive Class C Preferred Return related to such redeemed units, leaving PGS with approximately 207,970 Class C Preferred Units.

668.    In or about December 2016, six months after the Agera Sale, the Beechwood Defendants, led by Narain and Illumin, which had taken over management of the Beechwood Entities from BAM beginning in 2017, were marketing and negotiating the sale of AGH Parent to a third party investor for approximately $315 million in cash.

669.    The Beechwood Defendants thereafter sold their interests in Agera to an affiliate of Eli Global (the "**Eli Global Proceeds**").

670.    AGH Parent continues to hold the Agera Note, and Eli Global has acquired Beechwood's interests in AGH Parent.

671.    The Agera Transactions were the culmination of the Second Scheme and, standing alone, resulted in the dissipation of as much as $150 million of value to the Beechwood Entities, at a time when PPVA was known to be insolvent. The loss of PPVA's interest in Agera has caused substantial consequential damages in an amount to be determined at trial.

672.    PGS has not received any further distributions with respect to its Class C membership interests in AGH Parent.

## P.    **The Security Lockup**

673.    As PPVA's financial condition worsened throughout 2015 and 2016, the Platinum Defendants, orchestrated increasingly brazen transactions between PPVA and its subsidiaries and insiders in order to maintain control of such assets in the eventual liquidation of PPVA.

674.    At the same time, they conspired with certain friends, family and preferred investors to cash out, prioritize and secure their investments to the significant detriment of PPVA.

675.    To that end, in addition to the security interests and liens granted to the Beechwood Entities, the Platinum Defendants caused PPVA and its subsidiaries to enter into a series of agreements and transactions for the purpose of providing certain insiders and preferred investors and creditors with security interests in and liens on PPVA's Remaining Assets.

676.    These security interests and liens were designed to provide those insiders and preferred investors and creditors a priority debt position, to the detriment of other similarly situated creditors and investors.

### 1.    **PPNE Notes**

677.    Beginning in or about September 2014, the Platinum Defendants caused PPVA to issue a promissory note with a maximum principal amount of $36 million and an interest rate of 1.333% per month, and which subsequently was reissued in or about May 2015 (the "**16% PPNE Note**").

678.    The 16% PPNE Note is not payable to a particular person, but rather "to the order of each Lender."

679.    The 16% PPNE Note is signed by Nordlicht, as "CIO of PPVA." A true and correct copy of a certain version of the 16% PPNE Note is attached as **Exhibit 95.**

680.    Thereafter, on or about August 12, 2015, the Platinum Defendants caused PPVA to execute a promissory note with a maximum principal amount of $150 million and an interest rate of 1% per month (the "**12% PPNE Note**" and together with the 16% PPNE Note, the "**PPNE Notes**").

681.    Like the 16% PPNE Note, the 12% PPNE Note is payable "to the order of each Lender" rather than to a particular person. The August 2015 PPNE Note also is signed by Nordlicht, as "CIO of PPVA." A true and correct copy of the August 2015 PPNE Note is attached as **Exhibit 96.**

682.    Paragraph 2 of each of the PPNE Notes provides that the following collateral would secure PPVA's obligations under the PPNE Notes:

> As collateral security for all indebtedness, obligations and other liabilities of [PPVA] to [the PPNE Lenders] now or hereafter arising evidenced by this [PPNE Notes], [PPVA] hereby transfers, grants and pledges a continuing perfected security interest in all of [PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing (collectively, the "**Collateral**").

PPNE Notes at ¶ 2.

683.    The PPNE Notes do not identify the Lenders on the face of the document, nor did Platinum Management regularly annex an attachment listing the parties that are Lenders.

684.    Instead, from time to time, the Platinum Defendants caused PPVA to enter into side agreements with certain preferred insiders. Under the terms of those agreements, the insider would

be permitted to exchange its investment interest or its unsecured debt for ostensibly secured debt as a PPNE "lender."

685.    Certain of the Preferred Investors of the BEOF Funds were granted an interest in the PPNE Notes.

686.    Platinum Management did not disclose the existence or terms of, or amounts due under the PPNE Notes.

687.    Platinum Management also did not include the amount due under the PPNE Notes in calculating the net value of PPVA's assets.

### 2.    Kismetia

688.    Offshore Feeder Fund investor Kismetia Ltd. ("**Kismetia**") likewise was given preferential treatment by the Platinum Defendants.

689.    In or about June 30, 2015, Kismetia sought to redeem its investment in the Offshore Feeder Fund.

690.    At that time, PPVA was under severe liquidity constraints.  Although Platinum Management directed a partial payment of the amounts due to Kismetia, it did not cause the full payment of the amount owed to Kismetia in respect of Kismetia's redemption request.

691.    On or about March 16, 2016, the Platinum Defendants caused PPVA to issue a promissory note dated as of that date but effective as of December 31, 2015 (the "**Kismetia Note**") to Kismetia for the balance of the redemption payment due to it.

692.    Like the PPNE Notes, paragraph 2 of the Kismetia Note provides that the following collateral would secure PPVA's obligations under the Kismetia Note:

> As collateral security for all indebtedness, obligations and other liabilities of [PPVA] to [Kismetia] now or hereafter arising evidenced by this [Kismetia Note], [PPVA] hereby transfers, grants and pledges a continuing perfected security interest in all of [PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof (including without limitation all assets now or in the

future held in the Special Investments also known the "Side Pocket" whereby the Platinum Partners Value Arbitrage Fund L.P. may invest part of its assets in investments that the General Partner believes are illiquid, lacking a readily assessable market value or should be held until the resolution of a special event or circumstances) all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing. (collectively, the "**Collateral**"). In addition, [PPVA] shall pledge [Kismetia's] redeemed equity interest in the [Offshore Fund] to Kismetia as additional security for [PPVA's] obligations under this Note and shall deliver any certificates reflecting such redeemed interest to [Kismetia] to secure such pledge.

Kismetia Note at ¶ 2.

693.    The Kismetia Note was amended on June 14, 2016, six days after the Huberfeld Arrest and the same day Nordlicht announced that PPVA would stop taking redemption requests and its assets would be liquidated.

694.    Among other changes, the amendment provides that $484,338.36 in accrued interest was due by August 31, 2016, that all principal and interest would be due as of August 31, 2016 or potentially earlier dates, and that if all amounts were not paid in full, interest would triple, from 1% per month to 3% per month.

695.    As a result of the Kismetia Note, as amended, Kismetia exchanged worthless interests in the Offshore Feeder Fund and a worthless redemption claim for a claim secured by all the assets of PPVA that purports to accrue interest at *3% per month* or *36% per year*, to the detriment of PPVA.

### 3.    Twosons

696.    Defendant Twosons Corporation ("**Twosons**") is a Panamanian corporation authorized to do business in New York. Twosons was an investor in the BEOF Funds that received $15.4 million of proceeds from the Black Elk Renaissance Sale. Nordlicht subsequently executed a promissory note dated September 18, 2014 on behalf of PPVA as borrower in the original

maximum principal amount of $14 million dollars for the benefit of Twosons that accrued interest at a rate of 1.333% per month (the "**Twosons Note**"). A true and correct copy of the Twosons Note is attached hereto as **<u>Exhibit 97</u>**.

697. Twosons is owned principally and managed by members of the Harari family and their agents/employees, including, *inter alia*, Fabrice Harari, Raphael Harari, and Benjamin Uzan.

698. The Hararis are a family from France and Geneva, Switzerland with an estimated net worth of 400 - 500 million Swiss francs (about $400 - $500 million USD).

699. The Hararis made a fortune in France from a pharmaceutical company called Negma Laboratories, which they owned for 35 years and sold in 2007 for a reported $250 million.

700. The Hararis also own Steba Biotech, which they created in 1996 to begin developing a new prostate cancer drug called Tookad. Tookad reached Phase II trials in 2008, and completed its Phase III trials in 2016. Mexico approved the use of Tookad for early-stage prostate cancer in 2016, and the European Medicines Agency approved Tookad in November 2017.

701. Steba Biotech is a private company. The Hararis financed Steba Biotech themselves, investing hundreds of millions of dollars into that company.

702. There are significant business and personal connections between the Harari family and certain of the Platinum Defendants. Raphael Harari and Twosons invested in PPCO as early as 2011.

703. In a February 7, 2013 email to Fabrice Harari regarding David Levy's cell phone number on which David Levy is copied, Murray Huberfeld writes "David -- I had a call today with fabrice. Harari regarding black elk. Told him to reach out to u next week with any questions or concerns Please respond to him and give him any information he requires. **Fabrice is an important client as well as a close friend.** I told him that u will be in London on Feb 12 in case

127

he or someone from his team will be there as well Thx Murray." *See* Exhibit 53 (emphasis supplied).

704.    The Hararis'/Twosons' involvement with Black Elk had begun the week before when, on February 1, 2013, Murray Huberfeld emailed Fabrice Harari to offer him the opportunity to participate in a "one off deal" for Black Elk and provided a short description of the terms of the deal, including an initial interest rate of 16% net to investor, paid quarterly, which would increase to 36% if not paid on time, plus equity grants depending on the total amount invested.  The term of the investment was 14 months.

705.    As noted, the original Twosons investment was in PPCO, which provided a return of 9.5%.  By February 18, 2013, Twosons' principals were looking to redeem that investment in favor of something "more aggressive," such as the returns provided in connection with an investment in Black Elk that Murray Huberfeld had described the week before to Fabrice Harari.

706.    On information and belief, the Hararis' self-financing of Steba Biotech may explain in part the Twosons / Hararis' involvement with the Platinum Defendants and their efforts to lock in unusually high rates of return in 2013 and 2014, which was about seven years after the Hararis' initial investment in Steba Biotech, and two years before Steba Biotech received approvals for Tookad from Mexico and the European Union.

707.    Twosons eventually purchased $10 million of Black Elk series E preferred in 2013 from a PPVA subsidiary.  Under the terms of a side letter executed by Nordlicht in connection with the purchase, PPVA was obligated to repurchase the series E preferred that Twosons had bought at Twosons' request.  The side letter also required the payment of cash interest to Twosons even though other holders of the series E preferred would receive payment in kind "PIK" interest.

708.    Thereafter, in 2014, Twosons and its principals knowingly acted to further aid and

abet Nordlicht, Huberfeld, Levy, Small, Bodner, Manela, Landesman and the other Platinum Defendants to maintain the pretense that PPVA was a liquid fund with high net asset values thereby justifying the excessive fees charged.

709.    In return, the Platinum Defendants agreed to continue to provide Twosons and its principals the Hararis with special rights, privileges and rates of return not available to other investors and lenders.

710.    For example, in connection with Twosons' agreement to roll over their existing investment in the BEOF Funds in spring 2014 and invest an additional $10 million, Nordlicht executed a "side letter" dated April 1, 2014 on behalf of PPVA, BEOF II and certain related parties (the "**Side Letter**").  A true and correct copy of the Side Letter is attached hereto as **Exhibit 98.**

711.    The Side Letter provided that Twosons would receive its quarterly 20% dividends in cash, even though the BEOF Funds documents permitted such dividends to be paid in kind and all other investors received their payments in kind.

712.    Likewise, the Side Letter provided that Twosons could put their shares back to BEOF II at par, irrespective of certain events that would permit that fund to decline to redeem other investors' shares.

713.    Nordlicht, Landesman, Levy, Manela, Small, Fuchs and the other Platinum Defendants also caused the BEOF Funds to repurchase Twosons' series E preferred equity on or about April 1, 2014 at par.

714.    Within days after the Black Elk Renaissance Sale closed and the proceeds thereof purportedly were used to redeem the series E preferred equity,[7] Nordlicht, Small, Levy, Manela,

---

[7] It should be noted that, although the funds purportedly were supposed to redeem the series E preferred equity, corporate formalities were not fully observed in making such payments, nor were the series E preferred equity redeemed pro rata.  Rather, the Platinum Defendants directed how and to whom the proceeds of the Renaissance Sale should be paid out.

Fuchs, Huberfeld, Landesman worked together to cause PPVA to transfer approximately $36 Million of those proceeds to bank accounts in the name of the BEOF Funds at North Fork Bank, which in turn were distributed to the Preferred Investors of the BEOF Funds, among others.

715. On August 21, 2014, Twosons received $15,400,152.42 of those proceeds in respect of its remaining position as a Preferred Investor of the BEOF Funds. *See* Exhibit 61.

716. Within weeks after Twosons cashed out its investment via the Black Elk Scheme, Twosons once again agreed to aid and abet Huberfeld, Nordlicht, and the other Platinum Defendants and maintain the ongoing fraud regarding PPVA's inflated net asset value and liquidity, by loaning them $14 million of those proceeds to use in their operation, which was structured as secured "loan" to PPVA.

717. Once again, Nordlicht rewarded Twosons and its principals for helping to maintain the Platinum Defendants' fraud concerning the true status of PPVA's asset values, liquidity and business by binding PPVA to a transaction that provided Twosons with special protections and incentives not generally available to other investors and not disclosed when calculating PPVA's NAV.

718. Among other things, the Twosons Note required PPVA to pay Twosons interest on the loan at the exorbitant rate of 1.33% per month or 16% per year, and also purported to grant Twosons a security interest in and lien on all of "[PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing" as collateral to secure the repayment of the loan.

719.    Nordlicht signed and executed the Twosons Note in his capacity as Chief Investment Officer of PPVA on or about September 18, 2014, approximately one month after the proceeds of the Black Elk Scheme were disbursed.

720.    The original principal amount of the Twosons Note was $14 million.

721.    Between October 2014 and June 2016, the Platinum Defendants caused PPVA to pay Twosons monthly interest totaling $2.15 million.

722.    In addition, PPVA repaid $8 million in principal to Twosons during that period.

723.    The Platinum Defendants caused PPVA to pay Twosons its monthly interest every month through June 2016, even when Platinum Management caused PPVA not to fund payments necessary to preserve the value of its investments, pay redemption payments to investors or pay other creditors.

724.    Nordlicht, SanFilippo, Steinberg and the other members of the valuation committee did not include the amount due to Twosons in communicating to SS&C information required to calculate the net value of PPVA's assets.

725.    Platinum Management also did not include the amount due to Twosons in communicating to SS&C information required to calculate the fees payable to Platinum Management or in determining the amounts payable to the individual Platinum Defendants.

### 4.    <u>Seth Gerszberg and West Loop/Epocs</u>

726.    For certain preferred investors and creditors, the Platinum Defendants provided even greater illicit protection by purporting to grant security interests and liens at the subsidiary level, while at the same time failing to include these subsidiary encumbrances when calculating PPVA's NAV.

727.    A prime example of a subsidiary level security interest was that provided to Beechwood and SHIP is with respect to the Montsant Collateral Account.

131

728.     Another example is the series of transactions and collateral grants engaged in by Nordlicht and the other Platinum Defendants for the benefit of Nordlicht's close friend, Seth Gerszberg and Gerszberg's relatives, to the detriment of PPVA.

729.     In or about 2009, Defendant Seth Gerszberg began to form a collection of entities to operate his apparel wholesale and retail businesses ("**The Collective**") and utilize an exclusive license of the Mark Ecko apparel brands, a company he co-founded in 1993.

730.     On September 8, 2014, Atlantic Growth Capital, LLC ("**Atlantic Growth**"), a PPVA subsidiary, entered into a loan agreement with certain entities comprising The Collective, in order to provide The Collective with a $30 million line of credit for The Collective's working capital needs (the "**Collective Loan**") and loaned it funds thereunder.

731.     In connection with its apparel operations, The Collective also entered into a series of sub-licensing and supply agreements with West Loop, South, LLC ("**West Loop**") a company owned and managed by Steven and Alan Finkelman (together, the "**Finkelmans**"), who were cousins of Gerszberg.

732.     The Finkelmans and Gerszberg had a longstanding business relationship due to the Finkelmans' position in the apparel importing industry and The Collective's retail and wholesale operations.

733.     By the summer of 2015, The Collective was unable to make payments to PPVA or Atlantic Growth under the Collective Loan.

734.     By the summer of 2015, The Collective also was in debt to West Loop for an amount of more than $2.4 million, and West Loop refused to ship additional apparel to The Collective unless Gerszberg found a way to pay West Loop for the outstanding debt.

735.     Faced with a failing business and the prospect of no apparel for the critical holiday season, Gerszberg approached Nordlicht for financial assistance.

736.     The Platinum Defendants failed to take steps to protect PPVA's interests by declaring a default on the loans owed to PPVA by Seth Gerszberg and his companies and seeking to foreclose on the collateral securing such loans.

737.     Instead, in August 2015, the Platinum Defendants caused PPVA to enter into a series of transactions with West Loop and Epocs Real Estate Partnership Ltd. ("**Epocs**" and together, "**West Loop/Epocs**") over the coming months that would solely benefit West Loop/Epocs, Gerszberg and The Collective, to the detriment of PPVA.

738.     These transactions included: (i) PPVA assuming approximately $2.5 million of debt owed by The Collective to West Loop and granting West Loop a corresponding interest in the 12% PPNE Note; (ii) PPVA incurring a sham "loan" obligation to Epocs of approximately $2.5 million, where the loan proceeds were in fact provided to The Collective and providing Epocs with a corresponding interest in the 12% PPNE Note; and (iii) PPVA guarantying an apparel buyback obligation of approximately $2.5 million owed by The Collective to West Loop (collectively, the "**Purported Underlying West Loop/Epocs Obligations**").

739.     Instead of foreclosing on the non-performing Collective Loan and the guarantees by its shareholders, *i.e.* Gerszberg and his wife, the Platinum Defendants caused PPVA to enter into the Purported Underlying West Loop/Epocs Obligations although they knew The Collective had no ability to pay its debts to West Loop, as The Collective had been running at a substantial loss for months, its retail locations were in disrepair, and the Mark Ecko trademark license held by The Collective and West Loop was set to expire in September 2015.

740.     At the direction of the Platinum Defendants and Gerszberg, West Loop and Epocs were purportedly granted an interest as "lenders" under the 12% PPNE Note in the principal amount of approximately $5 million, even though they never provided any loan funds to PPVA or any company affiliated with PPVA.

741.     Once The Collective was unable to pay the Purported Underlying West Loop/Epocs Obligations, the Platinum Defendants made no effort to enforce PPVA's rights and collect from Gerszberg or The Collective on the Underlying West Loop/Epocs Obligations or the Collective Loan.

742.     To compound these breaches, on or around January 1, 2016, Nordlicht began to consult with Gerszberg with respect to business decisions concerning PPVA.

743.     From January 1, 2016, until commencement of the Cayman Liquidation, Gerszberg advised the Platinum Defendants with respect to PPVA's investments and provided substantial assistance in the formulation and execution of the Second Scheme.

744.     At this time, Gerszberg was provided with information concerning PPVA's financial condition, its ongoing liquidity issues and the misrepresentation of its NAV by the Platinum Defendants.

745.     Gerszberg also substantially assisted the Platinum Defendants with certain of the transactions comprising the Security Lockup.

746.     On July 4, 2016, Nordlicht informed Gerszberg that PPVA would be commencing the Cayman Liquidation and the Chapter 15 Bankruptcy, leaving creditors of PPVA, such as West Loop/Epocs, with claims in PPVA's insolvency proceedings.   A true and correct copy of Nordlicht's July 4, 2016 email to Gerszberg is attached hereto as **Exhibit 99.**

747.     On July 6, 2016, as Gerszberg demanded and the Platinum Defendants agreed, a

Forbearance and Security Agreement, dated July 5, 2016, was entered into among PPVA, DMRJ, West Loop and Epocs (the "**Forbearance and Security Agreement**"). A true and correct copy of the Forbearance and Security Agreement is attached hereto as **Exhibit 100**.

748. The Forbearance and Security Agreement purports to provide West Loop/Epocs with a security interest in DMRJ's rights to certain proceeds from the sale of IMSC, specifically from one of the IMSC Notes owned by DMRJ.

749. With direct knowledge of PPVA's imminent liquidation, Gerszberg, as agent or representative of West Loop/Epocs, drafted the Forbearance and Security Agreement for the sole benefit of West Loop/Epocs, and to the detriment of PPVA, knowing the alleged forbearance was wholly illusory.

750. The Forbearance and Security Agreement orchestrated by Gerszberg and the Platinum Defendants sought to encumber PPVA's assets at the subsidiary level for the benefit of Gerszberg's family members, at a time when Platinum Management already had engaged counsel to prepare the filings in connection with PPVA's liquidation and the commencement of an insolvency proceeding was a certainty.

751. In addition, the Platinum Defendants conspired with Gerszberg to effectuate the transfer of $15 million from the Agera proceeds to a Gerszberg-controlled entity for no consideration.

752. On or about June 3, 2016, Gerszberg and Franky Zapata ("**Zapata**") entered into that certain Master Agreement for the Unification of Zapata and Gerszberg Businesses (the

"**Zapata Master Agreement**"). A true and correct copy of the Zapata Master Agreement is attached hereto as __Exhibit 101.__

753. Zapata is the principal of the French company Zapata Industries SAS ("**Zapata Industries**") and the inventor of a water-based flyboard device.

754. The Zapata Master Agreement provides for the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC (the "**Proposed Zapata/IMSC Merger**").

755. As a condition of the Zapata Master Agreement becoming effective, Gerszberg-controlled entity Spectrum30, LLC ("**Spectrum30**") was required to deposit €10,000,000 into Zapata's bank accounts by June 10, 2016.

756. On June 9, 2016, day the Agera Transaction closed, the Platinum Defendants caused PPVA subsidiary Huron Capital LLC ("**Huron**") to transfer $15 million from the Agera proceeds to or on behalf of Gerszberg and Spectrum30 (the "**Spectrum30 Loan**"). Of that amount, a total of $11 million was wired directly to Zapata. A true and correct copy of documents evidencing that $15 million of the Agera proceeds were used for the "Zapata" transaction and that $11 million was wired directly to Zapata are attached hereto as __Exhibit 102.__

757. PPVA had no obligation under the Zapata Master Agreement to provide funds to Gerszberg, Spectrum30, or Zapata in connection with the Proposed Zapata/IMSC Merger, and received no valuable consideration in return.

758. The Platinum Defendants and Gerszberg caused PPVA to transfer a substantial portion of the limited cash PPVA received from the Agera Sale to Gerszberg and Zapata, to the detriment of PPVA.

759.     Thereafter, the Platinum Defendants and Gerszberg took steps in an attempt to protect Gerszberg and Spectrum from any claim in connection with the Spectrum30 Loan, regardless of whether or not the Proposed Zapata/IMSC Merger occurred.

760.     On August 23, 2016, the same day PPVA filed its winding up petition in the Grand Court of the Cayman Islands, the Platinum Defendants and Gerszberg caused the promissory note evidencing the Spectrum30 Loan to be amended (the "**Amended Spectrum30 Note**").

761.     The Amended Spectrum30 Note provides that if the Proposed Zapata/IMSC Merger occurs, Spectrum30 is released from any and all obligations in connections with the Spectrum30 Loan.

762.     The Amended Spectrum30 Note provides that if the Proposed Zapata/IMSC Merger *does not* occur, any amount owed to Huron under the Spectrum Loan is offset by claims of The Collective against Atlantic Growth and "the Finkelman Debt."

## CLAIMS FOR RELIEF

### First Count: Breach of Fiduciary Duty
### (Duty of Care and Good Faith) Against the Platinum Defendants

763.     The Plaintiffs repeat and re-allege paragraphs 1-762 as if fully set forth herein.

764.     The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties to PPVA.

765.     The Platinum Defendants were obligated and bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to PPVA.

766.     The Platinum Defendants were obligated to exercise due care and diligence to preserve, invest, value, manage, operate, and administer PPVA, its subsidiaries, its property and its assets.

767.    The Platinum Defendants also owed PPVA duties of full and candid disclosure of all material facts relevant to PPVA, to deal fairly and honestly with PPVA, and not to omit any material facts.

768.    The Platinum Defendants were obligated to ensure that they did not engage in any fraudulent, unsafe, unlawful or unsound investment, operational, administrative or management practices.

769.    In engaging in the First and Second Schemes described herein, including: (i) the systematic misrepresentation and overvaluation of PPVA's NAV for the purpose of paying the Platinum Defendants unearned fees (First Scheme); (ii) the Black Elk Scheme, Black Elk bond devaluation, and the significant creditor claims that resulted therefrom (First Scheme); and (iii) the transfer or encumbrance of nearly all of PPVA's Remaining Assets for the sole benefit of Beechwood, PPCO and other select insiders and to the detriment of PPVA (Second Scheme), the Platinum Defendants repeatedly breached their fiduciary obligation of due care to PPVA.

770.    As set forth in the SEC Action, the Platinum Defendants managed PPVA in an unlawful manner and failed to manage PPVA in good faith.

771.    As a direct and proximate result of the Platinum Defendants' breaches of their fiduciary duties, PPVA was injured and suffered damages.

772.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

773.    In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

## Second Count: Breach of Fiduciary Duty
### (Duty of Loyalty/Self-Dealing) Against the Platinum Defendants

774.     The Plaintiffs repeat and re-allege paragraphs 1-773 as if fully set forth herein.

775.     The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed PPVA fiduciary duties of loyalty and good faith.

776.     The Platinum Defendants were duty bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to PPVA.

777.     In engaging in the First and Second Schemes described herein, including: (i) intentionally engaging in certain acts for the purpose of artificially inflating PPVA's NAV, in order to generate unearned fees, bonuses, salaries, and other payments to enrich themselves at the expense of PPVA (First Scheme); (ii) intentionally engaging in the Black Elk Scheme, to enable the Preferred Investors of the BEOF Funds to take the proceeds from the Black Elk Renaissance Sale in contravention of the prior rights of PPVA, leaving PPVA with significant losses and claims (First Scheme); and (iii) the transfer or encumbrance of nearly all of PPVA's Remaining Assets for the sole benefit of Beechwood, PPCO and other select insiders and to the detriment of PPVA (Second Scheme), the Platinum Defendants breached their duties of loyalty and good faith to PPVA.

778.     For these reasons and others set forth herein, the Platinum Defendants engaged in a consistent pattern of self-dealing and breaches of their duty of loyalty throughout the course of the First and Second Schemes.

779.     As a direct and proximate result of the Platinum Defendants' self-dealing and breaches of their duty of loyalty to PPVA, PPVA was injured and suffered damages.

780.     By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

781.     In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Third Count: Aiding and Abetting Breach of
### Fiduciary Duties against the Individual Platinum Defendants

782.     The Plaintiffs repeat and re-allege Paragraphs 1-781 as if fully set forth herein.

783.     Platinum Management, the General Partner of PPVA, owed fiduciary duties of due care, loyalty and good faith to PPVA.

784.     As set forth above, Platinum Management breached its fiduciary duties to PPVA by its actions in connection with the First and Second Schemes.

785.     Platinum Defendants Nordlicht, Huberfeld, Bodner, Landesman, Saks, Bernard Fuchs, Levy, Beren, Manela, Ottensoser, SanFilippo, and Small (collectively, the "**Individual Platinum Defendants**") used their positions as owners, executives and managers of Platinum Management to cause Platinum Management to breach its fiduciary duties to PPVA.

786.     In addition, the Individual Platinum Defendants substantially assisted, aided and abetted, and participated in Platinum Management's breaches of its fiduciary obligations in connection with the First and Second Schemes by, *inter alia*, (i) orchestrating transactions among PPVA and various insiders designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable Platinum Management to charge PPVA for unearned fees and expenses; (ii) causing PPVA and its subsidiaries to engage in transactions to benefit the Platinum Defendants, BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii)

140

participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

787.     The Individual Platinum Defendants had actual knowledge that Platinum Management was breaching its fiduciary obligations to PPVA by engaging in the actions and transactions comprising the First and Second Schemes.

788.     As a direct and proximate result of the Individual Platinum Defendants' actions and substantial participation, PPVA was damaged.

789.     The actions of the Individual Platinum Defendants caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

790.     By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

791.     In addition, because the Individual Platinum Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fourth Count: Fraud against the Platinum Defendants

792.     The Plaintiffs repeat and re-allege paragraphs 1-791 as if fully set forth herein.

793.     As detailed herein, the Platinum Defendants intentionally engaged in the First and Second Schemes by communicating material representations to PPVA in various forms and by omitting to state material facts.

794.     These material representations occurred by way of the Platinum Defendants making, and causing to be made, written and oral representations concerning the financial

condition of PPVA and the acts in furtherance of the Platinum Defendants' administration and management of PPVA's assets and investments.

795.    These material representations included statements concerning the nature and characteristics of the investments of PPVA, the method of valuation of PPVA assets, including NAV, and the management and other fees earned by Platinum Defendants and subsequently paid by or charged to PPVA.

796.    At all relevant times, the Platinum Defendants knew that such representations were material to PPVA.

797.    At all relevant times, the Platinum Defendants knew that their omissions and the representations they individually or collectively made, caused to be made, or knew were being made with their consent, were false when made.

798.    At all relevant times, the Platinum Defendants misrepresented to PPVA that PPVA's NAV was steadily increasing, despite PPVA's assets being increasingly concentrated in speculative and unproven start-up companies, many of which were not publicly traded and for which there were no readily available market prices.

799.    The Platinum Defendants represented to PPVA that asset valuations for PPVA's investment positions would be initially set by an internal valuation committee.  Such initial valuations, however, were arbitrarily adjusted by Nordlicht, with the consent of the other Platinum Defendants, in order to increase NAV and increase management fees paid to the Platinum Defendants.

800.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Entities and the Beechwood Defendants in insider investments, loans and other transactions including, among others, Golden Gate Oil, PEDEVCO, Black Elk, Northstar,

Montsant/Navidea and Implant Sciences, at non-market prices, at terms unconnected to the actual value of the transaction, and with improper guaranty and put arrangements, by which the Platinum Defendants misrepresented the risk of loss to PPVA and placed the interests of the Beechwood Entities ahead of PPVA's interests.

801. The Platinum Defendants intentionally did not include the liabilities arising from the guaranties and put agreements that they caused PPVA to grant to the Beechwood Entities when they calculated the PPVA NAV and determined the amount of partnership share, fees and expenses owed to them by PPVA even though those guaranties placed PPVA at significant risk of loss.

802. At all times after the Black Elk Explosion, the Platinum Defendants falsely inflated PPVA's total net investment in Black Elk even though they well knew that Black Elk was experiencing significant deterioration in performance and had accrued significant unsecured liabilities and secured obligations.

803. The Platinum Defendants schemed to, and did, divert from PPVA and misappropriate to themselves and the Preferred Investors of the BEOF Funds proceeds from the Renaissance Sale, by engaging in the Black Elk Scheme, which resulted in significant claims against PPVA.

804. The Platinum Defendants falsely reported and inflated the valuation of Northstar, based in part on the false claim that PPVA's claims against Northstar were secured by liens on all of Northstar's assets even though they well knew mortgages and financing statements had not been filed with respect to any of the leases and other assets that Northstar purchased from Black Elk, the company was struggling to pay its obligations, and Platinum Management was causing PPVA and PPCO to fund Northstar's operations.

805.    The Platinum Defendants falsely inflated the NAV of PPVA's assets, in order to generate for themselves tens of millions of dollars in fraudulent fees and payments – to which they were not entitled – all to the detriment of PPVA.

806.    The Platinum Defendants knowingly and intentionally made numerous false representations of material fact and omitted to state material facts to PPVA concerning the Platinum Defendants' intent to manage and administer PPVA, its subsidiaries and its assets in compliance with the terms of PPVA's governing documents, including but not limited to the PPVA Partnership Agreement.

807.    The Platinum Defendants also knowingly and intentionally defrauded PPVA by causing it to engage in transactions with and involving the Beechwood Entities that were designed to benefit the Beechwood Entities to the detriment of PPVA.

808.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Defendants, PPCO and other insiders in insider investments, loans and other transactions at non-market prices and terms unconnected to the actual value of the transaction, such as the Nordlicht Side Letter, the Master Guaranty, creation of the Montsant Collateral Account and the Agera Transactions, without disclosing the purpose of these transactions to encumber or transfer PPVA's assets for the benefit of insiders.

809.    The Platinum Defendants intentionally withheld from PPVA the nature of the Second Scheme Transactions, purposefully omitting the encumbrances that the Platinum Defendants had granted upon PPVA's assets for the benefit of insiders and the significant loss to PPVA that resulted from the Second Scheme Transactions.

810.    PPVA justifiably relied on the foregoing false representations, omissions and fraudulent actions of the Platinum Defendants.

811.    PPVA has been damaged as a proximate result of each of the Platinum Defendants' fraudulent misrepresentations, omissions and actions to defraud PPVA during the First and Second Schemes in at least the following ways: (i) PPVA paid the Platinum Defendants tens of millions of dollars in unearned distributions and/or fees, expenses, bonuses and other payments; (ii) PPVA incurred tens of millions of dollars in creditor claims arising out of the Black Elk Scheme; (iii) the Preferred Investors of the BEOF Funds improperly received priority payments ahead of PPVA and its subsidiaries due to the Black Elk Scheme; and (iv) PPVA and its subsidiaries were made parties to numerous non-commercial transactions with the Beechwood Entities, PPCO and other Platinum Management insiders that subordinated PPVA's interests and depressed or encumbered the value of PPVA's assets.

812.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

813.    In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fifth Count: Constructive Fraud against the Platinum Defendants

814.    The Plaintiffs repeat and re-allege paragraphs 1-813 as if fully set forth herein.

815.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

816.    As detailed herein, the Platinum Defendants intentionally engaged in the First and Second Schemes by communicating material representations to PPVA in various forms and by omitting to state material facts.

817. These material representations occurred by way of the Platinum Defendants making, and causing to be made, written and oral representations concerning the financial condition of PPVA and the acts in furtherance of the Platinum Defendants' administration and management of PPVA's assets.

818. These material representations included statements concerning the nature and characteristics of the investments of PPVA, the method of valuation of PPVA assets, including NAV, and the management and other fees earned by Platinum Defendants and subsequently paid by or charged to PPVA.

819. At all relevant times, the Platinum Defendants knew that such representations were material to PPVA.

820. At all relevant times, the Platinum Defendants knew that their omissions and the representations they individually or collectively made, caused to be made, or knew were being made with their consent, were false when made.

821. At all relevant times, the Platinum Defendants misrepresented to PPVA that PPVA's NAV was steadily increasing, despite PPVA's assets being increasingly concentrated in speculative and unproven start-up companies, many of which were not publicly traded and for which there were no readily available market prices.

822. The Platinum Defendants represented to PPVA that asset valuations for PPVA's investment positions would be initially set by an internal valuation committee. Such initial valuations, however, were arbitrarily adjusted by Nordlicht, with the consent of the other Platinum Defendants, in order to increase NAV and increase management fees paid to the Platinum Defendants.

823.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Entities and the Beechwood Defendants in insider investments, loans and other transactions including, among others, Golden Gate Oil, PEDEVCO, Black Elk, Northstar, Montsant/Navidea and Implant Sciences, at non-market prices, at terms unconnected to the actual value of the transaction, and with improper guaranty and put arrangements, by which the Platinum Defendants misrepresented the risk of loss to PPVA and placed the interests of the Beechwood Entities ahead of PPVA's interests.

824.    The Platinum Defendants intentionally did not include the liabilities arising from the guaranties and put agreements that they caused PPVA to grant to the Beechwood Entities when they calculated the PPVA NAV and determined the amount of partnership share, fees and expenses owed to them by PPVA even though those guaranties placed PPVA at significant risk of loss.

825.    At all times after the Black Elk Explosion, the Platinum Defendants falsely inflated PPVA's total net investment in Black Elk even though they well knew that Black Elk was experiencing significant deterioration in performance and had accrued significant unsecured liabilities and secured obligations.

826.    The Platinum Defendants schemed to, and did, divert from PPVA and misappropriate to themselves and the Preferred Investors of the BEOF Funds proceeds from the Renaissance Sale, by engaging in the Black Elk Scheme, which resulted in significant claims against PPVA.

827.    The Platinum Defendants falsely reported and inflated the valuation of Northstar, based in part on the false claim that PPVA's claims against Northstar were secured by liens on all of Northstar's assets even though they well knew mortgages and financing statements had not been filed with respect to any of the leases and other assets that Northstar purchased from Black Elk,

the company was struggling to pay its obligations, and Platinum Management was causing PPVA and PPCO to fund Northstar's operations.

828.    The Platinum Defendants falsely inflated the NAV of PPVA's assets, in order to generate for themselves tens of millions of dollars in fraudulent fees and payments – to which they were not entitled – all to the detriment of PPVA.

829.    The Platinum Defendants knowingly and intentionally made numerous false representations of material fact and omitted to state material facts to PPVA concerning the Platinum Defendants' intent to manage and administer PPVA, its subsidiaries and its assets in compliance with the terms of PPVA's governing documents, including but not limited to the PPVA Partnership Agreement.

830.    The Platinum Defendants also knowingly and intentionally defrauded PPVA by causing it to engage in transactions with and involving the Beechwood Entities that were designed to benefit the Beechwood Entities to the detriment of PPVA.

831.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Defendants, PPCO and other insiders in insider investments, loans and other transactions at non-market prices and terms unconnected to the actual value of the transaction, such as the Nordlicht Side Letter, the Master Guaranty, creation of the Montsant Collateral Account and the Agera Transactions, without disclosing the purpose of these transactions to encumber or transfer PPVA's assets for the benefit of insiders.

832.    The Platinum Defendants intentionally withheld from PPVA the nature of the Second Scheme Transactions, purposefully omitting the encumbrances that the Platinum Defendants had granted upon PPVA's assets for the benefit of insiders and the significant loss to PPVA that resulted from the Second Scheme Transactions.

833. PPVA reposed trust and confidence in the Platinum Defendants, based on the Platinum Defendants' assurances that they would invest PPVA's assets prudently and in PPVA's best interest, in accordance with all relevant investment guidelines.

834. Because of the nature of the fiduciary relationship, PPVA justifiably relied upon the Platinum Defendants' misrepresentations and omissions or concealments to its detriment, by permitting the Platinum Defendants to continue management of PPVA's assets and by paying the Platinum Defendants unearned fees and bonuses based off of the Platinum Defendants' misrepresentations and omissions.

835. PPVA has been damaged as a proximate result of each of the Platinum Defendants' fraudulent misrepresentations, omissions and actions to defraud PPVA during the First and Second Schemes in at least the following ways: (i) PPVA paid the Platinum Defendants tens of millions of dollars in unearned distributions and/or fees, expenses, bonuses and other payments; (ii) PPVA incurred tens of millions of dollars in creditor claims arising out of the Black Elk Scheme; (iii) the Preferred Investors of the BEOF Funds improperly received priority payments ahead of PPVA and its subsidiaries due to the Black Elk Scheme; and (iv) PPVA and its subsidiaries were made parties to numerous non-commercial transactions with the Beechwood Entities, PPCO and other Platinum Management insiders that subordinated PPVA's interests and depressed or encumbered the value of PPVA's assets.

836. By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

837.  In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Sixth Count:  Aiding and Abetting Fraud against the Individual Platinum Defendants**

838.  The Plaintiffs repeat and re-allege paragraphs 1-837 as if fully set forth herein.

839.  As set forth above, Platinum Management defrauded PPVA in connection with the actions comprising the First and Second Schemes.

840.  The Individual Platinum Defendants substantially assisted and participated in Platinum Management's material misrepresentations, omissions and actions to defraud PPVA in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with the Beechwood Defendants and other insiders designed to support the inflated net asset values ascribed to PPVA's assets by Platinum Management, so as to enable Platinum Management to cause PPVA to pay it unearned distributions, fees, expenses and other payments; (ii) engaging in transactions to benefit the Platinum Defendants, Beechwood Defendants and other insiders to the detriment of PPVA; and (iii) participating in the Black Elk Scheme, including, among other things, the amendment of the Black Elk Indenture; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Platinum Defendants, Beechwood Defendants, the BEOF Funds and the Preferred Investors of the BEOF Funds, PPCO and other insiders to the detriment of PPVA.

841.  The Individual Platinum Defendants had actual knowledge that Platinum Management was defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the First and Second Schemes.

842.  As a direct and proximate result of the Individual Platinum Defendants' actions and substantial participation, PPVA was damaged.

150

843.     The actions of the Individual Platinum Defendants caused the harm on which the primary liability of fraud is predicated.

844.     By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

845.     In addition, because the Individual Platinum Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Seventh Count: Aiding and Abetting Breach of Fiduciary Duties against the Beechwood Defendants

846.     The Plaintiffs repeat and re-allege paragraphs 1-845 as if fully set forth herein.

847.     The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

848.     As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by their actions in connection with the First and Second Schemes as detailed above.

849.     At all relevant times, Nordlicht, Levy, Huberfeld and Bodner, together with Feuer and Taylor, created, owned, managed, controlled and operated the Beechwood Entities.

850.     Beechwood and Platinum Management initially shared offices and several senior staff members of the Beechwood Entities were current or seconded employees of Platinum Management, including Levy, who was named as BAM's initial CIO and was marketed as part of the Beechwood Entities' senior executive team.

851.     The Beechwood Defendants and Platinum Defendants communicated with one another regularly by email and in person regarding the statements and transactions comprising the First and Second Schemes.

852.     The Beechwood Defendants substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii) participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

853.     The Beechwood Defendants had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the actions and transactions comprising the First and Second Schemes.

854.     As a direct and proximate result of the Beechwood Defendants' actions and substantial participation, PPVA was damaged.

855.     The actions of the Beechwood Defendants caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

856.     By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

857. In addition, because the Beechwood Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Eighth Count: Aiding and Abetting Fraud
### against the Beechwood Defendants

858. The Plaintiffs repeat and re-allege paragraphs 1-857 as if fully set forth herein.

859. As set forth above, the Platinum Defendants defrauded PPVA in connection with the actions comprising the First and Second Schemes.

860. At all relevant times, Nordlicht, Levy, Huberfeld and Bodner, together with Feuer and Taylor, created, owned, managed, controlled and operated the Beechwood Entities.

861. The Beechwood Entities and Platinum Management initially shared offices and several senior staff members of the Beechwood Entities were current or seconded employees of Platinum Management, including Levy, who was named as BAM's initial CIO and was marketed as part of the Beechwood Entities' senior executive team.

862. The Beechwood Defendants and Platinum Defendants communicated with one another regularly by email and in person regarding the statements and transactions comprising the First and Second Schemes.

863. The Beechwood Defendants substantially assisted and participated in the Platinum Defendants' material misrepresentations, omissions and actions to defraud PPVA in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated net asset values ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, Beechwood Defendants and other insiders to the detriment of PPVA; and (iii) participating in the Black Elk Scheme, including,

among other things, the amendment of the Black Elk Indenture; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

864.    As a result, the Beechwood Defendants had actual knowledge that the Platinum Defendants were defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the First and Second Schemes.

865.    As a direct and proximate result of the Beechwood Defendants' actions and substantial participation, PPVA was damaged.

866.    The actions of the Beechwood Defendants caused the harm on which the primary liability of fraud is predicated.

867.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

868.    In addition, because the Beechwood Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Ninth Count: Aiding and Abetting Breach of Fiduciary Duties
### against the BEOF Funds and the Preferred Investors of the BEOF Funds

869.    The Plaintiffs repeat and re-allege paragraphs 1-868 as if fully set forth herein.

870.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

871.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by their actions in connection with the Black Elk Scheme.

872.     As described herein, the Platinum Defendants orchestrated the Black Elk Scheme so as to divert the proceeds of the Renaissance Sale for the benefit of themselves, the BEOF Funds and the Preferred Investors of BEOF, resulting in significant losses to and claims against PPVA.

873.     Both BEOF Funds were formed, managed and marketed by the Platinum Defendants, including Nordlicht, Landesman, Levy, Manela, Huberfeld, Bodner, Fuchs, Small, SanFilippo, Beren and other persons employed Platinum Management.

874.     Both BEOF Funds share overlapping investors with the funds managed by Platinum Management by way of the Preferred Investors of the BEOF Funds.

875.     Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

876.     That being said, the Preferred Investors of the BEOF Funds made a conscious choice to participate in the Platinum Defendants' actions with respect to Black Elk and eventually the Black Elk Scheme.  In spring 2014, each of the Preferred Investors of the BEOF Funds agreed to exchange their existing investments in the BEOF Funds for new investments and in some cases to invest additional funds, which agreements substantially assisted the Platinum Defendants in making it possible to effect the Black Elk Scheme.

877.     The spring 2014 agreements by the Preferred Investors of the BEOF Funds to exchange their existing investments in the BEOF Funds for new investments and/or to invest additional funds were made notwithstanding the fact that by Spring 2014, Black Elk's public filings indicated that it likely was insolvent.

878.     Both BEOF Funds and the Preferred Investors of the BEOF Funds substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Black Elk Scheme by, *inter alia*, (i) participating in the Black Elk Scheme;

and (ii) engaging in transactions to benefit the Platinum Defendants, the BEOF Funds and the Preferred Investors of the BEOF Funds to the detriment of PPVA.

879.    The BEOF Funds and the Preferred Investors of the BEOF Funds had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the acts and transactions comprising the Black Elk Scheme.

880.    Preferred Investor of the BEOF Funds Huberfeld Family Foundation, the alter ego of Platinum Management and Murray Huberfeld, provided substantial assistance to the Platinum Defendants in implementing the First and Second Schemes.

881.    In addition to its role in the Black Elk Scheme, the Huberfeld Family Foundation acted as a repository for assets illicitly gained by the Platinum Defendants by way of the First and Second Schemes.

882.    As a direct and proximate result of the actions and substantial participation of both BEOF Funds and the Preferred Investors of the BEOF Funds, PPVA was damaged.

883.    The actions of the BEOF Funds and the Preferred Investors of the BEOF Funds caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

884.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

885.    In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Tenth Count: Aiding and Abetting Fraud against**
**the BEOF Funds and the Preferred Investors of the BEOF Funds**

886.    The Plaintiffs repeat and re-allege paragraphs 1-885 as if fully set forth herein.

887.    As set forth above, the Platinum Defendants defrauded PPVA in connection with the actions comprising the Black Elk Scheme.

888.    As described herein, the Platinum Defendants orchestrated the Black Elk Scheme so as to divert the proceeds of the Renaissance Sale for the benefit of themselves, the BEOF Funds and the Preferred Investors of the BEOF Funds, resulting in significant losses and claims against PPVA.

889.    Both BEOF Funds were formed, managed and marketed by the Platinum Defendants, including Nordlicht, Landesman, Levy, Manela, Huberfeld, Bodner, Fuchs, Small, SanFilippo, Saks, Beren and other persons employed Platinum Management.

890.    Both BEOF Funds share overlapping investors with the funds managed by Platinum Management by way of the Preferred Investors of the BEOF Funds.

891.    Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

892.    That being said, the Preferred Investors of the BEOF Funds made a conscious choice to participate in the Platinum Defendants actions with respect to Black Elk and eventually the Black Elk Scheme.  In spring 2014, each of the Preferred Investors of the BEOF Funds agreed to exchange their existing investments in the BEOF Funds for new investments and in some cases to invest additional funds, which agreements substantially assisted the Platinum Defendants in making it possible to effect the Black Elk Scheme.

893.    The spring 2014 agreements by the Preferred Investors of the BEOF Funds to exchange their existing investments in the BEOF Funds for new investments and/or to invest

additional funds were made notwithstanding the fact that by Spring 2014, Black Elk's public filings indicated that it likely was insolvent.

894.    The BEOF Funds and the Preferred Investors of BEOF Funds substantially assisted and participated in the Platinum Defendants' material misrepresentations, omissions and actions to defraud PPVA in connection with the Black Elk Scheme by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated NAV ascribed to PPVA's investment in Black Elk by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, the BEOF Funds and the Preferred Investors of BEOF Funds to the detriment of PPVA; and (iii) participating in the Black Elk Scheme.

895.    The BEOF Funds and the Preferred Investors of the BEOF Funds had actual knowledge that the Platinum Defendants were defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the Black Elk Scheme.

896.    As a direct and proximate result of the actions and substantial participation of the BEOF Funds and the Preferred Investors of the BEOF Funds, PPVA was damaged.

897.    The actions of the BEOF Funds and the Preferred Investors of the BEOF Funds caused the harm on which the primary liability of fraud is predicated.

898.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

899.    In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's

rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Eleventh Count: Aiding and Abetting Breach of Fiduciary Duties against Michael Katz

900. The Plaintiffs repeat and re-allege paragraphs 1-899 as if fully set forth herein.

901. The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

902. As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the Agera Transactions.

903. Beginning at least in March 2016, Katz served as an advisor to Platinum Management, and assisted in orchestrating the scheme whereby the Platinum Defendants caused PPVA's interest in Agera Energy to be transferred to an "insider" to the detriment of PPVA, which was thereafter effectuated by way of the June 2016 Agera Transactions.

904. The Platinum Defendants communicated with Katz regularly by email and in person regarding the Agera Transactions.

905. Katz substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*, orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants at a significant loss to PPVA.

906. Katz had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Agera Transactions.

907.    As a direct and proximate result of Katz's actions and substantial participation, PPVA was damaged.

908.    The actions of Katz caused the harm on which the primary liability of breach of fiduciary duty is predicated.

909.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

910.    In addition, because Michael Katz acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Twelfth Count:  Aiding and Abetting Breach of
### Fiduciary Duties against Kevin Cassidy and Michael Nordlicht

911.    The Plaintiffs repeat and re-allege paragraphs 1-910 as if fully set forth herein.

912.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

913.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the Agera Transactions.

914.    When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the managing director of Agera Energy.

915.    Also in 2014, Michael Nordlicht was installed by Mark Nordlicht, his uncle, as in-house counsel for Agera Energy

916.    Cassidy and Starfish, an entity dominated and controlled by Cassidy, were parties to the Agera Transactions, and received millions of dollars in Agera Sale proceeds in exchange for nothing.

917.    Michael Nordlicht willfully consented to and actively participated in the Agera Transactions and the transfer of his voting and equity interests in Agera Holdings to AGH Parent.

918.    The Platinum Defendants communicated with Cassidy and Michael Nordlicht regularly by email and in person regarding the Agera Transactions, as both Cassidy and Michael Nordlicht were deeply involved in the negotiation of the Agera Transactions.

919.    Cassidy substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*, (i) orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants; and (ii) receiving $13,552,000 in cash and interests in AGH Parent from the corrupt Agera Transactions by way of his entity, Starfish.

920.    Michael Nordlicht substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*, (i) orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants; and (ii) consenting to the transfer of his voting and equity interests in Agera Energy's parent company to AGH Parent.

921.    Cassidy and Michael Nordlicht had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Agera Transactions.

922.    As a direct and proximate result of Cassidy and Michael Nordlicht's actions and substantial participation, PPVA was damaged.

923.    The actions of Cassidy and Michael Nordlicht caused the harm on which the primary liability of breaches of fiduciary duty is predicated.

924.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

925.    In addition, because Cassidy and Michael Nordlicht acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Thirteenth Count:  Aiding and Abetting Breach of Fiduciary Duties against Seth Gerszberg

926.    The Plaintiffs repeat and re-allege paragraphs 1-925 as if fully set forth herein.

927.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

928.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the certain transactions constituting the Security Lockup.

929.    On January 1, 2016, Nordlicht brought on Gerszberg as an informal advisor to Platinum Management.

930.    From January 1, 2016 until commencement of the Cayman Liquidation, Gerszberg advised the Platinum Defendants and provided substantial assistance in the formulation and execution of the Second Scheme.

931.    The Platinum Defendants communicated with Gerszberg regularly by email and in person regarding the Second Scheme.

932.    Gerszberg substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Second Scheme by, *inter alia*, (i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations; (ii) negotiating certain Second Scheme Transactions on behalf of the Platinum Defendants; (iii) negotiating and drafting the Forbearance and Security Agreement on behalf of West Loop/Epocs; and (iv) directing the transfer of $15 million in Agera Sale proceeds to himself (via Spectrum30) and Franky Zapata, all of which actions were a detriment to PPVA and its subsidiaries.

933.    Gerszberg had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Second Scheme.

934.    As a direct and proximate result of Gerszberg's actions and substantial participation, PPVA was damaged.

935.    The actions of Gerszberg caused the harm on which the primary liability of breaches of fiduciary duty is predicated.

936.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

937.    In addition, because Gerszberg acted willingly, grossly, recklessly and wantonly negligent, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fourteenth Count:  In the Alternative, Unjust Enrichment
### against the Beechwood Defendants, Kevin Cassidy and Seth Gerszberg

938.    The Plaintiffs repeat and re-allege paragraphs 1-937 as if fully set forth herein.

939.    In connection with the Second Scheme and as described herein, the Platinum Defendants intentionally engaged in certain acts for the purpose of transferring or encumbering

PPVA's assets for the sole benefit of insiders of the Platinum Defendants, including the Beechwood Defendants, Kevin Cassidy and Seth Gerszberg.

940.    The Platinum Defendants orchestrated the Second Scheme for the intentional purpose of diverting the remaining assets of PPVA and its subsidiaries to insiders such as the Beechwood Defendants, Cassidy and Gerszberg.

941.    In connection with the Second Scheme and as described herein, the Platinum Defendants did not seek fair market terms in connection with the Second Scheme Transactions, and instead set transaction terms that knowingly caused significant damage to PPVA and would unjustly benefit insiders such as the Beechwood Defendants, Cassidy and Gerszberg.

942.    Platinum Management caused PPVA and its subsidiaries to have a direct relationship with the Beechwood Defendants, Cassidy and Gerszberg.

943.    The Beechwood Defendants would be unjustly enriched at the expense of PPVA if they were permitted to receive full benefit from the Second Scheme Transactions and related transfers.

944.    PPVA would suffer an unjust detriment if the Beechwood Defendants were permitted to receive the full benefits of the Second Scheme Transactions.

945.    Permitting the Beechwood Defendants, Cassidy and Gerszberg to receive full benefit of the Second Scheme Transactions at the expense of PPVA would be against equity and good conscience.

946.    By reason of the foregoing, and pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2), the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

947.    In addition, because the Beechwood Defendants, Cassidy and Gerszberg acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Fifteenth Count:  In the Alternative, Unjust Enrichment against the BEOF Funds and the Preferred Investors of the BEOF Funds**

948.    The Plaintiffs repeat and re-allege paragraphs 1-947 as if fully set forth herein.

949.    In connection with the Black Elk Scheme and as described herein, the Platinum Defendants intentionally engaged in certain acts that resulted in the improper conveyance and transfer of $36 million in cash and other capital distributions to the BEOF Funds and the Preferred Investors of the BEOF Funds to the detriment of PPVA and its subsidiaries.

950.    The Platinum Defendants orchestrated the Black Elk Scheme in part to divert the proceeds of the Renaissance Sale away from PPVA for the benefit of the BEOF Funds and the Preferred Investors of the BEOF Funds.

951.    Platinum Management caused PPVA and its subsidiaries to have a direct relationship with the BEOF Funds and the Preferred Investors of the BEOF Funds.

952.    The BEOF Funds and the Preferred Investors of the BEOF Funds would be unjustly enriched at the expense of PPVA if they were permitted to receive and retain the capital distributions they received as a result of the Black Elk Scheme.

953.    PPVA would suffer an unjust detriment if the BEOF Funds and the Preferred Investors of the BEOF Funds are permitted to receive the full benefits of the Black Elk Scheme and the transfers related thereto.

954.    The result of the Black Elk Scheme was to unjustly subordinate PPVA's interest in Black Elk to that of the BEOF Funds and the Preferred Investors of the BEOF Funds, to the detriment of PPVA.

955. The Black Elk Scheme further resulted in significant creditor claims against PPVA, including without limitation claims brought by the Black Elk Trustee against PPVA.

956. The Black Elk Scheme further resulted in payment of unearned fees to the Platinum Defendants and permitted the Platinum Defendants to continue PPVA as an ongoing fund in order to dissipate assets by way of the Second Scheme.

957. Permitting the BEOF Funds and the Preferred Investors of the BEOF Funds to retain the full benefit of the Black Elk Scheme and the transfers related thereto at the expense of PPVA would be against equity and good conscience.

958. By reason of the foregoing, and pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

959. In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Sixteenth Count: Civil Conspiracy against the Platinum Defendants and the Beechwood Defendants

960. The Plaintiffs repeat and re-allege paragraphs 1-959 as if fully set forth herein.

961. As set forth herein, Defendants, acting in concert and as a conspiracy, engaged in various tortious conduct against PPVA in connection with the First and Second Schemes, including breach of fiduciary duties, fraud, constructive fraud and/or aiding and abetting of the same.

962. At all relevant times, each Defendant was a knowing and intentional participant in the conspiracy and agreed to pursue its aims, namely, to transfer or encumber PPVA's assets for the benefit of the Defendants.

166

963.    Defendants were closely related entities or individuals, with close corporate relationships and common control, that entered into various agreements among themselves and conspired to intentionally damage PPVA.

964.    Each Defendant committed one or more overt acts in furtherance of the conspiracy, including, but not limited to:  (i) engaging in transactions designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, Preferred Investors of the BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii) participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

965.    PPVA has been injured as a proximate result of the wrongful acts committed by Defendants in furtherance of the conspiracy, as set forth in this Amended Complaint.

966.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

967.    In addition, because Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Seventeenth Count:  Violation of Civil RICO against the Platinum Defendants and the Beechwood Defendants

968.    The Plaintiffs repeat and re-allege paragraphs 1-967 as if fully set forth herein.

969. The RICO scheme has common participants and a common victim. Each of the Platinum Defendants and Beechwood Defendants violated RICO, and PPVA was injured as a result.

970. Each of the Platinum Defendants and Beechwood Defendants is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. Section 1961(3).

971. Each of the Platinum Defendants and Beechwood Defendants violated 18 U.S.C. § 1962(c) by means of the acts described in the preceding paragraphs and as further described below.

972. Each of the Platinum Defendants and Beechwood Defendants, whether as an owner or employee of, or otherwise associated with, the Beechwood Entities, conducted the affairs of each of the Beechwood Entities through illegal acts as they individually and collectively directly or indirectly participated in managing, directing or operating each separate entity of the Beechwood Entities.

973. <u>The Enterprise</u>. The Platinum Defendants, Beechwood Defendants, and Beechwood Entities form an association-in-fact for the common and continuing purpose described herein and constitute an "enterprise," under 18 U.S.C. Section 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. Each one was an ongoing association with a shared purpose and relationships among the individual Platinum Defendants and Beechwood Defendants associated with the enterprise, and each entity of association endured with sufficient longevity so as to permit, encourage and support the individual associates in their efforts and actions in pursuing and advancing the purpose(s) of the enterprise. There may be other members of the enterprise who are unknown at this time.

974.   Pattern of Racketeering Activity.   The Platinum Defendants and Beechwood Defendants, each of whom is a person associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1), 1961(5), and 1962(c).   The racketeering activity was made possible by the Platinum Defendants and Beechwood Defendants' regular and repeated use of the facilities and services of the enterprise.   The Platinum Defendants and Beechwood Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

975.   Predicate acts of racketeering are acts that are indictable under provisions of the United States Code enumerated in 18 U.S.C. Section 1961(1)(B), as more specifically alleged below.   The Platinum Defendants and Beechwood Defendants each committed at least two such acts or else aided and abetting such acts.

976.   The acts of racketeering were not isolated.   Rather, the acts of the Platinum Defendants and Beechwood Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.   Further, the acts of racketeering have been continuous.   There was repeated conduct during a period of time beginning in approximately February 2014 and continuing through June 2016.

977.   Predicate Acts: Use of Mails and Wires to Defraud in Violation of 18 U.S.C. Sections 1341 and 1343.   Each of the Platinum Defendants and Beechwood Defendants, through the association-in-fact enterprise, engaged in two or more acts constituting indictable offenses under 18 U.S.C. Sections 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud PPVA, and to obtain money and property from PPVA, through false pretenses, representations, and promises.   To execute their scheme or artifice, the Platinum Defendants and

Beechwood Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom and transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals. The acts of the Platinum Defendants and Beechwood Defendants were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the scheme or artifice.

978. The predicate acts of racketeering include: (i) Wire Fraud - the bribery scheme admitted to by Murray Huberfeld in which he was convicted of conspiracy to commit wire fraud for defrauding Platinum of certain funds that were used to bribe a union official to invest approximately $20 million; (ii) Wire Fraud – an email, dated July 30, 2015, describing how the Platinum and Beechwood Defendants used Beechwood to disguise that Beechwood and Platinum were actually integrated and co-conspirators in multiple frauds; (iii) Wire Fraud - an email, dated March 11, 2014, to further the Black Elk Scheme to secure the votes to amend the Indenture through the fraudulent use of Beechwood as an unauthorized proxy; (iv) Wire Fraud - emails dated May 13, 2014, June 23, 2014, and July 1, 2014, furthering the fraudulent scheme to cause PPVA to sell loan interests to Beechwood Entities at artificial and inflated prices; (v) Wire Fraud - email communication containing false representations in the final Consent Solicitation published prior to amended of the Indenture; (vi) Wire Fraud - email communications to the Indenture Trustee consenting to the Indenture amendment; (vii) Wire Fraud - an email, dated August 18, 2014, directing wire of tens of millions of dollars in funds to designated parties from proceeds of the Renaissance Sale; (viii) Wire Fraud - email communications concerning Platinum Defendants and Beechwood Defendants' causing Montsant, a PPVA subsidiary, to purchase remaining 13.75%

Senior Secured Noted Beechwood Entities held at 93.5% of par; (ix) Wire Fraud - email communications from April through June 2016 concerning the sale by PGS, of which PPVA held a 55% interest, of PGS's only asset, the Agera Note, to an insider for a fraction of its fair market value; and (x) Wire Fraud - the Nordlicht Side Letter, dated January 14, 2016, signed by Mark Nordlicht and Mark Feuer, purportedly providing the proceeds owed to DMRJ from sale of IMSC to repay debts of Golden Gate Oil owed to Beechwood Entities. Each of these communications by or on behalf of the Platinum Defendants and Beechwood Defendants constitutes a distinct and separate offense.

979. The aforementioned predicate acts of racketeering activity involve distinct and independent criminal acts. They were neither isolated nor sporadic event but rather involve regular and repeated violations of law to accomplish the Platinum Defendants' and Beechwood Defendants' desired ends in the course of the business of the association-in-fact enterprise. These acts were related to one another and to the objects of the fraudulent schemes and of obtaining money and property through the First and Second Schemes, and the Platinum Defendants and Beechwood Defendants have perpetrated and engaged in the predicate acts to further their fraudulent schemes and obtain money and property. The predicate acts of racketeering activity have in common: (i) objectives (to divert PPVA's funds and assets for their own personal and financial benefit); (ii) participants (Platinum Defendants and Beechwood Defendants); (iii) victims (PPVA and its investors and creditors); (iv) methods of executing the schemes to defraud and to obtain money and property (using false and fraudulent representations regarding liquidity and fair market values of PPVA's assets to induce investment and regarding the independence of the Platinum Defendants and Beechwood Defendants and co-schemers); and (v) installing PPVA

insiders to manage the Beechwood Entities in violation of their fiduciary duties and in furthering the First and Second Schemes.

980.    The Platinum Defendants and Beechwood Defendants' predicate acts of racketeering were conducted in furtherance of the schemes to defraud and to obtain money and property and were continuous since February 2014 until June 2016.  The predicate acts of racketeering continue formed an integral part of the enterprises' *modus operandi*.

981.    Accordingly, the Platinum Defendants and Beechwood Defendants have engaged in a pattern of racketeering activity, pursuant to 18 U.S.C. Section 1961(5).

982.    At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce.

983.    Each of the Platinum Defendants and Beechwood Defendants has therefore violated 18 U.S.C. Section 1962(c) by conducting or participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

984.    PPVA has been injured in its business and property as a proximate result of each of the Platinum Defendants and Beechwood Defendants' violations of 18 U.S.C. Section 1962(c), in at least the following ways: (i) defrauding PPVA through the falsely inflated net asset value of the assets of PPVA; (ii) the Black Elk Scheme, which resulted in claims of more than $100 million against PPVA and the diversion of the Renaissance Sale proceeds away from PPVA; and (iii) the transactions comprising the Second Scheme, where PPVA's assets of approximately $300 million were offloaded to Beechwood Entities or insiders of Platinum Defendants and Beechwood Defendants, to the detriment of PPVA.

985.    All of these facts, in addition to others stated above, make it clear that Platinum Management and its executives dominated and controlled the Beechwood Entities in furtherance

of the First and Second Schemes. Accordingly, the Beechwood Entities are liable for all amounts owed by Platinum Management to PPVA in connection with the First and Second Schemes.

### Eighteenth Count: (For Relief Only) Alter Ego against the Beechwood Entities in respect of Counts One, Two, Four and Five

986. The Plaintiffs repeat and re-allege paragraphs 1-985 as if fully set forth herein.

987. This count is pleaded as additional allegations for relief against the Beechwood Entities as alter egos of Platinum Management in respect of Counts One, Two, Four and Five and not as a separate cause of action.

988. The Beechwood Entities were formed and conceived as the alter-ego of Platinum Management for the purpose of inflicting harm upon PPVA.

989. The Beechwood Entities and Platinum Management have overlapping ownership, in particular, Nordlicht, Huberfeld, Levy and Bodner.

990. The Beechwood Entities and Platinum Management have overlapping management, founders and officers, including Huberfeld, Nordlicht, Bodner, Levy, Ottensoser, Small, Saks, Manela, Beren and the other persons listed herein.

991. The Beechwood Entities were founded in and initially operated from the offices of Platinum Management.

992. The Beechwood Entities were capitalized by the Platinum Defendants with assets controlled by Platinum Management. The Beechwood Entities and Platinum Management were inadequately capitalized relative to their business and investment risks at all relevant times.

993. The Beechwood Entities were financed and created by Platinum Management and assets controlled by Platinum Management were used to finance the Beechwood Entities.

994.    The individual Platinum Defendants and Beechwood Defendants, including Levy and Manela, used email addresses at both Beechwood and Platinum Management interchangeably in furtherance of their efforts in connection with the First and Second Schemes.

995.    As set forth in detail herein, Platinum Management and the Beechwood Entities used the property of PPVA in furtherance of a fraud, in order to siphon fees off of inflated NAVs.  The Beechwood Entities and Platinum Management caused PPVA and Beechwood to make joint investments, often to the detriment of PPVA and its creditors and investors.  Beechwood and Platinum Management entered into informal and unreported loan agreements and terms, put-back agreements, and guarantees including the GGO Put Option and Guaranty, cross collateralization of assets, and the Nordlicht Side Letter, all of which were not reported to PPVA.

996.    The ultimate decision making for both Platinum Management and the Beechwood Entities rested with the same controlling minds: Nordlicht, Huberfeld, Levy and Bodner.

997.    Platinum Management often caused PPVA to commit acts which benefited the Beechwood Entities at PPVA's expense, including but not limited to the Black Elk Scheme, the Nordlicht Side Letter, the Master Guaranty, the PEDEVCO subordination, and the Agera Transactions.

998.    By virtue of the Master Guaranty and the Agera Transactions, PPVA assets were transferred to the ownership and control of the Beechwood Defendants and Beechwood Entities without formal marketing or other market-based controls, by way of corrupt and wrongful insider transactions.

999.    Beechwood and Platinum Management engaged in a corrupt enterprise to pursue fraudulent, wrongful, and illicit purposes, which directly harmed PPVA.  This enterprise and plan

is summarized herein as the First Scheme and the Second Scheme, wherein Platinum Management formed and created the Beechwood Entities for the corrupt and wrongful purposes of inflating PPVA's asset values and taking fees based upon these values, engaging in the Black Elk Scheme for the benefit of the BEOF Funds and to the detriment of PPVA, and then forming and executing the Second Scheme for the purpose of dissipating PPVA's remaining valuable assets to Beechwood, most notably its interests in IMSC and Agera Energy.

1000.  By reason of the foregoing, the Beechwood Entities are alter egos of Platinum Management and are liable to the same extent as Platinum Management in connection with the Plaintiffs' Counts One, Two, Four and Five.

### Nineteenth Count: (For Relief Only) Alter Ego against the BEOF Funds in respect of Counts One, Two, Four and Five

1001.  The Plaintiffs repeat and re-allege paragraphs 1-1000 as if fully set forth herein.

1002.  This count is pleaded as additional allegations for relief against the BEOF Funds as alter egos of Platinum Management in respect of Counts One, Two, Four and Five and not as a separate cause of action.

1003.  Platinum Management formed the BEOF Funds for the corrupt and wrongful purpose of siphoning nearly $100 million in funds out of Black Elk in connection with the Renaissance Sale, all the while allowing PPVA and its subsidiaries to face the consequences in the form of substantial creditor claims and the total devaluation of the Black Elk bonds that would be repurchased by PPVA via Montsant.

1004.  Both BEOF Funds were formed by the same persons and counsel that formed Platinum Management.

1005.  Both BEOF Funds have overlapping ownership, management and control with Platinum Management, and were formed by a corrupt group of the Platinum Defendants for the purpose of covering their Black Elk investment losses in the wake of the Black Elk Explosion.

1006.  Platinum Management directed the capitalization of both BEOF Funds.

1007.  Both BEOF Funds share overlapping investors with the funds managed by Platinum Management.

1008.  Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

1009.  Both BEOF Funds were named similar to other funds managed by Platinum Management, which other funds shared overlapping investments in Black Elk.

1010.  Ultimate decision making for both Platinum Management and the BEOF Funds rested in the same controlling minds: Nordlicht, Huberfeld, Small, Levy and Bodner.

1011.  Both BEOF Funds were formed and conceived to execute a fraud that harmed PPVA and benefited both BEOF Funds, to wit – the diversion of the Renaissance Sale proceeds.

1012.  By reason of the foregoing, the BEOF Funds are alter egos of Platinum Management and are liable to the same extent as Platinum Management in connection with Plaintiffs' Counts One, Two, Four and Five.

## Twentieth Count:  Declaratory Judgment
### The Nordlicht Side Letter Is Void and Unenforceable as Contrary to Public Policy

1013.  The Plaintiffs repeat and re-allege paragraphs 1-1012 as if fully set forth herein.

1014.  On or about January 14, 2016, Nordlicht executed the Nordlicht Side Letter purportedly on behalf of himself, PPVA, PPCO "and each of their affiliates."

1015.  The Nordlicht Side Letter is purportedly signed by Feuer as a witness.

1016.  Neither PPVA nor any of its subsidiaries received any consideration whatsoever in return for executing the Nordlicht Side Letter.

1017.  The intended and direct result of the Nordlicht Side Letter was to provide the Beechwood Entities with a right to obtain payment of the Golden Gate Oil Loan, which at that time totaled approximately $37 million, from the proceeds of the sale of IMSC and the repayment of IMSC's loan obligations to DMRJ and Montsant, irrespective of whether such amounts were held by PPVA or one of its affiliates.

1018.  The Nordlicht Side Letter constituted a furtherance of the corrupt and fraudulent First and Second Schemes, whereby the Platinum Defendants and Beechwood Defendants siphoned off hundreds of millions of dollars in assets from PPVA for their own benefit.

1019.  As the Nordlicht Side Letter is permeated with fraud and in violation of applicable law, the dictates of public policy and justice warrant a finding that the Nordlicht Side Letter is void and unenforceable.

1020.  By reason of the foregoing, the Plaintiffs are entitled to a judgment declaring that the Nordlicht Side Letter cannot be enforced by any of the Beechwood Defendants in any capacity, as the Nordlicht Side Letter is void and unenforceable as against public policy.

### Twenty-First Count: Declaratory Judgment that the
### Master Guaranty Is Void and Unenforceable as against Public Policy

1021.  The Plaintiffs repeat and re-allege paragraphs 1-1020 as if fully set forth herein.

1022.  On or about March 21, 2016, Montsant, PPVA, Golden Gate Oil and BAM Administrative entered into the "Master Guaranty", by which, *inter alia*, (i) Montsant agreed to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate Oil, to the extent of the assets contained in the Montsant Collateral Account; and (ii) BAM Administrative, as agent

for certain Beechwood Entities and SHIP, was provided with a non-recourse guaranty from PPVA of amounts owed by Golden Gate Oil and amounts owed by Montsant.

1023. The Master Guaranty amounted to a significant encumbrance of the remaining assets of PPVA which solely benefited the interests of the Beechwood Defendants.

1024. The intended result of the Master Guaranty was to provide the Beechwood Entities holding the Golden Gate Oil debt with a claim to IMSC proceeds, the Montsant Collateral Account, and various other PPVA assets.

1025. As a result of the Master Guaranty, the Platinum Defendants and Beechwood Defendants were able to continue their misrepresentation as to the value of the Golden Gate Oil investment, as the anticipated sale proceeds from IMSC and the assets in the Montsant Collateral Account could be used to pay the Golden Gate Oil Loan in full.

1026. The Master Guaranty constituted a furtherance of the corrupt First and Second Schemes, whereby the Platinum Defendants and Beechwood Defendants siphoned off hundreds of millions of dollars in assets from PPVA for their own benefit.

1027. As the Master Guaranty is permeated with fraud and in violation of applicable law, the dictates of public policy and justice warrant a finding that the Master Guaranty is void and unenforceable.

1028. By reason of the foregoing, the Plaintiffs are entitled to a judgment declaring that the Master Guaranty cannot be enforced by the Beechwood Entities in any capacity, as the Master Guaranty is void and unenforceable as against public policy.

**Twenty-Second Count: (For Relief Only) Alter Ego against the
Huberfeld Family Foundation in respect of Counts One, Two, Three, Four, Five and Six**

1029. The Plaintiffs repeat and re-allege paragraphs 1-1028 as if fully set forth herein.

1030. This count is pleaded as additional allegations for relief against the Huberfeld Family Foundation as an alter ego of both Platinum Management and Murray Huberfeld in respect of Counts One, Two, Three, Four, Five and Six and not as a separate cause of action.

1031. The Huberfeld Family Foundation was formed for the corrupt and wrongful purpose of acting as a clearing house for assets acquired by Murray Huberfeld and certain other Platinum Defendants in connection with the First and Second Schemes, namely, David Bodner, Mark Nordlicht, Bernard Fuchs, Uri Landesman and David Levy.

1032. At the direction of Murray Huberfeld and Platinum Management, the Huberfeld Family Foundation was one of the Preferred Investors of the BEOF Funds in connection with the siphoning of nearly $100 million in funds out of Black Elk in connection with the Renaissance Sale, all the while allowing PPVA and its subsidiaries to face the consequences in the form of substantial creditor claims and the total devaluation of the Black Elk bonds that would be repurchased by PPVA via Montsant.

1033. The Huberfeld Family Foundation regularly provided "loans" and otherwise transacted with Platinum insiders who, due to their checkered history, could not seek financing through PPVA or other regulated investment firms.

1034. The Huberfeld Family Foundation and Platinum Management were formed by the same persons and counsel that formed Platinum Management.

1035. The Huberfeld Family Foundation and Platinum Management have overlapping ownership, management and control with Platinum Management, namely Huberfeld as well as investments by other Platinum executives, and was formed for the corrupt purpose of the Black Elk Scheme as well as providing a clearing house for assets illicitly seized through the First and Second Schemes.

1036.   Platinum Management and Murray Huberfeld directed the capitalization of the Huberfeld Family Foundation.

1037.   The Huberfeld Family Foundation shares overlapping investors with Platinum Management.

1038.   The Huberfeld Family Foundation was operated by Platinum Management from the same offices.

1039.   Ultimate decision making for both Platinum Management and the Huberfeld Family Foundation rested, in part, with Huberfeld.

1040.   The Huberfeld Family Foundation was formed and conceived by Platinum Management and Murray Huberfeld to execute a fraud that harmed PPVA and benefited the Huberfeld Family Foundation, to wit – the diversion of the Renaissance Sale proceeds and the creation of a repository for the illicit gains derived from the First and Second Schemes.

1041.   By reason of the foregoing, the Huberfeld Family Foundation is the alter ego of Platinum Management and Murray Huberfeld and is liable to the same extent as Platinum Management and Murray Huberfeld in connection with Plaintiffs' Counts One, Two, Three, Four, Five and Six.

WHEREFORE, the Plaintiffs pray that this Court enter judgment against Defendants as follows:

a)      on the Plaintiffs' first count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

b)      on the Plaintiffs' second count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

c)      on the Plaintiffs' third count, awarding compensatory damages against the Individual Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Individual Platinum Defendants in an amount to be determined at trial;

d)      on the Plaintiffs' fourth count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

e)      on the Plaintiffs' fifth count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

f)      on the Plaintiffs' sixth count, awarding compensatory damages against the Individual Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Individual Platinum Defendants in an amount to be determined at trial;

g)      on the Plaintiffs' seventh count, awarding compensatory damages against the Beechwood Defendants in an amount to be determined at trial plus interest at

the statutory rate, plus punitive damages against the Beechwood Defendants in an amount to be determined at trial;

h)      on the Plaintiffs' eight count, awarding compensatory damages against the Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Defendants in an amount to be determined at trial;

i)      on the Plaintiffs' ninth count, awarding compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

j)      on the Plaintiffs' tenth count, awarding compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

k)      on the Plaintiffs' eleventh count, awarding compensatory damages against Michael Katz in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against Michael Katz in an amount to be determined at trial;

l)      on the Plaintiffs' twelfth count, awarding compensatory damages against Kevin Cassidy and Michael Nordlicht in an amount to be determined at trial plus

182

interest at the statutory rate, plus punitive damages against Kevin Cassidy and Michael Nordlicht in an amount to be determined at trial;

m)      on the Plaintiffs' thirteenth count, awarding compensatory damages against Seth Gerszberg in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against Seth Gerszberg in an amount to be determined at trial;

n)      on the Plaintiffs' fourteenth count, compensatory damages against the Beechwood Defendants, Seth Gerszberg and Kevin Cassidy in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Defendants, Seth Gerszberg and Kevin Cassidy  in an amount to be determined at trial;

o)      on the Plaintiffs' fifteenth count, compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

p)      on the Plaintiffs' sixteenth count, compensatory damages against the Platinum Defendants and Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants and Beechwood Defendants in an amount to be determined at trial;

q)      on the Plaintiffs' seventeenth count, treble damages against the Platinum and Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate;

r)      on the Plaintiffs' eighteenth count, awarding compensatory damages against the Beechwood Entities as the alter ego of Platinum Management in respect of counts one, two, four and five, in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Entities in an amount to be determined at trial, to the same extent that the Platinum Defendants are liable on the Plaintiffs' first, second, fourth and fifth counts;

s)      on the Plaintiffs' nineteenth count, awarding compensatory damages against the BEOF Funds as the alter ego of Platinum Management in respect of counts one, two, four and five, in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds in an amount to be determined at trial, to the same extent that the Platinum Defendants are liable on the Plaintiffs' first, second, fourth and fifth counts;

t)      on the Plaintiffs' twentieth count, a judgment declaring that the Nordlicht Side Letter cannot be enforced by the Beechwood Entities in any capacity as the Nordlicht Side Letter is void and unenforceable as against public policy;

u)      on the Plaintiffs' twenty-first count, a judgment declaring that the Master Guaranty cannot be enforced by the Beechwood Entities in any capacity as the Master Guaranty is void and unenforceable as against public policy; and

v)      on the Plaintiffs' twenty-second count, awarding compensatory damages against the Huberfeld Family Foundation as the alter ego of Platinum Management and Murray Huberfeld in respect of counts one, two, three, four, five and six, in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Huberfeld Family Foundation in an amount to be determined

at trial, to the same extent that the Platinum Defendants are liable on the Plaintiffs'

first, second, third, fourth, fifth and sixth counts.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 29, 2019
      New York, New York

                                  HOLLAND & KNIGHT LLP

                                  By:                        
                                         Warren E. Gluck, Esq.

                                  Warren E. Gluck, Esq.
                                  Barbra R. Parlin, Esq.
                                  Mitchell J. Geller, Esq.
                                  John Brownlee, Esq. (*pro hac vice*)
                                  Richard A. Bixter Jr., Esq. (*pro hac vice*)
                                  HOLLAND & KNIGHT LLP
                                  31 West 52nd Street
                                  New York, New York 10019
                                  Telephone: 212-513-3200
                                  Facsimile:  212-385-9010
                                  Email: warren.gluck@hklaw.com
                                            barbra.parlin@hklaw.com
                                            mitchell.geller@hklaw.com
                                            john.brownlee@hklaw.com
                                            richard.bixter@hklaw.com

                                *Attorneys for Plaintiffs Martin Trott and*
                                *Christopher Smith, as Joint Official Liquidators and*
                                *Foreign Representatives of Platinum Partners*
                                *Value Arbitrage Fund L.P. (in Official Liquidation),*
                                *and for Platinum Partners Value Arbitrage Fund*
                                *L.P. (in Official Liquidation)*

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Huberfeld Information & Guilty Plea |
| 2 | February 12, 2016 email from Fuchs to Bodner RE investor objection |
| 3 | 2014 Huberfeld Family Foundation Tax Return |
| 4 | June 2-3, 2009 Email Re Gordon Diamond Investment in PPCO Predecessor |
| 5 | January 31 - February 1, 2013 Email Re Black Elk Financial Condition |
| 6 | PPVA Second Amended & Restated Limited Partnership Agreement |
| 7 | Platinum Management Second Amended & Restated Operating Agreement |
| 8 | March 2016 PPVA Tearsheet |
| 9 | September 2015 PPVA Due Diligence Questionnaire |
| 10 | November 2012 PPM for Offshore Feeder Fund |
| 11 | December 2015 PPVA Marketing Presentation |
| 12 | January 8, 2016 Desert Hawk Email to Levy |
| 13 | February 18, 2016 Desert Hark Email to Levy |
| 14 | March 29-April 1, 2016 Urigen Email RE Missed Payroll |
| 15 | June 15-22, 2016 GGO Email RE Missed Payroll |
| 16 | June 30, 2016 Letter to PPVA Investors RE Suspension of NAV Reporting |
| 17 | July 8, 2016 Email Showing PPVA with Less than $100 |
| 18 | August 23, 2016 Voluntary Petition for PPVA Liquidation |
| 19 | August 23, 2016 Second Affidavit of Nordlicht for PPVA Liquidation |
| 20 | August 25, 2016 Cayman Order Appointing Joint Provisional Liquidators |
| 21 | October 27, 2016 Cayman Order Converting to Official Liquidation |
| 22 | November 22, 2016 Chapter 15 Recognition Order |
| 23 | December 16, 2016 Final Cayman Order Appointing JOLs |
| 24 | September 29, 2017 Order Appointing Trott & July 6, 2018 Order Appointing Smith |
| 25 | December 19, 2016 SEC Complaint |
| 26 | PPVA 2012 Q4 Valuation |
| 27 | January 22, 2015 Email Showing Adjustment of NAV |
| 28 | PPVA 2013 Q4 Valuation |
| 29 | Black Elk 2013 Q4 10-Q |
| 30 | May 23, 2014 Email RE Black Elk Disclosure of GGO Value |
| 31 | April 3, 2012 Email RE Optimistic Performance of GGO |
| 32 | November 23, 2012 Email RE GGO Value Rising to $45M |
| 33 | July 30, 2015 Email Re Concerns with Beechwood |
| 34 | February 28, 2013 Email Discussing Beechwood NDA |
| 35 | March 28, 2013 Email Concerning Platinum Management's Initial Investment in Beechwood |

| | |
|---|---|
| 36 | Beechwood Overview Memo |
| 37 | April-May 2013 Emails between Levy and Crystal O'Sullivan |
| 38 | Beechwood Term Sheet |
| 39 | O'Sullivan Invoice |
| 40 | June 4, 2013 Email Sample Investment Guidelines for Beechwood |
| 41 | June 12, 2013 Email RE Deal Opportunities for Beechwood |
| 42 | June 16, 2013 Beechwood Re Presentation |
| 43 | June 20, 2013 Email RE Bryan Cave Opening New Matter for Beechwood |
| 44 | Bryan Cave Engagement Letter |
| 45 | July 3, 2013 Bryan Cave Email RE Draft Beechwood Documents |
| 46 | Unaudited Balance Sheet September 1, 2013 |
| 47 | February 3, 2014 Email RE GGO Needing Funding |
| 48 | GGO Note Purchase Agreement |
| 49 | March 7, 2014 PEDEVCO Note Purchase Agreement |
| 50 | March 19, 2014 Intercreditor Agreement |
| 51 | Black Elk Indenture |
| 52 | February 1, 2013 Huberfeld Email Re BEOF Deal |
| 53 | February 7, 2013 Email Pitching BEOF to Twosons |
| 54 | Black Elk 2013 10-K |
| 55 | July 2014 Emails RE Rescinding Firing of Shulse |
| 56 | July 1, 2014 Emails RE Selling $7M Interest in Senior Secured Notes |
| 57 | Small Authorization for Consent Solicitation |
| 58 | Black Elk August 21, 2014 8-K |
| 59 | August 18, 2014 Email RE Wiring $70M from Black Elk |
| 60 | August 2014 Sterling Bank Statement |
| 61 | August 2014 Wire Transfers from PPVA to Black Elk |
| 62 | Black Elk Adversary Complaint |
| 63 | Black Elk 2014 Q3 10-Q |
| 64 | 2015 Montsant Loan Promissory Note |
| 65 | May 13, 2015 Montsant Pledge Agreement |
| 66 | Northstar Notes |
| 67 | Northstar/Agera Security Agreement |
| 68 | PPVA 2014 Q4 Valuation |
| 69 | PPVA 2015 Q1 Valuation |
| 70 | June 30, 2016 Indicative NAV Report |
| 71 | PPVA 2016 Q1 Valuation |
| 72 | Northstar Sale Order |
| 73 | May 4, 2015 Montsant Assignment Agreement |
| 74 | January 13, 2016 Cash Report |
| 75 | Nordlicht Side Letter |
| 76 | Stock ticker price of Navidea on October 26, 2015 |

| | |
|---|---|
| 77 | Stock ticker price of Navidea on March 21, 2016 |
| 78 | Master Guaranty |
| 79 | China Horizon Collateral Assignment |
| 80 | China Horizon Turnover Agreement |
| 81 | Carbon Credits Collateral Assignment |
| 82 | March 13, 2016 Email from Nordlicht to Katz RE Agera Sale to Insider |
| 83 | March 21, 2016 Email from Nordlicht to PM Employees Introducing Katz |
| 84 | Amended and Restated Agera Note |
| 85 | March 21, 2016 Email from Nordlicht to Reuters Reporter RE Cassidy |
| 86 | July 15, 2016 Narain Investment Memorandum |
| 87 | March 27, 2016 Email from Nordlicht to Katz RE Sale of Agera to Beechwood Led "consortium" |
| 88 | May 11, 2016 Email from Nordlicht RE Agera Off Market |
| 89 | AGH Parent Amended Operating Agreement |
| 90 | Agera Note Purchase Agreement |
| 91 | Agera Closing Documents:  Flow of Funds Memorandum and Funding Direction Letter |
| 92 | Starfish Purchase Agreement |
| 93 | AGH Parent Redemption Notice |
| 94 | AGH Parent to PGS Assignment |
| 95 | May 11, 2015 PPNE Note |
| 96 | August 12, 2015 PPNE Note |
| 97 | Twosons Note |
| 98 | Twosons Side Letter |
| 99 | July 4, 2016 Email from Nordlicht to Gerszberg  RE PPVA liquidation |
| 100 | Forbearance & Security Agreement |
| 101 | Zapata and Gerszberg Master Agreement for Unification of Businesses |
| 102 | Spectrum30 Flow of Funds Letter |
| 103 | Huberfeld Family Foundation Payroll Invoice |
| 104 | Huberfeld Family Foundation Promissory Note |

EFiled: Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 8

THIS CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SUCH ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR LENDER, SATISFACTORY TO BORROWER, THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

## AGERA HOLDINGS LLC

### SECOND AMENDED AND RESTATED
### SECURED CONVERTIBLE PROMISSORY NOTE

**$600,071.23**                                                    **June 9, 2016**
                                                                   **New York, New York**

**For Value Received,** Agera Holdings LLC, a Delaware limited liability company, located at 669 Crown Street, Brooklyn, NY 11213 *("Borrower"),* hereby unconditionally promises to pay to the order of Principal Growth Strategies LLC, a Delaware limited liability company, located at 152 W. 57th Street, 4th Floor, New York, New York *("Lender"),* in lawful money of the United States of America and in immediately available funds, the principal sum of $600,071.23 together with accrued and unpaid interest thereon, each due and payable on the dates and in the manner set forth below. This amended and restated secured convertible promissory note (the *"Note")* amends, restates and supersedes in its entirety that certain Amended and Restated Secured Convertible Promissory Note dated June 11, 2014 originally issued by Agera Energy LLC ("Agera") in favor of Lender in connection with that certain Note Purchase Agreement, dated as of May 18, 2014, by and between Agera and Lender.

The principal balance of the Note shall bear simple interest at an annual rate equal to 1.00%. Interest shall be calculated on the basis of a 365 day year for the actual number of days elapsed. Interest shall commence with the date hereof and shall continue on the outstanding principal balance hereof until paid in full or converted.

The Note is executed and delivered in connection with that certain Amended and Restated Note Purchase Agreement, dated as of June 9, 2016, by and between Borrower and Lender (the *"Purchase Agreement"*).

1.      **Repayment and Conversion.**

        (a)      **Payment Demand; Prepayment.** Unless the Note has been converted in accordance with the terms of this Section 1, at any time on or after the date hereof, Lender, at its sole discretion, may demand payment of the entire outstanding principal balance of the Note and all accrued and unpaid interest thereon (the **"Payment Demand"**). Borrower may not prepay all or any portion of the outstanding principal balance of this Note or any accrued and unpaid interest thereon at any time prior to June 9, 2026, and thereafter may pay such amounts without penalty

only upon 90 days' prior written notice to Lender. Any prepayment made under this Section 1(a) is subject to the rights of Lender set forth in Section 1(b) below.

(b) **Optional Conversion.** Subject to the requirements set forth in Section 1(c), at any time, Lender, in its sole discretion, may, upon five days' written notice to Borrower, require Borrower to convert the outstanding principal balance of the Note and all accrued and unpaid interest thereon automatically and without any further action by Lender into the number of units of limited liability company interests (the **"Units"**) of Borrower, equal to 95.01% of the outstanding capital securities of Borrower (the **"Conversion Securities"**).

(c) **Regulatory Requirements.** Notwithstanding the foregoing, the effectiveness of any conversion pursuant to this Section 1 shall be subject to and conditioned upon (i) all applicable federal and state laws, rules, regulations, policies and procedures (including without limitation, laws, rules, regulations, policies and procedures of the Federal Energy Regulatory Commission, any state public utility commission or public service commission or other regulatory commission having jurisdiction over Borrower or any of its subsidiaries, a regional transmission organization or independent system operator in which territory Borrower or any of its subsidiaries provides services, the North American Electric Reliability Corporation or any of its regional reliability organizations and any independent market monitor for any of the jurisdictions in which Borrower or its subsidiaries provides services) and (ii) obtaining all approvals required under such applicable federal and state laws, rules, regulations policies and procedures. Upon such conversion, Lender shall use its commercially reasonable efforts to comply with such laws, rules, regulations, policies and procedures and to provide Borrower with executed regulatory affirmations and/or disclosures as Borrower may require to comply with regulations.

2. **Mechanics of Conversion.** In the event of conversion pursuant to Section 1, the Note shall be converted automatically without any further action by Lender and whether or not the Note is surrendered to Borrower or its transfer agent; *provided, however,* that Borrower shall not be obligated to issue certificates evidencing the Conversion Securities issuable upon such conversion unless the Note is either delivered to Borrower or its transfer agent as provided below, or Lender notifies Borrower or its transfer agent in writing that the Note has been lost, stolen or destroyed and executes an agreement satisfactory to Borrower to indemnify Borrower from any loss incurred by it in connection with the Note. Upon the occurrence of such conversion, Lender shall surrender the Note at the office of Borrower or any transfer agent for the Conversion Securities. Thereupon, there shall be issued and delivered to Lender, at such office and in its name as shown on the surrendered Note, a certificate for the number of Units of Conversion Securities into which the Note was convertible on the date on which such conversion occurred.

3. **Fractional Units.** No fractional Units shall be issued upon the conversion of the Note. All Units issuable upon conversion of the outstanding amount of the Note shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional Unit. If, after the aforementioned aggregation, the conversion would result in the issuance of a fraction of a Unit of Conversion Securities, Borrower shall, in lieu of issuing any fractional Unit, pay Lender who is otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Manager of Borrower).

**4.     Security Interest.** This Note is secured pursuant to a Security Agreement by and between Borrower and Lender dated concurrently herewith (as the same may be amended, restated or otherwise modified from time to time, the ***"Security Agreement").*** Borrower and Lender acknowledge and agree that all references in the Security Agreement to the "Note" shall refer to this Note and that the term "Obligations" contained in the Security Agreement shall include all obligations arising under this Note. Borrower shall not, directly or indirectly, grant any security interests to any other party that are equal to or senior in priority to the security interest granted to Lender to secure Borrower's obligations under the Note while the Note is outstanding except (a) in connection with a loan, line of credit or similar lending agreement (a ***"Loan")*** to Borrower by a bank or other financial institution (a ***"Financial Institution"),*** or (b) as may be granted in equipment leasing transactions of Borrower. Lender agrees to subordinate the Note (and to enter into a subordination agreement in the form acceptable to a Financial Institution evidencing the same) with respect to a Loan from a Financial Institution.

**5.     Payments.** All payments of principal and interest shall be in lawful money of the United States of America and shall be payable at the address set forth in the opening paragraph of the Note unless another place of payment shall be specified in writing by Lender. Payment on the Note shall be applied first to accrued interest, and thereafter to the outstanding principal balance hereof. If any payments on the Note become due on a Saturday, Sunday, or a public holiday under the laws of the state of New York, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest in connection with such payment.

**6.     Default.** Each of the following events shall be an ***"Event of Default"*** hereunder:

(a)     Borrower fails to pay timely any of the principal amount, accrued interest or other amounts due under this Note within ten days of receipt of a Payment Demand;

(b)     Borrower does any of the following: (i) merge or consolidate with any person, (ii) dissolve, (iii) wind up its affairs, or (iv) sell, assign, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any person, except in the case of clause (i) or (iv), where such person is or becomes a Borrower hereunder as of the date of such transaction and such further assurances with respect to any such transaction satisfactory to Lender are delivered on or before the effective date of such transaction;

(c)     Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

(d)     An involuntary petition is filed against Borrower under any bankruptcy statute now or hereafter in effect, and such petition is not dismissed or discharged within 60 days, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of Borrower; and

(e)     Borrower breaches any representation, warranty or covenant under the Note, the Purchase Agreement or the Security Agreement.

7.     **Remedies.** Upon the occurrence and during the continuance of any Event of Default, the outstanding principal balance of the Note and all accrued and unpaid interest thereon shall, all at the option of Lender, upon notice to Borrower, except that no such election by Lender and notice to Borrower shall be required in the case of an Event of Default of the type specified in Sections 6(b)(ii) or (iii) or 6(c), automatically be immediately due, payable and collectible by Lender pursuant to applicable law.

8.     **Cumulative Remedies.** Lender's rights and remedies under the Note shall be cumulative. The Lender shall have all other rights and remedies not inconsistent herewith as provided under the Uniform Commercial Code, by law or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.

9.     **Creditor's Rights.** Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of the Note. Borrower hereby acknowledges that Lender shall be entitled to recover, and the undersigned agrees to pay when incurred, all reasonable costs and expenses of collection of the Note, including without limitation, reasonable attorneys' fees. The right to plead any and all statutes of limitations as a defense to any demands hereunder is hereby waived to the full extent permitted by law. Borrower and Lender consent irrevocably to personal jurisdiction in the state and federal courts having jurisdiction over New York City, New York for the resolution of any disputes arising hereunder or relating hereto.

10.     **Usury.** In no event shall the interest rate or rates payable under the Note, plus any other amounts paid in connection herewith and therewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrower and Lender, in executing and delivering the Note and the Purchase Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; *provided, however,* that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto,* as of the date of the Note, Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of any remaining obligations to the extent of such excess.

11.     **Governing Law.** THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

12.     **Waiver with respect to Damages.** BORROWER ACKNOWLEDGES THAT LENDER DOES NOT HAVE ANY FIDUCIARY RELATIONSHIP WITH, OR FIDUCIARY DUTY TO, BORROWER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT CONTEMPLATED HEREBY AND THE RELATIONSHIP BETWEEN LENDER, ON THE ONE HAND, AND BORROWER, ON THE OTHER HAND, IN CONNECTION HEREWITH IS SOLELY THAT OF CREDITOR AND DEBTOR.  TO THE

DB1/ 87833271.3

EXTENT PERMITTED BY APPLICABLE LAW, BORROWER SHALL NOT ASSERT, AND BORROWER HEREBY WAIVES, ANY CLAIMS AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS NOTE, ANY AGREEMENT OR INSTRUMENT CONTEMPLATED.

13.   SERVICE OF PROCESS; SUBMISSION TO JURISDICTION.  EACH OF THE PARTIES HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE STATE COURTS OF THE STATE OF NEW YORK IN NEW YORK COUNTY AND TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE AND THE SUBJECT MATTER HEREOF.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER (A) HEREBY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN THE ABOVE-NAMED COURTS, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT ITS PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER OR THAT THIS AGREEMENT, THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT, (B) HEREBY WAIVES THE RIGHT TO REMOVE ANY SUCH ACTION, SUIT OR PROCEEDING INSTITUTED BY LENDER IN STATE COURT TO FEDERAL COURT, AND (C) HEREBY WAIVES THE RIGHT TO ASSERT IN ANY SUCH ACTION, SUIT OR PROCEEDING ANY OFFSETS OR COUNTERCLAIMS EXCEPT COUNTERCLAIMS THAT ARE COMPULSORY OR OTHERWISE ARISE FROM THE SAME SUBJECT MATTER.  EACH OF THE PARTIES HEREBY CONSENTS TO SERVICE OF PROCESS BY MAIL AT THE ADDRESS TO WHICH NOTICES ARE TO BE GIVEN TO IT PURSUANT TO SECTION 17 HEREOF.

14.   **Amendment and Waiver.** Any provision of the Note may be amended or waived in a writing signed by both Borrower and Lender. No failure or delay on the part of the Lender to exercise any right, remedy, power or privilege under this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

15.   **Successors and Assigns.** The provisions of the Note shall inure to the benefit of and be binding on any successor to Borrower or Lender, as applicable. Lender may transfer its rights and obligations under the Note at any time in whole or in part without the consent of Borrower. Borrower may only transfer its rights and obligations under the Note in whole or in part with the prior written consent of Lender.

16.   **Transfers.** The Note may be transferred only upon its surrender to Borrower for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to Borrower. Thereupon, the Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the

registered holder of the Note. Such payment shall constitute full discharge of Borrower's obligation to pay such interest and principal.

17.   **Notice.** Notice permitted or required to be given hereunder shall be deemed sufficient if given in writing by electronic mail, facsimile, reputable overnight delivery service or by registered or certified mail, postage prepaid, return receipt requested, addressed to the respective addresses of the parties set forth in the introductory paragraph or at such other address as the respective parties may designate by like notice from time to time. Notices so given shall be deemed effective upon the earlier of (i) receipt by the party to which notice is given; (ii) on the fifth business day following the date such notice was deposited in the mail; or (iii) on the second business day following the date such notice was delivered to a reputable overnight delivery service.

*[Signature page follows]*

DB1/ 87833271.3

In Witness Whereof, this Note is executed as of the date first above written.

**BORROWER:**

**AGERA HOLDINGS LLC**

By: _____

Name: _____

Title: _____

[Signature page to Secured Convertible Promissory Note of Agera Holdings LLC]

AGREED TO AND ACCEPTED BY:

PRINCIPAL GROWTH STRATEGIES
LLC

By: _____

Name: _David Steinberg_____

Title: _Authd Sgnatory_____

[Signature page to Secured Convertible Promissory Note of Agera Holdings LLC]

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 9

**To:** Lawrence.Delevingne@thomsonreuters.com[Lawrence.Delevingne@thomsonreuters.com]
**From:** Mark Nordlicht
**Sent:** Mon 3/21/2016 2:35:25 AM
**Subject:** RE: On BACKGROUND

Please acknowledge that you received everything, I ended up being much more comprehensive than I set out to be!!

Still on background...yikes some of these phrases I can't believe came out of my mouth!!! I will start on background and then I will indicate as to some quotes I can go on the record on. On background now- In terms of "cheating" on liquidity, what I meant was given that we run an a fund solely devoted to asset backed lending in addition to PPVA, oftentimes the investments we see that have better risk adjusted characteristics will be ones in which we tolerate illiquidity. It is thus a "challenge " to lay off of them in order to maintain the balance allowing us to operate within the hedge fund structure. But the cause of our current illiquidity is what some would call a high class problem. The entire side pocket was successful positions that we either invested very little into or even ones in which we already took millions of dollars out but still own a sizeable equity stake (this is the case in much of our energy holdings). Overall though, we are running 1.35 billion and have returned 2.6 billion to investors in cash over the years so I think we have shown ourselves to "turn over" the money and manage liquidity fairly well. In PPVA, on average our strategy of utilizing debt as an entry point to create private equity upside has been successful and on average, the debt portion of our investments are less than a year in duration. It's when we end up with private equity upside "for free" or for little value that we have historically run into liquidity issues. On one hand, this is the price of producing the superior risk adjusted returns we have achieved. But on the other hand, we are taking the steps outlined previously to insure we can also avoid side pocketing in future. This includes lengthening liquidity terms and potentially setting aside equity kickers that we may thing will take a while to monetize earlier before they have appreciated in value (something easier said than done as hard to predict). But in general, being more vigilant about not straying from the 50% largest liquid trading strategies is the key and we will be monitoring that very closely going forward.

I am frankly a little surprised at the suggestion that we push the envelope from an "ethical perspective" as that is actually not something that I have really been accused of previously. Anyone who knows me  I really believe would think that is really the opposite of how we conduct business. I have certainly been accused of aggressively pursuing risk adjusted returns to the fullest extent of the law and that that may be true. That is where my comment of our extensive legal due  diligence for new strategies comes in. But there is a real distinction of being aggressive from a legal perspective and being aggressive from ethical perspective. You have aggregated our worst investments for the most part and I just don't see an inkling of "ethical " issue. Certainly being defrauded (Kuber, Banyon to some extent)  isn't ethical issue. Lending money to company like Glacial that ended up having some legal issues as a company is not unethical.  Investing in cash call can hardly be considered as pushing an "ethical" envelope. In terms of Black Elk, fighting with other creditors in a bankruptcy isn't ethical issue. I think you kind of have to have sharp elbows when you are a fiduciary for others. I guess closest thing you can point to is BDL but even there, we were certainly told that the annuitants would be given a split of the brokers commission which seemed to be a win win actually. This was a heavily scrutinized transaction and so it's clear we were not involved in signing people up.  I really do take offense as to charges of ethical impropriety as there is just no evidence of it even amongst the  most sordid investments you can dig up. Remmber over 13 years, we have thousands of investments, you are talking about a handful here. If you are even going to insinuate any ethical issues-and I know you have asked the investors about this too- please tell me one instance of an ethics issue other than some supposed person who is close to me who is not going on record and made this statement!!!!! I think fairness would require this.

In terms of Huberfeld and Bodner, my original seed investors, it is definitely true that it has been helpful in terms of institutional outreach that they are no longer involved or have any ownership in management company. I guess it is also not untrue that I have "distanced" myself when I give it some thought.  But I would not have separated from them had they not generously agreed to so as not to hold back me or Platinum. In general, I do really live my life by judging people as to how they interact with me and not solely by what a google search might uncover or past issues they may have. It is certainly a factor and issues to consider but I try to dig deeper and really get to know people I am doing business with. I have had people with sterling reputations who have been awful to do business with and some with colorful pasts who have been of the utmost integrity. If you are going to mention Cassidy, please let me know as I will defend him as he is one person who has proven himself to me from integrity perspective and that is why I recommended him for non fiduciary sales role at Agera.  In terms of our asset backed lending product, it's certainly not surprising that one can stitch together a "guilt by association" type of story as in the high interest world fraud is the number one risk and it attracts some unsavory characters. But on the whole, the overwhelming majority of people we have lent money to and transacted with have been people of integrity.

We are expecting some major news involving one of our portfolio companies over next couple of weeks and one that is major monetization event for us that should solve any lingering liquidity issues as well. It involves non material non public information so please treat the information sensitively. I will give you information as it becomes "hard" but I can tell you the company is Implant

Sciences where we have a hybrid debt/equity position. I will get you more info as it becomes available over next couple of days as well as give you some color as to the background of how we got involved but I am exhausted at the moment (hence probably giving you more info than I should across the board!!).

Some quotes I am comfortable with to go on record with are below:

"our core strategies have proven to have institutional appeal..that doesn't mean it's going to be attractive to everybody…. But we've always done well with institutional investors that go the extra step to really dig deep from a diligence perspective into how we invest . We are gratified that we have been able to reward them for that. "

"we are very aggressive to produce risk adjusted returns"

"It is definitely an attractive time to be deploying our strategy of utilizing  debt as an entry point to secure private equity upside in energy right now. "

**From:** Mark Nordlicht
**Sent:** Sunday, March 20, 2016 2:55 AM
**To:** 'Lawrence.Delevingne@thomsonreuters.com'
**Subject:** On BACKGROUND

On Background-
I am 47 (unless your article drags on to July which wd be fine with me)
I do drive myself back and forth from work other than the occasional UBER.
I live in Westchester.
I am proudly Jewish. We have broad investor base including some Jews and  many Gentiles.
Agera- Agera was set up to start a multi level marketing ESCO similar to Crius (formerly Viridian) which I had been a co founder and personal passive investor in. We normally wouldn't  start a  company from scratch as it doesn't match our risk mandate but the relatively small amount of capital necessary and the success of Crius whereby we merged Viridian with another company and took it public as Crius in Canada gave me the confidence to do so. When acquisitions opportunities arose outside of mlm, we shifted gears. We have already recouped all initial money paid for Glacial. Any value we have is in additional to the 53 million. Our cost basis is zero at this point. Agera has made additional accretive acquisitions. In terms of Glacial I don't recall exact amount of money lent but it was in the tens of millions. We recouped all our capital and reaped double digit interest rates. We did not profit from the equity kicker other than to be in advantageous position when the assets came up for bid in bankruptcy.
Cashcall, again I don't recall exact amount but it was in the tens of millions. I should point out by the way that Cashcall and Paul were previously financed by Morgan , Deutsche and Citi so notion that these loans were somehow predatory is a hard case to make. We don't anticipate any more lines at this time as traditional banks have reentered the space (capital one I think) and the risk adjusted opportunity is not as attractive. The investment has met or expectations as all our principal and interest was repaid.
Kuber- I would love to say we recouped substantial all capital on this one (as we did in Rothstein fraud)  but that's not the case. In our 13 + year history this is the one I would have most liked to have back. I feel our diligence was compromised by confidentiality related to Hipaa laws whereby we did not subject the receivables to same level of scrutiny of other transactions. We should have just walked away though. It's frustrating as we have avoided many other frauds over the years that have felled others- notably the Petters fraud which took down Gottex- given our rigorous legal and business due diligence procedures. Total losses were in 20-30 million range.
Black Elk
We took place of a fund that was winding down at the time and the initial terms was a 13 million dollar loan against production which was accompanied by a 50% equity stake. We later grew the line to 60 million and a 75% equity stake. We were repaid  the 60 million plus I believe around  20-40 million in dividends and were left with the equity stake in addition.
New Mountain reference is false. Whatever debt we had at that point we still had to pay back. Paying preferred had no effect on that.
PPBE had a wide range of investors. Average size was probably 2 million so may have been as much as 50 investors.
To my knowledge David Levy did not have any personal holding Of BEE Fund.
The vote really was never at issue. There was in fact a preferred investor who also held the bonds that didn't vote. It is more of a clerical issue of tracking down people to get their paperwork in. Whether or not Platinum votes counted (I think somewhat unclear), there was always going to be enough votes. Again, oil was 100, bond holders could have gotten paid out par plus accrued if they wanted to. The expectation was certainly that the money (other than 30 million approximately to pay down payables) was all going to pay back debt and preferred. What was surprising was how many bondholders stayed in which resulted in more pref getting paid out.

We are not going to comment on routine SEC exams (we have completed multiple ones over the years).
I will review below quotes and see if there's anything I feel comfortable going on record with. Get back to you tomorrow. Regards
**From:** Lawrence.Delevingne@thomsonreuters.com [mailto:Lawrence.Delevingne@thomsonreuters.com]
**Sent:** Sunday, March 20, 2016 1:52 AM
**To:** Mark Nordlicht
**Subject:** RE: Follow up questions/quotes

I haven't gotten anything back on this – please resend.

**From:** Mark Nordlicht [mailto:mnordlicht@platinumlp.com]
**Sent:** Saturday, March 19, 2016 7:51 PM
**To:** Delevingne, Lawrence (Reuters News)
**Subject:** RE: Follow up questions/quotes

I did answer a bunch of the below , didn't i? I can't find it for some reason. I believe I was up to Kuber? Do you have what I sent
you? regards

**From:** Mark Nordlicht
**Sent:** Tuesday, March 8, 2016 2:38 PM
**To:** 'Lawrence.Delevingne@thomsonreuters.com'
**Subject:** RE: Follow up questions/quotes

I missed it for some reason, will take a look.

**From:** Lawrence.Delevingne@thomsonreuters.com [mailto:Lawrence.Delevingne@thomsonreuters.com]
**Sent:** Tuesday, March 8, 2016 2:11 PM
**To:** Mark Nordlicht
**Subject:** Fwd: Follow up questions/quotes

I wanted to make sure you received this?


Begin forwarded message:

**From:** "Delevingne, Lawrence (Reuters News)" <Lawrence.Delevingne@thomsonreuters.com>
**Date:** March 1, 2016 at 5:23:38 PM EST
**To:** Mark Nordlicht <mnordlicht@platinumlp.com>
**Subject: Follow up questions/quotes**

Hi Mark,

I wanted to follow up on some points, including items in my fact-checking email that haven't been explicitly covered yet, and
quotes from our in-person conversation to potentially use on the record. If there's anything else in the fact-check email or
otherwise you take issue with, please let me know.

**Additional fact-checks/requests for comment:**

Personal background:
    --you are 48 years old
    --you live in New Rochelle with your wife and children. You drive yourself to work and back each day.
    --You have deep roots in the New York-area Jewish community, the source of some of PP's major investors.
On Agera/Glacial:
    --you said it is not correct that Agera was set up to buy assets of glacial – how did it work then?
    --PP paid $53 million for Glacial's assets out of bankruptcy and Agera Energy has since quintupled in value to about $275
    million.
    --For Glacial, when was the first Platinum investment in Glacial made? You had said 2010 before but wanted to make sure
    it wasn't earlier.
    --How much was lent to Glacial overall?

--PP's eventual equity stake was essentially a wash as it was acquired for free and didn't gain in value given the bankruptcy

On CashCall:

--How much was lent to Cashcall overall? Are there any more Cashcall funds planned?

--Has the investment met PP's financial expectations?

On Kuber:

--What was total amount invested by PP and what was the total amount recovered? If it's like Banyon, want to show assets all or substantially recovered

On Black Elk:

--How and when did $60M in loans turn into a controlling equity stake?

--Has PP put in any additional money or made any loans since? If so, how much?

--Is it fair to say the value of PP's stake in BEE increased from $60M to as much as $186M in mid 2014? Is that apples to apples? Want to show early success of investment.

--PP essentially controlled Black Elk in recent years and selected its management following John Hoffman's departure as CEO.

On BEE tender/consent solicitation offer in 2014:

--Didn't Platinum benefit from having Black Elk preferred equity holders getting paid because it didn't have to pay New Mountain?

--PPBE fund investors included the Huberfeld Family Foundation and Ace Foundation (Aaron Elbogen). Any others?

--Wasn't Platinum and its affiliate funds not allowed to vote its bonds on the consent solicitation and tender offer because it was the majority owner of BEE?

--Did David Levy have a personal holding in BEE bonds upon leaving for Beechwood, or just reestablished the position with Beechwood's money while an employee there? Both?

SEC exam:

--is there comment on the recent SEC examination of Platinum? Is it ongoing? I understand the difference between this more routine exam and an investigation from the Enforcement division.

**I would like to make the below quotes on the record from our in person conversation:**

--Re institutional investors:

"there's a lot of pressure to be more open to strategies that can deliver steady returns"

" "there are some institutional investors who never want to be in a headline, no matter what. They don't want to hear explanations, they don't want to hear stories"

"we are definitely not for everybody"

--Re strategy:

"we are very aggressive to produce risk adjusted returns"

"at the end of the day, we're gonna be aggressive. We have a fiduciary responsibility to preserve capital, to put up risk adjusted returns and to produce differentiated returns"

"we check everything thing out very, very carefully" from a legal perspective

--Re PPVA liquidity:

"is a challenge"

"I think we have taken corrective actions…we are tracking it much more carefully" re new PPVA liquidity terms (6 month notice period for redemptions), new share class with locked up capital.

"this definitely was a little bit of a storm but overall I do believe in the product" of PPVA mix of liquid/illiquid.

--Re energy PE positions become big in recent years before side-pocket:

"I definitely cheated..we've put in controls in place to really watch over me to make sure I don't cheat again and to make sure we are doing a better job of matching the liquidity terms versus what we are looking to do."

--Re energy asset-based lending opp:

"it's definitely an attractive time to be doing our strategy in energy right now" re assets at this price level – very attractive.

That's it for now.

Thanks,

Lawrence

Lawrence Delevingne
Reporter | Reuters
+1 646.223.5362 | @ldelevingne
lawrence.delevingne@tr.com

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 10

Alvarez & Marsal Valuation Services, LLC
600 Madison Avenue, 8th Floor
New York, NY 10022
Phone: +1 212 759 4433
Fax: +1 212 759 5532

June 9, 2016

**Private and Confidential**

Joseph SanFilippo
Chief Financial Officer
Platinum Partners, LP
250 West 55th Street, 14th Floor
New York, NY 10019

**RE: Valuation Advisory Services for Certain Investments Held by Funds Managed by Platinum Partners Value Arbitrage Fund, LP as of March 31, 2016**

Dear Mr. SanFilippo,

Per the engagement letter ("Engagement Letter") by and between Platinum Partners, LP, including its subsidiaries and affiliates and their respective successors and assigns (jointly and severally, "Platinum"), dated April 16, 2015, Alvarez & Marsal Valuation Services, LLC ("A&M") has been engaged by Platinum to provide valuation consulting services for certain investments (the "Investments") in portfolio companies (the "Portfolio Companies") held in Platinum Partners Value Arbitrage Master Fund, LP ("PPVA") as of March 31, 2016 (the "Valuation Date").

As defined in our Engagement Letter, our services included the execution of certain limited procedures (the "Limited Procedures") and the preparation of this letter report (the "Report"), which is intended to provide the management of Platinum ("Management") with information that A&M understands will be relied upon for financial reporting purposes only. Platinum understands that Management is solely and ultimately responsible for determining the Fair Value of its investments in good faith.

We relied, without further independent verification, on the accuracy and completeness of all publicly available information and information (including but not limited to the prospective financial information) that is furnished by or on behalf of Platinum and other sources reasonably deemed appropriate by A&M regarding each Portfolio Company or Investment. We are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein. We did not engage in any independent assessment of any prospective financial information.

Per our Engagement Letter, A&M assumes that all information provided (i) reflects accurately a description of the business and the nature of each underlying asset, the results of operations and financial condition, without additional verification and (ii) that all information made available to A&M was complete and correct in all material respects and did not contain any untrue statements of material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements were made.

Platinum has requested an estimated range of Fair Value for the following Investments in the following Portfolio Companies owned by PPVA, as of the Valuation Date:

> PPVA Oil & Gas (incl. NorthStar Offshore Group & Golden Gate Oil) – Senior secured promissory note / Preferred equity units/ Delayed draw term note / Second Priority Senior Secured Notes / Common equity
> Pedevco – Senior secured notes receivable / Subordinate notes receivable / Common equity / Senior and Junior warrants / Caspian Energy common equity & options
> China Horizon Holdings – Convertible note / Promissory notes / Demand promissory note / Series B&C preferred equity / Common equity
> Sky East International - Repurchase agreements
> Newrick Holdings – Repurchase agreement



Carbon offtake contracts
Urigen Pharmaceuticals – Convertible notes /  Preferred equity / Warrants
Viper High Performance – Notes receivable / Common equity
Viper Real Estate – Real property
AirDye / Saviva – Senior promissory note / Common equity
Echo Therapeutics – Secured convertible note / Promissory bridge note / Convertible preferred Series E&F equity / Common equity / Warrants
Navidea Biopharmaceuticals – Series A convertible preferred shares / Common shares / Equity swaps / Warrants
FluoroPharma Medical – Convertible preferred Series B / Common stock / Warrants
Vistagen Therapeutics – Series A, B & C convertible preferred stock / Common stock
Car Charging Group – Common equity
Infinity Augmented Reality – Preferred A&B / Common equity / Options
Implant Sciences – Senior secured promissory notes / Line of credit / First, Second and Third senior secured convertible promissory notes / Common shares
Zadara Storage – Series A preferred shares / Ordinary A-1 and A-2 shares
Liongold Corp – Common equity / Put option
Parot Tovot / Copper Rider – Loans (in Default)
Blumont – Notes receivable
Agera Energy – Membership interest
Over Everything – Notes receivable / Common Equity
Minque – Common equity
Desert Hawk Gold – Equity ownership

Platinum acknowledges that this Report and any advice (written or oral) provided by A&M to Platinum in connection with the Engagement Letter is intended solely for the benefit and use of Platinum in considering the matters to which the related Engagement Letter relates.  Platinum agrees that neither the Report nor any such advice shall be used for any other purpose or disclosed or made available to third parties (other than Platinum's auditor, administrator, tax and legal advisors) and other professional advisors, provided that any such other professional advisors first execute A&M's standard non-reliance letter, or otherwise reproduced, disseminated, quoted or referred to at any time in any manner without A&M's prior written approval, except as required by law or regulation of any relevant jurisdiction.  In addition, A&M will not provide consent to be a named expert in any filings, including, without limitation, any filings with the U.S. Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended.  The report is not being rendered by A&M as an agent or as a fiduciary of Platinum or any of its constituents and A&M shall not have any liability or obligation with respect to its services hereunder to such constituents or to any other person, firm or public or private entity.

Notwithstanding the foregoing, (i) Platinum shall not refer to A&M either directly by name or indirectly as an independent valuation service provider (or by any other indirect reference or description), or to the services, whether in any public filing or other document, without our prior written consent, which A&M may at its discretion grant, withhold, or grant subject to conditions; and (ii) in addition to the foregoing prohibitions and requirements with respect to all third parties, submission of A&M's Report or any portion thereof to, or responding to any comment letter issued by, the Securities and Exchange Commission or its staff, or any written or verbal references to A&M, A&M's Report or to the services in such a response is subject to Platinum providing A&M with prior written notice, and allowing A&M to provide input as to the content of such response.  In no event, regardless of whether consent or pre-approval has been provided, shall A&M assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

A&M's Report is as of the Valuation Date.  A&M cannot be held responsible for changes in the market conditions that could have a material impact on the values reported therein subsequent to the Valuation Date.  It is further stated that the terms of A&M's engagement do not provide for reporting on events and transactions which occurred subsequent to the Valuation Date.  Because A&M's services are limited in nature and scope, they cannot be relied upon to discover all documents and other information or provide all analyses that may be of importance in this matter.  For example, any procedures A&M performed



cannot be relied upon to give assurance that any defalcations or fraudulent transfers that might have taken place will be discovered.

Platinum understands that A&M is not undertaking to provide any legal, regulatory, accounting, insurance, tax or similar professional advice, and that A&M's Report will not be used for guidance in such matters.  It is also assumed that businesses or/or assets analyzed will not operate in violation of any applicable government regulations, codes, ordinances or statutes.  It is assumed that all necessary licenses and agreements remain in full force and effect in order to continue the operations of each company supporting the values of the Investments.

This engagement was conducted in accordance with our Engagement Letter and through discussions with Platinum.  The sufficiency of the Limited Procedures is solely the responsibility of those parties specified in this Report.  Consequently, A&M makes no representation regarding the sufficiency of the Limited Procedures either for the purposes for which this Report has been requested or for any other purpose.

**Summary of Conclusions**

Utilizing the approaches and procedures outlined in the following sections and in the attached Appendix, and under the guidelines of ASC 820, we estimate the Fair Value range of each of the Investments as of the Valuation Date to be as follows:

| Issuer | Investment | Concluded Fair Value Range (000s) |
|---|---|---|
| PPVA Oil & Gas / NorthStar Offshore Group/ Golden Gate Oil | Common equity | $202,500 - $243,100 |
| | Senior secured promissory note | $16,732 - $17,117 |
| | Preferred equity units | $60,831 |
| | Delayed Draw Term Loan / Second Priority Senior Secured Notes | $22,304 - $22,511 |
| Pedevco | Senior secured notes receivable / Subordinate notes receivable / Common equity / Senior and Junior Warrants / Caspian Energy common equity & options | $27,923 - $28,140 |
| China Horizon Holdings | Convertible note / Promissory notes / Demand promissory note / Series B&C preferred equity / Common equity | $51,675 - $81,152 |
| Sky East International - Repurchase Agreements | PT Eureka Prima Jakarta | $4,280 - $4,291 |
| | PT Sigmagold International Perkasa | $8,439 - $8,445 |
| | PT Polaris Investema | $7,526 - $7,593 |
| | Advance Energy - Repurchase agreement | $11,310 - $11,369 |
| Newrick Holdings | Repurchase agreement | $13,283 - $13,310 |
| Carbon offtake contracts | Carbon offtake contracts | $35,478 - $42,805 |
| Urigen Pharmaceuticals | Convertible notes / Preferred equity / Warrants | $75,450 - $91,182 |
| Viper High Performance | Notes receivable / Common equity | $878 - $1,228 |
| Viper Real Estate Inc. | Real property | $2,734 |
| Airdye / Saviva | Senior promissory note / Common equity | $24,491 - $27,227 |
| Echo Therapeutics | Secured Convertible Note / Promissory bridge note / Convertible preferred Series E&F equity / Common equity / Warrants | $6,150 - $6,920 |
| Navidea Biopharmaceuticals | Series A convertible preferred shares / Common shares / Equity swaps / Warrants | $30,300 - $31,600 |
| FluoroPharma Medical | Convertible preferred Series B / Common stock / Warrants | $3,436 - $3,457 |

ALVAREZ & MARSAL          3



| Issuer | Investment | Concluded Fair Value Range (000s) |
|---|---|---|
| Vistagen Therapeutics | Series A, B & C convertible preferred stock / Common stock | $39,600 - $43,000 |
| Car Charging Group, Inc. | Common equity | $2,700 |
| Infinity Augmented Reality | Preferred A&B / Common equity / Options | $4,639 - $5,345 |
| Implant Sciences | Senior secured promissory note / Line of credit / First, Second and Third senior secured convertible promissory notes / Common shares | $86,480 |
| Zadara Storage | Series A preferred shares / Ordinary A-1 & A-2 shares | $6,300 - $8,800 |
| Liongold | Common equity / Put option | $6,852 - $8,077 |
| Parot Tavot / Copper Rider | Loans (in Default) | $654 - $785 |
| Blumont Group | Notes receivable | $15,444 |
| Agera Energy | Membership interest | $117,800 - $148,100 |
| Over Everything | Notes receivable / Common equity | $19,110 - $27,380 |
| Minque | Common equity | $4,200 - $6,500 |
| Desert Hawk Gold | Equity ownership | $23,084 - $31,841 |

We appreciate the continued opportunity to work with you on this engagement.  Please contact me at (212) 763-1615 and mmcmahon@alvarezandmarsal.com, or Shankar Mulchandani at (212) 763-9759 and smulchandani@alvarezandmarsal.com if we can be of further assistance.

Yours sincerely,

*Alvarez & Marsal Valuation Services LLC*

Alvarez & Marsal Valuation Services, LLC
By:   Mark McMahon
        Managing Director

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**　　　　　　　　　　　　　　　　**Schedule 1**
Valuation of Equity Investments in Agera Energy LLC
Investment Overview and Summary of Valuation Methodology & Conclusions　　　　　　　　　　　**Valuation Date:  March 31, 2016**
US$ in 000s

## Agera Energy LLC

**Business Description & Investment Thesis**[1]

Agera Energy LLC ("Agera" or the "Company") is an energy company providing solutions for businesses and residents. The Company's solutions include natural gas and electricity supply, demand management, utility audits and small business funding. Agera is a licensed supplier in over 20 states and 50 different utilities.

Platinum owns 55.0% of Principal Growth Strategies ("PGS") which holds a convertible note issued by Agera Energy. The convertible note, issued in May 2014, can be converted into 95.0% of the outstanding securities of the Company at the sole discretion of PGS.  During the third quarter of 2015, Agera Energy repurchased the preferred units owned by Platinum.

| Summary of Investments Reviewed[1] | Percentage Owned | Terms |
|---|---|---|
| Membership Interest [2] | 52.25% | NA |

**Equity Value Summary**

| | Low | High |
|---|---|---|
| Enterprise Value | $ 251,000 | 309,000 |
| Add: Cash and Cash Equivalents | 11,083 | 11,083 |
| Less: Debt | 36,550 | 36,550 |
| Aggregate Equity Value | 225,533 | 283,533 |

Implied Enterprise Value Multiples

| | Low | High |
|---|---|---|
| 2016 EBITDA | 7.1 x | 8.8 x |

**Current Business Commentary** [1][3][4][5]

**Business**

New management has thus far successfully implemented many changes to the company and cost structure. The Company was able to stop the churning of customers and is now building the customer base which is greater than 200 thousand. The Company continues to eliminate legacy costs (i.e. bad debt) and to achieve regulatory approval in all operating states. In the first quarter of 2015, the Company announced the acquisition of Energy Me, an energy retailer supplying electricity to commercial and residential customers, for a purchase price of $5.5 million.

**Financials**

The Company had revenue of $352.5 million and EBITDA of $11.0 million in fiscal year 2013; however Agera Energy experienced customer churn as it went through the bankruptcy process in 2014. Management forecasted a recovery in EBITDA for 2015 to $13.4 million and expects significant growth in revenue and EBITDA in 2016 and 2017. Future growth will be driven primarily by expansion of the customer base and the acquisition of Energy Me, which is expected to add incremental revenue of approximately $104.0 million and incremental EBITDA of $4.1 million in 2015.

Based on December 31, 2015 financials, Agera achieved FY 2015 revenues of $301.4 million and EBITDA of $20.2 million. The EBITDA is signifantly higher than the projected FY 2015 EBITDA of $13.4. Management is projecting about 100% revenue growth and about 75% EBITDA growth in FY 2016.

**Valuation Methodology**

The enterprise value of the Company was estimated using the income approach and market approach. We performed a discounted cash flow analysis using the Company's forecasts to derive the future debt-free cash flows of the business. The cash flows were discounted to present value using a discount rate derived from the comparable publicly traded companies. We also considered the market approach, applying valuation multiples (one year forward revenue and EBITDA multiples) of comparable publicly-traded companies to the Company's projected financial parameters to estimated enterprise value.

Net debt was subtracted from enterprise value to derive the implied aggregate equity to which Platinum's 52.25% membership interest was applied, which reflects an effective controlling interest in the Company.

**Summary of Valuation Methodology**

| | Method A | %Wt. | Method B | %Wt. |
|---|---|---|---|---|
| 52.25% Membership Interest | Market Approach | 50.0% | Income Approach | 50.0% |

**Summary of Fair Value by Investment**

| | Low | High |
|---|---|---|
| 52.25% Membership Interest | $117,800 | $148,100 |

**Footnotes:**
(1) Source: Platinum Valuation Memo.
(2) PGS holds a convertible note in Agera Energy that can be converted at its sole discretion into 95.0% of the outstanding capital securities of the company. Platinum holds a 55.0% interest in PGS, resulting in an effective membership interest in the Company of 52.25%.
(3) Source: Agera Energy et al - proforma combined Nov. 2015 01.12.16.
(4) Source: Agera Business internal projections 1 27 2016
(5) Source: Agera Energy et al - proforma combined  Dec 2015 - 03 02 16

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**                    **Schedule 2**
Valuation of Equity Investments in Agera Energy LLC
Valuation Summary                                                        **Valuation Date: March 31, 2016**
US$ in 000s

|  | Weighting | Estimated Range of Enterprise Value | |
|---|---|---|---|
| **Market Approach:** | | | |
| Guideline Public Company Method - Control (1) | *50.0%* | $    255,000 | $    303,000 |
| | | | |
| **Income Approach:** | | | |
| Discounted Cash Flow Method - Control (2) | *50.0%* | $    246,000 | $    314,000 |
| | | | |
| **Indicated Enterprise Value Range - Rounded** | | $    251,000 | $    309,000 |
| Implied 2016 EBITDA Multiple (3) | | 7.1 x | 8.8 x |
| | | | |
| Add: Cash (4) | | 11,083 | 11,083 |
| Less: Debt (4) | | 36,550 | 36,550 |
| | | | |
| **Implied Aggregate Equity Value** | | $    225,533 | $    283,533 |
| | | | |
| | | | |
| **Common Equity Value** | | $    225,533 | $    283,533 |
| **PPVA 52.25% Membership Interest (rounded) (5)** | | **117,800** | **148,100** |

---

*Footnotes:*

(1) See Comparable Company Valuation Analysis, Schedule 3.

(2) See Business Enterprise Valuation: Income Approach - Discounted Debt-Free Cash Flow ("DCF") Method, Schedule 5.

(3) Projected 2016 EBITDA, per Company forecast.

(4) Cash and debt balances as of March 31, 2016 based on data provided by Management.

(5) A discount for illiquidity is not applied to Platinum's common equity value due to effective control of the Company.

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**    **Schedule 3**
**Valuation of Equity Investments in Agera Energy LLC**
**Comparable Company Valuation Analysis**    **Valuation Date:  March 31, 2016**
**US$ in 000s**

| Valuation Multiples | Weighting | Selected Multiple Range | | Agera Energy LLC Financial Statistic (1) | Enterprise Value Range (2) | | Less: Interest-Bearing Debt | Equity Value Range | |
|---|---|---|---|---|---|---|---|---|---|
| **1 Year Forward:** | | | | | | | | | |
| Enterprise Value / Revenue (3) | *33.3%* | 0.35 x | 0.45 x | $ 607,343 | $ 212,570 | $ 273,304 | $ 36,550 | $ 176,020 | $ 236,754 |
| Enterprise Value / EBITDA (3) | *66.7%* | 7.00 x | 8.00 x | 35,198 | 246,386 | 281,584 | 36,550 | 209,836 | 245,034 |
| **Weighted Indicated Fair Value Range - Minority, Marketable** | | | | | | | | **$ 198,564** | **$ 242,274** |
| Add: Control Premium (4) | | | | | | | *10.0%* | 19,856 | 24,227 |
| **Weighted Adjusted Fair Value of Equity - Control, Marketable Basis** | | | | | | | | **$ 218,420** | **$ 266,501** |
| Add: Interest-Bearing Debt | | | | | | | | 36,550 | 36,550 |
| **Weighted Adjusted Fair Value of Enterprise Value - Control (Rounded)** | | | | | | | | **$ 255,000** | **$ 303,000** |

*Footnotes:*
 *(1)* Projected financial parameters per Company forecast file.
 *(2)* Valuation Multiple x Financial Statistic.
 *(3)* Selected revenue and EBITDA multiple range based on the low indication from the comparable public companies.
 *(4)* As Platinum has effective control of the Company, a control premium is applied based on research and analysis by Alvarez & Marsal.

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**                                                    **Schedule 4**
**Valuation of Equity Investments in Agera Energy LLC**
**Comparable Company Multiples**                                                          **Valuation Date:  March 31, 2016**
**US$ in 000s, except per share**

| Company Name: | | | | | | | Just Energy Group Inc. | Superior Plus Corp. | Spark Energy, Inc. |
|---|---|---|---|---|---|---|---|---|---|
| Ticker Symbol: | | | | | | | TSX:JE | TSX:SPB | SPKE |
| Fiscal Year End (FYE): | | | | | | | Mar 31, '15 | Dec 31, '15 | Dec 31, '15 |
| Trailing Twelve Months (TTM): | High | 75th Percentile | 25th Percentile | Low | Mean | Median | Dec 31, '15 | Dec 31, '15 | Dec 31, '15 |
| **Valuation Multiples:** | | | | | | | | | |
| *Enterprise Value / Revenue* | | | | | | | | | |
| FYE+2 Consensus | 0.77 x | 0.66 x | 0.46 x | 0.39 x | 0.57 x | 0.54 x | 0.39 x | 0.54 x | 0.77 x |
| FYE+1 Consensus | 0.82 x | 0.70 x | 0.49 x | 0.40 x | 0.60 x | 0.58 x | 0.40 x | 0.58 x | 0.82 x |
| TTM | 0.90 x | 0.79 x | 0.55 x | 0.44 x | 0.67 x | 0.67 x | 0.44 x | 0.67 x | 0.90 x |
| **Enterprise Value / EBITDA** | | | | | | | | | |
| FYE+2 Consensus | 7.8 x | 7.2 x | 5.8 x | 5.1 x | 6.5 x | 6.5 x | 7.8 x | 5.1 x | 6.5 x |
| FYE+1 Consensus | 8.5 x | 7.8 x | 6.8 x | 6.5 x | 7.4 x | 7.1 x | 8.5 x | 6.5 x | 7.1 x |
| TTM | 9.3 x | 9.3 x | 8.9 x | 8.6 x | 9.0 x | 9.2 x | 9.2 x | 9.3 x | 8.6 x |

**Footnotes:**

(1)  Historical and forecast consensus financial statements for the selected guideline public companies provided by Capital IQ.

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**                                                    **Schedule 5**
Valuation of Equity Investments in Agera Energy LLC
Business Enterprise Valuation: Income Approach - Discounted Debt-Free Cash Flow ("DCF") Method         Valuation Date: March 31, 2016
US$ in 000s

|  | | Company Forecast (1) | | | Extended Forecast (2) | | | Terminal |
|---|---|---|---|---|---|---|---|---|
|  | | Dec 31, '16 | Dec 31, '17 | Dec 31, '18 | Dec 31, '19 | Dec 31, '20 | Dec 31, '21 | Terminal |
| **Net Revenue** | | $ 607,343 | $ 819,846 | $ 1,115,782 | $ 1,338,938 | $ 1,472,832 | $ 1,546,474 | $ 1,585,136 |
| *% Revenue Growth Rate* | | *100.5%* | *35.0%* | *36.1%* | *20.0%* | *10.0%* | *5.0%* | *2.5%* |
| Total Expenses | | 572,145 | 764,381 | 1,034,887 | 1,241,864 | 1,366,051 | 1,434,353 | 1,470,212 |
| **EBITDA** | | $ 35,198 | $ 55,465 | $ 80,895 | $ 97,074 | $ 106,781 | $ 112,120 | $ 114,923 |
| *EBITDA Margin* | | *5.8%* | *6.8%* | *7.3%* | *7.3%* | *7.3%* | *7.3%* | *7.3%* |
| Depreciation & Amortization | | 115 | 115 | 115 | 115 | 115 | 115 | 115 |
| **Earnings Before Interest & Taxes (EBIT)** | | $ 35,083 | $ 55,350 | $ 80,780 | $ 96,959 | $ 106,667 | $ 112,006 | $ 114,809 |
| *EBIT Margin* | | *5.8%* | *6.8%* | *7.2%* | *7.2%* | *7.2%* | *7.2%* | *7.2%* |
| Blended Income Taxes | | (12,279) | (19,373) | (28,273) | (33,936) | (37,333) | (39,202) | (40,183) |
| *Blended Income Tax Rate* | | *35.0%* | *35.0%* | *35.0%* | *35.0%* | *35.0%* | *35.0%* | *35.0%* |
| **Debt-Free Net Income** | | $ 22,804 | $ 35,978 | $ 52,507 | $ 63,024 | $ 69,333 | $ 72,804 | $ 74,626 |
| **Cash Flow Adjustments:** | | | | | | | | |
| Depreciation & Amortization | | 115 | 115 | 115 | 115 | 115 | 115 | 115 |
| Capital Expenditures | | (115) | (115) | (115) | (115) | (115) | (115) | (115) |
| Net Change in Non-Cash Working Capital | | (21,416) | (14,875) | (20,716) | (15,621) | (9,373) | (5,155) | (2,706) |
| **Debt-Free Cash Flow** | | $ 1,388 | $ 21,102 | $ 31,792 | $ 47,403 | $ 59,961 | $ 67,649 | $ 71,919 |
| Partial Period Factor | | 0.75 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Discount Period | | 0.38 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | |
| Present Value Factor | 20.0% | 0.9336 | 0.7957 | 0.6631 | 0.5526 | 0.4605 | 0.3837 | |
| **Present Value of Debt-Free Cash Flows** | | $ 976 | $ 16,791 | $ 21,081 | $ 26,193 | $ 27,611 | $ 25,959 | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Terminal Growth Rate | | *2.5%* |
| Sum of the Present Value of Discrete Year Cash Flows | 118,611 | | Residual Value at Terminal Year | $ | 410,968 |
| Present Value of Terminal Cash Flow | 157,701 | | Present Value Factor | | 0.3837 |
| **Indicated Enterprise Value from Operations (Rounded)** | **$ 276,000** | | **Present Value of Terminal Cash Flow** | **$** | **157,701** |

**Enterprise Value from Operations Sensitivity Test**

| Implied Enterprise Value from Operations Multiples: | | Growth | | WACC | |
|---|---|---|---|---|---|
| | | | 18.5% | 20.0% | 21.5% |
| FYE 2016 Revenue Multiple | 0.5 x | 2.0% | $ 303,000 | $ 272,000 | $ 246,000 |
| FYE 2016 EBITDA Multiple | 7.8 x | 2.5% | $ 308,000 | $ 276,000 | $ 250,000 |
| FYE 2017 Revenue Multiple | 0.3 x | 3.0% | $ 314,000 | $ 281,000 | $ 253,000 |
| FYE 2017 EBITDA Multiple | 5.0 x | | | | |

___

**Footnotes:**
(1) Projected revenue and cash flows per company guidance
(2) Company projections extended based on guidance from Platinum assuming EBITDA margin and working capital as a percent of revenue (7.3%) stabilize at 2018 levels.

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**                                                                    **Schedule 6**
Valuation of Equity Investments in Agera Energy LLC
Beta, Capital Asset Pricing Model ("CAPM") & Weighted Average Cost of Capital ("WACC") Analyses                     Valuation Date:  March 31, 2016
US$ in 000s, except per share amounts

| Selected Public Guideline Companies (1) | Total Debt | Total Preferred Equity | Month End Stock Price | Total Shares Outstanding | Market Value of Common Equity | Total Capital | Book Value of Debt to Equity | Book Value of Debt to Capital (Wd) | Effective Income Tax Rate | 5 Year Monthly Equity Raw Beta | 5 Year Monthly Asset Raw Beta (Ba) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Just Energy Group Inc. | $ 500,923 | $ - | $ 6.11 | 147,072 | $ 898,446 | $ 1,399,368 | 55.8% | 35.8% | 35.0% | 1.56 | 1.15 |
| Superior Plus Corp. | 612,045 | - | 6.99 | 141,093 | 985,999 | 1,598,044 | 62.1% | 38.3% | 2.9% | 1.15 | 0.72 |
| Spark Energy, Inc. | 48,737 | - | 17.81 | 14,869 | 264,810 | 313,547 | 18.4% | 15.5% | 35.0% | NA | NA |
| **High** | | | | | | | 62.1% | 38.3% | 35.0% | 1.56 | 1.15 |
| **Low** | | | | | | | 18.4% | 15.5% | 2.9% | 1.15 | 0.72 |
| **Mean** | | | | | | | 45.4% | 29.9% | 24.3% | 1.35 | 0.94 |
| **Median** | | | | | | | 55.8% | 35.8% | 35.0% | 1.35 | 0.94 |
| **Selected as Most Comparable to Subject Company** | | | | | | | 55.8% | 35.8% | 35.0% | | 0.94 |

| Cost of Equity Calculation: | | Source: |
|---|---|---|
| Risk-Free Rate (Rf) | 2.2% | Risk-free rate of return (20-year Treasury Bond yield) as of March 31, 2016 as published in Federal Reserve Statistical Release, H.15. |
| Plus Equity Premiums: | | |
| Equity Risk Premium (Rm-Rf) | 6.0% | The expected return of the market in excess of the risk-free rate (2) |
| Relevered Equity Beta (Be) | 1.27 | Be = Ba x [ 1 + (Wd / We) x ( 1 - T )] |
| Industry - Adjusted Equity Risk Premium | 7.6% | Be x (Rm - Rf) |
| Size Premium (SP) | 5.6% | 2016 Valuation Handbook - Cost of Capital, Wiley: 10th decile |
| Additional Risk Premium (ARP) | 13.0% | Additional risk premium based on risks to achieving forecasts. |
| **Cost of Equity (Re) Discount Rate (rounded)** | **28.5%** | Re = Rf + Be (Rm - Rf) + SP + ARP + CRP |

| Cost of Debt Calculation: | | |
|---|---|---|
| Pre-Tax Weighted Cost of Debt | 8.0% | Barclays Capital US Aggregate: High Yield Electric Utility Index yield as of March 31, 2016 |
| Estimated Tax Rate | 35.0% | Effective combined State and Federal income tax rate (Federal + [(1 - Federal) x State]) |
| **After-Tax Cost of Debt (Rd)** | **5.2%** | Rd = Rd x (1 - T) |

| Weighted Average Cost Of Capital Calculation: | | |
|---|---|---|
| Debt % of Capital | 35.8% | Wd |
| Cost of Debt | 5.2% | Rd |
| Weighted Cost of Debt | 1.9% | Wd x Rd |
| Equity % of Capital | 64.2% | We |
| Cost of Equity | 28.5% | Re |
| Weighted Cost of Equity | 18.3% | We x Re |
| **Weighted Average Cost of Capital (rounded)** | **20.0%** | |

**Footnotes:**
(1) Source: Capital IQ.
(2) The estimated Equity Risk Premium (ERP) of 6.0 percent is based on studies by NYU professor Aswath Damodaran, London Business School professors Elroy Dimson, Paul Marsh, and Mike Staunton, and the 2015 Valuation Handbook.

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 11

**To:**      mnordlicht@platinumlp.com[mnordlicht@platinumlp.com]
**Cc:**      dlevy@platinumlp.com[dlevy@platinumlp.com]
**From:**  mkatzmx@gmail.com
**Sent:**   Sun 3/13/2016 9:55:07 PM
**Subject:** Re: Agera

Of course. Had in mind the range you mentioned, which should be in line with an above industry average fw looking multiple.

On Mar 13, 2016, at 17:34, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:

> We can debate the merits of your analysis, i agree with the majority of it... But before we spend time on it, we need an insider buying at acceptable price.

Sent from my iPhone

On Mar 13, 2016, at 10:10 PM, Michael Katz <mkatzmx@gmail.com> wrote:

> Mark,
>
> After thinking about this for a few days I would like to share some thoughts on Agera and a potential sale to an insider. Believe this merits serious consideration now, some notes below on why.
>
> **Energy retail markets:**
>
> This is probably the best growth environment in over a decade because of the ample head room (spark spread) in many markets. It is a good reason to continue growing creating more value, however, this is exactly the type of thinking that got several retailers in deep trouble in the past. Probably before the end of the year utilities will finish re-setting prices eroding margins and triggering higher attrition rates. Before prices start increasing significantly there will be a "trough" of another re-set period with utilities which can take several quarters to correct, so topline revenue will not begin increasing until then. This period of time will be the least attractive for an exit (~2017) since top line will remain stagnant, margins will compress, growth will slow, and attrition will increase. We have seen this story before, it is rather predictable. For these reasons forward looking multiples are likely to be highest now.
>
> **Alternate exit strategies**
>
> _IPO_: Let's assume that yield does not go out of fashion and that an MLP-like exit in TMX is doable in the short to medium term even while other energy related mlps are being battered. The following factors should be considered,
>
> _Liquidity_: a much higher multiple IPO will not generate a full liquidity event, cash remaining

strapped for some time; cash that could be put into much higher multiple opportunities (see conclusions below) now.

*Management grooming*: We've discussed the need for a CEO. The market will see through a figurehead choice and to find a real guy who can successfully work with Kevin is going to take time (pp time), and be slow and painful to implement. A strategic sale now will bypass this problem, freeing up future bandwidth. It will also free up Kevin to take on other projects

*Strategic buyer*: In the next 24-36 months the following challenges will exist with any other credible potential buyer:

1. *Strategic buyers are wiser than in times past*: Unlike the potential insider, major sophisticated buyers have stopped trading books on RCEs but now look for and value acquisitions on the actual profitability of the book and assign much less weight to cosmetic MWh volume throughput. Gone are the days where sticky RCEs with any margin could trade at a multiple of top line revenue. Assuming that size and valuation will be linear is no longer a true. As mentioned above forward looking ebitda numbers are likely to be best now

2. *Challenging capital markets*: from the roughly 12 or so players who may be interested in the book many are battling management shakeups (NRG), bloated debt (cetrica), and past M&A activity that they are still trying to digest (Exelon). In the medium term I can't see the capital markets be kind to the sector, especially with issuance of new debt under reasonable terms or major cash acquisitions. Not saying it will not be possible but believe we will be facing headwinds as opposed to today's tailwinds.

The bottom line is that even if you don't agree with any or much of the above, surely you can agree that even in the best case scenario the amount of money potentially left on the table with a sale of Agera today (let's say 2-3X more than the current valuation) is significantly lower than any potential upside in heavily re-investing the proceeds from the sale of Agera into the Oil&Gas sector (+5-10x). This sector represents the greatest opportunity in a generation, a smart play can return the entire fund(s) several times over. Having insider knowledge and expertise in the oil & gas sector increases the handicap for success.

To summarize, a sale today to the strategic would:

- Bypass market headwinds that are around the corner

- Have a clean and full liquidity event now, bypassing complexities of a future exit with either an IPO, or with an unhealthy sector that will struggle to purchase an asset of that size

- Capitalize on an insider's willingness to purchase now

- Solve together with the sale of Implants our liquidity problem

- Create an amazing marketing story now that can help us push (alongside the reforms we've discussed) in building the AUM asp

- Free up cash to re-invest in the oil & gas sector which is a much higher multiple potential upside opportunity today than the energy retail sector

Perhaps the above merits some hard-data quantitative analysis?

Thoughts?

--
Michael

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 12

**To:** mkatzmx@gmail.com[mkatzmx@gmail.com]
**From:** Mark Nordlicht
**Sent:** Sun 3/27/2016 11:03:52 AM
**Subject:** Re: Trip

Not sure on victor yet, waiting to hear his schedule. Dont want to appear too desperate and with new plan im really not. I have additinal 13.5 follow on coming in this week/ early next as well. The 10 is kickstarting everything though, cd reslly use it asap. Thought it was coming last monday already.
Our focus now is going to be to get the right deal on agera. I guess best is you do paperwork with your grandfather in new york in person. I didnt think it was that complicated, thk God we really got everything we needed from murray and david. David and bernie meeting was added bonus, hopefully we get to see him before he leaves but it's really  just feel good thing anyhow. At this point i got to like the idea of two days with david anyhow just to really focus on action points on all the positions .

Sent from my iPhone

> On Mar 27, 2016, at 1:28 PM, Michael Katz <mkatzmx@gmail.com> wrote:

>

> Departure time seems to be a moving target, Europe stop may not happen.  I'd like to come and participate in the meetings, also very excited and have much to discuss, but finishing paperwork is the priority. I'm waiting to hear back on his firm plans in a couple of hours so can plan accordingly. Agree that setting up a war chest trumps other considerations and there seem to be other potential sources of optionality in the book to offset any loss in upside. A plan to clean up the balance sheet is also a priority; weighing the benefits of more high cost debt vs the added burden should be carefully considered. I'm excited to lead the effort on organization, there is much to do. We can discuss work on several fronts, org, hr, rebranding, and pr. A few immediate improvements should make big differences though we should prioritize and make sure whatever we do is foundational as opposed to cosmetic and will take root in the organization. You still plan on meeting Victor this week?

>

>> On Mar 27, 2016, at 05:23, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:

>>

>> He is not leaving until Monday 12 the earliest, leaving house 10:30 is plan currently (acc to yehudah who is there on inside). I think he is stopping in Europe too. I think David and Bernie shd come as I need to discuss entire plan with them which includes potentially selling agera besides implant and setting up debt facility besides  so we have war chest. In this scenario we would really clean everything up, I am very excited. I think I wd then steer Victor to helping us launch ppco 2 and use his infusion for that which will have added benefit of knocking him down on mgmt. percentage ask for me. In short, if they take afternoon flight, we can have feel good meeting at 9 am before your grandfather leaves and I can meet for two intense days with Bernie and David. You either come or wait for your grandfather in NY  but then we cd have meeting next week or week after in NY all of us regardless which will really be forward looking on execution of rebranding/marketing plan, shoring up operations etc. I will be laser like focused on the investment side (which we shd discuss as well, need to set up recruiting plan there that will add diversification and strength to team)  on rebuilding team I want and adding a few pieces to really set us up to power ahead as well. But I need to nail down what we do now. I was reluctant on agera at first but I have idea how to replace that upside in the fund and the liquidity is just too transformative for us to ignore. I also recognize your point on the right time in "cycle" to exit and it appear we might get satisfactory type of bid from a beechwood led consortium.  I am really looking at you as major asset in acting in principal capacity to get us really organized on all fronts to succeed (I think that is area of strength for you)  as that is area that frankly both David and I are weak at and are too busy needing to focus on bringing home existing investments.

>>

>> -----Original Message-----
>> From: Michael Katz [mailto:mkatzmx@gmail.com]
>> Sent: Sunday, March 27, 2016 12:02 PM
>> To: Mark Nordlicht
>> Subject: Re: Trip

>>

>> Just spoke to him. as it happens, the pilots were there when I called. He is coming to ny.

>>

>>> On Mar 26, 2016, at 20:36, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:

>>>

>>> Ok. Obviously i defer to u on this one. Just my two cents but i am worried about him flying all over the place. Even on a private plane, it takes a lot out of you. I was actually relieved when he didnt go to dubai. My father is 7 years younger but i am insisting they stay every place at least a month when they fly and preferably more. But im sure he is stubborn and wont listen to you unfortunately!!!

>>>

>>> Sent from my iPhone

>>>

>>>> On Mar 27, 2016, at 3:31 AM, Michael Katz <mkatzmx@gmail.com> wrote:

>>>>

>>>> Let's postpone 12h as there's a chance he will leave and need David here if he does. If he doesn't, would like to go there, conclude paperwork and we can all meet.

>>>>

>>>>> On Mar 26, 2016, at 20:25, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:

>>>>>

>>>>> David told me. Ok. Its 3:30 am here ... Its really also for me to meet with david and bernie ... And was hoping for you as well. Dahlia not letting me leave for two weeks ( dont ask), have some important  decisions to make, want to really get moving forward.
>>>>> Sent from my iPhone
>>>>>
>>>>>> On Mar 27, 2016, at 3:18 AM, Michael Katz <mkatzmx@gmail.com> wrote:
>>>>>>
>>>>>> He's coming to NY, message from Liliana, so he asked me not to go tonight. I'll speak to him in a few hours.
>>>>>>
>>>>>>> On Mar 26, 2016, at 12:48, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>>>>>>>
>>>>>>> All we really need is Sunday and it'll give us all chance to work
>>>>>>> together. Regards
>>>>>>>
>>>>>>> Sent from my iPad
>>>>>>>
>>>>>>>> On Mar 26, 2016, at 1:59 AM, Michael Katz <mkatzmx@gmail.com> wrote:
>>>>>>>>
>>>>>>>> Good call on Implats today!
>>>>>>>> As I told David and Bernie, nice gesture but may be off on timing. I'd like to get this signed first, and he may leave for Switzerland on Monday. Anyway we can work from there, much to do.
>>>>>>>
>>>>>>>
>>>>>>>
>>>>>>>
>>>>>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND
>>>>>>> MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY
>>>>>>> UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS
>>>>>>> PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND
DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.
>>>>>
>>>>>
>>>>>
>>>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY
>>>>> CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED
>>>>> REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE
>>>>> NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF
THE ORIGINAL E-MAIL.
>>>
>>>
>>>
>>>
>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY
>>> CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED
>>> REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT
>>> THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE
ORIGINAL E-MAIL.
>>
>>
>>
>>
>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
>> CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
>> OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
>> CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 13

**To:**        mnordlicht@platinumlp.com[mnordlicht@platinumlp.com]
**From:**    aron.turen@gmail.com
**Sent:**     Wed 5/11/2016 12:31:13 AM
**Subject:**  Re: Esco

Hmmm.
Any others for sale?
Please let me know if it falls through.. Hopefully it won't

On May 10, 2016 8:30 PM, "Mark Nordlicht" <mnordlicht@platinumlp.com> wrote:

    Under contract

Sent from my iPhone

On May 11, 2016, at 3:29 AM, Aron Turen <aron.turen@gmail.com> wrote:



        Hi,
Is agera for sale?


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 14

**From:**     Wegner, Brian <bwegner@fuzionanalytics.com>
**Sent:**     Friday, July 29, 2016 4:43 PM
**To:**       Serio, Gregory <gserio@parkstrategies.com>
**Cc:**       John Morrison <JMMMontana@msn.com>; Julie Bowler <JBowler@atlanticcharter.com>; Hampton, Thomas E. (thomas.hampton@dentons.com); Bykerk,Cecil <oakoffice1@cox.net>; Lorentz, Paul <plorentz@fuzionanalytics.com>
**Subject:**  Re: Platinum Partners

I agree, Platinum is a mess.

Sent from my iPhone

On Jul 29, 2016, at 12:39 PM, Greg Serio <gserio@parkstrategies.com> wrote:

> Notwithstanding the guaranteed returns and fixed rate, I would suggest, and the new investment committee will commence, a deeper dive into Beechwood's position, its contingency plans, etc. I would want Beechwood to present to the committee its plans for protecting SHIP, it's backups, etc.
>
> The Platinum situation is a real mess, and goes far beyond the current issues regarding the pension scandal. Does Madoff come to mind? Yup.
>
> Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
> **From:** Wegner, Brian
> **Sent:** Friday, July 29, 2016 12:13 PM
> **To:** John Morrison
> **Cc:** Bowler, Julianne; Hampton, Thomas E. (thomas.hampton@dentons.com); Greg Serio; Bykerk,Cecil; Lorentz, Paul
> **Subject:** Re: Platinum Partners

Regardless, our agreement with Beechwood includes guaranteed return of principal and a fixed 5.85% return, so SHIP is secure.

Sent from my iPhone

On Jul 29, 2016, at 12:06 PM, john morrison <JMMMontana@msn.com> wrote:

>> If I read this correctly, $18 million of SHIP money will remain in the Platinum hedge fund that is under investigation for fraud?
>>
>> John Morrison
>> Morrison Sherwood Wilson Deola
>> 401 N. Last Chance Gulch
>> Helena, MT 59601
>> 406.442.3261 (o)
>>
>>
>> On Jul 29, 2016, at 9:18 AM, Julie Bowler <JBowler@atlanticcharter.com> wrote:
>>
>>> Brian
>>> Thanks for the update and for the diligent oversight of these investments.  It is good that Beechwood is holding us harmless in this - a tribute to the positive working

relationship you have cultivated with them.

Julie

Sent from my iPhone

On Jul 29, 2016, at 11:14 AM, Wegner, Brian <bwegner@fuzionanalytics.com>
wrote:

> Good morning,
>
> You may have seen information this week about issues at Platinum Partners,
> a hedge fund in which Beechwood has investments. I'm forwarding this to
> you as an assurance that we are on top of the issue, and there are no impacts
> on SHIP per the note below. Eide Bailly inquired about this matter to us
> yesterday, and you will see our response and their reaction below. Please let
> me know if you have any questions or wish to discuss.
>
> Thanks,
>
> Brian
>
> *Brian C. Wegner*
> *President and CEO, Fuzion and Senior Health Insurance Company of*
> *Pennsylvania*
>
> bwegner@fuzionanalytics.com
> (317) 566-7501
>
> <image002.png>
>
> **From:** Joe Pope [mailto:JPope@eidebailly.com]
> **Sent:** Thursday, July 28, 2016 5:02 PM
> **To:** Lorentz, Paul
> **Cc:** Zaichek, Janna; Wegner, Brian
> **Subject:** RE: Platinum Partners
>
> Paul,
>
> Thank you for the information. Good to hear that SHIP/Fuzion has been on top
> of this and Beechwood has been responsive.
>
> Hope all is well with everyone at Fuzion,
>
> ## Joe Pope, CPA
> Partner
> Minneapolis, MN
>
> T  612.253.6575
>
> www.eidebailly.com
>
> Experience the Eide Bailly Difference
>
> **From:** Lorentz, Paul [mailto:plorentz@fuzionanalytics.com]
> **Sent:** Thursday, July 28, 2016 2:40 PM
> **To:** Joe Pope <JPope@eidebailly.com>
> **Cc:** Zaichek, Janna <jzaichek@fuzionanalytics.com>; Wegner, Brian

<bwegner@fuzionanalytics.com>
**Subject:** RE: Platinum Partners

Joe, your inquiry is timely.  Please see Brian's communication on this below.  I think this does a good job of explaining how our exposure is being addressed, but if you have any further questions, just let us know.

The article below is from SNL which discusses increased oversight by CNO of Beechwood.  The issue stems from a separate Tuesday WSJ article (on page 1) that revealed a federal probe into improper practices by Platinum of its hedge fund.  Beechwood has a stake in that fund, and it includes about $53 million of SHIP funds.

I spent significant time with Mark Feuer on Tuesday morning discussing this issue.  Mark assured us that their collateral on these investments is solid, regardless of the issues at Platinum.  Further, Mark and Scott will be moving all of SHIP's money out of the Platinum investments and replacing it, much with their own personal funds, until such time that they are able to dispose of them.  Of the $53 million, they anticipate moving $20 million by early next week, an additional $15 million within another week, and the remainder when the Agera Energy transaction closes within 2-3 months.

While the issues from Platinum are concerning, I think we should again recognize the great partnership we have with Beechwood, and the fact that simply upon our request, they are taking action with their own personal money to solve our concerns.

Thanks,

Brian

# CNO Financial strengthens oversight of reinsurance deal with Beechwood Re

Email  Print  Feedback + -
Thursday, July 28, 2016 1:45 AM ET

By  Jocelyn Grace Perdigon

CNO Financial Group Inc. executives have expressed concern about the reported ties between Beechwood Re and troubled hedge fund Platinum Partners.

In 2014, Beechwood entered into a reinsurance transaction agreement with CNO Financial subsidiaries, under which the subsidiaries ceded $550 million of statutory reserves and about $40 million of other capital associated with closed blocks of long-term care insurance underwritten by Bankers Conseco Life Insurance Co. and Washington National Insurance Co.

Platinum Partners is currently under investigation for alleged fraud and is now liquidating, *The Wall Street Journal* reported, citing "people familiar with the probe." Beechwood had previously agreed to certain transactions to acquire a portion of Platinum Partners' investment portfolio. However, the deals were later restructured as the investments came under pressure resulting in Platinum's about $70 million in debt to Beechwood, according to the report.

During CNO Financial's July 27 earnings call, CFO Erik Helding said

that in recent weeks the company has increased the level of review and oversight related to its relationship with Beechwood, according to a transcript. CNO Financial closely monitors compliance under the reinsurance agreement and as of June 30, Beechwood appears to be in compliance with the agreements, Helding added. The assets, which are held in a trust, are overcollateralized by 7% and are subject to certain "rigorous" guidelines, Helding further said.

**From:** Joe Pope [mailto:JPope@eidebailly.com]
**Sent:** Thursday, July 28, 2016 3:06 PM
**To:** plorentz_SHIPLTC; Zaichek, Janna
**Subject:** Platinum Partners

I have seen a few unfavorable articles about Platinum Partners in the news this past week. Has Beechwood mentioned anything to you at all?

## Joe Pope, CPA
Partner
Eide Bailly LLP
U.S. Bancorp Center
800 Nicollet Mall, Ste. 1300
Minneapolis, MN 55402-7033

**T** 612.253.6575
www.eidebailly.com

**Experience the Eide Bailly Difference**

Confidentiality Note: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain information that is confidential, privileged, or otherwise protected by law. Any unauthorized use, disclosure, or distribution of this communication is strictly prohibited. If you have received this communication in error, please contact the sender immediately by reply email and destroy the original and all copies of the email, including any attachment(s).

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 15

## SUBSCRIPTION AGREEMENT

This SUBSCRIPTION AGREEMENT (this "Agreement"), is dated as of June 9, 2016, by and between AGH Parent LLC, a Delaware limited liability company (the "Company"), and Beechwood Re Investments LLC, a Delaware limited liability company ("Subscriber"). All capitalized terms used but not defined herein shall have the meaning set forth in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of the date of this Agreement (the "LLC Agreement").

## RECITALS

WHEREAS, subject to the terms and conditions set forth in this Agreement, Subscriber desires to purchase from the Company, and the Company desires to issue and sell to Subscriber, 5,730 Units of the Company (the "Purchased Units"), for an aggregate purchase price of $100.00 (the "Purchase Price"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Subscriber shall execute and deliver a counterpart to the LLC Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and Subscriber agree as follows:

1.  Purchase and Sale of Units.  Subscriber agrees to purchase and the Company agrees to issue and sell to Subscriber, the Purchased Units in exchange for the Purchase Price by wire transfer of immediately available funds.

2.  Representations and Warranties of Subscriber.  In connection with the issuance, purchase and sale of the Purchased Units hereunder, Subscriber represents and warrants to the Company that:

(a)  Organization and Standing.  Subscriber is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)  Authority for Agreement.  Subscriber has all necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated by this Agreement. The execution, delivery and performance by Subscriber of this Agreement, and the consummation by Subscriber of the transactions contemplated by this Agreement, have been duly authorized by all necessary actions on the part of Subscriber and no other proceedings on the part of Subscriber are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement with respect to Subscriber. This Agreement has been duly executed and delivered by Subscriber and, assuming the due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of Subscriber enforceable against Subscriber in accordance with its terms subject, as to enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium or similar Applicable Laws affecting the rights and remedies of creditors generally and to the effect of general principles of equity.

(c)  No Conflict.  Neither execution and delivery of this Agreement by Subscriber, nor the performance of this Agreement by Subscriber and the consummation of the

transactions contemplated by this Agreement, shall, except as could not reasonably be expected to have a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement: (i) conflict with or violate Subscriber's governing documents, (ii) conflict with, or violate any law or judgment, in each case, applicable to Subscriber, or (iii) result in a breach of or constitute a default (or an event which with notice or lapse of time or both would become such a default) under, give to others any right of termination, amendment, acceleration or cancellation of, result in the triggering of any payment or other obligation or any right of consent under, or result in the creation of a lien pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Subscriber is a party or by which Subscriber is bound.

(d)     <u>Required Filings and Consents</u>.  Neither the execution and delivery of this Agreement by Subscriber, nor the performance of this Agreement by Subscriber and the consummation of the transactions contemplated by this Agreement, shall require any Governmental Authorization, except for any Government Authorizations the failure of which to obtain could not reasonably be expected to have a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement.

(e)     <u>Brokers</u>.  No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Subscriber for which Subscriber could have any liabilities or obligations of any nature whatsoever.

(f)     <u>Litigation</u>.  There is no Litigation pending or threatened against Subscriber that has had a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement.

(g)     <u>Investment Representations and Warranties</u>.

(i)     Subscriber has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Units and Subscriber possesses adequate financial resources and is able to bear the economic risk of the investment in the Purchased Units for an indefinite period of time because the Purchased Units are subject to the transfer restrictions contained in the LLC Agreement and have not been registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") or the securities laws of any state or other jurisdiction;

(ii)     Subscriber understands and agrees further that, subject to the limited rights set forth in this Agreement, (i) the Purchased Units issued to Subscriber must be held indefinitely unless such Purchased Units are subsequently registered under the Securities Act or other applicable securities laws or an exemption from registration under the Securities Act and Applicable Laws covering the sale of such Purchased Units is available; (ii) the Company has no obligation or present intention to register the Purchased Units under the Securities Act; (iii) even if such an exemption is available, the assignability and transferability of the Purchased Units will be governed by this Agreement and the LLC Agreement, which impose restrictions on transfer; and, (iv) if such Purchased Units are certificated, legends stating that such Purchased Units have not been registered under the Securities Act and such Applicable Laws and setting

out or referring to the restrictions on the transferability and resale of the Purchased Units will be placed on all certificates evidencing such Purchased Units;

(iii)   Subscriber has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Purchased Units and has had full access to such other information concerning the Company as Subscriber has requested. Subscriber has reviewed, or has had an opportunity to review, a copy of the LLC Agreement;

(iv)   Subscriber is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act, and has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Units and the Company, and the Subscriber is capable of bearing the economic risks of such investment and is able to bear the complete loss of its investment in the Purchased Units and the Company;

(v)   The Purchased Units to be acquired by Subscriber pursuant to this Agreement are being acquired for Subscriber's own account and not with a view to any distribution thereof or with any present intention of offering or selling any of the Purchased Units in a transaction that would violate the Securities Act or the Applicable Laws of any state of the United States of America or any other applicable jurisdiction; and

(vi)   Subscriber acknowledges that the Company will rely upon the accuracy and truth of the foregoing representations in this Section 2 and hereby consents to such reliance.

3.   Representations and Warranties of Company.   In connection with the issuance, purchase and sale of the Purchased Units hereunder, the Company represents and warrants to Subscriber that:

(a)   Organization and Standing. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)   Authority for Agreement.   The Company has all necessary power and authority, as the case may be, to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance by the Company of this Agreement, and the consummation by the Company of the transactions contemplated by this Agreement, have been duly authorized by all necessary actions on the part of the Company and no other proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement with respect to the Company.  This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by Subscriber, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms subject, as to enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium or similar Applicable Laws affecting the rights and remedies of creditors generally and to the effect of general principles of equity.

(c)     No Conflict.  Neither execution and delivery of this Agreement by the Company, nor the performance of this Agreement by the Company and the consummation of the transactions contemplated by this Agreement, shall: (i) conflict with or violate the Company's governing documents, (ii) conflict with, or violate any Applicable Law, in each case, applicable to the Company, or (iii) result in a breach of or constitute a default (or an event which with notice or lapse of time or both would become such a default) under, give to others any right of termination, amendment, acceleration or cancellation of, result in the triggering of any payment or other obligation or any right of consent under, or result in the creation of a lien pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Company is a party or by which the Company is bound.

(d)     Required Filings and Consents.  Neither the execution and delivery of this Agreement by the Company shall, nor shall the performance of this Agreement by the Company and the consummation of the transactions contemplated by this Agreement, require any Governmental Authorization.

(e)     Issuance of Purchased Units.  The Purchased Units purchased hereunder are duly authorized, validly issued and nonassessable and are being delivered to Subscriber free and clear of all liens (other than as set forth in the Company's governing documents or arising under applicable securities laws).

(f)     Disclaimer.  Notwithstanding anything contained in this Agreement to the contrary, Subscriber acknowledges and agrees that neither the Company nor any of its affiliates, directors, officers, employees, shareholders, partners, members or other representatives, has made or will make any representations or warranties whatsoever, express or implied, beyond those expressly given by the Company in this Section 3.  Without limiting the generality of the foregoing, Subscriber acknowledges that no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospective information that may have been or will be made available to such Subscriber or any of its representatives.  Subscriber further acknowledges that neither the Company nor any of its affiliates, directors, officers, employees, shareholders, partners, members or other representatives, shall have or be subject to any liabilities or obligations of any nature whatsoever to Subscriber or any other Person resulting from the issuance of the Purchased Units to Subscriber or any other investor, or Subscriber's use of or reliance on, any information regarding the Company furnished or made available to Subscriber and its representatives in connection with the transactions contemplated hereby, except as expressly set forth in this Agreement and applicable securities laws.

4.     Other Agreements.

(a)     Subscriber acknowledges that the transfer of the Purchased Units is subject to the provisions of the Securities Act, applicable state securities laws.

(b)     The Purchased Units shall be subject to the provisions contained in the LLC Agreement.

5.     Further Assurances.  From time to time following the date hereof, the parties hereto shall execute and deliver such other instruments and shall take such other actions as any

other party hereto may reasonably request in order to consummate, complete and carry out the transactions contemplated by this Agreement.

6.   <u>Notices</u>.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, sent by facsimile if confirmation is available or by electronic mail (including in portable document format (.pdf)) or sent by reputable overnight courier service (charges prepaid) to the recipient at the address indicated in the Company's records.  Any notice under this Agreement will be deemed to have been given when so delivered or sent.

7.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective with respect to Subscriber when one or more counterparts have been signed by the Company and Subscriber and delivered to such other party (including by facsimile or other electronic image scan transmission).

8.   <u>Entire Agreement; Third Party Beneficiaries</u>.  This Agreement (a) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and (b) is not intended to and does not confer upon any Person other than the parties hereto any legal or equitable rights or remedies.

9.   <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors, heirs and permitted assigns.  No party may assign this Agreement without the prior written consent of the Company.

10.  <u>Governing Law; Waiver of Jury Trial</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.  The parties hereto hereby waive, to the fullest extent permitted by Applicable Law, any right to trial by jury with respect to any action or proceeding arising out of or relating to this Agreement.  Each party hereto hereby waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any suit, action or other proceeding arising out of this Agreement or the transactions contemplated hereby.  Each party hereto certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any action, suit or proceeding, seek to enforce the foregoing waiver.

11.  <u>Specific Performance</u>.  The parties to this Agreement acknowledge and agree that each would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, the parties hereto agree that each party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties to this Agreement and the matter, in addition to any other remedy to which they may be entitled, at law or in equity.

12. <u>Amendments and Waivers</u>.   Any provision of this Agreement may be amended or waived only with the prior written consent of each of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Subscription Agreement on the date first written above.

BEECHWOOD RE INVESTMENTS LLC

By: _____
Name: Samuel Adler
Title:   Authorized Signatory

AGH PARENT LLC

By: _____
Name:  Dhruv Narain
Title:   Authorized Signatory

## SUBSCRIPTION AGREEMENT

This SUBSCRIPTION AGREEMENT (this "Agreement"), is dated as of June 9, 2016, by and between AGH Parent LLC, a Delaware limited liability company (the "Company"), and Senior Health Insurance Company of Pennsylvania, a Pennsylvania stock company ("Subscriber").  All capitalized terms used but not defined herein shall have the meaning set forth in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of the date of this Agreement (the "LLC Agreement").

## RECITALS

WHEREAS, subject to the terms and conditions set forth in this Agreement, Subscriber desires to purchase from the Company, and the Company desires to issue and sell to Subscriber, 350,000 Class A Preferred Units of the Company (the "Purchased Units"), for an aggregate purchase price of $35,000,000.00 (the "Purchase Price"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, Subscriber shall execute and deliver a counterpart to the LLC Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and Subscriber agree as follows:

1.  Purchase and Sale of Units.  Subscriber agrees to purchase and the Company agrees to issue and sell to Subscriber, the Purchased Units in exchange for the Purchase Price by wire transfer of immediately available funds.

2.  Representations and Warranties of Subscriber.  In connection with the issuance, purchase and sale of the Purchased Units hereunder, Subscriber represents and warrants to the Company that:

(a)  Organization and Standing.  Subscriber is a Pennsylvania stock company duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.

(b)  Authority for Agreement.  Subscriber has all necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance by Subscriber of this Agreement, and the consummation by Subscriber of the transactions contemplated by this Agreement, have been duly authorized by all necessary actions on the part of Subscriber and no other proceedings on the part of Subscriber are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement with respect to Subscriber.  This Agreement has been duly executed and delivered by Subscriber and, assuming the due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of Subscriber enforceable against Subscriber in accordance with its terms subject, as to enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium or similar Applicable Laws affecting the rights and remedies of creditors generally and to the effect of general principles of equity.

(c)      No Conflict.   Neither execution and delivery of this Agreement by Subscriber, nor the performance of this Agreement by Subscriber and the consummation of the transactions contemplated by this Agreement, shall, except as could not reasonably be expected to have a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement: (i) conflict with or violate Subscriber's governing documents, (ii) conflict with, or violate any law or judgment, in each case, applicable to Subscriber, or (iii) result in a breach of or constitute a default (or an event which with notice or lapse of time or both would become such a default) under, give to others any right of termination, amendment, acceleration or cancellation of, result in the triggering of any payment or other obligation or any right of consent under, or result in the creation of a lien pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Subscriber is a party or by which Subscriber is bound.

(d)      Required Filings and Consents.   Neither the execution and delivery of this Agreement by Subscriber, nor the performance of this Agreement by Subscriber and the consummation of the transactions contemplated by this Agreement, shall require any Governmental Authorization, except for any Government Authorizations the failure of which to obtain could not reasonably be expected to have a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement.

(e)      Brokers.   No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with this Agreement or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Subscriber for which Subscriber could have any liabilities or obligations of any nature whatsoever.

(f)      Litigation.   There is no Litigation pending or threatened against Subscriber that has had a material adverse effect on Subscriber's ability to consummate the transactions contemplated by this Agreement.

(g)      Investment Representations and Warranties.

(i)      Subscriber has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Units and Subscriber possesses adequate financial resources and is able to bear the economic risk of the investment in the Purchased Units for an indefinite period of time because the Purchased Units are subject to the transfer restrictions contained in the LLC Agreement and have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any state or other jurisdiction;

(ii)      Subscriber understands and agrees further that, subject to the limited rights set forth in this Agreement, (i) the Purchased Units issued to Subscriber must be held indefinitely unless such Purchased Units are subsequently registered under the Securities Act or other applicable securities laws or an exemption from registration under the Securities Act and Applicable Laws covering the sale of such Purchased Units is available; (ii) the Company has no obligation or present intention to register the Purchased Units under the Securities Act; (iii) even if such an exemption is available, the assignability and transferability of the Purchased Units will be governed by this Agreement and the LLC Agreement, which impose restrictions on

transfer; and, (iv) if such Purchased Units are certificated, legends stating that such Purchased Units have not been registered under the Securities Act and such Applicable Laws and setting out or referring to the restrictions on the transferability and resale of the Purchased Units will be placed on all certificates evidencing such Purchased Units;

(iii)      Subscriber has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Purchased Units and has had full access to such other information concerning the Company as Subscriber has requested. Subscriber has reviewed, or has had an opportunity to review, a copy of the LLC Agreement;

(iv)      Subscriber is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act, and has such knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Units and the Company, and the Subscriber is capable of bearing the economic risks of such investment and is able to bear the complete loss of its investment in the Purchased Units and the Company;

(v)      The Purchased Units to be acquired by Subscriber pursuant to this Agreement are being acquired for Subscriber's own account and not with a view to any distribution thereof or with any present intention of offering or selling any of the Purchased Units in a transaction that would violate the Securities Act or the Applicable Laws of any state of the United States of America or any other applicable jurisdiction; and

(vi)      Subscriber acknowledges that the Company will rely upon the accuracy and truth of the foregoing representations in this <u>Section 2</u> and hereby consents to such reliance.

3.      <u>Representations and Warranties of Company</u>.   In connection with the issuance, purchase and sale of the Purchased Units hereunder, the Company represents and warrants to Subscriber that:

(a)      <u>Organization and Standing</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)      <u>Authority for Agreement</u>.   The Company has all necessary power and authority, as the case may be, to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance by the Company of this Agreement, and the consummation by the Company of the transactions contemplated by this Agreement, have been duly authorized by all necessary actions on the part of the Company and no other proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement with respect to the Company.  This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by Subscriber, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms subject, as to enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium or similar Applicable Laws affecting the rights and remedies of creditors generally and to the effect of general principles of equity.

(c)      No Conflict.   Neither execution and delivery of this Agreement by the Company, nor the performance of this Agreement by the Company and the consummation of the transactions contemplated by this Agreement, shall: (i) conflict with or violate the Company's governing documents, (ii) conflict with, or violate any Applicable Law, in each case, applicable to the Company, or (iii) result in a breach of or constitute a default (or an event which with notice or lapse of time or both would become such a default) under, give to others any right of termination, amendment, acceleration or cancellation of, result in the triggering of any payment or other obligation or any right of consent under, or result in the creation of a lien pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Company is a party or by which the Company is bound.

(d)      Required Filings and Consents.   Neither the execution and delivery of this Agreement by the Company shall, nor shall the performance of this Agreement by the Company and the consummation of the transactions contemplated by this Agreement, require any Governmental Authorization.

(e)      Issuance of Purchased Units.   The Purchased Units purchased hereunder are duly authorized, validly issued and nonassessable and are being delivered to Subscriber free and clear of all liens (other than as set forth in the Company's governing documents or arising under applicable securities laws).

(f)      Disclaimer.   Notwithstanding anything contained in this Agreement to the contrary, Subscriber acknowledges and agrees that neither the Company nor any of its affiliates, directors, officers, employees, shareholders, partners, members or other representatives, has made or will make any representations or warranties whatsoever, express or implied, beyond those expressly given by the Company in this Section 3.   Without limiting the generality of the foregoing, Subscriber acknowledges that no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospective information that may have been or will be made available to such Subscriber or any of its representatives.   Subscriber further acknowledges that neither the Company nor any of its affiliates, directors, officers, employees, shareholders, partners, members or other representatives, shall have or be subject to any liabilities or obligations of any nature whatsoever to Subscriber or any other Person resulting from the issuance of the Purchased Units to Subscriber or any other investor, or Subscriber's use of or reliance on, any information regarding the Company furnished or made available to Subscriber and its representatives in connection with the transactions contemplated hereby, except as expressly set forth in this Agreement and applicable securities laws.

4.   Other Agreements.

(a)      Subscriber acknowledges that the transfer of the Purchased Units is subject to the provisions of the Securities Act, applicable state securities laws.

(b)      The Purchased Units shall be subject to the provisions contained in the LLC Agreement.

5.   Further Assurances.   From time to time following the date hereof, the parties hereto shall execute and deliver such other instruments and shall take such other actions as any

other party hereto may reasonably request in order to consummate, complete and carry out the transactions contemplated by this Agreement.

6.   Notices.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, sent by facsimile if confirmation is available or by electronic mail (including in portable document format (.pdf)) or sent by reputable overnight courier service (charges prepaid) to the recipient at the address indicated in the Company's records.  Any notice under this Agreement will be deemed to have been given when so delivered or sent.

7.   Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective with respect to Subscriber when one or more counterparts have been signed by the Company and Subscriber and delivered to such other party (including by facsimile or other electronic image scan transmission).

8.   Entire Agreement; Third Party Beneficiaries.  This Agreement (a) constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and (b) is not intended to and does not confer upon any Person other than the parties hereto any legal or equitable rights or remedies.

9.   Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors, heirs and permitted assigns.  No party may assign this Agreement without the prior written consent of the Company.

10.  Governing Law; Waiver of Jury Trial.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.  The parties hereto hereby waive, to the fullest extent permitted by Applicable Law, any right to trial by jury with respect to any action or proceeding arising out of or relating to this Agreement.  Each party hereto hereby waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any suit, action or other proceeding arising out of this Agreement or the transactions contemplated hereby.  Each party hereto certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any action, suit or proceeding, seek to enforce the foregoing waiver.

11.  Specific Performance.  The parties to this Agreement acknowledge and agree that each would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, the parties hereto agree that each party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties to this Agreement and the matter, in addition to any other remedy to which they may be entitled, at law or in equity.

12. <u>Amendments and Waivers</u>.   Any provision of this Agreement may be amended or waived only with the prior written consent of each of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Subscription Agreement on the date first written above.

SENIOR HEALTH INSURANCE COMPANY
OF PENNSYLVANIA

By: _____

Name: BRIAN C. WEGNER

Title: PRESIDENT & CEO

AGH PARENT LLC

By:_____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Subscription Agreement on the date first written above.

SENIOR HEALTH INSURANCE COMPANY
OF PENNSYLVANIA


By: _____
Name:
Title:




AGH PARENT LLC


By: _____
Name: Dhruv Narain
Title: Authorized Signatory

[*Signature Page to SHIP Subscription Agreement*]

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 16

## ASSIGNMENT OF SECURED CONVERTIBLE PROMISSORY NOTE

THIS ASSIGNMENT OF SECURED CONVERTIBLE PROMISSORY NOTE (this "**Assignment**"), dated as of June 9, 2016 (the "**Effective Date**"), is entered into by and among (i) BBIL ULICO 2014 ("**ULICO**"); (ii) Beechwood Bermuda Investment Holdings Ltd. linked to its segregated accounts ("**BBIHL**"); (iii) Beechwood Bermuda International Limited ("**BBIL**"); (iv) BBLN-Agera Corp, a Delaware corporation ("**BBLN-Agera**" and, together with ULICO, BBIHL and BBIL, the "**Assignors**" and each, an "**Assignor**"); and (v) Principal Growth Strategies LLC, a Delaware limited liability company ("**Assignee**").

WHEREAS, the Assignors are the owner of all right, title, and interest in and to that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014 (as the same has been amended, restated, supplemented or otherwise modified from time to time, the "**Note**") in the original principal amount of $600,071.23 and issued by Agera Energy LLC (the "**Company**"), as agreed to and accepted via amendment by Agera Holdings, LLC ("**Holdings**");

WHEREAS, the Note is subject to and governed by that certain Note Purchase Agreement, dated as of May 16, 2014 (as the same has been amended, restated, supplemented or otherwise modified from time to time, the "**Note Purchase Agreement**"), between the Company and Assignor;

WHEREAS, the Assignors desire to sell, assign, and transfer all of its right, title, and interest in and to the Note to Assignee, and Assignee desires to assume and accept the same, subject in all respects to the terms of the Note and the Note Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    As of the Effective Date, each Assignor hereby sells, assigns, and transfers unto Assignee, and Assignee hereby assumes and accepts from each Assignor, the Note. Following the Effective Date, each Assignor agrees that it shall have no right, title, or interest in or to the Company (including, without limitation, in or to any interests pursuant to the Note Purchase Agreement or the Note).

2.    By execution of this Assignment, Assignee hereby joins the Note Purchase Agreement and agrees that the Note is bound by and subject to in all respects all of the covenants, promises, agreements, and undertakings contained in the Note Purchase Agreement and the Note. Assignee hereby makes, as of the Effective Date, all of the representations and warranties made by the Assignors in the Note Purchase Agreement as if Assignee were the Purchaser (as defined in the Note Purchase Agreement) making such representations and warranties for the benefit of the Company. Without limiting the foregoing, Assignee hereby represents and warrants that it is an "accredited investor," as defined in Rule 501(a) promulgated under the Securities Act of 1933.

3.    It is understood that no consent is required from any other party to the Note Purchase Agreement, except for Company and the Assignors, in order for the transfer to become effective as of the date of execution of this agreement.

4.    The Assignors and Assignee agree to deliver to the Company an executed copy of this Assignment and either the originally executed Note or a lost note affidavit reasonably acceptable to the Company in exchange for a Convertible Promissory Note in form identical to the Note in favor of Assignee.

5.      This Assignment shall be governed by, construed and enforced in accordance with, the laws of the State of New York, without regard to the conflicts of law provisions of the State of New York or any other state.  This Assignment may be executed in counterparts, each of which will be deemed an original, and both of which together will constitute one and the same agreement.  For purposes of this Assignment, an electronic copy of a party's signature printed by a receiving printer shall be deemed an original signature. This Assignment shall be binding upon and shall inure to the benefit of each of the parties hereto and to their respective successors and permitted assigns.  The Company shall be deemed a third-party beneficiary of this Assignment.  This Assignment may not be modified or amended except by written agreement of the Assignors, Assignee, and the Company.

*[Signature follows on next page]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment effective as of the Effective Date.

**ASSIGNORS:**

**BBIL ULICO 2014**

Wilmington Trust, National Association not in its individual capacity but solely as Trustee

By:

Name:
Title:   David B. Young
          Vice President

**BEECHWOOD BERMUDA INVESTMENT HOLDINGS LTD.,** linked to its segregated accounts,
By: B Asset Manager II, LP, its investment manager

By:

Name: Mark Feuer
Title:  Authorized Signatory

**BEECHWOOD BERMUDA INTERNATIONAL LIMITED,**
By: B Asset Manager II, LP, its investment manager

By:

Name:  Mark Feuer
TITLE: Authorized Signatory

**BBLN-AGERA CORP.**

By:

Name: Dhruv Narain
Title:  Chairman, President and
         Secretary

*[Signature page to Assignment of Amended and Restated Secured Convertible Promissory Note]*

**ASSIGNEE:**

**PRINCIPAL GROWTH STRATEGIES LLC**

By: _____
    Name: Daniel Steinberg
    Title: Authorized Signatory

*[Signature page to Assignment of Amended and Restated Secured Convertible Promissory Note]*

## ACKNOWLEDGED AND AGREED

Reference is made to the foregoing Assignment. Each of the Company and Holdings hereby acknowledges receipt and acceptance of the foregoing Assignment. Upon receipt by the Company of an executed copy of the Assignment and either the originally executed Note or a lost note affidavit reasonably acceptable to the Company, the Company shall destroy such Note and issue to Assignee a Convertible Promissory Note in form identical to the Note in favor of Assignee, and Holdings shall acknowledge and accept same..

**AGERA ENERGY LLC**

By: _____
Name: Steven E Laker
Title: CEO

**AGERA HOLDINGS, LLC**

By: _____
Name: Steven E laker
Title: Vice President

*[Signature page to Assignment of Amended and Restated Secured Convertible Promissory Note]*

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 17

EXECUTION VERSION

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "**Agreement**") is dated as of June 9, 2016, by and between AGH Parent LLC, a Delaware limited liability company (the "**Buyer**"), and Principal Growth Strategies LLC, a Delaware limited liability company (the "**Seller**").

WHEREAS, the Seller has agreed to sell, and the Buyer has agreed to purchase, that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended as of the date of this Agreement by that certain amendment dated as of the date of this Agreement (the "**Closing Note Amendment**"), in the principal amount of $600,071.23 (Six Hundred Thousand Seventy-One Dollars and Twenty Three Cents), executed by Agera Energy LLC ("**Agera Energy**"), as acknowledged by Agera Holdings LLC ("**Holdings**" and together with Agera Energy and each Subsidiary of Holdings and Agera Energy, collectively, the "**Company Parties**"), payable to the order of the Seller as specified therein (as so amended as aforesaid, the "**Note**"), and all rights, titles and interests of the Seller existing and to exist in connection with or as security for the payment of the indebtedness evidenced by the Note, including, without limitation, all rights, titles and interests arising under or evidenced by (a) the Note; (b) that certain Secured Note Purchase  Agreement, dated as of May 16, 2014, by and between Agera Energy and the Seller (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of this Agreement (the "**Closing Note Purchase Agreement Amendment**"), the "**Purchase Agreement**"); and (c) that certain Security Agreement, dated as of May 16, 2014 by Agera Energy for the benefit of the Seller (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of this Agreement (the "**Closing Security Agreement Amendment**"), (the "**Security Agreement**" and, together with the Note, the Purchase Agreement and all other documents, instruments, amendments and agreements entered into in connection with the transactions contemplated thereby, collectively, the "**Loan Documents**"); and

WHEREAS, all capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Section 8.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **PURCHASE AND SALE.**

1.1      **Purchase of Loan Documents.**  Subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller hereby sells, transfers, assigns and delivers to the Buyer, and the Buyer hereby purchases and accepts from the Seller, all of the Seller's right, title and interest in, to and under the Loan Documents, free and clear of any Lien (other than Permitted Liens).

1.2      **Excluded Assets and Liabilities.**   For the avoidance of doubt, the sale, assignment, transfer and conveyance of the Loan Documents hereunder does not include the sale, assignment, transfer, conveyance or assumption of any assets, Liabilities or obligations of the Seller of any nature whatsoever other than the Loan Documents.

2.      **CLOSING**

2.1      Time and Place.  The consummation of the sale by the Seller to the Buyer of the Loan Documents (the "**Closing**") will take place on the date of this Agreement at the offices of Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060, or remotely via the exchange of

2

documents and signature pages (consistent with <u>Section 9.3</u>).  The Closing will be on the date of this Agreement, which is sometimes referred to herein as the "**Closing Date**," and the Closing shall be effective as of 11:59 p.m. on the Closing Date.

2.2     <u>Seller Deliveries at Closing</u>.  At the Closing, in addition to any other instruments or documents referred to herein, the Seller shall execute and deliver to the Buyer such bills of sale, certificates of title and other instruments of assignment or transfer with respect to the Loan Documents as the Buyer may reasonably request and as may be necessary to vest in the Buyer good and marketable title to all of the Loan Documents, free and clear of any Lien (other than Permitted Liens), including:

(a)     an Assignment of Secured Convertible Promissory Note in the form of <u>Exhibit A</u> (the "**Assignment**");

(b)     an Amendment to that certain Master Service Agreement by and among Agera Management Corp., Agera Energy LLC, Aequitas Energy Inc., and energy.me llc d/b/a energy.me in the form of <u>Exhibit B</u> (the "**MSA Amendment**");

(c)     Amendment to Employment Agreement of Kevin Cassidy, dated June 9, 2016;

(d)     Amendment to Employment Agreement of Michael Nordlicht, dated June 9, 2016;

(e)     Amendment to Employment Agreement of Steven Laker, dated June 9, 2016;

(f)     Independent Contractor/Contractor Agreement between Agera Energy LLC & Starfish Capital, Inc., dated June 9, 2016;

(g)     Profits Interest Award Agreement Non-Solicitation and Non-Compete Agreement between Kevin Cassidy and Agera Parent LLC, dated as of June 9, 2016;

(h)     the Closing Note Amendment;

(i)     the Closing Note Purchase Agreement Amendment;

(j)     the Closing Security Agreement Amendment;

(k)     the Buyer LLC Agreement;

(l)     IRS Form W-9 claiming a complete exemption from back-up withholding, and a properly prepared and executed certificate of non-foreign status under Treas. Reg. §1.1445-2(b)(2); each in form reasonably satisfactory to Buyer;

(m)     <u>Secretary's Certificate</u>.  The Seller shall have delivered to the Buyer a Secretary's certificate, dated as of the Closing Date and signed by its Secretary or Assistant Secretary, certifying as to its incumbent officers, Charter Documents and resolutions of the managers/members of the Seller approving the Transactions;

(n)     <u>Good Standing Certificates</u>.  The Seller shall have delivered to the Buyer a Certificate of Good Standing of the Seller and each of the Company Parties issued by the Secretaries of State of the respective jurisdictions of organizations of each such entity, dated within five (5) Business Days of the Closing Date; and

2.3    Buyer Deliveries at Closing. At the Closing, the Buyer shall execute and deliver to Seller:

(a)    the Assignment; and

(b)    the Buyer LLC Agreement.

2.4    Payment of Purchase Price.  The aggregate consideration to be paid at the Closing for the purchase and sale of all of the Seller's right, title and interest in, to and under the Loan Documents, will be $170,000,000.00 (the "**Purchase Price**") to be paid as follows:

(a)    The Buyer will pay the following amounts in cash by wire transfer, an amount equal to $65,293,540.00 (Sixty-Five Million Two Hundred Ninety Three Thousand Five Hundred Forty Dollars) to the Seller (with an amount of $25,000,000.00 (Twenty-Five Million Dollars) to be paid to at the direction of the Seller to certain payees); and

(b)    The Buyer will assign the debt and equity instruments listed on Schedule 1 to the Seller with a value of $43,666,460.00 (Forty-Three Million Six Hundred Sixty-Six Thousand Four Hundred Sixty Dollars);

(c)    The Buyer will issue to the Seller 3,438 Class B-2 Units with an original value equal to $2,000,000.00 (Two Million Dollars); and

(d)    The Buyer will issue to the Seller 590,400 Class C Units with an original value equal to $59,040,000.00 (Fifty-Nine Million Forty Thousand Dollars).

2.5    Withholding.  Notwithstanding anything in this Agreement to the contrary, the Buyer and the Seller shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under the Code, or any other provision of Tax Law.  To the extent that amounts are so withheld or deducted by the Buyer or the Seller, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made by the Buyer or the Seller, as the case may be.  To the extent that amounts required to be withheld or deducted from payment by the Buyer to or for the account of any Person, were not so withheld or deducted by the Buyer or Holdings, such Person shall indemnify and hold harmless the Buyer and Holdings from such amount so required to be withheld (including any interest and penalties thereon, and, in the case of a payment deemed to be compensation subject to withholding, the employer's portion of any Taxes associated with such payment).

3.    **REPRESENTATIONS AND WARRANTIES OF THE SELLER REGARDING THE COMPANY PARTIES**

The Seller represents and warrants to the Buyer as follows:

3.1    Organization; Capitalization; Ownership.

(a)    Organization.  Each Company Party is duly formed, validly existing and in good standing under the laws of the state in which each such Company Party was formed or incorporated and has all requisite limited liability company power and authority and all necessary government approvals to own, lease and operate its properties and to carry on the Business as now being conducted by the Company Parties and as currently proposed to be conducted by the Company Parties.

Each Company Party is duly qualified or licensed, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of the Business makes such qualification or licensing necessary, except where the failure to so qualify has not had or could not reasonably be expected to have a Material Adverse Effect.  All jurisdictions in which the Company Parties are qualified to do business are set forth in <u>Section 3.1</u> of the Disclosure Schedules.

   (b) <u>Capitalization</u>.  <u>Section 3.1(b)</u> of the Disclosure Schedules sets forth (i) the total number of authorized units or other equity interests of such Company Party, (ii) the number of such units or other equity interests issued and outstanding, and (iii) the record and beneficial owner of all the issued and outstanding units or other equity interests of each Company Party.  All of the outstanding units or other equity interests of the Company Parties are duly authorized, validly issued and fully paid.

   (c) <u>Ownership</u>.  Except as set forth in <u>Section 3.1(c)</u> of the Disclosure Schedules, (i) there are no outstanding securities convertible into or exchangeable for units or other equity interests in the Company Parties, (ii) there are no outstanding or authorized options, preferred units, restricted units, warrants, calls, rights (preemptive or otherwise), subscriptions, rights of first refusal or first offer, or other rights of any character obligating any Company Party to issue, transfer or sell or cause to be issued, transferred or sold any units or other equity interests, (iii) no units or other equity interests of the Company Parties are reserved for issuance, (iv) there are no Contracts affecting or relating to the voting, issuance, purchase, redemption, registration, repurchase or transfer of any units or other equity interests of the Company Parties, or securities or obligations of any kind convertible into any units of or other equity interests of the Company Parties, and (v) none of the outstanding units or other equity interests of the Company Parties were issued in violation of any federal or state securities laws or other applicable law.

   (d) <u>Other Equity Interests, etc</u>. The Company Parties do not own, directly or indirectly, any shares of capital stock or other equity interest (or any other interest convertible into, or exchangeable for, an equity interest) in any Person and has not made any loans or advances to any Person.

   (e) <u>Conversion Interests</u>.  The Note is convertible into 95.01% of the outstanding equity interests of Holdings.  Except as set forth in <u>Section 3.1(e)</u> of the Disclosure Schedules, no consent, approval, exemption or authorization of, or registration, qualification or filing with, any Person, including any Governmental Authority, is required for the conversion by the Buyer of the Note (the "<u>Conversion</u>").

   3.2 <u>Charter Documents</u>.  The Seller has delivered to the Buyer a true and correct copy of each Company Party's Charter Documents.  None of the Company Parties is in default under or in violation of any provision of its Charter Documents.

   3.3 <u>No Conflicts; Required Filings and Consents</u>.  Except as set forth in <u>Section 3.3</u> of the Disclosure Schedules, the consummation of the Transactions and any Conversion will not conflict with, or result in any material violation of, or material default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien (other than Permitted Liens) on, any of the Loan Documents, Material Contracts, assets or rights of the Company under (i) any provision of any of the Company Parties' Charter Documents, (ii) any Material Contract to which any Company Party is a party, (iii) any Permit, judgment, order or decree applicable to any Company Party, or any of their respective properties or assets, or (iv) any Law applicable to any Company Party or any of their respective properties or assets.

   3.4 <u>Financial Statements</u>.  <u>Section 3.4</u> of the Disclosure Schedules includes a true, correct and complete copy of the Company Parties' consolidated (a) audited financial statements

consisting of the consolidated balance sheet of the Company Parties as at December 31, 2015 and the related statements of consolidated operations and cash flows for the year then ended including the related notes (the "Annual Financial Statements"), and (b) unaudited financial statements of the Company Parties consisting of the consolidated balance sheet of the Company Parties as at March 31, 2016 and the related consolidated statements of income for the three months then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements").  The Financial Statements have been prepared in accordance with GAAP, are true, correct and complete in all material respects, and fairly present and describe the consolidated  financial condition and operating results of the Company Parties as of the dates, and for the periods, indicated therein.  The consolidated  balance sheet of the Company Parties as of December 31, 2015 is referred to herein as the "12/31/15 Balance Sheet" and the date thereof as the "Balance Sheet Date."

       3.5     Absence of Undisclosed Liabilities.  Since the Balance Sheet Date none of the Company Parties has any Liabilities that are of the type that would be set forth on a balance sheet of such Company Party that has been prepared in accordance with the methodologies used to prepare the 12/31/15 Balance Sheet, other than (a) those which are adequately reflected or reserved against in the 12/31/15 Balance Sheet, (b) those which have been incurred in the Ordinary Course of Business since the Balance Sheet Date, (c) those incurred in connection with the execution and delivery of this Agreement, or (d) Liabilities disclosed in Section 3.5 of the Disclosure Schedules.

       3.6     Absence of Certain Changes.  Except as set forth in Section 3.6 of the Disclosure Schedules, since the Balance Sheet Date, the Company Parties have carried on the Business only in the Ordinary Course of Business, and, without limiting the generality of the foregoing, there has not been:

       (a)     any change in the assets, Liabilities, sales, income or business of the Company Parties in their relationships with suppliers, customers or lessors, other than changes which were both in the Ordinary Course of Business and have not been, either in any case or in the aggregate, materially adverse to the Business;

       (b)     any acquisition, disposition, lease, assignment or other transfer by the Company Parties (including transfers to or from the equity holders of the Company Parties) of any material asset or material property (including the Company Parties' Intellectual Property) other than in the Ordinary Course of Business;

       (c)     any Material Adverse Effect or any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting, either in any case or in the aggregate, the property of the Company Parties or the Business;

       (d)     any declaration, setting aside or payment of any dividend or any other distributions (whether in cash or in kind) with respect to the Company Parties' equity interests;

       (e)     any issuance of any notes, bonds or other debt securities, any equity securities or any securities convertible or exercisable into, directly or indirectly, any of the equity securities of the Company Parties, or any direct or indirect redemption, purchase or other acquisition of any equity securities of the Company Parties;

       (f)     any increase in the compensation, pension or other benefits payable or to become payable by any Company Party to any of their respective directors, managers, officers, employees, sales representatives or consultants, or any bonus payments or arrangements made by any such Company Party to or with any of them (other than pursuant to the terms of any existing written agreement or plan of which the Buyer has been supplied complete and correct copies, and other than

normal merit increases to employees made in the Ordinary Course of Business), granted or promised any increase in any employee benefit plan or arrangement, amended or terminated any existing employee benefit plan or arrangement (other than an amendment required by Law), or adopted any new employee benefit plan or arrangement;

       (g)     any forgiveness or cancellation of any material Debt or material claim by any Company Party or any waiver of any right of material value other than compromises of accounts receivable in the Ordinary Course of Business;

       (h)     any capital expenditures in the aggregate in excess of $100,000;

       (i)     any change or authorization of any change in any Company Party's Charter Documents;

       (j)     any entry by the Company Parties into any Material Contract or amendment or termination of the applicable Company Party's rights thereunder, or any transaction other than in the Ordinary Course of Business;

       (k)     any acquisition of any other business or Person (or any significant portion or division thereof), whether by merger, consolidation or reorganization or by purchase of its assets or stock, or any acquisition of any other material assets;

       (l)     any Lien (other than Permitted Liens) on any of the assets, tangible or intangible, of the Company Parties;

       (m)     any material change in the Company Parties' business practices, including, without limitation, any change in accounting methods or practices or collection, credit, pricing or payment policies of the Company Parties;

       (n)     any loan or advance to, or guarantees for the benefit of, any Persons (other than advances to employees for travel and business expenses incurred in the Ordinary Course of Business that do not exceed $50,000 in the aggregate);

       (o)     any discharge or satisfaction by the Company Parties of any Lien, or payment by the Company Parties of any material Liability (fixed or contingent) other than (A) current Liabilities included in the 12/31/15 Balance Sheet, and (B) current Liabilities incurred since the Balance Sheet Date in the Ordinary Course of Business; or

       (p)     any commitment or agreement, in writing or otherwise, to any of the foregoing, except as expressly contemplated by this Agreement.

       3.7    <u>Litigation</u>.  Except as disclosed in <u>Section 3.7</u> of the Disclosure Schedules, there is no private or governmental Action pending before any Governmental Authority, or, to the Seller's Knowledge, threatened, against or affecting the Company Parties, or any of the Company Parties' properties or assets or officers, managers, directors or employees (in their capacities as such).  There is no judgment, decree or order against the Company Parties or, to the Seller's Knowledge, any of the Company Parties' managers, directors, officers or employees (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the Transactions.

       3.8       <u>Licenses and Permits; Regulation</u>.

(a)       The Company Parties are in possession of, and have made proper and timely application for renewal for, as applicable, all licenses, permits, approvals, consents, registrations, authorizations, easements, variances, and exceptions, necessary for the Company Parties to own, lease and operate their properties or to carry on the Business as it is now being conducted by the Company Parties or currently planned to be conducted by the Company Parties (collectively, the "<u>Authorizations</u>"), a list of which has been set forth by the Seller in <u>Section 3.8(a)</u> of the Disclosure Schedules, and no suspension or cancellation of any Authorization is pending or, to the Seller's Knowledge, threatened.  No Company Party is in conflict with, or in material default or material violation of, any Authorization.

(b)       The Company Parties have not operated the Business prior to receiving any required Authorizations from any applicable Governmental Authority.  All such Authorizations are in full force and effect on the date of this Agreement.  The Seller and the Company Parties have identified and made available for examination by the Buyer all information relating to regulation of the Business, including the Company Parties' Authorizations.  All regulatory information and documents are kept by the Company Parties at the principal place of business at 555 Pleasantville Rd. S-107, Briarcliff Manor, NY 10510.

       3.9       <u>Title to Property; Use of Assets</u>.

(a)       <u>Section 3.9(a)</u> of the Disclosure Schedules sets forth a true, correct and complete list of the Leased Real Property leased by the Company Parties, the name of the lessor, the date of the lease and each amendment thereto (collectively, the "<u>Leases</u>").  The Company Parties have delivered or made available to the Buyer true, correct and complete copies of each Lease.  The Company Parties have valid leasehold or sublease interests in all Leased Real Property, free and clear of any Lien (other than Permitted Liens), and there is not under any such Leases any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default) by the applicable Company Party, or, to the Seller's Knowledge, any other party thereto.  Following the Closing, after giving effect to the consummation of the Transactions no Company Party, nor to the Seller's Knowledge, any other party to any Lease, will be in breach or default under any Lease, and, to the Seller's Knowledge, no event has occurred which, with notice or lapse of time, would constitute such a breach or default or permit termination, modification or acceleration under the Lease.

(b)       <u>Section 3.9(b)</u> of the Disclosure Schedules sets forth a true, correct and complete list of all Owned Real Property held by the Company Parties.  The Company Parties have good and marketable title to all Owned Real Property, free and clear of any Lien (other than Permitted Liens).  To the Seller's Knowledge, all water, sewer, gas, electric, telephone and drainage facilities, and all other utilities required by any Law or by the use and operation of the Owned Real Property in the conduct of the business are operable and are adequate to service the Owned Real Property in the operation of the business as currently conducted.

(c)       <u>Section 3.9(c)</u> of the Disclosure Schedules sets forth a true, correct and complete list of all personal property of the Company Parties with a replacement cost or value of at least $20,000 owned or leased by the Company Parties, and such personal property is, taken as a whole, in good operating condition (except for ordinary wear and tear).

(d)       The Company Parties, and the operation of the Business by the Company Parties, do not use or otherwise receive the benefit of any assets, whether tangible or intangible, that are not validly owned, validly licensed or validly leased by the Company Parties.

8

3.10    Intellectual Property.

(a)    Section 3.10(a) of the Disclosure Schedules lists (i) all of the Company Parties' issued patents and patent applications and all registered and unregistered trademarks, trade names and service marks, registered and unregistered copyrights, maskworks, and domain names, including the jurisdictions in which each such Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed, (ii) all licenses, sublicenses and other agreements to which any Company Party is a party and pursuant to which any third party is authorized by a Company Party to use any Intellectual Property owned by a Company Party, and (iii) all licenses, sublicenses and other agreements to which a Company Party is a party and pursuant to which a Company Party is authorized to use any third party Intellectual Property (other than "off the shelf" commercially available software with an aggregate annual cost of less than $50,000) which are incorporated in, are or form a part of any Product and that is material to the Business (collectively, "Third Party Intellectual Property Rights").   The Intellectual Property listed in Section 3.10(a) of the Disclosure Schedules constitutes all Intellectual Property necessary in all material respects to conduct the Business as currently conducted by the Company Parties and as proposed to be conducted by the Company Parties.  Except as set forth in Section 3.10(a) of the Disclosure Schedules, (A) the Company Parties are the sole and exclusive owners of the Intellectual Property used by the Company Parties to conduct the Business, and (B) the Intellectual Property licensed to the Company Parties by a third party (other than "off the shelf" software) is the subject of a written license or other agreements; in the case of the foregoing clauses (A) and (B), free and clear of all Liens.

(b)    To the Seller's Knowledge, there is no unauthorized use, disclosure, infringement or misappropriation by any third party of any Intellectual Property rights owned by the Company Parties or any Third Party Intellectual Property Rights of any third party to the extent licensed by or through the Company Parties, including by any employee or former employee of the Company Parties.  No Company Party has entered into any agreement to indemnify any other Person against any charge of infringement of any Intellectual Property.

(c)    The Company Parties are not, and will not be as a result of the performance of the Company Parties' obligations under this Agreement, in breach of any license, sublicense or other agreement relating to the Intellectual Property owned by the Company Parties or Third Party Intellectual Property Rights.

(d)    All issued patents, registered trademarks, registered service marks and registered copyrights held by the Company Parties are valid and existing, and there is no assertion or claim challenging the validity of any such registered Intellectual Property, or material unregistered Intellectual Property of the Company Parties.  No Company Party has received any written notice of any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party, and there are no pending or, to the Seller's Knowledge, threatened, claims of infringement with respect to the Company Parties' use of any such patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party, nor has any Company Party received any cease-and-desist or invitations to license letters with respect to the Intellectual Property of any third party.  The conduct of the Business as currently conducted by the Company Parties or the use by the Company Parties of any Intellectual Property in connection therewith does not infringe any Intellectual Property of any third party.  No third party is challenging the ownership by the Company Parties of, or the validity or effectiveness of, any of the Intellectual Property of the Company Parties.  The Company Parties have not brought any action, suit or proceeding for infringement of Intellectual Property or breach of any license or agreement involving Intellectual Property against any third party.  There are no pending, or, to the Seller's Knowledge, threatened, interference, re-examinations, oppositions or nullities involving any

patents, patent rights or applications therefor of the Company Parties, except such as may have been commenced by the Company Parties.  There is no material breach or violation by the Company Parties, or, to the Seller's Knowledge, threatened or actual loss of rights under, any license agreement to which any Company Party is a party.

(e)     Section 3.10(e) of the Disclosure Schedules lists the only employees, consultants and/or independent contractors of the Company Parties who have contributed to the development of the Company Parties' Intellectual Property. All employees, consultants and/or independent contractors who have developed or contributed to the development of the Company Parties' Intellectual Property have executed a valid assignment to the Company Parties' of any intellectual property rights which such employees, consultants and/or independent contractors may have in such Intellectual Property

3.11    Compliance With Laws.  Except as set forth in Section 3.11 of the Disclosure Schedules, the Company Parties have complied in all material respects with, is not in violation of, and has not received in the past five (5) years any notices of violation with respect to, any Laws applicable to the Company Parties or with respect to the ownership or operation of the Business or by which any property or asset of any Company Party is bound.

3.12    Absence of Certain Payments.  No Company Party has (nor has any of its directors, managers, officers, agents, or employees nor any other Person, acting on behalf of any Company Party) directly or indirectly (a) used any of such Company Party's funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (b) made any unlawful payment to foreign or domestic government officials or employees, or to the officers or employees of a company owned or controlled in whole or in part by a foreign or domestic government (e.g., "state owned enterprise"), or to foreign or domestic political parties or campaigns from such Company Party's funds, (c) violated any provision of the U.S. Foreign Corrupt Practices Act of 1977 or any comparable U.S. or foreign Law, (d) established or maintained any unlawful or unrecorded fund of such Company Party's monies or other assets, or (e) offered or made any bribe, rebate, payoff, influence payment, kickback, or anything of value, or other unlawful payment, to any Person, private or public, whether in money, property, or services, to obtain favorable treatment in securing business or to obtain special concessions for such Company Party, or to pay for favorable treatment for business secured or for special concessions already obtained for such Company Party.

3.13    Taxes.

(a)     Filing of Tax Returns and Payment of Taxes.  Except as set forth in Section 3.13(a) of the Disclosure Schedules, each of the Company Parties has timely filed all Tax Returns required to have been filed by it, and all such Tax Returns have been prepared in material compliance with all applicable laws and regulations.  All Taxes, assessments, fees and other governmental charges upon the Company Parties or any of their respective properties, assets, revenues, income and franchises with respect to any full or partial Tax period ending on or before the Closing Date have been paid, other than those not yet due or currently payable without penalty or interest.  The Seller has delivered to the Buyer true, correct and complete copies of all income Tax Returns filed by the Company Parties for all applicable taxable periods ended after December 31, 2009.

(b)     Deficiencies and Refund Claims.  Except as set forth in Section 3.13(b) of the Disclosure Schedules, no deficiency or adjustment in respect of Taxes has been proposed, asserted or assessed in writing by any Taxing Authority against the Company Parties.  No written claim for assessment or collection of Taxes which previously has been asserted relating in whole or in part to any Company Party remains unpaid.

(c) <u>Liens</u>.  There are no Liens for Taxes (other than current Taxes not yet due and payable) on any of the properties or assets of the Company Parties.

(d) <u>Extensions of the Time for Filing Tax Returns</u>.  No Company Party has requested or been granted an extension of the time for filing any non-income Tax Return that has not yet been filed.

(e) <u>Pending Proceedings</u>.  Except as set forth in <u>Section 3.13(e)</u> of the Disclosure Schedules, there is no action, suit, Taxing Authority proceeding, or audit with respect to any Tax now in progress, pending or, to the Seller's Knowledge, threatened in writing, against or with respect to the Company Parties.

(f) <u>No Failures to File Tax Returns</u>.  No claim has ever been made in writing by a Taxing Authority in a jurisdiction where the Company Parties do not pay Tax or file Tax Returns that any Company Party is or may be subject to Taxes assessed by such jurisdiction.

(g) <u>Membership in Affiliated Groups, Liability for Taxes of Other Persons, Etc</u>.  No Company Party has ever been a member of any affiliated group of corporations (as defined in Section 1504(a) of the Code) or filed or been included in a combined, consolidated, or unitary Tax Return, other than any affiliated group the parent of which is any of the Company Parties.  No Company Party is a party to or bound by any Tax sharing or Tax allocation agreement (other than agreements entered into in the Ordinary Course of Business, the principal purpose of which is unrelated to Taxes).  Except for any Liability for the Taxes of the Company Parties, no Company Party is presently liable, nor does any Company Party have any potential liability, for the Taxes of another person (i) under Treasury Regulations Section 1.1502-6 (or comparable provision of state, local or foreign law), (ii) as transferee or successor, or (iii) by contract or indemnity or otherwise (other than agreements entered into in the Ordinary Course of Business, the principal purpose of which is unrelated to Taxes).

(h) <u>Withholding Taxes</u>.  The Company Parties have timely withheld and timely paid all Taxes which are required to have been withheld and paid by them in connection with amounts paid or owing to any employee, independent contractor, creditor or other person, and have timely collected and Taxes imposed on its sales, including any Taxes with respect to the furnishing of energy.

(i) <u>Tax Status</u>.  At all times since their formation, the Company Parties were properly characterized as either "partnerships" or "disregarded entities" for U.S. federal income Tax purposes and state and local Tax purposes, other than Aequitas Energy, Inc., which has been characterized as a "corporation."  Note of the properties of any Company Party is subject to the "anti-churning rules" of Section 197(f)(9) of the Code.  Each Company Party that is characterized as a partnership for U.S. federal income Tax purposes has in place a valid election under Section 754 of the Code.

3.14 <u>Employee Benefit Plans</u>.

(a) <u>Identification of Plans</u>.  Except for the arrangements set forth in <u>Section 3.14(a)</u> of the Disclosure Schedules, the Company Parties do not now maintain or contribute to, and do not have any outstanding liability to or in respect of or obligation under, any plan, program, policy or arrangement providing pension, profit-sharing, deferred compensation, bonus or incentive compensation, stock option or equity-based compensation, severance, group or individual health, dental, medical, life insurance, survivor, or other similar benefits, whether formal or informal, written or oral, for the benefit of any director, officer, consultant or employee, whether active or terminated.  Neither the Company Parties nor any other Person treated as a single employer with the Company Parties (any such Person, an

"ERISA Affiliate") under Section 414 of the Code or Section 4001(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") sponsors, maintains or contributes to or has ever sponsored, maintained or contributed to any Employee Benefit Plan within the meaning of Section 3(3) of ERISA that is subject to Title IV of ERISA or Section 412 of the Code.  Each of the arrangements set forth in Section 3.14(a) of the Disclosure Schedules is herein referred to as an "Employee Benefit Plan," except that any such arrangement which is a multi-employer plan within the meaning of Section 4001 of ERISA (a "Multi-Employer Plan") shall be treated as an Employee Benefit Plan only for purposes of Sections 3.14(g)(ii), (vi) and (vii).

(b)    Delivery of Documents.  The Seller has delivered or made available to the Buyer true, correct and complete copies of each material Employee Benefit Plan, and with respect to each such Plan (or if such Plan is not written, an accurate description of the material terms thereof) true, correct and complete copies of (a) any associated trust, custodial, insurance or service agreements, (b) any annual report, actuarial report, or disclosure materials (including specifically any summary plan descriptions) submitted to any governmental agency or distributed to participants or beneficiaries thereunder in the current or any of the three (3) preceding calendar years, (c) the most recently received IRS determination or opinion letters and any governmental advisory opinions, rulings, compliance statements, closing agreements, or similar materials specific to such Plan, and pending requests relating to any of the foregoing, (d) any written policies or procedures used in the administration of such Plan, (e) all material written agreements and contracts relating to each Employee Benefit Plan, including fidelity or ERISA bonds, administrative service agreements, group annuity contracts and group insurance contracts, (f) all communications material to any Employee or Employees relating to any Employee Benefit Plan and any proposed Employee Benefit Plan, in each case relating to any amendments, terminations, establishments, increases or decreases in benefits, acceleration of payments or vesting schedules or other events that would result in any material liability to the Company Parties that are not reflected in the current summary plan description and plan document, (g) all material forms and notices relating to the provision of post-employment continuation of health coverage, and (h) all policies pertaining to fiduciary liability insurance covering the fiduciaries of each Employee Benefit Plan.

(c)    Compliance with Terms and Law.  Each Employee Benefit Plan is and has heretofore been maintained and operated in all material respects in compliance with the terms of such Plan and with the requirements prescribed (whether as a matter of substantive Law or as necessary to secure favorable Tax treatment) by any and all statutes, governmental or court orders, or governmental rules or regulations in effect from time to time, including, but not limited to, ERISA and the Code, and applicable to such Plan. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code (a "Qualified Plan"), is expressly identified as such in Section 3.14(c) of the Disclosure Schedules and has received a favorable determination letter from the IRS (or, where there is no determination letter but the Qualified Plan is based upon a master and prototype or volume submitter form, the sponsor of such form has received a current advisory opinion as to the form upon which the Seller is entitled rely under applicable IRS procedures) and to the Seller's Knowledge, nothing has occurred as to each which has resulted or would reasonably be expected to result in the revocation of such qualification or which requires or would reasonably be expected to require action under the compliance resolution programs of the IRS to preserve such qualification.

(d)    Each plan, program, arrangement or agreement that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code is identified as such in Section 3.14(d) of the Disclosure Schedules.  Since December 31, 2004 and through December 31, 2008, each plan, program, arrangement or agreement identified or required to be identified in Section 3.14(d) of the Disclosure Schedules has been operated and maintained in accordance with a good faith, reasonable interpretation of Section 409A of the Code and its purpose with respect to amounts deferred (within the meaning of Section 409A of the Code) after December 31, 2004.  By December 31,

2008, each plan, program, arrangement or agreement identified or required to be identified in <u>Section 3.14(d)</u> of the Disclosure Schedules was amended to the extent necessary or appropriate to comply with Section 409A of the Code and the final regulations promulgated thereunder.  From and after January 1, 2009, each plan, program, arrangement or agreement identified or required to be identified in <u>Schedule 3.14(d)</u> has been operated and maintained in accordance with Section 409A of the Code and applicable guidance thereunder, including the final regulations promulgated with respect thereto.

(e)     No event has occurred and, to the Seller's Knowledge, no condition exists with respect to the Employee Benefit Plans or any other employee benefit matter that would subject the Company Parties, either directly or indirectly by reason of their affiliation with any other member of their controlled group, to any material Tax, fine, lien, penalty or other liability imposed by applicable Laws.

(f)     Except as set forth in <u>Section 3.14(f)</u> of the Disclosure Schedules or as required by applicable Law, neither the execution and delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated hereby (either alone or in combination with another event pursuant to a so-called "double-trigger" or similar provision) will or would reasonably be expected to (a) entitle any Company employee to severance pay, unemployment compensation, bonus payment or any other payment or benefit, (b) result in the acceleration or creation of any rights of any Company employee to payments or benefits or increases in any payments or benefits or any loan forgiveness or give rise to any additional service credits under any Employee Benefit Plan, (c) directly or indirectly cause the Company or any of its Subsidiaries to transfer or set aside any assets to fund any benefits under any Employee Benefit Plan, (d) limit or restrict the right to amend, terminate or transfer the assets of any Employee Benefit Plan on or following the Closing Date or (e) result in any payment, right or benefit that would, individually or in combination with any other such payment, right, or benefit, constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) to any Company employee.

(g)     <u>Absence of Certain Events and Arrangements</u>.

(i)     there is no pending or threatened legal Action, other than routine claims for benefits, concerning any Employee Benefit Plan and, to the Seller's Knowledge, there is no basis for any such legal action, proceeding or investigation;

(ii)     no Liability (contingent or otherwise) to the Pension Benefit Guaranty Corporation ("<u>PBGC</u>") or any Multi-Employer Plan has been incurred by the Company Parties or any ERISA Affiliate (other than insurance premiums satisfied in due course);

(iii)     no reportable event within the meaning of Section 4043 of ERISA, or event or condition which presents a material risk of termination by the PBGC, has occurred with respect to any Employee Benefit Plan, or any retirement plan of an ERISA Affiliate, which is subject to Title IV of ERISA; and

(iv)     no Employee Benefit Plan provides welfare benefits subsequent to termination of employment to employees or their beneficiaries except to the extent required by applicable state insurance laws and Title I, Subtitle B, Part 6 of ERISA;

(h)     <u>Effect of Transactions</u>.  Except as set forth in <u>Section 3.14(h)</u> of the Disclosure Schedules, the consummation of the Transactions will not, by itself or in combination with any other event (regardless of whether that other event has or will occur), result in any payment (whether of severance pay or otherwise) becoming due from or under any Employee Benefit Plan to any current or

former director, officer, consultant or employee of the Company Parties or result in the vesting, acceleration of payment or increases in the amount of any benefit payable to or in respect of any such current or former director, officer, consultant or employee.

(i) <u>Multi-Employer Plans</u>.  No Employee Benefit Plan is a Multi-Employer Plan and none of the Company Parties nor any ERISA Affiliate has in the past contributed to any Multi-Employer Plan.

(j) None of the Company Parties has any stated plan, intention or commitment to establish any new Employee Benefit Plan, to modify or terminate any Employee Benefit Plan (except to the extent required by Law or to conform any such Employee Benefit Plan to the requirements of any applicable Law, in each case as previously disclosed to Buyer in writing, or as required by this Agreement), or to enter into any Employee Benefit Plan.

(k) (a) No claim, legal proceeding, arbitration or other action is pending, or, to the Seller's Knowledge, has been threatened relating to or otherwise in connection with any Employee Benefit Plan, the assets thereof, or fiduciaries or parties-in-interest, as defined under ERISA, (b) to the Seller's Knowledge, no facts or circumstances exist that could reasonably be expected to give rise to any such claim, legal proceeding, arbitration or other action, (c) no administrative investigation, audit or other administrative proceeding by any Governmental Authority is pending, in progress, or, to the Seller's Knowledge, threatened and (d) no Employee Benefit Plan and no party in interest with respect thereto has engaged in a "prohibited transaction," which could subject the Company Parties or any ERISA Affiliate directly or indirectly to liability under Section 4975 of the Code or Sections 409 or 502(i) of ERISA.

(l) None of the Employee Benefit Plans provide, nor does the Company Parties or any member of their controlled group maintain or contribute to any plan that provides, post-employment medical, health, life or welfare insurance benefits or coverage to any employee of the Company Parties, their spouse or dependents, except as may be required by applicable Law.

(m) Each individual who is classified as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Employee Benefit Plan.

(n) With respect to any Employee Benefit Plan that is an employee welfare benefit plan (within the meaning of Section 3(1) of ERISA), (i) each such plan for which contributions are claimed as deductions under any provision of the Code is in material compliance with all applicable requirements pertaining to such deduction, (ii) with respect to any welfare benefit fund (within the meaning of Section 419 of the Code) to the Seller's Knowledge there is no disqualified benefit (within the meaning of Section 4976(b) of the Code) that would result in the imposition of a Tax under Section 4976(a) of the Code, (iii) any Employee Benefit Plan that is a group health plan (within the meaning of Section 4980B(g)(2) of the Code) complies with all of the applicable requirements of Section 4980B of the Code, ERISA, Title XXII of the Public Health Service Act, the applicable provisions of the Social Security Act, the Health Insurance Portability and Accountability Act of 1996, and other applicable Laws, and (iv) no welfare benefit plan provides health or other benefits after an employee's or former employee's retirement or other termination of employment except as required by Section 4980B of the Code.  Each of the Employee Benefit Plans is in compliance with the Patient Protection and Affordable Care Act and its companion bill, the Health Care and Education Reconciliation Act of 2010, to the extent applicable.

3.15    Employee Matters.

(a)    The Company Parties, in their capacity as an employer or joint employer, are in compliance with all Laws in respect of employment and employment practices, including, without limitation, with respect to the classification of employees for purposes of federal, state and local Law, terms and conditions of employment, wages and hours and nondiscrimination in employment, and is not engaged in any unfair labor practice and has never been engaged in any unfair labor practice or accused of engaging in an unfair labor practice.  There is no Action pending, and within the last five (5) years there has not been any Action, with respect to employment or labor matters (including allegations of employment discrimination, retaliation and unfair labor practices), or, to the Seller's Knowledge, threatened, against the Company Parties alleging unlawful discrimination in employment practices before any Governmental Authority, and there is no charge of or proceeding with regard to any unfair labor practice against the Company Parties pending before the National Labor Relations Board.  There is no labor strike, dispute, slow-down or work stoppage actually pending or, to the Seller's Knowledge, threatened, against or involving the Company Parties, nor do the Seller or the Company Parties know of any reasonable basis for any such activity.  No Person has petitioned within the last five (5) years, and no Person is now petitioning, for union representation of any of the employees of the Company Parties.  No grievance or Action arising out of or under any collective bargaining agreement is pending against the Seller and no claim therefor has been asserted.  None of the employees of the Company Parties is covered by any collective bargaining agreement and have never been a party to or bound by any collective bargaining agreement, and no collective bargaining agreement is currently being negotiated by the Company Parties.  The Company Parties have not experienced any work stoppage during the last five (5) years.  None of the Company Parties, in their capacity as an employer or joint employer, is delinquent to, or has failed to pay, any of its employees, consultants or contractors for any wages (including overtime, meal breaks or waiting time penalties), salaries, commissions, accrued and unused vacation, on-call payments, equal pay, or collective bargaining payments to which they would be entitled under applicable Law, if any, bonuses, benefits, advantage in kind, profit sharing, stock options or other compensation for any services performed by them or amounts required to be reimbursed or damages or interest paid to such individuals.  None of the Company Parties is liable for any payment to any trust or other fund or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistent with past practice).  The Company Parties have paid all outstanding liabilities, fees, expenses and obligations relating to the employees, former employees, consultants, independent contractors, directors, officers and any other Person who provides or has provided services to the Company Parties.  None of the Company Parties have any liability, including under any Employee Benefit Plan, arising out of the treatment of any service provider as a consultant or independent contractor and not as an employee.

(b)    Section 3.15(b) of the Disclosure Schedules sets forth a true and complete list and summary of (i) all officers and directors of the Company Parties, and (ii) all employees of the Company Parties, including each such employee's job title, remuneration (including, but not limited to, wages, salary, commissions, normal bonus, profit sharing, deferred compensation or other compensation) and duration of employment.  Section 3.15(b) of the Disclosure Schedules also contains a complete and accurate list of all of the independent contractors, consultants, temporary employees, leased employees or other servants or agents employed or used as of the date of this Agreement with respect to the operation of the Business and classified by the Company Parties as other than employees or compensated other than through wages paid by the Company Parties through the Company Parties' payroll department and reported on a form W-4 ("Contingent Workers"), showing for each Contingent Worker such individual's role in the business, fee or compensation arrangements and other contractual terms with the Seller.  Except as set forth in Section 3.15(b) of the Disclosure Schedules, no Person listed

thereon has received or been promised, orally or in writing, any bonus or increase in compensation and there has been no "general increase" in the compensation or rate of compensation payable to any employees of the Seller since the Balance Sheet Date.  Except as set forth in <u>Section 3.15(b)</u> of the Disclosure Schedules, no Person listed thereon is a party to any Contracts with the Company Parties other than standard agreements with the Company Parties entered into in such Persons' capacities as employees or Contingent Workers. To the extent that the Company Parties contract with any Contingent Workers, the Company Parties have properly classified and treated them in all material respects in accordance with applicable Laws and for purposes of all employee benefit plans and perquisites.

(c)     None of the Company Parties is a government contractor or subcontractor.

(d)     There has not been a "mass layoff" or "plant closing" (as defined by the Worker Adjustment and Retraining Notification Act of 1988 and any similar state, local or foreign law) with respect to the Company Parties at any time within the twelve months preceding the date of this Agreement and none of the Company Parties has implemented any plant or office closing, transfer of employees or layoff of employees that (without regard to any actions that might be taken by Buyer after the Closing) is or could reasonably be expected to be in violation of any applicable WARN or similar Laws

(e)     Each Employment Agreement is set forth on <u>Section 3.15(e)</u> of the Disclosure Schedules and a copy of each Employment Agreement and any amendment thereto has been delivered to Buyer.  Except as set forth in <u>Section 3.15(e)</u> of the Disclosure Schedules, the employment of each of the current employees is terminable at will, and none of the Company Parties has any obligation to provide any particular form or period of notice prior to terminating the employment of any of its current employees.  None of the Company Parties has, and to the Seller's Knowledge, no other Person has, (i) entered into any agreement that obligates or purports to obligate Buyer or any of Buyer's Affiliates to make an offer of employment to any employee, consultant or contractor of the Company or (ii) promised or otherwise provided any assurances (contingent or other) to any employee, consultant or contractor of the Company Parties of any terms or conditions of employment with Buyer or any of Buyer's Affiliates following the Closing.  The Seller has delivered to Buyer accurate and complete copies of all employee manuals and handbooks, employment policy statements, employment customs and practices, internal regulations, collective bargaining or labor agreements and Employment Agreements with respect to employees, all of which complied at all relevant times with applicable Law in all material respects.

(f)     All Persons who perform services in the United States for the Company Parties are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, and any other United States immigration laws relating to the employment of non-United States citizens applicable in the state in which the employees are employed.  All individuals who perform services outside of the United States for the Company Parties are legally entitled to work in the country in which the individuals perform services. The Company Parties have not and does not employ any minors.

(g)     The Company Parties are compliant in all material respects with data privacy Laws regarding the retention, recording, use and transfer of personal and sensitive data, whether cross border or to third parties, have completed all adequate agreements and filings or notifications with all applicable Governmental Authorities or otherwise, and have in all material respects informed the employees or candidates for employment, and kept the data secure and confidential at all times, and the Transactions will not result in Buyer or the Company Parties to be in breach of such data privacy Laws.

(h)        Except as set forth in <u>Section 3.15(h)</u> of the Disclosure Schedules, there are no Actions filed, pending or, to the Seller's Knowledge, threatened (or for which the Company Parties received any written notice of) before any arbitrator, the Equal Employment Opportunity Commission, the Department of Labor, or any similar state agencies, or any other Governmental Authority concerning any matter relating to the labor and employment practices of the Company Parties or any employee, former employee, consultant or independent contractor of the Company Parties including with respect to matters involving discrimination or harassment, wage and hour, vacation or paid time off, the WARN Act, collective bargaining, civil rights, fair employment practices, the proper classification of employees, consultants or independent contractors, immigration, pay equity, safety and health, workers' compensation and the collection and payment of employment related Taxes, or the keeping of records in relation to the foregoing.

3.16     <u>Material Contracts</u>.

(a)        Except as set forth in <u>Section 3.16(a)</u> of the Disclosure Schedules, the Company Parties are not party to or bound by any Contracts, whether written or oral,  involving the following (such contracts, agreements and arrangements as are required to be set forth in <u>Section 3.16(a)</u> of the Disclosure Schedules being referred to herein collectively as the "<u>Material Contracts</u>"):

(i)        Other than in the Ordinary Course of Business, Contracts for the (A) future purchase, exchange or sale of natural gas, (B) future purchase, exchange, transmission or sale of electric power in any form, including energy, capacity or any ancillary services, and (C) future transportation of natural gas;

(ii)        Other than Contracts of the nature covered by <u>Section 3.16(a)(i)</u>, Contracts for the (A) purchase or sale of any asset or that grant a right or option to purchase or sell any asset, other than in each case Contracts relating to assets with a nominal value of less than $50,000 individually or $100,000 in the aggregate, and (B) provision or receipt of any services or that grant a right or option to provide or receive any services, other than in each case Contracts relating to services with a nominal value of less than $50,000 individually or $100,000 in the aggregate;

(iii)        any interconnection, transportation, storage, capacity release, or market participant Contracts;

(iv)        Partnership, joint venture or limited liability company agreements;

(v)        any offset, countertrade, distributor, sales, advertising, agency or manufacturer's representative Contract or group purchasing Contract;

(vi)        any Contract (including proposals) for the purchase or lease of machinery, equipment, motor vehicles, office furniture, fixtures, materials, supplies, or other personal property or services involving the payment by the Seller of more than $50,000 over the remaining life of the Contract from the date of this Agreement;

(vii)        any Contract that expires or may be renewed at the option of any Person other than the Seller so as to expire more than one year after the date of this Agreement;

(viii)        any trust indenture, mortgage, promissory note, loan agreement or other Contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with GAAP,

consistently applied;

(ix)     any Contract for capital expenditures in excess of $50,000 in the aggregate;

(x)     any non-competition, non-solicitation, assignment of inventions or similar agreement between any Company Party and any employee of, or consultant to, any Company Party;

(xi)     any Contract or guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the Liabilities (whether accrued, absolute, contingent or otherwise) of any other Person;

(xii)     any guarantee of any obligation or any letter of credit, bond or other indemnity (excluding endorsements of instruments for collection in the Ordinary Course of Business);

(xiii)     any Contract for the sale or lease of any of its assets, excluding sales of services in the Ordinary Course of Business, or entered into other than in the Ordinary Course of Business;

(xiv)     any Contract (including proposals) for the performance of services by any Company Party;

(xv)     Any management or advisory Contract;

(xvi)     Contracts relating to the supply or storage of water to any Company Party or any Company Party's entitlement to water;

(xvii)     any Contract that (A) limits any Company Party's freedom to compete in any line of business or in any geographic area, (B) contains a "Most Favored Nation" or other similar provision, or (C) is a requirements Contract;

(xviii)     any Contract disclosed pursuant to Section 3.22 (*Restrictions on Business Activities*);

(xix)     any license, development or other agreement relating to any of the Company Parties' Intellectual Property or relating to Intellectual Property which any Company Party has licensed from or to any other Person, or authorized for use by any other Person, or been authorized by any other Person for use by the Seller, other than "off the shelf" software;

(xx)     any Contract pursuant to which any Company Party has agreed to indemnify or hold harmless any other Person or which imposes any non-competition or exclusive dealing obligations of any Company Party;

(xxi)     any Employment, consulting, or other Contract  providing for severance payments or other additional rights or benefits (whether or not optional) in the event of the sale or other change in control of any Company Party;

(xxii)     any Contract with any current employee or consultant of the Company Party or with any Person in which any Company Party has an interest;

(xxiii) any research or co-development agreements relating to any of the Intellectual Property owned by any Company Party; or

(xxiv) any Tax sharing or Tax allocation agreement.

(b)     Each Material Contract is a legal, valid and binding agreement, and no Company Party is in material default under, or in material breach of, any Material Contract, and, to the Seller's Knowledge, no other party thereto is in material default under, or in material breach of, any Material Contract; neither the Seller nor any Company Party is in receipt of any claim of default under any such Material Contract; and neither the Seller nor any Company Party anticipates any termination or change to, or receipt of a proposal with respect to, any Material Contract as a result of the Transactions.

3.17    Environmental Matters.

(a)     (i)     Each Company Party holds and has held all required Environmental Permits; (ii) each such Environmental Permit is identified in Section 3.17(a) of the Disclosure Schedules; and (iii) each such Environmental Permit will remain valid and effective after the Closing without any notice to or consent of any Governmental Authority;

(b)     Each Company Party is and has been in compliance with, and has no Liability under, any and all applicable or required (i) Environmental Permits, and (ii) Environmental Laws;

(c)     There are no past, pending or threatened Environmental Claims against any Company Party, and no Company Party is aware of any facts or circumstances which could reasonably be expected to form the basis for any Environmental Claim against any Company Party;

(d)     No Releases of Hazardous Materials have occurred and no Person has been exposed to any Hazardous Materials at, from, in, to, on or under any Sites and no Hazardous Materials are present in, on, about or migrating to or from any Site that could give rise to an Environmental Claim against any Company Party;

(e)     No Company Party, any predecessors of any Company Party, or any Person previously owned by any Company Party, has transported or arranged for the treatment, storage, handling, disposal, or transportation of any Hazardous Material to any off-Site location which has or could result in an Environmental Claim against any Company Party;

(f)     There are no (i) polychlorinated biphenyl containing equipment, (ii) underground storage tanks, or (iii) asbestos containing material at any owned, leased, operated or occupied real property;

(g)     There are no Phase I or Phase II environmental assessments, environmental investigations, studies, audits, tests, reviews or other analyses conducted by, on behalf of, or which are in the possession of, the Seller or any Company Party (or any of their respective advisors or representatives) with respect to any Site which have not been delivered to the Buyer prior to execution of this Agreement;

(h)     Neither the execution of this Agreement nor the consummation of the transaction contemplated by this Agreement will require any notification to or consent of any Governmental Authority or the undertaking of any investigations or remedial actions pursuant to Environmental Laws; and

(i)        No Company Party has entered into or is subject to any judgment, Action or other similar requirement of or agreement with any Governmental Authority under any Environmental Laws.

(j)        No Company Party  has, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any liability or obligation, arising under or relating to Environmental Laws, including, but not limited to, any obligation for investigation, corrective or remedial action.

3.18        Insurance.  Section 3.18 of the Disclosure Schedules lists all policies of fire, liability, workmen's compensation, life, property and casualty and other insurance owned or held by the Company Parties with respect to the Business or with respect to which any Company Party is a beneficiary thereunder.  Such policies of insurance are maintained with financially sound and reputable insurance companies, funds or underwriters and are of the kinds and cover such risks and are in such amounts and with such deductibles and exclusions as are consistent with prudent business practice (collectively, the "Insurance Policies").  All such Insurance Policies are in full force and effect.  All premiums dues on such Insurance Policies have been paid.  No Company Party is in default with respect to its obligations under any of such Insurance Policies, and has not received any notification of cancellation of any such insurance policies.

3.19        Suppliers and Customers.  Section 3.19 of the Disclosure Schedules sets forth (a) the five (5) largest suppliers of the Company Parties (the "Material Suppliers"), each based on the dollar amount of expenditures for the 2015 fiscal year, (b) the twenty-five (25) largest customers of the Seller (the "Material Customers"), each based on the dollar amount of purchases for the 2015 fiscal year, and (c) the amount of consideration paid to or from such Material Supplier or Material Customer.  No Material Supplier or Material Customer has cancelled or otherwise terminated, or threatened to cancel or otherwise terminate, its relationship with any Company Party, or has during the last twelve (12) months decreased materially, or threatened to decrease or limit materially, its services, supplies or materials for use by the Company Parties, except for normal cyclical changes related to customers' businesses.  The Seller has no Knowledge that any such Material Supplier or Material Customer intends to cancel or otherwise substantially modify its relationship with any Company Party or to decrease materially or limit its services, supplies or materials to the Company Parties, and to the Seller's  Knowledge, the consummation of the Transactions will not adversely affect the relationship of the Buyer with any such Material Supplier or Material Customer.

3.20        Interested Party Transactions.  Neither the Seller, nor any of its respective Affiliates, (a) is indebted to the Company Parties, nor are the Company Parties indebted to any such Person (except for amounts due as normal salaries and bonuses and in reimbursement of ordinary expenses), (b) owns, directly or indirectly, any interest in (excepting not more than 1% stock holdings for investment purposes in securities of publicly held and traded companies) or is an officer, director, manager, employee or consultant of any Person which is a competitor, lessor, lessee, customer or supplier of the Company Parties, (c) owns, directly or indirectly (other than as an equity holder of the Company Parties), in whole or in part, any tangible or intangible property which any Company Party is using or the use of which is necessary for the Business, or (d) has any cause of action or other claim whatsoever against, or owes any amount to, the Company Parties, except for claims in the Ordinary Course of Business, such as for accrued vacation pay, accrued benefits under Employee Benefit Plans and similar matters and agreements.

3.21        Certain Agreements Affected by the Transactions.  Except as set forth in Section 3.21 of the Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the Transactions and any Conversion will (a) result in the Company Parties paying or

becoming obligated to pay any payment (including, without limitation, severance, unemployment compensation, golden parachute, bonus or otherwise) to any director or employee of any Company Party, (b) materially increase any benefits otherwise payable by the Company Parties, or (c) result in the acceleration of the time of payment or vesting of any such benefits.

3.22    Restrictions on Business Activities.  Except as set forth in Section 3.22 of the Disclosure Schedules, there is no Contract or Action binding upon the Company Parties which has or could reasonably be expected to have the effect of prohibiting or impairing any current or future activity of the Company Parties or the overall conduct of the Business by the Company Parties as currently conducted or as proposed to be conducted.

3.23    Books and Records.  The Books and Records, all of which have been made available to the Buyer, are complete and correct in all material respects and have been maintained in accordance with sound business practices.

3.24    Complete Copies of Materials.  The Seller has delivered or made available to the Buyer and its representatives true and complete copies of each document specifically identified on the Disclosure Schedules.

3.25    Brokers.  Neither the Seller, nor has any of its Affiliates, has dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or intermediary in connection with the negotiation or consummation of the Transactions.

3.26    Disclosure.  No representation or warranty by the Seller in this Agreement or in any exhibit or schedule to this Agreement, or in any written statement, certificate or other document to be delivered to the Buyer at the Closing pursuant hereto or in connection with the Transactions, contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading.  There is no material fact of which the Seller is actually aware and has not disclosed to the Buyer in writing which materially adversely affects, or that the Seller can now reasonably foresee, in its good faith reasonable determination, will materially adversely affect, the financial condition or operations of the Company Parties or the Business.

4.    **REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer as follows:

4.1    Organization.  The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2    Authority and Enforceability.  The Seller has all requisite power and full legal right to enter into the Transaction Documents, and to perform all of such Seller's agreements and obligations thereunder in accordance with their respective terms.  Each of the Transaction Documents has been duly authorized by all necessary limited liability company action of the Seller.  The Seller has delivered to the Buyer certified copies of the resolutions duly adopted by the managing member of the Seller authorizing and approving the Transactions and the Transaction Documents (the "Transaction Approvals").  The Transaction Approvals constitute all necessary limited liability company action for the authorization, execution and delivery of the Transaction Documents by the Seller and the performance by the Seller of the Transactions, and such approvals have not been revoked, rescinded or amended.

4.3     No Conflicts; Required Filings and Consents.

(a)     Except as set forth in Section 4.3(a) of the Disclosure Schedules, the execution and delivery of the Transaction Documents by the Seller, and the consummation of the Transactions, will not conflict with, or result in any material violation of, or material default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien (other than Permitted Liens) on any of the Loan Documents under (i) any provision of the Seller's Charter Documents, (ii) any Material Contract to which the Seller is a party, (iii) any Permit, judgment, order or decree applicable to the Seller, or any of its respective properties or assets, or (iv) any Law applicable to the Seller or any of its properties or assets.

(b)     Except as set forth in Section 4.3(b) of the Disclosure Schedules, no consent, approval, exemption or authorization of, or registration, qualification or filing with, any Governmental Authority is required for the execution and delivery by the Seller of the Transaction Documents to which it is a party or for the consummation by the Seller of the Transactions.

(c)     Title.  As of the date hereof, the Seller owns the Loan Documents and all rights, titles, and interests arising thereunder, free and clear of all Liens.

(d)     Brokers.  The Seller has not dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or other intermediary in connection with the negotiation or consummation of the Transactions.

## 5.     REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows:

5.1     Organization.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite limited liability power and authority and all necessary material government approval to own, lease and operate its properties and to carry on its business as it is now being conducted.

5.2     Authority and Enforceability.  The Buyer has all requisite power and full legal right to enter into the Transaction Documents and to perform all of the Buyer's agreements and obligations thereunder in accordance with their respective terms.  Each of the Transaction Documents has been duly and validly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery by the Seller, constitutes the legal, valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms, except as the enforceability thereof may be limited by any applicable bankruptcy, reorganization, insolvency or other Laws affecting creditors' rights generally or by general principles of equity.

5.3     No Conflict; Required Filings and Consents.

(a)     The execution and delivery of the Transaction Documents by the Buyer does not, and the consummation of the Transactions will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien on any asset of the Buyer, under (i) any provision of the Buyer's organizational documents, each as amended to date, (ii) any agreement or instrument to which the Buyer is a party or to which any of its properties or

assets is bound, (iii) any Permit, judgment, order or decree applicable to the Buyer or any of its properties or assets, or (iv) Law applicable to the Buyer or any of its properties or assets.

(b)    No consent, approval or authorization of, or registration, qualification or filing with, any Governmental Authority is required for the execution and delivery by the Buyer of the Transaction Documents or for the consummation by the Buyer of the Transactions.

5.4    <u>Brokers</u>.  The Buyer has not dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or other intermediary in connection with the negotiation or consummation of the Transactions.

## 6.    CERTAIN COVENANTS

6.1    <u>Covenants regarding Confidentiality, Non-Competition, and Non-Solicitation</u>.  As an inducement for the Buyer to enter into this Agreement and to consummate the Transactions, the Seller agrees as follows:

(a)    <u>Confidential Information</u>.  The Seller shall, and shall cause its Affiliates and representatives to, hold, in confidence any and all information, whether written or oral, concerning the Business and the Company Parties and the Buyer, except to the extent that the Seller can show that such information (i) is generally available and known to the public through no fault of the Seller, any of the Seller's Affiliates or representatives, or (ii) is lawfully acquired by such Seller's Affiliates or representatives from and after the Closing Date from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation (all of the foregoing, "<u>Business Confidential Information</u>").  If the Seller's Affiliates or representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller, on behalf of such Affiliate or representative, shall promptly notify the Buyer in writing and shall disclose only that portion of such information which such Seller Affiliate or representative is advised by such Affiliates or representative's legal counsel in writing is legally required to be disclosed; <u>provided</u>, that such Seller Affiliate or representative shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.  Notwithstanding anything contained in this Agreement to the contrary, each Seller Affiliate or representative may disclose Business Confidential Information to its respective legal, accounting and Tax advisors in connection with enforcing its respective rights under this Agreement and the other Transaction Documents.

(b)    <u>Non-Competition; Non-Interference</u>.  The Seller shall not, and shall not permit any of its Affiliates (including any successor thereof) to, directly or indirectly:

(i)    for a period commencing on the Closing Date and ending on the date that is the earlier of (A) 9 months after the redemption of the Class C Units (as provided for in the Buyer LLC Agreement) and (B) the first anniversary of the Closing Date (the "<u>Non-Compete</u> Period"), own a controlling interest in (whether through the ownership of equity, the possession of contractual rights, or otherwise), manage, operate or participate in the management or operation, or provide any financing with controlling or other management rights to, any Person that engages in the Business, as currently conducted by the Company Parties or proposed to be conducted by the Company Parties, anywhere in the world as of the Closing Date;

(ii)    for a period commencing on the Closing Date and ending on the date that is the third anniversary of the Closing Date (the "<u>Non-Interference Period</u>"), permit intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Closing Date) of the Company Parties, including, without limitation, any of their customers or

suppliers;

(iii)   for the Non-Interference Period, (A) take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer or supplier, from having a business relationship or potential business relationship with the Company Parties, or from maintaining business relationships or entering into a new business relationship with the Company Parties, and the Seller will refer all inquiries relating to the Business or the Company Parties to the Buyer; or (B) interfere with, or attempt to interfere with, the employment of, or relationships with, any employees of the Company Parties, or, directly or indirectly, solicit, hire or attempt to induce any of them to leave the employ of, or terminate such party's relationship with, the Company Parties; provided, that the foregoing shall not prohibit the Seller from hiring a Person who responds to general media advertisements not specifically directed at the officers, employees, representatives or agents of the Company Parties, or their respective Affiliates.

(c)   The Seller acknowledges and agrees that the covenants set forth in this Section 6.1 are necessary to protect the Company Parties and the Business following the Closing.  The Seller further acknowledges and agrees that the Buyer's willingness to enter into this Agreement is conditioned and dependent upon the Seller's promises to be bound by this Section 6.1 and the covenants set forth herein.  The Seller acknowledges and agrees that any breach or threatened breach of the restrictive covenants contained in this Section 6.1 would cause irreparable injury to the Company Parties and/or the Buyer and that the remedy at Law for any such breach or threatened breach would be inadequate, and, accordingly, the Seller agrees and consents that, in addition to any other available remedy to the Company Parties and/or the Buyer, temporary and permanent injunctive relief may be granted in any action which may be brought by the Company Parties and/or the Buyer to enforce such restrictive covenants without necessity of proof that any other remedy at Law is inadequate.

(d)   The Seller acknowledges and agrees that all of the restrictions, covenants and agreements in this Section 6.1 are appropriate, reasonable and valid (including with respect to geographic scope and duration) and fully necessary for the protection of the legitimate interests of the Company Parties and the Buyer.  If any provision contained in this Section 6.1 shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Section 6.1, but this Section 6.1 shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  It is the intention of the parties that if any of the restrictions or covenants contained herein is held to cover a geographic area or to be for a length of time which is not permitted by applicable Law, or in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent such provision would be valid or enforceable under applicable Law, a court of competent jurisdiction shall construe and interpret or reform this Section 6.1 to provide for a covenant having the maximum enforceable geographic area, time period and other provisions (not greater than those contained herein) as shall be valid and enforceable under such applicable Law.  The Seller acknowledges and agrees that the Restricted Period shall be automatically extended by the length of any period during which the Seller is in breach of the terms of this Section 6.1.

6.2   Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees incurred in connection with this Agreement will be paid by the Seller when due.  The Seller, at its expense, will file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, the other parties hereto will join in the execution of any such Tax Returns and other documentation.  The Buyer and the Seller further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any

other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the Transactions.

6.3     Tax Matters Cooperation.  The parties hereto shall cooperate fully, as and to the extent reasonably requested by any other party hereto, in connection with the filing of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention for six (6) years following the Closing Date and (upon such other party's reasonable request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Each party hereto shall provide to the others, within ten (10) Business Days of the receipt thereof, any Tax related communications and notices it receives which may impact such other party's Liability with respect to Taxes or filing responsibilities.

**7.     INDEMNIFICATION**

7.1     Indemnification by the Buyer.  Subject to the limitations set forth in this Section 7, the Buyer hereby agrees to indemnify, defend and hold harmless the Seller and its Affiliates, and their respective directors, managers, officers, employees, representatives and agents, from and against any and all Damages related to or arising out of or in connection with:

(a)     any inaccuracy or breach of any representation or warranty made by the Buyer in the Transaction Documents (including any schedules thereto); and

(b)     any breach by the Buyer of, or default in the performance by the Buyer of, any covenant, agreement, obligation or undertaking made by the Buyer in the Transaction Documents (including any schedules thereto).

7.2     Indemnification by the Seller.  Subject to the limitations set forth in this Section 7, the Seller hereby agrees to indemnify, defend and hold harmless the Buyer and its Affiliates, and their respective directors, managers, officers, employees, representatives and agents, from and against any and all Damages related to or arising out of or in connection with:

(a)     any inaccuracy or breach of any representation or warranty made by the Seller in the Transaction Documents (including the Disclosure Schedules and any other schedules thereto);

(b)     any breach by the Seller of, or default in the performance by the Seller of, any covenant, agreement, obligation or undertaking made by the Seller in the Transaction Documents (including the Disclosure Schedules and any schedules thereto);

(c)     any Pre-Closing Taxes imposed on any Company Party, and any Taxes imposed on Seller; and

(d)     any inaccuracy or breach of the representation and warranty under Section 3.14(d), related to compliance with Section 409A of the Code; and any issues relating to the classification of Contingent Workers under Section 3.15(b); the offer of coverage or any other requirements under the Patient Protection and Affordable Care Act; and any inaccuracy or breach of the representation and warranty under Section 3.10(e). This Section 7.2(d) will not be subject to the limitations under Section 7.5.

7.3     Third-Party Claims.

25

(a)       In the event that any party hereto (an "Indemnified Party") desires to make a claim against another party hereto (an "Indemnifying Party," which term includes all Indemnifying Parties if more than one), in connection with any third-party Action any time instituted against or made upon the Indemnified Party for which the Indemnified Party may seek indemnification hereunder (a "Third-Party Claim"), the Indemnified Party will promptly notify the Indemnifying Party of such Third-Party Claim and of the Indemnified Party's claim of indemnification with respect thereto; provided, that failure to promptly give such notice will not relieve the Indemnifying Party of its indemnification obligations under this Section 7.3, except to the extent, if any, that the Indemnifying Party has actually been prejudiced thereby.

(b)       The Indemnifying Party will have the right to assume the defense of the Third-Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party by written notice to the Indemnified Party within fifteen (15) days after the Indemnifying Party has received notice of the Third-Party Claim; provided, that the Indemnifying Party must conduct the defense of the Third-Party Claim actively and diligently thereafter in order to preserve its rights in this regard; and, provided further, that the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third-Party Claim.  Notwithstanding the foregoing, the Indemnifying Party will not have the right to assume the defense of the Third-Party Claim if such Third Party Claim (i) seeks non-monetary relief, (ii) involves criminal or quasi-criminal allegations, (iii) is one in which an Indemnifying Party and the Indemnified Party are jointly named in the complaint or (iv) could reasonably be expected to materially adversely affect the Taxes of the Indemnified Party for a taxable period (or portion thereof) beginning after the Closing Date.  If the Indemnifying Party (A) fails to assume the defense of the Third-Party Claim in accordance with this Section 7.3(b), (B) is unable to assume such defense on account of the restrictions set forth in the immediately preceding sentence, or (C) after assuming such defense, fails to conduct the defense of the Third-Party Claim actively and diligently, the Indemnified Party, with counsel of its choice may conduct the defense of such Third-Party Claim, with the costs and expenses thereof to be borne as provided in Sections 7.3(c) or 7.3(d), as applicable.

(c)       With respect to any Third-Party Claim the defense of which is being conducted by the Indemnifying Party pursuant to the provisions of Section 7.3(b), the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior consent of the Indemnified Party (which will not be unreasonably withheld or delayed) unless the judgment or proposed settlement (i) includes an unconditional release of all liability of each Indemnified Party with respect to such Third-Party Claim, (ii) involves only the payment of money damages by the Indemnifying Party and does not impose an injunction or other equitable relief upon the Indemnified Party, and (iii) does not involve an admission of any liability or wrongdoing on the part of the Indemnified Party.  With respect to any Third-Party Claim the defense of which is being conducted by the Indemnified Party pursuant to the provisions of Section 7.3(b), the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party (which will not be unreasonably withheld or delayed).  In the event of any settlement of any Third-Party Claim by (A) the Indemnifying Party with or without the prior consent of the Indemnified Party in accordance with the applicable provisions hereinabove set forth in this Section 7.3(c), or (B) the Indemnified Party with the prior consent of the Indemnifying Party as hereinabove set forth in this Section 7.3(c), all of the costs and expenses incurred in connection with any such Third-Party Claim and the settlement thereof (including the costs and expenses of counsel for the Indemnified Party) shall be Damages of the Indemnified Party and borne by the Indemnifying Party, subject in all events to the applicable limitations set forth in Section 7.

7.4       Purchase Price Adjustments.  The parties agree that to the greatest extent possible the payment of any indemnity hereunder shall be treated as an adjustment to the Purchase Price for Tax purposes.

7.5     Limitations of Liability and Order of Recourse.

(a)     Deductible.  No Indemnifying Party will be required to indemnify any Indemnified Party hereunder with respect to any breaches of such party's representations or warranties hereunder until such time as the aggregate amount of Damages resulting therefrom for which the applicable Indemnified Party(ies) are otherwise entitled to indemnification pursuant to this Agreement, exceeds $1,700,000.00 (One Million Seven Hundred Thousand) (the "Indemnification Deductible"), after which the applicable Indemnifying Party(ies) shall be obligated to indemnify the applicable Indemnified Party(ies) for the full amount of all Damages incurred by such Indemnified Party(ies) in excess of such Indemnification Deductible, subject to the limitations in this Section 7.5.  Notwithstanding anything to the contrary in this Section 7.5, the Indemnification Deductible shall not apply to any Damages arising out of or in connection with (i) fraud,   (ii) the breach of the representations set forth in Sections 3.1 (*Organization; Capitalization; Ownership*), 3.2 (*Charter Documents*), 3.3 (*No conflicts; Required Filings and Consents*), and 3.13 (*Taxes*), or (iii) the matters set forth in Section 7.2(d).

(b)     Maximum Liability.  The parties specifically agree that notwithstanding any provision of this Agreement to the contrary, the indemnification provided for in Section 7.2 is subject to the following limitations:

(i)     The maximum aggregate liability of the Seller under Section 7.2(a) shall in no event exceed an amount equal to $49,000,000 (Forty Nine Million Dollars);

(ii)     Notwithstanding anything to the contrary in this Section 7.5, the maximum aggregate liability set forth in this Section 7.5(b) shall not apply to any Damages arising out of or in connection with fraud on the part of the Seller.

(c)     Survival.  All representations and warranties of the parties in this Agreement shall survive the Closing and shall expire on, and no Indemnifying Party will be liable for any Damages resulting from any breach thereof unless a written claim for indemnification is given by the Indemnified Party to the Indemnifying Party with respect thereto prior to, December 8, 2017.

(d)     Order of Recourse.   The Buyer's right to indemnification or reimbursement pursuant to this Article 7, on account of any indemnifiable Damages, will be satisfied (i) first to the extent available, by a cancellation in the Class C Preferred Units held by the Seller, and, (ii) to the extent not satisfied by clause (i), such excess Damages will be satisfied by the Seller.  For each dollar of indemnification payment in clause (i), the Class C Preferred Unreturned Capital with respect to such Class C Preferred Units shall be reduced by one dollar, and for each $100, one Class C Preferred Unit held by such Seller shall be cancelled.  The parties to this Agreement agree that such reduction shall be reflected in the Members Schedule to the Buyer LLC Agreement.

7.6     Survival of Representations and Warranties.  The representations and warranties of the parties hereto contained in this Agreement or otherwise made in writing in connection with the Transactions (in each case except as affected by the Transactions) shall be deemed material and, notwithstanding any investigation by the Buyer, shall be deemed to have been relied on by the Buyer and shall survive the Closing and the consummation of the Transactions in accordance with the provisions of Section 7.5(b).  Each representation and warranty made by the Seller or the Buyer in this Agreement shall expire on the last day, if any, that claims for breaches of such representation or warranty may be made pursuant to Section 7.5, except that any such representation or warranty that has been made the subject of a claim prior to such expiration date shall survive with respect to such claim until the final resolution of such claim pursuant to this Section 7.

7.7    Effect of Investigation.  The representations, warranties and covenants of an Indemnifying Party, and an Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of the fact that such Indemnified Party or any of its Representatives actually knew that any such representation or warranty is, was or might be inaccurate.

7.8    Exclusive Remedy.  From and after the Closing, the indemnification provided pursuant to this Section 7 shall be the sole and exclusive remedy for any Damages resulting from or arising out of any breach or claim in connection with this Agreement, the other Transaction Documents, the Disclosure Schedules or any certificate delivered in connection with this Agreement, regardless of the cause of action; provided, that, the indemnification rights provided pursuant to this Section 7 are independent of, and, in addition to, such rights and remedies as the parties may have in equity to seek specific performance or other equitable remedies in the case of any breach of any covenant set forth in Section 6.1.

**8.**    DEFINITIONS

As used herein the following terms not otherwise defined have the following respective meanings:

"12/31/15 Balance Sheet" shall have the meaning given such term in Section 3.4.

"Action" means any claim, grievance, complaint, charge, action, cause of action, demand, lawsuit, arbitration, inquiry, investigation, audit, notice of violation, proceeding, litigation, injunction, order, decree, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at Law or in equity.

"Affiliate" shall mean any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, the Seller (or other specified Person) and shall include (a) any Person who is a director or beneficial holder of at least 10% of any class of the then outstanding capital stock (or other shares of beneficial interest) of the Seller (or other specified Person) and (b) any Person of which the Seller (or other specified Person) or an Affiliate of the kind listed in clause (a) above of the Seller (or other specified Person) shall, directly or indirectly, either beneficially own at least 10% of any class of the then outstanding capital stock (or other shares of beneficial interest) or constitute at least a 10% equity participant.

"Agreement" shall have the meaning given such term in the preamble.

"Annual Financial Statements" shall have the meaning given such term in Section 3.4.

"Assignment" shall have the meaning given such term in Section 2.2(a).

"Authorizations" shall have the meaning given such term in Section 3.8.

"Balance Sheet Date" shall have the meaning given such term in Section 3.4.

"Books and Records" means all records (whether in written or other form) of any kind (whether held by the Company Parties or by others on its behalf) owned and in the possession or control of the Seller or Company Parties, including purchase and sales records, customer lists and records, customer prospect lists and records, distributor lists and records, referral sources, marketing materials, research and development materials, operating guides and manuals, creative materials, Intellectual Property materials, studies, cost and pricing information, supplier lists and records, business plans, specifications, personnel

28

and labor relations records, accounting and financial records, maintenance records, operating and management manuals, computer systems and software documentation, disks, tapes and other computer storage media and the information stored thereon, blank forms, blank checks and other blank instruments, and studies and reports, plans, specifications and designs of equipment and records (whether in written or oral form).

"<u>Business</u>" shall mean the provision of energy products, including physical electricity and natural gas to business and residential consumers, purchasing electricity and natural gas from wholesale providers and distributing such commodities to consumers.

"<u>Business Confidential Information</u>" shall have the meaning given such term in <u>Section 6.1(a)(i)</u>.

"<u>Business Day</u>" shall mean any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of New York.

"<u>Buyer</u>" shall have the meaning given such term in the preamble.

"<u>Buyer LLC Agreement</u>" means the amended and restated limited liability company agreement of Buyer, dated as of June 9, 2016, as the same may be amended or modified from time to time.

"<u>CERCLA</u>" shall have the meaning given such term in <u>Section 3.17(a)</u>.

"<u>Charter Documents</u>" shall mean, with respect to any Person which is an entity, the certificate of incorporation, bylaws, limited liability company operating agreement, partnership agreement, or other equivalent organizational or constituent documents, each as then amended and in effect.

"<u>Class B-2 Units</u>" shall have the meaning given such term in the Buyer LLC Agreement.

"<u>Class C Units</u>" shall have the meaning given such term in the Buyer LLC Agreement.

"<u>Closing</u>" shall have the meaning given such term in <u>Section 2.1</u>.

"<u>Closing Date</u>" shall have the meaning given such term in <u>Section 2.1</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Contingent Workers</u>" shall have the meaning given such term in <u>Section 3.15(b)</u>.

"<u>Contract</u>" means any contract, purchase order, agreement, mortgage, indenture, lease, license, insurance policy or other agreement, instrument or binding commitment, whether oral or written.

"<u>Conversion</u>" shall have the meaning given such term in <u>Section 3.1(e)</u>.

"<u>Damages</u>" shall mean all damages, losses, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, costs, and expenses of whatever kind, including court costs and the reasonable fees and expenses of legal counsel, that are incurred as a result of any claims, demands, actions, causes of action, suits, litigations, arbitrations or liabilities; <u>provided</u>, that in no event shall Damages include any punitive, consequential, special or exemplary damages.

"Debt" shall mean as to any Person at any time, without duplication: (i) all indebtedness, liabilities and obligations of such Person for borrowed money, including from the Seller; (ii) all indebtedness, Liabilities and obligations of such Person evidenced by bonds, notes, debentures or other similar instruments; (iii) all indebtedness, liabilities and obligations of such Person to pay the deferred purchase price of property or services, contingent or otherwise; (iv) all Liabilities under leases of such Person that would be required to be recorded as capital leases under GAAP; (v) all indebtedness of others guaranteed by such Person (including guarantees in the form of an agreement to repurchase or reimburse); (vi) all reimbursement obligations of such Person (whether contingent or otherwise) in respect of letters of credit, bankers' acceptances, surety or other bonds and similar instruments; (vii) any amounts owed to any Person under any noncompetition, severance or similar arrangement; (viii) any change-of-control or similar payment or increased cost that is triggered in whole or in part by the Transactions; (ix) any Liability of a Person under deferred compensation plans, phantom stock plans, severance or bonus plans, or similar arrangements made payable in whole or in part as a result of the Transactions; (x) any off-balance sheet financing of a Person (but excluding all leases recorded for accounting purposes by the applicable Person as an operating lease); and (xi) any accrued and unpaid interest on, and any prepayment premiums, penalties or similar contractual charges in respect of, any of the foregoing obligations computed as though payment is being made in respect thereof on the Closing Date.

"Disclosure Schedule," or "Disclosure Schedules" mean the Disclosure Schedule attached hereto, dated as of the date of this Agreement, delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement.

"Employee Benefit Plan" shall have the meaning given such term in Section 3.14(a).

"Environmental Claim" means any and all administrative or judicial actions, suits, orders, claims, liens, notices, notices of violations, investigations, complaints, requests for information, proceedings, or other communication, whether criminal or civil, pursuant to or relating to any applicable Environmental Law.

"Environmental Laws" shall mean any and all federal, state, local, provincial and foreign, civil and criminal laws, statutes, ordinances, orders, common law, codes, rules, regulations, Environmental Permits, policies, guidance documents, judgments, decrees, injunctions, or agreements with any Governmental Authority, relating to the protection of health and the environment, worker health and safety, and/or governing the handling, use, generation, treatment, storage, transportation, disposal, manufacture, registration, distribution, formulation, packaging, labeling, or Release of or exposure to Hazardous Substances.

"Environmental Permit" means any federal, state, local, provincial, or foreign permits, licenses, approvals, consents or authorizations required or issued by any Governmental Authority under or in connection with any Environmental Law, including without limitation, any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"ERISA" shall have the meaning given such term in Section 3.14(a).

"ERISA Affiliate" shall have the meaning given such term in Section 3.14(a).

"Exchange Act" shall mean the Securities and Exchange Act of 1934, as amended.

"Family Member" shall mean, as applied to any individual, any parent, spouse, child, spouse of a child, brother or sister of the individual, and each trust created for the benefit of one or more of such Persons, and each custodian of property of one or more such Persons.

"FERC" means the Federal Energy Regulatory Commission.

"Financial Statements" shall have the meaning given such term in Section 3.4.

"FPA" means the Federal Power Act, as amended, including the implementing regulations adopted by FERC thereunder.

"GAAP" shall mean United States generally accepted accounting principles, consistently applied throughout the periods involved.

"Governmental Authority" shall mean any nation, sovereign or government or political subdivision, whether federal, regional, state, province, local or foreign, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any such nation, sovereign, government or political subdivision, and any private certification agencies or entities.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Substances" shall mean petroleum, petroleum hydrocarbons or petroleum products, petroleum by-products, radioactive materials, asbestos or asbestos-containing materials, gasoline, diesel fuel, pesticides, radon, urea formaldehyde, mold, lead or lead-containing materials, polychlorinated biphenyls; and any other chemicals, materials, substances or wastes in any amount or concentration which are regulated under or for which liability can be imposed under any Environmental Law.

"Indemnified Party" shall have the meaning given such term in Section 7.3(a).

"Indemnifying Party" shall have the meaning given such term in Section 7.3(a).

"Insurance Policies" shall have the meaning given such term in Section 3.18.

"Intellectual Property" shall mean intellectual property or proprietary rights of any description, including, without limitation, (i) rights in any patent, patent application (including, without limitation, any continuation, continuation-in-part and divisional filings), copyright, industrial design, URL, domain name, social media address, trademark, service mark, logo, slogan, trade dress, corporate name or trade name, (ii) related registrations and applications for registration, (iii) trade secrets, moral rights or publicity rights, (iv) inventions, discoveries, or improvements, modifications, know-how, techniques, methodologies, writings, works of authorship, design or data, whether or not patented, patentable, copyrightable or reduced to practice, including, but not limited to, any inventions, discoveries, improvements, modifications, know-how, techniques, methodologies, writings, works of authorship, designs or data embodied or disclosed in any: (1) computer source codes (human readable format) and object codes (machine readable format); (2) specifications; (3) manufacturing, assembly, test, installation, service and inspection instructions and procedures; (4) engineering, programming, service and maintenance notes and logs; (5) technical, operating and service and maintenance manuals and data; (6) hardware reference manuals; and (7) user documentation, help files or training materials, and (v) goodwill, franchises, consents, approvals, and claims of infringement and misappropriation against third parties related to any of the foregoing.

"Interim Financial Statements" shall have the meaning given such term in Section 3.4.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge" or "knowledge" means, with respect to the Seller, the actual knowledge of the Seller or the knowledge the Seller should have known after reasonable investigation and due inquiry thereby.

"Law" means with respect to any Governmental Authority, any constitutional provision, law, statute, code, rule, regulation, ordinance, treaty, order, decree, writ, judgment, decision, certificate, holding, determination, injunction, permit, directive, requirement or rule of law (including common law) of such Governmental Authority along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, including the Securities Act, the Exchange Act, or rules or regulations promulgated by the Securities and Exchange Commission or any of the foregoing or of related to FERC, the FPA or PUHCA. Unless the context clearly requires otherwise, the term "Law" shall include each of the foregoing (and each provision thereof) as in effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the date of this Agreement.

"Leases" shall have the meaning given such term in Section 3.9(b).

"Leased Real Property" means the real property leased, subleased or licensed by the Seller as tenant, subtenant, licensee or other similar party, together with, to the extent leased, licensed or owned by the Seller, all buildings and other structures, facilities or leasehold improvements, currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property and other assets of every kind, nature and description of the Seller located at or attached or appurtenant thereto and all easements, licenses, rights, options, privileges and appurtenances relating to any of the foregoing.

"Liability" means any liability, Debt, obligation, deficiency, Tax, penalty, assessment, fine, claim, cause of action or other loss, fee, cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"Lien" means with respect to any asset, any mortgage, lien, license, pledge, charge, security interest, claim, title retention agreement, restriction or encumbrance of any kind in respect of such asset.

"Material Adverse Effect" means any event, change, circumstance, condition, state of facts, development or effect that has had or would reasonably be expected to have a materially adverse effect on the financial condition, properties, assets, Liabilities, business, operations or results of operations of the Company Parties taken as a whole, or may prevent or materially delay consummation of the Transactions or otherwise prevent the Seller from performing its obligations under any Transaction Document to which it is a party; provided, however, that neither of the following shall be deemed to be a Material Adverse Effect: (i) any adverse change in the price of electricity or gas, and (ii) changes in general economic conditions.

"Material Contracts" shall have the meaning given such term in Section 3.16(a).

"Material Customers" shall have the meaning given such term in Section 3.19.

"<u>Material Suppliers</u>" shall have the meaning given such term in <u>Section 3.19</u>.

"<u>Multi-Employer Plan</u>" shall have the meaning given such term in <u>Section 3.14(a)</u>.

"<u>Ordinary Course of Business</u>" means any action taken by a Person if such action is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"<u>Owned Real Property</u>" means the real property owned by the Company Parties.

"<u>PBGC</u>" shall have the meaning given such term in <u>Section 3.14(d)(ii)</u>.

"<u>Permitted Liens</u>" means any Lien for Taxes or other governmental charges, assessments or levies that are not yet due and payable.

"<u>Person</u>" shall mean a corporation, an association, a partnership (general or limited), a limited liability company, an organization, a business, an individual, a government or political subdivision thereof or a Governmental Authority.

"<u>Pre-Closing Tax</u>" means any Tax for any taxable period or portion thereof ending on the Closing Date.  If a taxable period begins prior to the Closing Date and ends after the Closing Date, then the portion of the taxable period that ends on the Closing Date shall constitute a Pre-Closing Tax.  In the case of Taxes arising in a taxable period of a Company Party that includes, but does not end on, the Closing Date, except as provided in the next sentence, the allocation of such Taxes to the portion of such taxable period that ends on the Closing Date shall be made on the basis of an interim closing of the books as of the end of the Closing Date.  In the case of any Taxes based on capitalization, debt or shares of stock authorized, issued or outstanding, or any real property, personal property or similar ad valorem Taxes that are payable for a taxable period that includes, but does not end on, the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire taxable period.  However, any such Taxes attributable to any property that was owned by a Company Party at some point prior to the Closing Date, but is not owned as of the Closing Date, shall be allocated entirely to portion of such taxable period ending on the Closing Date.

"<u>PUHCA</u>" means the Public Utility Holding Company Act of 2005, including the implementing regulations adopted by FERC thereunder.

"<u>Purchase Price</u>" shall have the meaning given such term in <u>Section 2.1</u>.

"<u>Qualified Plan</u>" shall have the meaning given such term in <u>Section 3.14(c)</u>.

"<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, migrating, leaching, dumping, or disposing of a Hazardous Substance.

"<u>Restricted Period</u>" shall have the meaning given such term in <u>Section 6.1(b)</u>.

"<u>SARA</u>" shall have the meaning given such term in <u>Section 3.17(a)</u>.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seller" shall have the meaning given such term in the preamble.

"Site" means any real properties currently or previously owned, leased, occupied or operated by: (i) any Company Party; (ii) any predecessors of any Company Party; or (iii) any entities previously owned by any Company Party, in each case, including all soil, subsoil, surface waters and groundwater thereat.

"Subsidiary" or "Subsidiaries" means with respect to a specified Person, any other Person of which (i) a majority of the voting power of the voting equity securities or equity interests is owned, directly or indirectly, by such specified Person or (ii) the general partner, manager or other entity governing such other Person is controlled by such specified Person.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means any United States federal, state or local, or non-United States, income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, export, natural resources, energy, severance, stamp, withholding, occupational, premium, windfall profit, environmental tax, customs, duties, real property, personal property, capital stock, capital gains, net worth, escheat, unclaimed property, intangibles, social security, pension insurance contributions, unemployment, disability, payroll, license, employee or other tax or similar levy in the nature of a tax, of any kind whatsoever, including any interest, penalties, or additions to tax in respect of the foregoing

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Laws, regulations, or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having any responsibility for (i) the determination, assessment or collection or payment of any Tax, or (ii) the administration, implementation or enforcement of or compliance with any law, rule or regulation relating to any Tax.

"Third Party Claim" shall have the meaning given such term in Section 7.3(a).

"Third Party Intellectual Property Rights" shall have the meaning given such term in Section 4.11(b).

"Transaction Approvals" shall have the meaning given such term in Section 4.2.

"Transaction Documents" shall mean this Agreement and the Assignment.

"Transactions" means the purchase and sale of the Loan Documents and the other transactions contemplated by this Agreement and the other Transaction Documents.

**9.      GENERAL**

9.1      Consent to Jurisdiction.

(a)      Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any federal or state court located within the Borough of Manhattan in the City and State of New York over any dispute arising out of or relating to this Agreement or any of the Transaction

Documents or any of the transactions contemplated by this Agreement and the other Transaction Documents or thereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)      Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Section 8.3.

(c)      EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

9.2      Expenses.  Each of the Buyer, on the one hand, and the Seller, on the other hand, will pay all of their respective own fees, costs and expenses incurred in connection with negotiation of this Agreement and the Transactions, including, without limitation, any legal, accounting, banking, appraisal, consulting or other professional or brokerage or finder's fees payable in connection therewith.

9.3      Notices.  All notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication, as follows:

If to the Seller as follows:

        c/o Platinum Partners
        250 West 55th Street
        14th Floor
        New York, NY 10019
        Fax 212-582-2424
        Attention: Suzanne Horowitz, Chief Legal Officer
        Email: shorowitz@platinumlp.com

If to the Buyer, to:

        c/o B Asset Manager

1370 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Dhruv Narain
Fax: (212) 260-5051
E-Mail: dnarain@bassetmanager.com

with a copy* to:

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Attention: Steven A. Navarro, Esq.
Fax: (212) 309-6001
E-mail: steven.navarro@morganlewis.com

*Which copy will not constitute notice to the Seller or the Buyer as the case may be, and will be sent at the same time and by the same means as the corresponding notice is sent to the Seller or the Buyer, as the case may be.

Any such notice shall be effective (a) if delivered personally, when received, (b) if sent by overnight courier, when receipted for, (c) if mailed, five (5) days after being mailed as described above, and (d) if sent by written telecommunication, when dispatched.

    9.4  <u>Entire Agreement</u>.  This Agreement and the other schedules referred to herein, together with the other Transaction Documents, contain the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings relating to the subject matter hereof, and shall not be amended except by a written agreement hereafter signed by the parties hereto.

    9.5  <u>Governing Law</u>.  The validity and construction of this Agreement shall be governed and construed and enforced in accordance with the internal Laws (and not the choice-of-law rules) of the State of Delaware.

    9.6  <u>Interpretation</u>.  The headings of sections and subsections are for reference only and shall not limit or control the meaning thereof.  All references in this Agreement to "dollars" or "$" mean United States dollars.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation."  The words "list" and "listed" when used in this Agreement shall be deemed to include, true, complete and correct lists, as the case may be.  References in this Agreement to any gender include references to all genders, and, unless the context otherwise requires, references to the singular include references to the plural and vice versa. The words "hereof," "herein," and "hereunder" and word of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

    9.7  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Neither this Agreement nor the obligations of any party hereunder shall be assignable or transferable by such party without the prior written consent of any other party hereto; <u>provided</u>, that nothing contained in this <u>Section 9.7</u> shall prevent the Buyer, without the consent of the Seller, (a) from transferring or assigning this Agreement or any of its rights or obligations hereunder to an Affiliate of the Buyer, or a Person which is acquiring all or substantially of the assets of the Buyer, or (b) from assigning all or part of its rights or

obligations hereunder by way of collateral assignment to any bank or financing institution providing financing for the acquisition contemplated hereby, but no such transfer or assignment made pursuant to clauses (a) or (b) shall relieve the Buyer of its obligation under this Agreement.

9.8    Severability.  In the event that any provision of this Agreement is held to be invalid, void, illegal, or unenforceable by any court of competent jurisdiction, the same shall be deemed to be severable from the remainder of this Agreement and shall in no way affect, impair, or invalidate any other provision contained herein; provided, that if any that if any provision of this Agreement is deemed or held invalid, void, illegal, or unenforceable, such provision shall be replaced with a provision as similar as possible in such a manner as to be effective, valid and enforceable.

9.9    Further Assurances.  The parties hereto agree to take such reasonable steps and execute such other and further documents as may be necessary or appropriate to cause the terms and conditions contained in the Transaction Documents to be carried into effect.

9.10    No Implied Rights or Remedies.  Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any Person, other than the Seller and the Buyer and their respective successors and permitted assigns or shareholders, if any, any rights or remedies under or by reason of this Agreement.

9.11    Delivery By Facsimile; Counterparts.  This Agreement may be executed and delivered in person, by facsimile, .pdf, .tiff, or other electronic means intended to preserve the original graphic and pictorial appearance of a document, and in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, binding on all of the parties hereto.

9.12    Public Statements or Releases.  Unless otherwise required by applicable Law (after consulting with legal counsel), no party to this Agreement will make, issue or release any public announcement, statement or acknowledgment of the existence of, or reveal the status of, this Agreement or the Transactions, without first obtaining the written consent of the other party.  Notwithstanding the foregoing, nothing contained in this Section 9.12 shall prevent a party hereto from making such disclosures as such party may consider necessary, after consulting with its counsel, to satisfy such party's legal obligations (and in such case, such party will, to the extent consistent with timely compliance with such requirement, consult with the other parties prior to making the required release, announcement or statement).  In the event the terms of this Agreement and the Transactions must, in the reasonable discretion of the Buyer's counsel, be disclosed in connection with legal obligations or proceedings, including applicable requirements of any stock exchange or applicable Law, then (a) the Buyer shall notify the Seller within a reasonable period of time prior to such disclosure being made, and (b) the Buyer shall take all commercially reasonable actions permitted under applicable Law to ensure that such information is maintained confidential to the maximum extent possible.

9.13    Specific Performance.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other rights or remedies to which they are entitled at Law or in equity.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be duly executed and delivered as a sealed instrument as of the date first above written.

BUYER:

AGH PARENT LLC

By: _____
Name:  Dhruv Narain
Title:  Authorized Signatory

SELLER:

PRINCIPAL GROWTH STRATEGIES LLC

By: _____
Name:_____
Title:_____

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be duly executed and delivered as a sealed instrument as of the date first above written.

BUYER:

AGH PARENT LLC

By: _____
Name:_____
Title:_____

SELLER:

PRINCIPAL GROWTH STRATEGIES LLC

By: _____
Name:_____
Title:_____

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

SCHEDULE 1

| Transferor Name and Address | Description of Assigned Asset | FMV of Assigned Asset as of Effective Date | Requires Consent /Notification | FMV of Assigned Asset transferred to PGS |
|---|---|---|---|---|
| AGH Parent LLC | $6,749,714.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $6,749,714.94 | No | $6,749,714.94 |
| AGH Parent LLC | $2,309,462 of principal indebtedness outstanding and $107,310.90 of accrued and unpaid interest under that certain Amended and Restated Convertible Promissory Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to Senior Health Insurance Company of Pennsylvania  in the stated principal amount of $2,309,462, as subsequently assigned to AGH Parent LLC. | $2,416,772.90 | Notification will be given to debtor | $2,416,772.90 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $12,849.28 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | $368,151.15 | Notification will be given to debtor | $368,151.15 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $17,229.70 of accrued and unpaid interest under that certain Promissory Note, dated as of December | $372,531.57 | Notification will be given to | $372,531.57 |

SCHEDULE 1

|  | | | | |
|---|---|---|---|---|
|  | 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. |  | debtor |  |
| AGH Parent LLC | $571,929.18 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $571,929.18 | No | $571,929.18 |
| AGH Parent LLC | $3,438,544.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as subsequently assigned to AGH Parent LLC. | $3,438,544.94 | No | $3,438,544.94 |
| AGH Parent LLC | $3,352,355.32 of principal indebtedness outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | $3,352,355.32 | Notification will be given to debtor | $3,352,355.32 |
| AGH Parent LLC | $3,117,889.24 of principal indebtedness outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as | $3,117,889.24 | Notification will be given to debtor | $3,117,889.24 |

SCHEDULE 1

| | | | | |
|---|---|---|---|---|
| | subsequently assigned to AGH Parent LLC. | | | |
| AGH Parent LLC | $12,901,696.77 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $12,901,696.77 | Notification will be given to debtor | $12,901,696.77 |
| AGH Parent LLC | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538, as subsequently assigned to AGH Parent LLC. | $4,385,254.50 | Notification will be given to debtor | $4,385,254.50 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $668,013.24 | Notification will be given to debtor | $668,013.24 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $675,961.57 | Notification will be given to debtor | $675,961.57 |
| AGH Parent LLC | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO** | $4,647,644.68 | Notification | $4,647,644.68 |

SCHEDULE 1

| | | | |
|---|---|---|---|
| | **Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | will be given to debtor | |
| **Total** | | | $43,666,460.00 |

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 18

FINAL

## FLOW OF FUNDS MEMORANDUM

The following sets forth the fund transfers required at the Closing in connection with the transactions contemplated by that certain Purchase Agreement, dated as of June 9, 2016 (as such agreement may be amended or modified, the "Purchase Agreement"), by and between AGH Parent LLC, a Delaware limited liability company ("AGH Parent"), and Principal Growth Strategies LLC, a Delaware limited liability company (the "Seller"). All capitalized terms used but not otherwise defined herein will have the meanings assigned to such terms in the Purchase Agreement.

**Order of Events on June 9, 2016 (all actions are deemed to take place simultaneously):**

1. Beechwood entities contribute: (i) $22,000,000 in assets to AGH Parent pursuant to Contribution Agreement in exchange for 220,000 Class B-1 Preferred Units; and (ii) $36,960,000.00 in assets to AGH Parent pursuant to Note Purchase Agreement/Contribution Agreement in exchange for B-1 Debt in the principal amount of $36,960,000.00, all as set forth on Schedule 1. Beechwood entities become parties to AGH Parent LLC Agreement.

2. SHIP enters into Subscription Agreement and Note Purchase Agreement and related debt documents to purchase 350,000 Class A Preferred Units for $35,000,000 and B-1 Debt in the principal amount of $15,000,000. SHIP wires an aggregate of $50,000,000 to AGH Parent. SHIP becomes party to AGH Parent LLC Agreement.

3. AGH Parent sells 5,730 Common Units to Beechwood Re Investments LLC for $100 pursuant to a Subscription Agreement. Beechwood Re Investments becomes party to AGH Parent LLC Agreement.

4. AGH Parent and Seller enter into Purchase Agreement to purchase the Note for an aggregate purchase price of $170,000,000 (the "**Purchase Price**").

5. Purchase Price Allocation:

   a. AGH Parent wires **$25,000,000.00** to Beechwood entities at the direction of Seller pursuant to Funds Direction Letter, as set forth in the funds flow below; Beechwood entities assign the Note to PGS;

   b. AGH Parent wires **$40,293,540.00** at the direction of Seller pursuant to the Funds Direction Letter, as set forth in the funds flow below;

   c. AGH Parent assigns debt and equity instruments to Seller with a value of **$43,666,460**, as set forth on Schedule 1 to the Purchase Agreement;

   d. AGH Parent issues **3,438 Class B-2 Units** to Seller; and

   e. AGH Parent issues **590,400 Class C Units** to the Seller.

| | | Funds Flow | | Amount |
|---|---|---|---|---|
| (1) | | Beechwood entities (listed below) wire an aggregate $10,093,540.00 to AGH Parent pursuant to steps 1(i) ($1,382,110.76) and 1(ii) ($8,711,429.24) above, as set forth on Schedule 1 attached hereto. | | $10,093,540.00 |
| | | SHIP - BAM | 331,690.00 | |
| | | BBIL SHIP | 30,000.00 | |
| | | Bre BCLIC Sub | 500,000.00 | |
| | | Bre WNIC 2013 LTC Primary | 601,850.00 | |
| | | Bre WNIC 2013 LTC Sub | 700,000.00 | |
| | | BBIL ULICO 2014 | 90,000.00 | |
| | | BBIHL-SEG | 60,000.00 | |
| | | BBLN-Agera (BBIL Custody) | 4,060,000.00 | |
| | | BBLN-Agera (BBIL SHIP) | 60,000.00 | |
| | | Old Mutual (Bermuda) Ltd. | 3,660,000.00 | |
| | Wire Instructions: | | | |
| | | Bank Name: | Signature Bank | |
| | | FRB / ABA Routing Number: | ███████ | |
| | | Account Number: | | |
| | | Beneficiary Name: | AGH Parent LLC | |
| | | Reference: | c/o AGH Parent LLC<br>1370 Avenue of the Americas<br>32nd Floor<br>New York, NY 10019 | |
| (2) | | SHIP wires an aggregate of $50,000,000 to AGH Parent pursuant to step 2 above. | | $ 50,000,000.00 |
| | Wire Instructions: | | | |
| | | Bank Name: | Signature Bank | |
| | | FRB / ABA Routing Number: | ███████ | |
| | | Account Number: | | |
| | | Beneficiary Name: | AGH Parent LLC | |
| | | Reference: | c/o AGH Parent LLC<br>1370 Avenue of the Americas<br>32nd Floor<br>New York, NY 10019 | |
| (3) | | Net cash flow from AGH Parent to BAM Administrative Services on behalf of its clients. | | $ 19,800,000.00 |
| | Wire Instructions: | | | |
| | | Bank Name: | Signature Bank | |
| | | FRB / ABA Routing Number: | ███████ | |
| | | Account Number: | | |
| | | Beneficiary Name: | BAM Administrative Services LLC | |
| | | Reference: | c/o BAM Administrative Services LLC<br>1370 Avenue of the Americas<br>32nd Floor<br>New York, NY 10019 | |

DB1/ 87947029.1

| | Funds Flow | Amount |
|---|---|---|
| (4) | AGH Parent to send an aggregate amount of $40,293,540.00 by wires on behalf of and at the direction of Seller pursuant to the Direction Letter as follows: | $40,293,540.00 |
| (4)(a) | **Yellow River** | **$933,540.00** |
| | **Wire Instructions:** | |
| | Bank Name: | JPMorgan Chase Bank |
| | Bank Address: | 60 East 42nd Street, New York, NY 10165 |
| | Name: | Yellow River Management LLC Chase Bank, USA |
| | Beneficiary name: | Yellow River Management LLC |
| | Beneficiary address: | 335 Madison Ave, 27th Floor, New York, NY 10017 |
| | ABA/Routing Number: | ███████ |
| | Account Number: | ███████ |
| | SWIFT code: | ███████ |
| | Reference: | Principal Growth Strategies, LLC |
| (4)(b) | **ALS** | **$1,500,000.00** |
| | **Wire Instructions:** | |
| | Bank Name: | Signature Bank |
| | FRB / ABA Routing Number: | ████ |
| | Beneficiary name: | BAM Administrative Services LLC |
| | Account Number: | ████ |
| | Reference: | c/o BAM Administrative Services LLC 1370 Avenue of the Americas 32nd Floor New York, NY 10019 |
| (4)(c) | **Seller** | **$37,860,000.00** |
| | **Wire Instructions:** | |
| | Bank Name: | Sterling National Bank |
| | Address: | 650 Fifth Avenue, New York, NY 10022 |
| | FRB / ABA Routing Number: | ████ |
| | Account Number: | ████ |
| | Account Name/Beneficiary: | Principal Growth Strategies, LLC |
| | Reference: | Agera |

\* \* \* \* \*

Schedule 1

Contribution of $22,000,000 in assets to AGH Parent pursuant
to Contribution Agreement in exchange for 220,000 Class B-1 Preferred Units

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | No. of Class B-1 Preferred Units Issued by the Company to the Transferor |
|---|---|---|---|---|
| BRe WNIC 2013 LTC Primary | $3,117,889.24 of principal indebtedness (the "Assigned WNIC-PPCO Debt") outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78. | $3,117,889.24 | Notification will be given to debtor | 31,178.8924 |
| BBLN-Agera Corp. | 50% of the right title and interest of BBLN-Agera Corp. under that certain Amended and Restated Assignment of Note and Liens, entered into as of May 12, 2016 by and among Principal Growth Strategies LLC, BBIL ULICO 2014, Beechwood Bermuda Investment Holdings Ltd., linked to its Segregated Accounts, Beechwood Bermuda International Ltd. and BBLN-Agera Corp. (as amended and restated, further amended, modified or supplemented from time to time, the "Repo Agreement"); provided, that, it is agreed and acknowledged that BBLN-Agera Corp. hereby agrees to waive, without duplication, $60,000 of the "Repurchase Price" (as defined in the Repo Agreement). | $5,000,000 | No | 50,000.00 |
| BBLN-Agera Corp. | Cash | $60,000 | N/A | 600.00 |
| BBIL ULICO 2014 | 100% of the right title and interest of BBIL ULICO 2014 under the Repo Agreement; provided, that, it is agreed and acknowledged that BBIL ULICO 2014 hereby agrees to waive $90,000 of the "Repurchase Price" (as defined | $7,500,000 | No | 75,000.00 |

Schedule 1

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | No. of Class B-1 Preferred Units Issued by the Company to the Transferor |
|---|---|---|---|---|
| | in the Repo Agreement). | | | |
| BBIL ULICO 2014 | Cash | $90,000 | N/A | 900.00 |
| BHLN-Agera Corp. | 100% of the right title and interest of BHLN-Agera Corp. under the Repo Agreement; provided, that it is agreed and acknowledged that BHLN-Agera Corp. hereby agrees to waive $60,000 of the "Repurchase Price" (as defined in the Repo Agreement). | $5,000,000 | No | 50,000.00 |
| BHLN-Agera Corp. | Cash | $60,000 | No | 600.00 |
| BOLN-Agera Corp. | Cash | $1,172,110.76 | N/A | 11,721.1076 |
| TOTAL | | $22,000,000 | | 220,000 |

$36,960,000 in assets to AGH Parent pursuant to
Note Purchase Agreement/Contribution Agreement in exchange for B-1 Debt

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | Principal Debt to be issued by AGH Parent LLC |
|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania (in respect of its SHIP-BAM Account) | Cash | $331,690 | N/A | $331,690 |
| Senior Health Insurance Company of Pennsylvania (in respect of its SHIP-BAM Account) | $12,901,696.77 of principal indebtedness (the "**Assigned SHIP-PPCO Debt**") outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04. | $12,901,696.77 | Notification will be given to debtor | $608,310 |
| BOLN-Agera Corp. | BOLN-Agera Corp. holds a participation interest in $12,293,386.77 of such Assigned SHIP-PPCO Debt (the "**SHIP-PPCO Participation**") and hereby releases its claim to the SHIP-PPCO Participation (such that the Assigned SHIP-PPCO Debt shall be transferred hereunder free and clear of any obligations arising under the SHIP-PPCO Participation) in exchange for the issuance by AGH Parent LLC to BOLN-Agera Corp. of $12,293,386.77 of principal indebtedness pursuant to the terms of that certain Note Purchase Agreement, dated as of June ___, 2016, by and between the investors from time to time party thereto (the "**Investors**"), BAM Administrative Services LLC, as agent for the Investors, and AGH. | N/A | N/A | $12,293,386.77 |
|  | 49.7% of the right title and interest of BBLN-Agera Corp. under that | $4,970,000 | No | $4,970,000 |

Schedule 1

| | | | | |
|---|---|---|---|---|
| BBLN-Agera Corp. | certain Amended and Restated Assignment of Note and Liens, entered into as of May 12, 2016 by and among PGS, BBIL ULICO 2014, Beechwood Bermuda Investment Holdings Ltd., linked to its Segregated Accounts, Beechwood Bermuda International Ltd. and BBLN-Agera Corp. (as further amended and restated, amended, modified or supplemented from time to time, the "**Repo Agreement**"); provided, that, it is agreed and acknowledged that BBLN-Agera Corp. hereby agrees to waive, without duplication, $90,000 of the "Repurchase Price" (as defined in the Repo Agreement). | | | $4,090,000 |
| BBLN-Agera Corp. | Cash | $4,090,000 | N/A | $4,090,000 |
| BRe BCLIC Sub | Cash | $500,000 | N/A | $500,000 |
| BRe WNIC 2013 LTC Primary | Cash | $601,850 | N/A | $601,850 |
| BRe WNIC 2013 LTC Sub | Cash | $700,000 | N/A | $700,000 |
| BOLN-Agera Corp. | Cash | $2,487,889.24 | N/A | $2,487,889.24 |
| BRe WNIC 2013 LTC Primary | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538. | $4,385,254.50 | Notification will be given to debtor | $4,385,254.50 |

Schedule 1

| | | | |
|---|---|---|---|
| BRe WNIC 2013 LTC Primary | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13. | $668,013.24 | Notification will be given to debtor | $668,013.24 |
| BRe WNIC 2013 LTC Primary | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13. | $675,961.57 | Notification will be given to debtor | $675,961.57 |
| BRe WNIC 2013 LTC Primary | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98. | $4,647,644.68 | Notification will be given to debtor | $2,899,051.68 |
| BOLN-Agera Corp. | BOLN-Agera Corp. holds a participation interest in $1,748,593 of such Assigned WNIC-PEDCO Debt (the "**WNIC-PEDCO Participation**") and hereby releases its claim to the WNIC-PEDCO Participation (such that the Assigned WNIC-PEDCO Debt shall be transferred hereunder free and clear of any obligations arising under the WNIC-PEDCO Participation) in exchange for the issuance by AGH Parent LLC to BOLN-Agera Corp. of $1,748,593 of principal indebtedness pursuant to the terms of that certain Note Purchase | N/A | N/A | $1,748,593 |

DB1/ 87947029.1

Schedule 1

| | | | |
|---|---|---|---|
| Agreement, dated as of June ___, 2016, by and between the Investors, BAM Administrative Services LLC, as agent for the Investors, and AGH Parent LLC. | $36,960,000 | | $36,960,000 |
| TOTAL | $36,960,000 | | |

DB1/ 87947029.1

**PRINCIPLE GROWTH STRATEGIES LLC**
**C/O PLATINUM PARTNERS**
**250 WEST 55TH STREET**
**14TH FLOOR**
**NEW YORK, NY 10019**

June 9, 2016

AGH Parent LLC
c/o B Asset Manager
1370 Avenue of the Americas
32nd Floor
New York, NY 10019

Each of the Parties listed
on the attached <u>Schedule 1</u>.

Re:     **Funding Direction Letter**

Pursuant to the terms of that certain Purchase Agreement (the "***Purchase Agreement***"), dated as of the date hereof, by and between Principal Growth Strategies LLC, a Delaware limited liability company ("***PGS***"), and AGH Parent LLC, a Delaware limited liability company ("***AGH Parent***"), PGS has agreed to issue and sell to AGH that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended and restated as of the date of this Agreement by that certain Second Amended and Restated Secured Convertible Promissory Note dated as of the date of this Agreement (as so amended and restated, the "***Second A&R Note***"), in the principal amount of $600,071.23, executed by Agera Holdings LLC, payable to the order of PGS as specified therein, and all rights, titles and interests of PGS existing and to exist in connection with or as security for the payment of the indebtedness evidenced by the Second A&R Note, including, without limitation, all rights, titles and interests arising under or evidenced by (a) the Note; (b) that certain Secured Note Purchase Agreement, dated as of May 16, 2014, by and between Agera Energy LLC ("***Agera Energy***") and PGS (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of the Purchase Agreement) (the "***Note Purchase Agreement***"); and (c) that certain Security Agreement, dated as of May 16, 2014 by Agera Energy for the benefit of PGS (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of the Purchase Agreement) (the "***Security Agreement***" and, together with the Second A&R Note, the Note Purchase Agreement and all other documents, instruments, amendments and agreements entered into in connection with the transactions contemplated thereby, collectively, the "***Loan Documents***"). All capitalized terms used herein without definition which are defined in the Purchase Agreement shall have the same meanings herein as therein.

Pursuant to the Purchase Agreement, the Purchase Price of $170,000,000 is comprised of cash, Class B-1 Units, Class C Units, Common Units and the relinquishment of certain debt and/or equity investments as set forth on <u>Schedule 1</u>. For administrative convenience, PGS hereby requests, authorizes and directs AGH Parent to pay and deliver, as applicable, portions of such cash, Class B-1 Units, Class C Units, and Common Units directly to the parties, or to their designees, as applicable, the respective amounts listed on <u>Schedule 2</u> attached hereto.

*[The remainder of this page is intentionally left blank.*
*Signature page on the following page.]*

Very truly yours,

Principal Growth Strategies LLC

By _____

Name:  David Steinberg

Title:  Authorized Signatory

[Signature Page to Funding Direction Letter]

Schedule 1

SCHEDULE 1

| Transferor Name and Address | Description of Assigned Asset | FMV of Assigned Asset as of Effective Date | Requires Consent /Notification | FMV of Assigned Asset transferred to PGS |
|---|---|---|---|---|
| AGH Parent LLC | $6,749,714.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $6,749,714.94 | No | $6,749,714.94 |
| AGH Parent LLC | $2,309,462 of principal indebtedness outstanding and $107,310.90 of accrued and unpaid interest under that certain Amended and Restated Convertible Promissory Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to Senior Health Insurance Company of Pennsylvania in the stated principal amount of $2,309,462, as subsequently assigned to AGH Parent LLC. | $2,416,772.90 | Notification will be given to debtor | $2,416,772.90 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $12,849.28 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | $368,151.15 | Notification will be given to debtor | $368,151.15 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and unpaid interest under that certain Promissory Note, dated as of December | $372,531.57 | Notification will be given to | $372,531.57 |

SCHEDULE 1

| | | | debtor | |
|---|---|---|---|---|
| | 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | | | $571,929.18 |
| AGH Parent LLC | $571,929.18 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $571,929.18 | No | |
| AGH Parent LLC | $3,438,544.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as subsequently assigned to AGH Parent LLC. | $3,438,544.94 | No | |
| AGH Parent LLC | $3,352,355.32 of principal indebtedness outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | $3,352,355.32 | Notification will be given to debtor | |
| AGH Parent LLC | $3,117,889.24 of principal indebtedness outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as | $3,117,889.24 | Notification will be given to debtor | |

SCHEDULE 1

| | | | |
|---|---|---|---|
| | subsequently assigned to AGH Parent LLC. | | |
| AGH Parent LLC | $12,901,696.77 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | Notification will be given to debtor | $12,901,696.77 |
| AGH Parent LLC | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538, as subsequently assigned to AGH Parent LLC. | Notification will be given to debtor | $4,385,254.50 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | Notification will be given to debtor | $668,013.24 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | Notification will be given to debtor | $675,961.57 |
| AGH Parent LLC | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO** | Notification | $4,647,644.68 |

SCHEDULE 1

|  |  | will be given to debtor |
|---|---|---|
| **Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. |  |  |
| **Total** |  | $43,666,460.00 |

Schedule 2

| Name | Wiring Instructions | Amounts |
|---|---|---|
| c/o BAM Administrative Services LLC  for benefit of:<br><br>1.  BBIL ULICO 2014 - 30%- ($7,500,000)<br>2.  Beechwood Bermuda Investment Holdings Ltd., for the benefit of its segregated accounts - 20%- ($5,000,000)<br>3.  Beechwood Bermuda International Limited - 10%- ($2,500,000)<br>4.  BBLN-Agera Corp. - 40% - ($10,000,000) | Bank Name:<br>Signature Bank<br>FRB / ABA Routing Number:<br>█████████<br><br>Account Number:<br>█████████<br><br>Reference:<br>c/o BAM Administrative Services LLC<br>1370 Avenue of the Americas<br>32nd Floor<br>New York, NY 10019<br><br>(Or as further directed by BAM pursuant to funds flow memo) | **$25,000,000.00** |
| Principal Growth Strategies LLC | Bank Name: Sterling National Bank<br>Address: 650 Fifth Avenue, New York, NY 10022<br>FRB / ABA Routing Number:<br>█████████<br>Account Number: █████████<br>Reference:  Agera<br><br>(Or as further directed by PGS pursuant to funds flow memo) | **$40,293,540.00**<br><br>**590,400 Class C Units** with an aggregate original value equal to $59,040,000.00.<br><br>**3,438 Class B-1 Units** with an aggregate original value equal to $2,000,000.<br><br>Relinquishment of debt and/or equity by AGH Parent as set forth on Schedule 1 with an aggregate value equal to $43,666,460.00. |

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 19

# PURCHASE AGREEMENT

This **PURCHASE AGREEMENT**, dated as of June 9, 2016 (this "Agreement"), is by and between Principal Growth Strategies, LLC (the "Company"), a Delaware limited liability company and Starfish Capital, Inc., a New York corporation ("Seller"). Capitalized terms and certain other terms used in this Agreement and not otherwise defined have the meanings set forth in Exhibit A.

## BACKGROUND

Seller currently holds an eight percent (8%) membership interest of the Company in accordance with the terms of the Operating Agreement. The Company desires to purchase, and Seller desires to sell, transfer and assign to the Company, all of such Membership Interests (collectively, "Seller's Membership Interests"), upon the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements of the parties contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF MEMBERSHIP INTERESTS;
## PURCHASE PRICE

**1.1.    Purchase and Sale of Membership Interests.**

Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing (as defined in Section 2.1 hereof), Seller hereby sells, conveys, transfers, assigns, and delivers to the Company, and the Company hereby purchases from Seller, the Seller's Membership Interests, free and clear of all Encumbrances.

**1.2.    Purchase Price.**

The purchase price for the Seller's Membership Interests shall be at a purchase price of $13,552,000 (the "Purchase Price").

**1.3.    Payments by the Company.**

At the Closing, the Company shall purchase from the Seller the Seller's Membership Interests and will pay the Purchase Price as follows:

(i)      $7,000,000 in cash or by wire transfer of immediately available funds, to an account designated by the Seller as set forth on Schedule I attached hereto;

1

(ii)   $2,000,000 of Class B-2 Preferred Interests in AGH Parent; and

(iii)   $4,552,000 of Class C Preferred Interests in AGH Parent.

## ARTICLE II
## CLOSING

**2.1.**   <u>Closing</u>.

The initial closing of the transactions contemplated herein (the "<u>Closing</u>") shall be held at 10:00 a.m. New York time at the offices of Seller's counsel, Herrick Feinstein, LLP, 2 Park Avenue, New York, New York 10016 on the date hereof (the "<u>Closing Date</u>"). For tax and accounting purposes, the Closing shall be effective as of 12:01 a.m. New York City time on the Closing Date. Upon the Closing, Seller shall be deemed to have relinquished all of its rights and privileges with respect to the Company and its subsidiaries, including, without limitation, any and all rights under the Operating Agreement or applicable law as a member of the Company, including any right to seek indemnification from the Company and shall be released from all obligations as a member of the Company.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Company as follows:

**3.1.**   <u>Organization of the Seller</u>.

The Seller has been duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed, with the full power and authority to conduct its business as presently being conducted and to enter into this Agreement.

**3.2.**   <u>Authorization</u>.

The Seller has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of this Agreement by the Company, is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**3.3.**   <u>No Conflict or Violation; Consents and Approvals</u>.

(a)   Neither the execution, delivery or performance by the Seller of this Agreement nor the consummation of the transactions contemplated hereby, will (i) violate or conflict with any provision of the certificate of formation, operating agreement, bylaws or similar organizational documents of Seller, (ii) violate, conflict with, or result in or constitute a

breach or default under (with the giving of notice or passage of time, or both), or result in the termination of, or accelerate the performance required by, or result in a right of termination, or acceleration under, any of the terms, conditions or provisions of any contract to which Seller is a party or by which its assets are bound, or (iii) violate any Law or Governmental Order applicable to Seller.

(b)    No consent, approval or authorization of or from, notice to or declaration, filing or registration with any domestic or foreign Governmental Authority, lender or any other person is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where failure to obtain such consent, approval or authorization or to make such notice, declaration, filing or registration would not reasonably be expected to have a material adverse effect on Seller or to materially adversely affect the ability of Seller to carry out their obligations hereunder or consummate the transactions contemplated hereby.

### 3.4.    Title to Seller's Membership Interests.

Seller is the legal and beneficial owner of Seller's Membership Interests, free and clear of all Encumbrances and such Seller's Membership Interests represent all membership interests of the Company legally or beneficially owned by Seller.

### 3.5.    No Encumbrances.

The Seller's Membership Interests are free and clear of all Encumbrances, of any nature whatsoever, whether or not perfected, and are free and clear of any restrictions regarding transfer, other than those contained in the LLC Agreement, which restrictions have been waived by the Company with respect to the transactions contemplated by this Agreement.

### 3.6.    No Brokers or Finders.

Seller has not engaged or made any agreement with any broker, finder or similar agent or any person or firm which will result in the obligation of the Company to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

### 3.7.    No Litigation.

There is no claim, action, suit, proceeding or government investigation pending or, to the knowledge of Seller, threatened against Seller by or before any court or Governmental Authority that individually or in the aggregate would, or would reasonably be expected to, impede to the ability of the Company to complete the Closing.

### 3.8.    No Restrictive Agreements.

Seller is not a party to any contract or subject to any other legal restriction, which prevents either Seller from entering into, performing and complying with this Agreement, nor is Seller party to any contract or obligation granting to any person or entity any absolute or contingent rights in or to the Seller's Membership Interests.

**3.9.   No Other Agreements.**

Seller has not granted to any person, any options, warrants, rights, or other instruments or agreements giving any person the right to acquire the Seller's Membership Interests, nor are there any commitments to issue or execute any such options, warrants, rights, instruments or agreements.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Seller as follows:

**4.1.   Organization of the Company.**

The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed, with the full power and authority to conduct its business as presently being conducted and to enter into this Agreement.

**4.2.   Authorization.**

The Company has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by Seller, is a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**4.3.   No Conflict or Violation; Consents and Approvals.**

(a)    Neither the execution, delivery or performance by the Company of this Agreement nor the consummation of the transactions contemplated hereby, will (i) violate or conflict with any provision of the certificate of formation, operating agreement or similar organizational documents of the Company, (ii) violate, conflict with, or result in or constitute a breach or default under (with the giving of notice or passage of time, or both), or result in the termination of, or accelerate the performance required by, or result in a right of termination, or acceleration under, any of the terms, conditions or provisions of any contract to which the Company is a party or by which its assets are bound, or (iii) violate any Law or Governmental Order applicable to the Company.

(b)    No consent, approval or authorization of or from, notice to or declaration, filing or registration with any domestic or foreign Governmental Authority or any other person is required to be made or obtained by the Company in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where failure to obtain such consent, approval or authorization or to make such notice, declaration, filing or registration would not reasonably be expected to have a material adverse

effect on the Company or to materially adversely affect the ability of the Company to carry out their obligations hereunder or consummate the transactions contemplated hereby.

### 4.4. No Brokers or Finders.

The Company has not engaged or made any agreement with any broker, finder or similar agent or any person or firm which will result in the obligation of the Seller to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

### 4.5. No Litigation.

There is no claim, action, suit, proceeding or government investigation pending or, to the knowledge of the Company, threatened against the Company by or before any court or Governmental Authority that individually or in the aggregate would, or would reasonably by expected to, impede to the ability of the Company to complete any Closing.

## ARTICLE V
## COVENANTS OF THE PARTIES

The parties agree as follows with respect to the period following the execution of this Agreement and the Closing:

### 5.1. AGH Parent Agreement.
Seller agrees to be bound by the terms of the AGH Parent Agreement and to execute such documents as may be reasonably requested by AGH Parent to evidence such agreement.

### 5.2. Further Assurances.
Upon the terms and subject to the conditions contained herein, the parties agree, from and after the Closing, (i) to use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder, and (iii) to cooperate with each other in connection with the foregoing.

## ARTICLE VI
## INDEMNIFICATION

### 6.1. Reliance on Representations, Etc.

Each party hereto shall be entitled to rely upon the representations and warranties of the other party set forth in this Agreement and such representations and warranties shall survive the Closing. The right of any person to indemnification, reimbursement or other remedy based upon breaches of representations, warranties, covenants and agreements contained in this Agreement shall not be affected by any investigation conducted by any person, or any knowledge of any person acquired at any time (whether before or after the execution and delivery of this Agreement or Closing Date), with respect to the accuracy of, or compliance with, any such

representation, warranty, covenant or agreement. Each of the covenants and agreements made in this Agreement shall survive the Closing until they are fully performed or terminate in accordance with their respective terms.

### 6.2.   Indemnification.

(a)   From and after the Closing, Seller shall indemnify, defend and hold harmless the Company, its affiliates and each of their respective members, managers, directors, officers, employees, agents, successors and permitted assigns, their affiliates and subsidiaries (collectively, the "Company Indemnified Parties"), from and against any and all Losses incurred in connection with, arising out of, resulting from or incident to: (i) any breach of any representation or warranty made by Seller in or pursuant to this Agreement; and (ii) any breach of any covenant or agreement made by Seller in or pursuant to this Agreement;.

(b)   From and after the Closing, the Company shall indemnify, defend and hold harmless Seller, its affiliates and each of their respective members, managers, directors, officers, employees, agents, successors and permitted assigns their affiliates and subsidiaries (collectively, the "Seller Indemnified Parties"), from and against any and all Losses incurred in connection with, arising out of, resulting from or incident to: (i) any breach of any representation or warranty made by the Company in or pursuant to this Agreement; and (ii) any breach of any covenant or agreement made by the Company in or pursuant to this Agreement.

## ARTICLE VII
## MISCELLANEOUS

### 7.1.   Assignment; Binding Effect.

No party shall assign its rights or delegate its obligations hereunder without the prior written consent of the other party or parties, and any attempted assignment or delegation in contravention of this sentence shall be null and void *ab initio*. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, executors, administrators and permitted assigns, and no other person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

### 7.2.   No Third-Party Rights.

Except as expressly set forth herein, nothing in this Agreement shall be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. Except as expressly set forth herein, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

### 7.3.   Notices.

All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when received if personally delivered; (b) when transmitted if transmitted by telecopy, electronic or digital transmission; (c) the day after it is sent, if sent for next day delivery to a domestic

address by recognized overnight delivery service; and (d) upon receipt, if sent by certified or registered mail, return receipt requested. In each case any such notice, request, demand or other communication shall be sent to:

If to the Company, to:

> Principal Growth Strategies LLC
> c/o Platinum Partners
> 250 West 55th Street, 14th Floor
> New York, NY 10019
> Attn: Mark Nordlicht

If to Seller, to:

> Starfish Capital, Inc.
> 72 North State Road, #502
> Briarcliff Manor, New York 10510
> Attn: Kevin Cassidy

with a copy to:

> Herrick, Feinstein LLP
> 2 Park Avenue
> New York, NY 10016
> Attn: Therese Doherty, Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

### 7.4. Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED, INTERPRETED AND THE RIGHTS OF THE PARTIES DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK; (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW BUT WITHOUT REFERENCE TO ALL OTHER CHOICE OF LAW PROVISIONS OF NEW YORK LAW).

### 7.5. Waiver of Jury Trial.

Each of the parties hereby waives to the fullest extent permitted by applicable Law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each of the parties hereby (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into this Agreement and the transactions contemplated by this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 7.5.

**7.6.** **Entire Agreement; Amendments and Waivers.**

This Agreement (together with all exhibits, schedules, and attachments hereto), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**7.7.** **Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument, binding upon the parties hereto.

**7.8.** **Expenses.**

Each of the Company and Seller shall pay all of its own and its affiliates' out-of-pocket expenses incurred in connection with the transactions contemplated hereby and in connection with any subsequent amendment or waiver thereof, including without limitation all fees and disbursements of any outside accounting, legal, insurance, real estate, environmental, geological, or other professionals engaged by such party or its affiliates in connection with such transactions.

**7.9.** **Severability.**

In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

**7.10.** **Titles; Gender.**

The titles, captions or headings of the Articles and Sections herein, and the use of a particular gender, are for convenience of reference only and are not intended to be a part of or to affect or restrict the meaning or interpretation of this Agreement.

**7.11.** **Exhibits.**

The Exhibits referred to in this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth in their entirety herein.

**7.12.** **Cumulative Remedies.**

All rights and remedies of either party hereto are cumulative of each other and of every

other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

### 7.13.   Specific Performance.

Each of the Company and Seller acknowledges and agrees that the other party would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the other party could not be adequately compensated in all cases by monetary damages alone.  Accordingly, in addition to any other right or remedy to which Seller or the Company may be entitled under this Agreement, it shall be entitled to enforce any provision of this Agreement by seeking a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

### 7.14.   No Admissions.

The release and covenants in this Agreement do not constitute an admission by the parties to this Agreement.

### 7.15.   Service of Process, Consent to Jurisdiction.

(a)     Each of the parties hereto irrevocably consents to the service of any process, pleading, notices or other papers by the mailing of copies thereof by registered or certified mail, or by nationally recognized overnight courier, postage or delivery charges prepaid, to such party at such party's address set forth herein, or by any other method provided or permitted under New York law.

(b)     Each party hereto irrevocably and unconditionally (i) agrees that any suit, action or other legal proceeding arising out of this Agreement may be brought in any New York state court or federal court sitting in the Borough of Manhattan, New York; (ii) consents to the exclusive jurisdiction of any such court in any such suit, action or proceeding; and (iii) waives any objection to the laying of venue of any such suit, action or proceeding in any such court.

*[Signature page follows]*

HF 10862393v.1

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

COMPANY:

**PRINCIPAL GROWTH STRARTEGIES LLC**

By:_____

Name:_____

Title:_____

**SELLER:**

**STARFISH CAPITAL, INC.**

By:_____

Name: Kevin Cassidy

Title:   President

HF 10862393v.1

## **Schedule I**

### Wire Instructions

<u>Seller Wire Instructions</u>:

Wire Instructions:

Bank Name:    JPMorgan Chase Bank, N.A.

New York, New York 10017

FRB / ABA Routing Number:

Account Number:

SWIFT No.

Account  Name:      Lawrence R. Gelber

Attorney-at-Law Master Trust Account

HF 10862393v.1

## **EXHIBIT A**

## **DEFINITIONS**

As used in this Agreement, the terms below shall have the following meanings.  Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"AGH Parent" means AGH Parent LLC, a Delaware limited liability company.

"AGH Parent Agreement" means the Amended and Restated Limited Liability Company Agreement of AGH Parent, dated as of June 9, 2016, as amended from time to time.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Claim" means any claim, demand, demand letter, administrative, regulatory or judicial action, suit, petition, appeals lien, notice of non-compliance or violation, investigation, proceeding, consent order, consent agreement, cause of action, chose in action, right of recovery or right of set-off of whatever kind or description against any person.

"Company" has the meaning set forth in the Introduction to this Agreement.

"control" (including its correlative meanings "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of securities or partnership or other interests, by contract or otherwise.

"Encumbrance" means any mortgage, deed of trust, hypothecation, rights of others, claim, encumbrance, burden, reservation, title defect, title retention agreement, conditional sale arrangement, lease, sublease, license, occupancy agreement, restrictive covenant, condition, encroachment, voting trust agreement, interest option, right of first offer, negotiation or refusal, proxy, or other similar restriction, limitation, lien, pledge, charge, easement or other security interest.

"Governmental Authority" means any court, tribunal, judicial or arbitral body, government (federal, state, provincial, local, foreign, or multinational) or other regulatory, administrative or governmental agency or authority.

"Governmental Order" means any judgment, decision, decree, injunction, ruling, stipulation, determination, award, writ or order of or entered by or with any Governmental Authority that is binding on any person or its property under applicable Law.

"Law" or "Laws" means any federal, national, supranational, state, provincial, local or similar law, statute, ordinance, regulation, rule, court decision, code, requirement or rule of law (including common law).

"Liabilities" means any direct or indirect liability, indebtedness, obligation, commitment,

expense, claim, deficiency, guaranty or endorsement of or by any person of any type, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, including all costs and expenses relating thereto, and including without limitation those liabilities, Indebtedness and obligations arising under any Law, Action, threatened Action, Governmental Order or any award of any arbitrator of any kind, and those arising under any Contract.

"Operating Agreement" means the   Operating   Agreement   of   the   Company   dated December 4, 2014, as amended.

"Losses" means, in respect of the indemnification obligations of any party pursuant to this Agreement, any and all costs, losses, Liabilities, obligations, damages (including consequential damages, lost profits, special or incidental damages, multiple damages, exemplary damages and other penalty damages) and other reasonable out-of-pocket expenses, including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement of Actions relating to Losses.

"Membership Interests" has the meaning set forth in the Operating Agreement.

"Seller" has the meaning set forth in the Introduction to this Agreement.

"Seller's Membership Interests" has the meaning set forth in the "Background" section of this Agreement.

**EFiled:  Jun 07 2019 03:20PM EDT**
**Transaction ID 63335909**
**Case No. 2019-0431-**

# Exhibit 20

EXECUTION VERSION

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

among

**AGH PARENT LLC**

and

**THE MEMBERS NAMED HEREIN**

dated as of

June 9, 2016

# TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS ...............................................................................................1

Section 1.01 Definitions. ........................................................... 1

Section 1.02 Interpretation. ....................................................... 15

**ARTICLE II** ORGANIZATION .......................................................................................15

Section 2.01 Formation. ........................................................... 15

Section 2.02 Name. ................................................................ 16

Section 2.03 Principal Office. ................................................... 16

Section 2.04 Registered Office; Registered Agent. ........................ 16

Section 2.05 Purpose; Powers. ................................................. 16

Section 2.06 Term. ................................................................ 16

Section 2.07 No State-Law Partnership. ..................................... 16

**ARTICLE III** UNITS .......................................................................................................17

Section 3.01 Units Generally. ................................................... 17

Section 3.02 Authorization and Issuance of Preferred Units. ............ 17

Section 3.03 Authorization and Issuance of Common Units. ............. 17

Section 3.04 Incentive Units. ................................................... 17

Section 3.05 Other Issuances. .................................................. 19

Section 3.06 Certification of Units. ............................................ 19

**ARTICLE IV** MEMBERS .................................................................................................20

Section 4.01 Admission of New Members. ................................... 20

Section 4.02 Representations and Warranties of Members. ............... 20

Section 4.03 No Personal Liability. ............................................ 21

Section 4.04 No Withdrawal. .................................................... 21

Section 4.05 Death. ............................................................... 22

Section 4.06 Voting. .............................................................. 22

Section 4.07 Meetings. ........................................................... 22

Section 4.08 Quorum. ............................................................ 23

Section 4.09 Action Without Meeting. ........................................ 23

Section 4.10 Power of Members. ............................................... 23

i

Section 4.11 No Interest in Company Property. 23

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS .........................23

Section 5.01 Initial Capital Contributions. 23

Section 5.02 Additional Capital Contributions. 24

Section 5.03 Maintenance of Capital Accounts. 24

Section 5.04 Succession Upon Transfer. 25

Section 5.05 Negative Capital Accounts. 25

Section 5.06 No Withdrawal. 25

Section 5.07 Treatment of Loans From Members. 25

Section 5.08 Modifications. 25

**ARTICLE VI** ALLOCATIONS ........................................................................................25

Section 6.01 Allocation of Net Income and Net Loss. 25

Section 6.02 Regulatory and Special Allocations. 26

Section 6.03 Tax Allocations. 28

Section 6.04 Allocations in Respect of Transferred Units. 28

Section 6.05 Curative Allocations. 29

**ARTICLE VII** DISTRIBUTIONS ...................................................................................29

Section 7.01 General. 29

Section 7.02 Priority of Distributions. 29

Section 7.03 Limitations on Incentive Units. 30

Section 7.04 Tax Advances. 31

Section 7.05 Tax Withholding; Withholding Advances. 32

Section 7.06 Distributions in Kind. 34

Section 7.07 Cancellation of Certain Preferred Units. 34

**ARTICLE VIII** MANAGEMENT ....................................................................................34

Section 8.01 The Manager. 34

Section 8.02 Officers. 35

Section 8.03 No Personal Liability. 35

**ARTICLE IX** TRANSFERS AND PRE-EMPTIVE RIGHTS .........................................35

Section 9.01 General Restrictions on Transfer. 35

ii

Section 9.02 Permitted Transfers.                                        36

Section 9.03 Drag-along Rights.                                          36

Section 9.04 Purchase Right.                                             37

Section 9.05 Class A Preferred Unit Redemption.                          39

Section 9.06 Class C Preferred Unit Redemption.                          40

Section 9.07 Tag-Along Right.                                            40

Section 9.08 Pre-Emptive Rights.                                         44

Section 9.09 Rights with Respect to Blockers.                           44

**ARTICLE X** COVENANTS ............................................................44

Section 10.01 Confidentiality.                                           44

Section 10.02 Registration Rights.                                       44

**ARTICLE XI** ACCOUNTING; TAX MATTERS ...........................................46

Section 11.01 Inspection Rights; Information Rights.                     46

Section 11.02 Tax Matters Member.                                        46

Section 11.03 Tax Returns.                                               48

Section 11.04 Company Funds.                                             48

**ARTICLE XII** DISSOLUTION AND LIQUIDATION ....................................48

Section 12.01 Events of Dissolution.                                     48

Section 12.02 Effectiveness of Dissolution.                              49

Section 12.03 Liquidation.                                               49

Section 12.04 Cancellation of Certificate.                               50

Section 12.05 Survival of Rights, Duties and Obligations.                50

Section 12.06 Recourse for Claims.                                       50

**ARTICLE XIII** EXCULPATION AND INDEMNIFICATION ...............................50

Section 13.01 Exculpation of Covered Persons.                            50

Section 13.02 Liabilities of Covered Persons.                            51

Section 13.03 Indemnification.                                           51

Section 13.04 Survival.                                                  53

**ARTICLE XIV** MISCELLANEOUS ..................................................54

Section 14.01 Expenses.                                                  54

iii

Section 14.02 Further Assurances.                                    54

Section 14.03 Notices.                                              54

Section 14.04 Headings.                                             55

Section 14.05 Severability.                                         55

Section 14.06 Entire Agreement.                                     55

Section 14.07 Successors and Assigns.                              55

Section 14.08 No Third-party Beneficiaries.                        55

Section 14.09 Amendment.                                           55

Section 14.10 Waiver.                                              56

Section 14.11 Governing Law.                                       56

Section 14.12 Submission to Jurisdiction.                          56

Section 14.13 Waiver of Jury Trial.                                57

Section 14.14 Equitable Remedies.                                  57

Section 14.15 Remedies Cumulative.                                 57

Section 14.16 Counterparts.                                        57

Section 14.17 Initial Public Offering.                             57

iv

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement of AGH Parent LLC, a Delaware limited liability company (the "**Company**"), is entered into as of June 9, 2016 by and among the Company, the Initial Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in **Section 1.01** of this Agreement.

## RECITALS

**WHEREAS**, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on May 31, 2016 (the "**Certificate of Formation**");

**WHEREAS**, the Members wish to amend and restate in its entirety that certain Limited Liability Company Agreement of the Company, dated as of June 3, 2016, in order to set forth their binding agreement as to the affairs of the Company, the conduct of its business and certain rights with respect to the relationship among the parties hereto; and

**WHEREAS**, the Members wish to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the allocation and distribution of profits and losses, and the respective rights and obligations of the Members and the Company to and among each other.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this **Section 1.01**:

"**Acceptance Notice**" has the meaning set forth in Section 9.08(c).

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)        crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)        debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*).

"**Adjusted Taxable Income**" of a Member for a Fiscal Year (or portion thereof) with respect to Units held by such Member means the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (i) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) without taking into account the application of Code Section 704(c) and any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, or is a Family Member of such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of any doubt, any Person for whom B Asset Manager, LP, a Delaware limited partnership, or its Affiliates, serves as investment or asset manager, shall be deemed to be an "Affiliate" of the Beechwood Members.

"**Agreement**" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Award Agreements**" has the meaning set forth in **Section 3.04(c)**.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent

jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**Beechwood Members**" means BRe WNIC 2013 LTC Primary, BBLN-Agera Corp., BBIL ULICO 2014, BHLN-Agera Corp., BOLN-Agera Corp and Beechwood Re Investments LLC.

"**Blocker Equityholder**" means any Person holding equity securities of a Blocker.

"**Blocker**" means any Beechwood Member, or Transferee thereof, that is treated as a corporation for tax purposes.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)     the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company;

(iii)     the grant to a Service Provider of any Incentive Units, or the issuance by the Company of a noncompensatory option; and

(iv)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(*g*);

> *provided*, that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Manager reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)    if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required to close.

"**Capital Account**" has the meaning set forth in **Section 5.03**.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member; *provided*, however, no Member shall be deemed to have made any Capital Contribution to the Company with respect to the issuance to such Member of an Incentive Unit, the vesting of an Incentive Unit or a Code Section 83(b) election made by such Member with respect to an Incentive Unit.

"**Cause,**" with respect to any particular Service Provider, has the meaning set forth in any Award Agreement, employment agreement or other written contract of engagement entered into between the Company or any Company Subsidiary and such Service Provider; *provided*, however, if none, then "Cause" means any of the following:

(a)    such Service Provider's fraud, embezzlement or other material dishonesty or breach of fiduciary duty against the Company or any of the Company Subsidiaries as determined by the Manager;

(b)    any conviction of, or the entering of a plea of guilty or *nolo contendere* to, a crime or the commission of an act that involves moral turpitude as determined by the Manager, or any willful or material violation by such Service Provider of any federal, state or foreign securities laws;

(c)      any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by such Service Provider as determined by the Manager;

(d)      the use (including being under the influence) or possession of illegal drugs by such Service Provider on the premises of the Company or any of the Company Subsidiaries or while performing any duties or responsibilities with the Company or any of the Company Subsidiaries; or

(e)      the material breach by such Service Provider of any covenant undertaken in **Article X** herein, any Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, or the material violation by such Service Provider of any material policy of the Company or any Company Subsidiary; which breach or violation, if capable of cure, has continued unremedied for more than thirty (30) days after the Company or Company Subsidiary has provided written notice thereof.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Change of Control**" means: (a) the sale of all or substantially all of the consolidated assets of the Company and the Company Subsidiaries to a Third Party Purchaser or (b) a transaction resulting in no less than a majority of the Units on a Fully Diluted Basis being held by a Third Party Purchaser.

"**Class A Preferred Capital Value**" means $35,000,000.

"**Class A Preferred Return**" means, with respect to the Class A Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class A Preferred Unreturned Capital Value with respect to such Class A Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class A Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class A Preferred Units" in this Agreement.

"**Class A Preferred Unreturned Capital Value**" means, for any Class A Preferred Unit at any time, the amount of the Class A Preferred Capital Value for such Class A Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class A Preferred Unit pursuant to **Section 7.02(b)** prior to such time.

"**Class B Preferred Units**" means the Class B-1 Preferred Units and the Class B-2 Preferred Units.

"**Class B-1 Preferred Capital Value**" means $22,000,000.

"**Class B-1 Preferred Return**" means, with respect to the Class B Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class B Preferred

Unreturned Capital Value with respect to such Class B Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class B-1 Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B Preferred Units" in this Agreement.

"**Class B-1 Preferred Unreturned Capital Value**" means, for any Class B Preferred Unit at any time, the amount of the Class B Preferred Capital Value for such Class B Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class B Preferred Unit pursuant to **Section 7.02(d)** prior to such time.

"**Class B-2 Preferred Capital Value**" means $2,000,000.

"**Class B-2 Preferred Return**" means, with respect to the Class B-2 Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class B-2 Preferred Unreturned Capital Value with respect to such Class B-2 Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class B-2 Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B-2 Preferred Units" in this Agreement.

"**Class B-2 Preferred Unreturned Capital Value**" means, for any Class B-2 Preferred Unit at any time, the amount of the Class B-2 Preferred Capital Value for such Class B-2 Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class B-2 Preferred Unit pursuant to **Section 7.02(f)** prior to such time.

"**Class C Preferred Capital Value**" means $59,040,000.

"**Class C Preferred Return**" means, with respect to the Class C Preferred Units, an amount equal to a compounded annual rate of return of eight percent (8%) on the Class C Preferred Unreturned Capital Value with respect to such Class C Preferred Units, calculated from the date on which the related Capital Contribution is made.  For purposes of the calculation of the Class C Preferred Return, the reduction in the Class C Preferred Unreturned Capital Value pursuant to Section 7.5(d) of the Purchase Agreement shall be deemed to occur on the date of the contribution, such that there would be no preferred return *ab initio* with respect to such reduced Class C Preferred Unreturned Capital Value.

"**Class C Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class C Preferred Units" in this Agreement.

"**Class C Preferred Unreturned Capital Value**" means, for any Class C Preferred Unit at any time, the amount of the Class C Preferred Capital Value for such Class C Preferred Unit,

DB1/ 87817619.15

reduced by (x) the aggregate amount of all Distributions made by the Company in respect of such Class C Preferred Unit pursuant to **Section 7.02(h)** prior to such time and (y) reductions pursuant to Section 7.5(d) of the Purchase Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Class A Redemption**" has the meaning set forth in **Section 9.05(a)(i)**.

"**Company Class A Redemption Notice**" has the meaning set forth in **Section 9.05(b)**.

"**Company Class C Redemption Notice**" has the meaning set forth in **Section 9.06(b)**.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"**Company Subsidiary**" means a Subsidiary of the Company.

"**Confidential Information**" has the meaning set forth in **Section 10.01(a)**.

"**Covered Person**" has the meaning set forth in **Section 13.01(a)**.

"**Covered Transaction**" has the meaning set forth in **Section 9.09**.

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*, and any successor statute, as it may be amended from time to time.

"**Dissolution Event**" has the meaning set forth in **Section 12.01**.

"**Distributable Cash**" means, as of any date, the excess of (a) the cash, cash equivalent items, marketable securities and money market investments held by the Company over (b) the sum of the amount of such items as the Manager reasonably determines to be necessary for (i) the payment of the Company's then due or accrued expenses, liabilities and other obligations and (ii) the establishment of appropriate reserves for expenses, liabilities and obligations.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or purchase by the Company or any Member of any Units or Unit Equivalents; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Service Provider or

Manager for the Company or a Company Subsidiary. "**Distribute**" when used as a verb and "**Distributable**" when used as an adjective shall each have a correlative meaning.

"**Drag-along Member**" has the meaning set forth in **Section 9.03(a)**.

"**Drag-along Notice**" has the meaning set forth in **Section 9.03(b)**.

"**Drag-along Sale**" has the meaning set forth in **Section 9.03(a)**.

"**Dragging Member**" has the meaning set forth in **Section 9.03(a)**.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Estimated Tax Amount**" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Manager.  In making such estimate, the Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Manager are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in **Section 7.04(b)**.

"**Excess Net Losses**" has the meaning set forth in **Section 6.02(i)**.

"**Exercise Period**" has the meaning set forth in **Section 9.08(c)**.

"**Exercising Member**" means each Pre-emptive Member exercising its rights to purchase its Pre-emptive Pro Rata Portion of the New Securities in full.

"**Fair Market Value**" of any asset as of any date means (a) the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager, in the exercise of its reasonable business judgment, considers relevant and (b) for purposes of **Section 9.04** only, if the Service Provider disagrees with the Manager's determination of Fair Market Value, the purchase price of the Incentive Units of such date as determined in good faith by an independent investment banking, accounting or valuation firm (paid for one-half by the Company and one-half by the Service Provider) chosen by the Manager that is reasonably acceptable to the Service Provider.

"**Family Members**" has the meaning set forth in **Section 9.02(a)**.

"**Fiscal Year**" means the calendar year, unless otherwise determined by the Manager.

"**Forfeiture Allocations**" has the meaning set forth in **Section 6.02(h)**.

8

"**Fully Diluted Basis**" means, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable, or (b) with respect to any specified type, class or series of Units, all issued and outstanding Units designated as such type, class or series and all such designated Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"**GAAP**" means United States generally accepted accounting principles consistently applied from period to period and throughout any period.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Imputed Underpayment Amount**" has the meaning set forth in **Section 7.05(d)**.

"**Incentive Plan**" has the meaning set forth in **Section 3.04(c)**.

"**Incentive Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Incentive Units" in this Agreement and includes both Restricted Incentive Units and Unrestricted Incentive Units.

"**Initial Member**" has the meaning set forth in the definition of the term Member.

"**Initial Public Offering**" has the meaning set forth in **Section 14.17(a)**.

"**IPO Entity**" has the meaning set forth in **Section 14.17(a)**.

"**Issuance Notice**" has the meaning set forth in **Section 9.08(b)**.

"**Joinder Agreement**" means the joinder agreement in form and substance attached hereto as Exhibit A.

"**Liquidator**" has the meaning set forth in **Section 12.03(a)**.

"**Losses**" has the meaning set forth in **Section 13.03(a)**.

"**Manager**" has the meaning set forth in **Section 8.01(b)**.

"**Member**" means (a) each Person who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Member Class A Redemption**" has the meaning set forth in **Section 9.05(a)(ii)**.

"**Member Class A Redemption Notice**" has the meaning set forth in **Section 9.05(c)**.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in **Section 3.01**.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, (a) to a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company; (b) to a Distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act.

"**Misallocated Item**" has the meaning set forth in **Section 6.05**.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)      any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)      any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)      any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by

reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)    any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*);

(e)    if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)    to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**New Interests**" has the meaning set forth in **Section 3.05**.

"**New Partnership Audit Rules**" shall mean, as enacted pursuant to the Bipartisan Budget Act of 2015, Sections 6221 through 6241 of the Code, including any amendments thereto or other Code provisions with respect to the same subject matter as Sections 6221 through 6241 of the Code, and any regulations promulgated or proposed under any such Sections and any administrative guidance with respect thereto.

"**New Securities**" means Units or Unit Equivalents; *provided*, that the term "New Securities" shall not include any Units or Unit Equivalents issued by the Company in connection with: (A) a grant to any existing or prospective Service Providers other than any Service Provider who is an affiliate of the Manager; (B) any acquisition by the Company or any Company Subsidiary of any equity interests, assets, properties or business of any Person other than from an affiliate of the Manager; (C) any transaction or series of related transactions involving a Change of Control; (D) any Public Offering; (E) any subdivision of Units (by a split of Units or otherwise), payment of Distributions or any similar recapitalization; (F) any issuance of Units or Unit Equivalents to lenders or other institutional investors (excluding the Members) in any arm's length transaction in which such lenders or investors provide debt financing to the Company or any Company Subsidiary; or (G) a joint venture, strategic alliance or other commercial relationship with any Person (including Persons that are customers, suppliers and strategic partners of the Company or any Company Subsidiary but not including any affiliate of the Manager) relating to the operation of the Company's or any Company Subsidiary's business and not for the primary purpose of raising equity capital.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in **Section 8.02**. "**Permitted Transfer**" means a Transfer of Common Units carried out pursuant to **Section 9.02**.

"**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**PGS**" means Principal Growth Strategies LLC, a Delaware limited liability company, and any Transferee thereof.

"**PGS Redemption Notice**" has the meaning set forth in **Section 9.06(c)**.

"**PGS Value**" means investments held by the Company in Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, Platinum Partners Value Arbitrage Fund L.P., an exempted limited partnership under the laws of the Cayman Islands, their respective shareholders or any of their respective Affiliates, with an approximate aggregate value equal to $35,400,000 of all amounts payable thereunder (including principal and interest), including equity in Yellow River (Cayman) Ltd.  The value attributable to PGS Value in connection with Section 9.06 shall be (x) with respect to debt instruments, face value (including principal and interest) and (y) with respect to limited partnership interests, the capital account value as carried on the books of the applicable partnership.

"**Pre-emptive Member**" means the holders of Class A Preferred Units.

"**Pre-emptive Pro Rata Portion**" means a pro rata portion determined by dividing (i) the Class A Preferred Unreturned Capital Value of the applicable Member by (ii) the Preferred Unreturned Capital Value.

"**Preferred Units**" means the Class A Preferred Units, the Class B Preferred Units and the Class C Preferred Units.

"**Preferred Unreturned Capital Value**" means, as of the date of determination, the sum of the Class A Preferred Unreturned Capital Value, Class B-1 Preferred Unreturned Capital Value, Class B-2 Preferred Unreturned Capital Value and Class C Preferred Unreturned Capital Value.

"**Profits Interest**" has the meaning set forth in **Section 3.04(f)**.

"**Profits Interest Hurdle**" means an amount set forth in each Award Agreement reflecting the P Series Liquidation Value (or a multiple thereof) of the relevant P Series Incentive Units at the time the Units are issued as determined by the Manager.

"**Prospective Purchaser**" has the meaning set forth in **Section 9.08(b).**

"**P Series**" has the meaning set forth in **Section 3.04(b)**.

"**P Series Liquidation Value**" means, as of the date of determination and with respect to the relevant new P Series Incentive Units to be issued, the aggregate amount that would be Distributed to the Members pursuant to **Section 7.02**, if, immediately prior to the issuance of the relevant new P Series Incentive Units, the Company sold all of its assets for Fair Market Value and immediately liquidated, the Company's debts and liabilities were satisfied and the proceeds of the liquidation were Distributed pursuant to **Section 12.03(c)**.

"**Public Offering**" means any underwritten public offering pursuant to a registration statement filed in accordance with the Securities Act.

"**Purchase Agreement**" means that certain Purchase Agreement dated as of the date hereof, 2016 by and between the Company and PGS.

"**Purchase Notice**" has the meaning set forth in **Section 9.04(b)(i)**.

"**Purchased Units**" has the meaning set forth in **Section 9.04(b)(i)**.

"**Qualified Public Offering**" means the sale, in a firm commitment underwritten public offering led by a nationally recognized underwriting firm pursuant to an effective registration statement under the Securities Act, of Units (or common stock of the Company or an IPO Entity) having an aggregate offering value (net of underwriters' discounts and selling commissions) of at least $75,00000, following which at least 20% of the total Units (or common stock of the Company or an IPO Entity) on a Fully Diluted Basis shall have been sold to the public and shall be listed on any national securities exchange or quoted on the NASDAQ Stock Market System.

"**Qualifying Incentive Units**" has the meaning set forth in **Section 7.03**.

"**Quarterly Estimated Tax Amount**" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all Distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in **Section 6.02(g)**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Incentive Units**" has the meaning set forth in **Section 3.04(d)(i)**.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service Providers**" has the meaning set forth in **Section 3.04(a)**.

"**Shortfall Amount**" has the meaning set forth in **Section 7.04(b)**.

13

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in **Section 7.04(a)**.

"**Tax Amount**" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"**Tax Matters Member**" means the "tax matters partner" (within the meaning of Section 6231(a)(7) of the Code as in effect prior to the enactment of the Bipartisan Budget Act of 2015) for periods prior to the effectiveness with respect to the LLC of the New Partnership Audit Rules and thereafter the "partnership representative"  as such term is defined in Section 6223(a) of the Code.

"**Tax Rate**" means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period applicable to any of the Members (or its direct or indirect owners), taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions, and taking into account any tax imposed by Section 1301 or 1411 of the Code, which rate shall be determined by the Manager; *provided*, *however*, the same Tax Rate (as determined by the Manager) shall be applied with respect to each Member.

"**Taxing Authority**" has the meaning set forth in **Section 7.05(b)**.

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Preferred Units or Common Units (or applicable Unit Equivalents), (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Preferred Units or Common Units (or applicable Unit Equivalents) or (c) is not an Affiliate of the Company or of any Member, Manager or Officer.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Unallocated Item**" has the meaning set forth in **Section 6.05**.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including but not limited to the Preferred Units, the Common Units and any other units hereinafter issued by the Company; *provided*, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Unit Equivalents**" means any security or obligation that is by its terms, directly or indirectly, convertible into, or exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"**Unrestricted Incentive Units**" has the meaning set forth in **Section 3.04(d)(ii)**.

"**Voting Members**" has the meaning set forth in **Section 4.07(b)**.

"**Voting Units**" has the meaning set forth in **Section 4.07(a)**.

"**Withholding Advances**" has the meaning set forth in **Section 7.05(b)**.

**Section 1.02   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**ARTICLE II**

**ORGANIZATION**

**Section 2.01   Formation.**

(a)     The Company was formed on May 31, 2016, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)     This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations

and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

**Section 2.02   Name.** The name of the Company is "AGH Parent LLC" or such other name or names as the Manager may from time to time designate; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."   The Manager shall give prompt notice to each of the Members of any change to the name of the Company.

**Section 2.03   Principal Office.** The principal office of the Company shall be at such place as may from time to time be determined by the Manager.

**Section 2.04   Registered Office; Registered Agent.**

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.05   Purpose; Powers.**

(a)      The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 2.06   Term.** The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.07   No State-Law Partnership.** The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes.   The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.   The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture,

and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this **Section 2.07**.

**ARTICLE III**
**UNITS**

**Section 3.01   Units Generally.** The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member in accordance with this Agreement and as may be required pursuant to Section 7.5(c) of the Purchase Agreement.  The Members Schedule shall be kept confidential but shall be available for review at the Company to all Members upon written request by any such Member.

**Section 3.02   Authorization and Issuance of Preferred Units.**   The Company is hereby authorized to issue a class of Units designated as Preferred Units.  As of the date hereof, there are four (4) classes of Preferred Units: Class A Preferred Units, Class B-1 Preferred Units, Class B-2 Preferred Units and Class C Preferred Units.  As of the date hereof, 350,000 Class A Preferred Units are issued and outstanding, 220,000 Class B-1 Preferred Units are issued and outstanding, 3,438 Class B-2 Preferred Units, and 590,400 Class C Preferred Units are issued and outstanding.

**Section 3.03   Authorization and Issuance of Common Units.**  The Company is hereby authorized to issue a class of Units designated as Common Units.  As of the date hereof, 5,730 Common Units are issued and outstanding.

**Section 3.04   Incentive Units.**

(a)      Subject to **Section 3.03** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements approved by the Manager, the Company may issue Incentive Units up to 10% of the total number of issued and outstanding Units on a Fully Diluted Basis to any Manager, Officer, employee, consultant, independent contractor, advisor or other service provider of the Company or any Company Subsidiary (collectively, "**Service Providers**", and each a "**Service Provider**").

(b)      Subject to **Section 3.03** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements approved by the Manager, the Company may issue a profits interest series of Incentive Units to any Service Provider (each a "**P Series**" Incentive Units, to be consecutively designated as "Series P-1," "Series P-2," etc.).

(c)      The Manager is hereby authorized and directed to adopt a written plan pursuant to which P Series Incentive Units may be granted, each of which shall be granted in compliance

17

with Rule 701 of the Securities Act or another applicable exemption (such plan as in effect from time to time, the "**Incentive Plan**").  In connection with the adoption of the Incentive Plan and issuance of Incentive Units, the Manager is hereby authorized to negotiate and enter into award agreements with any Service Provider to whom it grants Incentive Units (such agreements, "**Award Agreements**").  Each Award Agreement shall include such terms, conditions, rights and obligations as may be determined by the Manager, in its sole discretion, consistent with the terms herein.  As of the date hereof, 12,062 Incentive Units are issued and outstanding.

(d)  The Manager shall establish such vesting criteria for the Incentive Units as it determines in its discretion and shall include such vesting criteria in the Incentive Plan and/or the applicable Award Agreement for any grant of Incentive Units.  As used in this Agreement:

(i)  any Incentive Units that have not vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Restricted Incentive Units**"; and

(ii)  any Incentive Units that have vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Unrestricted Incentive Units.**"

(e)  Immediately prior to each issuance of each P Series Incentive Unit following the initial issuance described in the second sentence of **Section 3.04(c)**, the Manager shall determine in good faith the P Series Liquidation Value.  In each Award Agreement that the Company enters into with a Service Provider for the issuance of each new P Series Incentive Units, the Manager shall include an appropriate Profits Interest Hurdle for such Incentive Units on the basis of the P Series Liquidation Value (or a multiple thereof) immediately prior to the issuance of such Incentive Units as determined by the Manager.

(f)  The Company and each Member hereby acknowledge and agree that all P Series Incentive Units constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27 (a "**Profits Interest**"), and that any and all P Series Incentive Units received by any Service Provider are received in exchange for the provision of services to or for the benefit of the Company or Company Subsidiary in a Service Provider capacity or in anticipation of becoming a Service Provider. The Company and any Member which receives P Series Incentive Units hereby agree to comply with the provisions of Rev. Proc. 2001-43, and neither the Company nor any Member who receives any P Series Incentive Units shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43 or any future Internal Revenue Service guidance or other Governmental Authority that supplements or supersedes the foregoing Revenue Procedures.

(g)  Incentive Units granted to a Service Provider shall receive the following tax treatment:

(i)  each Member that receives Incentive Units must make a timely and effective election under Code Section 83(b) with respect to such Incentive Units received by such Member and shall promptly provide a copy of any such election which is made to the Company.  Except as otherwise determined by the Manager, both the Company and all Members shall (A) treat such Incentive Units as outstanding for tax purposes, (B) treat such Member as a

18

partner for tax purposes with respect to such Incentive Units and (C) file all tax returns and reports consistently with the foregoing.  Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the receipt of such P Series Incentive Units (whether or not vested) for federal income tax purposes; and

(ii)    in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(l) and IRS Notice 2005-43, each Member, by executing this Agreement, authorizes and directs the Company to elect a safe harbor under which the fair market value of any P Series Incentive Units issued after the effective date of such Proposed Treasury Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Treasury Regulations or successor rules) of the P Series Incentive Units as of the date of issuance of such P Series Incentive Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to Transfers of Units while the safe harbor election remains effective.

(h)    For the avoidance of any doubt, all Incentive Units, including Unrestricted Incentive Units, shall be subject to **Section 9.03.**

**Section 3.05   Other Issuances.** In addition to Preferred Units, Common Units and Incentive Units, the Company is hereby authorized, to authorize and issue or sell to any Person any of the following (collectively, "**New Interests**"): (i) any new type, class or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of the Preferred Units, Common Units or Incentive Units but having different rights; and (ii) Unit Equivalents. The Manager is hereby authorized, subject to **Section 14.09**, to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations and rights of any such New Interests, including the number of such New Interests to be issued, the preference (with respect to Distributions, in liquidation or otherwise) over any other Units and any contributions required in connection therewith.

**Section 3.06   Certification of Units.**

(a)    The Manager in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)    In the event that the Manager shall issue certificates representing Units in accordance with **Section 3.06(a)**, then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED  EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
### MEMBERS

**Section 4.01   Admission of New Members.**

(a)      New Members may be admitted by the Manager from time to time (i) in connection with an issuance of Units by the Company, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of **Article IX**, and in either case, following compliance with the provisions of **Section 4.01(b)**.

(b)      In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement.  Upon the amendment of the Members Schedule by the Manager and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units.  The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with **Section 5.03**.

**Section 4.02   Representations and Warranties of Members.**  By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to **Section 4.01**, represents and warrants to the Company and acknowledges that:

(a)      The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)      Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that would have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)      Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(d)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member;

(e)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(f)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(g)     The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(h)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by Bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(i)     Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Company Subsidiary or affect the right of the Company or any Company Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or Company Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in the Purchase Agreement or any Award Agreement, as applicable.

**Section 4.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 4.04   No Withdrawal.** A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon

as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

**Section 4.05   Death.** The death of any Member shall not cause the dissolution of the Company.   In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided*, that within a reasonable time after such Transfer, the applicable heirs shall sign a written undertaking substantially in the form of the Joinder Agreement.

**Section 4.06   Voting.** Except as otherwise provided by this Agreement (including **Section 14.09**) or as otherwise required by the Delaware Act or Applicable Law, on all matters on which all the Members are entitled to vote:

(a)      each holder of a Class B Preferred Unit and Common Unit shall be entitled to one vote per each Class B Preferred Unit and each Common Unit of which such Member is the record owner and shall vote together as a single class; and

(b)      the holders of Preferred Units (other than Class B Preferred Units) and Incentive Units shall not be entitled to vote.

**Section 4.07   Meetings.**

(a)      **Voting Units.** As used herein, the term "**Voting Units**" shall mean the Common Units and the Class B Preferred Units.

(b)      **Calling the Meeting.** Meetings of the Members may be called by the Manager. Only Members who hold the relevant Voting Units ("**Voting Members**") shall have the right to attend meetings of the Members.

(c)      **Notice.** Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than one (1) day and not more than thirty (30) days before the date of the meeting to each Voting Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be. The Voting Members may hold meetings at the Company's principal office or at such other place as the Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(d)      **Participation.** Any Voting Member may participate in a meeting of the Voting Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)      **Vote by Proxy.** On any matter that is to be voted on by Voting Members, a Voting Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Voting Member executing it unless otherwise provided

DB1/ 87817619.15

in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(f)    **Conduct of Business.** The business to be conducted at such meeting need not be limited to the purpose described in the notice.  Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**Section 4.08   Quorum.** A quorum of any meeting of the Voting Members shall require the presence of the Members holding a majority of the Voting Units held by all Voting Members. Subject to **Section 4.09**, no action at any meeting may be taken by the Members unless the appropriate quorum is present.  Subject to **Section 4.09**, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of Members holding a majority of the Voting Units held by all Voting Members.

**Section 4.09   Action Without Meeting.** Notwithstanding the provisions of **Section 4.08**, any matter that is to be voted on, consented to or approved by Voting Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of the Voting Units held by all Voting Members. A record shall be maintained by the Manager of each such action taken by written consent of a Member or Members.

**Section 4.10   Power of Members.** The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act.  Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

**Section 4.11   No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 5.01   Initial Capital Accounts.** Contemporaneously with the execution of this Agreement, each Member shall have an initial Capital Account, be credited with an initial Capital Contribution and shall own the number, type, series and class of Units, in each case, in the amounts set forth opposite such Initial Member's name on the Members Schedule as in effect on the date hereof.

**Section 5.02   Additional Capital Contributions.**

(a)      No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Manager.

(b)      No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

**Section 5.03   Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this **Section 5.03**.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to **Article VI**; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property Distributed to such Member pursuant to **Article VII** and **Section 12.03(c)**;

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to **Article VI**; and

(iii)      the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Manager shall determine that it is prudent to modify or adjust the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members), are computed in order to comply with such Treasury Regulations, the Manager may make such modification or adjustment, provided such modification or adjustment does not affect the amounts distributable to any Member pursuant to this Agreement.

DB1/ 87817619.15

**Section 5.04   Succession Upon Transfer.** In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to **Section 6.04**, shall receive allocations and Distributions pursuant to **Article VI**, **Article VII** and **Article XII** in respect of such Units.

**Section 5.05   Negative Capital Accounts.** In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 5.06   No Withdrawal.** No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement.  No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

**Section 5.07   Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in **Section 5.03(a)(iii)**, if applicable.

**Section 5.08   Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Manager may authorize such modifications.

## ARTICLE VI
### ALLOCATIONS

**Section 6.01   Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary and provided herein, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in **Section 6.02**, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Member pursuant to **Section 12.03(c)** if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were

Distributed, in accordance with **Section 12.03(c)**, to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, upon a liquidation of the Company pursuant to **Section 12.03**, the Company shall, to the extent necessary, allocate individual items of income, gain, loss or deduction of the Company among the Members such that the Capital Account balance of each Member is as nearly as possible, on a proportionate basis, equal to the amounts provided for in the first sentence of this **Section 6.01**.  Notwithstanding any other provision of this Agreement, the Manager may make such allocations of Net Income or Net Loss (or items thereof) as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into such facts and circumstances as it deems reasonably necessary for this purpose.

    **Section 6.02   Regulatory and Special Allocations.** Notwithstanding the provisions of **Section 6.01**:

    (a)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(1).  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and  1.704-2(j)(2).   This **Section 6.02(a)** is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in a manner consistently therewith.

    (b)     Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This **Section 6.02(b)** is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

    (c)     In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*) that causes an Adjusted Capital Account Deficit, Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or Distributions to the extent required by the Treasury Regulations as quickly as possible.  This **Section 6.02(c)** is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(d)     In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amount such Member is obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(*g)(1)* and 1.704-2(*i)(5)*, each such Member shall be specially allocated items of Company income and gain in the amount of such excess to the extent required by the Treasury Regulations as quickly as possible, *provided,* that an allocation pursuant to this **Section 6.02(d)** shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VI have been made as if **Section 6.02(c)** and this **Section 6.02(d)** were not in the Agreement.

(e)     Nonrecourse Deductions for any Fiscal Year shall be allocated among the Members in the same proportions as are the other Net Losses of the Company for such year.

(f)     Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     The allocations set forth in paragraphs (a) through (f) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this **Article VI** (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(h)     The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(*c*) ("**Forfeiture Allocations**") result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(*c*) or any successor provision or guidance.

(i)     Net Losses allocated pursuant to **Section 6.01** shall not exceed the maximum amount of Net Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event some but not all of Members would otherwise have Adjusted Capital Account Deficits as a consequence of an allocation of Net Losses pursuant to **Section 6.01**, the limitation set forth in this **Section 6.02(i)** shall be applied on a Member by Member basis and Net Losses not allocable to any Member as a result of such limitation shall be allocated (a) first, to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Net Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations (until the Capital Account balances of all Members shall be reduced to zero), and (b) thereafter in the same manner as Nonrecourse Deductions.  If and to the extent Net Losses are allocated pursuant to this **Section 6.02(i)** rather than **Section 6.01**, then, notwithstanding **Section 6.01** above, subsequent allocations of Net Profits shall be made first to the Members who received excess

27

allocations of Net Losses pursuant to this **Section 6.02(i)** in excess of what they would have otherwise received pursuant to **Section 6.01** ("**Excess Net Losses**"), in proportion to those Excess Net Losses, until all such Excess Net Losses have been offset with allocations of Net Profits pursuant to this sentence.  Any remaining allocations of Net Profits shall be made in accordance with **Section 6.01**.

Section 6.03   Tax Allocations.

(a)     Subject to **Section 6.03(b)** through **Section 6.03(e)**, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and Treasury Regulations Section 1.704-3, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The Company shall make allocations pursuant to this Section 6.03 in accordance with such method or methods as may be adopted for the Company by the Tax Matters Member pursuant to Code Section 704(c).

(f)     Allocations pursuant to this **Section 6.03** are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04   **Allocations in Respect of Transferred Units.** In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of **Article IX**, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method in accordance with applicable Treasury Regulations.

**Section 6.05   Curative Allocations.** In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this **Article VI** (an "**Unallocated Item**"), or that the allocation of any item of Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "**Misallocated Item**"), then the Manager may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; *provided*, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and *provided*, *further*, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

**Section 7.01   General.**

(a)      Subject to **Section 7.01(b)**, **Section 7.02** and **Section 7.04**, the Manager shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

**Section 7.02   Priority of Distributions.** Subject to any payments to be made under **Section 9.05** or **Section 9.06**, after making all Distributions required for a given Fiscal Year under **Section 7.04** and subject to the priority of Distributions pursuant to **Section 12.03(c)**, if applicable, all Distributions determined to be made by the Company pursuant to **Section 7.01** shall be made in the following manner:

(a)      *first*, to the Members holding Class A Preferred Units pro rata in proportion to their holdings of Class A Preferred Units, until each such Member has received its Class A Preferred Return under this **Section 7.02(a)** (after giving effect to **Section 7.04(d)**);

(b)      *second*, to the Members holding Class A Preferred Units pro rata in proportion to their holdings of Class A Preferred Units, until each such Member has received its Class A Preferred Unreturned Capital Value under this **Section 7.02(b)**;

(c)      *third*, to the Members holding Class B-1 Preferred Units pro rata in proportion to their holdings of Class B-1 Preferred Units, until each such Member has received its Class B-1 Preferred Return under this **Section 7.02(c)** (after giving effect to **Section 7.04(d)**)**;**

(d)      *fourth*, to the Members holding Class B-1 Preferred Units pro rata in proportion to their holdings of Class B-1 Preferred Units, until each such Member has received its Class B-1 Preferred Unreturned Capital Value under this **Section 7.02(d)**;

(e)      *fifth*, to the Members holding Class B-2 Preferred Units pro rata in proportion to their holdings of Class B-2 Preferred Units, until each such Member has received its Class B-2 Preferred Return under this **Section 7.02(e)** (after giving effect to **Section 7.04(d)**);

(f)      *sixth*, to the Members holding Class B-2 Preferred Units pro rata in proportion to their holdings of Class B-2 Preferred Units, until each such Member has received its Class B-2 Preferred Unreturned Capital Value under this **Section 7.02(f)**;

(g)      *seventh*, to the Members holding Class C Preferred Units pro rata in proportion to their holdings of Class C Preferred Units, until each such Member has received its Class C Preferred Return under this **Section 7.02(g)** (after giving effect to **Section 7.04(d)**);

(h)      *eighth*, to the Members holding Class C Preferred Units pro rata in proportion to their holdings of Class C Preferred Units, until each such Member has received its Class C Preferred Unreturned Capital Value under this **Section 7.02(f)**;

(i)      *ninth,* any remaining amounts to all Members holding Class B Preferred Units, Common Units and Incentive Units (subject to the limitations on Incentive Units set forth in **Section 7.03**) pro rata in proportion to the aggregate number of such Units outstanding treated as one class of Units.

Notwithstanding the foregoing, any holder of a Class B-1 Preferred Unit can give written notice to the Company not to receive Distributions that they otherwise would be entitled to pursuant to clause (c) and/or (d) of this **Section 7.02** until such time as such holder notifies the Company in writing that it wishes to commence again receiving Distributions pursuant to clause (c) and/or (d) of this **Section 7.02**.  Upon the recommencement of such Distributions, such holder shall receive Distributions in priority to any other Distributions pursuant to this **Section 7.02**, until such time that it receives an amount equal to the forgone Distributions.

**Section 7.03   Limitations on Incentive Units.** It is the intention of the parties to this Agreement that Distributions to any Service Provider with respect to P Series Incentive Units be limited to the extent necessary so that the related Membership Interest constitutes a Profits Interest.  In furtherance of the foregoing, and notwithstanding anything to the contrary in this Agreement, the Manager shall, if necessary, limit any Distributions to any Service Provider with respect to P Series Incentive Units so that such Distributions in respect of such Units do not exceed the available profits in respect of such Service Provider's related Profits Interest. Available profits shall include the aggregate amount of profit and unrealized appreciation in all of the assets of the Company between the date of issuance of such P Series Incentive Units and the date of such Distribution, it being understood that such unrealized appreciation shall be determined on the basis of the Profits Interest Hurdle applicable to such P Series Incentive Unit.

In the event that a Service Provider's Distributions and allocations with respect to P Series Incentive Units are reduced pursuant to the preceding sentence, an amount equal to such excess Distributions shall be treated as instead apportioned to the holders of Preferred Units, Common Units and P Series Incentive Units that have met their Profits Interest Hurdle (such P Series Incentive Units, "**Qualifying Incentive Units**"), pro rata in proportion to their aggregate holdings of Preferred Units, Common Units and Qualifying Incentive Units treated as one class of Units.  In addition, any amount otherwise distributable with respect to a Restricted Incentive Unit pursuant to **Section 7.02** shall be distributed by the Company pursuant to **Section 7.02** and, upon such Restricted Incentive Unit becoming an Unrestricted Incentive Unit, such Unrestricted Incentive Unit shall receive an amount that would have been received but for this sentence pursuant to the next Distribution pursuant to **Section 7.02**, prior to, and in priority to, any other Distributions pursuant **Section 7.02** (other than other distributions with respect to Unrestricted Incentive Units pursuant to this sentence which will be allocated among holders of Unrestricted Incentive Units in accordance with the amount to be distributed to each such holder pursuant to this sentence).

### Section 7.04   Tax Advances.

(a)     Subject to any restrictions in any of the Company's and/or any Company Subsidiary's then applicable debt-financing arrangements to retain any other amounts necessary to satisfy the Company's and/or the Company Subsidiaries' obligations and subject to the Company having sufficient Distributable Cash at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall Distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such Distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been Distributed pursuant to **Section 7.04(a)** with respect to any Fiscal Year, the aggregate amount of Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall Distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall Distribute Shortfall Amounts with respect to a Fiscal Year before the 75th day of the next succeeding Fiscal Year; *provided*, that if the Company has made Distributions during such Fiscal Year other than pursuant to this **Section 7.04**, the Manager shall apply such Distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this **Section 7.04** for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this **Section 7.04**.

(d)     Any Distributions made pursuant to this **Section 7.04** with respect to Adjusted Taxable Income on account of amounts distributable pursuant to **Sections 7.02(a), (c), (e)** or **(g)** shall be treated for purposes of this Agreement as advances on Distributions pursuant to such Sections (and such Sections only) and shall reduce, dollar-for-dollar, the amount otherwise Distributable to such Member pursuant to such Sections.

(e)      Notwithstanding anything to the contrary herein, no Tax Advance will be required to be made with respect to items arising with respect to any Covered Transaction, although any unpaid Tax Advance with respect to any taxable period, or portion thereof, ending before a Covered Transaction shall continue to be required to be paid prior to any Distributions being made under **Section 7.02**.

**Section 7.05   Tax Withholding; Withholding Advances.**

(a)      **Tax Withholding.** If requested by the Manager, each Member shall, if able to do so, deliver to the Manager:

(i)      an affidavit in form satisfactory to the Manager that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii)      any certificate that the Manager may reasonably request with respect to any such laws; and/or

(iii)      any other form or instrument reasonably requested by the Manager relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Manager the affidavit described in **Section 7.05(a)(i)**, the Manager may withhold amounts from such Member in accordance with **Section 7.05(b)**.

(b)      **Withholding Advances.** The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. In the event that the distributions or proceeds to the Company or any Company Subsidiary are reduced on account of taxes withheld at the source or any taxes are otherwise required to be paid by the Company and such taxes are imposed on or with respect to one or more, but not all of the Members in the Company, the amount of the reduction shall be borne by the relevant Members and treated as if it were paid by the Company as a Withholding Advance with respect to such Members. Taxes imposed on the Company where the rate of tax varies depending on characteristics of the Members shall be treated as taxes imposed on or with respect to the Members for purposes of the preceding sentence.  Any funds withheld from a Distribution by reason of this **Section 7.05(b)** shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Manager, shall be charged against the Member's Capital Account.

(c)      **Repayment of Withholding Advances.** Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum:

(i)     be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)     with the consent of the Manager, be repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but which shall not further reduce the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)     **Imputed Underpayment**.  Any "imputed underpayment" within the meaning of Code Section 6225 paid (or payable) by the Company as a result of an adjustment with respect to any Company item, including any interest or penalties with respect to any such adjustment (collectively, an "**Imputed Underpayment Amount**"), shall be treated as if it were paid by the Company as a Withholding Advance with respect to the appropriate Members.  The Manager shall reasonably determine the portion of an Imputed Underpayment Amount attributable to each Member or former Member.  The portion of the Imputed Underpayment Amount that the Manager attribute to a Member shall be treated as a Withholding Advance with respect to such Member.  The portion of the Imputed Underpayment Amount that the Manager attributes to a former Member shall be treated as a Withholding Advance with respect to both such former Member and such former Member's transferee(s) or assignee(s), as applicable, and the Manager may in its discretion exercise the Company's rights pursuant to this Section in respect of either or both of the former Member and its transferee or assignee.  Imputed Underpayment Amounts treated as a Withholding Advance also shall include any imputed underpayment within the meaning of Code Section 6225 paid (or payable) by any entity treated as a partnership for U.S. federal income tax purposes in which the Company holds (or has held) a  direct or indirect interest other than through entities treated as corporations for U.S. federal income tax purposes to the extent that the Company bears the economic burden of such amounts, whether by law or agreement.

(e)     **Indemnification.** Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member.  The provisions of this **Section 7.05(e)** and the obligations of a Member pursuant to **Section 7.05(e)** shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units.  The Company may pursue and enforce all rights and remedies it may have against each Member under this **Section 7.05(e)**, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(f)     **Overwithholding.** Neither the Company nor the Manager shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

### Section 7.06   Distributions in Kind.

(a)     The Manager is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided*, that Tax Advances shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to **Section 7.02**.

(b)     Any Distribution of securities shall be subject to such conditions and restrictions as the Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Manager may require that the Members execute and deliver such documents as the Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

### Section 7.07   Cancellation of Certain Preferred Units.

(a)     At such time as the Class A Preferred Unreturned Capital Value is equal to zero, the Class A Preferred Units shall automatically, and with no further action by any Member, the Company or the Manager, be deemed cancelled.

(b)     At such time as the Class C Preferred Unreturned Capital Value is equal to zero, the Class C Preferred Units shall automatically, and with no further action by any Member, the Company or the Manager, be deemed cancelled.

(c)     A certain number of Class C Preferred Units shall automatically, and with no further action by the Member, the Company or the Manager, be deemed cancelled in accordance with and pursuant to Section 7.05(c) of the Purchase Agreement.


### ARTICLE VIII
#### MANAGEMENT

### Section 8.01   The Manager.

(a)     The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Manager, and the Manager shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement; *provided*, *however*, that the Company shall not engage in transactions with an

Affiliate of a holder of Class B Preferred Units other than on arms-length terms without the prior written consent of the holders of a majority of the Class A Preferred Units (other than the those Class A Preferred Units held by Senior Health Insurance Company of Pennsylvania), the holders of a majority of Class C Preferred Units, and Senior Health Insurance Company of Pennsylvania (as long as it holds Class A Preferred Units). Notwithstanding the foregoing proviso, all Members hereby consent to entering into a consulting services agreement in substantially the form attached hereto as Exhibit B. In addition, without the prior written consent of the holders of a majority of the Class A Preferred Units, the Company shall not:

   (i) effect a dissolution, liquidation or winding up of the Company, or make any filing for or in connection with a proceeding in bankruptcy (or the out-of-court contractual equivalent thereof);

   (ii) issue or obligate itself to issue any New Securities unless the same ranks junior to the Class A Preferred Units with respect to Distributions; or

   (iii) purchase or redeem Class B Preferred Units.

 (b) The Manager shall be the "manager" of the Company as provided in the Delaware Act. The Manager, in the performance of its duties as such, shall not owe to the Company or the Members any fiduciary duties. The "**Manager**" shall initially be BAM Management Services, LLC, who shall hold such office until it resigns or is removed by a vote of the holders of a majority of the Voting Units, and its successor has been designated by a vote of the holders of a majority of the Voting Units. The Manager may resign at any time by delivering its resignation to the Company, which resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.

 **Section 8.02  Officers.** The Manager may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Manager may delegate to such Officers such power and authority as the Manager deems advisable. No Officer need be a Member. Any individual may hold two (2) or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Manager or until his or her earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Manager. Any Officer may be removed by the Manager with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Manager.

 **Section 8.03  No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, neither the Manager nor any Officer will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries, whether arising in contract, tort or otherwise, solely by reason of being an Officer or the Manager.

**ARTICLE IX**
**TRANSFERS AND PRE-EMPTIVE RIGHTS**

 **Section 9.01   General Restrictions on Transfer.**

(a)     Each Member acknowledges and agrees that, until the consummation of a Qualified Public Offering, such Member (or any Permitted Transferee of such Member) shall not, without the consent of the Manager (which consent shall not be unreasonably withheld), Transfer any Units or Unit Equivalents except as permitted pursuant to **Section 9.02** or in accordance with the procedures described in **Section 9.02** through **Section 9.07**, as applicable.

(b)     Any Transfer or attempted Transfer of any Units or Unit Equivalents in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units or Unit Equivalents for all purposes of this Agreement.

**Section 9.02   Permitted Transfers.** The provisions of **Section 9.01(a)**, **Section 9.03** (with respect to the Dragging Member only) and **Section 9.07** shall not apply to any of the following Transfers by any Member of any of its Units or Unit Equivalents:

(a)     With respect to any Member, to (i) an Affiliate of such Member; (ii) a trust under which the distribution of Units may be made only to such Member and/or any such Member's spouse, parent, siblings, descendants (including adoptive relationships and stepchildren) and the spouses of each such natural persons (collectively, "**Family Members**"), *provided*, that the trustee of any such trust is at all times the Member or a trustee reasonably acceptable to the Manager; (iii) a charitable remainder trust, the income from which will be paid to such Member during his or her life, *provided*, that the trustee of any such trust is at all times the Member or a successor trustee acceptable to the Manager, (iv) a corporation, partnership or limited liability company, the stockholders, partners or members of which are only such Member and/or Family Members of such Member, *provided*, that the Member or a successor acceptable to the Manager at all times controls any such corporation, partnership or limited liability company, or (v) by will or by the laws of intestate succession, to such Member's executors, administrators, testamentary trustees, legatees or beneficiaries; *provided*, that any Member who Transfers Units shall remain bound by the provisions of **Section 10.01**;

(b)     Pursuant to a Public Offering; or

(c)     With respect to PGS, to Starfish Capital, Inc.

Any Imputed Underpayment Amount that is properly allocable to an assignor of an interest, as reasonably determined by the Manager, shall be treated as a Withholding Payment with respect to the applicable assignee in accordance with **Section 7.05**. Furthermore, as a condition to any assignment, each assignor shall be required to agree (i) to continue to comply with the provisions of **Section 11.02(a)** notwithstanding such assignment and (ii) to indemnify and hold harmless the Company and the Manager from and against any and all liability with respect to the assignee's Withholding Payments resulting from Imputed Underpayment Amounts attributable to the assignor to the extent that the assignee fails to do so.

**Section 9.03   Drag-along Rights.**

36

(a)    **Participation.** At any time prior to the consummation of a Qualified Public Offering, if the holders of at least a majority of the Class B Preferred Units (for the purposes of this **Section 9.03**, the "**Dragging Member**") propose to consummate, in one transaction or a series of related transactions, a Change of Control (a "**Drag-along Sale**"), the Dragging Member may, after delivering the Drag-along Notice in accordance with **Section 9.03(b)**, require that each other Member (each, a "**Drag-along Member**") participate in such sale (including, if necessary, by converting their Unit Equivalents into the Units to be sold in the Drag-along Sale) in accordance with **Section 9.03(b)**.  The Distribution of the aggregate consideration of such transaction shall be made in accordance with **Section 12.03(c)**.

(b)    **Procedures.** The Dragging Member shall exercise its rights pursuant to this **Section 9.03** by delivering a written notice (the "**Drag-along Notice**") to the Company and each Drag-along Member no later than five (5) Business Days prior to the anticipated closing date of such Drag-along Sale.  The Drag-along Notice shall make reference to the Dragging Member's rights and obligations hereunder and shall describe in reasonable detail the person or entity to whom such Units are proposed to be sold, the number of each class or series of Units to be sold by the Dragging Member, the proposed amount of consideration for the Drag-along Sale and the other material terms and conditions of the Drag-along Sale.  Each Drag-along Member shall execute the purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Dragging Member makes or provides in connection with the Drag-along Sale; *provided*, that each Drag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Drag-along Member, and other matters relating to such Drag-along Member and any Drag-along Member's liability relating to representations, warranties and covenants (and related indemnities) and other indemnification obligations related to the Company in connection with such Drag-along Sale, shall be several and pro rata and shall not be more than the consideration actually received by such Drag-along Member in such Sale. Each Drag-along Member shall pay its pro-rata share of any costs of the transaction that are not otherwise paid by the Company, and costs incurred by any Drag-along Member on such Drag-along Member's own behalf are not treated as costs of the transaction.  Each Drag-along Member who is required to participate in a Drag-along Sale must, with respect to any such Drag-along Sale: (i) subject to the foregoing provisions of this **Section 9.03**, cooperate fully with the transaction and take all steps reasonably requested by the Dragging Member to effect the transaction,  including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Member (*provided*, that no Drag-along Member shall have any obligation to agree to any restrictive covenant in connection with any such sale); (ii) consent to and vote in favor of the transaction; and (iii) not exercise any applicable dissenter's, appraisal or like rights with respect to the transaction.

### Section 9.04   Purchase Right.

(a)    **Purchase Right.**

(i)    Following the termination of employment or other engagement of any Service Provider with the Company or any Company Subsidiary for any reason, the Company

may, within the later of 180 days after the Company becomes aware of any breach by such terminated Service Provider of any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, but shall not be obligated to, elect to purchase any and all Incentive Units owned by such Service Provider at the following purchase price: (x) in the event of a termination other than a termination for Cause, if such Service Provider has not, prior to the time of any purchase, breached any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, at a purchase price equal to Fair Market Value; (y) in the event of a termination other than a termination for Cause, if such Service Provider breaches, prior to the time of any purchase, any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, at a purchase price equal to zero; or (z) in the event of a termination for Cause, at a purchase price equal to zero.

(ii)     Following the termination of employment or other engagement of any Service Provider with the Company or any Company Subsidiary for any reason, if any such Service Provider later provides any services for any competitor of the Company (whether as an employee, contractor, consultant, director, officer or otherwise), the Company may, at any time, elect to purchase any and all Incentive Units (including Incentive Units not previously purchased) owned by such Service Provider at a purchase price equal to Fair Market Value.

(b)     **Procedures.**

(i)     If the Company desires to exercise its right to purchase Units granted to a Service Provider pursuant to this **Section 9.04**, the Company shall deliver to the Service Provider, as applicable, a written notice (the "**Purchase Notice**") within the aforementioned time period set forth in **Section 9.04(a)** specifying the number of Units to be purchased by the Company (the "**Purchased Units**") and the purchase price therefor in accordance with **Section 9.04(a)**.

(ii)     Such Service Provider shall, at the closing of any purchase consummated pursuant to this **Section 9.04**, represent and warrant to the Company that:

(A)     such Service Provider has full right, title and interest in and to the Purchased Units;

(B)     such Service Provider has all the necessary power and authority and has taken all necessary action to sell such Purchased Units as contemplated by this **Section 9.04**; and

(C)     the Purchased Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(iii)     Subject to **Section 9.04(b)(iv)**, the closing of any sale of Purchased Units pursuant to this **Section 9.04** shall take place no later than thirty (30) days following receipt by the Service Provider of the Purchase Notice.  Subject to **Section 9.04(b)(iv)**, the purchase price for the Purchased Units shall be paid on the fifth (5) Business Day following expiration of all covenants with an expiration date which are applicable to such Service Provider in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries.

(iv)     To the extent that the payment of the purchase price for the Purchased Units at the time of such closing in **Section 9.04(b)(iii)** is not permitted by any credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries, the Company may pay such purchase price in installments, with simple interest accruing on the unpaid amount of such purchase price at 3% per annum, over a period of up to five (5) years after such closing.

(c)     **Cooperation.** The Service Provider shall take all actions as may be reasonably necessary to consummate the sale contemplated by this **Section 9.04**, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d)     **Closing.** At the closing of any sale and purchase pursuant to this **Section 9.04**, the Service Provider, as applicable, shall deliver to the Company a certificate or certificates representing the Incentive Units to be sold (if any), accompanied by evidence of transfer and payment of all necessary transfer taxes.

### Section 9.05    Class A Preferred Unit Redemption.

(a)     Subject to the terms and conditions set forth in this **Section 9.05**, at any time after the fifteenth (15) year anniversary of this Agreement:

(i)     the Company shall have the right to redeem all, or any portion, of the Class A Preferred Units held by any holder of Class A Preferred Units for a per Unit redemption price equal (A) to the sum of the Class A Preferred Unreturned Capital Value <u>plus</u> the any unpaid Class A Preferred Return calculated as of date of redemption, <u>divided by</u> (B) the number of outstanding Class A Preferred Units, payable in cash (a "**Company Class A Redemption**"); and

(ii)     each holder of Class A Preferred Units shall have the right to elect to cause the Company to redeem all, or any portion, of the Class A Preferred Units held by such Member for a per Unit redemption price equal to (A) the sum of the Class A Preferred Unreturned Capital Value <u>plus</u> the any unpaid Class A Preferred Return calculated as of date of redemption, which sum is <u>divided by</u> (B) the number of outstanding Class A Preferred Units, payable in cash (a "**Member Class A Redemption**").

(b)     In the event that the Company wishes to exercise its redemption rights set forth in **Section 9.05(a)(i)**, the Company shall provide written notice (a "**Company Class A Redemption Notice**") of such election to the applicable holder of Class A Preferred Units.  The Company Class A Redemption Notice shall specify the effective date of the redemption;

39

*provided* that, unless consented to by such holder in writing, the effective date of the redemption shall be no earlier than thirty (30) days and no later than ninety (90) days after the delivery of the Company Class A Redemption Notice.

(c)     In the event that a holder of Class A Preferred Units wishes to excise its redemption rights set forth in Section **9.05(a)(ii)**, such holder of Class A Preferred Units shall provide written notice of such election (a "**Member Class A Redemption Notice**") to the Company.   A Member Class A Redemption Notice shall specify the effective date of the redemption; *provided* that, unless consented to by the Company in writing, the effective date of the redemption shall be no earlier than thirty (30) days and no later than ninety (90) days after the delivery of a Member Class A Redemption Notice.

(d)     If on the date of any redemption, the Act or other Applicable Law, credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries prevents the Company from redeeming, or the Company does not have sufficient assets to redeem, in each case, all Class A Preferred Units required hereunder to be redeemed on such date, (i) the Company shall redeem the maximum number of Class A Preferred Units that it may redeem consistent with, as applicable, the Act, other Applicable Law or as the Company's assets permit, and shall redeem the remaining Class A Preferred Units (in one or a series of transactions), as soon as it may lawfully do so under the Act, other Applicable Law and/or as soon as the Company has sufficient assets, as applicable, (ii) any such partial redemptions shall be among the Members holding Class A Preferred Units based on the Preferred Percentage of such Members, and (iii) the holders of the Class A Preferred Units being redeemed shall continue to be considered to be the holder of such Class A Preferred Units and shall have all rights (including the right to receive the Preferred Return) associated with such Class A Preferred Units (regardless of whether such holder continues to have satisfied any threshold ownership requirements as a result of partial redemptions as long as such holder satisfied such rights at the time the redemption was exercised) until such time as such Class A Preferred Units are redeemed in full.

**Section 9.06   Class C Preferred Unit Redemption.**

(a)     Subject to the terms and conditions set forth in this **Section 9.06**, the Company shall have the right at any time to redeem all, or any portion, of the outstanding Class C Preferred Units held by any holder of Class C Preferred Units for a per Unit redemption price equal to (A) the sum of the Class C Preferred Unreturned Capital Value <u>plus</u> the any unpaid Class C Preferred Return calculated as of date of redemption, which sum is <u>divided by</u> (B) the number of outstanding Class C Preferred Units, payable:

(i)     with respect to the Class C Preferred Units held by PGS, in the case of a redemption of Class C Units pursuant to a Class C Redemption Notice delivered by the Company on or prior to October 31, 2016, in the form of PGS Value, with the remainder to be paid in cash; or

(ii)     in all other cases, in cash.

(b)     In the event that the Company wishes to exercise its redemption rights set forth in **Section 9.06(a)**, the Company shall provide written notice (a "**Class C Redemption**

Notice") of such election to the applicable holder of Class C Preferred Units. The Class C Redemption Notice shall specify the effective date of the redemption. The effective date of the redemption shall be no later than ninety (90) days after the delivery of a Class C Redemption Notice.

(c)    Subject to the terms and conditions set forth in this **Section 9.06**, PGS may send a written notice to the Company on October 31, 2016, requesting that the Company redeem a certain number of Class C Preferred Units held by PGS with a value equal to, and in exchange for as consideration, the PGS Value (the "**PGS Redemption Notice**"). If, upon receipt of a duly delivered PGS Redemption Notice, the Company determines in good faith that such redemption in exchange for PGS Value complies with Applicable Laws and does not conflict with or violate any restrictions or limitations on such use or Transfer of PGS Value, the Company shall use commercially reasonable efforts to effect such redemption no later than ninety (90) days after the delivery of the PGS Redemption Notice.

(d)    If on the date of any redemption, the Act or other Applicable Law, credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries prevents the Company from redeeming, or the Company does not have sufficient assets to redeem, in each case, all Class C Preferred Units required hereunder to be redeemed on such date, (i) the Company shall redeem the maximum number of Class C Preferred Units that it may redeem consistent with, as applicable, the Act, other Applicable Law or as the Company's assets permit, and shall redeem the remaining Class C Preferred Units (in one or a series of transactions), as soon as it may lawfully do so under the Act, other Applicable Law and/or as soon as the Company has sufficient assets, as applicable, (ii) any such partial redemptions shall be among the Members holding Class C Preferred Units based on the Preferred Percentage of such Members, and (iii) the holders of the Class C Preferred Units being redeemed shall continue to be considered to be the holder of such Class C Preferred Units and shall have all rights (including the right to receive the Preferred Return) associated with such Class C Preferred Units (regardless of whether such holder continues to have satisfied any threshold ownership requirements as a result of partial redemptions as long as such holder satisfied such rights at the time the redemption was exercised) until such time as such Class C Preferred Units are redeemed in full.

### Section 9.07   Tag-along Right.

(a)    If at any time prior to a Qualified Public Offering, a holder of Class B Preferred Units proposes to Transfer any portion of such holders' Class B Preferred Units other than in connection with **Section 9.02** and does not elect to exercise the drag-along right in accordance with **Section 9.03** (if applicable), then such holder of Class B Preferred Units shall send written notice to Beechwood Re Investments LLC which shall state (i) that such holder of Class B Preferred Units desires to make such a Transfer, (ii) the identity of the proposed transferee and the number of Units proposed to be sold or otherwise transferred, (iii) the proposed purchase price per Unit to be paid and the other terms and conditions of such Transfer, and (iv) the projected closing date of such Transfer.

(b)    For a period of ten (10) days after the giving of the notice pursuant to clause (a) above, the Beechwood Re Investments LLC shall have the right to sell to the proposed transferee

in such Transfer at a price and upon the same terms and conditions as the holder of Class B Preferred Units a percentage of the total number of Units proposed to be Transferred to such proposed transferee equal to the percentage obtained by <u>dividing</u> (x) the number of  Common Units then held by Beechwood Re Investments LLC <u>by</u> (y) the sum of the total number of Class B Preferred Units then outstanding, the total number of Common Units then Outstanding and the total number of  Incentive Units then outstanding.

(c)     The rights of Beechwood Re Investments LLC under **Section 9.07(b)** shall be exercisable by delivering written notice thereof, prior to the expiration of the 10-day period referred to in clause (b) above, to the applicable holder of Class B Preferred Units with a copy to the Company.  The failure of any Beechwood Re Investments LLC to respond within such period to the holder of Class B Preferred Units shall be deemed to be a waiver of Beechwood Re Investments LLC rights under this **Section 9.07** with respect to that Transfer, so long as such Transfer takes place within a period of one hundred and twenty (120) days following the expiration of the 10-day period.

**Section 9.08   Pre-emptive Right.**

(a)     **Issuance of New Securities.** The Company hereby grants to each Pre-emptive Member **t**he right to purchase New Securities that the Company may from time to time propose to issue or sell to any party between the date hereof and the consummation of a Qualified Public Offering.

(b)     **Additional Issuance Notices.** The Company shall give written notice (an "**Issuance Notice**") of any proposed issuance or sale described in **Section 9.08(a)** to the Pre-emptive Members promptly following the date on which any such issuance or sale is approved. The Issuance Notice shall, if applicable, be accompanied by a written offer from, or summary of terms submitted to, any prospective purchaser seeking to purchase New Securities (a "**Prospective Purchaser**") and shall set forth the material terms and conditions of the proposed issuance or sale, including:

(i)     the number and description of the New Securities proposed to be issued;

(ii)     the proposed issuance date, which shall be at least fifteen (15) days from the date of the Issuance Notice;

(iii)     the proposed purchase price per unit of the New Securities; and

(iv)     if the consideration to be paid by the Prospective Purchaser includes non-cash consideration, the Manager's good-faith determination of the Fair Market Value thereof.

(c)     **Exercise of Pre-emptive Rights.**  Each Pre-emptive Member shall for a period of ten (10) days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase all or any portion of its Pre-emptive Pro Rata Portion of any New Securities, as applicable, at the respective purchase prices set forth in the Issuance Notice by delivering a written notice to the Company (an "**Acceptance Notice**") specifying the number of New Securities it desires to purchase.  The delivery of an Acceptance Notice by a Pre-emptive

42

Member shall be a binding and irrevocable offer by such Member to purchase the New Securities described therein.  The failure of a Pre-emptive Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this **Section 9.08** with respect to the purchase of such New Securities, but shall not affect its rights with respect to any future issuances or sales of New Securities.

(d)     **Sales to the Prospective Purchaser.**  Following the expiration of the Exercise Period, the Company shall be free to complete the proposed issuance or sale of New Securities described in the Issuance Notice with respect to which Pre-emptive Members declined to exercise the pre-emptive right set forth in this **Section 9.08** on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced); *provided*, that: (i) such issuance or sale is closed within sixty (60) days after the expiration of the Exercise Period(subject to the extension of such sixty(60) day period for a reasonable time not to exceed thirty (30) days to the extent reasonably necessary to obtain any third-party approvals); and (ii) for the avoidance of doubt, the price at which the New Securities are sold to the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice.  In the event the Company has not sold such New Securities within such time period, the Company shall not thereafter issue or sell any New Securities without first again complying with the procedures set forth in this **Section 9.08**.

(e)     **Closing of the Issuance.** The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Securities in accordance with this **Section 9.08**, the Company shall deliver the New Securities free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Securities shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. The Company, in the discretion of the Manager pursuant to **Section 3.06(a)**, may deliver to each Exercising Member certificates evidencing the New Securities. Each Exercising Member shall deliver to the Company the purchase price for the New Securities purchased by it by certified or bank check or wire transfer of immediately available funds.  Each party to the purchase and sale of New Securities shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

(f)     **Timing of Pre-Emptive Right.** The Pre-emptive Members hereby acknowledge and agree that the Company, due to timing constraints, confidentiality considerations, or other reasons, may request that one or more third party purchasers acquire securities in advance of complying with the requirements of this **Section 9.08**, and each Pre-emptive Member consents to such issuance; *provided* that, as promptly as practicable thereafter, but in no event later than thirty (30) days following such acquisition, the Company complies with the requirements of this **Section 9.08** with respect thereto.  Failure by a Pre-emptive Member to exercise such Pre-emptive Member's option to purchase New Securities with respect to any offering, sale and issuance shall not effect such Pre-emptive Member's option to purchase New Securities in any subsequent offering, sale and purchase.

**Section 9.09   Rights with Respect to Blockers.**   Notwithstanding anything in this Agreement to contrary, in addition to any other rights in connection with (a) a Dissolution Event, (b) an Initial Public Offering or (c) any other sale, transfer, exchange, redemption, contribution, merger, consolidation, disposition or similar transaction involving Membership Interests or assets of the Company or a Company  Subsidiary (each of the transactions described in clauses (a) through (c), a "**Covered Transaction**"), the Company and the Members shall negotiate such transaction so as to include a right on the part of the Blocker Equityholders to dispose of their securities in the Blockers in the Covered Transaction on terms and conditions not less favorable to the Blocker Equityholders than the terms of the Covered Transaction that would have applied to the Blockers' disposition of their Units or a sale of assets by the Company followed by a distribution of proceeds to the Members, as applicable, for a price equal to the amount that the Blockers would otherwise have received in the Covered Transaction.  For the avoidance of doubt, this Section is intended to provide the Blocker Equityholders with any benefits the Blockers would have received (ratably reduced only by the net reduction in tax benefits deliverable by all Members in the aggregate as a result of the transfer of securities of the Blocker) under any so-called "tax receivables agreement" in connection with any public offering if the Blocker Equityholders had participated themselves in such transaction with respect to its interest in the Company.  Any Covered Transaction that is an Initial Public Offering will be structured as a tax-free transaction under Code Section 351 or 368, as applicable.

## ARTICLE X
### COVENANTS

**Section 10.01  Confidentiality.**

(a)      Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and the Company Subsidiaries that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that: (i) the Company and the Company Subsidiaries have invested, and continue to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company and the Company Subsidiaries with a competitive advantage over others in the marketplace; and (iii) the Company and the Company Subsidiaries would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing their investment in the Company or performing their duties as a Manager, Officer, employee, consultant or other service provider of the Company and/or the Company Subsidiaries) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during their association or

44

employment with the Company and/or the Company Subsidiaries or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)      Nothing contained in **Section 10.01(a)** shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this **Section 10.01** as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this **Section 10.01** as if a Member or (viii) with respect to any Member that is an Affiliate of a private equity fund, to its Affiliates' current and potential investors in the ordinary course of their private equity business; *provided*, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available; and *provided, further*, that in the case of clause (viii) the Manager shall be entitled to review any such disclosure relating to the Company prior to its publication and the Manager's comments with respect to any such disclosure that would be competitively harmful to the Company shall be considered in good faith by the disclosing party.

(c)      The restrictions of **Section 10.01(a)** shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; (iii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iv) becomes available to the receiving Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided*, that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

**Section 10.02 Registration Rights**.  In anticipation of an Initial Public Offering, the Manager, the holders of a majority of the Class A Preferred Units (other than those Class A Preferred Units held by Senior Heath Insurance Company of Pennsylvania), the holders of a majority of the Class B Preferred Units or the holders of a majority of the Class C Preferred Units, or Senior Heath Insurance Company of Pennsylvania (as long as it holds Class A Preferred Units), may require the Company to enter into a customary "Registration Rights Agreement" with the Members, which agreement shall set forth the rights and obligations of the Members in connection with an Initial Public Offering or any other public offering, facilitate the

consummation of the Initial Public Offering in an orderly and efficient manner and contain customary piggyback registration rights for the holders of Preferred Units and Common Units (including cutback provisions).

## ARTICLE XI
### ACCOUNTING; TAX MATTERS

**Section 11.01 Inspection Rights; Information Rights.**

(a)     The Company shall furnish to each Member the following reports:

(A)     <u>Annual Financial Statements</u>.  As soon as practicable, but in any event within ninety (90) business days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries, if any, as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, prepared in accordance with GAAP, together with an audit thereof by a firm of independent public accountants of nationally recognized standing selected by the Manager; and

(B)     <u>Quarterly Financial Statements</u>.  As soon as practicable, but in any event within thirty (30) business days after the end of each fiscal quarter of the Company, a consolidated balance sheet of the Company and its Subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal quarter then ended, unaudited but prepared in accordance with GAAP and certified by the chief financial officer of the Company, such consolidated balance sheet to be as of the end of such quarter and such consolidated statements of income, stockholders' equity and cash flows to be for such quarter and for the period from the beginning of the fiscal year to the end of such quarter, in each case with comparative statements for the prior fiscal year.

**Section 11.02  Tax Matters.**

(a)     **Appointment.** The Members hereby appoint BBLN-Agera Corp. as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Section 6231 of the Code) for the Company.

(b)     **Procedural Compliance**.  Each Member hereby agrees (i) to take such actions as may be required to effect the designation of BBLN-Agera Corp. as the Tax Matters Member, (ii) to cooperate to provide any information or take such other actions as may be reasonably requested by the Tax Matters Member in order to determine whether any Imputed Underpayment Amount may be modified pursuant to Code Section 6225(c),  and (iii) to, upon the request of the

46

Tax Matters Member, file any amended U.S. federal income tax return and pay any tax due in connection with such tax return in accordance with Code Section 6225(c)(2).  A Member's obligation to comply with this Section shall survive the transfer, assignment or liquidation of such Member's interest in the Company.

(c)     **Tax Examinations and Audits.** (i) the Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith; (ii) each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings; and (iii) each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(d)     **Income Tax Elections.** The Tax Matters Member shall have discretion to make any income tax election it deems advisable on behalf of the Company. All determinations as to tax elections and accounting principles shall be made by the Tax Matters Member.

(e)     **Tax Returns and Tax Deficiencies.** Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in **Section 7.05(d)**.

(f)     **Resignation.** The Tax Matters Member may resign at any time. If BBLN-Agera Corp. resigns as the Tax Maters Member, the holders of a majority of the Voting Units shall appoint a new Tax Matters Member.

(g)     **New Partnership Audit Rules**.  As and to the extent required by the New Partnership Audit Rules, the Tax Matters Member shall be the "partnership representative" (as defined in Section 6223(a) of the Code). Unless otherwise determined by the Manager, the Company shall not elect to apply the New Partnership Audit Rules prior to the effective date described in Section 6241(g)(1) of the Code.  The Manager, in its discretion, shall determine (A) whether or not the Company should make the election under Section 6221(b) of the Code with respect to determinations of adjustments at the Company level and (B) if the election described in clause (A) is not made or is not available, to the extent applicable, whether or not the Company should make the election under Section 6226(a) of the Code with respect to the alternative to payment of imputed underpayment by the Company and, in each such case if such election is made, the Company, the Manager and the partnership representative, as applicable, shall take any other action such as filings, disclosures and notifications necessary to effectuate such election.   Notwithstanding the foregoing, the Manager, the Company and the partnership

representative are each authorized, in its discretion, to make any available election related to Sections 6221 through 6241 of the Code and take any action it deems necessary or appropriate to comply with the requirements of the Code and conduct the Company's affairs under Sections 6221 through 6241 of the Code.  Each Member shall cooperate with the Company in order to make any election or to otherwise comply with the Partnership Audit Rules, including providing necessary information, documents and forms.

**Section 11.03 Tax Returns.** At the expense of the Company, the Manager (or any Officer that it may designate pursuant to **Section 8.02**) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Company Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, and no later than May 31 of the next Fiscal Year with respect to such Fiscal Year, the Manager or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.  Upon request of the Majority Member, the Company will provide tax data in electronic form as reasonably requested by May 31.  For each Fiscal Year, the Company will provide each Person who was a Member at any time during such Fiscal Year with an estimate of the taxable income and state apportionments allocable to such Person on a periodic basis during such Fiscal Year, including (x) by the end of May of such Fiscal Year an estimate of taxable income and state apportionments as of that date, and (y) by the end of October of such year an estimate of taxable income and state apportionments as of that date.  The Company will use a "more-likely-than-not" standard when taking tax positions.

**Section 11.04 Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Manager, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Manager may designate.

## ARTICLE XII
### DISSOLUTION AND LIQUIDATION

**Section 12.01 Events of Dissolution.** The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events (each, a "**Dissolution Event**"):

(a)      The determination of the Manager to dissolve the Company;

(b)      An election to dissolve the Company made by holders of a majority of the Voting Units;

(c)      The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d)      The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

**Section 12.02 Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in **Section 12.01** occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in **Section 12.03** and the Certificate of Formation shall have been cancelled as provided in **Section 12.04**.

**Section 12.03 Liquidation.** If the Company is dissolved pursuant to **Section 12.01**, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)      **Liquidator.** The Manager, or, if the Manager is unable to do so, a Person selected by the holders of a majority of the Voting Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)      **Accounting.** As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)      **Distribution of Proceeds.** The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)      *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)      *second*, to the establishment of and additions to reserves that are determined by the Manager in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)      *third*, to the Members in the same manner as Distributions are made under **Section 7.02**.

(d)      **Discretion of Liquidator.** Notwithstanding the provisions of **Section 12.03(c)** that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in **Section 12.03(c)**, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion,

49

Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of **Section 12.03(c)**, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

   **Section 12.04 Cancellation of Certificate.** Upon completion of the Distribution of the assets of the Company as provided in **Section 12.03(c)** hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

   **Section 12.05 Survival of Rights, Duties and Obligations.** Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to **Section 13.03**.

   **Section 12.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Manager, the Liquidator or any other Member.

## ARTICLE XIII
### EXCULPATION AND INDEMNIFICATION

  **Section 13.01 Exculpation of Covered Persons.**

   (a)  **Covered Persons.** As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) the Manager and each Officer, employee, agent or representative of the Company.

   (b)  **Standard of Care.** No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

   (c)  **Good Faith Reliance.** A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to

the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) one or more Officers or employees of the Company; (ii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iii) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

### Section 13.02  Liabilities of Covered Persons.

(a)      This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

### Section 13.03 Indemnification.

(a)      **Indemnification.** To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)      Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)      The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Company Subsidiary;

51

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct; *provided, further*, that, unless the Manager otherwise determines, no Person shall be entitled to indemnification hereunder with respect to a proceeding initiated by such Person or with respect to a proceeding between such Person on the one hand and any of the Company or its Subsidiaries on the other.

(b)     **Reimbursement.** The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this **Section 13.03**; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this **Section 13.03**, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)     **Entitlement to Indemnity.** The indemnification provided by this **Section 13.03** shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this **Section 13.03** shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this **Section 13.03** and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     **Insurance.** To the extent available on commercially reasonable terms, the Company may purchase and maintain, at its expense as determined by the Manager, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.  The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by a Member, or its Affiliates (excluding the Company and its Subsidiaries).  The Company hereby agrees, on behalf of itself and its Subsidiaries, (i) that it is an indemnitor of first resort (i.e., its obligations to each

of the Covered Persons are primary and any obligation of a Member or its Affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of any of the Covered Persons is secondary); (ii) that it shall be required to advance the full amount of expenses incurred by or on behalf of each of the Covered Persons and shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement (or, to the extent applicable, the Delaware Act), without regard to any rights such Covered Persons may have against a Member or its Affiliates (including under director and officer insurance policies); and (iii) that it irrevocably waives, relinquishes and releases each Member and its Affiliates from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by a Member or its Affiliates on behalf of a Covered Persons with respect to any claim for which a Covered Person has sought indemnification from the Company or any Subsidiary of the Company shall affect the foregoing, and each Member shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Covered Person against the Company or any Subsidiary of the Company. The Company and each of the Covered Persons agree that each Member, and its Affiliates are express third-party beneficiaries of the terms of this **Section 13.03(d)**.

(e) **Funding of Indemnification Obligation.** Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this **Section 13.03** shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause.** If this **Section 13.03** or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this **Section 13.03** to the fullest extent permitted by any applicable portion of this **Section 13.03** that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment.** The provisions of this **Section 13.03** shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this **Section 13.03** is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification or repeal of this **Section 13.03** that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 13.04 Survival.** The provisions of this **Article XIII** shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XIV
### MISCELLANEOUS

**Section 14.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 14.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 14.03 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 14.03**):

If to the Company:      AGH Parent LLC
c/0 B Asset Manager
1370 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Dhruv Narain
Facsimile: 212.260.5051
E-Mail: dnarain@bassetmanager.com

with a copy to:      Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178
Attention: Steven A. Navarro, Esq.
Facsimile: 212.309.6001
E-mail: steven.navarro@morganlewis.com

If to any Member, to such Member's respective mailing address as set forth on the Members Schedule.

**Section 14.04 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

**Section 14.05 Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 14.06 Entire Agreement.**

(a)     This Agreement, together with the Certificate of Formation, the Incentive Plan, each Award Agreement, the Purchase Agreement and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(b)     In the event of an inconsistency or conflict between the provisions of this Agreement and any provision of the Incentive Plan or an applicable Award Agreement with respect to the subject matter of the Incentive Plan or Award Agreement, the Manager shall resolve such conflict in its sole discretion.

**Section 14.07 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 14.08 No Third-party Beneficiaries.** Except as provided in **Article XIII**, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 14.09 Amendment.**

(a)     No provision of this Agreement may be amended or modified except by a writing executed by the Manager; *provided,* that no amendment or modification that would materially and adversely affect holders of one class or series of Membership Interests without similarly and proportionately affecting holders of other classes or series of Membership Interests, shall be made without the prior written consent of holders of at least a majority of the Membership Interests of such class; for the avoidance of doubt, no such consent shall be required with respect

to amendments or modifications made solely to establish the terms of Incentive Units or new securities of the Company.

(b)     Any amendment in accordance with **Section 14.09(a)** shall be binding upon each Member and the Company.

(c)     Without limiting the generality of the foregoing, and for the avoidance of any doubt, the Manager may amend this Agreement without the consent of any Member (i) to reflect changes validly made in the Members and corresponding changes in the terms and provisions of this Agreement necessary to reflect or conform with any such change in the Members; (ii) to reflect changes permitted in accordance with this Agreement in the Capital Accounts or the Membership Interests of the Members; or (iii) to clarify any ambiguities herein or to appropriately adjust any mechanics or procedures set forth herein so long as the rights of the Members are not prejudiced (in more than an insignificant manner) thereby.

(d)     Anything in the foregoing provisions of this **Section 14.09** to the contrary notwithstanding, this Agreement may be amended from time to time in each and every manner deemed necessary or appropriate by the Manager to comply with the then existing requirements of the Code and the Treasury Regulations affecting the Company or any other provision of applicable law or regulation.

**Section 14.10  Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 14.11  Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 14.12  Submission to Jurisdiction.** The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such

56

courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in **Section 14.03** shall be effective service of process for any suit, action or other proceeding brought in any such court.

**Section 14.13  Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 14.14  Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 14.15  Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in **Section 13.02** to the contrary.

**Section 14.16  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 14.17  Initial Public Offering.**

(a)     **Initial Public Offering.** If at any time the Manager desires to cause (i) a Transfer of all or a substantial portion of (x) the assets of the Company or (y) the Units to a newly organized corporation or other business entity (an "**IPO Entity**"); (ii) a merger or consolidation of the Company into or with a IPO Entity as provided under § 18-209 of the Delaware Act or otherwise; or (iii) another restructuring of all or substantially all the assets or Units of the Company into an IPO Entity, including by way of the conversion of the Company into a Delaware corporation as provided under § 18-216 of the Delaware Act (any such corporation also herein referred to as an "**IPO Entity**"), in any such case in anticipation of or otherwise in connection with an Initial Public Offering of securities of an IPO Entity or its Affiliate (an "**Initial Public Offering**"), each Member shall take such steps to effect such Transfer, merger,

consolidation, conversion or other restructuring as may be reasonably requested by the Manager, including, without limitation, executing and delivering all agreements, instruments and documents as may be reasonably required and Transferring or tendering such Member's Units to an IPO Entity in exchange for consideration for shares of capital stock or other equity interests of the IPO Entity, determined in accordance with the valuation procedures set forth in **Section 14.17(b)**.

(b)     **Fair Market Value.** In connection with a transaction described in **Section 14.17(a)**, the Manager shall, in good faith but subject to the following sentence, determine the Fair Market Value of the assets and/or Transferred Units to, merged with or converted into shares of the IPO Entity, the aggregate Fair Market Value of the IPO Entity and the number of shares of capital stock or other equity interests to be issued to each Member in exchange for consideration therefore.  In determining Fair Market Value, (i) the offering price of the Initial Public Offering shall be used by the Manager to determine the Fair Market Value of the capital stock or other equity interests of the IPO Entity and (ii) the Fair Market Value of the Units shall be based upon a hypothetical orderly liquidation of the Company utilizing generally accepted valuation methodologies, including the assumption that the assets of the Company are a "going concern" at the time of such determination and shall not include any discounts for lack of marketability, minority ownership or otherwise. In addition, any Units (including Incentive Units) to be converted into or redeemed or exchanged for shares of the IPO Entity shall receive shares with substantially equivalent economic, governance, priority and other rights and privileges as in effect immediately prior to such transaction (disregarding the tax treatment of such transaction).

(c)     **Appointment of Proxy.** Each Member hereby makes, constitutes and appoints the Company, with full power of substitution and resubstitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this **Section 14.17**, including any vote or approval required under § 18-209 or § 18-216 of the Delaware Act. The proxy granted pursuant to this **Section 14.17(c)** is a special proxy coupled with an interest and is irrevocable.

(d)     **Lock-up Agreement.** Each Member hereby agrees that in connection with an Initial Public Offering, and upon the request of the managing underwriter in such offering, such Member shall not, without the prior written consent of such managing underwriter, during the period commencing three days prior to the effective date of such registration and until the date specified by such managing underwriter (such period not to exceed 180 days in the case of an Initial Public Offering, and such lock-up period subject to automatic expiration in the event the Initial Public Offering has not been consummated by a date to be reasonably agreed upon between the Company and the managing underwriting), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Units or Unit Equivalents (including any equity securities of the IPO Entity) (whether such Units or Unit Equivalents or any such securities are then owned by the Member or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Units or Unit Equivalents (including equity securities of the IPO Entity) or such other securities, in cash or otherwise. The

foregoing provisions of this **Section 14.17(d)** shall not apply to sales of securities to be included in such Initial Public Offering or other offering if otherwise permitted. Each Member agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. The forgoing provisions of this **Section 14.17(d)** shall apply only to the Company's Initial Public Offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Members if all executive officers, directors and greater than 5% stockholders of the Company enter into similar agreements.

[SIGNATURE PAGE FOLLOWS]

59

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

**AGH Parent LLC**

By: _____
Name:  Dhruv Narain
Title:  Authorized Signatory

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

The Members:

**SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA**

By: _____
Name: BRIAN C. WEGNER
Title: PRESIDENT & CEO

**BRE WNIC 2013 LTC PRIMARY**

Wilmington Trust, National Association
not in its individual capacity
but solely as Trustee

By: _____

Name:

Title:   David B. Young
         Vice President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BBLN-AGERA CORP.**

By: _____
Name:  Dhruv Narain
Title:  President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BBIL ULICO 2014**

Wilmington Trust, National Association
not in its individual capacity
but solely as Trustee

By: _____

Name:

Title:        David B. Young
             Vice President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BHLN-AGERA CORP.**

By: _____
Name:  Dhruv Narain
Title:  President

**BOLN-AGERA CORP.**

By: _____

Name:  Dhruv Narain

Title:  President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**STARFISH HOLDINGS GROUP, INC.**

By: _____

Name: Kevin Cassidy

Title: President

**PRINCIPAL GROWTH STRATEGIES, LLC**

By: _____

Name: David Steinberg

Title: Authorized Signator

**BEECHWOOD RE INVESTMENTS LLC**


By: _____

Name:  Samuel Adler

Title:  Authorized Signatory

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

## Members Schedule

| Members | Class A Preferred Units | Class B-1 Preferred Units | Class B-2 Preferred Units | Class C Preferred Units | Preferred Class A Unreturned Capital Value | Preferred Class B-1 Unreturned Capital Value | Preferred Class B-2 Unreturned Capital Value | Preferred Class C Unreturned Capital Value | Common Units | Incentive Units | Total Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania | 350,000 | | | | $35,000,000 | | | | | | 350,000 |
| BRe WNIC 2013 LTC Primary | | 31,178.89 | | | | $3,117,889.24 | | | | | 31,178.89 |
| BBLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BBIL ULICO 2014 | | 75,900 | | | | $7,590,000 | | | | | 75,900 |
| BHLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BOLN-Agera Corp. | | 11,721.11 | | | | $1,172,110.76 | | | | | 11,721.11 |
| Starfish Holdings Group, Inc. | | | | | | | | | | 12,062 | 12,062 |
| Principal Growth Strategies, LLC | | | 3,438 | 590,400 | | | $2,000,000 | $59,040,000 | | | 593,838 |
| Beechwood Re Investments LLC | | | | | | | | | 5,730 | | 5,730 |
| **Total** | **350,000** | **220,000** | **3,438** | **590,400** | **$35,000,000** | **$22,000,000** | **$2,000,000** | **$59,040,000** | **5,730** | **12,062** | **1,181,630** |

**Exhibit A**

*FORM OF JOINDER AGREEMENT*

**JOINDER AGREEMENT**

Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated June 9, 2016, as amended from time to time (the "**LLC Agreement**"), among [*EXISTING MEMBERS*] and AGH Parent LLC, a company organized under the laws of Delaware (the "**Company**"). Pursuant to and in accordance with Section 4.01(b) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto [, and shall hold the status of [*MEMBERSHIP CLASS*]].

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of [DATE].

[NEW MEMBER]

By_____

Name:

Title:

**Exhibit B**

*FORM OF AGREEMENT FOR CONSULTING SERVICES*

*Execution Version*

## AGREEMENT FOR CONSULTING SERVICES

THIS AGREEMENT is made effective as of June 9, 2016 (the "**Effective Date**"), by and between BAM Management Services LLC, a Delaware limited liability company ("**Management**"), and AGH Parent LLC, a Delaware limited liability company (the "**Company**," and together with the Company's direct or indirect subsidiaries, the "**Companies**").

WHEREAS, Management, by and through its officers, employees, agents and affiliates has developed in connection with the conduct of its business and affairs various areas of expertise in the fields of finance, accounting, marketing, and strategic planning and corporate consulting;

WHEREAS, the Company has, pursuant to that certain Purchase Agreement by and between the Company and Principal Growth Strategies LLC ("**PGS**"), dated as of the date hereof (the "**Purchase Agreement**"), purchased that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended as of the date of the Purchase Agreement by that certain amendment dated as of the date of the Purchase Agreement (the "**Closing Note Amendment**"), in the principal amount of $600,071.23 (Six Hundred Thousand Seventy-One Dollars and Twenty Three Cents), executed by Agera Energy LLC ("**Agera Energy**") as acknowledged by Agera Holdings LLC, payable to the order of PGS as specified therein (as so amended as aforesaid, the "**Note**"); and

WHEREAS, the Companies desire to avail themselves of the expertise of Management in those areas hereinabove enumerated and in which Management is acknowledged to have expertise.

NOW, THEREFORE, the parties do hereby agree as follows:

1.      Appointment; Term. The Company hereby appoints Management for a period of ten (10) years from the Effective Date (the "**Term**") to render strategic planning and consulting services to the Companies during the Term as herein contemplated. Management's role in this regard shall be strictly limited to that of a consultant. Nothing in this Agreement shall confer or be deemed to confer any corporate or managerial authority over any of the business affairs of the Companies.

2.      Services. During the Term, Management shall render to the Companies, by and through such of its officers, employees, agents and affiliates as Management, in its sole discretion, shall designate from time to time, strategic planning and corporate consulting services (the "**Services**"). Upon completion of the Term, upon mutual agreement between Management and the Company, Management shall render to the Companies the Services for an additional period of mutual determination. Said Services shall consist of advice concerning finance, marketing, strategic planning, and such other corporate consulting services as shall be requested from time to time by Company. Company acknowledge and agrees that the Services to be provided by Management hereunder do not encompass services that would be required in connection with (i) (a) a sale, merger, joint venture formation or other business combination or recapitalization in connection with which an unaffiliated third party acquires an equity interest in

any of the Companies, directly or indirectly or (b) any acquisition by any of the Companies of the capital stock or assets (other than assets acquired by the Companies in the ordinary course of business), (whether by purchase, merger, joint venture formation or other business combination, or otherwise), of any unaffiliated third party, (ii) a sale, lease or conveyance of all or a portion of the assets of any of the Companies, (iii) (A) any offering by the Companies of capital  or (B) any issuance of debt financing or indebtedness or the refinancing of any indebtedness of any of the Companies, or (iv) any declaration of an extraordinary dividend by any of the Companies. Further, notwithstanding anything to the contrary contained herein, Management shall perform no services of a type or nature that would require Management to be registered or regulated under any applicable law in the United States relating to the regulation of broker/dealer or investment advisory services.

3.      Fees.  In consideration of Management's performance of the above-described Services, the Company agrees to pay to Management, in cash, a services fee at the rate of one million ($1,000,000) dollars per annum payable in advance in quarterly installments commencing on the Effective Date of two hundred fifty thousand ($250,000) dollars for the duration of the Term (the "**Fee**"). It is recognized that, subject to the terms of this Agreement, the Company is committed to pay the full amount payable hereunder, and the Fee, once paid, is non-refundable. The Fee shall then after be due on the first day of each calendar quarter thereafter, or such other time as mutually agreed; provided, however that any payments otherwise due prior to the conversion or sale of the Note shall neither be earned nor accrue, but rather shall become an executory contractual obligation, the earning and payment of all of which contractual obligations in the aggregate shall be entirely contingent upon the conversion of the Note where upon all amounts otherwise due hereunder shall be earned and paid.  In the event of (i) the termination of this Agreement prior to the end of the Term, (ii) a change of control of the Company or (iii) a direct or indirect change of control of Agera Energy, all Fees then due that have not previously been paid, shall be accelerated and become immediately due and payable to Management.

4.      Subsidiaries.  The Company shall cause and take all action needed such that any direct or indirect subsidiary of the Company agrees to the terms hereof by duly executing and delivering a guaranty in the form attached hereto as **Exhibit A**.

5.      Reimbursements. Within 15 calendar days of delivery of Management's invoice, Company shall reimburse Management for its reasonable actual out-of-pocket expenses incurred in connection with the performance of services pursuant to this Agreement.

6.      Default. In the event that Company fails to pay any part of the Fee as set forth in Paragraph 3 above when and as due, and Company does not cure such failure prior to the 5th day of the month following the month in which such payment is due, then Company shall be in default under this Agreement and Management shall be entitled to receive payment in full of the unpaid portion of the Fee upon making written demand upon Company for such payment. Upon delivery of such written demand, Management shall be excused from rendering any further services pursuant to this Agreement. The aforesaid right and privilege of Management to withhold services is intended to be in addition to any and all other remedies available because of Company's default, including Management's right to payment of all fees set forth herein. Further, in the event of a default by Company, Company agree to reimburse Management for any and all costs and expenses incurred by Management, including, without limitation, reasonable

2

counsel fees and expenses, in connection with such default and any litigation or other proceedings instituted for the collection of payments due hereunder.

7. <u>Permissible Activities</u>. Nothing herein shall in any way preclude Management from engaging in any business activities or from performing services for its own account or for the account of others, in addition to performing the Services hereunder. Except as may otherwise be agreed in writing after the date hereof: (a) each member of the Management Group (as defined in Section 8) shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly: (i) engage in the same or similar business activities or lines of business as the Companies or any of their affiliates, or advise, manage, supervise or monitor any company or business, including any and all existing and future portfolio companies of any affiliate of Management, whether or not such company or business competes with the business of the Companies, and (ii) do business with any client or customer of the Companies or any of their affiliates; and (b) no member of the Management Group shall be liable to the Companies or any of their affiliates for breach of any duty (contractual or otherwise) by reason of any such activities or of such person's participation therein.

8. <u>Liability; Indemnification</u>.

(a) Neither Management, any of its affiliates, nor any of their respective partners, directors, officers, members, employees or agents (collectively, the "**Management Group**") shall be liable to the Companies or any of their affiliates for any loss, liability, damage or expense (including attorney's fees and expenses) (collectively, a "**Loss**") arising out of or in connection with the performance of services contemplated by this Agreement, unless such Loss shall be proven to result directly from the gross negligence or bad faith on the part of such member of the Management Group. Management makes no representations or warranties, express or implied, in respect of the services provided by any member of the Management Group. In no event will any member of the Management Group be liable (x) for any indirect, special, incidental or consequential damages, including lost profits or savings, whether or not such damages are foreseeable or (y) in respect of any Losses relating to any third party claims (whether based in contract, tort or otherwise) other than for the Losses relating to the services which may be provided by Management hereunder.

(b) Company shall indemnify and hold harmless Management and its directors, officers, employees, agents and controlling persons (each being an "**Indemnified Party**") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, relating to or arising out of the strategic planning and consulting services contemplated by, this Agreement. Company shall reimburse any Indemnified Party for all costs and expenses (including reasonable counsel fees and expenses) incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party. Company shall not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted primarily from the bad faith or gross negligence of Management.

3

9.     <u>Amendments</u>. No amendment or waiver of any provision of this Agreement, or consent to any departure by either party from any such provision, shall in any event be effective unless the same shall be in writing and signed by the parties to this Agreement and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.     <u>Notices</u>. Any and all notices hereunder shall, in the absence of receipted hand delivery, be deemed duly given when mailed, if the same shall be sent by registered or certified mail, return receipt requested, and the mailing date shall be deemed the date from which all time periods pertaining to a date of notice shall run. Notices shall be addressed to the parties at the following addresses:

> If to Management, to:
>
> c/o B Asset Manager
> 1370 Avenue of the Americas
> 32nd Floor
> New York, NY 10019
> Attention:   Dhruv Narain
>
> If to Company, to:
>
> c/o B Asset Manager
> 1370 Avenue of the Americas
> 32nd Floor
> New York, NY 10019
> Attention:   Dhruv Narain

11.     <u>Entire Agreement</u>. This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

12.     <u>Assignment</u>. This Agreement shall be assignable by either party hereto provided that the non-assigning party consents in writing to such assignment.

13.     <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the laws of Delaware (without regard to the conflicts of laws provisions thereof or of any other jurisdiction) and shall inure to the benefit of, and be binding upon, Management and Company and their respective successors and assigns.

14.     <u>No Continuing Waiver</u>. The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

15.     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

4

*Remainder of Page Intentionally Left Blank*

5

# EXHIBIT A

# FORM OF SUBSIDIARY GUARANTY

THIS GUARANTY, dated as of [_____ ___, _____], is executed and delivered pursuant to that certain Agreement for Consulting Services (the "**Consulting Agreement**"), dated as of June 9, 2016 (the "**Effective Date**"), by and between AGH Parent LLC, a Delaware limited liability company (the "**Company**") and BAM Management Services LLC a Delaware limited liability company ("**Management**").  Capitalized terms not otherwise defined in this Guaranty have the meanings ascribed to them in the Consulting Agreement.

In consideration of Management's execution and delivery of the Consulting Agreement and its agreement to perform the transactions contemplated hereby, and as a material inducement to such execution, delivery and performance, each of the undersigned hereby (a) guarantees (jointly and severally with any other guarantors under the Consulting Agreement) any payments owed by the Company to the Consultant pursuant to this Agreement and (b) acknowledges and concurs in each and all of the terms and conditions of the Consulting Agreement, including (without limitation) each such term that defines, limits or otherwise circumscribes the relationship between the parties thereto and the scope of any party's responsibility or authority thereunder.  The undersigned agrees that no formal change, amendment, modification or waiver of any terms or condition hereof or the Consulting Agreement, no extension in whole or in part of the time for the performance by Management of any of its obligations hereunder or under the Consulting Agreement, and no settlement, compromise, release, surrender, modification or impairment of, or exercise or failure to exercise any claim, right or remedy of any kind or nature in connection herewith or the Consulting Agreement, shall affect, impair or discharge, in whole or in part, the liability of the undersigned for the full, prompt and unconditional performance of the obligations of the Company under the Consulting Agreement.  The obligations of the undersigned hereunder are absolute and unconditional, irrespective of any circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor.  The liability of the undersigned shall be direct and not conditional or contingent on the pursuit of remedies against the Company.  Management may at its option proceed in the first instance against the undersigned to collect any amount owed hereunder without first proceeding against the Company.  The guarantee of the undersigned shall be a continuing guarantee, and the above consent and waiver of the undersigned shall remain in full force and effect until the obligations of the Company hereunder are discharged and paid in full.  The undersigned agrees to pay all costs, fees and expenses (including reasonable attorneys' fees and all disbursements) incurred by Management in collecting or enforcing the undersigned's obligations hereunder.

[NAME OF SUBSIDIARY]

By:_____
Name:
Title:

## JOINDER AGREEMENT

Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated June 9, 2016, as amended from time to time (the "**LLC Agreement**"), among the Initial Members and AGH Parent LLC, a company organized under the laws of Delaware (the "**Company**"). Pursuant to and in accordance with Section 4.01(b) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a holder of Class B-2 Preferred Units and Class C Preferred Units.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of June 9, 2016.

Starfish Capital, Inc.

By _____

Name: Kevin Cassidy

Title: President

DB1/ 88011359.3

## AGH Parent LLC
### Amended and Restated Members Schedule
### to the Amended and Restated Limited Liability Company Agreement of AGH Parent LLC
### (June 9, 2016)

| Members | Class A Preferred Units | Class B-1 Preferred Units | Class B-2 Preferred Units | Class C Preferred Units | Preferred Class A Unreturned Capital Value | Preferred Class B-1 Unreturned Capital Value | Preferred Class B-2 Unreturned Capital Value | Preferred Class C Unreturned Capital Value | Common Units | Incentive Units | Total Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania | 350,000 | | | | $35,000,000 | | | | | | 350,000 |
| BRe WNIC 2013 LTC Primary | | 31,178.89 | | | | $3,117,889.24 | | | | | 31,178.89 |
| BBLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BBIL ULICO 2014 | | 75,900 | | | | $7,590,000 | | | | | 75,900 |
| BHLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BOLN-Agera Corp. | | 11,721.11 | | | | $1,172,110.76 | | | | | 11,721.11 |
| Starfish Holdings Group, Inc. | | | | | | | | | | 12,062 | 12,062 |
| Starfish Capital, Inc. | | | 3,438 | 45,520 | | | $2,000,000 | $4,552,000 | | | 48,958 |
| Principal Growth Strategies, LLC | | | | 544,880 | | | | $54,488,000 | | | 544,880 |
| Beechwood Re Investments LLC | | | | | | | | | 5,730 | | 5,730 |
| **Total** | **350,000** | **220,000** | **3,438** | **590,400** | **$35,000,000** | **$22,000,000** | **$2,000,000** | **$59,040,000** | **5,730** | **12,062** | **1,181,630** |

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 21

**AGH Parent LLC**
**c/o BAM Management Services LLC**
**1370 Avenue of the Americas, 32nd Floor**
**New York, New York  10019**

October 28, 2016

Principal Growth Strategies LLC
c/o Platinum Partners
250 West 55th Street, 14th Floor
New York, New York  10019
Attn:  Suzanne Horowitz, Chief Legal Officer

> Re:  Notice of AGH Parent LLC ("**AGH Parent**") Redemption of Class C Preferred
>      Units held by Principal Growth Strategies LLC ("**PGS**")

Dear Ms. Horowitz:

Pursuant to Section 9.06 of the AGH Parent Amended and Restated Limited Liability Company Agreement entered into as of June 9, 2016 ("**LLC Agreement**"), we write to notify you that AGH Parent will exercise its redemption rights set forth in Section 9.06(a)(i) of the LLC Agreement with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value ("**Redemption**").  The effective date of the Redemption will be the earlier of January 26, 2017 and the Business Day immediately preceding the date of a Change of Control or a Dissolution Event ("**Effective Date**").  On the Effective Date, AGH Parent will pay PGS a redemption price for the Class C Preferred Units held by PGS in the form of PGS Value.  Any capitalized term used but not defined herein shall have the meaning specified in the LLC Agreement.

Sincerely,

AGH Parent LLC
By: BAM Management Services LLC, its manager

By: _____
Name: Dhruv Narain
Title: Authorized Signatory

cc:   Mark Nordlicht
      David Steinberg
      Bart Schwartz
      Matthew Wright
      Chris Kennedy
      Barbra Parlin, Esq.

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

# Exhibit 22

**AGH Parent LLC**
**c/o BAM Management Services LLC**
**1370 Avenue of the Americas, 32nd Floor**
**New York, New York 10019**

January 26, 2017

Principal Growth Strategies LLC
c/o Platinum Partners
1325 Avenue of the Americas
Suite 2717
New York, New York 10019
Attn: Suzanne Horowitz, Chief Legal Officer

Re:   AGH Parent LLC's Partial Redemption of Class C Preferred Units Held by
        Principal Growth Strategies LLC

Dear Ms. Horowitz,

We refer to that certain Amended and Restated Limited Liability Company Agreement among AGH Parent LLC ("**AGH Parent**"), Principal Growth Strategies LLC ("**PGS**") and the Members named therein dated as of June 9, 2016 (the "**LLC Agreement**"). Any capitalized term used but not defined herein shall have the meaning specified in the LLC Agreement.

Pursuant to Section 9.06 of the LLC Agreement, AGH Parent elected, by delivery to PGS of a Class C Redemption Notice dated October 28, 2016 (the "**AGH Parent Redemption Notice**"), to exercise its redemption rights as set forth in Section 9.06(a)(i) of the LLC Agreement to redeem, effective as of January 26, 2017, the portion of the Class C Preferred Units held by PGS that may be redeemed on such date in consideration for the full amount of the PGS Value ($35,400,000.00) as provided therein.

Accordingly, enclosed with this letter is an Assignment (the "**Assignment**"), duly executed on behalf of AGH Parent, transferring to PGS all of AGH Parent's interest in the assets set forth in Schedule A to such Assignment, which together have aggregate value, as determined in accordance with the LLC Agreement, equal to the PGS Value.

AGH Parent is simultaneously updating its records to reflect the redemption of 336,928.93 Class C Preferred Units held by PGS, as well as the satisfaction as relates to PGS of $1,707,107.00 in accretive Class C Preferred Return related to the redeemed units, in each case, effective as of the date hereof.

67606107v2

Sincerely,

AGH Parent LLC

By: BAM Management Services LLC, its manager

By: _____
Name: Dhruv Narain
Title:   Authorized Signatory

Cc:   Mark Nordlicht (mnordlicht@platinumlp.com)
      David Steinberg (DSteinberg@platinumlp.com)
      Bart Schwartz (BSchwartz@guidepostsolutions.com)
      Robert Rittereiser (rrittereiser@guidepostsolutions.com)
      Matthew Wright (MWright@RHSWCaribbean.com)
      Chris Kennedy (CKennedy@RHSWCaribbean.com)
      Barbra Parlin, Esq. (Barbra.Parlin@hklaw.com)
      Warren Gluck, Esq. (Warren.Gluck@hklaw.com)
      Alan Levine, Esq. (alevine@cooley.com)
      Celia Barenholtz, Esq. (cbarenholtz@cooley.com)

## Schedule A

| Identification of PGS Value Asset | Ascribed PGS Value Pursuant to LLC Agreement |
|---|---|
| -$1,436,721.13 of principal indebtedness and $19,715.07 of accrued and unpaid interest and fees outstanding under that certain Promissory Note, issued to BBIL ULICO 2014 by **Montsant Partners LLC** in the principal amount of $6,137,215.50 on or about March 31, 2016 and subsequently assigned in relevant part to Beechwood Omnia Ltd. effective as of January 26, 2017, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$1,456,436.20** |
| -$4,567,599.71 of principal indebtedness and $24,741.17 of accrued and unpaid interest and fees outstanding under that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to BRe WNIC 2013 LTC Primary by **Golden Gate Oil LLC** in the principal amount of $20,405,749.26 on or about March 21, 2016 and subsequently assigned in relevant part to Beechwood Omnia Ltd. effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$4,592,340.88** |
| -$2,720,431.68 of principal indebtedness and $14,735.67 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Omnia Ltd. in that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Golden Gate Oil LLC** in the principal amount of $11,249,414.40 on or about March 21, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$2,735,167.35** |
| -$6,734,192.89 of principal indebtedness and $36,476.88 of accrued and unpaid interest and fees outstanding under that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to BRe WNIC 2013 LTC Primary by **Golden Gate Oil LLC** in the principal amount of $20,405,749.26 on or about March 21, 2016 and subsequently assigned in relevant part to Beechwood Bermuda International Ltd. (for its BBILCustody (ULICO) Account) Ltd. effective as of November 1, 2016, as further assigned in relevant part by Beechwood Bermuda International Ltd. (for its BBILCustody (ULICO) Account) to Beechwood OMNIA Ltd. effective as of January 26, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$6,770,669.77** |
| -$941,438.32 of principal indebtedness and $10,199.06 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Primary by **Pedevco Corp.** in the principal amount of $13,065,703.98 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Primary to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$951,637.37** |
| -$95,064.88 of principal indebtedness and $1,029.88 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Sub by **Pedevco Corp.** in the principal amount of $856,992.17 on or about May | **$96,094.76** |

3

| | |
|---|---|
| 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Sub to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | |
| -$50,110.30 of principal indebtedness and $542.87 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe BCLIC Sub by **Pedevco Corp.** in the principal amount of $451,709.79 on or about May 12, 2016 and subsequently assigned in relevant part by BRe BCLIC Sub to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and | $50,653.17 |
| -$1,396,059.50 of principal indebtedness and $15,124.19 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Omnia Ltd. in that certain Amended and Restated Secured Term Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Pedevco Corp.** in the principal amount of $12,585,118.75 on or about May 12, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | $1,411,183.69 |
| -$5,359,751.87 of principal indebtedness and $73,547.93 of accrued and unpaid interest and fees outstanding under that certain Promissory Note, issued to BBIL ULICO 2014 by **Montsant Partners LLC** in the principal amount of $6,137,215.50 on or about March 31, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | $5,433,299.80 |
| -$1,255,736.22 of principal indebtedness and $13,603.63 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Primary by **Pedevco Corp.** in the principal amount of $13,065,703.98 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Primary to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | $1,269,339.85 |
| -$115,685.39 of principal indebtedness and $1,253.24 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Sub by **Pedevco Corp.** in the principal amount of $856,992.17 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Sub to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and | $116,938.63 |
| -$60,980.86 of principal indebtedness and $660.62 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe BCLIC Sub by **Pedevco Corp.** in the principal amount of $451,709.79 on or about May 12, 2016 and subsequently assigned in relevant part by BRe BCLIC Sub to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, | $61,641.48 |

| | |
|---|---|
| effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and<br><br>-$1,698,900.53 of principal indebtedness and $18,404.51 of accrued and unpaid interest and fees outstanding in the participation interests held by BBIL ULICO 2014 in that certain Amended and Restated Secured Term Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Pedevco Corp.** in the principal amount of $12,585,118.75 on or about May 12, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | **$1,717,305.04** |
| -$8,619,020.00 of principal indebtedness and $118,272.01 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Bermuda International Limited (for credit to its ULICO custody account) in that certain Second Amended and Restated Secured Term Note, issued to Senior Health Insurance Company of Pennsylvania by **Montsant Partners LLC** in the principal amount of $36,774,055.56 on or about March 21, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | **$8,737,292.01** |
| **TOTAL** | **$35,400,000** |

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(a)
OF THE RULES OF THE COURT OF CHANCERY

EFiled: Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

The information contained herein is for the use by the Court for statistical and administrative p
only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:
Principal Growth Strategies, LLC, Platinum Partners Value Arbitrage Fund L.P., Martin Trott & Christopher Smith, Joint Official Liquidators, PLAINTIFFS, v. AGH Parent LLC, Senior Health Insurance Company Of Pennsylvania, Fuzion Analytics, Inc.Bankers Conseco Life Insurance Company, Washington National Insurance Company, 40/86 Advisors, Inc., Private Bankers Life Annuity LTC 2, Washington National LTC 2, BHLN-AGERA Corp., BOLN-AGERA Corp, BBLN-AGERA Corp. Beechwood Re Investments LLC, CNO Financial Group, Inc., Cassidy, Kevin Starfish Capital, Inc., John Does 1-100, DEFENDANTS, v. Platinum Management (NY) LLC, Mark Nordlicht, David Levy,  Murray Huberfeld, and David Bodner, NOMINAL DEFENDANTS.

2. Date Filed:    JUNE 7, 2019

3. Name and address of counsel for plaintiff(s):    Brett D. Fallon, Esquire (#2480)
                                                     R. Eric Hacker, Esquire (#6122)
                                                     500 Delaware Avenue, Suite 1500
                                                     Wilmington, DE  19801-1494
                                                     (302) 888-6800

4. Short statement and nature of claim asserted:
This action involves allegations that fiduciaries of Plaintiff PGS stripped PGS of an asset worth approximately $250-300 million through a series of fraudulent, insider transactions. Plaintiffs seek equitable relief and monetary damages related to claims of breaches of fiduciary duty, unjust enrichment, and fraudulent trading, as well as other claims

5. Substantive field of law involved (check one):

| | | |
|---|---|---|
| ____Administrative law | ____Labor law | ____Trusts, Wills and Estates |
| ____Commercial law | ____Real Property | ____Consent trust petitions |
| ____Constitutional law | ____348 Deed Restriction | ____Partition |
| _x_ Corporation law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
| ____Trade secrets/trade mark/or other intellectual property | | ____Other |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):
    There are no related Delaware cases.

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):
    6 *Del. C.* § 18-111, 6 *Del. C.* § 2708, and 10 *Del. C.* § 341

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.
    This complaint does not request preliminary equitable relief.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here ____.  (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause. _x_

                    /s/ Brett D. Fallon #2480
                Signature of Attorney of Record & Bar ID

## STATEMENT OF GOOD CAUSE

This action involves allegations that fiduciaries of Plaintiff PGS stripped PGS of an asset worth approximately $250-300 million through a series of fraudulent, insider transactions. Plaintiffs seek equitable relief and monetary damages related to claims of breaches of fiduciary duty, unjust enrichment, and fraudulent trading, as well as other claims more fully set out in the Verified Petition. Given the complexity of this matter, and that the Plaintiffs expect this matter to be heavily litigated, assigning this action to a Master will likely significantly delay this matter's resolution due to the report and exceptions process for Masters established by Court of Chancery Rule 144. Plaintiffs are concerned that they will suffer greater harm if this dispute is not resolved promptly. As such, this matter should proceed directly before the Chancellor or a Vice Chancellor of this Court.

**MORRIS JAMES LLP**

By: */s/ Brett D. Fallon*

| | |
|---|---|
| **OF COUNSEL:** | Brett D. Fallon, Esquire (#2480) |
| Warren E. Gluck, Esquire | R. Eric Hacker, Esquire (#6122) |
| Barbra R. Parlin, Esquire | 500 Delaware Avenue, Suite 1500 |
| Richard A. Bixter, Jr., Esquire | Wilmington, DE  19801-1494 |
| Holland & Knight LLP | (302) 888-6800 |
| 31 West 52nd Street | *Attorneys for Plaintiffs* |
| New York, NY 10019 | |
| (212) 513-3200 | |

Dated: June 7, 2019

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

EFiled: Jun 07 2019 05:20PM EDT
Transaction ID 63341013
Case No. 2019-0431-JTL

   The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:

Principal Growth Strategies, LLC, Platinum Partners Value Arbitrage Fund L.P., Martin Trott & Christopher Smith, Joint Official Liquidators, PLAINTIFFS,  v. AGH Parent LLC, Senior Health Insurance Company Of Pennsylvania, Bankers Conseco Life Insurance Company, Washington National Insurance Company, 40/86 Advisors, Inc., Private Bankers Life Annuity LTC 2, Washing National LTC 2, BHLN-AGERA Corp., BOLN-AGERA Corp, BBLN-AGERA Corp. Beechwood Re Investments LLC, CNO Financial Group, Inc., Cassidy, Kevin Starfish Capital, Inc., John Does 1-100, DEFENDANTS, v. Platinum Management (NY) LLC, Mark Nordlicht, David Levy,  Murray Huberfeld, and David Bodner, NOMINAL DEFENDANTS.

2. Date Filed: June 7, 2019

3. Name and address of counsel for plaintiff(s):

Brett D. Fallon, Esquire (#2480), R. Eric Hacker, Esquire (#6122), 500 Delaware Avenue, Suite 1500 Wilmington, DE  19801-1494, (302) 888-6800

4. Short statement and nature of claim asserted:

This action involves allegations that fiduciaries of Plaintiff PGS stripped PGS of an asset worth approximately $250-300 million through a series of fraudulent, insider transactions. Plaintiffs seek equitable relief and monetary damages related to claims of breaches of fiduciary duty, unjust enrichment, and fraudulent trading, as well as other claims.

5. Substantive field of law involved (check one):

| | | |
|---|---|---|
| ____Administrative law | ____Labor law | ____Trusts, Wills and Estates |
| ____Commercial law | ____Real Property | ____Consent trust petitions |
| ____Constitutional law | ____348 Deed Restriction | ____Partition |
| __x_Corporation law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
| ____Trade secrets/trade mark/or other intellectual property | | ____Other |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):

There are no related Delaware cases.

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):

6 Del. C. § 18-111, 6 Del. C. § 2708, and 10 Del. C. § 341

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.

This complaint does not request preliminary equitable relief.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here ___.  (If #9 is checked, a Motion to Expedite _must_ accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause. __x_

    ___/s/ Brett Fallon 2480_____
    Signature of Attorney of Record & Bar ID

## STATEMENT OF GOOD CAUSE

This action involves allegations that fiduciaries of Plaintiff PGS stripped PGS of an asset worth approximately $250-300 million through a series of fraudulent, insider transactions. Plaintiffs seek equitable relief and monetary damages related to claims of breaches of fiduciary duty, unjust enrichment, and fraudulent trading, as well as other claims more fully set out in the Verified Petition. Given the complexity of this matter, and that the Plaintiffs expect this matter to be heavily litigated, assigning this action to a Master will likely significantly delay this matter's resolution due to the report and exceptions process for Masters established by Court of Chancery Rule 144. Plaintiffs are concerned that they will suffer greater harm if this dispute is not resolved promptly. As such, this matter should proceed directly before the Chancellor or a Vice Chancellor of this Court.

MORRIS JAMES LLP

By: */s/ Brett D. Fallon*

**OF COUNSEL**:
Warren E. Gluck, Esquire
Barbra R. Parlin, Esquire
Richard A. Bixter, Jr., Esquire
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200

Brett D. Fallon, Esquire (#2480)
R. Eric Hacker, Esquire (#6122)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
*Attorneys for Plaintiffs*

Dated: June 7, 2019

# Morris James<sub>LLP</sub>

EFiled: Jun 12 2019 12:37PM EDT
Transaction ID 63354553
Case No. 2019-0431-JTL

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 12, 2019

**VIA E-FILING**

Register in Chancery
Leonard L.Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, DE 19801

      Re:    *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
                Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action. If the paperwork appears to be in appropriate form,

we would appreciate your office preparing the following summons to be served as

follows:

> **Pursuant to 10 *Del. C.* § 3103, for hand delivery by
> Brandywine Process Servers, to:**
>
> AGH Parent LLC
> c/o The Corporation Trust Company
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE 19801

Register in Chancery
June 12, 2019
Page 2

Morris James LLP

Private Bankers Life Annuity LTC 2,
as successor in interest to BBIL ULICO 2014 Trust
c/o Wilmington Trust Company
1100 N. Market Street
Wilmington, DE  19801

Washington National LTC 2,
as successor in interest to BRe WNIC 2013 LTC Primary
c/o Northern Trust Corporation
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

BHLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BOLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BBLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Beechwood Re Investments, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Morris James LLP

Register in Chancery
June 12, 2019
Page 3


Platinum Management (NY) LLC
c/o Vcorp Services, LLC
1013 Centre Road, Suite 403-B
Wilmington, DE  19805

**Pursuant to 10 *Del. C.* § 3104(d), for service by our office, via registered mail to:**

Kevin Cassidy
7 Killdeer Lane
Nantucket, MA  02254

Starfish Capital, Inc.
72 N. State Road, #502
Briarcliff Manor, NY  10510

Senior Health Insurance Company of Pennsylvania
27 North Front Street
Harrisburg, PA  17101

Fuzion Analytics, Inc.
500 Congressional Boulevard, #200
Carmel, IN  46032

Bankers Conseco Life Insurance Company
350 Jericho Turnpike #304
Jericho, NY  11753

Washington National Insurance Company
11825 N. Pennsylvania Street
Carmel, IN  46032

CNO Financial Group, Inc.
11825 N. Pennsylvania Street
Carmel, IN  46032

Morris James LLP

Register in Chancery
June 12, 2019
Page 4


40/86 Advisors, Inc.
11825 N. Pennsylvania Street
Carmel, IN 46032

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY 10804

David Bodner
16 Grosser Lane
Monsey, NY 10952

Murray Huberfeld
15 Manor Lane
Lawrence, NY 11559

David Levy
80 Riverside Boulevard, Apt #24C
New York, NY 10069

If you have any questions regarding this request, please do not hesitate to

contact me.

Respectfully submitted,

/s/ *R. Eric Hacker*

R. Eric Hacker (#6122)

WORDS: 353


REH/dar

**EFiled:  Jun 17 2019 12:40PM EDT**
**Transaction ID 63368957**
**Case No. 2019-0431-JTL**

# Morris James LLP

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 12, 2019

6/14/19 - issued (3) 3104 Summonses
to law firm (11 copies)
- issued (1) summons to
SPS (8 copies)

**VIA E-FILING**

Register in Chancery
Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, DE 19801

Re:   *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,*
      *Del. Ch., C.A. No. 2019-0431-JTL*

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action.  If the paperwork appears to be in appropriate form,

we would appreciate your office preparing the following summons to be served as

follows:

**Pursuant to 10 *Del. C.* § 3103, for hand delivery by
Brandywine Process Servers, to:**

AGH Parent LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

500 Delaware Avenue, Suite 1500 | Wilmington, DE 19801-1494   T 302.888.6800   F 302.571.1750
Mailing Address   P.O. Box 2306 | Wilmington, DE 19899-2306   www.morrisjames.com



Register in Chancery
June 12, 2019
Page 2

Morris James LLP

Private Bankers Life Annuity LTC 2,
as successor in interest to BBIL ULICO 2014 Trust
c/o Wilmington Trust Company
1100 N. Market Street
Wilmington, DE  19801

Washington National LTC 2,
as successor in interest to BRe WNIC 2013 LTC Primary
c/o Northern Trust Corporation
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

BHLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BOLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BBLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Beechwood Re Investments, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Morris James LLP

Register in Chancery
June 12, 2019
Page 3

Platinum Management (NY) LLC
c/o Vcorp Services, LLC
1013 Centre Road, Suite 403-B
Wilmington, DE  19805

**Pursuant to 10 *Del. C.* § 3104(d), for service by our office, via registered mail to:**

Kevin Cassidy
7 Killdeer Lane
Nantucket, MA  02254

Starfish Capital, Inc.
72 N. State Road, #502
Briarcliff Manor, NY  10510

Senior Health Insurance Company of Pennsylvania
27 North Front Street
Harrisburg, PA  17101

Fuzion Analytics, Inc.
500 Congressional Boulevard, #200
Carmel, IN  46032

Bankers Conseco Life Insurance Company
350 Jericho Turnpike #304
Jericho, NY  11753

Washington National Insurance Company
11825 N. Pennsylvania Street
Carmel, IN  46032

CNO Financial Group, Inc.
11825 N. Pennsylvania Street
Carmel, IN  46032

Morris James LLP

Register in Chancery
June 12, 2019
Page 4


40/86 Advisors, Inc.
11825 N. Pennsylvania Street
Carmel, IN  46032

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY  10804

David Bodner
16 Grosser Lane
Monsey, NY  10952

Murray Huberfeld
15 Manor Lane
Lawrence, NY  11559

David Levy
80 Riverside Boulevard, Apt #24C
New York, NY  10069

If you have any questions regarding this request, please do not hesitate to

contact me.

Respectfully submitted,

/s/ *R. Eric Hacker*

R. Eric Hacker (#6122)

WORDS:  353


REH/dar


10994858/1

EFiled: Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES,   )
LLC, a Delaware limited liability company; )
PLATINUM PARTNERS VALUE   )
ARBITRAGE FUND L.P. (in Official   )
Liquidation), a Cayman Islands exempted   )
limited partnership; and MARTIN TROTT   )   C.A. No.
& CHRISTOPHER SMITH, Joint Official   )
Liquidators of Platinum Partners Value   )
Arbitrage Fund L.P. (in official liquidation), )

        Plaintiffs,    )
     v.    )

AGH PARENT LLC, a Delaware limited   )
liability company; SENIOR HEALTH   )
INSURANCE COMPANY OF   )
PENNSYLVANIA, a Pennsylvania   )
insurance company; FUZION   )
ANALYTICS, INC., a Delaware   )
corporation; BANKERS CONSECO LIFE   )
INSURANCE COMPANY, a New York   )
insurance company; WASHINGTON   )
NATIONAL INSURANCE COMPANY,   )
an Indiana insurance company; CNO   )
FINANCIAL GROUP, INC., a Delaware   )
corporation; 40/86 ADVISORS, INC., a   )
Delaware corporation; PRIVATE   )
BANKERS LIFE ANNUITY LTC 2, a   )
Delaware reinsurance trust, as successor in )
interest to BBIL ULICO 2014 Trust;   )
WASHINGTON NATIONAL LTC 2, a   )
Delaware reinsurance trust, as successor in )
interest to BRE WNIC 2013 LTC Primary; )
BHLN-AGERA CORP., a Delaware   )
corporation; BOLN-AGERA CORP., a   )
Delaware corporation; BBLN-AGERA   )
CORP., a Delaware corporation;   )
BEECHWOOD RE INVESTMENTS LLC, )
a Delaware limited liability company;   )

KEVIN CASSIDY; STARFISH CAPITAL, )
INC., a New York corporation; and JOHN )
DOES 1-100, )
                                                                           )

              Defendants. )

    v. )

PLATINUM MANAGEMENT (NY) LLC, )
a Delaware limited liability company; )
MARK NORDLICHT, DAVID LEVY, )
MURRAY HUBERFELD, and DAVID )
BODNER, )
                                  )

          Nominal Defendants. )

                                   )
                                   )

## **VERIFIED COMPLAINT**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), <br><br> Plaintiffs, <br><br> v. <br><br> AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, <br><br> Defendants <br><br> v. <br><br> PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, <br><br> Nominal Defendants. | C.A. No. 2019-0431-JTL <br><br> SUMMONS |

**THE STATE OF DELAWARE**
**TO:      SPECIAL PROCESS SERVER – Brandywine Process Servers:**
**YOU ARE COMMANDED:**

      To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>R. Eric Hacker</u>, Esquire, Plaintiff's counsel, whose address is <u>Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306,</u> an answer to the verified complaint.

      To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

      In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:      June 14, 2019

_____
Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1. **AGH Parent LLC**

   c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

2. **Private Bankers Life Annuity LTC 2,** as successor in interest to BBIL ULICO 2014 TRUST

   c/o Wilmington Trust Company, 1100 N. Market Street, Wilmington, DE 19801

3. **Washington National LTC 2**, as successor in interest to BRe WNIC 2013 LTC PRIMARY

   c/o Northern Trust Corporation, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

4. **BHLN-Agera Corp.**
5. **BOLN-Agera Corp.**
6. **BBLN-Agera Corp.**
7. **Beechwood Re Investments, LLC**

   c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

8. **Platinum Management (NY) LLC**

   c/o Vcorp Services, LLC, 1013 Centre Rd., Suite 403-B, Wilmington, DE 19805

All pursuant to 10 Del.C. Sec. 3103

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Brandywine Process Servers

<u>R. Eric Hacker, Esquire</u>
Plaintiff's Attorney



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>          Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>          Defendants,<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>          Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 Del.C. Sec. 3104 |

**THE STATE OF DELAWARE**
**TO:    MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

    To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:      June 14, 2019

                                            Register in Chancery

**C.A. # 2019-0431-JTL**

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1. **Kevin Cassidy**
   7 Killdeer Lane
   Nantucket, MA 02254

2. **Senior Health Insurance Company of Pennsylvania**
   27 North Front Street
   Harrisburg, PA 17101

Both Pursuant to 10 Del.C. Sec. 3104

SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail

R. Eric Hacker, Esquire
Plaintiff's Counsel



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>                             Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>                             Defendants<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>                        Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 Del.C. Sec. 3104 |

**THE STATE OF DELAWARE**
**TO:      MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:          June 14, 2019

_____
Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.    **Starfish Capital, Inc.**
      72 N. State Road, #502
      Briarcliff Manor, NY 10510

2.    **Mark Nordlicht**
      245 Trenor Drive
      New Rochelle, NY 10804

3.    **David Bodner**
      16 Grosser Lane
      Monsey, NY 10952

4.    **Murray Huberfeld**
      15 Manor Lane
      Lawrence, NY 11559

5.    **David Levy**
      80 Riverside Boulevard, Apt. #24C
      New York, NY 10069

All Pursuant to 10 Del.C. Sec. 3104


SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail



R. Eric Hacker, Esquire
Plaintiff's Counsel



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>       Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>       Defendants,<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>       Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 <u>Del.C.</u> Sec. 3104 |

**THE STATE OF DELAWARE**
**TO: MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

  To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>R. Eric Hacker</u>, Esquire, Plaintiff's counsel, whose address is <u>Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306</u>, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

  In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:   June 14, 2019

               _____
               Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.   **Fuzion Analytics, Inc.**
     500 Congressional Boulevard, #200
     Carmel, IN 46032

2.   **Washington National Insurance Company**
     350 Jericho Turnpike, #304
     Carmel, IN 46032

3.   **CNO Financial Group, Inc.**
     11825 N. Pennsylvania Street
     Carmel, IN 46032

4.   **40/86 Advisors, Inc.**
     11825 N. Pennsylvania Street
     Carmel, IN 46032

All Pursuant to 10 <u>Del.C.</u> Sec. 3104

SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail

<u>R. Eric Hacker, Esquire</u>
Plaintiff's Counsel



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>     Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>     Defendants<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>     Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 <u>Del.C.</u> Sec. 3104 |

**THE STATE OF DELAWARE**
**TO: MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

  To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>R. Eric Hacker</u>, Esquire, Plaintiff's counsel, whose address is <u>Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306</u>, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

  In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:  June 14, 2019

        _Karen Jackson_
        Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.   **Fuzion Analytics, Inc.**
     500 Congressional Boulevard, #200
     Carmel, IN 46032

2.   **Washington National Insurance Company**
     11825 N. Pennsylvania Street
     Carmel, IN 46032

3.   **CNO Financial Group, Inc.**
     11825 N. Pennsylvania Street
     Carmel, IN 46032

4.   **40/86 Advisors, Inc.**
     11825 N. Pennsylvania Street
     Carmel, IN 46032

All Pursuant to 10 Del.C. Sec. 3104

SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail

R. Eric Hacker, Esquire
Plaintiff's Counsel



EFiled: Jun 17 2019 12:40PM EDT
Transaction ID 63362937
Case No. 2019-0431-JTL

# Morris James

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 12, 2019

**VIA E-FILING**

*[handwritten]* 6/17/19 - issued (1) 3104
summons to law
firm (1 copy)

Register in Chancery
Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, DE  19801

> Re:  *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,*
> Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action.  If the paperwork appears to be in appropriate form,

we would appreciate your office preparing the following summons to be served as

follows:

> **Pursuant to 10 *Del. C.* § 3103, for hand delivery by**
> **Brandywine Process Servers, to:**
>
> AGH Parent LLC
> c/o The Corporation Trust Company
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE  19801

Register in Chancery
June 12, 2019
Page 2

Morris James LLP

Private Bankers Life Annuity LTC 2,
as successor in interest to BBIL ULICO 2014 Trust
c/o Wilmington Trust Company
1100 N. Market Street
Wilmington, DE  19801

Washington National LTC 2,
as successor in interest to BRe WNIC 2013 LTC Primary
c/o Northern Trust Corporation
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

BHLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BOLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

BBLN-Agera Corp.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Beechwood Re Investments, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

Register in Chancery
June 12, 2019
Page 3

Morris James LLP

  Platinum Management (NY) LLC
  c/o Vcorp Services, LLC
  1013 Centre Road, Suite 403-B
  Wilmington, DE  19805

  **Pursuant to 10 *Del. C.* § 3104(d), for service by our office, via registered mail to:**

  Kevin Cassidy
  7 Killdeer Lane
  Nantucket, MA  02254

  Starfish Capital, Inc.
  72 N. State Road, #502
  Briarcliff Manor, NY  10510

  Senior Health Insurance Company of Pennsylvania
  27 North Front Street
  Harrisburg, PA  17101

  Fuzion Analytics, Inc.
  500 Congressional Boulevard, #200
  Carmel, IN  46032

  Bankers Conseco Life Insurance Company
  350 Jericho Turnpike #304
  Jericho, NY  11753

  Washington National Insurance Company
  11825 N. Pennsylvania Street
  Carmel, IN  46032

  CNO Financial Group, Inc.
  11825 N. Pennsylvania Street
  Carmel, IN  46032

Morris James LLP

Register in Chancery
June 12, 2019
Page 4

40/86 Advisors, Inc.
11825 N. Pennsylvania Street
Carmel, IN  46032

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY  10804

David Bodner
16 Grosser Lane
Monsey, NY  10952

Murray Huberfeld
15 Manor Lane
Lawrence, NY  11559

David Levy
80 Riverside Boulevard, Apt #24C
New York, NY  10069

If you have any questions regarding this request, please do not hesitate to

contact me.

Respectfully submitted,

/s/ *R. Eric Hacker*

R. Eric Hacker (#6122)

WORDS:  353

REH/dar

10994858/1



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>       Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP.,  a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>       Defendants<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>       Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 Del.C. Sec. 3104 |

**THE STATE OF DELAWARE**
**TO: MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

  To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

  In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:   June 17, 2019

                    _____
                    Register in Chancery

**C.A. # 2019-0431-JTL**

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.  **Bankers Conseco Life Insurance Company**
    350 Jericho Turnpike #304
    Jericho, NY 11753

All Pursuant to 10 <u>Del.C.</u> Sec. 3104

SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail

<u>R. Eric Hacker, Esquire</u>
Plaintiff's Counsel



EFiled: Jun 18 2019 01:27PM EDT
Transaction ID 63374271
Case No. 2019-0431-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ORIGINAL

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | )<br>) |
| v. | )<br>) |
| PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, | )<br>)<br>)<br>) |
| Nominal Defendants. | )<br>) |

C.A. No. 2019-0431-JTL

SUMMONS

THE STATE OF DELAWARE
TO:     SPECIAL PROCESS SERVER – Brandywine Process Servers:
YOU ARE COMMANDED:

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        June 14, 2019

_____
Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.   **AGH Parent LLC**

   c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

2.   **Private Bankers Life Annuity LTC 2**, as successor in interest to BBIL ULICO 2014 TRUST

   c/o Wilmington Trust Company, 1100 N. Market Street, Wilmington, DE 19801

3.   **Washington National LTC 2**, as successor in interest to BRe WNIC 2013 LTC PRIMARY

   c/o Northern Trust Corporation, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

4.   **BHLN-Agera Corp.**
5.   **BOLN-Agera Corp.**
6 .   **BBLN-Agera Corp.**
7.   **Beechwood Re Investments, LLC**

   c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

8.   **Platinum Management (NY) LLC**

   c/o Vcorp Services, LLC, 1013 Centre Rd., Suite 403-B, Wilmington, DE 19805

All pursuant to 10 Del.C. Sec. 3103

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Brandywine Process Servers

R. Eric Hacker, Esquire
Plaintiff's Attorney

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| **CASE NO:** | 2019-0431-JTL |
| **SERVED:** | AGH PARENT, LLC |
| **DOCUMENT:** | Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons Instruction Letter, Summons |
| **ADDRESS:** | C/O THE CORPORATION TRUST CO. 1209 ORANGE STREET WILMINGTON, DE 19801 |
| **DATE:** | 6/17/19 |

## MANNER OF SERVICE

☒    **PERSONAL:**     ACCEPTED BY:    AMY MCLAREN (authorized person at the registered agent)

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

KEVIN S. DUNN      PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX  1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**    2019-0431-JTL

**SERVED:**    PRIVATE BANKERS LIFE ANNUITY LTC2 as s/i/i/ to BBIL ULICO 2014 TRUST

**DOCUMENT:**    Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons Instruction Letter, Summons

**ADDRESS:**    C/O WILMINGTON TRUST COMPANY 1100 N. MARKET STREET WILMINGTON, DE 19801

**DATE:**    6/18/19

## MANNER OF SERVICE

☒    **PERSONAL:**    ACCEPTED BY:    TARA AKIN (authorized person at the registered agent)

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

KEVIN S. DUNN    PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON  6/18/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| **CASE NO:** | 2019-0431-JTL |
| **SERVED:** | WASHINGTON NATIONAL LTC2 as s/i/i TO BRe WNIC 2013 LTC PRIMARY C/O NORTHERN TRUST CORPORATION |
| **DOCUMENT:** | Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons Instruction Letter, Summons |
| **ADDRESS:** | C/O THE CORPORATION TRUST CO. 1209 ORANGE STREET WILMINGTON, DE 19801 |
| **DATE:** | 6/17/19 |

## MANNER OF SERVICE

☒    **PERSONAL:**        ACCEPTED BY:    AMY MCLAREN (authorized person at the registered agent)

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**  2019-0431-JTL

**SERVED:**  BHLN-AGRA CORP.

**DOCUMENT:**  Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons Instruction Letter, Summons

**ADDRESS:**  C/O CORPORATION SERVICE CO.  251 LITTLE FALLS DRIVE WILMINGTON, DE 19808

**DATE:**  6/17/19

## MANNER OF SERVICE

☒   **PERSONAL:**      ACCEPTED BY:   LYNANNE GARRES (authorized person at the registered agent)

☐   **SUBSTITUTE:**

☐   **NO SERVICE:**

KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**       2019-0431-JTL

**SERVED:**        BOLN-AGERA CORP.

**DOCUMENT:**      Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons
                   Instruction Letter, Summons

**ADDRESS:**       C/O CORPORATION SERVICE CO.  251 LITTLE FALLS DRIVE WILMINGTON, DE 19808

**DATE:**          6/17/19

## MANNER OF SERVICE

☒   **PERSONAL:**       ACCEPTED BY:   LYNANNE GARRES (authorized person at the registered agent)

☐   **SUBSTITUTE:**

☐   **NO SERVICE:**

KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**       2019-0431-JTL

**SERVED:**        BBLN-AGERA CORP.

**DOCUMENT:**   Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons
Instruction Letter, Summons

**ADDRESS:**      C/O CORPORATION SERVICE CO.  251 LITTLE FALLS DRIVE WILMINGTON, DE 19808

**DATE:**           6/17/19

## MANNER OF SERVICE

☒    **PERSONAL:**        ACCEPTED BY:   LYNANNE GARRES (authorized person at the registered agent)

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**       2019-0431-JTL

**SERVED:**        BEECHWOOD RE INVESTMENTS, LLC

**DOCUMENT:**      Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons
                   Instruction Letter, Summons

**ADDRESS:**       C/O CORPORATION SERVICE CO.  251 LITTLE FALLS DRIVE WILMINGTON, DE 19808

**DATE:**          6/17/19

## MANNER OF SERVICE

☒   **PERSONAL:**       ACCEPTED BY:   LYNANNE GARRES (authorized person at the registered agent)

☐   **SUBSTITUTE:**

☐   **NO SERVICE:**

_____
KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

_____
NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**        2019-0431-JTL

**SERVED:**        PLATINUM MANAGEMENT (NY) LLC

**DOCUMENT:**   Complaint, Verifications, Exhibits 1-22, Supplemental Information Sheet, Summons Instruction Letter, Summons

**ADDRESS:**      C/O VCORP SERVICES, LLC 1013 CENTRE RD. WILMINGTON, DE 19805

**DATE:**            6/17/19

## MANNER OF SERVICE

☒     **PERSONAL:**      ACCEPTED BY:    HEATHER HOWE (authorized person at the registered agent)

☐     **SUBSTITUTE:**

☐     **NO SERVICE:**

KEVIN S. DUNN          PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   6/17/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

EFiled:  Jun 24 2019 11:51AM EDT
Transaction ID 63474684
Case No. 2019-0431-JTL

# Morris James LLP

Brett D. Fallon
302.888.6888
bfallon@morrisjames.com

June 24, 2019

## VIA FILE&SERVEXPRESS

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE  19801

> Re:   *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
> Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint in the above-captioned action.  The Court previously issued a summons, but we had provided an incorrect address and have since realized that the entity is incorporated in Delaware, hence a long arm service is no longer needed.  We would appreciate your office preparing a replacement summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE  19801-1494 T: 302.888.6800 F: 302.571.1750
Mailing Address P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11014804/1

Register in Chancery
June 24, 2019
Page 2

Morris James LLP

**Pursuant to 10 *Del. C.* § 3103, for hand delivery by Brandywine Process Servers, to:**

Fuzion Analytics, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808
Carmel, IN  46032

Sincerely,

*/s/ Brett D. Fallon*

Brett D. Fallon (#2480)

Words:  102

BDF:clb

EFiled: Jun 25 2019 03:44PM EDT
Transaction ID 63480858
Case No. 2019-0431-JTL

# Morris James LLP

Brett D. Fallon
302.888.6888
bfallon@morrisjames.com

June 24, 2019

**VIA FILE&SERVEXPRESS**

*[handwritten: 6/25/19 — issued (1) Summons to SPS (1 copy)]*

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE  19801

Re:   *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,*
*Del. Ch., C.A. No. 2019-0431-JTL*

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint in the above-captioned action.  The Court previously issued a summons, but we had provided an incorrect address and have since realized that the entity is incorporated in Delaware, hence a long arm service is no longer needed.  We would appreciate your office preparing a replacement summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE  19801-1494 **T:** 302.888.6800 **F:** 302.571.1750
**Mailing Address** P. O. Box 2306 | Wilmington, DE 19899-2306 **www.morrisjames.com**

11014804/1

Register in Chancery
June 24, 2019
Page 2

**Morris James** LLP

**Pursuant to 10 *Del. C.* § 3103, for hand delivery by Brandywine Process Servers, to:**

Fuzion Analytics, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808
Carmel, IN  46032

Sincerely,

*/s/ Brett D. Fallon*

Brett D. Fallon (#2480)

Words:  102

BDF:clb

EFiled:  Jun 21 2019 03:24PM EDT
Transaction ID 63387386
Case No. 2019-0473-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ENCLAVECAP, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019- |
| ENCLAVE AT ODESSA, LLC, a Delaware Limited Liability Company, ODESSA NATIONAL DEVELOPMENT COMPANY, LLC, a Delaware Limited Liability Company, and MARIO B. CAPANO, jointly and severally, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | ) ) ) ) | |
| Minimal Party. | ) ) | |

## VERIFIED COMPLAINT TO QUIET TITLE

### The Parties

1.     Plaintiff Enclavecap, LLC ("Enclavecap") is a Delaware Limited

Liability Company.



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), | )<br>)<br>)<br>)<br>) C.A. No. 2019-0431-JTL<br>)<br>) SUMMONS |
| Plaintiffs, | ) |
| v. | ) |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | ) |
| v. | ) |
| PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, | )<br>)<br>) |
| Nominal Defendants. | ) |

**THE STATE OF DELAWARE**
**TO:   SPECIAL PROCESS SERVER – Brandywine Process Servers:**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:   June 25, 2019

_Karen Johnson_
Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1. Fuzion Analytics, Inc.

   c/o Corporation Service Company
   251 LIttle Falls Drive
   Wilmington, DE 19808

All pursuant to 10 Del.C. Sec. 3103

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Brandywine Process Servers

R. Eric Hacker, Esquire
Plaintiff's Attorney

EFiled:  Jun 26 2019 11:04AM EDT
Transaction ID 63483344
Case No. 2019-0431-JTL

# Morris James LLP

Brett D. Fallon
302.888.6888
bfallon@morrisjames.com

June 26, 2019

**VIA FILE&SERVEXPRESS**

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE  19801

> Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
> Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint in the above-captioned action.  The Court previously issued a summons, but we had provided an incorrect address and the Complaint was not served.  We recently have found a correct address for long arm service and would appreciate your office preparing a replacement summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE  19801-1494 T: 302.888.6800 F: 302.571.1750
Mailing Address P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11020731/1

Register in Chancery
June 26, 2019
Page 2

**Morris James** LLP

**Pursuant to 10 *Del. C.* § 3104(d) for service by our office, via registered mail, to:**

Kevin Cassidy
72 N. State Rd., #502
Briarcliff, NY  10510

Sincerely,

*/s/ Brett D. Fallon*

Brett D. Fallon (#2480)

Words:  93

BDF:clb

EFiled: Jun 26 2019 03:57PM EDT
Transaction ID 63485619
Case No. 2019-0431-JTL



### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ORIGINAL

|  |  |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), <br><br> Plaintiffs, <br><br> v. <br><br> AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, <br><br> Defendants <br><br> v. <br><br> PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, <br><br> Nominal Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br> C.A. No. 2019-0431-JTL <br><br> SUMMONS |

**THE STATE OF DELAWARE**
**TO:      SPECIAL PROCESS SERVER – Brandywine Process Servers:**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:   June 25, 2019

_____
Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

```
1. Fuzion Analytics, Inc.

   c/o Corporation Service Company
   251 LIttle Falls Drive
   Wilmington, DE 19808
```

All pursuant to 10 Del.C. Sec. 3103

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Brandywine Process Servers

R. Eric Hacker, Esquire
Plaintiff's Attorney

# *RETURN OF SERVICE*

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**      2019-0431-JTL

**SERVED:**       FUZION ANALYTICS, INC.

**DOCUMENT:**     SUMMONS; COMPLAINT WITH EXHIBITS; VERIFICATION; SUPPLEMENTAL INFORMATION
                  PURSUANT TO RULE 3(A) OF THE RULES OF THE COURT OF CHANCERY; STATEMENT OF GOOD
                  CAUSE; LETTER TO CHANCERY DATED JUNE 24, 2019;

**ADDRESS:**      C/O CORPORATION SERVICE COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808

**DATE:**         6/26/19

## MANNER OF SERVICE

☒     **PERSONAL:**          ACCEPTED BY:    LYNANNE GARES (AUTHORIZED PERSON AT REGISTERED AGENT)

☐     **SUBSTITUTE:**

☐     **NO SERVICE:**

KEVIN S. DUNN

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON    6/26/19

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

EFiled: Jun 27 2019 05:33PM EDT
Transaction ID 63490093
Case No. 2019-0431-JTL

# Morris James LLP

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 27, 2019

**VIA FILE&SERVEXPRESS**

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE 19801

Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint in the above-captioned action. Yesterday, June 26, we filed a summons instruction letter requesting a replacement summons (T.I. 6348334) for Defendant Kevin Cassidy at 72 N. State Rd., #502, Briarcliff, NY 10510. However, today, our office received updated information that indicates that service may not be possible at this address.

Therefore, we respectfully request that you cancel the issuance of this summons. Please contact me with any questions.

---

500 Delaware Avenue, Suite 1500 | Wilmington, DE 19801-1494 **T:** 302.888.6800 **F:** 302.571.1750
**Mailing Address** P. O. Box 2306 | Wilmington, DE 19899-2306 **www.morrisjames.com**

11026299/1

Register in Chancery
June 27, 2019
Page 2

Morris James LLP

Sincerely,

*/s/ R.  Eric Hacker*

R.  Eric Hacker (#6122)

Words:  80

REH:clb

**EFiled:  Jun 28 2019 03:56PM EDT**
**Transaction ID 63493716**
**Case No. 2019-0431-JTL**

# Morris James LLP

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 28, 2019

## VIA FILE&SERVEXPRESS

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE  19801

   Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
     Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint in the above-captioned action.  The Court previously issued a summons, but we had provided an incorrect address and the Complaint was not served.  We recently have found a correct address for long arm service and would appreciate your office preparing a replacement summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE  19801-1494 **T:** 302.888.6800 **F:** 302.571.1750
**Mailing Address** P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11020731/2

Register in Chancery
June 28, 2019
Page 2

**Morris James**LLP

**Pursuant to 10 *Del. C.* § 3104(d) for service by our office, via registered mail, to:**

Kevin Cassidy
76 Narrows Road
Bedford Hills, New York  10507

Respectfully,

*/s/ R.  Eric Hacker*

R.  Eric Hacker (#2480)

Words:  93

REH:clb

EFiled: Jul 05 2019 02:45PM EDT
EFiled: Jun 28 2018 03:56PM
Transaction ID 63493716
Case No. 2019-0431-JTL

# Morris James LLP

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

June 28, 2019

**VIA FILE&SERVEXPRESS**

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE 19801

> Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
> Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action. The Court previously issued a summons, but we

had provided an incorrect address and the Complaint was not served. We recently

have found a correct address for long arm service and would appreciate your office

preparing a replacement summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE 19801-1494 **T:** 302.888.6800 **F:** 302.571.1750
**Mailing Address** P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11020731/2

Register in Chancery
June 28, 2019
Page 2

**Morris James** LLP

**Pursuant to 10 _Del. C._ § 3104(d) for service by our office, via registered mail, to:**

Kevin Cassidy
76 Narrows Road
Bedford Hills, New York  10507

Respectfully,

_/s/ R.  Eric Hacker_

R.  Eric Hacker (#2480)

Words:  93

REH:clb

EFiled:  Jun 07 2019 03:20PM EDT
Transaction ID 63335909
Case No. 2019-0431-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation), | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Principal Growth Strategies, LLC, a
Delaware limited liability company;
Platinum Partners Value Arbitrage
Fund L.P. (in Official Liquidation), a
Cayman Islands exempted limited
partnership; and Martin Trott &
Christopher Smith, Joint Official
Liquidators of Platinum Partners Value
Arbitrage Fund L.P. (in Official
Liquidation)

}

CA #: 2019-0431-JTL

ALIAS 10 Del.C. sec. 3104

SUMMONS

　　　　　　　Plaintiff(s)

　　　　　　　　V

AGH Parent LLC, a Delaware limited
liability company; Senior Health
Insurance Company of Pennsylvania, a
Pennsylvania insurance company;
Fuzion Analytics, Inc. a Delaware
corporation; Bankers Conseco Life
Insurance Company, a New York
insurance company; Washington
National Insurance Company, an
Indiana insurance company, CNO
Financial Group, Inc., a Delaware
corporation; 40/86 Advisors, Inc. a
Delaware corporation; Private Bankers
Life Annuity LTC 2, a Delaware
reinsurance trust, as successor in
interest to BBIL Ulico 2014 Trust;
Washington National LTC 2, a
Delaware reinsurance trust, as
successor in interest to BRE WNIC
2013 LTC Primary; BHLN-Agera
Corp. a Delaware corporation; BOLN-
Agera Corp., a Delaware corporation;
BBLN-Agera Corp., a Delaware
corporation; Beechwood
Reinvestments LLC, a Delaware
limited liability company;

　　　　　　　Defendant(s)

THE STATE OF DELAWARE

TO:   Law Firm (Morris James LLP)

## YOU ARE COMMANDED:

To summon the above named defendants so that, within 20 days after service

hereof upon defendants, exclusive of the day of service, defendants shall serve upon

R. Eric Hacker, Esq., Plaintiff's attorney whose address is P.O. Box 2306,

Wilmington, DE 19899 an answer to the complaint.

To serve upon defendants a copy hereof and of the complaint.

## TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you,
exclusive of the day of service, to serve on plaintiff's attorney name above an
answer to the complaint, judgment by default will be rendered against you for the
relief demanded in the complaint.

Dated July 5, 2019

_____
Register in Chancery

Case # <u>2019-0431-JTL</u>
<u>ALIAS 10 Del.C. sec. 3104</u>

*PRINCIPAL GROWTH STRATEGIES, LLC, ETAL*

Plaintiff(s)

V

*AGH PARENT LLC, ETAL*

Defendant(s)

*ALIAS*
# SUMMONS

Please effectuate pursuant to 10 *Del.C. sec.* 3104 upon:

Kevin Cassidy
76 Narrows Road
Bedford Hills, NY 10507

By Registered Mail

Plaintiff's Attorney:  <u>R. Eric Hacker, Esq.</u>

**EFiled:  Jul 08 2019 02:49PM EDT**
**Transaction ID 63503526**
**Case No. 2019-0431-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation), | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) | C.A. No. 2019-0431-JTL |
| v. | ) ) |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary;BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Delaware limited liability company; KEVIN )
CASSIDY; STARFISH CAPITAL, INC., a )
New York corporation; and JOHN DOES 1- )
100, )
                                          )
                    Defendants,           )
        and                               )
                                          )
PLATINUM MANAGEMENT (NY) LLC, a )
Delaware limited liability company; MARK )
NORDLICHT, DAVID LEVY, MURRAY )
HUBERFELD, and DAVID BODNER, )
                                          )
                Nominal Defendants.       )

## STIPULATION AND [PROPOSED] ORDER
## EXTENDING DEADLINE TO RESPOND TO THE COMPLAINT

WHEREAS, on June 7, 2019, Plaintiffs filed a Verified Complaint in the above-captioned action (the "Verified Complaint") (Dkt. 1);

WHEREAS, on June 17, 2019, Plaintiffs served Defendants Bankers Conseco Life Insurance Company, Washington National Insurance Company, CNO Financial Group, Inc., and 40/86 Advisors, Inc. (collectively, the "CNO Defendants") with the Complaint; and

WHEREAS, the deadline for the CNO Defendants to respond to the Verified Complaint is July 8, 2019;

IT IS HEREBY STIPULATED AND AGREED, by the parties hereto, through their undersigned counsel, subject to the approval of the Court, that the

2

deadline for the CNO Defendants to respond to the Verified Complaint is extended

until July 31, 2019.

OF COUNSEL:                          /s/ Brett D. Fallon
                                     Brett D. Fallon (#2480)
Warren E. Gluck                      R. Eric Hacker (#6122)
Barbra R. Parlin                     MORRIS JAMES LLP
Richard A. Baxter, Jr.               500 Delaware Avenue, Suite 1500
HOLLAND & KNIGHT LLP                 P.O. Box 2306
31 West 52nd Street                  Wilmington, DE 19899-2306
New York, New York 10019             302-888-6800
212-513-3200

                                     *Attorneys for Plaintiffs*

OF COUNSEL:                          /s/   April M. Kirby
                                     A. Thompson Bayliss (#4379)
Adam J. Kaiser                       April M. Kirby (#6152)
Daniella Main                        ABRAMS & BAYLISS LLP
ALSTON & BIRD LLP                    20 Montchanin Rd., Suite 200
90 Park Avenue                       Wilmington, DE 19807
New York, New York 10016             302-778-1000
212-210-9400

                                     *Attorneys for Defendants Bankers*
                                     *Conseco Life Insurance Company,*
                                     *Washington National Insurance*
                                     *Company, CNO Financial Group,*
                                     *Inc., and 40/86 Advisors, Inc.*

July 8, 2019

3

SO ORDERED this _____ day of _____, 2019

_____
Vice Chancellor J. Travis Laster

**GRANTED**

EFiled: Jul 09 2019 09:49AM EDT
Transaction ID 63521165
Case No. 2019-0431-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation), | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 2019-0431-JTL |
| v. | ) ) | |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary;BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Delaware limited liability company; KEVIN          )
CASSIDY; STARFISH CAPITAL, INC., a                )
New York corporation; and JOHN DOES 1-            )
100,                                               )
                                                   )
                Defendants,                )
     and                                           )
                                                   )
PLATINUM MANAGEMENT (NY) LLC, a                    )
Delaware limited liability company; MARK           )
NORDLICHT, DAVID LEVY, MURRAY                      )
HUBERFELD, and DAVID BODNER,                       )
                                                   )
            Nominal Defendants.                    )

## STIPULATION AND [PROPOSED] ORDER
## <u>EXTENDING DEADLINE TO RESPOND TO THE COMPLAINT</u>

WHEREAS, on June 7, 2019, Plaintiffs filed a Verified Complaint in the above-captioned action (the "Verified Complaint") (Dkt. 1);

WHEREAS, on June 17, 2019, Plaintiffs served Defendants Bankers Conseco Life Insurance Company, Washington National Insurance Company, CNO Financial Group, Inc., and 40/86 Advisors, Inc. (collectively, the "CNO Defendants") with the Complaint; and

WHEREAS, the deadline for the CNO Defendants to respond to the Verified Complaint is July 8, 2019;

IT IS HEREBY STIPULATED AND AGREED, by the parties hereto, through their undersigned counsel, subject to the approval of the Court, that the

deadline for the CNO Defendants to respond to the Verified Complaint is extended

until July 31, 2019.

OF COUNSEL:

Warren E. Gluck
Barbra R. Parlin
Richard A. Baxter, Jr.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
212-513-3200

/s/ Brett D. Fallon
Brett D. Fallon (#2480)
R. Eric Hacker (#6122)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
302-888-6800

*Attorneys for Plaintiffs*

OF COUNSEL:

Adam J. Kaiser
Daniella Main
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
212-210-9400

/s/  April M. Kirby
A. Thompson Bayliss (#4379)
April M. Kirby (#6152)
ABRAMS & BAYLISS LLP
20 Montchanin Rd., Suite 200
Wilmington, DE 19807
302-778-1000

*Attorneys for Defendants Bankers*
*Conseco Life Insurance Company,*
*Washington National Insurance*
*Company, CNO Financial Group,*
*Inc., and 40/86 Advisors, Inc.*

July 8, 2019

SO ORDERED this _____ day of _____, 2019

_____
Vice Chancellor J. Travis Laster

| This document constitutes a ruling of the court and should be treated as such. |
| --- |

| | |
| --- | --- |
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | J Travis Laster |
| **File & Serve Transaction ID:** | 63503526 |
| **Current Date:** | Jul 09, 2019 |
| **Case Number:** | 2019-0431-JTL |
| **Case Name:** | Principal Growth Strategies, LLC v. AGH Parent, LLC |
| **Court Authorizer:** | Laster, J Travis |

**/s/ Judge Laster, J Travis**

EFiled:  Jul 10 2019 11:50AM EDT
Transaction ID 63530183
Case No. 2019-0431-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AGH PARENT LLC, *et al.*, | ) ) | C.A. No. 2019-0431-JTL |
| Defendants, | ) ) | |
| v. | ) ) | |
| PLATINUM MANAGEMENT (NY) LLC, *et al.*, | ) ) ) | |
| Nominal Defendants. | ) | |

### AFFIDAVIT OF PROOF OF NON-RECEIPT

| | | |
|---|---|---|
| STATE OF DELAWARE | ) ) | SS. |
| NEW CASTLE COUNTY | ) | |

I, R. Eric Hacker, being first duly sworn, do depose and say as follows:

1.      I am a member of the Bar of the State of Delaware, and I am an attorney with the law firm of Morris James, LLP, counsel to Plaintiffs in the above-captioned matter.

2.      On June 7, 2019, Plaintiffs filed a Verified Complaint against Defendants.

3.      On June 27, 2019, Plaintiffs' counsel sent a copy of the Complaint, Summons, and supporting documents to defendant Washington National LTC 2, as

successor in interest to BRe WNIC 2013 LTC Primary, c/o Northern Trust

Corporation, at Corporation Trust Center, 1209 Orange St., Wilmington, DE

19801, via hand delivery through Brandywine Special Process Servers, pursuant to

10 *Del. C.* § 3103.

4.      Thereafter, the package was returned to Plaintiffs' counsel as non-

deliverable.  A copy of the letter dated June 27, 2019 from The Corporation Trust

Company reflecting non-delivery is attached hereto as Exhibit A.

5.      Exhibit A indicates service will need to be reattempted.

6.      I have read this affidavit, and everything in it is true and correct to the

best of my knowledge, information and belief.

R. Eric Hacker, Esquire (#6122)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
*Attorneys for Plaintiffs*

Dated:  July 10, 2019

SWORN TO AND SUBSCRIBED before me this 10ᵗʰ day of *July*, 2019.



Notary Public

11040386/1

2

**EFiled:  Jul 10 2019 11:50AM EDT**
**Transaction ID 63530183**
**Case No. 2019-0431-JTL**

# EXHIBIT A



RECEIVED

JUL 0 2 2019

BRETT D. FALLON

June 27, 2019

Brett D. Fallon, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500,
Wilmington, DE  19801-1494

Re:  PRINCIPAL GROWTH STRATEGIES, LLC, ETC., ET AL., PLTFS. vs. AGH PARENT LLC, ETC., ET AL., DFTS. VS. PLATINUM MANAGEMENT (NY) LLC, ETC., ET AL., NOMINAL DFTS.

Case No.  20190431JTL

Dear Sir/Madam:

Washington National LTC 2 is not listed on our records or on the records of the State of DE.

CT was unable to forward.

Very truly yours,


The Corporation Trust Company

Log# 535703826

Sent By Regular Mail

cc: --


**(Returned To)**

Brett D. Fallon, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500,
Wilmington, DE  19801-1494

EFiled:  Jul 10 2019 11:50AM EDT
Transaction ID 63530183
Case No. 2019-0431-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*,     ) | |
| ) | |
| Plaintiffs,     ) | |
| ) | C.A. No. 2019-0431-JTL |
| v.     ) | |
| ) | |
| AGH PARENT LLC, *et al.*,     ) | |
| ) | |
| Defendants,     ) | |
| ) | |
| v.     ) | |
| ) | |
| PLATINUM MANAGEMENT (NY) LLC, *et al.*,     ) | |
| ) | |
| Nominal Defendants.     ) | |

### <u>CERTIFICATE OF SERVICE</u>

I, R. Eric Hacker, hereby certify that on July 10, 2019, I caused a copy of the

foregoing:  1) *Affidavit of Proof of Non-Receipt*, and 2) this *Certificate of Service*

to be served upon the following counsel of record via File & Serve*Xpress*:

A. Thomas Bayliss, Esquire
April M. Kirby, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807


                               */s/ R. Eric Hacker*
                               R. Eric Hacker (#6122)

EFiled:  Jul 10 2019 02:31PM EDT
Transaction ID 63531119
Case No. 2019-0431-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES,  )
LLC, *et al.*,                )
                              )
                 Plaintiffs,  )
                              )
        v.                    )        C.A. No. 2019-0431-JTL
                              )
AGH PARENT LLC, *et al.*,     )
                              )
                 Defendants,  )
                              )
        v.                    )
                              )
PLATINUM MANAGEMENT (NY)      )
LLC, *et al.*,                )
                              )
         Nominal Defendants.  )

## AFFIDAVIT OF SERVICE
## UPON DEFENDANT MURRAY HUBERFELD

1.      I am R. Eric Hacker, Esquire, an attorney with Morris James LLP,
counsel for Plaintiff in the above-captioned matter.

2.      On June 7, 2019, Plaintiffs filed a Verified Complaint in the Court of
Chancery of the State of Delaware naming Murray Huberfeld a defendant.

3.      On June 17, 2019, Plaintiffs mailed defendant Murray Huberfeld a
long-arm service letter along with a copy of the Summons, Verified Complaint,
and all other documents theretofore filed by Plaintiffs in the case.

4.      The mailing was sent by Registered United States Mail with return
receipt requested and by First Class United States Mail with Certificate of Mailing.
Copies of the June 17 letter and mailing receipts are attached, collectively, as
Exhibit A.

5.     The First Class mailing has not been returned as undeliverable.

6.     On June 24, 2019, the United States Postal Service returned the Registered Mail envelope with the notation that it had been refused on June 22. Copies of the envelope and green mailing card are attached, collectively, as Exhibit B.

7.     Pursuant to 10 Del. C. § 3104(h)(2), the notation of refusal is presumptive evidence that defendant Murray Huberfeld received, but refused, the mailing.

R. Eric Hacker, Esquire (#6122)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800

Dated:  July 10, 2019


SWORN TO AND SUBSCRIBED before me this 10ᵗʰ day of July, 2019.



Notary Public

EFiled:  Jul 10 2019 02:31PM EDT
Transaction ID 63531119
Case No. 2019-0431-JTL

# EXHIBIT A

# Morris James LLP

Kathleen A. Murphy
302.888.6847
kmurphy@morrisjames.com

June 17, 2019

## VIA FIRST CLASS MAIL AND REGISTERED MAIL

Murray Huberfeld
15 Manor Lane
Lawrence, NY  11559

   Re:   ***Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,***
   **Del. Ch., C.A. No. 2019-0431-JTL**

To Whom It May Concern:

   A Verified Complaint was filed against you in the Court of Chancery of the State of Delaware on June 7, 2019.  Service of Process is being made upon you pursuant to 10 *Del. C.* § 3104, which relates to the service of process over non-resident individuals. Specifically, 10 *Del. C.* § 3104(c) provides that a Delaware Court "may exercise personal jurisdiction over any nonresident, or a personal representative" under circumstances set forth in the statute.  10 *Del. C.* § 3104(c).

   Enclosed are copies of the Summons, the Verified Complaint, and related materials.  Service in this manner is as effective as if it had been made upon you by personal service within this State.

   Very truly yours,

   *Kathleen A. Murphy*

   Kathleen A. Murphy, Esq.

KAM/clb
Enclosures



REGISTERED MAIL ™

RE 477 506 678 US

Label 200, August 2005     PSN 7690-03-000-9311



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 19801
02 1W
0001397994   JUN 17 2019   $ 023.95⁰

---

gistered No.
RE 477 506 678 US     Date Stamp

| Reg. Fee | 12.40 | | |
| Handling Charge | | Return Receipt | 2.80 |
| Postage | 8.75 | Restricted Delivery | |
| Received by | | | |

Customer Must Declare
Full Value $

Domestic Insurance up to $25,000 is included
based upon the declared value. International
Indemnity is limited. (See Reverse).

**OFFICIAL USE**

FROM
Brett D. Fallon, Esq.
R. Eric Hacker, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

TO
Murray Huberfeld
15 Manor Lane
Lawrence, NY 11559

Form **3806,** **Receipt for Registered Mail**     Copy 1 - Customer
y 2007 (7530-02-000-9051)     (See Information on Reverse)
For domestic delivery information, visit our website at www.usps.com ®

---

**Morris James** LLP

500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

TO:

Murray Huberfeld
15 Manor Lane
Lawrence, NY 11559

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X         □ Agent<br>         □ Addressee<br>B. Received by *(Printed Name)*    C. Date of Delivery |

1. Article Addressed to:

Murray Huberfeld
15 Manor Lane
Lawrence, NY 11559

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:  □ No

9590 9402 2928 7094 3018 14

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery (over $500)

□ Priority Mail Express®
☒ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

RE 477 506 678 US

PS Form **3811**, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

**UNITED STATES POSTAL SERVICE®**

U.S. POSTAGE >> PITNEY BOWES
ZIP 19801 $ 016.80⁰
1W
02 7W 1397994 JUN 17. 2019

| # | USPS Tracking/Article Number | Name and Address of Sender | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | (Extra Service) Fee | Handling Charge |
|---|---|---|---|---|---|---|
| 1. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Kevin Cassidy 7 Killdeer Lane Nantucket, MA 02254 | 10.15 | 1.40 | |
| 2. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Starfish Capital, Inc. 72 N. State Rd., #502 Briarcliff Manor, NY 10510 | 8.75 | | |
| 3. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Senior Health Insurance Co of Pennsylvania 27 North Front Street Harrisburg, PA 17101 | 8.75 | | |
| 4. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Fuzion Analytics, Inc. 500 Congressional Blvd., #200 Carmel, IN 46032 | 1.10 | | |
| 5. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Bankers Conseco Life Insurance Company 350 Jericho Turnpike #304 Jericho, NY 11753 | 8.75 | | |
| 6. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Washington National Insurance Company 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |
| 7. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | CNO Financial Group, Inc. 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |
| 8. | | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | 40/86 Advisors, Inc. 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |

Check type of mail or service:
☐ Adult Signature Required   ☐ Priority Mail Express
☐ Adult Signature Restricted Delivery   ☐ Registered Mail
☐ Certified Mail   ☐ Return Receipt for Merchandise
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery (COD)   ☐ Signature Confirmation
☐ Insured Mail   ☐ Signature Confirmation Restricted Delivery
☐ Priority Mail

Affix Stamp Here
(if issued as an international certificate of mailing or for additional copies of this receipt).
Postmark with Date of Receipt.

Handling Charge - if Registered and over $50,000 in value

Columns: Actual Value If Registered | Insured Value | COD | RRD Fee | Adult Signature Required | Adult Signature Restricted Delivery | Restricted Delivery | RD Fee | Return Receipt | RR Fee | Signature Confirmation | SC Fee | Signature Confirmation Restricted Delivery | SCRD Fee | Special Handling | SH Fee

| Total Number of Pieces Listed by Sender | Total Number of Pieces Received at Post Office | Postmaster, Per (Name of receiving employee) |
|---|---|---|
| 8 | | |

PS Form **3877**, April 2015 (Page 1 of 2)
PSN 7530-02-000-9098

**Complete in Ink**

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

# UNITED STATES POSTAL SERVICE®

## Firm Mailing Book For Accountable Mail

**Name and Address of Sender**

Check type of mail or service
- ☐ Adult Signature Required
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery (COD)
- ☐ Insured Mail
- ☐ Priority Mail
- ☐ Priority Mail Express
- ☐ Registered Mail
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation
- ☐ Signature Confirmation Restricted Delivery

**Affix Stamp Here**
(if issued as an international certificate of mailing or for additional copies of this receipt. Postmark with Date of Receipt)

U.S. POSTAGE PAID
WILMINGTON, DE
19801
JUN 17 19
AMOUNT
**$1.64**
R2305M143826-27

UNITED STATES POSTAL SERVICE
0000

JUN 17 2019

| | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | (Extra Service) Fee | Handling Charge | Fee if Registered | Value | Sender if COD | Adult Signature Required | Adult Signature Restricted Delivery | Restricted Delivery | Return Receipt | Signature Confirmation | Signature Confirmation Restricted Delivery | Special Handling |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USPS Tracking/Article Number | | | | | | | | | | | | | | |
| 1. Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Mark Nordlicht 245 Trenor Drive New Rochelle, NY 10804 | $.75 | 1.40 | | | | | | | | | | | |
| 2. Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | David Bodner 16 Grosser Lane Monsey, NY 10952 | $.75 | | | | | | | | | | | | |
| 3. Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Murray Huberfeld 15 Manor Lane Lawrence, NY 11559 | $.75 | | | | | | | | | | | | |
| 4. Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | David Levy 80 Riverside Blvd., Apt # 24C New York, NY 10069 | $.75 | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | | |

Handling Charge - if Registered and over $50,000 in value

Total Number of Pieces Listed by Sender

Total Number of Pieces Received at Post Office

Postmaster, Per (Name of receiving employee)

**Complete in Ink**

PS Form **3877**, April 2015 (Page 1 of 2)
PSN 7530-02-000-9098

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

# EXHIBIT B

US POSTAGE PITNEY BOWES

$ 023.95⁰

ZIP 1980 $
02 3W
0001 387736 JUN 17 2019

RTS

**Morris James** LLP

500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

REASON CHECKED

☐ Moved, Left No Address
☐ Unable To Forward
☐ Attempted – Not Known
☐ No Such Number
☐ Insufficient Address
Refused — No Such Number

REGISTERED MAIL™

RE 477 506 678 US



**EFiled:  Jul 10 2019 02:31PM EDT**
**Transaction ID 63531119**
**Case No. 2019-0431-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) C.A. No. 2019-0431-JTL |
| AGH PARENT LLC, *et al.*, | ) ) |
| Defendants, | ) ) |
| v. | ) ) |
| PLATINUM MANAGEMENT (NY) LLC, *et al.*, | ) ) ) |
| Nominal Defendants. | ) |

## CERTIFICATE OF SERVICE

I, R. Eric Hacker, hereby certify that on July 10, 2019, I caused a copy of the foregoing:  1) *Affidavit of Service Upon Defendant Murray Huberfeld;* 2) *Exhibits A and B to Affidavit of Service Upon Defendant Murray Huberfeld*; and 3) this *Certificate of Service* to be served upon the following counsel of record via File & Serve*Xpress*:

A. Thomas Bayliss, Esquire
April M. Kirby, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807

*/s/ R. Eric Hacker*
R. Eric Hacker (#6122)

EFiled: Jul 10 2019 02:42PM EDT
Transaction ID 63531356
Case No. 2019-0431-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES, )
LLC, *et al.*, )
               Plaintiffs, )
    v. )
                        )    C.A. No. 2019-0431-JTL
AGH PARENT LLC, *et al.*, )
               Defendants, )
    v. )
PLATINUM MANAGEMENT (NY) )
LLC, *et al.*, )
               Nominal Defendants. )

## AFFIDAVIT OF SERVICE UPON DEFENDANT DAVID LEVY

1.    I am R. Eric Hacker, Esquire, an attorney with Morris James LLP, counsel for Plaintiff in the above-captioned matter.

2.    On June 7, 2019, Plaintiffs filed a Verified Complaint in the Court of Chancery of the State of Delaware naming David Levy as a defendant.

3.    On June 17, 2019, Plaintiffs mailed defendant David Levy a long-arm service letter along with a copy of the Summons, Verified Complaint, and all other documents theretofore filed by Plaintiffs in the case.

4.    The mailing was sent by Registered United States Mail with return receipt requested and by First Class United States Mail with Certificate of Mailing. Copies of the June 17 letter and mailing receipts are attached, collectively, as Exhibit A.

5.    The First Class mailing has not been returned as undeliverable.

6.    On June 22, 2019, the United States Postal Service returned the

Registered Mail envelope with the notation that it had been refused on June 22.

Copies of the envelope and green mailing card are attached, collectively, as Exhibit

B.

7.    Pursuant to 10 Del. C. § 3104(h)(2), the notation of refusal is

presumptive evidence that defendant David Levy received, but refused, the

mailing.

R. Eric Hacker, Esquire (#6122)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800

Dated:  July 10, 2019


SWORN TO AND SUBSCRIBED before me this 10th day of July, 2019.



Notary Public

EFiled:  Jul 10 2019 02:42PM EDT
Transaction ID 63531356
Case No. 2019-0431-JTL

# EXHIBIT A

# MorrisJames LLP

Kathleen A. Murphy
302.888.6847
kmurphy@morrisjames.com

June 17, 2019

## VIA FIRST CLASS MAIL AND REGISTERED MAIL

David Levy
80 Riverside Blvd., Apt. #24C
New York, NY  10069

Re:   *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,*
       *Del. Ch., C.A. No. 2019-0431-JTL*

To Whom It May Concern:

A Verified Complaint was filed against you in the Court of Chancery of the State of Delaware on June 7, 2019.  Service of Process is being made upon you pursuant to 10 *Del. C.* § 3104, which relates to the service of process over nonresident individuals. Specifically, 10 *Del. C.* § 3104(c) provides that a Delaware Court "may exercise personal jurisdiction over any nonresident, or a personal representative" under circumstances set forth in the statute.  10 *Del. C.* § 3104(c).

Enclosed are copies of the Summons, the Verified Complaint, and related materials.  Service in this manner is as effective as if it had been made upon you by personal service within this State.

Very truly yours,

Kathleen A. Murphy, Esq.

KAM/clb
Enclosures

REGISTERED MAIL™

RE 477 506 681 US

Label 200, August 2006          PSN 7690-03-000-9311



U.S. POSTAGE ›› PITNEY BOWES

ZIP 19801
02 1W          $ 023.95⁰
0001397994 JUN 17 2019

---

## Morris James LLP

500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

**TO:**

David Levy
80 Riverside Blvd., Apt # 24C
New York, NY 10069

---

ered No.
477 506 681 US          Date Stamp

Reg. Fee        12.40

Handling
Charge

Postage    8.79          Return
Receipt          2.80
Restricted
Delivery

Received by

Customer Must Declare
ull Value $          Domestic insurance up to $25,000 is included
based upon the **declared value**. International
indemnity is limited. (See Reverse).

**OFFICIAL USE**

Brett D. Fallon, Esq.
R. Eric Hacker, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

David Levy
80 Riverside Blvd., Apt # 24C
New York, NY 10069

6,          **Receipt for Registered Mail**     Copy 1 - Customer
30-02-000-9051)                              (See Information on Reverse)
stic delivery information, visit our website at www.usps.com ®



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Levy
80 Riverside Blvd., Apt # 24C
New York, NY 10069

9590 9402 2928 7094 3016 54

2. Article Number (Transfer from service label)

RE 477 506 681 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☒ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

**UNITED STATES POSTAL SERVICE®**

Name and Address of Sender

Morris James LLP
500 Delaware Ave, Ste 1500
Wilmington, DE 19899-9098

U.S. POSTAGE 》》PITNEY BOWES

ZIP 19801 $ 016.80⁰
0000337994 JUN 17. 2019

| | USPS Tracking/Article Number | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | (Extra Service) Fee | Handling Charge |
|---|---|---|---|---|---|
| 1. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Kevin Cassidy 7 Killdeer Lane Nantucket, MA 02254 | 10.15 | 1.40 | |
| 2. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Starfish Capital, Inc. 72 N. State Rd., #502 Briarcliff Manor, NY 10510 | 8.75 | | |
| 3. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Senior Health Insurance Co of Pennsylvania 27 North Front Street Harrisburg, PA 17101 | 8.75 | | |
| 4. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Fuzion Analytics, Inc. 500 Congressional Blvd., #200 Carmel, IN 46032 | 11.10 | | |
| 5. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Bankers Conseco Life Insurance Company 350 Jericho Turnpike #304 Jericho, NY 11753 | 8.75 | | |
| 6. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Washington National Insurance Company 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |
| 7. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | CNO Financial Group, Inc. 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |
| 8. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | 40/86 Advisors, Inc. 11825 N. Pennsylvania St. Carmel, IN 46032 | 11.10 | | |

Check type of mail or service
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery
☐ Certified Mail
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery (COD)
☐ Insured Mail
☐ Priority Mail
☐ Priority Mail Express
☐ Registered Mail
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

Affix Stamp Here
(if issued as an international certificate of mailing or for additional copies of this receipt).
Postmark with Date of Receipt.

Handling Charge - if Registered and over $50,000 in value

Total Number of Pieces Listed by Sender **3877**

Total Number of Pieces Received at Post Office

PS Form **3877**, April 2015 (Page 1 of 2)
PSN 7530-02-000-9098

Postmaster, Per (Name of receiving employee)

Complete in Ink

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

**UNITED STATES POSTAL SERVICE®**

**Firm Mailing Book For Accountable Mail**

Name and Address of Sender

Morris James LLP
500 Delaware Ave, Ste 1500
Wilmington, DE 19899-2306

Check type of mail or service
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery
☐ Certified Mail
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery (COD)
☐ Insured Mail
☐ Priority Mail
☐ Priority Mail Express
☐ Registered Mail
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

Affix Stamp Here
(if issued as an international certificate of mailing or for additional copies of this receipt)
Postmark with Date of Receipt

U.S. POSTAGE PAID
WILMINGTON, DE
19801
JUN 17, 19
AMOUNT
**$1.64**
R2305M143926-27

JUN 17 2019

0000

Handling Charge - If Registered and over $50,000 in value

| | USPS Tracking/Article Number | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | (Extra Service) Fee | Handling Charge |
|---|---|---|---|---|---|
| 1. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Mark Nordlicht 245 Trenor Drive New Rochelle, NY 10804 | $.75 | 1.40 | |
| 2. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | David Bodner 16 Grosser Lane Monsey, NY 10952 | $.75 | | |
| 3. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | Murray Huberfeld 15 Manor Lane Lawrence, NY 11559 | $.75 | | |
| 4. | Morris James LLP 500 Delaware Ave, Ste 1500 Wilmington, DE 19899-2306 | David Levy 80 Riverside Blvd., Apt # 24C New York, NY 10069 | $.75 | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |

Total Number of Pieces Listed by Sender  4

Total Number of Pieces Received at Post Office  4

Postmaster, Per (Name of receiving employee)

**Complete in Ink**

PS Form **3877**, April 2015 (Page 1 of 2)
PSN 7530-02-000-9098

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

# EXHIBIT B



U.S. POSTAGE >> PITNEY BOWES

ZIP 19801   $ 023.15
02 1W
0001397994 JUN 17

RE 477 506 681 US

PSN 7690-02-000-9311

Label 200, August 2005



Morris James LLP

500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

✱ R.F.S ✱

06/22/19

-R-T-S-   10069-RFS-1N

RETURN TO SENDER
REFUSED
UNABLE TO FORWARD
RETURN TO SENDER

TO:

REF / bh

RC / SS

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Levy
80 Riverside Blvd., Apt # 24C
New York, NY 10069

9590 9402 2928 7094 3016 54

2. Article Number (Transfer from service label)

RE 477 506 663 US

PS Form 3811, July 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**EFiled:  Jul 10 2019 02:42PM EDT**
**Transaction ID 63531356**
**Case No. 2019-0431-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   C.A. No. 2019-0431-JTL |
| AGH PARENT LLC, *et al.*, | ) ) |
| Defendants, | ) ) |
| v. | ) ) |
| PLATINUM MANAGEMENT (NY) LLC, *et al.*, | ) ) ) |
| Nominal Defendants. | ) |

## CERTIFICATE OF SERVICE

I, R. Eric Hacker, hereby certify that on July 10, 2019, I caused a copy of the foregoing:  1) *Affidavit of Service Upon Defendant David Levy;* 2) *Exhibits A and B to Affidavit of Service Upon Defendant Murray Huberfeld*; and 3) this *Certificate of Service* to be served upon the following counsel of record via File & Serve*Xpress*:

A. Thomas Bayliss, Esquire
April M. Kirby, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807

*/s/ R. Eric Hacker*
R. Eric Hacker (#6122)

EFiled:  Jul 10 2019 03:43PM EDT
Transaction ID 63531848
Case No. 2019-0431-JTL

# Morris James LLP

R.  Eric Hacker
302.856.0023
ehacker@morrisjames.com

July 10, 2019

**VIA FILE&SERVEXPRESS**

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE  19801

   Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.*,
     Del. Ch., C.A. No. 2019-0431-JTL

To The Register in Chancery:

   On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action.  The Court previously issued a summons, but the

service was not able to be completed and we filed an Affidavit of Proof of Non-

Service (T.I. #63530183).  We would appreciate your office preparing an Alias

Summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE  19801-1494 T: 302.888.6800 F: 302.571.1750
Mailing Address P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11040212/1

Register in Chancery
July 10, 2019
Page 2

**Morris James** LLP

**Pursuant to 10 *Del. C.* § 3103, for hand delivery by Brandywine Process Servers, to:**

Washington National LTC 2,
as successor in interest to BRe WNIC 2013 LTC Primary
c/o Wilmington Trust, National Association
1100 N. Market Street
Wilmington, DE  19890

Respectfully,

*/s/ R. Eric Hacker*

R. Eric Hacker (#6122)

Words:  104

REH:clb
cc:    Register in Chancery (via e-filing)
        A. Thompson Bayliss, Esquire (via e-filing)
        April M Kirby, Esquire (via e-filing)

11040212/1



EFiled: Jul 15 2019 03:13PM EDT
Transaction ID 63546982
Case No. 2019-0431-JTL

# Morris James LLP

R. Eric Hacker
302.856.0023
ehacker@morrisjames.com

July 10, 2019

**VIA FILE&SERVEXPRESS**

*7/15/19 - issued (1) 91,195*
*Summons to SpS*
*(1 Copy)*

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, DE 19801

Re: *Principal Growth Strategies, LLC, et al. v. AGH Parent LLC, et al.,*
*Del. Ch., C.A. No. 2019-0431-JTL*

To The Register in Chancery:

On Friday, June 7, 2019, our firm electronically filed a Verified Complaint

in the above-captioned action. The Court previously issued a summons, but the

service was not able to be completed and we filed an Affidavit of Proof of Non-

Service (T.I. #63530183). We would appreciate your office preparing an Alias

Summons to be served at the following address:

500 Delaware Avenue, Suite 1500 | Wilmington, DE 19801-1494 **T:** 302.888.6800 **F:** 302.571.1750
**Mailing Address** P. O. Box 2306 | Wilmington, DE 19899-2306 www.morrisjames.com

11040212/1

Register in Chancery                                    Morris James LLP
July 10, 2019
Page 2


**Pursuant to 10 *Del. C.* § 3103, for hand delivery by Brandywine Process Servers, to:**

Washington National LTC 2,
as successor in interest to BRe WNIC 2013 LTC Primary
c/o Wilmington Trust, National Association
1100 N. Market Street
Wilmington, DE  19890


                  Respectfully,

                  */s/ R.  Eric Hacker*

                  R.  Eric Hacker (#6122)

                  Words:  104

REH:clb
cc:    Register in Chancery (via e-filing)
       A. Thompson Bayliss, Esquire (via e-filing)
       April M Kirby, Esquire (via e-filing)



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company;
PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a
Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER
SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official
liquidation),

                          Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE
COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION
ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE
COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE
COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware
corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE
ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014
TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in
interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware
corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE
INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH
CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,

                          Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK
NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,

                          Nominal Defendants.

C.A. No. 2019-0431-JTL

ALIAS
SUMMONS

THE STATE OF DELAWARE
TO:    SPECIAL PROCESS SERVER – Brandywine Process Servers:
YOU ARE COMMANDED:

     To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of
service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware
Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

     To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

     In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's
attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the
complaint.

Dated: July 15, 2019

                               Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## ALIAS
## SUMMONS

Please effectuate service upon:

1.  Washington National LTC 2,
    as successor in interest toBRe WNIC 2013 LTC Primary

    c/o Wilmington Trust, National Association
    1100 N. Market Street
    Wilmington, DE 19890

Pursuant to 10 Del.C. Sec. 3103

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Brandywine Process Servers

R. Eric Hacker, Esquire
Plaintiff's Attorney

**EFiled:  Jul 15 2019 04:51PM EDT**
**Transaction ID 63548240**
**Case No. 2019-0431-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (in official liquidation | ) ) ) ) ) ) ) ) ) ) | C.A. No. 2019-0431-JTL |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANAL YTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; *40/86* ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 Trust; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC Primary; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BBLN-AGERA | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

CORP., a Delaware corporation;                )
BEECHWOOD RE INVESTMENTS LLC, )
a Delaware limited liability company;          )
KEVIN CASSIDY; STARFISH CAPITAL, )
INC., a New York corporation; and JOHN  )
DOES 1-100,                                     )
                                                )
      Defendants.                              )
                                                )
             v.                                 )
                                                )
PLATINUM MANAGEMENT (NY) LLC,  )
a Delaware limited liability company;          )
MARK NORDLICHT, DAVID LEVY,             )
MURRAY HUBERFELD, and DAVID            )
BODNER,                                         )
                                                )
      Nominal Defendants.                      )

## DEFENDANT AGH PARENT LLC'S ANSWER
## TO PLAINTIFFS' VERIFIED COMPLAINT

Defendant AGH Parent LLC answers Plaintiffs' Verified Complaint as follows:

## PRELIMINARY STATEMENT

1.      This complaint tells the story of how the Agera Note (defined below) was stripped away from Principal Growth Strategies LLC ("PGS") via a series of transactions orchestrated by insiders for their own benefit and the benefit of certain select clients and friends.

**ANSWER:** Paragraph 1 of Plaintiffs' Verified Complaint does not contain factual allegations that require a response. Defendant denies any allegations in paragraph 1.

2.      At all relevant times, the Agera Note was convertible into 95% of the

2

equity of the holding company that owns Agera Energy (defined below) - a company that in 2016 was valued at about $250-300 million - and the holder of that note effectively controls the company.

**ANSWER:** The allegations in paragraph 2 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 2.

3.     As a result of the Agera Transactions (defined below), the Platinum Funds (defined below) were stripped of their single largest remaining valuable asset for the benefit of the Platinum-Beechwood Alter Egos (defined below) and preferred investor clients the CNO Defendants and SHIP Defendants. At the same time, Defendants used the Agera Transactions to enable Beechwood (defined below), the CNO Defendants (defined below) and the SHIP Defendants (defined below) to exchange nearly worthless interests in the Platinum Funds and certain related investments for valuable investments in AGH Parent, LLC.

**ANSWER:** Defendant denies the allegations in paragraph 3 of Plaintiffs' Verified Complaint.

4.     By the time the various steps of the Agera Transactions were completed, PGS was left with a pile of worthless debt and other instruments, while the Defendants here had obtained the crown jewel of the Platinum Funds' portfolios.

**ANSWER:** Defendant denies the allegations in paragraph 4 of Plaintiffs' Verified Complaint.

5.     Defendants AGH Parent, LLC and the Beechwood Agera Entities (defined below), which were created to effect the Agera Transactions at issue here, are alter egos of the Platinum-Beechwood enterprise that was owned, managed and/or controlled at all relevant times by the following nominal defendants: Platinum Management (NY) LLC, PPVA's general partner, and Mark Nordlicht, Murray Huberfeld, David Bodner and David Levy, the founders/owners/mangers of Platinum Management and of Beechwood. Defendants AGH Parent and the Beechwood Agera Entities thus are alter egos of these nominal defendants, and are liable to the same extent as the foregoing persons and entities in connection with the

tortious acts described herein.

**ANSWER:** The allegations in paragraph 5 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 5.

## PARTIES

6.    Plaintiff Principal Growth Strategies, LLC **("PGS")** is a Delaware limited liability company formed on December 4, 2013 for the  initial purpose of holding the Platinum Funds' interest in the Agera Note.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 6 of Plaintiffs' Verified Complaint, so Defendant denies them.

7.    Prior to June 8, 2016 and since the consummation of the various parts of the first step of the Agera Transactions in June 2016, PPVA (defined below) has held 55% of the membership interests in PGS, and PPCO (defined below) has held 45% of the PGS membership  interests.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 7 of Plaintiffs' Verified Complaint, so Defendant denies them.

8.    PGS also holds certain Class C preferred membership units in AGH Parent as a result of the Agera  Transactions.

**ANSWER:** The allegations in paragraph 8 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 8.

9.      PGS had no employees of its own. Mark Nordlicht signed the PGS LLC Operating Agreement as its "managing member." Nordlicht, together with other persons employed by Platinum Management, oversaw and managed PGS.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 9 of Plaintiffs' Verified Complaint,

so Defendant denies them.

10.      Plaintiffs Martin Trott and Christopher Smith are the duly appointed Joint Official Liquidators (the **"JOLs"**) of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation).

**ANSWER:** Defendant admits the allegations in paragraph 10 of Plaintiffs'

Verified Complaint.

11.      Plaintiff Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) **("PPVA")** is an exempted limited partnership that was marketed as a multi-strategy investment fund and registered under the Exempted Limited Partnership Law, 2014, of the Cayman Islands.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 11 of Plaintiffs' Verified

Complaint, so Defendant denies them.

12.      Defendant AGH Parent LLC **("AGH Parent")** is and, at all material times was a limited liability company organized under the laws of the State of Delaware. AGH Parent was organized by Beechwood and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer (defined below) in or about May 2016 for the purpose of acquiring the Agera Note.

**ANSWER:**  Defendant admits that it is a Delaware limited liability company.

Defendant also admits that it was formed in May 2016.  Defendant denies all

remaining allegations in paragraph 12 of Plaintiffs' Verified Complaint.

13. BAM Management Services, LLC **("BAM Management Services"),** a Delaware limited liability company organized and controlled by Beechwood's ultimate owners, Nordlicht, Bodner, Huberfeld, Levy, Taylor and Feuer, was the manager of AGH Parent at all times from the organization of AGH Parent until about July 27, 2017, when it was replaced  as manager  by AGX Holdings LLC **("AGX Holdings").**

**ANSWER:** Defendant denies the allegations in paragraph 13 of Plaintiffs' Verified Complaint.

14. Defendant Senior Health Insurance Company of Pennsylvania **("SHIP")** is and, at all material times was an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 14 of Plaintiffs' Verified Complaint, so Defendant denies them.

15. As a result of the transactions described herein, SHIP is a member of AGH Parent and a lender to AGH  Parent.

**ANSWER:** The allegations in paragraph 15 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 15.

16. Defendant Fuzion Analytics, Inc. **("Fuzion"** and together with  SHIP, the **"SHIP  Defendants")** is and, at all material  times was, a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 16 of Plaintiffs' Verified

Complaint, so Defendant denies them.

17.    SHIP assigned certain near-worthless debt previously owned by it to AGH Parent in exchange for certain notes issued by AGH Parent.  AGH Parent in turn transferred the debt that SHIP assigned to it to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June  2016.

**ANSWER:** Defendant denies the allegations in paragraph 17 of Plaintiffs'

Verified Complaint.

18.    Defendant Bankers Conseco Life Insurance Company **("BCLIC")** is and, at all material times hereinafter mentioned, was an insurance company domiciled in New York with its principal place of business in Carmel, Indiana.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 18 of Plaintiffs' Verified

Complaint, so Defendant denies them.

19.    Defendant Washington National Insurance Company **("WNIC") is** and, at all material times was an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 19 of Plaintiffs' Verified

Complaint, so Defendant denies them.

20.    Defendant CNO Financial Group, Inc.  **("CNO")** is and, at all material times hereinafter mentioned, was a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth  or  falsity  of  the  allegations  in  paragraph  20  of  Plaintiffs'  Verified

7

Complaint, so Defendant denies them.

21.     BCLIC and WNIC are direct or indirect subsidiaries of CNO.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 21 of Plaintiffs' Verified Complaint, so Defendant denies them.

22.     Defendant 40/86 Advisors, Inc. **("40/86 Advisors"** and collectively with CNO, BCLIC and WNIC, the **"CNO Defendants")** is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in Carmel, Indiana.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 22 of Plaintiffs' Verified Complaint, so Defendant denies them.

23.     Defendants (i) Private Bankers Life Annuity LTC 2, as successor in interest  to BBIL ULICO  2014  Trust **("BBIL  ULICO");** and (ii) Washington National LTC  2, as successor in interest to BRe WNIC  2013 LTC Primary **("BRe WNIC  2013 LTC Primary"** and collectively with BBIL ULICO, the **"CNO Reinsurance Trusts")** are reinsurance trusts formed under Delaware law.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 23 of Plaintiffs' Verified Complaint, so Defendant denies them.

24.     At all relevant times, the CNO Reinsurance Trusts were managed by BAM Administrative, LLC and/or Illumin Capital L.P., both Delaware limited liability companies.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 24 of Plaintiffs' Verified

Complaint, so Defendant denies them.

25.    The CNO Reinsurance Trusts were used to hold funds turned over to the Beechwood Reinsurance Companies (defined below) by BCLIC and WNIC in connection with certain reinsurance agreements entered into between the Beechwood Reinsurance Companies and on the one hand and BCLIC or WNIC, as well as certain investments made by BAM (defined below) on behalf of BCLIC or WNIC in connection with such agreements.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 25 of Plaintiffs' Verified

Complaint, so Defendant denies them.

26.    The    CNO    Reinsurance Trusts also held the CNO  Defendants' membership interests in AGH Parent and the debt owed to them by AGH Parent in connection with the Agera Transactions described herein.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 26 of Plaintiffs' Verified

Complaint, so Defendant denies them.

27.    The CNO Reinsurance Trusts assigned certain near-worthless debt and other instruments previously owned by them to AGH Parent in exchange for certain notes and preferred membership units in AGH Parent. AGH Parent in turn transferred the debt and other instruments that were assigned to it by the CNO Reinsurance Trusts to PGS as part of the consideration for the initial step of the Agera Transactions that occurred in June 2016.

**ANSWER:** Defendant denies the allegations in paragraph 27 of Plaintiffs'

Verified Complaint.

28.    The CNO Reinsurance Trusts and SHIP also assigned AGH Parent near-worthless debt and other instruments that AGH Parent subsequently assigned to PGS as "PGS Value" when AGH Parent purported to redeem $35.4 million worth of PGS' Class C preferred membership units in AGH Parent in January 2017.

**ANSWER:** Defendant denies the allegations in paragraph 28 of Plaintiffs' Verified Complaint.

29.     Defendants BHLN-Agera Corp., BOLN-Agera Corp. and BBLN-Agera Corp. each are Delaware corporations (collectively the **"Beechwood Agera Corporations")** that were incorporated between May 11 and June 2, 2016, for the specific purpose of holding Beechwood's preferred B-1 membership units in AGH Parent. The directors of the Beechwood Agera Corporations included Feuer and Narain.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 29 of Plaintiffs' Verified Complaint, so Defendant denies them.

30.     The shares in Beechwood Agera Corporations are owned, directly or indirectly, by the Beechwood Reinsurance Companies (defined and discussed below), and thus ultimately by Nordlicht, Bodner, Huberfeld, Levy, Feuer and Taylor.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 30 of Plaintiffs' Verified Complaint, so Defendant denies them.

31.     The Beechwood Agera Corporations also assigned worthless debt and other instruments to AGH Parent in exchange for membership interests in AGH Parent. These worthless debt and other instruments were in turn assigned to PGS as part of the consideration paid in connection with the first step of the Agera Transaction in June 2016.

**ANSWER:** Defendant denies the allegations in paragraph 31 of Plaintiffs' Verified Complaint.

32.    Defendant  Beechwood  Re   Investments LLC    **("Beechwood Investments")** is a limited liability company formed under Delaware law. Beechwood Investments was used as a vehicle by Mark Nordlicht, David Bodner, Murray Hubetfeld and David Levy to purchase all the preferred shares in the Beechwood Reinsurance Companies (defined below).

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 32 of Plaintiffs' Verified Complaint, so Defendant denies them.

33.    The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various trusts of which they or their family members were the beneficiaries.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 33 of Plaintiffs' Verified Complaint, so Defendant denies them.

34.    Beechwood Investments was granted all of the common equity units in AGH Parent pursuant to a subscription agreement entered into on June 9, 2016 in connection with the first step of the Agera Transactions.

**ANSWER:** Defendant denies the allegations in paragraph 34 of Plaintiffs' Verified Complaint.

35.    For purposes of this complaint, Beechwood Investments and the Beechwood Agera Corporations are referred to collectively as the **"Beechwood Agera Entities."**

**ANSWER:** Paragraph 35 of Plaintiffs' Verified Complaint does not contain factual allegations that require a response.  Defendant denies any allegations in

paragraph 35.

36.     At all relevant times, the Beechwood Agera Entities were controlled by Beechwood's majority owners, Mark Nordlicht, David Bodner, Murray Huberfeld and David Levy, and their co-conspirators, Scott Taylor and Moshe M. Feuer.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 36 of Plaintiffs' Verified Complaint, so Defendant denies them.

37.     Nordlicht, Levy, Huberfeld, and Bodner used the Beechwood Agera Entities as a way of maintaining ownership and control of Agera even after the "sale" of the Agera Note from PGS to AGH Parent.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 37 of Plaintiffs' Verified Complaint, so Defendant denies them.

38.     Beechwood and its ultimate owners, Nordlicht, Bodner, Huberfeld and Levy, acted by and through AGH Parent and the Beechwood Agera Entities in connection with the matters at issue in this complaint such that AGH Parent and the Beechwood Agera Entities are their alter egos.

**ANSWER:**  The allegations in paragraph 38 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 38.

39.     Defendant Kevin Cassidy **("Cassidy")** is a resident of Briarcliff Manor, New York.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 39 of Plaintiffs' Verified

Complaint, so Defendant denies them.

40.     In 2007, Optionable Inc., a fund co-founded by Cassidy and affiliated with Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives. Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 40 of Plaintiffs' Verified Complaint, so Defendant denies them.

41.     When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the *managing director* of Agera Energy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 41 of Plaintiffs' Verified Complaint, so Defendant denies them.

42.     Defendant Starfish Capital, Inc. **("Starfish"),** is an entity created and controlled by Cassidy. Starfish had no employees and no separate operations or business purpose. It was a sham entity used by the Defendants and Cassidy to serve as a party to the Agera Transactions for the improper purpose of paying Cassidy millions of dollars out of the consideration payable to PGS.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 42 of Plaintiffs' Verified Complaint, so Defendant denies them.

43.     Defendants John Does 1-100 are entities and/ or individuals whose identities are not known at this time who were, or may have been, involved in, or otherwise liable for, the unlawful or otherwise tortious activities described herein, including, but not limited to, any subsequent transferees in connection with the Agera Transactions.

**ANSWER:** Paragraph 43 of Plaintiffs' Verified Complaint does not contain factual allegations that require a response.  Defendant denies any allegations in paragraph 43.

44.    Nominal Defendant Platinum Management (NY) LLC **("Platinum Management")** is a Delaware limited liability company with its principal place of business in New York, New York. Platinum Management is the general partner of PPVA and also was its investment manager.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 44 of Plaintiffs' Verified Complaint, so Defendant denies them.

45.    Nordlicht, Bodner, Huberfeld and Levy controlled and operated Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 45 of Plaintiffs' Verified Complaint, so Defendant denies them.

46.    Nominal Defendant Mark Nordlicht **("Nordlicht")** is a resident of New Rochelle, New York. Together with Huberfeld and Bodner, Nordlicht founded the Platinum affiliated group of funds that includes, *inter alia,* PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Huberfeld, Bodner and Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 46 of Plaintiffs' Verified Complaint, so Defendant denies them.

47.    At all relevant times, Nordlicht was the managing member of

Platinum Management and the co-chief investment officer and co-chief risk officer of PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 47 of Plaintiffs' Verified Complaint, so Defendant denies them.

48.     As a founder and a direct or indirect member of both Platinum Management and Beechwood, Nordlicht personally benefitted from the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 48 of Plaintiffs' Verified Complaint, so Defendant denies them.

49.     Nominal Defendant David Levy **("Levy")** is a resident of New York, New York and is Murray Huberfeld's nephew. Before 2014, Levy worked at Platinum Management as a portfolio manager and in other executive capacities.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 49 of Plaintiffs' Verified Complaint, so Defendant denies them.

50.     Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief investment officer of B Asset Manager LP, the Beechwood asset management entity, until the end of 2014. Beechwood marketed Levy to the CNO Defendants and SHIP Defendants as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as a key to Beechwood's future success. In late 2014/early 2015, Levy "left" his position at Beechwood, but continued to be involved with Beechwood and its investments. Levy also remained an owner of Beechwood after his return to Platinum Management.

15

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 50 of Plaintiffs' Verified Complaint, so Defendant denies them.

51.   As a direct or indirect member of both Platinum Management and Beechwood, Levy personally benefitted from the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 51 of Plaintiffs' Verified Complaint, so Defendant denies them.

52.   Nominal Defendant Murray Huberfeld **("Huberfeld")** is a resident of Lawrence, New York. Together with Nordlicht and Bodner, Huberfeld founded the Platinum affiliated group of funds that includes, *inter alia,* PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Bodner and Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 52 of Plaintiffs' Verified Complaint, so Defendant denies them.

53.   As a direct or indirect member of both Platinum Management and Beechwood, Huberfeld personally benefitted from the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 53 of Plaintiffs' Verified Complaint, so Defendant denies them.

54.   Until his indictment on June 8, 2016, the day before the closing of the first step of the Agera Transactions, Huberfeld continued to make management decisions that directly impacted PGS, PPVA, PPCO and Beechwood.

16

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 54 of Plaintiffs' Verified Complaint, so Defendant denies them.

55.    On or about May 25, 2018, Huberfeld pled guilty to federal charges of conspiracy to commit wire fraud, in connection with a bribe Huberfeld offered to Norman Seabrook, the former President of the Correction Officer's Benevolent Association of New York **("COBA"),** in exchange for COBA's investment of $20 million with PPVA and other Platinum-affiliated funds.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 55 of Plaintiffs' Verified Complaint, so Defendant denies them.

56.    Huberfeld was instrumental in the creation, operation and management of Beechwood and helped solicit investment funds for use by Beechwood. At all relevant times, Huberfeld was a direct or indirect owner of Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 56 of Plaintiffs' Verified Complaint, so Defendant denies them.

57.    Nominal Defendant David Bodner **("Bodner")** is a resident of Monsey, New York. Together with Nordlicht and Huberfeld, Bodner founded the Platinum affiliated group of funds that includes, *inter alia,* PPVA and PPCO, and controlled and orchestrated the creation of Beechwood with Nordlicht, Huberfeld and Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 57 of Plaintiffs' Verified Complaint, so Defendant denies them.

58.    As a direct or indirect member of both Platinum Management and

17

Beechwood, Bodner personally benefitted from the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 58 of Plaintiffs' Verified Complaint, so Defendant denies them.

## **NON-PARTIES RELEVANT TO PLAINTIFFS' CLAIMS**

59.    Platinum Partners Credit Opportunities Master Fund L.P. **("PPCO").** PPCO is a limited partnership organized under Delaware law that was marketed as a multi-strategy investment fund. PPVA and PPCO are referred to herein as the **"Platinum Funds."**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 59 of Plaintiffs' Verified Complaint, so Defendant denies them

60.    Beechwood, a business comprised of remsurance compames, investment management entities, investment trusts and related entities, the individual members of which will be described in more detail below (collectively, **"Beechwood"),** was founded, owned and managed by the very persons who founded, owned and managed Platinum Management, PPVA, PPCO and PGS - and originally was operated out of Platinum Management's offices.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 60 of Plaintiffs' Verified Complaint, so Defendant denies them.

61.    Beechwood was utilized as part of a scheme to permit Platinum Management and its owners, Nordlicht, Huberfeld, Bodner and Levy, to inflate the valuation of investments held by PPVA and PPCO for purposes of siphoning unearned fees from the those funds, and then subsequently use Beechwood to strip out PPVA's remaining valuable assets, including the Agera Note, for their own benefit and the benefit of Beechwood and certain select clients.

18

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 61 of Plaintiffs' Verified Complaint, so Defendant denies them.

62.     Moshe M. Feuer **("Feuer")** is a resident of Lawrence, New York. Feuer, Levy and Taylor were the original public face of Beechwood and, together with Nordlicht, Levy, Bodner and Huberfeld, founded Beechwood. Feuer remained with Beechwood at all relevant times.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 62 of Plaintiffs' Verified Complaint, so Defendant denies them.

63.     At all relevant times, Feuer (through trusts) owned common stock in various Beechwood entities and had managerial authority over Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 63 of Plaintiffs' Verified Complaint, so Defendant denies them.

64.     Scott Taylor **("Taylor")** is a resident of New York, New York. Taylor, Feuer and Levy founded Beechwood together with Nordlicht, Bodner and Huberfeld. Taylor, Feuer and Levy were the original public face of Beechwood, and Taylor remained with Beechwood at all relevant times.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 64 of Plaintiffs' Verified Complaint, so Defendant denies them.

65.     At all relevant times, Taylor (through trusts) owned common stock in Beechwood and had managerial authority over Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 65 of Plaintiffs' Verified Complaint, so Defendant denies them.

66.     Prior to forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 66 of Plaintiffs' Verified Complaint, so Defendant denies them.

67.     Taylor, together with Levy, helped prepare the marketing documents by which the SHIP Defendants and CNO Defendants initially invested funds with Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 67 of Plaintiffs' Verified Complaint, so Defendant denies them.

68.     Dhruv Narain **("Narain")** was chief investment officer of Beechwood at the time of the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 67 of Plaintiffs' Verified Complaint, so Defendant denies them.

## JURISDICTION AND VENUE

69.     This Court has jurisdiction over this case and venue is appropriate pursuant to 6 Del. C. § 18-111, 6 Del. C. § 2708, and 10 Del. C. § 341.

**ANSWER:** The allegations in paragraph 69 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 69.

70. This court has personal jurisdiction over each of the Defendants because they: (i) are domiciled in the State of Delaware; (ii) are authorized to do business in the State of Delaware; (iii) have transacted business in the State of Delaware with respect to certain of the agreements and other matters at issue in this case and/or have consented to the jurisdiction of the state of Delaware in connection with such agreements; or (iv) are members or former members of AGH Parent, a Delaware limited liability company or of PGS, which also is a Delaware limited liability company.

**ANSWER:** The allegations in paragraph 70 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 70.

71. Section 14.11 of the AGH Parent Amended Operating Agreement (defined below) states:

> **Section 14.11 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**ANSWER:** Defendant states that Section 14.11 of the AGH Parent Amended Operating Agreement speaks for itself. Defendant denies the allegations in paragraph 71 of Plaintiffs' Verified Complaint.

72.    Section 14.12 of the AGH Parent Amended Operating Agreement states, in part:

> **Section 14.12 Submission to Jurisdiction.** The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

**ANSWER:** Defendant states that Section 14.12 of the AGH Parent Amended Operating Agreement speaks for itself. Defendant denies the allegations in paragraph 72 of Plaintiffs' Verified Complaint.

73.    As a result of the Agera Transactions, PGS is a member of AGH Parent.

**ANSWER:** The allegations in paragraph 73 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 73.

74.     At all relevant times, PPVA has been a member of PGS.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 74 of Plaintiffs' Verified Complaint, so Defendant denies them.

## NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW

75.     Pursuant to Court of Chancery Rule 44.1, Plaintiffs hereby gives notice of their intent to raise issues of foreign law. Specifically, Plaintiffs contend that the substantive law of the Cayman Islands, as cited herein, governs some or all of the parties' disputes.

**ANSWER:** Paragraph 75 does not contain factual allegations that require a response. Defendant denies Plaintiffs' contention that the substantive law of the Cayman Islands governs some or all of the parties' disputes.

## FACTUAL BACKGROUND

**A.    PGS**

76.     PGS was set up by Platinum Management in December 2013 for the purpose of holding the Agera Note.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 76 of Plaintiffs' Verified Complaint, so Defendant denies them.

77.     At all relevant times before June 8, 2016, PPVA held 55% of the membership interests in PGS, and PPCO held 45% of the PGS membership interests. A true and correct copy of the December 4, 2013 Operating Agreement for PGS **("PGS Operating Agreement")** is attached hereto as **Exhibit 1.**

**ANSWER:** Defendant states that Exhibit 1 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant is without sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 77, so Defendant denies them.

78.    Mark Nordlicht signed the PGS Operating Agreement as "managing member" of PGS.

**ANSWER:**  Defendant states that Exhibit 1 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 78.

79.    PGS does not have any employees. All management and operations of PGS were handled by Platinum Management employees and the executives and other persons that managed PPVA and  PPCO.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 79 of Plaintiffs' Verified Complaint, so Defendant denies them.

80.    Corporate formalities were not observed with respect to PGS. For example, annual meetings that were required by the PGS Operating Agreement did not occur. In particular, the Agera Note also was not treated as if it were a separately held asset of PGS.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 80 of Plaintiffs' Verified Complaint, so Defendant denies them.

81.    The Agera Note was used as collateral to secure purported debts owed by PPVA, PPCO and/or portfolio companies from time to time before June 2016 without regard to the impact of such pledges upon PGS and without paying PGS any consideration for providing such pledges.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 81 of Plaintiffs' Verified Complaint, so Defendant denies them.

82.    PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of its share of such value, and it had not been converted. Similarly, PPCO's financial statements and valuation statements described and calculated PPCO's interests in Agera Energy on an "as converted" basis, as though PPCO was the direct holder of its share of such value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 82 of Plaintiffs' Verified Complaint, so Defendant denies them.

83.    PGS was not separately capitalized so as to carry on its business. PPVA provided the initial funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 83 of Plaintiffs' Verified Complaint, so Defendant denies them.

84.    At all relevant times, the assets of PGS were commingled with the assets of PPVA and PPCO.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 84 of Plaintiffs' Verified Complaint, so Defendant denies them.

85.    PGS was used as a tool in the furtherance of a fraud, namely, the Agera Transactions which culminated in the Second Scheme (described below), whereby PGS's asset valued at $250-$300 million was transferred for an amount substantially below that.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 85 of Plaintiffs' Verified Complaint, so Defendant denies them.

### B.    The Platinum Funds

86.    PPCO and PPVA are hedge funds founded between 2003 and 2005. Each of these funds was structured to include a master fund, several feeder funds and a management entity.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 86 of Plaintiffs' Verified Complaint, so Defendant denies them.

### i.    PPVA

87.    PPVA was marketed as a multi-strategy, liquid fund utilizing investment strategies such as long/short fundamental equity trading, asset-based financing in energy, mining, and other industries, energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 87 of Plaintiffs' Verified Complaint, so Defendant denies them.

88.    PPVA was a Cayman Islands exempted limited partnership that, up until the commencement of the Cayman Liquidation (defined below) was managed by Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 88 of Plaintiffs' Verified Complaint, so Defendant denies them.

89.     On June 8, 2016, the day before the closing of the Agera Transactions, the United States Attorney's Office for the Southern District of New York filed criminal charges against Huberfeld in connection with a bribery scheme by which Huberfeld used PPVA funds to pay kickbacks to a New York City Correction Officer's Union official (the **"Huberfeld Arrest").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 89 of Plaintiffs' Verified Complaint, so Defendant denies them.

90.     On June 14, 2016, Nordlicht announced on an investor call that Platinum Management had decided that PPVA would stop taking in new investors and all PPVA investments would be unwound and liquidated.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 90 of Plaintiffs' Verified Complaint, so Defendant denies them.

91.     Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral, and sought the immediate unwinding of their relationships with PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 91 of Plaintiffs' Verified Complaint, so Defendant denies them.

92.     On or about June 22, 2016, the Federal Bureau of Investigation executed a search warrant at Platinum Management's offices in connection with a broad, multi-agency federal investigation of their business practices.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 92 of Plaintiffs' Verified

Complaint, so Defendant denies them.

93.     On July 8, 2016, when PPVA was facing margin calls by its securities transaction counterparties, PPVA had less than $100 cash on hand.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 93 of Plaintiffs' Verified Complaint, so Defendant denies them.

94.     On August 23, 2016, Platinum Management, as general partner of PPVA, filed a voluntary petition seeking the liquidation of PPVA and the appointment of Christopher Kennedy and Matthew Wright as joint provisional liquidators (the **"Cayman Petition"**) in the Grand Court of the Cayman Islands (the **"Grand Court").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 94 of Plaintiffs' Verified Complaint, so Defendant denies them.

95.     On August 25, 2016, the Grand Court entered an order (the **"August 25, 2016 Order"**) directing the provisional liquidation of PPVA and appointing joint provisional liquidators (the **"Cayman Liquidation").** A true and correct copy of the August 25, 2016 Order is attached hereto as **Exhibit 2.**

**ANSWER:** Defendant states that Exhibit 2 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 95.

96.     On October 18, 2016, the predecessors of the JOLs filed petitions and accompanying Declarations seeking recognition of the Cayman Liquidation of PPVA and one of PPVA's feeder funds as foreign main proceedings and of the JOLs as foreign representatives and certain other relief under chapter 15 of the Bankruptcy in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Case No. 16-12925 (the **"Chapter 15 Court").**

**ANSWER:** Defendant admits that a Chapter 15 proceeding, jointly

administered as Case No. 16-12925, was instituted in the United States Bankruptcy Court for the Southern District of New York.   Defendant denies all remaining allegations in paragraph 96 of Plaintiffs' Verified Complaint.

97.     On October 27, 2016, the Grand Court entered an order directing that PPVA's Cayman Liquidation be converted to an official liquidation and appointing Messrs. Wright and Kennedy as Interim Joint Official Liquidators until a final hearing in December 2016 (the **"October 27, 2016 Order"**). A true and correct copy of the October 27, 2016 Order is attached hereto as **Exhibit 3.**

**ANSWER:** Defendant states that Exhibit 3 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 97.

98.     On November 23, 2016, the Chapter 15 Court entered an order recognizing the Cayman Liquidation and the joint provisional liquidators as a foreign main proceeding, and as foreign representatives, respectively, pursuant to 11 U.S.C. 1501 *et seq.* (the **"Chapter 15 Recognition Order"**)**,** permitting the foreign representatives to bring claims against third parties on behalf of the PPVA estate within the United States. A true and correct copy of the Chapter 15 Recognition Order is attached hereto as **Exhibit  4.**

**ANSWER:**  Defendant states that Exhibit 4 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 98.

99.     On December 16, 2016, the Grand Court entered an order appointing the joint official liquidators of PPVA (the **"December 16, 2016 Order"**).  Martin Trott and Christopher Smith are the current JOLs of PPVA pursuant to September 29, 2017 and July 6, 2018 Orders of the Grand Court. True and correct copies of the Orders entered by the Cayman Court in connection with the Cayman  Liquidation (the **"Cayman Orders"**) are attached hereto as **Exhibit 5.**

**ANSWER:**  Defendant states that Exhibit 5 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 99.

100.   Pursuant to the Cayman Orders, the JOLs have authority to act in

29

connection with PPVA's assets.

**ANSWER:**  Defendant states that Exhibit 5 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 100.

     ii.    **PPCO**

101.   The PPCO family of funds, (collectively, the **"PPCO Funds")** were marketed as a single-strategy group of funds whose business was to originate short and medium term, high yield, debt secured by collateral, and/or equity investments.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 101 of Plaintiffs' Verified Complaint, so Defendant denies them.

102.   The PPCO Funds originated loans and made equity investments in various industries, including consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 102 of Plaintiffs' Verified Complaint, so Defendant denies them.

103.   Platinum Credit Management, L.P., a Delaware limited partnership **("Platinum Credit"),** served as investment manager for PPCO.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 103 of Plaintiffs' Verified Complaint, so Defendant denies them.

104.  Platinum Management, Platinum Credit and the Platinum executives, including Nordlicht, Huberfeld, Bodner and Levy, operated PPVA and

PPCO out of various locations in New York, New York. From 2012 until the commencement of the Criminal Action (defined below), they operated out of an office located at 250 West 55th Street, 14th Floor, New York, NY 10019.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 104 of Plaintiffs' Verified Complaint, so Defendant denies them.

### iii. <u>Commencement of the SEC Receivership and the Criminal Action</u>

105. On December 19, 2016, an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York, commencing a criminal action against, among others, Platinum Management, Platinum Credit, Mark Nordlicht, David Levy and certain other Platinum executives (the **"Criminal** <u>Action").</u>

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 105 of Plaintiffs' Verified Complaint, so Defendant denies them.

106. The defendants in the Criminal Action were charged with fraud, investment advisor fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors through, among other wrongdoing, the overvaluation of their largest assets, the concealment of severe cash flow problems at PPVA, and the preferential payment of redemptions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 106 of Plaintiffs' Verified Complaint, so Defendant denies them.

107. Also on December 19, 2016, the Securities and Exchange Commission (the **"SEC")** commenced a civil action in the United States District Court for the Eastern District of New York (the **"Receivership Court")** against

the defendants named in the Criminal Action asserting certain securities laws violations. *See Securities and Exchange Commission v. PMNY (NY) LLC, et al.,* Case No. 16-06848 (the **"Receivership Action").**

**ANSWER:** Defendant admits that Case No. 16-06848, styled *Securities and Exchange Commission v. PMNY (NY) LLC, et al.*, was commenced in December 2016 in the United States District Court for the Eastern District of New York. Defendant denies all remaining allegations in paragraph 107 of Plaintiffs' Verified Complaint.

108.   In connection with filing the Receivership Action, the SEC sought and obtained the appointment of Bart M.  Schwartz as receiver over certain entities including PPCO and Platinum Credit Management, L.P.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 108 of Plaintiffs' Verified Complaint, so Defendant denies them.

109.   Effective as of July 6, 2017, the Receivership Court accepted Mr. Schwartz's resignation and appointed Melanie L. Cyganowski as Receiver.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 109 of Plaintiffs' Verified Complaint, so Defendant denies them.

110.  Pursuant to the October 16, 2017 *Second Amended Order Appointing Receiver* (the **"Receivership Order"),** the Receivership Court empowered the Receiver to, among other things, recover, liquidate, marshal, and preserve  all  assets of the Receivership Entities and to, *inter alia:* (i) "bring such legal actions based on law or equity in any state, federal, or  foreign  court

as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver"; and (ii) "investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in the Receiver's discretion, be advisable or proper to recover and/or conserve Receivership Property." A true and correct copy of the Receivership Order is attached hereto as **Exhibit 6.**

**ANSWER:** Defendant states that Exhibit 6 to Plaintiffs' Verified Complaint speaks for itself. Defendant denies the allegations in paragraph 110.

111. Under the terms of the Receivership Order, the Receiver also has authority to act in connection with assets of PPCO.

**ANSWER:** Defendant states that Exhibit 6 to Plaintiffs' Verified Complaint speaks for itself. Defendant denies the allegations in paragraph 111.

### C.   **The Financial Condition of PPVA and PPCO**

#### i.   **PPVA**

112. PPVA, at one time, held valuable assets.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 112 of Plaintiffs' Verified Complaint, so Defendant denies them.

113. However, from at least 2012 until the commencement of PPVA's Cayman Liquidation, Platinum Management failed to abide by the balanced investment strategies set forth in PPVA's governing documents, which were designed to maintain PPVA's liquidity and financial condition.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 113 of Plaintiffs' Verified Complaint, so Defendant denies them.

114.   Instead, Platinum Management its executive and owners,  including Nordlicht, Huberfeld, Bodner and Levy, caused PPVA's investment portfolio to be increasingly more concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly  traded.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the  truth  or  falsity  of  the  allegations  in  paragraph  114  of  Plaintiffs'  Verified Complaint, so Defendant denies them.

115.   By the end of 2012, Platinum Management and its executives  and owners  caused PPVA's  investments  to become  concentrated  such that nearly 40% of its reported  NAV  was  represented  by  investments  in  just  two  oil  and  gas operations: Black Elk Energy Offshore Operations, LLC **("Black Elk"),** a Gulf of Mexico oil platform operator, and Golden Gate Oil, LLC **("Golden Gate"),** a California-based onshore oil operation.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the  truth  or  falsity  of  the  allegations  in  paragraph  115  of  Plaintiffs'  Verified Complaint, so Defendant denies them.

116.   Golden  Gate  was  a  highly  speculative  investment  that  Platinum Management realized was a failure at an early stage, as Golden Gate barely produced any oil, suffered large operating losses and never made a single interest payment on loans originated by PPVA. Despite this, Platinum Management falsely reported a five-fold increase in the value of PPVA's Golden Gate Oil investment during fiscal year 2013.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the  truth  or  falsity  of  the  allegations  in  paragraph  116  of  Plaintiffs'  Verified Complaint, so Defendant denies them.

117.   Black Elk was a Houston, Texas-based publicly reported company that  mostly  operated  offshore  platforms  located  in  the  Gulf  of  Mexico.  In

November 2012, an explosion occurred on Black Elk's West Delta 32 platforms, resulting in the death of Black Elk employees and prompting numerous investigations (the **"Black Elk Explosion").** Following the Black Elk Explosion, Black Elk's financial results, liquidity and business operations deteriorated significantly.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 117 of Plaintiffs' Verified Complaint, so Defendant denies them.

118.   Given the impact that the Black Elk and Golden Gate Oil business losses would have had on PPVA's net asset value if reported accurately, PPVA should have been liquidated in 2013. Platinum Management and its executives and owners refused to admit a loss or realize a write-down in value, declaring instead that PPVA's net asset actually increased during this period, in order to enrich themselves with unearned partnership shares and/or fees.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 118 of Plaintiffs' Verified Complaint, so Defendant denies them.

119.   The concentration of PPVA's investments in illiquid assets meant that Platinum Management and the Platinum executives and owners had significant discretion over their valuation, since there was no ready market for such investments. The lack of a ready market also meant that many of these investments could not be quickly or easily liquidated when cash was needed to pay the Platinum executives and owners themselves and operate Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 119 of Plaintiffs' Verified Complaint, so Defendant denies them.

120.   In 2013, Nordlicht, Huberfeld, Bodner (collectively the co-founders

of Platinum Management, Platinum Credit, PPVA and PPCO), together with Levy, Scott Taylor, and Moshe "Mark" Feuer, created Beechwood and, between March 2013 and late 2015, these individuals used their positions of trust, authority and control over PPVA to cause PPVA and Beechwood to engage in various fraudulent, non-commercial transactions designed to support Platinum Management's fraudulently inflated valuations of PPVA's assets.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 120 of Plaintiffs' Verified Complaint, so Defendant denies them.

121. To that end, during the period from 2012 through 2015, Platinum Management reported that PPVA "experienced" annualized returns of between a maximum of 11.6% and a minimum of 7.15%, and reported that the net value of its assets under management had increased steadily from $688 million until they reached $789 million as of October 1, 2015, which in turn enabled them to award themselves tens of millions in unearned partnership distributions, fees· and other compensation based on these fraudulently inflated results.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 121 of Plaintiffs' Verified Complaint, so Defendant denies them.

122. By late 2015, the liabilities resulting from the non-commercial transactions to which Platinum Management and Beechwood had caused PPVA to become a party, coupled with ongoing losses at PPVA's most significant investments, made it clear that the PPVA Funds could not continue to exist for much longer. At that time, Platinum Management and its executives and owners, including Nordlicht, Levy, Huberfeld, Bodner and others, worked with Feuer, Taylor, Narain and others at Beechwood to encumber or strip the last valuable assets away from PPVA to benefit themselves and particularly Beechwood and its preferred investor clients.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 122 of Plaintiffs' Verified

Complaint, so Defendant denies them.

123.   This scheme culminated with the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 123 of Plaintiffs' Verified Complaint, so Defendant denies them.

## ii.   **PPCO**

124.   At the end of 2013, PPCO had only $5.7 million of cash on hand. Absent a large cash infusion from investments or subscriptions, it would likely have been unable to meet both the increased redemption requests it faced in 2014 and adequately fund its portfolio companies. This dire situation was exacerbated because the majority of PPCO's assets were "Level 3," assets for which there was only a small active market.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 124 of Plaintiffs' Verified Complaint, so Defendant denies them.

125.   The table below summarizes PPCO and its subsidiaries' Consolidated Condensed Schedule of Investments as of December 31, 2012 and 2013:

| Year | Total Investment Asset Value | Level 1 Assets | Level 2 Assets | Level 3 Assets | % of Level 3 Assets |
|---|---|---|---|---|---|
| As of December 31, 2012 | $306.6 million | $0 | $36.3 Million | $270-3 million | 88% |
| As of December | $317.3 million | $18.9 million | $56.9 Million | $241.5 million | 76% |

| 31, 2013 | | | | | |
|---|---|---|---|---|---|

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 125 of Plaintiffs' Verified Complaint, so Defendant denies them.

126.   Not only were PPCO's assets primarily made up of illiquid Level 3 assets, but many of these assets were significantly overvalued.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 126 of Plaintiffs' Verified Complaint, so Defendant denies them.

127.   Much like other investment vehicles created by Platinum Management and Platinum Credit, each share of the various classes issued to investors required a different "lock up" period, a time during which investors could not redeem their investments.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 127 of Plaintiffs' Verified Complaint, so Defendant denies them.

128.   Given the significant percentage of PPCO Funds' shares with a relatively short lock-up period held by individual investors or families/trusts, there was significant redemption pressure - that is, a constant need to provide liquidity upon demand to investors.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 128 of Plaintiffs' Verified Complaint, so Defendant denies them.

129.   This short lock-up period created liquidity pressures for PPCO, which certain Platinum Fund insiders, including Nordlicht, Huberfeld, Bodner and Levy, sought to solve by creating Beechwood, which would have an ability to attract institutional investors which generally do not require short-term liquidity.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 129 of Plaintiffs' Verified Complaint, so Defendant denies them.

130.   During 2012 and 2013, PPCO began to experience increasing redemptions. In 2012, the $55.9 million of contributions (subscriptions) barely eclipsed the $50.8 million of redemptions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 130 of Plaintiffs' Verified Complaint, so Defendant denies them.

131.   In 2013, the $67.7 million of redemptions exceeded the contributions (subscriptions) of $43.6 million. At the same time, PPCO's cash balance decreased from $7.2 million to $5.7 million.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 131 of Plaintiffs' Verified Complaint, so Defendant denies them.

132.   Around the end of 2013, Nordlicht and the other Platinum executives and owners understood the funding requirements of PPCO's investments were not being met. In a November 26, 2013 email to Nordlicht, portfolio manager Zach Weiner asked:

> Mark, Can you please give us an update on when we can expect some liquidity in PPCO for this week. We've pushed off everyone for a month now, but we really do need 80k for greentown, 50k for alcor.. . and 200k for daybreak .... In addition, we need to pay 72K of

receivership fees on RCKE prior to transferring the note to AYN. We have knocked this down as much as possible but we are kind of at the end of that game now.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 132 of Plaintiffs' Verified Complaint, so Defendant denies them.

### D.   <u>Creation of the Beechwood Alter Ego</u>

133.   In or about February 2013, Nordlicht, Bodner, Huberfeld and Levy, among other Platinum personnel, commenced working with Taylor and Feuer - *out of Platinum Management's office space* - to create Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 133 of Plaintiffs' Verified Complaint, so Defendant denies them.

134.   Beechwood was established with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets.   Beechwood used those assets to engage in transactions with PPVA and PPCO to support Platinum Management's inflated valuations, in order to enrich Platinum's and Beechwood's common owners through management and other fees.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 134 of Plaintiffs' Verified Complaint, so Defendant denies them.

135.   The ownership in and ultimate control of Beechwood was held by Nordlicht, Huberfeld, Bodner and Levy (in part through trusts), while Taylor, as President, and Feuer, as Chief Executive Officer, maintained ostensible and nominal management authority, with Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 135 of Plaintiffs' Verified Complaint, so Defendant denies them.

136. Beechwood Re Ltd. (**"Beechwood Cayman"**) is a remsurance company domiciled in the Cayman Islands, that had its principal place of business in New York, New York at all relevant times. Nearly 70% of the common stock of Beechwood Cayman was held by various trusts created by Nordlicht, Bodner, Huberfeld and Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 136 of Plaintiffs' Verified Complaint, so Defendant denies them.

137. Beechwood Bermuda International Ltd. (**"Beechwood Bermuda"** and, collectively with Beechwood Cayman, the **"Beechwood Reinsurance Companies"**) is a reinsurance company domiciled in Bermuda that had its principal place of business in New York, New York at all relevant times.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 137 of Plaintiffs' Verified Complaint, so Defendant denies them.

138. As noted above, Nordlicht, Bodner Huberfeld and Levy owned and controlled all preferred shares of the Beechwood Reinsurance Companies via their interests in Beechwood Investments.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 138 of Plaintiffs' Verified Complaint, so Defendant denies them.

139. In addition to the Beechwood Reinsurance Companies, Nordlicht,

Bodner, Huberfeld and Levy, together with Feuer and Taylor, established, owned and controlled B Asset Manager LP and B Asset Manager II LP (together **"BAM"**) both of which are Delaware limited partnerships, and BAM Administrative Services LLC **("BAM Administrative")** a Delaware limited liability company.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 139 of Plaintiffs' Verified Complaint, so Defendant denies them.

140.  BAM and BAM Administrative were entities set up to serve as investment agents on behalf of the Beechwood Reinsurance Companies as well as the CNO Reinsurance Trusts and SHIP in connection with various investments.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 140 of Plaintiffs' Verified Complaint, so Defendant denies them.

141.  Beechwood's management team was largely comprised of personnel employed by or otherwise connected to Platinum Management and Platinum Credit. For example, the Beechwood team included, from time to time, the following individuals who were former or current Platinum Fund employees: (i) '"Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer"; (iii) David Ottensoser, as "General Counsel"; and (iv) Daniel Small, as the "Senior Secured Collateralized Loans PM."

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 141 of Plaintiffs' Verified Complaint, so Defendant denies them.

142.  The alter-ego relationship between the various Beechwood entities and Platinum Management/Nordlicht/Bodner/Huberfeld/Levy ("the **Platinum-Beechwood Alter Egos")** was readily apparent and otherwise easily discoverable by the CNO Defendants and SHIP Defendants, given the many ties

between the Platinum-Beechwood Alter Egos, including:

- Beechwood marketed Levy to potential clients as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as key to Beechwood's future success. Levy, the co-Chief Investment Officer of Platinum Management together with Nordlicht, served as chief financial officer and secretary of Beechwood Re and Beechwood Bermuda. He was also BAM's Chief Investment Officer and Chief Financial Officer until the end of 2014, when he was replaced by Daniel Saks, Platinum Management's co-CIO.

- Ezra Beren, Huberfeld's son-in-law, was hired in January 2014 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management.

- Naftali Manela, then CFO of Platinum Credit Management and later COO of Platinum Management, performed services for Beechwood related to general operations while still employed by Platinum Credit Management.

- Eli Rakower, director of valuation for Platinum Management, provided consulting services to Deechwood related to iuleral:liun with valuation firms that would value assets of the Beechwood Reinsurance Trusts.

- Stewart Kim, an employee of Platinum Management, simultaneously worked for Beechwood as its Chief Risk Officer until January 2015, when he became Beechwood's full time Chief Risk Officer.

- Beechwood operated out of the Platinum Management's office space until at least the end of February 2014.

- Even after separate office space was procured, Levy maintained an office at Beechwood through at least the end of 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 142 of Plaintiffs' Verified Complaint, so Defendant denies them.

143.   Once the CNO Defendants and SHIP Defendants could no longer deny the web of relationships between and among Platinum Management, Beechwood and their common owners, they accepted those relationships, and then directed and actively participated in a series of transactions by and among Beechwood  and PPVA, PPCO and their subsidiaries, culminating with the Agera Transactions, to accomplish their goal of ridding  themselves  of nonperforming loans being held on their accounts  at  Beechwood and receiving an illicit return on their investment, in the form of looting the Platinum Funds' investment in Agera.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 143 of Plaintiffs' Verified Complaint, so Defendant denies them.

**E.    Formation of the Beechwood, BCLIC, WNIC and SHIP Relationship**

**i.    The Long-Term Care Insurance Industry**

144.   BCLIC, WNIC and SHIP each are long-term care insurance carriers that hold portfolios largely comprised of an early generation of long-term care policies, no longer offered in the marketplace, because they were underwritten with faulty assumptions. As a result, these carriers face both increasing claims payments and increasing capital requirements.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 144 of Plaintiffs' Verified Complaint, so Defendant denies them.

145. By 2012, reinsurance for companies with legacy portfolios comprised of such long-term care policies was available only under extremely onerous financial terms, including the requirement that the ceding insurance company make significant payments (negative ceding commissions) to the reinsurer to complete the transaction.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 145 of Plaintiffs' Verified Complaint, so Defendant denies them.

### ii.   CNO's Spinoff of SHIP

146.   Until November 2008, CNO was the direct or indirect parent of SHIP, which was then known as Conseco Senior Health Insurance Company.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 146 of Plaintiffs' Verified Complaint, so Defendant denies them.

147. As of November 2008, SHIP was in solvent run-off of a diminishing, closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into SHIP between 1997 and 2000.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 147 of Plaintiffs' Verified Complaint, so Defendant denies them.

148.   To reduce the strain of supporting SHIP's underwriting losses, in November 2008, CNO transferred ownership of SHIP to the Senior Healthcare Trust, which was then merged into an independent oversight trust, the Senior Healthcare Oversight Trust (kin/a Senior Health Insurance Company of Pennsylvania). The Trustees of Senior Healthcare Oversight Trust serve as SHIP's directors and are primarily former insurance regulators.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 148 of Plaintiffs' Verified Complaint, so Defendant denies them.

149. At the time of the transfer, CNO and its subsidiaries contributed $164 million of capital to SHIP to add to SHIP's existing $125 million of adjusted statutory capital, reflecting concerns that SHIP would need additional capital to sustain itself on a standalone basis.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 149 of Plaintiffs' Verified Complaint, so Defendant denies them.

150. Since being spun off, SHIP has remained a long-term care insurer in runoff. SHIP continues to operate out of the same site in Carmel, Indiana where it operated while under CNO's control, along with CNO's other long-term care legacy portfolios, BCLIC and WNIC.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 150 of Plaintiffs' Verified Complaint, so Defendant denies them.

151. Fuzion, a wholly-owned subsidiary of Senior Healthcare Oversight Trust, was formed in 2012 to provide administrative and management services to long-term care insurance companies, including SHIP. Fuzion is located in the same office complex as SHIP, BCLIC and WNIC.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 151 of Plaintiffs' Verified Complaint, so Defendant denies them.

152.   In or about December 2013, pursuant to a comprehensive master services agreement, SHIP transferred its employees and physical assets to Fuzion to provide management services to SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 152 of Plaintiffs' Verified Complaint, so Defendant denies them.

153.   After the SHIP spinoff in 2008, SHIP's financial condition continued to decline because, *inter alia,* SHIP's long-term care portfolio incurred significant unforeseen increases in claims totaling over $200 million in the five-year period from 2009 through 2013.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 153 of Plaintiffs' Verified Complaint, so Defendant denies them.

### iii.   The CNO, BCLIC and WNIC Relationship

154.   After SHIP's spinoff, CNO's other legacy long-term care subsidiaries, BCLIC and WNIC, continued to flounder, dragging down CNO's overall financial performance.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 154 of Plaintiffs' Verified Complaint, so Defendant denies them.

155.   At CNO, a common set of holding company board members and executive management oversaw the overall financial and risk-management decisions of its individual insurance companies.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 155 of Plaintiffs' Verified

Complaint, so Defendant denies them.

156.   Certain key functions at CNO were shared across the insurance subsidiaries, including insurance asset management, treasury, accounting and legal functions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 156 of Plaintiffs' Verified Complaint, so Defendant denies them.

157.   For example, Eric Johnson **("Johnson"),** the Chief Investment Officer and President of 40/86 Advisors, also served as an Executive Vice President of WNIC and BCLIC. In this role, Johnson appears to have overseen the investment decisions at BCLIC and WNIC.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 157 of Plaintiffs' Verified Complaint, so Defendant denies them.

158.   Similarly, Mathew Zimpfer, the general counsel of CNO, was also listed as an Executive Vice President of BCLIC and WNIC in their statutory filings.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 158 of Plaintiffs' Verified Complaint, so Defendant denies them.

159.   CNO, as the holding company, received dividends from its subsidiaries, including BCLIC and WNIC, to fund its operations. The debt issued by CNO was guaranteed by its subsidiaries, including BCLIC and WNIC.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 159 of Plaintiffs' Verified

Complaint, so Defendant denies them.

160.   The value of CNO stock is derived from its ownership of its insurance subsidiaries, including BCLIC and WNIC. Indeed, all earnings calls were, and are, directed and addressed by the executive management of CNO, who address business and financial strategy across all CNO's operating insurance companies.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 160 of Plaintiffs' Verified

Complaint, so Defendant denies them.

161.   When assessing the value of CNO, rating agencies acknowledge the unified management of CNO. For example, in their credit and ratings reviews for CNO as the holding company, they frequently assess transactions undertaken at the insurance company subsidiary level.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 161 of Plaintiffs' Verified

Complaint, so Defendant denies them.

162.   CNO was highly incentivized to, and did, direct the actions of BCLIC and WNIC because its financial health was dependent on BCLIC and WNIC.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 162 of Plaintiffs' Verified

Complaint, so Defendant denies them.

163.   Each and every action taken by BCLIC and WNIC discussed herein was done in concert with, and at the direction of, CNO.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 163 of Plaintiffs' Verified

Complaint, so Defendant denies them.

164.   Because of the overlapping roles played by many of the employees of BCLIC, WNIC, CNO and 40186 Advisors, such as Johnson's role as Chief Investment Officer and President of 40/86 Advisors while serving as the Executive Vice President of WNIC and BCLIC, each and every action taken by BCLIC and WNIC discussed herein was done in concert with, or at the direction of, 40/86 Advisors.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 164 of Plaintiffs' Verified Complaint, so Defendant denies them.

### iv.    BCLIC and WNIC's Introduction to Beechwood

165.   By 2013, CNO had been searching for reinsurance for CNO's legacy long-term care policies housed at BCLIC and WNIC in order to reduce and mitigate the exposure associated from those companies' long-term care portfolios, but was unable to find a reinsurer that would reinsure its risk on acceptable terms.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 165 of Plaintiffs' Verified Complaint, so Defendant denies them.

166.   In connection therewith, two employees of Willis Re Inc., Rick Hodgdon (later a Platinum Management and Beechwood employee) and Michael Kaster (a former CNO employee who was familiar with the long-term care portfolio), introduced CNO's subsidiaries, BCLIC and WNIC, to Beechwood in or about November 2013.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 166 of Plaintiffs' Verified Complaint, so Defendant denies them.

167.   By agreements that were executed later but made retroactive to October 2013, BCLIC and WNIC ceded a substantial portion of their legacy, runoff long-term care business to Beechwood Cayman. The agreements were titled: (i) *Indemnity Reinsurance Agreement by and between Washington National Insurance Company and Beechwood Re Ltd,* as amended by Amendment No. 1 to Indemnity Reinsurance Agreement; and (ii) *New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd.* (together, the **"Reinsurance Agreements").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 167 of Plaintiffs' Verified Complaint, so Defendant denies them.

168.   As part of the transactions: (i) WNIC ceded to Beechwood Cayman $357 million of statutory reserves to cover future losses from policies and paid $394 million in cash to Beechwood Cayman; and (ii) BCLIC ceded $196 million of statutory reserves to Beechwood Cayman to cover future losses from policies and paid $198 million in cash to Beechwood Cayman.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 168 of Plaintiffs' Verified Complaint, so Defendant denies them.

169.   Because Beechwood Cayman was an unauthorized offshore reinsurer *(i.e.,* domiciled outside New York and Indiana where BCLIC and WNIC were domiciled), it was required to create on-shore reinsurance trusts, and specifically established the CNO Reinsurance Trusts, to manage the assets received in the reinsurance transaction.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 169 of Plaintiffs' Verified Complaint, so Defendant denies them.

170.   Wilmington Trust, N.A. was appointed the trustee for each of the CNO Reinsurance Trusts and signed various agreements on their behalf, including the

AGH Parent Amended Operating Agreement.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 170 of Plaintiffs' Verified Complaint, so Defendant denies them.

171.   B Asset Manager LP was appointed as the asset manager for the CNO Reinsurance Trusts.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 171 of Plaintiffs' Verified Complaint, so Defendant denies them.

172.   On or about February 1, 2014, the task of administering the long-term BCLIC and WNIC policies in the Reinsurance Agreements was delegated by BCLIC and WNIC to Fuzion pursuant to a February 1, 2014 Master Services Agreement.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 172 of Plaintiffs' Verified Complaint, so Defendant denies them.

173.   Fuzion's employees (as employees of SHIP) already were providing the same service to SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 173 of Plaintiffs' Verified Complaint, so Defendant denies them.

174.   While Beechwood Cayman assumed CNO's (through BCLIC and WNIC) risk through the reinsurance transactions, those entities remained responsible for any unsatisfied claims to the extent Beechwood Cayman failed to replenish the CNO Reinsurance Trusts.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 174 of Plaintiffs' Verified Complaint, so Defendant denies them.

175. This incentivized CNO to be an active participant, not a passive investor in or with Beechwood, in order to make certain it reduced BCLIC and WNIC's exposure to any claims that might be unsatisfied because of Beechwood's inability to pay.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 175 of Plaintiffs' Verified Complaint, so Defendant denies them.

176. To that end, the Reinsurance Agreements included "audit provisions" which permitted BCLIC and WNIC to initiate an audit of the investments in certain circumstances.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 176 of Plaintiffs' Verified Complaint, so Defendant denies them.

### v. SHIP's Introduction to Beechwood

177. SHIP was introduced to Beechwood in late 2013, when it was made aware of the BCLIC and WNIC reinsurance arrangements through Fuzion, which also managed SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 177 of Plaintiffs' Verified Complaint, so Defendant denies them.

178.   Following SHIP's introduction to Beechwood in 2013, Brian Wegner **("Wegner"),** the President and CEO of SHIP at the time, Paul Lorentz **("Lorentz"),** the CFO of SHIP at the time, and others met with Feuer, Taylor and Levy to discuss SHIP's financial condition.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 178 of Plaintiffs' Verified Complaint, so Defendant denies them.

179.   A series of meetings and communications between Fuzion, for SHIP, and Beechwood, primarily through Feuer, Taylor, and Levy, ensued in 2014, when SHIP was evaluating Beechwood as a potential investment manager.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 179 of Plaintiffs' Verified Complaint, so Defendant denies them.

180.   Given the distressed nature of SHIP's business, Beechwood Cayman declined to enter into agreements similar to the Reinsurance Agreements it executed with BCLIC and WNIC, but agreed to enter into investment management agreements.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 180 of Plaintiffs' Verified Complaint, so Defendant denies them.

181.   SHIP was highly motivated to enter into the investment management agreements because it was unable to obtain reinsurance in the marketplace.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 181 of Plaintiffs' Verified Complaint, so Defendant denies them.

182.   Because Fuzion was highly dependent on SHIP to pay its fees, Fuzion also was highly motivated to keep SHIP out of rehabilitation proceedings.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 182 of Plaintiffs' Verified Complaint, so Defendant denies them.

183.   SHIP, acting by and through Fuzion, entered into three investment management agreements (collectively, the **"SHIP IMAs")** with certain Beechwood entities, all of which contained roughly similar terms.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 183 of Plaintiffs' Verified Complaint, so Defendant denies them.

184.   All three IMAs contain the same basic structure:

    i.    Beechwood guaranteed SHIP a 5.85% annual investment return on the net asset value of the assets SHIP contributed.

    ii.   If SHIP's investments under the IMAs did not achieve a 5.85% return, Beechwood was obligated to pay SHIP any shortfall while also being obligated to contribute its own assets to make certain the net asset value of the account funded by SHIP was no less than that initially invested.

    iii.   Beechwood would retain investment returns above the 5.85% guaranteed investment return as a "Performance Fee."

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 184 of Plaintiffs' Verified Complaint, so Defendant denies them.

185.   The foregoing terms were highly beneficial to the SHIP Defendants:

SHIP would achieve a guaranteed return on the investment that it could not otherwise obtain in the market for the level of risk that SHIP was portrayed to be assuming in exchange.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 185 of Plaintiffs' Verified Complaint, so Defendant denies them.

186. The IMAs were comprised of the following agreements:

    i.    A May 22, 2014 IMA with Beechwood Bermuda (the **"BBIL IMA"),** pursuant to which SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

    ii.    A June 13, 2014 IMA with Beechwood Cayman (the **"BRe IMA")** pursuant to which it invested $80 million with Beechwood Cayman.  SHIP deposited that amount into a custody account at Wilmington Trust for investment by Beechwood Cayman on SHIP's behalf.

    iii.    A January 15, 2015 IMA with B Asset Manager LP (the **"BAM I IMA")** pursuant to which SHIP invested $110 million with B Asset Manager LP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 186 of Plaintiffs' Verified Complaint, so Defendant denies them.

187. Over time, SHIP invested approximately $270 million with Beechwood and its affiliates pursuant to these three initial  IMAs.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 187 of Plaintiffs' Verified

Complaint, so Defendant denies them.

188.   While BAM generally was given discretion to invest SHIP's funds, Beechwood's discretion was required to be exercised in accordance with SHIP's corporate investment guidelines set forth in its *"Adviser Investment Policy, Guidelines and Restrictions"* and *"Guidelines for Senior Secured Credit Opportunities."*

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 188 of Plaintiffs' Verified Complaint, so Defendant denies them.

### F.    Beechwood's Use of the Insurance Companies' Funds

189.   Between 2014 and 2016, CNO directed BCLIC and WNIC to transfer a total of approximately $592 million to Beechwood pursuant to the Reinsurance Agreements while SHIP transferred approximately $270 million to Beechwood pursuant to the SHIP IMAs, for a total investment of approximately $862 million.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 189 of Plaintiffs' Verified Complaint, so Defendant denies them.

190.   Upon receipt of the funds, Beechwood quickly engaged in a series of debt and equity transactions and co-investments with PPVA, PPCO and/or their subsidiaries, even though these investments did not comport with the guidelines required under the CNO Reinsurance Agreements and the SHIP IMAs.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 190 of Plaintiffs' Verified Complaint, so Defendant denies them.

191.   The Beechwood and Platinum insiders structured and implemented the various non-commercial, non-arm's length transactions by which Beechwood

engaged in these transactions with PPVA and PPCO, in part using the funds held in the accounts held on behalf of the CNO Defendants and SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 191 of Plaintiffs' Verified Complaint, so Defendant denies them.

192.   The transactions were intended to justify the values ascribed to the assets held by PPVA by Platinum Management, in order to generate unearned fees for the Platinum-Beechwood Alter Egos.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 192 of Plaintiffs' Verified Complaint, so Defendant denies them.

193.   At the helm of the transactions were Nordlicht, Huberfeld, Bodner, and Levy, in their hopelessly conflicted roles as common owners and control persons of both Platinum Management and Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 193 of Plaintiffs' Verified Complaint, so Defendant denies them.

194.   The CNO Defendants and SHIP Defendants' knew about the hundreds of millions of dollars of transactions between Beechwood and PPVA and PPCO using the funds in the CNO Reinsurance Trusts and the SHIP IMA accounts. Senior management and/or the agents of the CNO Defendants and SHIP Defendants were also aware early on of the Beechwood/Platinum ties and were provided with copies of valuation statements and other documents containing information that clearly identified the counterparty to the transactions as PPVA, PPCO or their affiliates.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 194 of Plaintiffs' Verified

Complaint, so Defendant denies them.

195.  Having offloaded a substantial portion of their future claims risk to Beechwood and confronted with a market that could not provide for those claims in the same advantageous manner anywhere else, the CNO Defendants made a conscious and calculated decision not to lose the Beechwood white knight they had found.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 195 of Plaintiffs' Verified

Complaint, so Defendant denies them.

196.  SHIP too made that decision, having procured a guaranteed return on investment under the SHIP IMAs that it could not otherwise obtain.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 196 of Plaintiffs' Verified

Complaint, so Defendant denies them.

197.  However, by the end of 2015, when it was clear that Beechwood's transactions with PPVA were floundering, the Platinum-Beechwood Alter Egos, for the unjust benefit of the CNO Defendants and SHIP Defendants, directed Beechwood to consummate several transactions with PPVA, PPCO and their subsidiaries, which had but one goal: ridding the SHIP Defendants and the CNO Defendants of bad assets by assigning them back to PPVA and PPCO and obtaining possession of or a security interest in any Platinum Fund asset of value. This scheme culminated with the Agera Transactions, discussed below.

**ANSWER:**  Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 197 of Plaintiffs' Verified

Complaint, so Defendant denies them.

198.  It was not until the CNO Defendants came to learn that their investments with Beechwood were underperforming that they took action to

reduce their exposure to PPVA and PPCO, making sure to acquire anything of value from PPVA and PPCO on their way out, in the form of fraudulent transfers of the Platinum Funds' assets and security interests in the Platinum Funds' remaining valuable assets. These efforts culminated with the Agera Transactions in June 2016.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 198 of Plaintiffs' Verified Complaint, so Defendant denies them.

199. In September 2016, only after the initial step of the Agera Transactions closed, PPVA commenced the Cayman Liquidation and the very public indictment of Murray Huberfeld created a public relations liability, the CNO Defendants took action to terminate the Reinsurance Agreements with Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 199 of Plaintiffs' Verified Complaint, so Defendant denies them.

200. SHIP was fully aware that the Platinum Funds related investments Beechwood arranged for it were underperforming through 2014-2016 and that its funds were used to perpetrate a host of fraudulent schemes on PPVA and PPCO, but SHIP did not seek to terminate its relationship with Beechwood and provided financing for the Agera Transactions that are the subject of this complaint with the belief that such transactions would benefit SHIP and Beechwood to the detriment of PGS and PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 200 of Plaintiffs' Verified Complaint, so Defendant denies them.

201. Thus, the SHIP Defendants doubled down, participating in the fraudulent Agera Transactions by investing an additional $50 million and transferring some of the near-worthless investments in PPVA and PPCO to AGH

Parent that were then used as "consideration" for the purchase of the Agera Note and the January Redemption (defined below), thereby assisting in the knowing transfer of an asset worth at least $300 million for a substantial discount.

**ANSWER:** Defendant denies the allegations in paragraph 201 of Plaintiffs' Verified Complaint.

202.   It was not until about November 2016, long after the first stage of the Agera Transactions concluded, that SHIP directed Beechwood to transfer all cash and short-term investments out of the IMA accounts managed by Beechwood and to move those assets into SHIP's custodial accounts at Bank of New York Mellon.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 202 of Plaintiffs' Verified Complaint, so Defendant denies them.

203.   At the same time, SHIP also instructed Beechwood to transfer all limited partnership and other equity interests in each of the IMA accounts that were not registered solely in SHIP's name into SHIP's exclusive name and advised Beechwood that it was no longer authorized to act with respect to any asset in which SHIP possessed a direct or indirect interest, without express direction from SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 203 of Plaintiffs' Verified Complaint, so Defendant denies them.

### G.   **Beechwood and the First Scheme**

204.   Shortly after Beechwood gained access to the first reinsurance trust assets, Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused PPVA, PPCO and their subsidiaries to enter into numerous non-commercial transactions with Beechwood entities and, in some cases, to co-invest with the Beechwood entities in third-party companies.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 204 of Plaintiffs' Verified Complaint, so Defendant denies them.

205.   The prices at which assets/loans were bought and sold were used to support Platinum Management's inflated valuations of the relevant equity, debt or investment.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 205 of Plaintiffs' Verified Complaint, so Defendant denies them.

206.   These were not real market transactions in which prices are established as a result of arm's-length  negotiations.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 206 of Plaintiffs' Verified Complaint, so Defendant denies them.

207.   To the contrary, the transactions between and among Beechwood and their clients, on the one hand, and PPVA and its subsidiaries/affiliates on the other, were insider transactions, orchestrated by the Platinum-Beechwood Alter Egos, which transactions harmed  PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 207 of Plaintiffs' Verified Complaint, so Defendant denies them.

208.   The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would be repaid, but rather to further the goal to enrich the Platinum- Beechwood Alter Egos by increasing the fees payable to Platinum

Management and BAM **("First Scheme Transactions").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 208 of Plaintiffs' Verified Complaint, so Defendant denies them.

209.   In some cases the First Scheme Transactions were used to justify ever-increasing valuations of the underlying assets as reported by Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 209 of Plaintiffs' Verified Complaint, so Defendant denies them.

210.   In other cases, the First Scheme Transactions were used to mask the performance failures at the underlying operating companies.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 210 of Plaintiffs' Verified Complaint, so Defendant denies them.

211.   In all cases, the First Scheme Transactions were used as a basis to pay the Platinum-Beechwood Alter Egos' unearned fees.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 211 of Plaintiffs' Verified Complaint, so Defendant denies them.

212. The Platinum-Beechwood Alter Egos used First Scheme Transactions in which significant loans were extended/purchased or investments made by a "third party," *i.e.,* Beechwood, as evidence of the validity of Platinum Management's "estimate" as to the true enterprise value of the underlying company.

63

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 212 of Plaintiffs' Verified Complaint, so Defendant denies them.

213.   These were insider transactions, however. Also, in most cases, any investment or loan made by the Beechwood entities was backed by a guarantee from or a put right back to PPVA, and thus was not a valid basis upon which to assess the merits of the underlying business.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 213 of Plaintiffs' Verified Complaint, so Defendant denies them.

214.   In other cases, PPVA or its subsidiaries' prior rights in collateral were made subordinate to the rights of Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 214 of Plaintiffs' Verified Complaint, so Defendant denies them.

215.   The Platinum-Beechwood Alter Egos damaged PPVA because they favored the rights of the Platinum-Beechwood Alter Egos over those of PPVA, by causing PPVA and its subsidiaries to grant guarantees and put rights in favor of Beechwood, and to subordinate its rights in collateral in favor of Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 215 of Plaintiffs' Verified Complaint, so Defendant denies them.

216.   These inflated valuations enabled Platinum Management to report to PPVA a steady rise in the NAV of the assets it managed, which in turn enabled

Platinum Management to pay itself excessive partnership shares, investment management and performance fees, to the detriment of the Platinum Funds and their subsidiaries.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 216 of Plaintiffs' Verified Complaint, so Defendant denies them.

217.   A full account of the transactions with Beechwood by which Platinum Management inflated the value of PPVA's NAV is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as **Exhibit 7** hereto and incorporated  herein.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 217 of Plaintiffs' Verified Complaint, so Defendant denies them.   Also, to the extent that a response is necessary to the allegations that are set forth in Exhibit 7 to Plaintiffs' Verified Complaint, Defendant denies them, as well.

### H.   The Second Scheme

218.   Despite the actions of the Platinum-Beechwood Alter Egos set forth above, by mid-2015 PPVA still held assets worth approximately $300 million, a significant portion of which was comprised of PPVA's investment positions in Implant Sciences Corporation and Agera Energy (the **"Remaining PPVA Assets").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 218 of Plaintiffs' Verified Complaint, so Defendant denies them.

219. Beginning in late 2015, the Platinum-Beechwood Alter Egos, among others, conspired to commence the Second Scheme, engaging in an intentional scheme to transfer or encumber nearly all of the Remaining PPVA Assets to or for the benefit of the Platinum Beechwood Alter Egos, and certain select clients and friends.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 219 of Plaintiffs' Verified Complaint, so Defendant denies them.

220. Throughout the course of the Second Scheme, the Platinum-Beechwood Alter Egos deliberately granted Beechwood liens on PPVA's investments at the subsidiary level, and Platinum Management would consistently report PPVA's NAV without taking into account the encumbrances provided to its Beechwood alter ego.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 220 of Plaintiffs' Verified Complaint, so Defendant denies them.

221. As a result of the Second Scheme, by the time the Cayman Liquidation of PPVA commenced, PPVA had hundreds of millions of dollars in liabilities and minimal assets.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 221 of Plaintiffs' Verified Complaint, so Defendant denies them.

222. A full account of the transactions involving Beechwood comprising the Second Scheme is set forth in the second amended complaint filed by PPVA and the JOLs in the United States District Court for the Southern District of New York, a copy of which, excluding exhibits, is attached as Exhibit 7 hereto and incorporated herein.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 222 of Plaintiffs' Verified Complaint, so Defendant denies them.  Also, to the extent that a response is necessary to the allegations that are set forth in Exhibit 7 to Plaintiffs' Verified Complaint, Defendant denies them, as well.

223.   The Agera Transaction which is the subject of this complaint was the culmination of the Second Scheme, and redress is sought by this action.

**ANSWER:** The allegations in paragraph 223 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 223.

### I.     The Platinum Investment in Agera Energy

224.   Agera Energy, LLC **("Agera Energy")** is a Delaware limited liability company and a leading energy reseller to the consumer and business  markets.

**ANSWER:** Defendant admits that Agera Energy, LLC is a Delaware limited liability company.  Defendant denies all remaining allegations in paragraph 224 of Plaintiffs' Verified Complaint.

225.   Agera Energy maintains a principal place of business in Briarcliff Manor, New York.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 225 of Plaintiffs' Verified Complaint, so Defendant denies them.

226.   Agera Energy was formed through the combination of Agera Energy

LLC, an entity formed at the direction of Platinum Management, and the assets of Glacial Energy Holdings LLC, which were purchased by the Platinum Funds pursuant to a June 17, 2014 sale order entered by the United States Bankruptcy Court for the District of Delaware pursuant to Section 363 of the Bankruptcy Code (the **"Glacial Energy Purchase"**).

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 226 of Plaintiffs' Verified Complaint, so Defendant denies them.

227. PPVA provided all of the funding for the Glacial Energy Purchase.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 227 of Plaintiffs' Verified Complaint, so Defendant denies them.

228. At all relevant times, Agera Energy was a wholly owned subsidiary of Agera Holdings, LLC, a Delaware limited liability company **("Agera Holdings")**.

**ANSWER:** Defendant admits that Agera Energy, LLC is a subsidiary of Agera Holdings, LLC. Defendant also admits that Agera Holdings, LLC is a Delaware limited liability company. Defendant denies all remaining allegations in paragraph 228 of Plaintiffs' Verified Complaint.

229. Agera Holdings' sole business was to act as a holding company and control the business of its wholly owned subsidiaries. Those subsidiaries are Agera Energy, Utility Recovery LLC and Agera Solutions LLC.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 229 of Plaintiffs' Verified Complaint, so Defendant denies them.

230.   Although PPVA paid the initial purchase price to effect the Glacial Energy Purchase, Platinum Management gave 95.01% of the equity of Agera Holdings to Michael Joseph Nordlicht, and 4.99% of the equity in Agera Holdings to MF Energy Holdings, LLC **("MF Holdings").**

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 230 of Plaintiffs' Verified Complaint, so Defendant denies them.

231.   Feuer, one of the co-owners of Beechwood, owns all of the membership interests in MF Holdings.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 231 of Plaintiffs' Verified Complaint, so Defendant denies them.

232.   Michael Joseph Nordlicht is Nordlicht's nephew.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 232 of Plaintiffs' Verified Complaint, so Defendant denies them.

233.   According to his LinkedIn profile, Michael Nordlicht graduated from Georgetown University Law Center in 2012. Following graduation, he worked a few months as a law clerk for the Public Defender's office in Baltimore, Maryland. He also was an associate attorney for about eight months at the Maryland Attorney General's office in the Department of Public Safety and Correctional Services.

**ANSWER:** Defendant states that Michael Nordlicht's LinkedIn profile speaks for itself.  Defendant denies the allegations in paragraph 233 of Plaintiffs' Verified Complaint.

234.   In or about late 2013, Nordlicht installed his nephew as the general counsel of Agera Energy, despite the fact that he appears to have had no prior experience in private practice, much less any experience in the energy sector.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 234 of Plaintiffs' Verified Complaint, so Defendant denies them.

235.   Neither Michael Nordlicht nor MF Holdings paid anything for the equity each held in Agera Holdings.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 235 of Plaintiffs' Verified Complaint, so Defendant denies them.

236.   While Michael Joseph Nordlicht and MF Holdings held the equity in Agera Energy's parent, PPVA and PPCO could nevertheless assert a controlling interest in Agera Energy because prior to spring 2016, their jointly held entity, PGS, was the holder of that certain May 19, 2014 promissory note issued by Agera Energy that was convertible into approximately 95% of the equity in Agera Energy (the **"Agera Note").** A true and correct copy of the Second Amended and Restated Agera Note is attached hereto as **Exhibit 8.**

**ANSWER:**  Defendant states that Exhibit 8 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 236.

**J.   Hiring Kevin Cassidy**

237.   Shortly after the Glacial Energy Purchase, Agera Energy hired Kevin Cassidy as a senior executive.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 237 of Plaintiffs' Verified

Complaint, so Defendant denies them.

238.   Cassidy, who had served two prior stints in prison, was arrested a third time in 2007 for deliberately misstating the value of natural gas derivatives held by one of Nordlicht's previous funds, Optionable Inc., which had collapsed amid scandal in 2007.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 238 of Plaintiffs' Verified Complaint, so Defendant denies them.

239.   Nordlicht and/or other persons employed by Platinum Management caused Cassidy to be hired as a senior executive by Agera Energy upon Cassidy's release from prison, despite the fact that he had no prior experience in the energy sector.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 239 of Plaintiffs' Verified Complaint, so Defendant denies them.

240.   Despite Cassidy's multiple convictions, Nordlicht vouched for Cassidy's integrity when questioned by a reporter. A true and correct copy of a March 21, 2016 email from Nordlicht to a reporter for Thomson Reuters is attached as **Exhibit 9.**

**ANSWER:** Defendant states that Exhibit 9 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 240.

241.   In responses to inquiries from auditors concerning Cassidy's employment and in disclosures provided concerning the same, Platinum Management provided a copy of Cassidy's offer letter from Agera Energy, which listed the salary he would be paid and specifically denied that Cassidy had been or ever was employed as a portfolio manager at Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 241 of Plaintiffs' Verified Complaint, so Defendant denies them.

242.   At no time did Platinum Management ever disclose to its auditors any promise or obligation to pay Cassidy or any entity owned or controlled by Cassidy, a percentage of the sale price to be received upon the sale of PGS' interest in Agera Energy or the Agera Note.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 242 of Plaintiffs' Verified Complaint, so Defendant denies them.

## K.   **Valuation of Agera Energy**

243.   Despite the fact that Mark Nordlicht installed unqualified insiders to help run the operating company, Agera Energy appears to have thrived.  Based on its December 31, 2015 financial statements, Agera Energy achieved FYE 2015 revenues of $301.4 million and EBITDA of $20.2 million.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 243 of Plaintiffs' Verified Complaint, so Defendant denies them.

244. According to valuation reports commissioned by Platinum Management, Agera Energy's value as of March 31, 2016 was estimated to be between $225,533,000 and $283,553,000. A true and correct copy of portions of the PPVA 1st Quarter 2016 Valuation is attached hereto as **Exhibit 10.** This valuation report was issued on the same day as the Agera Note Sale (defined below).

**ANSWER:** Defendant states that Exhibit 10 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 244.

245.   A June 30, 2016 valuation report commissioned by Beechwood valued Agera Energy at between $260,000,000 and $330,000,000.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 245 of Plaintiffs' Verified Complaint, so Defendant denies them.

246.   A July 15, 2016 investment memorandum prepared on behalf of BAM states that due to Agera Energy's profitable financial performance, the true valuation of Agera Energy likely was closer to the high end of available estimates.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 246 of Plaintiffs' Verified Complaint, so Defendant denies them.

247.   Platinum Management caused PPVA and PPCO to hold their interests in the Agera Note via PGS, a special purpose entity with no separate employees or business operations at that time other than the ownership of the Agera Note and their interests in Agera.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 247 of Plaintiffs' Verified Complaint, so Defendant denies them.

248.   The valuation statements, net asset value statements and financial statements prepared on behalf of PPVA and PPCO described their interests in Agera as though they each held those interests directly, and valued their interests in Agera Energy on an "as converted basis" rather than based on the value of the face amount of the Agera Note itself.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 248 of Plaintiffs' Verified Complaint, so Defendant denies them.

### L.   **The Agera Transactions**

249.   As set forth above, since as early as 2014, the CNO Defendants and SHIP Defendants were aware that Beechwood was engaging in transactions with PPVA and PPCO and their respective portfolio companies, using funds from the CNO Reinsurance Trusts and the SHIP IMA Accounts.  While the CNO Defendants and SHIP Defendants questioned certain of these investments, initially neither party took any action to terminate their relationship with Beechwood.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 249 of Plaintiffs' Verified Complaint, so Defendant denies them.

250.   However, after determining that their investments were nonperforming, leading to a risk of sustaining large losses, they worked with Beechwood and its Platinum alter egos, including Platinum Management, Nordlicht, Huberfeld, Bodner and Levy, in consummating fraudulent conveyances which were specifically designed to alleviate the CNO Defendants' and SHIP Defendants' concerns.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 250 of Plaintiffs' Verified Complaint, so Defendant denies them.

251.   Against this backdrop, as early as March 2016, the Platinum and Beechwood executives conspired to transfer the rest of the remaining valuable assets of PPVA and PPCO by way of a series of "insider" transactions in order to clear out the uncollectable debt obligations owed to the CNO Reinsurance Trusts and SHIP Defendants, leaving PPVA and PPCO with little to nothing in exchange for the transactions, culminating with the Agera Transactions.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 251 of Plaintiffs' Verified Complaint, so Defendant denies them.

252.   The Agera Transactions were conceived by Platinum-Beechwood Alter Egos as an insider transaction by at least as early as March 13, 2016. See attached **Exhibit 11,** a true and correct copy of a March 13, 2016 email regarding a proposed insider sale of Agera.

**ANSWER:**  Defendant states that Exhibit 11 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 252.

253.  By March 27, 2016, the Platinum-Beechwood Alter Egos began planning an insider sale of Agera to a "[B]eechwood led consortium."  See attached **Exhibit 12,** a true and correct copy of a March 27, 2016 email regarding the planning for an insider sale of Agera.

**ANSWER:**  Defendant states that Exhibit 12 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 253.

254.   The insider transaction was intended to be substantially below fair value and was the product of the insider relationship between the Platinum-Beechwood Alter Egos, with the unjust benefits flowing to the Defendants and the Platinum-Beechwood-Alter Egos.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 254 of Plaintiffs' Verified Complaint, so Defendant denies them.

255.   Nordlicht and the other Platinum executives did not attempt to market the Agera Note and actively dissuaded potential buyers from inquiring into the purchase of the Agera Note.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 255 of Plaintiffs' Verified Complaint, so Defendant denies them.

256.  For example, on May 11, 2016, in response to ail inquiry by a non-

investor potential purchaser, Nordlicht stated that PGS's interest in Agera Energy was off the market. A true and correct copy of this May 11, 2016 email is attached hereto as **Exhibit 13.**

**ANSWER:** Defendant states that Exhibit 13 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 256.

257. Implant Sciences Corporation, PPVA's only other remaining investment of significant value by May 2016, was being marketed for sale at the same time as Platinum Management and Beechwood were "negotiating" the Agera Note Sale.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 257 of Plaintiffs' Verified Complaint, so Defendant denies them.

258.   By contrast to their actions in connection with the sale of the Agera Note, Platinum Management arranged for Implant Sciences Corporation to hire an investment banker to openly market the company for sale and took all necessary due diligence actions customary for the legitimate sale of an operating company.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 258 of Plaintiffs' Verified Complaint, so Defendant denies them.

259.   Between April 1, 2016 and June 9, 2016, the specific terms by which the Agera Note Sale was effected were put in place by the Platinum-Beechwood Alter Egos among others, all operating with the knowledge of and in conjunction and with the assistance of, among others, the CNO Defendants, the CNO Reinsurance Trusts, SHIP Defendants, AGH Parent, Beechwood Agera Entities, Cassidy and Starfish.

**ANSWER:** Defendant denies the allegations in paragraph 259 of Plaintiffs' Verified Complaint.

76

### i.      The April 2016 First Assignment Agreement

260.   On April 1, 2016, pursuant to the Assignment of Note and Liens (the **"First Assignment Agreement"),** PGS assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda in exchange for $15 million in cash.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 260 of Plaintiffs' Verified Complaint, so Defendant denies them.

261.   The First Assignment Agreement gave PGS the unconditional right to repurchase the Agera Note by repaying the $15 million purchase price plus a fee, by June 15, 2016.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 261 of Plaintiffs' Verified Complaint, so Defendant denies them.

### ii.      The May 2016 Second Assignment Agreement

262.   On May 12, 2016, pursuant to an Amended and Restated Assignment of Note and Liens (the **"Second Assignment Agreement"** and collectively with the First Assignment Agreement, the **"Agera Assignment Agreements"),** PGS re-assigned the Agera Note to Defendant BBIL ULICO 2014 Trust, Beechwood Bermuda Investment Holdings Ltd., and Beechwood Bermuda, along with newly created Defendant BBLN-Agera Corp., which effectively resold the Agera Note at a new purchase price of $25 million. This price included the $15 million previously paid pursuant to the First Assignment Agreement.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 262 of Plaintiffs' Verified Complaint, so Defendant denies them.

263.   Among other terms, the Agera Assignment Agreements provided that PGS would forfeit its interest in the Agera Note, and thus its control over Agera Energy, if it did not repay the amounts due to the assignees within the time provided in such Agreements.  These transactions had the effect of locking up the sale of the Agera Note.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 263 of Plaintiffs' Verified Complaint, so Defendant denies them.

### iii.   <u>SHIP Agrees to Provide Substantial Assistance</u>

264.   In May 2016, representatives for the SHIP Defendants attended meetings with Dhruv Narain, Feuer and Kevin Cassidy and other representatives of Agera Energy to formulate the plan for SHIP's participation in the illicit Agera Transactions.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 264 of Plaintiffs' Verified Complaint, so Defendant denies them.

265.   Narain and Feuer first approached the SHIP Defendants in mid-May 2016 to invest funds in what was to become AGH Parent. At all times, the SHIP Defendants and Beechwood understood that this new investment would be made outside of the structure of the SHIP IMA agreements.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 265 of Plaintiffs' Verified Complaint, so Defendant denies them.

266.   The initial meeting occurred on May 19, 2016. During that meeting, Narain walked representatives of the SHIP Defendants through the details of what he and Feuer characterized as a tremendous "opportunity" for SHIP.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 266 of Plaintiffs' Verified Complaint, so Defendant denies them.

267.   Narain and Feuer told executives of the SHIP Defendants that the owners of PGS needed to generate cash and, thus, were motivated to sell Agera Energy on favorable terms. Narain also represented that he had done extensive diligence on Agera Energy and that it was orchestrating a purchase of Agera Energy for far less than its actual value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 267 of Plaintiffs' Verified Complaint, so Defendant denies them.

268.   On May 25, 2016, executives for the SHIP Defendants, including Wegner and Lorentz, attended follow up meetings in Beechwood's offices. Narain and Feuer participated, along with individuals from Agera Energy, including Kevin Cassidy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 268 of Plaintiffs' Verified Complaint, so Defendant denies them.

269.   At the May 19 and May 25 meetings, Cassidy and others from Agera Energy provided information to SHIP regarding corporate operations. Narain and other representatives of Beechwood provided the SHIP Defendants with information regarding the value of Agera Energy and the proposed purchase of the company at a substantial discount to its actual value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 269 of Plaintiffs' Verified Complaint, so Defendant denies them.

270.   Meetings regarding the proposed transaction also were held on those days with representatives of the CNO Defendants.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 270 of Plaintiffs' Verified Complaint, so Defendant denies them.

271.   In a follow up email to representatives of the SHIP Defendants dated May 26, 2016, Narain proposed what he characterized as a "**strawman structure**" (emphasis supplied) that would comply with insurance industry standards governing exposure to non-investment grade debt.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 271 of Plaintiffs' Verified Complaint, so Defendant denies them.

272.   To that end, Narain proposed that SHIP directly invest an "incremental $50 million in the newly formed AGH Parent, with an additional $20.5 million to be acquired through the SHIP IMAs. Narain further proposed that Beechwood would sell certain limited partnership interests in the SHIP IMA accounts, including reducing SHIP's PPCO investment from $32 million to $5.5 million and bringing SHIP's PPVA investment below $5.5 million.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 272 of Plaintiffs' Verified Complaint, so Defendant denies them.

273.   Though this transaction, the Platinum-Beechwood Alter Egos offered SHIP, and SHIP accepted a way to exit its investments in PPVA and PPCO, which were failing, and supplant them with Plaintiffs' interest in the remaining valuable, unencumbered asset: the Agera Note.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 273 of Plaintiffs' Verified Complaint, so Defendant denies them.

274.   SHIP agreed to move forward with the proposed investments in AGH Parent for this wrongful purpose.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 274 of Plaintiffs' Verified Complaint, so Defendant denies them.

275.   Throughout the Agera Note Sale process, the SHIP Defendants took an active role in its investment in AGH Parent, with full access to Beechwood's due diligence reports and with actual knowledge of the connection between Mark Nordlicht and Cassidy and Cassidy's checkered past.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 275 of Plaintiffs' Verified Complaint, so Defendant denies them.

276.   On June 1, 2016, Narain sent an email to Lorentz and SHIP's drafting counsel that "we have a motivated seller who very much needs the money. As a result, we are really trying to close and fund on Monday, June 6, 2016."

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 276 of Plaintiffs' Verified Complaint, so Defendant denies them.

277.   Upon information and belief, the SHIP Defendants and CNO Defendants were acutely aware of the fraudulent circumstances at the Platinum Beechwood enterprise and the effect of the transaction on Plaintiffs. Attached hereto as **Exhibit 14** is an email dated July 29, 2016 in which Fuzion executives describe the situation as a "real mess" and similar to "Madoff."

**ANSWER:** Defendant states that Exhibit 14 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 277.

### iv.  The Sale of the Agera Note

278.   On June 9, 2016, the day after Huberfeld's arrest, the Platinum-Beechwood Alter Egos, working in concert with the Defendants here, caused PGS to transfer its interest in the Agera Note to AGH Parent – an entity created at the behest of the Platinum-Beechwood Alter Egos, for purposes of the transaction, and would be controlled and managed by Beechwood post sale, for the benefit of the Defendants (the **"Agera Note Sale").**

**ANSWER:** Defendant denies the allegations in paragraph 278 of Plaintiffs' Verified Complaint.

279.   The SHIP Defendants and the CNO  Defendants,  with full knowledge of the insider nature of the Agera Note Sale and the detriment it would cause to PGS, PPVA and PPCO, worked in tandem with or knowingly allowed Beechwood and the other Defendants to work to the detriment of PGS, PPVA and PPCO, just weeks before they would publicly distance themselves from Beechwood for fraud, and while litigation was anticipated.

**ANSWER:** Defendant denies the allegations in paragraph 279 of Plaintiffs' Verified Complaint.

280.   To create the appearance that the Agera Note Sale was an arm's length, valid transaction, numerous agreements were executed between and among the parties.

**ANSWER:** Defendant denies the allegations in paragraph 280 of Plaintiffs' Verified Complaint.

### v.  Assignment of the Worthless Debt to AGH Parent

281.   On or about June 8 and 9, 2016, the Beechwood Agera Corporations and CNO Reinsurance  Trusts each executed agreements with AGH Parent by

which they contributed near-worthless debt and other investments related to the Platinum Funds to AGH Parent in exchange for preferred membership units and notes issued to them by AGH Parent.

**ANSWER:** Defendant denies the allegations in paragraph 281 of Plaintiffs' Verified Complaint.

282.   Similarly, Beechwood Investments executed an Agreement with AGH Parent stating that it had purportedly paid $100 for all of the common equity units in AGH Parent, while SHIP executed agreements stating that it was contributing cash plus certain worthless debt and other investments related to the Platinum Funds in exchange for preferred membership units and notes issued to it by AGH Parent. True and correct copies of the Agreements by which these purported "contributions" and "subscriptions" (the **"Subscription Agreements"**) were effected and attached hereto as **Exhibit 15**.

**ANSWER:** Defendant states that Exhibit 15 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 282.

283.   As noted above, at all relevant times Nordlicht, Bodner Huberfeld and Levy or their family members, via trusts, held the membership interests in Beechwood Investments.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 283 of Plaintiffs' Verified Complaint, so Defendant denies them.

### vi.   The Repurchase Agreement

284.   As part of the Agera Transactions, on June 9, 2016, PGS re-acquired the Agera Note from Defendant BBLN-Agera Corp. and other Beechwood-related entities under that certain Assignment of Secured Convertible Promissory Note (the **"Repurchase Assignment").**   A true and correct copy of the Repurchase Agreement is attached hereto as **Exhibit 16**.  PGS assigned the Agera Note to AGH Parent in connection with the Agera Note Sale.

**ANSWER:** Defendant states that Exhibit 16 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 284.

### vii.  The Agera Purchase Agreement

285.   On June 9, 2016, simultaneous with the execution of the AGH Parent Amended Operating Agreement (described below) and the Subscription Agreements, PGS and AGH Parent entered into the Purchase Agreement (the **"Agera Purchase Agreement"**), by which PGS sold the Agera Note to AGH Parent. A true and correct copy of the Agera Purchase Agreement is attached hereto as **Exhibit 17**.

**ANSWER:** Defendant states that Exhibit 17 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 285.

286.   The Agera Purchase Agreement is governed by Delaware law.

**ANSWER:** The allegations in paragraph 286 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 286.

287.   Each of PGS and AGH Parent are limited liability companies created under Delaware law, and their operating agreements are governed by Delaware law.

**ANSWER:** Defendant admits that it is a Delaware limited liability company. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 287.

288.   Even though the Platinum-Beechwood Alter Egos and the Defendants were aware and believed that the market value of the Agera Note was at least $250- 300 million and possibly higher, the stated purchase price for the Agera Note was only $170 million (the **"Note Purchase Price").**

**ANSWER:** Defendant states that Exhibit 17 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 288.

289.  The  Note  Purchase  Price  was  significantly  below  the contemporaneous valuations of the Platinum Funds' interests in the Agera Note commissioned by the Platinum-Beechwood Alter Egos, the latter of which was shared  with  the  SHIP  Defendants  and,  on  information  and  belief,  the  other Defendants.

**ANSWER:** Defendant denies the allegations in paragraph 289 of Plaintiffs'

Verified Complaint.

290.  Even then, approximately $43.67 million of the Note Purchase Price was  paid  in  the  form  of  nearly  valueless  debt  and  other  instruments -  the  very instruments that had been assigned to AGH Parent by the Beechwood Agera Entities, the SHIP Defendants, the CNO Defendants and the CNO Reinsurance Trusts the day before, in partial exchange for their membership interests in AGH Parent. Although these instruments were nearly worthless, they were provided as consideration to PGS at face value.

**ANSWER:** Defendant denies the allegations in paragraph 290 of Plaintiffs'

Verified Complaint.

291.  The Purchase Agreement further provided for the transfer to PGS of a total of 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at  $2,000,000.

**ANSWER:** Defendant states that Exhibit 17 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 291.

292.  Of these, all of the Class B-2 Units and $4,552,000 of the Class C Preferred Units were immediately transferred to Starfish, Cassidy's alter ego, both discussed below.

**ANSWER:** Defendant states that Exhibit 18 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 292.

293.   PGS retained $54 million worth of class C Preferred Units in AGH Parent that were valued at face or par value.

**ANSWER:**  Defendant states that Exhibit 18 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 293.

294.   Under the terms of the AGH Parent Operating Agreement, any distribution to the Class C Preferred Units held by PGS was subordinated to those held by the Beechwood Agera Entities, SHIP, the CNO Defendants, the CNO Reinsurance Trusts and the B-2 Units held by Starfish/Cassidy.

**ANSWER:**  Defendant denies the allegations in paragraph 294 of Plaintiffs' Verified Complaint.

295.   In addition, $35.4 million of those Class C Preferred Units could be redeemed at the sole discretion of AGH Parent/Beechwood, in exchange for debt and or other instruments at face value, irrespective of the actual value of such debt or instruments.

**ANSWER:**  Defendant states that Exhibit 18 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 295.

296.   The Purchase Agreement provides that approximately $65 million of the Note Purchase Price was payable in cash.

**ANSWER:**  Defendant states that Exhibit 17 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 296.

297.   The cash paid in June 2016 was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part and had knowledge concerning.

**ANSWER:**  Defendant denies the allegations in paragraph 297 of Plaintiffs' Verified Complaint.

86

298.   True and correct copies of the closing documents related to the Agera Note Sale and the other transactions described above are attached hereto as **Exhibit 18**.

**ANSWER:**  Defendant states that Exhibit 18 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 298.

### viii.   PGS's Payment to Starfish/Cassidy

299.   The Platinum-Beechwood Alter Egos caused PGS to pay Cassidy, via his entity Starfish, 8% of the **gross** proceeds from the sale of Agera, in connection with Cassidy's efforts to shepherd through the Agera Transactions.

**ANSWER:**  Defendant denies the allegations in paragraph 299 of Plaintiffs'

Verified Complaint.

300.   This payment was made despite Platinum Management's pnor statements to PPVA's auditor indicating that (i) Cassidy was an employee of Agera who was paid a salary of $135,000 per annum and (ii) Cassidy was not a portfolio manager employed by Platinum Management.

**ANSWER:**  Defendant denies the allegations in paragraph 300 of Plaintiffs'

Verified Complaint.

301.   To effect the payment, the Platinum-Beechwood Alter Egos, Cassidy and Cassidy's counsel prepared an amendment to the PGS operating agreement that granted Starfish, Cassidy's alter ego, 8% of the membership interests in PGS on the day before the Agera Note Sale closed **("First Amendment to PGS Operating Agreement"}.** The grant was illicit. The other parties to the Agera Note Sale, including the Beechwood Agera Entities, AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts and the CNO Defendants, were aware of the transfer to Cassidy/Starfish.

**ANSWER:**  Defendant denies the allegations in paragraph 301 of Plaintiffs'

Verified Complaint.

302.   Thereafter, on June 9, 2016 (concurrent with the Agera Transactions and the day after Huberfeld's arrest), PGS entered into a Purchase Agreement with Starfish by which PGS purported to "repurchase" Starfish's membership interests in PGS for $13,552,000 (the **"Starfish Purchase Agreement"),** consisting of: (i) $7,000,000 in cash; (ii) the $2,000,000 of Class B-2 Preferred Units in AGH Parent granted to PGS under the Purchase Agreement; and (iii) $4,552,000 of the total amount of Class C Preferred Units in AGH Parent granted to PGS.

**ANSWER:** Defendant states that Exhibit 19 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 302.

303.   Notably, Cassidy's Class C Preferred Units were expressly not subject to redemption in exchange for "PGS Value." In addition, Cassidy received all of the Class B-2 Preferred Units granted to PGS under the Starfish Purchase Agreement. The Class B-2 Preferred Units have a higher liquidation preference than the Class C Units retained by PGS. A true and correct copy of the Starfish Purchase Agreement is attached hereto as **Exhibit 19.**

**ANSWER:** Defendant states that Exhibit 19 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 303.

304.   The payoff to Cassidy was structured as a grant and repurchase of membership interests in PGS by Starfish so that Cassidy could avoid the payment of any withholding taxes with respect to the  transfer.

**ANSWER:** Defendant denies the allegations in paragraph 304 of Plaintiffs' Verified Complaint.

305.   All of the various transactions described above and leading up to and including the purchase of the Agera Note on June 9, 2016 are referred to herein as the **"Agera Purchase Transactions".**

**ANSWER:** Paragraph 305 of Plaintiffs' Verified Complaint does not contain factual allegations that require a response.  Defendant denies any allegations in paragraph 305.

### ix.  The AGH Parent Amended Operating Agreement

306.  Also on June 9, 2016, AGH Parent amended its Limited Liability Company Agreement (the **"AGH Parent Amended Operating Agreement"**) to show the admission of the new members resulting from the transactions that comprised the various elements of the Agera Note Sale and related transactions. A true and correct copy of the AGH Parent Amended Operating Agreement is attached hereto as **Exhibit 20.**

**ANSWER:** Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 306.

307.  Narain executed the AGH Parent Amended Operating Agreement on behalf of AGH Parent and the Beechwood Agera Entities. Wegner signed the AGH Parent Amended Operating Agreement on behalf of SHIP. The CNO Reinsurance Trusts also were admitted as members of AGH Parent.

**ANSWER:** Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 307.

308.  Pursuant to the AGH Parent Amended Operating Agreement and the Subscription Agreements, AGH Parent issued the following notes and membership interests:

- SHIP received 350,000 Class A Units, valued at $35 million, B-1 debt in the principal amount of $15 million, and 5,730 Common Units in AGH Parent as an "equity kicker."

- SHIP also received a $940,000 B-1 Senior Secured Note issued by AGH Parent and a $5,000,000 interest in BBLN-Agera's $9,060,000 B-1 Senior Secured Note issued by AGH Parent from cash and assets contributed through the SHIP IMA Accounts.

- BBIL ULICO 2014, BRe WNIC 2013 LTC Primary, BBLN-Agera Corp., BHLN-Agera Corp., and BOLN-Agera Corp. were collectively provided 220,000 Class B-1 Units, valued at $22 million, and B-1 debt in the principal amount of $36,960,000.

- AGH Parent provided 5,730 Common Units in AGH Parent to Beechwood Re Investments, LLC for $100. Beechwood Re Investments, LLC is a Delaware limited liability company managed by N Management LLC, the sole member of which is Nordlicht.

- In connection with the sale of the Agera Note, PGS was provided with 590,400 Class C units in AGH Parent, valued at $59,400,000, and 3,438 Class B-2 Units, valued at 2,000,000. These valuations were misleading, as they failed to take into account "PGS Value" and the redemption rights against PGS's Class C units, and the contemporaneous transfer of the Class B-2 Units to Starfish, Cassidy's alter ego, both discussed below.

- Starfish Holdings Group, Inc., another Cassidy-controlled entity, was provided with 12,062 incentive units in AGH Parent.

**ANSWER:** Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself. Defendant denies the allegations in paragraph 308.

309. After the Agera Note Sale was consummated, AGH Parent did not provide PGS with any of the quarterly or annual financial statements required by section 11.01 of its operating agreement, nor did it provide PGS with any distributions.

**ANSWER:** Defendant denies the allegations in paragraph 309 of Plaintiffs' Verified Complaint.

## M.   Redemption of the Class C Units for PGS Value

310. As noted above, approximately $59,040,00 million of the Note Purchase Price was paid to PGS via Class C Units in AGH Parent. Of these, $4,552,000 worth were given to Starfish/Cassidy, and PGS retained the remaining $54 million worth of such Class C Preferred Units.

**ANSWER:** Defendant states that Exhibit 18 to Plaintiffs' Verified Complaint speaks for itself. Defendant denies the allegations in paragraph 310.

311.   The Class C Preferred Units that PGS received were deeply subordinated to the membership interests held by the Beechwood Agera Entities, SHIP, the CNO Reinsurance Trusts and Starfish's B-2 Units, and thus had little or no value.

**ANSWER:**  Defendant denies the allegations in paragraph 311 of Plaintiffs'

Verified Complaint.

312.   The Amended AGH Parent Operating Agreement further provided that $35.4 million of PGS' Class C Preferred Units were subject to being redeemed in exchange for $35.4 million of debt or partnership interests in the Platinum Funds by AGH Parent (defined as **"PGS Value"**) if a notice was sent out on or before a certain date.

**ANSWER:**  Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 312.

313.   On October 28, 2016, AGH Parent delivered a letter to PGS (the **"AGH Redemption Notice"**), indicating its intent to exercise the redemption rights set forth in Section 9.06(a)(i) of the Amended AGH Parent Operating Agreement "with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."   A true and correct copy of the AGH Redemption Notice is attached hereto as **Exhibit 21**.

**ANSWER:**  Defendant states that Exhibit 21 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 313.

314.   Thereafter, on January 26, 2017, AGH Parent delivered a letter to PGS enclosing an Assignment (the **"PGS Assignment"),** executed by AGH Parent, transferring to PGS all of AGH Parent's interest in the debt obligations/instruments set forth on Schedule A thereto. A true and correct copy of the PGS Assignment is attached hereto as **Exhibit 22.**

**ANSWER:**  Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint

speaks for itself.  Defendant denies the allegations in paragraph 314.

315.   Together, the debt obligations/instruments listed on Schedule A of the PGS Assignment have a face value equal to the total amount of PGS Value subject to redemption, or $35.4 million.

**ANSWER:**  Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 315.

316.   The debt obligations/instruments listed in the PGS Assignment consist of distressed debt and instruments transferred to AGH Parent by the CNO Reinsurance Trusts, SHIP and the Beechwood Agera Entities.

**ANSWER:**  Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 316.

317.   The debt/instruments listed in the PGS Assignment include: (i) $14.1 million owed by Golden Gate Oil, (ii) $5.7 million owed by PEDEVCO Corp., and (iii) $15.6 of debt owed by Montsant Partners, LLC, a subsidiary of PPVA.

**ANSWER:**  Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself.  Defendant denies the allegations in paragraph 317.

318.   Defendants had actual knowledge that these distressed debt obligations were near-worthless when they were transferred to PGS in January 2017.

**ANSWER:**  Defendant denies the allegations in paragraph 318 of Plaintiffs' Verified Complaint.

319.   As a result of the AGH Redemption Notice and PGS Assignment, AGH Parent sought to redeem 336,928.93 Class C Preferred Units held by PGS and recorded satisfaction relative to PGS of $1,707,107 in accretive Class C Preferred Return related to such redeemed units, leaving PGS with approximately 207,970 Class C Preferred Units (the **"January Redemption").**

**ANSWER:**  Defendant denies the allegations in paragraph 319 of Plaintiffs' Verified Complaint.

320. Together, the January Redemption and the Agera Purchase Transactions are referred to herein as the **"Agera Transactions."**

**ANSWER:** Paragraph 320 of Plaintiffs' Verified Complaint does not contain factual allegations that require a response. Defendant denies any allegations in paragraph 320.

321. PGS has not received any further distributions with respect to its Class C Preferred Units in AGH Parent.

**ANSWER:** Defendant denies the allegations in paragraph 321 of Plaintiffs' Verified Complaint.

322. Within a week after the Agera Note Sale closed in June 2016, BAM Management Services began marketing AGH Parent to prospective investors.

**ANSWER:** Defendant denies the allegations in paragraph 322 of Plaintiffs' Verified Complaint.

323. In or about December 2016, six months after the Agera Note Sale, BAM Management Services had entered into negotiations to sell AGH Parent to a third party investor for approximately $315 million in cash.

**ANSWER:** Defendant denies the allegations in paragraph 323 of Plaintiffs' Verified Complaint.

324. In the summer of 2017, certain assets under Beechwood's control, including its interests in BAM Management Services and AGH Parent, as well as the CNO Defendants' interests in AGH Parent, were sold to an affiliate of Eli Global (the **"Eli Global Proceeds"**).

**ANSWER:** Defendant denies the allegations in paragraph 324 of Plaintiffs' Verified Complaint.

325.   On information and belief, SHIP still remains a member of AGH Parent.

**ANSWER:** Defendant denies the allegations in paragraph 325 of Plaintiffs' Verified Complaint.

326.   AGH Parent continues to hold the Agera Note or as converted equity, and Eli Global has acquired the preferred and common Units previously held by Beechwood and the CNO Defendants in AGH Parent.

**ANSWER:** Defendant denies the allegations in paragraph 326 of Plaintiffs' Verified Complaint.

327.   The Agera Transactions were the culmination of the looting of PPVA and PPCO by the Platinum-Beechwood Alter Egos and the Defendants and, standing alone, resulted in the dissipation of as much as $250 million of value to the Defendants, at a time when PPVA and PPCO were known to be insolvent. The loss of PGS's interest in the Agera Note has caused substantial direct and consequential damages in an amount to be determined at trial, and the CNO Defendants were unjustly enriched by same.

**ANSWER:** Defendant denies the allegations in paragraph 327 of Plaintiffs' Verified Complaint.

## CLAIMS FOR RELIEF

### First Count (by PGS):  Aiding and Abetting Breach of Fiduciary Duty and Corporate Waste against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy

328.   PGS repeats and re-alleges paragraphs 1-327 as if fully set forth herein.

**ANSWER:** Paragraph 328 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its

responses to paragraphs 1 through 327 as if fully set forth herein.

329.   Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, who were the general partner and founders and controlling persons of PGS's members and, in the case of Nordlicht, the managing member of PGS, and were responsible for overseeing and managing PGS, owed fiduciary duties of due care, loyalty and good faith to PGS.

**ANSWER:** The allegations in paragraph 329 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 329.

330.  As set forth above, Platinum Management, Nordlicht, Bodner, Huberfeld, and Levy, breached their fiduciary duties to PGS by causing the Agera Note to be sold in connection with the Agera Transactions when they believed it was worth at least $250-$300 million and potentially more.

**ANSWER:** The allegations in paragraph 330 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 330.

331.   The SHIP Defendants, CNO Reinsurance Trusts and Beechwood Agera Entities knowingly and substantially assisted and participated in the foregoing breaches of fiduciary duties in connection with the Agera Transactions. Each assigned to AGH Parent the nearly worthless debt instruments and other investments that AGH Parent in turn used as "consideration" for the purchase of the Agera Note and the January Redemption, and in return received senior preferred units, and all of the common equity in AGH Parent as well as debt.

**ANSWER:** The allegations in paragraph 331 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 331.

332.   The foregoing transactions enabled the SHIP Defendants, CNO

Reinsurance Trusts and Beechwood Agera Entities to exchange near-worthless investments in PPVA and PPCO and their subsidiaries and affiliates for valuable interests in Agera Energy, to the detriment of PGS.

**ANSWER:** Defendant denies the allegations in paragraph 332 of Plaintiffs' Verified Complaint.

333.   Cassidy, via Starfish, received 8% of the consideration paid to PGS in connection with the Agera Transactions, including $7 million of the total cash and valuable membership units in AGH Parent illicitly, even though Cassidy already was paid a salary of $135,000 per annum for his work at Agera Energy.

**ANSWER:** Defendant denies the allegations in paragraph 333 of Plaintiffs' Verified Complaint.

334.   AGH Parent, the alter ego of the Platinum-Beechwood Alter Egos, substantially assisted in the breaches of fiduciary duties by purchasing the Agera Note at a substantial discount, to the detriment of PGS and its members.

**ANSWER:** The allegations in paragraph 334 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 334.

335.   The SHIP Defendants also substantially assisted and participated in the breaches of fiduciary duties by contributing $50 million and nearly worthless debt to finance the fraudulent acquisition of the Agera Note by AGH Parent.

**ANSWER:** The allegations in paragraph 335 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 335.

336.   Cassidy and Starfish substantially assisted and participated in the breaches of fiduciary duties by participating in the execution of the purchase of the Agera Note and taking 8% of the proceeds that were supposed to be paid to PGS for

no consideration.

**ANSWER:** The allegations in paragraph 336 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 336.

337.   AGH Parent and the Beechwood Agera Entities substantially assisted and participated in the breaches of fiduciary duties because they are the alter egos of the Platinum-'Beechwood Alter Egos, and by acting as the "insiders" by which they looted PGS's valuable asset, the Agera Note, for the benefit of the Defendants and Beechwood's ultimate owners, Nordlicht, Levy, Bodner and  Huberfeld.

**ANSWER:** The allegations in paragraph 337 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 337.

338.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, the CNO Reinsurance Trusts, Cassidy and Starfish were aware that the Agera Transactions enabled Nordlicht, Levy, Bodner and Huberfeld to retain control of Agera Energy via their ownership of Beechwood Investments, which owned the common equity of AGH Parent, their ownership and control of the  Beechwood Agera Corporations, which held preferred units, and of BAM Management Services, the manager of AGH Parent at all relevant times.

**ANSWER:** The allegations in paragraph 338 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 338.

339.   AGH Parent, the Beechwood Agera Entities, the SHIP Defendants, and the CNO Reinsurance Trusts also knowingly and substantially assisted the breach of fiduciary duties to PGS and its members by engaging in a transaction by which 8% of the consideration, including $7 million of cash, was siphoned off to pay Nordlicht's friend, Cassidy, to the detriment of PGS and the Platinum Funds.

**ANSWER:** The allegations in paragraph 339 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 339.

340.   AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Starfish and Cassidy had actual knowledge of breaches of fiduciary duties to PGS in connection with the Agera Transactions, as the parties were well aware of the financial condition of PPVA and PPCO at that time, the alter ego relationship between and among the Platinum-Beechwood Alter Egos, and the Platinum-Beechwood Alter Egos' intent to sell the Agera Note to an insider at a substantial undervalue and to direct a significant portion of even that small consideration to Cassidy/Starfish.

**ANSWER:** The allegations in paragraph 340 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 340.

341.   As a direct and proximate result of the actions and substantial participation of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish, PGS was damaged.

**ANSWER:** The allegations in paragraph 341 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 341.

342.   The actions of AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy and Starfish caused the harm on which the primary liability of breach of fiduciary duty is predicated.

**ANSWER:** The allegations in paragraph 342 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 342.

343.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**ANSWER:** The allegations in paragraph 343 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 343.

## Second Count (by PGS, in the alternative): Unjust Enrichment against the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities, Cassidy, Starfish and John Does 1-100

344.   PGS repeats and re-alleges paragraphs 1-343 as if fully set forth herein.

**ANSWER:**  Paragraph 344 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 343 as if fully set forth herein.

345.   In connection with the Agera Transactions and as described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities intentionally engaged in certain acts for the purpose of transferring the Agera Note away from PGS at a substantial discount.

**ANSWER:** The allegations in paragraph 345 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 345.

346.   The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities worked together with the Platinum-Beechwood Alter Egos to orchestrate the Agera Transactions for the purpose of acquiring the last remaining valuable asset of PPVA, which was held by PGS.

**ANSWER:** The allegations in paragraph 346 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 346.

347. As described herein, the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities all had knowledge that the Agera Transaction would result in up to hundreds of millions in damages to PGS.

**ANSWER:** The allegations in paragraph 347 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 347.

348. The SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, along with any subsequent transferees, would be unjustly enriched at the expense of PGS if they were permitted to receive and retain the full benefit of the Agera Transactions.

**ANSWER:** The allegations in paragraph 348 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 348.

349. PGS would suffer an unjust detriment if the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities, and any subsequent transferees, were permitted to receive and retain the full benefit of the Agera Transactions.

**ANSWER:** The allegations in paragraph 349 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 349.

350.   Permitting the SHIP Defendants, the CNO Defendants, the CNO Reinsurance Trusts, Cassidy, Starfish and the Beechwood Agera Entities to receive and retain the full benefit of the Agera Transactions at the expense of PGS would be against equity and good conscience.

**ANSWER:** The allegations in paragraph 350 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 350.

351.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**ANSWER:** The allegations in paragraph 351 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 352.

### Third Count (by PGS):  Breach of the AGH Parent Amended Operating Agreement (Implied Covenant of Good Faith and Fair Dealing) against AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts, the Beechwood Agera Entities and John Does 1-100

352.   PGS repeats and re-alleges paragraphs 1-351 as if fully set forth herein.

**ANSWER:**  Paragraph 352 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 351.

353.   The AGH Parent Amended Operating Agreement provides for the redemption of $35.4 million of PGS's Class C preferred membership units in exchange for "PGS Value" under certain  circumstances.

**ANSWER:** Defendant states that Exhibit 20 to Plaintiffs' Verified Complaint speaks for itself. Defendant denies the allegations in paragraph 353.

354.   The terms of the AGH Parent Operating Agreement, including the provisions concerning the redemption of PGS' Class C preferred membership units for PGS Value, were not negotiated at arm's length, but rather were imposed upon PGS by persons and entities engaged in a scheme to transfer PGS' interest in the Agera Note to Defendants for nearly worthless consideration. Those persons and entities included AGH Parent, the SHIP Defendants, the CNO Reinsurance Trusts and the Beechwood Agera Entities, working together with the Platinum-Beechwood Alter Egos.

**ANSWER:** The allegations in paragraph 354 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 354.

355.   AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities acted in bad faith and deprived PGS of any value that it may have obtained from the Agera Transactions by receiving Class C Preferred Units in AGH Parent, by transferring to it debt and other instruments that they were aware were nearly valueless in connection with the January Redemption.

**ANSWER:** The allegations in paragraph 355 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 355.

356.   By reason of the foregoing, PGS is entitled to a judgment awarding it compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

**ANSWER:** The allegations in paragraph 356 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 356.

**Fourth Count (by the JOLs):  Fraudulent Trading under Cayman Law against AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities**

357.   The JOLs repeat and re-allege paragraphs 1-356 as if fully set forth herein.

**ANSWER:**  Paragraph 357 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 356 as if fully set forth herein.

358.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

**ANSWER:** The allegations in paragraph 358 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 358.

359.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

**ANSWER:** The allegations in paragraph 359 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 359.

360.   At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

**ANSWER:** The allegations in paragraph 360 of Plaintiffs' Verified

103

Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 360.

361.   PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

**ANSWER:** The allegations in paragraph 361 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 361.

362.   For example, no annual meetings were held, as required by the PGS Operating Agreement. The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 362 of Plaintiffs' Verified Complaint, so Defendant denies them.

363.  Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 363 of Plaintiffs' Verified Complaint, so Defendant denies them.

364.   At all relevant times, PGS had no employees. All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 364 of Plaintiffs' Verified

Complaint, so Defendant denies them.

365.   PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 365 of Plaintiffs' Verified Complaint, so Defendant denies them.

366.   The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

**ANSWER:**  Defendant denies the allegations in paragraph 366 of Plaintiffs' Verified Complaint.

367.   The Agera Transactions evidenc all of the badges of fraud for which fraudulent transfer law was enacted.

**ANSWER:** The allegations in paragraph 367 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 367.

368.   In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

**ANSWER:** The allegations in paragraph 368 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 368.

369.   The transfer to AGH Parent was made to or for the benefit of

insiders.

**ANSWER:** The allegations in paragraph 369 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 369.

370.   PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth $300 million.

**ANSWER:** The allegations in paragraph 370 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 370.

371.   At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

**ANSWER:** The allegations in paragraph 371 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 371.

372.   Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

**ANSWER:** The allegations in paragraph 372 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 372.

373.   Section 147 of the Cayman Islands Companies Law (2018 Revision) states as follows:

## 147. FRAUDULENT TRADING

(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

(2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

**ANSWER:** Defendant states that Section 147 of the Cayman Islands Companies Law (2018 Revision) speaks for itself. Defendant denies the allegations in paragraph 373 of Plaintiffs' Verified Complaint.

374. The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

**ANSWER:** The allegations in paragraph 374 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 374.

375. The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

**ANSWER:** The allegations in paragraph 375 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 375.

376.   At the time of the January Redemption and Agera Note Sale, PPVA was insolvent and unable to pay its debts. Five days after the closing of the Agera Note Sale, Nordlicht announced to PPVA's investors that PPVA would be liquidated and unwound. The Cayman Proceeding was commenced a few weeks thereafter.

**ANSWER:** The allegations in paragraph 376 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 376.

377.   Accordingly, AGH Parent, the SHIP Defendants, CNO Reinsurance Trusts and the Beechwood Agera Entities are liable to the PPVA estate and are obligated to contribute to the PPVA estate amounts to be determined at trial, including cash proceeds, the Agera Note, or membership interests in AGH Parent.

**ANSWER:** The allegations in paragraph 377 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 377.

### Fifth Count (by the JOLs):  Transfer for Undervalue and Voidable Preference under Cayman Law against AGH Parent and John Does 1-100

378.   The JOLs repeat and re-allege paragraphs 1-377 as if fully set forth herein.

**ANSWER:**  Paragraph 378 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 377 as if fully set forth herein.

379.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

**ANSWER:** The allegations in paragraph 379 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 379.

380. For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note that was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

**ANSWER:** The allegations in paragraph 380 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 380.

381. At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

**ANSWER:** The allegations in paragraph 381 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 381.

382. PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

**ANSWER:** The allegations in paragraph 382 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 382.

383. For example, no annual meetings were held, as required by the PGS Operating Agreement. The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 383 of Plaintiffs' Verified Complaint, so Defendant denies them.

384. Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 384 of Plaintiffs' Verified Complaint, so Defendant denies them.

385. At all relevant times, PGS had no employees. All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 385 of Plaintiffs' Verified Complaint, so Defendant denies them.

386. PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 386 of Plaintiffs' Verified Complaint, so Defendant denies them.

387. The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

**ANSWER:** The allegations in paragraph 387 of Plaintiffs' Verified

Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 387.

388.   The Agera Transactions evidence all of the badges of fraud for which fraudulent transfer law was enacted.

**ANSWER:** The allegations in paragraph 388 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 388.

389.   In connection with the Agera Transactions, the Agera Note was transferred to AGH Parent, which was formed by the Platinum-Beechwood Alter Egos for that wrongful purpose.

**ANSWER:** The allegations in paragraph 389 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 389.

390.   The transfer to AGH Parent was made to or for the benefit of insiders.

**ANSWER:** The allegations in paragraph 390 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 390.

391.   PPVA received less than reasonably equivalent value and/or less than fair consideration when PGS transferred the Agera Note to AGH Parent in exchange for an asset worth at least $250-$300 million.

**ANSWER:** The allegations in paragraph 391 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 391.

392.   At the time the Agera Note Sale occurred in April - June 2016 and the January Redemption occurred in January 2017, there existed substantial creditor claims against PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 392 of Plaintiffs' Verified Complaint, so Defendant denies them.

393.   Since the Agera Note Sale occurred in June 2016, additional creditor claims have been asserted against PPVA.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 393 of Plaintiffs' Verified Complaint, so Defendant denies them.

394.   The transfer to AGH Parent was made to or for the benefit of insiders, who were (or purported creditors) of PPVA and PPVA was unable to pay its debts.

**ANSWER:** The allegations in paragraph 394 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 394.

395.   PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 395 of Plaintiffs' Verified Complaint, so Defendant denies them.

396.   Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the

instance of its official liquidator.

**ANSWER:** Defendant states that Section 146(2) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 396 of Plaintiffs' Verified Complaint.

397.   In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance  or transfer  of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

**ANSWER:** Defendant states that Section 145(1) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 397 of Plaintiffs' Verified Complaint.

398.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made with a view to giving such creditor a preference.

**ANSWER:** Defendant states that Section 145(2) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 398 of Plaintiffs' Verified Complaint.

399.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or exercise significant influence over the company in making financial and operating  decisions.

**ANSWER:** Defendant states that Section 145(3) of the Cayman Islands

Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 399 of Plaintiffs' Verified Complaint.

400.   The transfer of the Agera Note to AGH Parent was made with intent to defraud creditors of PPVA, as it transferred one of PPVA's only remaining assets of significant value at a substantial discount, to Platinum Management's AGH Parent alter ego, and the other Defendants.

**ANSWER:** The allegations in paragraph 400 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 400.

401.   The transfer of the Agera Note to AGH Parent was made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship, PPVA's financial distress, and the true value of the Agera Note.

**ANSWER:** The allegations in paragraph 401 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 401.

402.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts. Five days after the closing of the first step of the Agera Transactions, Nordlicht on behalf of Platinum Management announced to PPVA's investors that PPVA would be liquidated and unwound. The Cayman Liquidation was commenced a few weeks thereafter on August 23, 2016.

**ANSWER:** The allegations in paragraph 402 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 402.

403.   The transfer of the Agera Note to AGH Parent amounted to a transfer of, *inter alia,* property of PPVA made (i) with the intent to give the insiders a

preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

**ANSWER:** The allegations in paragraph 403 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 403.

404.   Accordingly, PPVA is entitled to a judicial determination that the transfer of the Agera Note to AGH Parent and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

**ANSWER:** The allegations in paragraph 404 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 404.

### Sixth Count (by the JOLs):  Transfer for Undervalue and Voidable Preference under Cayman Law against Starfish, Cassidy and John Does 1-100

405.   The JOLs repeat and re-allege paragraphs 1-404 as if fully set forth herein.

**ANSWER:**  Paragraph 405 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 404 as if fully set forth herein.

406.   The JOLs are authorized and have standing to seek avoidance and recovery of fraudulently transferred property under applicable Cayman law.

**ANSWER:** The allegations in paragraph 406 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 406.

407.   For purposes of this count, the JOLs ask this Court to disregard the corporate form of PGS and deem PPVA to have had a direct interest in the Agera Note was fraudulently transferred, just as the Platinum-Beechwood Alter Egos did.

**ANSWER:** The allegations in paragraph 407 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 407.

408.   At the direction of the Platinum-Beechwood Alter Egos, PGS was created as a special purpose entity owned jointly by PPVA and PPCO for the purpose of holding the Agera Note.

**ANSWER:** The allegations in paragraph 408 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 408.

409.   PGS technically held title to the Agera Note, but corporate formalities otherwise were not observed.

**ANSWER:** The allegations in paragraph 409 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 409.

410.   For example, no annual meetings were held, as required by the PGS Operating Agreement. The Platinum-Beechwood Alter Egos also did not treat the Agera Note as though it was a separate asset of PGS.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 410 of Plaintiffs' Verified Complaint, so Defendant denies them.

116

411. Instead, at all relevant times, PPVA's financial statements and valuation statements described and calculated PPVA's interest in Agera Energy on an "as converted" basis, as though PPVA was the direct holder of such value.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 411 of Plaintiffs' Verified Complaint, so Defendant denies them.

412. At all relevant times, PGS had no employees. All administration of the investment in Agera was managed by the Platinum-Beechwood Alter Egos.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 412 of Plaintiffs' Verified Complaint, so Defendant denies them.

413. PPVA provided the funding to purchase the assets out of which Agera was formed, and PGS did not provide any such funding.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 413 of Plaintiffs' Verified Complaint, so Defendant denies them.

414. The cash paid pursuant to the Agera Note Sale was initially directed to or for the benefit of PPVA in disregard of PGS, and then was quickly dissipated pursuant to a pre-set plan set up by the Platinum-Beechwood Alter Egos, as to which AGH Parent, the payor, was a part.

**ANSWER:** The allegations in paragraph 414 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 414.

415. The transactions set forth in the First Amendment to the PGS Operating

Agreement and the Starfish Purchase Agreement evidence all of the badges of fraud for which fraudulent transfer law was enacted.

**ANSWER:** The allegations in paragraph 415 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 415.

416.   In connection with the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, Starfish and Cassidy "sold" interests in PGS that they held for a single day.

**ANSWER:** The allegations in paragraph 416 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 416.

417.   The transfers pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made to or for the benefit of insiders.

**ANSWER:** The allegations in paragraph 417 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 417.

418.   PPVA received less than reasonably equivalent value and/or less than fair consideration in connection with the transfers made to Cassidy and Starfish pursuant to the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement.

**ANSWER:** The allegations in paragraph 418 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 418.

419.   At the time of the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement, there existed substantial creditor claims against PPVA.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 419 of Plaintiffs' Verified Complaint, so Defendant denies them.

420.   Since the transactions set forth in the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement occurred in June 2016, additional creditor claims have been asserted against PPVA.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 420 of Plaintiffs' Verified Complaint, so Defendant denies them.

421.   The transfers to Cassidy and Starfish pursuant to the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made to or for the benefit of insiders, who were creditors (or purported creditors) of PPVA and PPVA was unable to pay its debts.

**ANSWER:** The allegations in paragraph 421 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 421.

422.   PPVA's liquidation subsequently commenced on August 23, 2016, when a winding up petition was presented to the Grand Court.

**ANSWER:**  Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 422 of Plaintiffs' Verified Complaint, so Defendant denies them.

423.   Section 146(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator.

**ANSWER:** Defendant states that Section 146(2) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 423 of Plaintiffs' Verified Complaint.

424.   In addition, Section 145(1) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: Every conveyance  or transfer  of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation.

**ANSWER:** Defendant states that Section 145(1) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 424 of Plaintiffs' Verified Complaint.

425.   Section 145(2) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: A payment made as aforesaid to a related party of the company shall be deemed to have been made. with a view to giving such creditor a preference.

**ANSWER:** Defendant states that Section 145(2) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 425 of Plaintiffs' Verified Complaint.

426.   Section 145(3) of the Cayman Islands Companies Law (2018 Revision) states, in relevant part: For the purposes of this section a creditor shall be treated as a "related party" if it has the ability to control the company or

120

exercise significant influence over the company in making financial and operating decisions.

**ANSWER:** Defendant states that Section 145(3) of the Cayman Islands Companies Law (2018 Revision) speaks for itself.  Defendant denies the allegations in paragraph 426 of Plaintiffs' Verified Complaint.

427.   The transfers made to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement were made with intent to defraud creditors of PPVA, as it transferred valuable consideration to Cassidy and Starfish for membership interests in PGS that Cassidy and Starfish had acquired the previous day illicit purpose and inadequate or no consideration.

**ANSWER:** The allegations in paragraph 427 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 427.

428.   The transfers under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement to Cassidy and Starfish were made with a fraudulent purpose, as, by June 2016, all Defendants knew of the Platinum/Beechwood relationship and PPVA's financial distress.

**ANSWER:** The allegations in paragraph 428 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 428.

429.   At the time of the Agera Transactions, PPVA was insolvent and unable to pay its debts. Five days after the closing of the Agera Note Sale, Nordlicht  on behalf of Platinum Management announced to PPVA's investors that PPVA would be liquidated and unwound. The Cayman Liquidation was commenced a few weeks thereafter, on August 23, 2016.

**ANSWER:** Defendant is without sufficient information to form a belief as to

the truth or falsity of the allegations in paragraph 429 of Plaintiffs' Verified Complaint, so Defendant denies them.

430.   The transfers to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement amounted to a transfer of, *inter alia,* property of PPVA made (i) with the intent to give the insiders a preference over the other creditors of PPVA, (ii) at a time when PPVA was unable to pay its debts and (iii) within the six months immediately preceding the commencement of the liquidation.

**ANSWER:** The allegations in paragraph 430 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 430.

431.   Accordingly, PPVA is entitled to a judicial determination that the transfer of cash and other valuable assets to Cassidy and Starfish under the First Amendment to the PGS Operating Agreement and the Starfish Purchase Agreement and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

**ANSWER:** The allegations in paragraph 431 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 431.

### Seventh Count (by JOLs and PPVA) (for Relief Only):  Alter Ego against AGH Parent and the Beechwood Agera Entities and John Does 1-100

432.   JOLs and PPVA repeat and re-allege paragraph 1 through 431 as if fully set forth herein.

**ANSWER:** Paragraph 432 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response.  Defendant incorporates and reasserts its responses to paragraphs 1 through 431 as if fully set forth herein.

433.   This count is pled as additional allegations for relief against AGH Parent and the Beechwood Agera Entities because they are alter egos of Platinum Management and controlling persons Nordlicht, Huberfeld, Bodner and Levy.

**ANSWER:** The allegations in paragraph 433 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 433.

434.   AGH Parent and the Beechwood Agera Entities were formed and conceived as the alter egos of Platinum Management and controlling persons, Nordlicht, Huberfeld, Bodner and Levy, for the purpose of inflicting harm upon PPVA.

**ANSWER:** The allegations in paragraph 434 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 434.

435.   The Beechwood Agera Entities, AGH Parent and Platinum Management had overlapping ownership and control, in particular, Nordlicht, Huberfeld, Bodner and Levy.

**ANSWER:** The allegations in paragraph 435 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 435.

436.   At the time of the January Redemption and Agera Note Sale, AGH Parent, the Beechwood Agera Entities, Platinum Management and Beechwood were under common control, namely Nordlicht, Huberfeld, Bodner and Levy.

**ANSWER:** The allegations in paragraph 436 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 436.

437. Platinum Management and Beechwood have had overlapping management, direct or indirect owners and controlling persons, including Huberfeld, Nordlicht, Bodner and Levy.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 437 of Plaintiffs' Verified Complaint, so Defendant denies them.

438. Beechwood was founded and initially operated from the offices of Platinum Management.

**ANSWER:** Defendant is without sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 438 of Plaintiffs' Verified Complaint, so Defendant denies them.

439. The Platinum-Beechwood Alter Egos, including AGH Parent and the Beechwood Agera Entities, were inadequately capitalized and upon information and belief, have cumulative creditor claims in excess of $2 billion.

**ANSWER:** The allegations in paragraph 439 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 439.

440. AGH Parent and the Beechwood Agera Entities were created by the Platinum-Beechwood Alter Egos for a wrongful purpose, *i.e.* the transfer of the Agera Note.

**ANSWER:** The allegations in paragraph 440 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 440.

441. As set forth in detail herein, as well as in the action filed by PPVA and

the JOLs pending in the United States District Court for the Southern District of New York, Platinum Management, as general partner of PPVA, and Nordlicht, Huberfeld, Bodner and Levy, as the co-founders and/or officers/controlling persons of PPVA, owed fiduciary duties of due care, loyalty and good faith to PPVA and PGS. These parties breached their fiduciary obligations and committed fraudulent and otherwise tortious acts in connection with the overvaluation of the PPVA's net asset value in order to siphon off unearned fees for their benefit, and by engaging in transactions to loot PPVA's valuable assets for their own benefit, culminating with the Agera Transactions.

**ANSWER:** The allegations in paragraph 441 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 441.

442. The Platinum-Beechwood Alter Egos used AGH Parent and the Beechwood Agera Entities, as fraudulent tools to siphon off the assets of PPVA and PGS, namely the Agera Note.

**ANSWER:** The allegations in paragraph 442 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 442.

443. The ultimate decision making for Platinum Management, Beechwood, AGH Parent and the Beechwood Agera Entities rested with the same controlling minds: Nordlicht, Huberfeld, Bodner and Levy.

**ANSWER:** The allegations in paragraph 443 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 443.

444. The Platinum-Beechwood Alter Egos regularly caused PPVA and its subsidiaries such as PGS to commit acts that benefited the Platinum-Beechwood Alter Egos and their preferred clients and friends at the expense of PPVA by way of wrongful insider transactions, including but not limited to the Agera Transactions.

**ANSWER:** The allegations in paragraph 444 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 444.

445.   By reason of the foregoing, AGH Parent and the Beechwood Agera Entities are liable to the same extent as the Platinum-Beechwood-Alter Egos in connection with the tortious acts described herein.

**ANSWER:** The allegations in paragraph 445 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly admitted, Defendant denies any remaining allegations in paragraph 445.

## Eighth Count (by all Plaintiffs) (for Relief Only): Imposition of a Constructive Trust against Defendants

446.   Plaintiffs repeat and re-allege paragraph **1** through 444 as if fully set forth herein.

**ANSWER:**  Paragraph 446 of Plaintiffs' Verified Complaint does not contain factual allegations requiring a response. Defendant incorporates and reasserts its responses to paragraphs 1 through 445 as if fully set forth herein.

447.   This count seeks the equitable remedy of imposition of a constructive trust over the Agera Note and any proceeds received by Defendants in connection with their ownership of the Agera Note, membership units in AGH Parent, sale of membership units in or notes issued by AGH Parent, the sale of membership interests in PGS, and/or or any other proceeds or benefits received in connection with the Agera Transactions.

**ANSWER:** The allegations in paragraph 447 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required. Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 447.

448.   In connection with the Agera Transactions and as described herein, all Defendants each intentionally engaged in various acts and transactions for the purpose of transferring the Agera Note away from PGS at a substantial discount and receiving the benefit and proceeds thereof, and in the case of the CNO Defendants, knowingly permitted and authorized the same.

**ANSWER:** The allegations in paragraph 448 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 448.

449.   Defendants, among others, orchestrated the Agera Transactions together with the Platinum-Beechwood Alter Egos for the purpose of acquiring the last remaining valuable asset of  PPVA.

**ANSWER:** The allegations in paragraph 449 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 449.

450.   As described herein, Defendants all had knowledge that the Agera Transactions would result in the transfer of an asset they understood to be worth at least $250-$300 million.

**ANSWER:** The allegations in paragraph 450 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 450.

451.   Defendants would be unjustly enriched at the expense of the Plaintiffs if they were permitted to receive and retain the full benefit of the Agera Transactions.

**ANSWER:** The allegations in paragraph 451 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 451.

452.   The Plaintiffs would suffer an unjust detriment if Defendants, were permitted to receive and retain the full proceeds of the Agera Transactions, or of any sales of the membership units or notes received in connection therewith.

**ANSWER:** The  allegations  in  paragraph  452  of  Plaintiffs'  Verified

Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 452.

453.   Permitting the Defendants to receive and retain the full benefit of the Agera Transactions, the proceeds thereof or of any sales of the membership units in or notes issued by AGH Parent or the proceeds of membership interests in PGS received in connection therewith at the expense of the Plaintiffs would be against equity and good conscience.

**ANSWER:** The  allegations  in  paragraph  453  of  Plaintiffs'  Verified

Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 453.

454.   As set forth herein, the Defendants engaged in fraudulent and or unfair and unconscionable conduct in connection with the Agera Transactions.

**ANSWER:** The  allegations  in  paragraph  454  of  Plaintiffs'  Verified

Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 454.

455.  Legal remedies are insufficient to compensate the Plaintiffs for the damages suffered by Plaintiffs in connection with the Agera Transactions.

**ANSWER:** The  allegations  in  paragraph  455  of  Plaintiffs'  Verified

Complaint are legal conclusions to which no response is required.  Unless expressly

admitted, Defendant denies any remaining allegations in paragraph 455.

456.  The Agera Note and the proceeds received from Defendants in connection with the sale of their interests in the Agera Note or in AGH Parent or PGS, or any other proceeds received in connection with the Agera Transactions, constitute identifiable property appropriate for the imposition of a constructive trust.

**ANSWER:** The allegations in paragraph 456 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 456.

457.  By reason of the foregoing, the Plaintiffs request imposition of a constructive trust over certain assets of Defendants including but not limited to (i) the Agera Note; (ii) all proceeds received by the Defendants in connection with any sale of the Agera Note, i.e. membership units in AGH Parent and any notes issued to the foregoing entities by AGH Parent, (iii) proceeds from the sale of any membership units in or notes issued by AGH Parent; (iv) proceeds from the sale of any membership units in PGS; and (v) all other equitable relief that this Court deems just and proper.

**ANSWER:** The allegations in paragraph 457 of Plaintiffs' Verified Complaint are legal conclusions to which no response is required.  Unless expressly admitted, Defendant denies any remaining allegations in paragraph 457.

Wherefore, Defendant AGH Parent LLC respectfully requests that the Court dismiss Plaintiffs' claims against Defendant in their entirety, award Defendant its attorneys' fees and costs against Plaintiffs, and grant such other and further relief as the Court may deem is just and proper.

Dated:  July 15, 2019          **CHIPMAN BROWN CICERO & COLE, LLP**

         */s/ Paul D. Brown*
         Paul D. Brown (No. 3903)
         Joseph B. Cicero (No. 4388)
         Hercules Plaza
         1313 North Market Street, Suite 5400
         Wilmington, DE  19801

         *Attorneys for Defendant AGH Parent LLC*

OF COUNSEL:

Aaron Z. Tobin
Kendal B. Reed
Michael J. Merrick
Condon Tobin Sladek Thornton
8080 Park Lane
Suite 700
Dallas, Texas 75231

130

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Notice of Entry of Appearance*

was served upon the following counsel of record via File and Serve*Xpress* on the

15th day of July, 2019 on the following:

Brett D. Fallon, Esquire
R. Eric Hacker, Esquire
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801

A. Thompson Bayliss, Esquire
April M. Kirby, Esquire
**ABRAMS & BAYLISS LLP**
20 Montchanin Road
Wilmington, DE 19807

/s/ Paul D. Brown
Paul D. Brown (No. 3903)

131

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PRINCIPAL GROWTH STRATEGIES, )
LLC, *et al.*,                                        )
                                                             )
                        Plaintiffs,              )
                                                             )
            v.                                          )
                                                             )
AGH PARENT LLC, *et al.*,               )         C.A. No. 2019-0431-JTL
                                                             )
                        Defendants,            )
                                                             )
            v.                                          )
                                                             )
PLATINUM MANAGEMENT (NY)        )
LLC, *et al.*,                                        )
                                                             )
                        Nominal Defendants.

## AFFIDAVIT OF PROOF OF SERVICE

STATE OF DELAWARE          )
                                              )     SS.
NEW CASTLE COUNTY        )

I, R. Eric Hacker, being first duly sworn, do depose and say as follows:

1.      I am a member of the Bar of the State of Delaware, and I am an attorney with the law firm of Morris James, LLP, counsel to Plaintiffs in the above-captioned matter.

2.      On June 7, 2019, Plaintiffs filed a Verified Complaint against Defendants.

3.      On June 17, 2019, Plaintiffs' counsel sent a long-arm service letter, a copy of the Summons, Verified Complaint, and all supporting documents to the

following defendants, via U.S. Registered Mail and U.S. First Class Mail, pursuant

to 10 *Del. C.* § 3104:

| | |
|---|---|
| 40/86 Advisors, Inc.<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | Washington National Insurance<br>Company<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 |
| CNO Financial Group, Inc.<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | David Bodner<br>16 Grosser Lane<br>Monsey, NY 10952 |
| Bankers Conseco Life Insurance<br>Company<br>350 Jericho Turnpike #304<br>Jericho, NY 11753 | Mark Nordlicht<br>245 Trenor Drive<br>New Rochelle, NY 10804 |

4.     The mailing was sent by Registered United States Mail with return

receipt requested and by First Class United States Mail with Certificate of Mailing.

5.     Copies of the mailing receipts and signed return receipts are attached

for individual defendants as Exhibits A through F.

6.     A copy of the Certificate of Mailing by First Class United States Mail

for all foregoing defendants is attached as Exhibit G.

7.     I have read this affidavit, and everything in it is true and correct to the

best of my knowledge, information and belief.

R. Eric Hacker, Esquire (#6122)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
*Attorneys for Plaintiffs*

Dated:  July 16, 2019

SWORN TO AND SUBSCRIBED before me this 16th day of July, 2019.

Notary Public

3

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ORIGINAL

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), <br><br> Plaintiffs, <br><br> v. <br><br> AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, <br><br> Defendants, <br><br> v. <br><br> PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, <br><br> Nominal Defendants. | C.A. No. 2019-0431-JTL <br><br> SUMMONS <br> Pursuant to 10 <u>Del.C.</u> Sec. 3104 |

**THE STATE OF DELAWARE**
**TO:    MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>R. Eric Hacker</u>, Esquire, Plaintiff's counsel, whose address is <u>Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306,</u> an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        June 17, 2019

_____
Register in Chancery

### C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1.   **Bankers Conseco Life Insurance Company**
     350 Jericho Turnpike #304
     Jericho, NY 11753


All Pursuant to 10 <u>Del.C.</u> Sec. 3104


SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail



<u>R. Eric Hacker, Esquire</u>
Plaintiff's Counsel

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ORIGINAL

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation),<br><br>                               Plaintiffs,<br><br>v.<br><br>AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100,<br><br>                               Defendants,<br><br>v.<br><br>PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER,<br><br>                          Nominal Defendants. | C.A. No. 2019-0431-JTL<br><br>SUMMONS<br>Pursuant to 10 <u>Del.C.</u> Sec. 3104 |

**THE STATE OF DELAWARE**
**TO:**    **MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

        To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>R. Eric Hacker</u>, Esquire, Plaintiff's counsel, whose address is <u>Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306,</u> an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

        In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:      June 14, 2019

                                                _____
                                              Register in Chancery

C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

## SUMMONS

Please effectuate service upon:

1. **Starfish Capital, Inc.**
   72 N. State Road, #502
   Briarcliff Manor, NY 10510

2. **Mark Nordlicht**
   245 Trenor Drive
   New Rochelle, NY 10804

3. **David Bodner**
   16 Grosser Lane
   Monsey, NY 10952

4. **Murray Huberfeld**
   15 Manor Lane
   Lawrence, NY 11559

5. **David Levy**
   80 Riverside Boulevard, Apt. #24C
   New York, NY 10069

All Pursuant to 10 Del.C. Sec. 3104


SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail



R. Eric Hacker, Esquire
Plaintiff's Counsel

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ORIGINAL

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), a Cayman Islands exempted limited partnership; and MARTIN TROTT & CHRISTOPHER SMITH, Joint Official Liquidators of Platinum Partners Value Arbitrage Fund, L.P. (in official liquidation), ) ) ) ) ) ) ) | C.A. No. 2019-0431-JTL |
| Plaintiffs, ) ) | SUMMONS Pursuant to 10 Del.C. Sec. 3104 |
| v. ) | |
| AGH PARENT LLC, a Delaware limited liability company; SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania insurance company; FUZION ANALYTICS, INC., a Delaware corporation; BANKERS CONSECO LIFE INSURANCE COMPANY, a New York insurance company; WASHINGTON NATIONAL INSURANCE COMPANY, an Indiana insurance company; CNO FINANCIAL GROUP, INC., a Delaware corporation; 40/86 ADVISORS, INC., a Delaware corporation; PRIVATE BANKERS LIFE ANNUITY LTC 2, a Delaware reinsurance trust, as successor in interest to BBIL ULICO 2014 TRUST; WASHINGTON NATIONAL LTC 2, a Delaware reinsurance trust, as successor in interest to BRE WNIC 2013 LTC PRIMARY; BHLN-AGERA CORP., a Delaware corporation; BOLN-AGERA CORP., a Delaware corporation; BEECHWOOD RE INVESTMENTS LLC, a Delaware limited liability company; KEVIN CASSIDY; STARFISH CAPITAL, INC., a New York corporation; and JOHN DOES 1-100, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants ) | |
| v. ) | |
| PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; MARK NORDLICHT, DAVID LEVY, MURRAY HUBERFELD, and DAVID BODNER, ) ) ) ) ) ) | |
| Nominal Defendants. ) | |

**THE STATE OF DELAWARE**
**TO:    MORRIS JAMES LLP:**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon R. Eric Hacker, Esquire, Plaintiff's counsel, whose address is Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306, Wilmington, Delaware 19899-2306, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        June 14, 2019

_____
Register in Chancery

### C.A. # 2019-0431-JTL

PRINCIPAL GROWTH STRATEGIES, LLC, a Delaware limited liability company; et.al.,

Plaintiffs,

v.

AGH PARENT LLC, a Delaware limited liability company; et.al.,

Defendants

v.

PLATINUM MANAGEMENT (NY) LLC, a Delaware limited liability company; et.al.,

Nominal Defendants.

### SUMMONS

Please effectuate service upon:

1. **Fuzion Analytics, Inc.**
   500 Congressional Boulevard, #200
   Carmel, IN 46032

2. **Washington National Insurance Company**
   11825 N. Pennsylvania Street
   Carmel, IN 46032

3. **CNO Financial Group, Inc.**
   11825 N. Pennsylvania Street
   Carmel, IN 46032

4. **40/86 Advisors, Inc.**
   11825 N. Pennsylvania Street
   Carmel, IN 46032

All Pursuant to 10 <u>Del.C.</u> Sec. 3104


SERVICE TO BE COMPLETED BY MORRIS JAMES LLP -
Via Registered Mail



<u>R. Eric Hacker, Esquire</u>
Plaintiff's Counsel

EFiled: Jul 16 2019 11:05AM EDT
Transaction ID 63529804
Case No. 2019-0431-JTL

# EXHIBIT A



**REGISTERED MAIL**

RE 477 506 704 US

U.S. POSTAGE PITNEY BOWES

ZIP 19801
02 1W
0001397894 JUN 17 2019
$ 026.30⁰

Morris James LLP
500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

TO:
40/86 Advisors, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

40/86 Advisors, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

9590 9402 2928 7094 3016 30

2. Article Number (Transfer from service label)

RE 477 506 704 US

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☒ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X                                    ☐ Agent<br>                                         ☐ Addressee<br>B. Received by (Printed Name)   C. Date of Delivery |
| 1. Article Addressed to:<br><br>40/86 Advisors, Inc.<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | D. Is delivery address different from item 1?  ☐ Yes<br>    If YES, enter delivery address below:  ☐ No<br><br>JUN 2 0 2019<br><br>SABRINA LEBLANC |
| 9590 9402 2928 7094 3016 30 | 3. Service Type<br>☐ Adult Signature<br>☐ Adult Signature Restricted Delivery<br>☐ Certified Mail®<br>☐ Certified Mail Restricted Delivery<br>☐ Collect on Delivery<br>☐ Collect on Delivery Restricted Delivery<br>☐ Insured Mail<br>☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express®<br>☒ Registered Mail™<br>☐ Registered Mail Restricted Delivery<br>☐ Return Receipt for Merchandise<br>☐ Signature Confirmation™<br>☐ Signature Confirmation Restricted Delivery |
| 2. Article Number (Transfer from service label)<br>RE 477 506 704 US | |

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt

EFiled:  Jul 16 2019 11:05AM EDT
Transaction ID 63529804
Case No. 2019-0431-JTL

# EXHIBIT B



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Washington National Insurance
Company
11825 N. Pennsylvania St.
Carmel, IN 46032

9590 9402 2928 7094 3016 16

2. Article Number (Transfer from service label)
RE 477 506 721 US

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Washington National Insurance
Company
11825 N. Pennsylvania St.
Carmel, IN 46032

9590 9402 2928 7094 3016 16

2. Article Number (Transfer from service label)

RE 477 506 721 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

RECEIVED
JUN 20 2019
SABRINA LEBLANC

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**

# EXHIBIT C



**REGISTERED MAIL**™

RE 477 506 633 US

U.S. POSTAGE ▷ PITNEY BOWES

ZIP 19801   $ 026.30⁰
0001397904 JUN 17 2019

Morris James LLP
500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

TO:
CNO Financial Group, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

Registered No.
RE 477 506 633 US

| Reg. Fee | 12.40 | | |
| Handling Charge | | Return Receipt | 2.80 |
| Postage | 11.10 | Restricted Delivery | |
| Received by | | | |

Date Stamp

Customer Must Declare   Domestic insurance up to $25,000 is included
Full Value $   based upon the declared value. International
Indemnity is limited. (See Reverse).

OFFICIAL USE

FROM
Brett D. Fallon, Esq.
R. Eric Hacker, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

TO
CNO Financial Group, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

PS Form 3806,   Receipt for Registered Mail   Copy 1 - Customer
May 2007 (7530-02-000-9051)   (See Information on Reverse)
For domestic delivery information, visit our website at www.usps.com ®



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CNO Financial Group, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

9590 9402 2928 7094 3008 24

2. Article Number (Transfer from service label)

RE 477 506 633 US

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CNO Financial Group, Inc.
11825 N. Pennsylvania St.
Carmel, IN 46032

9590 9402 2928 7094 3008 24

2. Article Number *(Transfer from service label)*

RE 477 506 633 US

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____  ☐ Agent
                           ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

RECEIVED

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

SABRINA LEBLANC

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

EFiled:  Jul 16 2019 11:05AM EDT
Transaction ID 63529804
Case No. 2019-0431-JTL

# EXHIBIT D



REGISTERED MAIL™

RE 477 506 664 US

U.S. POSTAGE ⟩⟩ PITNEY BOWES

ZIP 19601
02
0001397984 JUN 17 2019   $ 023.95

Morris James LLP

500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

TO:

David Bodner
16 Grosser Lane
Monsey, NY 10952



**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Bodner
16 Grosser Lane
Monsey, NY 10952

9590 9402 2928 7094 3018 21

2. Article Number (Transfer from service label)

RE 477 506 664 US

PS Form **3811**, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature
X _D Bodner_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
D Bodner   1/6/2019

1. Article Addressed to:

David Bodner
16 Grosser Lane
Monsey, NY 10952

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below:   ☐ No

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9590 9402 2928 7094 3018 21

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☒ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)
RE 477 506 664 US

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

EFiled:  Jul 16 2019 11:05AM EDT
Transaction ID 63529804
Case No. 2019-0431-JTL

# EXHIBIT E



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bankers Conseco Life
Insurance Company
350 Jericho Turnpike #304
Jericho, NY 11753

9590 9402 2928 7094 3016 23

2. Article Number (Transfer from service label)

RE 477 506 718 US

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



SENDER: *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bankers Conseco Life
Insurance Company
350 Jericho Turnpike #304
Jericho, NY 11753

9590 9402 2928 7094 3016 23

2. Article Number *(Transfer from service label)*

RE 477 506 718 US

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

JUN 20 2019

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☒ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt

EFiled:  Jul 16 2019 11:05AM EDT
Transaction ID 63529804
Case No. 2019-0431-JTL

# EXHIBIT F



REGISTERED MAIL™

RE 477 506 655 US

U.S. POSTAGE ▷▷ PITNEY BOWES

ZIP 19801
02 1H   $ 023.95⁰
0001397994 JUN 17 2019

Morris James LLP
500 DELAWARE AVENUE, SUITE 1500
P.O. BOX 2306
WILMINGTON, DELAWARE 19899-2306

To:

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY 10804

Registered No. RE 477 506 655 US

Reg. Fee 12.40

Handling Charge

Postage 8.75   Return Receipt 2.80

Received by

Customer Must Declare
Full Value $

Domestic Insurance up to $25,000 is included based upon the declared value. International Indemnity is limited (See Reverse).

OFFICIAL USE

FROM: Brett D. Fallon, Esq.
R. Eric Hacker, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

TO: Mark Nordlicht
245 Trenor Drive
New Rochelle, NY 10804

PS Form 3806, Receipt for Registered Mail   Copy 1 - Customer
May 2007 (7530-02-000-9051)   (See Information on Reverse)
For domestic delivery information, visit our website at www.usps.com ®

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY 10804

9590 9402 2928 7094 3008 00

2. Article Number (Transfer from service label)

RE 477 506 655 US

PS Form **3811**, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X          ☐ Agent
           ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mark Nordlicht
245 Trenor Drive
New Rochelle, NY 10804

9590 9402 2928 7094 3008 00

2. Article Number *(Transfer from service label)*

RE 477 506 655 US

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _Nordhe_   ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery (over $500)

- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**

# EXHIBIT G

# UNITED STATES POSTAL SERVICE ®

**PS Form 3877, April 2015 (Page 1 of 2)**
PSN 7530-02-000-9098

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

U.S. POSTAGE ›› PITNEY BOWES
ZIP 19801  $ 016.80⁰
0001397994 JUN 17 2019

Name and Address of Sender

| # | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | Handling Charge | (Extra Service) Fee |
|---|---|---|---|---|
| 1. | Kevin Cassidy<br>7 Killdeer Lane<br>Nantucket, MA 02254 | 10.15 | | 1.40 |
| 2. | Starfish Capital, Inc.<br>72 N. State Rd., #502<br>Briarcliff Manor, NY 10510 | 8.75 | | |
| 3. | Senior Health Insurance Co of Pennsylvania<br>27 North Front Street<br>Harrisburg, PA 17101 | 8.75 | | |
| 4. | Fuzion Analytics, Inc.<br>500 Congressional Blvd., #200<br>Carmel, IN 46032 | 11.10 | | |
| 5. | Bankers Conseco Life Insurance Company<br>350 Jericho Turnpike #304<br>Jericho, NY 11753 | 8.75 | | |
| 6. | Washington National Insurance Company<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | 11.10 | | |
| 7. | CNO Financial Group, Inc.<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | 11.10 | | |
| 8. | 40/86 Advisors, Inc.<br>11825 N. Pennsylvania St.<br>Carmel, IN 46032 | 11.10 | | |

Sender for each item:
Morris James LLP
500 Delaware Ave, Ste 1500
Wilmington, DE 19899-2306

Handling Charge - if Registered and over $50,000 in value

Total Number of Pieces Listed by Sender

Total Number of Pieces Received at Post Office

Postmaster, Per (Name of receiving employee)

Complete in Ink

USPS Form 3877 — Firm Mailing Book For Accountable Mail

**Name and Address of Sender:** UNITED STATES POSTAL SERVICE®

U.S. POSTAGE PAID
WILMINGTON, DE
JUN 17 19
AMOUNT
**$1.64**
R2305M143826-27

Check type of mail or service:
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery
☐ Certified Mail
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery (COD)
☐ Insured Mail
☐ Priority Mail
☐ Priority Mail Express
☐ Registered Mail
☐ Return Receipt for Merchandise
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

| # | USPS Tracking/Article Number | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | Extra Service Fee | Handling Charge |
|---|---|---|---|---|---|
| 1. | Morris James LLP, 500 Delaware Ave, Ste 1500, Wilmington, DE 19899-2306 | Mark Nordlicht, 245 Trenor Drive, New Rochelle, NY 10804 | | 8.75 /.40 | |
| 2. | Morris James LLP, 500 Delaware Ave, Ste 1500, Wilmington, DE 19899-2306 | David Bodner, 16 Grosser Lane, Monsey, NY 10952 | | 8.75 | |
| 3. | Morris James LLP, 500 Delaware Ave, Ste 1500, Wilmington, DE 19899-2306 | Murray Huberfeld, 15 Manor Lane, Lawrence, NY 11559 | | 8.75 | |
| 4. | Morris James LLP, 500 Delaware Ave, Ste 1500, Wilmington, DE 19899-2306 | David Levy, 80 Riverside Blvd, Apt # 24C, New York, NY 10069 | | 8.75 | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |

Total Number of Pieces Listed by Sender: 4
Total Number of Pieces Received at Post Office: 

PS Form **3877**, April 2015 (Page 1 of 2)   PSN 7530-02-000-9098

Privacy Notice: For more information on USPS privacy policies, visit usps.com/privacypolicy.

**EFiled:  Jul 16 2019 11:05AM EDT**
**Transaction ID 63529804**
**Case No. 2019-0431-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al*., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0431-JTL |
| AGH PARENT LLC, *et al*., | ) ) | |
| Defendants, | ) ) | |
| v. | ) ) | |
| PLATINUM MANAGEMENT (NY) LLC, *et al*., | ) ) ) | |
| Nominal Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, R. Eric Hacker, hereby certify that on July 16, 2019, I caused a copy of the foregoing:  1) *Affidavit of Service Upon Defendants Pursuant to Del. C. § 3104;* 2) *Summonses to Defendants*; 3) *Exhibits A through I;* and 4) this *Certificate of Service* to be served upon the following counsel of record via File & Serve*Xpress*:

A. Thomas Bayliss, Esquire
April M. Kirby, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807

Paul D. Brown, Esquire
Joseph B. Cicero, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

*/s/ R. Eric Hacker*
R. Eric Hacker (#6122)